```
UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
In re:                                          :    Chapter 11
                                                :
SAS AB, et al.,                                 :    Case No. 22-10925 (MEW)
                                                :
              Debtors.                          :    (Jointly Administered)
----------------------------------------------------------------x
```

**BENCH DECISION (I) AUTHORIZING THE DEBTORS TO OBTAIN SENIOR
SECURED, SUPERPRIORITY, POSTPETITION FINANCING, (II) GRANTING LIENS
AND SUPERPRIORITY CLAIMS, AND (III) GRANTING RELATED RELIEF**

A P P E A R A N C E S:

WEIL, GOTSHAL & MANGES LLP
New York, New York
*Attorneys for the Debtors*
   By: David. N. Griffiths
      Gary Holtzer

WILLKIE FARR & GALLAGHER LLP
New York, New York
*Attorneys for the Official Committee of Unsecured Creditors*
   By: Todd M. Goren
      Brett H. Miller

**HONORABLE MICHAEL E. WILES
UNITED STATES BANKRUPTCY JUDGE**

On September 9, 2022, this Court heard argument on the motion by SAS AB and its debtor subsidiaries, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), for entry of an order (i) authorizing the Debtors to obtain senior secured, superpriority, postpetition financing, (ii) granting liens and superpriority claims, and (iii) granting related relief. The Court dictated a ruling at the conclusion of the September 9 hearing with the intention that this formal Bench Decision would be issued after corrections and clarifications to the transcript of the dictated decision. This Bench Decision constitutes the official decision of the Court.

I have before me a motion to approve a Debtor in Possession Financing Agreement (the "**DIP Agreement**") under which a group organized by Apollo Management Holdings, L.P. will act as lenders ("**Apollo**" or the "**DIP Lenders**"). I am going to approve the proposed financing, although not without some significant reservations.

The proposed DIP Agreement includes some unusual terms. First, it includes a call option under which the DIP Lenders would have the right to convert their outstanding DIP loans, or to pay cash, to acquire equity to be issued by the Debtors under a plan of reorganization. The equity to be purchased would have a value, at the election of the DIP Lenders, equal to the greater of the actual outstanding DIP obligation at the effective date or $700 million plus some accumulation of interest and fees. The option would be exercisable on the assumption that the reorganized Debtors collectively have a total enterprise value of $3.2 billion, calculated in accordance with a methodology set forth in Schedule 6.15(a) to the DIP Agreement. In other words, if a proposed plan were on file that was premised on a total enterprise value of $3.3 billion, Apollo would have the right to buy $700 million or more of equity that would be valued as if the total enterprise value were $3.2 billion, thereby effectively allowing Apollo to buy the equity at a discount.

The DIP Agreement contemplates that DIP loans will be extended in two pieces. The Debtors would immediately qualify for loans of $350 million, but the Debtors will only qualify for an additional $350 million loan if they achieve significant cost savings in accordance with a Cost Reduction Plan that the Debtors have adopted. The Unsecured Creditors Committee has negotiated a modification to the DIP Agreement that provides that the call option essentially will not exist if the Debtors do not qualify for the extra $350 million loan or if they qualify and Apollo refuses to make the additional loan. But if the Debtors qualify for the loan, the option will vest regardless of whether the Debtors actually choose to borrow the additional funds.

Second, the proposed DIP Agreement includes so called "tag rights" under which the DIP Lenders would have the right to buy up to thirty percent (30%) of the new money equity interests

to be issued under a plan of reorganization. The DIP Lenders would have the right to buy those equity interests on the same terms available to a third party. The tag rights would vest immediately upon approval of the DIP financing and would not depend on the amounts of the DIP loans that actually are extended.

Importantly, these proposed options and rights would not be irrevocable. The DIP Agreement provides that the Debtors may refuse to allow the DIP Lenders to exercise the call option, in which case the Debtors would be obligated to pay a call option termination fee. If that termination fee comes due within the first twelve (12) months after the loan is made, then the Debtors would be required to pay a termination fee of $19.52 million. If the termination were to be exercised after twelve (12) months, then the termination fee would be equal to whatever amount would be necessary to give the DIP Lenders an all-in rate of return of 23.2 percent (23.2%).

The tag rights also would be terminable. The DIP Agreement, as originally proposed, provided that the Debtors could terminate the tag rights upon the payment of a $28 million fee. The Official Committee of Unsecured Creditors has negotiated revisions to the DIP Agreement that include a reduction in that proposed termination fee to $21 million instead of $28 million.

The DIP Agreement also required the Debtors to seek approval of a breakup fee and of expense reimbursements that would be payable if the DIP Agreement ultimately were not approved. At a prior hearing in August, the parties asked me to approve a breakup fee of one percent (1%) and potential expense reimbursements of up to $1 million. At that time, all parties urged that I approve the proposed breakup fee and expense reimbursements, and I did so. However, at that prior hearing I expressed some doubts and raised several questions about the proposed arrangement.

First, I raised questions as to whether the proposed options would grant equity rights that should only be granted as part of a plan process and not as part of a DIP financing negotiation. I asked, for example, whether the Bankruptcy Code would permit a debtor to sell options to buy

equity that might be issued under a plan and to do so independently of any other transaction, early in a case but separate from a plan process. If the answer were that a debtor could not do so in the abstract, then I questioned whether a debtor should be allowed to do so as part of a DIP process and in exchange for reduced interest rates rather than cash. On a related note, I questioned whether the sale of the proposed options would interfere with a potential plan process in ways that would raise issues under prior decisions regarding *sub rosa* plans of reorganization. *See, e.g., In re LATAM Airlines Group S.A.*, 620 B.R. 722 (Bankr. S.D.N.Y. 2020).

Second, I noted that I had questions about the economics of the trade that the Debtors were proposing to make, and whether the values of the options being granted to Apollo might be higher than the interest savings that the Debtors believed they would achieve. In that regard, the Debtors had submitted declarations stating that they estimated that the inclusion of these options in the DIP financing package had allowed the Debtors to achieve interest savings that they estimated to be equal to three percent (3%). Of course, it would not be inevitable that the options would be terminated or that they would be exercised; Apollo might decline to exercise the options and tag rights, in which case the call option and tag rights would lapse without any expense to the Debtors. However, I noted that if the termination rights were exercised the proposed termination fees – which together, at that time, added up to $47.52 million – would be equal to 6.79% of the DIP commitments, so that the fees (if they became payable) would significantly exceed the three percent interest savings. I noted, therefore, that at the final hearing I would want the Debtors to explain how they had come to the conclusion that they had achieved fair value by including the options in the financing package.

Third, I raised questions about some of the mechanics of the proposed option exercise. In particular, it seemed to me that, as originally proposed, the DIP Agreement would have given the Debtors the sole discretion to decide whether to exercise termination rights, which might effectively have given the Debtors the power to decide (if there were competing plan options)

which plan option would prevail. The manner in which that decision making process had been structured did not appear to allow for sufficient Court or creditor oversight, or any circumstance under which creditors would have the right (as part of a plan process) to vote for a plan proposal that required the exercise of the termination rights even if the Debtors' management did not want to exercise those rights. The parties have since said that they are happy to make it clear that if, as part of the plan process, other people think that the termination rights should be exercised, and if I agree that the termination rights should be exercised, then in effect that will mean that the termination rights have to be exercised.

In early August, notwithstanding these concerns, I noted that no objections to the breakup fee and expense reimbursements had been filed. I then approved those terms. Over the succeeding weeks, the Debtors kept the process open to give other people the right to submit competing financing proposals. As I understand it, the Debtors have not received any committed proposals that they believe are better than those that are contained in the proposed DIP Agreement.

No party in interest has objected to the proposed DIP financing or to the inclusion of the call option and the tag rights in the DIP Agreement. The Unsecured Creditors Committee expressed concerns about the call option and tag rights in August, and acknowledged again at the September 9 hearing that it did not like those provisions in the abstract, but the Committee has ultimately elected to support the proposed DIP Agreement. I nevertheless engaged the Debtors and the Committee and their advisors in somewhat lengthy further discussions and testimony about these points at the final hearing.

One question I had raised was whether it is proper for a debtor to sell rights that relate to the equity to be issued under a future plan or reorganization, at a time when no plan is on file and at a time when the parties themselves have made clear that we really do not know what the enterprise value of the Debtors will be and what the plan proposals will be. I do not honestly know if the Debtors meant to suggest this, but at one point during the hearing I thought that the Debtors'

counsel suggested, by analogy to the Supreme Court's decision in *Bank of America Nat'l Tr. & Savings Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434 (1999), that the right to participate in a plan process is a property right that the Debtors may sell under Section 363(b) of the Bankruptcy Code. I do not know for sure that the Debtors meant to suggest that, but in any event I do not think that the suggestion is correct.

There are many business decisions under the Bankruptcy Code that are subject to the business judgments of debtors, including decisions about asset sales. However, there are other decisions that ultimately are to be made by creditors in connection with a proposed plan of reorganization, following full disclosure and an opportunity to submit votes. Plans often are proposed by management but that is not necessarily the case, and implicit in the plan process is the notion that creditors have the right to make choices that may or may not align with the business judgments of a debtor's management. I do not believe that Section 363 of the Bankruptcy Code contemplates that any of the elements of a future plan of reorganization, or the terms on which equity will be issued or sold under a future plan, can be determined in advance, or can be sold to willing buyers outside of a plan process, based solely on the suggestion that a debtor's management thinks that doing so would represent an exercise of sound business judgment. If, for example, the DIP Agreement before me today had included the proposed call options and the proposed tag rights in an irrevocable form, without any termination rights, then frankly I cannot imagine that I would have approved it. The terms of a plan should be decided through the plan process, and not otherwise.

I have, in fact, had some prior cases in which parties have proposed that DIP lenders receive a specified percentage of the reorganized equity in consideration for their DIP loans. Those proposals all were made early in cases, at times when the parties had no clear idea what the equity values would be, and not as part of a plan process in which creditor votes were being solicited. I did not issue published opinions in those cases, but I flatly denied the proposed terms in each of

those prior cases. I think it is very clear that decisions about the issuance of equity in the reorganized debtors should be reserved for the plan process.

The main argument that the Debtors have made in this particular case is a more substantive one and a more difficult one. Essentially, the Debtors have argued that in light of the termination rights the call option and tag rights do not actually lock in any particular rights to buy equity. The Debtors have argued that the options can be terminated if their exercise would not make sense to the Debtors and other parties in interest. As a result, they contend, I should just think of these as potential future increases in the cost of the DIP financing, rather than as terms that necessarily or potentially interfere with the plan process or that potentially predetermine the elements of a plan.

I think that it is obvious that the inclusion of the termination rights means that nothing irrevocable is being done, and so some further thought and analysis is required. I understand the arguments, and I understand that makes this a more difficult situation than a straight sale of predetermined equity rights or the issuance of options that are not revocable. To be honest, though, I still have some misgivings about the whole idea.

No matter how you look at it, the Debtors are proposing to achieve benefits in the form of reduced DIP pricing in exchange for a sale of rights that relate to equity to be issued in the future under a plan of reorganization. I think a respectable argument can be made that the Bankruptcy Code reserves such matters to the plan process and does not permit a sale of such rights at all, regardless of whether it would make business sense and regardless of whether the rights are terminable.

I am assured that in this particular case, the termination costs would be relatively small in relation to the equity that eventually will be raised so that it is therefore not likely to be a big impediment to the plan process, and that I should not be overly worried about the precedent that might be set in approving an arrangement of this kind. But if we have learned anything in the course of administering the Bankruptcy Code, it is that if we open a door by a crack in one case,

the door gets pushed open ever wider in succeeding cases. Once we suggest that it is permissible to sell tag rights and call options outside of a plan process, so long as the rights are terminable and the transaction makes business sense, where will we draw the line? Will we allow terminable tag rights or terminable call options to be sold to insiders, outside of a plan process? Will we allow terminable tag rights or terminable call options to be sold to potential acquirers who are not technically insiders but who are potentially more friendly to management than other bidders might later turn out to be? Are we really comfortable that the inclusion of a termination right eliminates all of the potential problems with such terms, and all of the potential detrimental effects that such arrangements may have on the ultimate plan process?

In addition, are we completely comfortable that courts can assess the values of the options that are being granted, and whether proposed termination payments have been set at levels that preserve a real termination option, as opposed to being set at levels that effectively guarantee that the termination of an option would be prohibitive? While I am assured that I do not have those issues in this case, I worry that when we open the door to the inclusion of equity options in DIP financing agreements we almost guarantee that we will have these issues in future cases. That is of particular concern to me because, as I will make clear below, it is extremely difficult in this case to calculate the benefits and costs of the call option and the tag rights. If these arrangements become more common, I fear that we will have difficulty determining whether they are fair in the abstract, or whether instead they are being used as tools by which insiders, large creditors or friendly buyers give themselves unfair advantages in a future plan process, or take (for themselves) a disproportionate share of a debtor's potential reorganization value.

Having said all that, I am not going to refuse to approve this particular motion based on the abstract principles I have described. I note that I have no objections before me, so that if I were to deny the motion it would need to be based on issues that only I have thought it important to raise. In addition, while there is not much precedent for this kind of arrangement, there is some. Most

of the cases I know of where people have proposed to include equity rights in DIP financings have been denied, but there is precedent, including the *Aeroméxico* case in this District, where some such arrangements have been approved in the absence of objection and with the support of an unsecured creditors' committee. *See In re Grupo Aeroméxico, S.A.B. de C.V.*, Case No. 20-11563 (SCC), Doc. No. 527 (Bankr. S.D.N.Y. Oct. 13, 2020). Furthermore, it may not have occurred to me that I was doing so, but in hindsight it seems to me that when I approved the breakup fee I implicitly ruled, at that time, that there was no absolute bar to the proposed terms. If there had been an absolute bar, then I should not have approved the breakup fee to begin with. Implicitly my Order said to the parties and to the world that we might still have a hearing to determine whether the proposal made economic sense and whether a better alternative was available, but that there was no absolute rule against doing what was proposed. That implicit ruling may have affected the remainder of the DIP process, to a point where I do not feel it would be appropriate for me to take a different view on the issue at this stage.

      I therefore will save for another day exactly what I think about terminable options of this kind in the abstract and whether they are permissible in future cases, particularly where objections may be filed. I will instead note my reservations, and note that there are some special factors that would make it inappropriate for me in this particular case– without objections, in the face of some precedent to the contrary, and in light of the implicit ruling contained in my own prior order – to say that these arrangements cannot be included in the proposed DIP financing.

      The second question was as to the costs and benefits of the call option and tag rights in this case. The Debtors have offered a number of proposed calculations on this point. As to the potential benefits, the Debtors have assumed a benefit of $19.5 million. That is based on the assumption that the DIP loan will be outstanding for a full year and that interest savings will amount to three percent (3%). I note that the DIP loan actually has a proposed term of only nine months (not one year), though there are extension options. If the DIP loan is outstanding for only nine months,

then obviously the benefit would be less than $19.5 million. In addition, the $19.5 million benefit calculation assumes that the Debtors will qualify for the full $700 million draw under the DIP, and that the Debtors will qualify for that by December 2022. We all hope the Debtors will meet those goals, but it has to be conceded that the Debtors may not do so. That means, in effect, that the $19.5 million in potential savings is really the maximum benefit if the DIP lasts an entire year, rather than necessarily being the expected or likely benefit.

As to the potential value of the options being granted: I can only say that, based on the testimony, I do not have a clear sense of what that is. A call option normally would be valued by the use of a Black-Scholes or similar calculation model. In fairness, a Black-Scholes calculation suggests a kind of mathematical certainty that, in many situations, does not really exist. Options calculations involve subjective assumptions about volatility – *i.e.,* the likelihood that future values will vary from current values. If one sells a call option with respect to a stock that has a current market price, the option value can be calculated using historical volatility factors. But in this particular case, call option valuations would have to be based on a calculation of the current total enterprise value of the Debtors (which is itself not so easy to calculate given that the Debtors are in the midst of an ambitious cost-reduction plan) and based on the expected "volatility" as to what the total enterprise values might turn out to be in the future. In fact, we have no idea what the future enterprise value will be; we do not know what cost savings are going to be achieved, we do not know what else is going to happen in the markets between today and the date on which the enterprise value will be calculated, and we do not know, other than by pure guesswork, exactly how to figure what the volatility is. So I recognize that even if a Black-Scholes calculation were to be done, it would have a significant subjective component.

Nevertheless, Black-Scholes calculations do offer some sense of value. In this case, the proposed termination fee could be regarded as a cap on the value of the call option. As Mr. Szlezinger acknowledged, Black-Scholes models can be adjusted to take account of caps and to

calculate values accordingly. However, the Debtors and the Committee have not done such calculations. Maybe that is implicitly a statement that as a practical matter it is useless to do such calculation, given the uncertainties over just what the enterprise value currently is and what it might turn out to be. As a result, though, I do not have an option value calculation to use as a guide to measure the value of the option that has been granted to Apollo.

I also do not have a clear sense at all of how to value the tag rights. The tag rights do not involve options to buy at any particular price; instead, they are rights to buy at the prices that are available to third parties. Apollo bargained very hard to get them, and it bargained hard for the inclusion of relatively high termination fees, so the bargaining history clearly tells me that these are very valuable rights. But beyond that, in terms of measuring just how much value has been given to Apollo, I have not been given any evidence that would allow me to do that.

The Debtors' advisors instead have prepared tables that purport to compare the benefits and costs of the call option and the tag rights in various scenarios. I do not find those to be particularly helpful. One table, which is slide 3 in the presentation that was made, assumed that the Debtors will achieve savings of $19.5 million. But as I have already noted, that is really the maximum savings, not necessarily the guaranteed savings or even the projected likely savings. At the same time, the table assumes that the cost of terminating the tag rights would only be fifty percent (50%) of the actual termination price – $10.5 million rather than $21 million – based on an assumption that it is fifty percent (50%) likely that Apollo will be the winning bidder in a plan process. So, in other words, on this table, the benefits that the Debtors have included are the maximum values (not necessarily the expected values), but the costs are expected costs, not maximum costs, based on assumptions about what might happen in the future plan process. That, to me, is an "apples to oranges" comparison. The Debtors' advisor acknowledged that if the same table were constructed so as to compare the maximum benefits (in terms of interest savings) to the maximum potential costs (if the termination rights were executed as to both the call option and the

tag rights), then the table actually would show that, under most possible situations, the Debtors would not benefit and that the costs would exceed the benefits. That is not definitive unless one knows how likely each of the potential outcomes is, but I was given no evidence by which I could make such further assessments.

Some of the other tables that were prepared by the Debtors' advisors assumed that the costs of terminating the tag rights would only be 25% of the actual termination price (in other words, $5.25 million rather than $21 million), on the assumption that it is 50% likely that Apollo would be the winning bidder and on the further assumption that it is 50% likely, even if somebody else was the winning bidder, that that other bidder would be happy to let Apollo have the right to buy 30% of the equity to be issued to that bidder's group. I find that there is no basis for either of those assumptions. We have no idea what the likely enterprise value is going to be, who is going to be interested in purchasing equity, how exclusive a competing buyer might wish to be, or even if Apollo is going to be interested in exercising the options that are to be granted to it. Those particular percentages seem to me to have simply been grabbed out of thin air. I do not mean to be overly critical of the advisors, but these calculations give me the impression that they were selected more for the purpose of trying to downplay the likely costs of the tag right termination fees, rather than for the purpose of showing what the likely costs will be.

The difficulty in measuring the values of the call option and the tag rights – particularly in the absence of an objection and in the absence of evidence of a kind that an objector might offer – illustrates the concern that I raised earlier, and why I have reservations about opening the door to these kinds of arrangements. What the benefits or costs will turn out to be, and whether this is a good deal, depends entirely on what the enterprise values turn out to be, the extent to which other parties are interested in making offers at that time, and the extent to which Apollo itself is still interested at that time. In the *LATAM Airlines* case, Judge Garrity concluded that it would have violated the rules against *sub-rosa* plans of reorganization to approve the issuance of equity rights

separate from the plan process and at a time when it was impossible to know the values of those equity rights. *See In re LATAM Airlines Group S.A.*, 620 B.R. 722 (Bankr. S.D.N.Y. 2020). We similarly do not really have any way of knowing, in this case, just what effect the call option and the tag rights might have on the plan process or on the extent to which other people are interested in being part of that process.

If I had an objection in front of me, I would have a lot of questions about this arrangement, not only in terms of the relevant principles, but also as to whether the proposal ultimately makes economic sense. But I do not have such an objection. For the reasons stated above I do not feel it would be appropriate to say, in this particular case, that these arrangements are barred in the abstract. I have doubts as to the costs and benefits, but I am reluctant to substitute my open questions and my doubts in place of the judgments that have been made by the parties who hold the actual economic interests in such matters. I should not disregard their consensus opinions unless I have something before me that more clearly shows to me that they are wrong as to the potential costs and benefits, and I do not have that.

Accordingly, notwithstanding my reservations, and for the reasons stated above, I will approve the proposed agreement. A separate Order has been issued to that effect.

Dated: New York, New York
September 21, 2022

**s/Michael E. Wiles**
United States Bankruptcy Judge
