UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| SAS AB, *et al.*, | : | Case No. 22-10925 (MEW) |
| | : | |
| Debtors. | : | (Jointly Administered) |

---------------------------------------------------------------x

### DECISION AUTHORIZING THE RETENTION OF SEABURY SECURITIES LLC AND SKANDINAVISKA ENSKILDA BANKEN AB AS CO-INVESTMENT BANKERS TO THE DEBTORS

A P P E A R A N C E S:

WEIL, GOTSHAL & MANGES LLP
New York, New York
*Attorneys for the Debtors*
  By: David. N. Griffiths
    Gary Holtzer

WILLKIE FARR & GALLAGHER LLP
New York, New York
*Attorneys for the Official Committee of Unsecured creditors*
  By: Todd M. Goren
    Brett H. Miller

OFFICE OF THE UNITED STATES TRUSTEE, REGION 2
New York, New York
  By:  Greg Zipes
     Annie Wells
     Tara Tiantian

STROOCK & STROOCK & LAVAN LLP
New York, New York
*Attorneys for Skandinaviska Enskilda Banken AB*
  By:  Michael Luskin

**HONORABLE MICHAEL E. WILES
UNITED STATES BANKRUPTCY JUDGE**

     The Debtors in these procedurally-consolidated cases have sought to retain Seabury

Securities LLC ("**Seabury**") and Skandinaviska Enskilda Banken AB ("**SEB**") as co-investment

bankers. All issues as to the Seabury retention, and as to the overall compensation package for the investment bankers (whoever those bankers turn out to be), have been resolved during the course of prior proceedings in this case. The remaining issue is the objection by the Office of the United States Trustee (the "**US Trustee**") to the Debtors' employment of SEB. The US Trustee contends that SEB is not "disinterested" and therefore is not eligible to be employed as the Debtors' investment banker pursuant to the terms of sections 101(14) and 327 of the Bankruptcy Code. The parties stipulated that the relevant facts were accurately set forth in the Declaration of Per-Erik Larsson [ECF No. 384] and in the Second Supplemental Declaration of Carlo Lugani [ECF No. 385], and that no further evidentiary hearing was required. The Court heard argument on these issues on September 28, 2022, and as described below SEB has since made additional concessions that resolve part of the objection that the US Trustee filed.

For the reasons set forth below, the remaining objections of the US Trustee are overruled and the Debtors' retentions of Seabury and SEB are approved.

## Discussion

SEB is a commercial and investment bank with operations primarily in Sweden, Norway, Denmark, Finland and other Northern European countries. In prior years SEB has acted as both a commercial bank and as an investment banker to the Debtors in connection with many transactions, including six debt capital market transactions, five capital raises, and three M&A transactions. The Debtors are engaged in an extensive program that they have referred to as their "SAS FORWARD" program, and that program (and the negotiation of a plan of reorganization in these cases) will require new capital raises and debt-to-equity conversions. The governments of Norway, Denmark and Sweden are stakeholders in the Debtors, and many of the Debtors' other creditors and parties in interest are located in Scandinavia. The Debtors therefore believe that an

investment banker with experience and contacts in Scandinavia is needed, and they believe SEB is well-suited (perhaps uniquely suited) to provide the necessary services.

No party in interest has disputed SEB's qualifications for the tasks that must be completed. Instead, the objection is based on the "disinterested" requirement that is incorporated into section 327 of the Bankruptcy Code and that is defined in section 101(14) of the Bankruptcy Code. Section 327 permits the employment of professional advisors who are "disinterested persons," and section 101(14) defines that term as follows:

> The terms "disinterested person" means a person that –
>
> (A)  is not a creditor, an equity security holder, or an insider;
>
> (B)  is not and was not, within 2 years before the date of the filing of the petition, a director, officer, or employee of the Debtor; and
>
> (C)  does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, or connection with, or interest in, the debtor, or for any other reason.

See 11 U.S.C. § 101(14), 327.  Further standards that are relevant to these chapter 11 cases are set forth in section 1107(b) of the Bankruptcy Code, which states:

> Notwithstanding section 327(a) of this title, a person is not disqualified for employment under section 327 of this title by a debtor in possession solely because of such person's employment by or representation of the debtor before the commencement of the case.

See 11 U.S.C. § 1107(b).

The US Trustee contends that there are a number of "connections" between the Debtors and SEB that raise "disinterestedness" issues that that should disqualify SEB from acting as an investment banker in these cases.

1.      **The Wallenberg Foundations**

3

Marcus Wallenberg is the Chairman of SEB's board of directors. Mr. Wallenberg's family is associated with sixteen non-profit public and private foundations that for convenience I will refer to as the "Wallenberg Foundations." The Wallenberg Foundations own an entity known as Wallenberg Investments AB ("**Wallenberg Investments**"). Wallenberg Investments, in turn, has many investments, including the ownership of 3.42% of the common stock of SAS. The value of the SAS holding is approximately $13.2 million, compared to total assets of the Wallenberg Foundations in excess of $24.3 billion.

The US Trustee initially complained that this "connection" between SEB and SAS had not been disclosed in the declarations that were filed in support of the retention applications. I note that SEB itself does not directly or indirectly own any stock in SAS; it is the Wallenberg Foundations who indirectly own a minor amount of that stock. Furthermore, the record shows that the Debtors promptly brought these matters to the attention of the US Trustee shortly after the retention applications were filed, and prior to the time when objections to the retention applications were due. I am aware of decisions that have disqualified professionals from employment, or that have refused to award compensation, based on egregious failures to comply with disclosure requirements. *See, e.g., In re Midway Indus. Contractors, Inc.*, 272 B.R. 651 (Bankr. N.D. Ill. 2001) (failure by an attorney to disclose a prior contingency fee agreement and attorney's lien in connection with the attorney's own retention); *In re Granite Partners, L.P.*, 219 B.R. 22 (Bankr. S.D.N.Y. 1998) (law firm's failure to make complete disclosure of its connections to a brokerage firm that was to be a subject of the law firm's investigation on behalf of a debtor). However, I find that nothing of the kind occurred in this case. The purpose of the disclosures that are required by the Code is to enable parties to evaluate possible disqualifying interests. *In re Leslie Fay Co.*, 175 B.R. 525, 533 (Bankr. S.D.N.Y. 1994). Even if Mr. Wallenberg's association with the

4

Wallenberg Foundations were to be considered an "interest" or a "connection" of SEB itself, the fact is that full disclosure was provided in ample time to permit the US Trustee or other parties in interest to file objections. For this reason, the US Trustee stated, during the hearing on this matter, that it was withdrawing its request that SEB's retention be disallowed based on alleged disclosure deficiencies.

The US Trustee contends, however, that Mr. Wallenberg's association with the Wallenberg Foundations could create conflicts of interest for SEB. The US Trustee suggests, for example, that the Wallenberg Foundations' interests in Wallenberg Investments might cause SEB's investment bankers to favor equity interests of the kind that Wallenberg Investments owns, or might prompt Mr. Wallenberg to issue instructions that the investment bankers do so. Under the statute, however, a professional is disqualified only if it holds an interest that is "materially adverse" to the interests of the estate, any creditor group or equity security holders. 11 U.S.C. § 101(14). Interests are not considered to be "materially adverse" just because it is possible to imagine a set of remote and unlikely circumstances that might create issues. *TWI Int'l Inc. v. Vanguard Oil & Serv. Co.*, 162 B.R. 672, 675 (S.D.N.Y. 1993) (conflicts that are hypothetical or theoretical are not disqualifying). Instead, the question to be decided by the Court is whether a given set of facts gives rise to a bias against the estate or to an economic interest that actually has a significant potential to affect the professional's loyalty, to undercut the value of the professional's services, or to give rise to a dispute in which the estate would be a rival party. *See Bank Brussels Lambert v. Coan (In re AroChem Corp.)*, 176 F.3d 610, 623 (2d Cir. 1999).

I simply cannot see how Mr. Wallenberg's connection to the Wallenberg Foundations gives rise to a "materially adverse interest" under these standards. Among other things:

- Neither Mr. Wallenberg nor SEB itself own any stock in the Debtors;

5

- Mr. Wallenberg is associated with the Wallenberg Foundations, but there is no suggestion that in that capacity he has any personal interest in the investments of the assets of the Foundations, let alone any suggestion that SEB itself has any such interests;

- The small equity stake in SAS in which the Wallenberg Foundations have an indirect interest is just a tiny fraction of the overall assets of the Foundations and is not material to the Foundations;

- Mr. Wallenberg has no day-to-day involvement with the investment banker teams who will work on this engagement;

- SEB is not the sole investment banker; it will be a co-investment banker with Seabury (which as I understand it will be the primary banker), and Mr. Wallenberg is not alleged to have any interest or control over Seabury;

- SEB has indicated its willingness to bar communications between Mr. Wallenberg and the investment bankers as a further protection against any perceived risks; and

- Mr. Wallenberg has agreed that he will not participate in any discussions or votes at directors' meetings of the Wallenberg Foundations that in any way pertain to the Debtors.

The US Trustee has taken the position that the last two items on the foregoing list (the use of so-called "ethical walls") is insufficient as a matter of law, citing to a single decision by a Florida court entered in 1994. *See In re Trust America Serv. Corp.*, 175 B.R. 413, 421 (Bankr. M.D. Fla. 1994). However, the cited decision does not support the US Trustee's position. In *Trust America*, the Creditors' Committee sought to retain an accounting firm that was already actively involved in an audit of the debtors that had been commissioned by a large creditor. The court had approved

6

the retention but held that it would evaluate conflicts at the time a fee application was made. *Id.* at 417. Later, when the accounting firm sought payment of its fees, the court held that an actual conflict of interest existed and also that the accounting firm had not made an appropriate inquiry or appropriate disclosures about the conflict. *Id*. at 420. The court held that "there may be an instance in which the potential of a conflict can be removed by implanting sufficient protective measures to ensure there is no dissemination of information while isolating the conflict," but that in that particular case the purported ethical wall had actually been breached. *Id*. at 420-21.

In this case, by contrast, the connections of Mr. Wallenberg to the Wallenberg Foundations does not give rise to an actual, active conflict of any kind. It is only through strained speculation that a potential issue can even be posited. Furthermore, as this Court noted during oral argument, it is routine in this district, and in other districts to this Court's personal knowledge, that "ethical walls" are relied upon in cases where large investment banking firms have affiliates or divisions that engage in debt trading, stock trading, or other activities that arguably might give rise to potential issues if the persons engaged in those activities were permitted to communicate with the investment bankers. The US Trustee itself has endorsed the use of ethical walls in such situations in a countless number of cases, including many cases in which I participated both as a private attorney and during my time on the bench. I see no reason why such arrangements would not be sufficient to protect against any risks that one might posit with respect to Mr. Wallenberg's association with the Wallenberg Foundations.

I will require that the investment banking team at SEB have no communications with Mr. Wallenberg, the Wallenberg Foundations, Wallenberg Investments, other groups within SEB and individuals associated with any of those entities or groups about the investment banking team's work for the Debtors and about any non-public information that the investment banking team has

7

Pg 8 of 16

about the Debtors. I believe that this, along with the other matters noted above, makes it quite clear that Mr. Wallenberg's association with the Wallenberg Foundations, and the Wallenberg Foundations' indirect ownership of a small portion of SAS's outstanding equity, do not raise a disqualifying "materially adverse interest" as to SEB's retention as co-investment banker.

**2.    Other Alleged Wallenberg Foundation Connections**

The US Trustee contends that Jacob Wallenberg (a cousin of Marcus Wallenberg) sits on the boards of directors of Wallenberg Investments and of another entity (Investor AB) in which Wallenberg Investments holds a 23% interest, and that Jacob Wallenberg also is a member of the SAS AB Nomination Committee, though he is not a member of the SAS board of directors. However, Jacob Wallenberg is not associated with SEB at all. Perhaps the US Trustee is concerned that Jacob Wallenberg might try to influence Marcus Wallenberg and that Marcus Wallenberg, in turn, might try to influence the investment banking team of SEB. However, this is far too attenuated a "connection" to be disqualifying. I find nothing in this minor family connection that creates a "materially adverse interest" as to the services that SEB will perform as co-investment banker for the Debtors. In addition, the "ethical wall" described above will apply to Jacob Wallenberg as well, further eliminating any risk of the kind that the US Trustee has posited.

The US Trustee further argues that Oscar Stege Unger is a Senior Advisor to the Wallenberg Foundations and also a member of the board of directors of SAS AB, one of the Debtors. Again, however, Mr. Unger is not associated with SEB at all. He has been identified as a person with a connection to both the Wallenberg Foundations and the Debtors, but so far as the record discloses the only connection between the Wallenberg Foundations and SEB is the fact that Marcus Wallenberg is a director of some or all of the Wallenberg Foundations, as described above. I see nothing about Mr. Unger's alleged "connections" that bears in any way on the investment

8

banking work that SEB will do, or that gives rise to any "materially adverse" interest that disqualifies SEB from performing such work. In any event, the broad "ethical wall" discussed above would bar communications with Mr. Unger about the investment bankers' work on this engagement.

3.     **The Sale of SEB's Interest in an Outstanding Loan**

SEB was a lender under a 2020 loan facility that was guaranteed by the Kingdom of Norway through an entity named Garantiinstituttet for eksportkreditt (now "**Eksfin**"). In June 2022, prior to the commencement of these bankruptcy cases, Eksfin (as guarantor) purchased all of the lenders' interests in such loans, and the lenders assigned their rights and interests to Eksfin. The US Trustee argues that this arrangement allowed SEB to "improve" its position. However, the loans already were guaranteed by Eksfin, so I do not see how any such "improvement" was accomplished. To the extent that this transaction was motivated by a desire to eliminate a "creditor" claim, similar techniques have been approved in other cases. *See, e.g., In re 7677 E. Berry Ave. Assocs., L.P.*, 419 B.R. 833 (Bankr. D. Colo. 2009) (law firm sold its prepetition claim against debtor to insiders before case commenced and received a note in exchange).

There is no argument that the Debtors made recoverable transfers in connection with Eksfin's acquisition of the loans, and there is no contention that the Debtors funded any of Eksfin's purchase of the outstanding loans. There is nothing else about this transaction that strikes me as suspicious or (more importantly) as raising any conflict of interest. The US Trustee suggested that the Official Committee of Unsecured Creditors should nevertheless look at these facts to see if any issues exist, but during the Hearing the counsel for the Committee represented that the Committee had looked at these transactions and saw no issues to be pursued.

4.     **The Volume and Significance of SEB's Transactions With the Debtors**

9

SEB has acted as an investment banker or financial advisor to the Debtors on many transactions over the past nine years. It has also acted as a commercial banker, and many of the Debtors' open bank accounts (which held more than $485 million as of July 31, 2022) are with SEB. The US Trustee contends that these "vast connections" raise potential issues. However, the particular issues that US Trustee has posited do not support its position.

For example, the US Trustee suggests that SEB might be a logical entity to approach for exit financing. *See* US Trustee's Suppl. Obj. 7, ECF No. 397. But if (as the US Trustee suggests) it would be a conflict of interest for SEB's investment bankers to approach SEB or to negotiate with about such loans, then the answer is simply that SEB's investment bankers should not do so. The "disinterested" definition focuses on the question of whether there presently are materially adverse interests that would preclude a professional's retention. I know of no theory under which the speculative loss of a potential future borrowing opportunity (the Debtors' ability to approach SEB to participate in exit financing) ought to be considered as a presently disabling factor in SEB's retention.

The US Trustee also says that SEB (as co-investment banker) might be required to give advice as to whether the Debtors' bank deposits should be moved, and that SEB's investment bankers would face conflicts in providing such advice. *Id*. That contention, however, just reflects a misunderstanding of the services that investment bankers provide. Those services (which are described at length in the retention application and in the written retention agreement between the Debtors and SEB) have nothing to do with the issue of where funds are deposited. In my experience this is simply not a question on which investment bankers provide advice, and it is not a basis on which to refuse the retention of SEB. For the avoidance of doubt, I will ask the parties to include, in a proposed form of order, a provision that makes clear that SEB's investment bankers

10

are not being retained to provide advice or services with respect to the location or management of SAS's bank accounts.

The US Trustee also suggests that SEB might have to offer advice as to how to treat equity security holders under a Plan, and that this could raise issues because of the indirect holdings of the Wallenberg Foundation. I have already addressed those issues above. I find that, in fact, those connections will not affect SEB's performance of its services.

During argument, the US Trustee suggested that the sheer number of SEB's prior connections with SAS also increases the risk that an issue might arise and that a presently unknown conflict might reveal itself in the future. There certainly could be cases where multiple connections could give rise to a "materially adverse interest." However, it is still necessary to point to specific issues that actually exist. I do not think it would be appropriate to refuse to allow the Debtors to have access to the important and necessary investment banking services of SEB based on speculation that some unknown issue might arise out of SEB's past work. In the absence of a materially adverse interest that can actually be identified (either by virtue of a single connection or by virtue of multiple connections), it would not be proper to disqualify SEB from acting as the Debtors' co-investment banker.

5.  **Whether SEB is a "Creditor" of the Debtors**

Subpart "C" of the "disinterested" definition focuses on connections generally and whether they give rise to a "materially adverse interest." Subpart "A" provides that a professional may not be retained if the professional is a "creditor." Of course, every professional is a post-petition creditor in the sense that the professional earns fee payments and is entitled to seek allowance of such fees; that itself cannot be a disqualifying factor, or else no professional could be retained except on a *pro bono* basis. *See In re Martin*, 817 F.2d 175, 180 (1st Cir. 1987). Courts also

11

generally have not treated professionals as "creditors" if their pre-petition fees were secured by retainer payments. *See, e.g., Rus, Miliband & Smith, APC v. Yoo (In re Dick Cepek, Inc.)*, 339 B.R. 730 (BAP 9th Cir. 2006) (law firm that holds a security interest in a retainer is not a "creditor" and is not disqualified from retention). However, in at least one well-known decision a law firm's retention was denied where the law firm's fees were not fully covered by advance retainers and where the law firm may have received payments that were subject to recovery as preferences. *See In re Pillowtex,Inc.*, 304 F.3d 246 (3d Cir. 2002).

The US Trustee raised the following questions in this regard.

A.      **Pre-Petition Payments of Investment Banking Fees**

The US Trustee noted that SEB, Skyworks and the Debtors entered into an engagement letter prior to the Debtors' bankruptcy filings and that SEB received payments thereunder. However, Debtors in large bankruptcy cases almost always hire professionals in advance. Those professionals receive pre-petition payments for their pre-petition services, but that alone is not understood to be a fact that disqualifies the professional from being retained on a post-petition basis. In fact, as noted above section 1107(b) of the Bankruptcy Code makes clear that a professional's pre-petition work for a debtor does not disqualify the professional from being retained on a post-petition basis. There is nothing in section 1107(b) that says that the professional's pre-bankruptcy services had to be provided free of charge.

In this case, Skyworks received pre-petition payments under the same investment banking engagement, and the US Trustee acknowledges that Skyworks is a "disinterested" person. The Debtors' other professionals also received pre-petition payments for their services, and no issue has been raised as to their retentions. The US Trustee has not identified any facts that suggest that any of the payments that were made to SEB for pre-petition investment banking services were

12

improper in any way, or that they are subject to recovery as preferences, or that there is any reason to treat them differently than the fees that other professionals received for their own pre-bankruptcy services. During the Hearing, counsel to the US Trustee acknowledged that the US Trustee is no longer pursuing its objection on this particular ground. In any event, I find that the mere fact that SEB was paid for its prior services is not a fact that disqualifies it from being retained to provide investment banking services in these cases.

B.    **Pre-Petition Payments of Banking/Cash Management Fees**

The Debtors have bank accounts with SEB. During the 90-day preference period the Debtors paid approximately $9,000 to SEB in cash management fees. The US Trustee contended that it is conceivable that there might be "preference" issues associated with the payments of fees with respect to those accounts. However, SEB presumably had a right of offset with respect to its cash management fees, in which case those would be treated as fully secured claims for bankruptcy purposes and not subject to preference attack. *See* 11 U.S.C. §§ 506, 553. In addition, the US Trustee has not identified any actual facts that suggest that any preference issues exist as to the cash management fees. To the contrary: the US Trustee has stipulated to the accuracy of the Larsson Declaration, which represented that the fees were paid in the ordinary course of business. I therefore see no reason to believe that any preference issue exists with respect to the cash management fees.

C.    **Credit Card Services Provided by SEB Kort AB**

The US Trustee contended in its papers that "SEB" is a creditor and received preferential payments in connection with certain credit card arrangements. *See* US Trustee's Suppl. Obj. 11, ECF No. 397. The Declarations that are on file, however, show that the credit card arrangements are not provided by SEB itself, but instead are provided by an affiliated company named SEB Kort

13

AB. During the Hearing, the US Trustee acknowledged that even if SEB Kort AB were to be treated as a "creditor" of the Debtors, that would not mean that SEB itself is a "creditor," although the alleged "connection" and alleged interests of SEB Kort should be considered in determining whether SEB has a "materially adverse interest."

The stipulated testimony shows that SEB Kort AB received approximately $7,000 in credit card management fees through March 30, 2022 (a date which precedes the preference period) and that such payments all were made in the ordinary course of business. In light of the stipulated accuracy of the Declarations there is no preference issue as to these payments. In addition, approximately $13,600 came due and remained unpaid prior to the filing of the bankruptcy petitions, representing some annual fees that came due and/or charges for travel or business expenses that were incurred. As noted above, the US Trustee confirmed during the Hearing that it does not believe that amounts owed to SEB Kort AB constitute "creditor" claims by SEB itself. I do not believe that the small amount owed to SEB Kort AB actually creates a "materially adverse interest" on the part of SEB or that it will affect SEB's work as investment banker in any way.

For some time prior to July 1, 2022 the Debtors and SEB Kort AB had agreed that the maximum delinquent credit card accounts would not exceed $400,000. The Debtors and SEB Kort AB agreed on July 1, 2022 to increase the "delinquent" maximums from $400,000 to $1.5 million, and in connection with that agreement the Debtors provided cash collateral for the new exposure limit. The fact that an increased exposure limit was set on a going-forward basis, and that the new exposure was collateralized on a contemporaneous basis, should not give rise to any preference issues, and the US Trustee has not suggested otherwise. It is conceivable that the collateralization of previously unsecured delinquencies might have constituted a preference, but no evidence has been offered to suggest that there was such an actual delinquency. In any event, the US Trustee

14

agreed during the hearing that the credit card arrangements with SEB Kort AB do not make SEB itself a "creditor" for purposes of applying the disinterestedness standards. I do not believe that the collateralization of the potential credit card delinquency gives rise to a materially adverse interest on the part of SEB.

### D.    FX Transactions

The Debtors engaged in currency transactions with SEB. However, all pre-petition transactions were closed in accordance with their terms. No issue has been identified as to these transactions or as to any payments made in the course of those transactions.

### E.    Guarantees by SEB of Airport and Other Arrangements

The item identified by the US Trustee that raised the biggest question is the fact that SEB issued 42 separate guarantees of the Debtors' obligations for the payment of various airport fees, airport services, airport rents, ticketing charges, customs charges, energy taxes and other items. The total outstanding amounts of the guarantees is about $10 million. They are now fully cash collateralized, although apparently the cash collateralization of two of the guarantees (in the total amount of approximately $452,937) did not occur until some time within 90 days before the bankruptcy filings. I noted at the conclusion of the Hearing that I did not believe that any of the matters that had been identified by the parties would actually affect the work to be performed by SEB or gave rise to a materially adverse interest. No claim on the guarantees has been made, and the Debtors' payment of the underlying obligations (including the Debtors' payments of any amounts outstanding on a pre-petition basis) has been approved through other orders entered in these cases. In addition, the Debtors must perform these obligations on a continuing basis in order to maintain their business. I noted, however, that I was concerned at the portion of the "disinterested" definition that disqualifies a professional from retention if the professional is a

15

"creditor." I asked the parties to make additional submissions on this issue, particularly as to the guarantee transactions. I also urged the parties to continue their discussions to see if they could resolve their differences.

Subsequently, the Court has been advised that SEB had waived any and all prepetition claims it has or may have for indemnification, reimbursement, or other similar amounts with respect to the guarantees. The US Trustee's office separately confirmed that it is satisfied that the agreements it reached with SEB in this regard have eliminated any issue as to whether the guarantees gave rise to a "creditor" obligation that disqualifies SEB from being retained as co-investment banker. Since the parties have resolved this issue to their own satisfaction there is no need to discuss it further.

## Conclusion

For the foregoing reasons, the retentions of SEB and Seabury as co-investment bankers to the Debtors will be approved. The parties are directed to agree upon and to submit a form of order that reflects the Court's rulings.

Dated: New York, New York
       October 17, 2022

                              **s/Michael E. Wiles**
                              Hon. Michael E. Wiles
                              United States Bankruptcy Judge