WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Gary T. Holtzer
Kelly DiBlasi
David Griffiths
Lauren Tauro

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------- x
In re                                        :        **Chapter 11**
                                             :
**SAS AB,** *et al.*,                        :        **Case No. 22-10925 (MEW)**
                                             :
               Debtors.[1]                   :        **(Jointly Administered)**
                                             :        **Re:  ECF Nos. 1732, 1843 & 1905**
-------------------------------------------------------- x

**NOTICE OF FILING OF DISCLOSURE STATEMENT**
**FOR SECOND AMENDED JOINT CHAPTER 11 PLAN OF**
**REORGANIZATION OF SAS AB AND ITS SUBSIDIARY DEBTORS**

      **PLEASE TAKE NOTICE THAT**, on December 19, 2023, SAS AB and its debtor

subsidiaries, as debtors and debtors in possession in the above-captioned chapter 11 cases

(collectively, the "**Debtors**"), filed the *Disclosure Statement for Joint Chapter 11 Plan of*

*Reorganization of SAS AB And Its Subsidiary Debtors* [ECF No. 1732].

      **PLEASE TAKE FURTHER NOTICE THAT**, on January 23, 2024, the Debtors

filed the *Disclosure Statement for Amended Joint Chapter 11 Plan of Reorganization of SAS AB*

*and Its Subsidiary Debtors* [ECF No. 1843] (the "**Amended Disclosure Statement**").

---

[1] The Debtors in these chapter 11 cases are SAS AB, SAS Danmark A/S, SAS Norge AS, SAS Sverige AB, Scandinavian Airlines System Denmark-Norway-Sweden, Scandinavian Airlines of North America Inc. (2393), Gorm Asset Management Ltd., Gorm Dark Blue Ltd., Gorm Deep Blue Ltd., Gorm Sky Blue Ltd., Gorm Warm Red Ltd., Gorm Light Blue Ltd., Gorm Ocean Blue Ltd., and Gorm Engine Management Ltd.  The Debtors' mailing address is AVD kod: STOUU-T, SE-195 87 Stockholm, Sweden.

**PLEASE TAKE FURTHER NOTICE THAT**, on February 4, 2024, the Debtors filed the *Disclosure Statement for Second Amended Joint Chapter 11 Plan of Reorganization of SAS AB and Its Subsidiary Debtors* [ECF No. 1905] (the "**Second Amended Disclosure Statement**").

**PLEASE TAKE FURTHER NOTICE THAT**, attached hereto as **Exhibit A** is a redline of the Second Amended Disclosure Statement marked against the Amended Disclosure Statement (the "**Redline**").

Dated: February 4, 2024
New York, New York

           */s/ Gary T. Holtzer*
           WEIL, GOTSHAL & MANGES LLP
           767 Fifth Avenue
           New York, New York 10153
           Telephone: (212) 310-8000
           Facsimile: (212) 310-8007
           Gary T. Holtzer
           Kelly DiBlasi
           David Griffiths
           Lauren Tauro

           *Attorneys for Debtors*
           *and Debtors in Possession*

**Exhibit A**

**Redline**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------- x
In re                                        :        Chapter 11
                                               :
SAS AB, *et al.*,                    :        Case No. 22-10925 (MEW)
                                               :
                Debtors.[1]       :        (Jointly Administered)
-------------------------------------------------------------- x

### DISCLOSURE STATEMENT FOR SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF SAS AB AND ITS SUBSIDIARY DEBTORS

---

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THE DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT TO DATE.**

---

**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Gary T. Holtzer
Kelly DiBlasi
David Griffiths
Lauren Tauro

*Attorneys for Debtors*
*and Debtors in Possession*

Dated: ~~January 23~~February 4, 2024
         New York, New York

---

[1] The Debtors in these chapter 11 cases are SAS AB, SAS Danmark A/S, SAS Norge AS, SAS Sverige AB, Scandinavian Airlines System Denmark-Norway-Sweden, Scandinavian Airlines of North America Inc. (2393), Gorm Asset Management Ltd., Gorm Dark Blue Ltd., Gorm Deep Blue Ltd., Gorm Sky Blue Ltd., Gorm Warm Red Ltd., Gorm Light Blue Ltd., Gorm Ocean Blue Ltd., and Gorm Engine Management Ltd.  The Debtors' mailing address is AVD kod: STOUU-T, SE-195 87 Stockholm, Sweden.

## DISCLAIMER

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") IS INCLUDED HEREIN FOR THE PURPOSES OF SOLICITING ACCEPTANCES OF THE SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF SAS AB AND ITS SUBSIDIARY DEBTORS, DATED ~~JANUARY 23~~FEBRUARY 4, 2024 (AS MAY BE AMENDED, MODIFIED, OR SUPPLEMENTED FROM TIME TO TIME, THE "PLAN"),[2] AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.  A COPY OF THE PLAN IS ANNEXED HERETO AS EXHIBIT A.  NO SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN MAY BE MADE EXCEPT PURSUANT TO SECTION 1125 OF CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE (THE "BANKRUPTCY CODE").

ALL HOLDERS OF CLAIMS AND INTERESTS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY.  IN PARTICULAR, ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CAREFULLY READ AND CONSIDER FULLY THE RISK FACTORS SET FORTH IN SECTION VI (CERTAIN RISK FACTORS TO BE CONSIDERED) OF THIS DISCLOSURE STATEMENT.  THE PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN.  IN THE EVENT OF ANY CONFLICT BETWEEN THE DESCRIPTIONS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN SHALL GOVERN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (THE "BANKRUPTCY RULES") AND NOT NECESSARILY IN ACCORDANCE WITH NON-BANKRUPTCY LAW.

HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE AND SHOULD CONSULT WITH THEIR OWN ADVISORS BEFORE VOTING ON THE PLAN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY SECURITIES IN ANY STATE OR JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS UNLAWFUL.

---

[2] Unless otherwise expressly set forth herein, capitalized terms used but not otherwise defined herein shall have the same meanings ascribed to such terms in the Plan.

THE ISSUANCE OF AND DISTRIBUTION UNDER THE PLAN OF THE NEW SHARES (OTHER THAN THOSE ISSUED FOR CASH UNDER THE INVESTMENT AGREEMENT) (THE "1145 SECURITIES") WILL BE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") AND ALL RULES AND REGULATIONS PROMULGATED THEREUNDER AND ANY OTHER APPLICABLE U.S. SECURITIES LAWS REQUIRING REGISTRATION FOR THE OFFER, ISSUANCE, OR DISTRIBUTION OF SECURITIES, IN EACH CASE, TO THE FULLEST EXTENT PERMITTED UNDER SECTION 1145 OF THE BANKRUPTCY CODE. SUCH SECURITIES MAY BE RESOLD WITHOUT REGISTRATION UNDER THE SECURITIES ACT OR OTHER U.S. FEDERAL SECURITIES LAWS PURSUANT TO THE EXEMPTION PROVIDED BY SECTION 4(a)(1) OF THE SECURITIES ACT, UNLESS THE HOLDER IS AN "UNDERWRITER" WITH RESPECT TO SUCH SECURITIES, AS THAT TERM IS DEFINED IN SECTION 1145(b) OF THE BANKRUPTCY CODE. IN ADDITION, SUCH SECURITIES GENERALLY MAY BE RESOLD WITHOUT REGISTRATION UNDER STATE SECURITIES LAWS PURSUANT TO VARIOUS EXEMPTIONS PROVIDED BY THE RESPECTIVE LAWS OF THE SEVERAL STATES.

THE ISSUANCE AND DISTRIBUTION OF THE NEW SHARES AND CONVERTIBLE NOTES PURSUANT TO THE INVESTMENT AGREEMENT (OTHER THAN THE 1145 SECURITIES) (THE "4(a)(2) SECURITIES") WILL BE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT PURSUANT TO SECTION 4(a)(2). THE ISSUANCE OF SUCH SECURITIES WILL BE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND CONSIDERED "RESTRICTED SECURITIES" (WITHIN THE MEANING OF RULE 144 UNDER THE SECURITIES ACT) AND MAY NOT BE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR UNDER AN AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT.

THE AVAILABILITY OF THE EXEMPTION UNDER SECTION 1145 OF THE BANKRUPTCY CODE OR ANY OTHER APPLICABLE SECURITIES LAWS WILL NOT BE A CONDITION TO THE OCCURRENCE OF THE EFFECTIVE DATE.

THE ISSUANCE OF THE SECURITIES AND THE GUC ~~TRUST~~ INTERESTS PURSUANT TO THE PLAN HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR BY ANY STATE SECURITIES COMMISSION OR SIMILAR PUBLIC, GOVERNMENTAL, OR REGULATORY AUTHORITY, AND NEITHER THE SEC NOR ANY SUCH AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING STATEMENTS INCORPORATED BY REFERENCE,

PROJECTED FINANCIAL INFORMATION, PROJECTED CREDITOR RECOVERIES, AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS AND ARE NECESSARILY SPECULATIVE. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. FORWARD-LOOKING STATEMENTS PROVIDED IN THIS DISCLOSURE STATEMENT SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN.

FURTHER, READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS HEREIN ARE BASED ON ASSUMPTIONS THAT ARE BELIEVED TO BE REASONABLE, BUT ARE SUBJECT TO A WIDE RANGE OF RISKS IDENTIFIED IN THIS DISCLOSURE STATEMENT. DUE TO THESE UNCERTAINTIES, READERS CANNOT BE ASSURED THAT ANY FORWARD-LOOKING STATEMENTS WILL PROVE TO BE CORRECT. THE DEBTORS ARE UNDER NO OBLIGATION TO (AND EXPRESSLY DISCLAIM ANY OBLIGATION TO) UPDATE OR ALTER ANY FORWARD-LOOKING STATEMENTS, INCLUDING ANY FINANCIAL PROJECTIONS CONTAINED HEREIN, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE HEREOF, OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE BANKRUPTCY COURT.

NO INDEPENDENT AUDITOR OR INDEPENDENT ACCOUNTANT HAS REVIEWED OR APPROVED THE LIQUIDATION ANALYSIS OR FINANCIAL INFORMATION PROVIDED OR REFERENCED HEREIN. THE DEBTORS HAVE NOT AUTHORIZED ANY PERSON TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, IN CONNECTION WITH THE PLAN OR THIS DISCLOSURE STATEMENT.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED.

THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN OR OBJECTING TO CONFIRMATION. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PARTY FOR ANY OTHER PURPOSE.

THE PLAN PROVIDES THAT CERTAIN ENTITIES AND PERSONS WILL BE DEEMED TO HAVE GRANTED THE RELEASES CONTAINED IN ARTICLE X THEREOF. FOR MORE INFORMATION ABOUT SUCH RELEASES, PLEASE REFER TO SECTION V.H OF THIS DISCLOSURE STATEMENT.

ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

# TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................. 1

    A.    Overview of Proposed Restructuring ...................................................... 1

    B.    Creditors' Committee Recommendation ................................................ 4

    ~~B~~C.    Summary Classification and Estimated Recoveries of Claims and Interests ... ~~3~~5

    ~~C~~D.    Inquiries ............................................................................................ ~~22~~21

II. DEBTORS' OPERATIONS, CORPORATE, AND CAPITAL STRUCTURE ....... 22

    A.    Debtors' History and Operations ........................................................ 22

    B.    Organizational Structure ..................................................................... ~~27~~26

    C.    Directors and Senior Management ...................................................... ~~28~~27

    D.    Capital Structure ................................................................................ ~~29~~28

III. EVENTS LEADING TO COMMENCEMENT OF CHAPTER 11 CASES ....... ~~34~~33

    A.    State Aid Overview ............................................................................ ~~35~~34

    B.    2020 Recapitalization ........................................................................ ~~35~~34

    C.    SAS FORWARD ............................................................................... ~~37~~36

    D.    Political Mandates ............................................................................. ~~38~~37

    E.    Pilot Unions' Strike ........................................................................... ~~38~~37

    F.    Ryanair Litigation ............................................................................. ~~39~~38

IV. OVERVIEW OF CHAPTER 11 CASES ........................................................ ~~41~~39

    A.    First Day Motions ............................................................................. ~~41~~39

    B.    Procedural Motions ........................................................................... ~~42~~40

    C.    Retention of Professionals ................................................................. ~~42~~41

    D.    Appointment of Creditors' Committee ............................................... ~~42~~41

    E.    Payment of Eligible Employees Under AIS Program ........................... ~~43~~41

    F.    Pilot Unions Agreement ..................................................................... ~~43~~42

    G.    DIP Financing ................................................................................... ~~44~~43

    H.    Commercial Hybrid Forbearance Agreement ...................................... ~~46~~45

    I.    Vendor Contract Negotiations ............................................................ ~~46~~45

    J.    Unexpired Leases of Non-Residential Real Property ........................... ~~47~~45

    K.    Fleet Restructuring ............................................................................ ~~47~~46

    L.    Swedish Tax Respite Program ........................................................... ~~51~~50

| | | |
|---|---|---:|
| M. | Claims | ~~51~~50 |
| N. | Exclusivity | ~~52~~51 |
| O. | Equity Solicitation Procedures and Selection of Investors | ~~53~~52 |

**V. SUMMARY OF THE PLAN** ............................................................................ ~~57~~56

| | | |
|---|---|---:|
| ~~A.~~ | ~~Administrative Expense and Priority Claims~~ | ~~57~~ |
| ~~B~~A. | Classification of Claims and Interests | ~~59~~56 |
| ~~C~~B. | Treatment of Claims and Interests | ~~66~~57 |
| ~~D~~C. | Means for Implementation | ~~66~~57 |
| ~~E~~D. | Distributions | ~~77~~70 |
| ~~F~~E. | Procedures for Disputed Claims | ~~82~~75 |
| ~~G~~F. | Executory Contracts and Unexpired Leases | ~~84~~77 |
| ~~H~~G. | Conditions Precedent to the Effective Date | ~~88~~81 |
| ~~I~~H. | Effect of Confirmation | ~~91~~84 |
| ~~J~~I. | Retention of Jurisdiction | ~~98~~91 |
| ~~K~~J. | Miscellaneous Provisions | ~~101~~94 |

**VI. CERTAIN RISK FACTORS TO BE CONSIDERED** ............................... ~~107~~97

| | | |
|---|---|---:|
| A. | Certain Bankruptcy Law Considerations | ~~108~~97 |
| B. | Risks Relating to Transaction and Investment Agreement | ~~110~~99 |
| C. | Risks Relating to Debtors' Businesses and Financial Condition | ~~111~~101 |
| D. | Risks Related to Ownership of New Shares | ~~119~~109 |
| E. | Additional Considerations | ~~121~~111 |

**VII. TRANSFER RESTRICTIONS AND CONSEQUENCES UNDER FEDERAL SECURITIES LAWS** ............................................................................. ~~125~~116

| | | |
|---|---|---:|
| A. | 1145 Securities | ~~125~~116 |
| B. | Section 4(a)(2) Securities | ~~126~~117 |
| C. | GUC Interests | 118 |

**VIII. CERTAIN U.S. FEDERAL TAX CONSEQUENCES OF PLAN** ............. ~~128~~118

| | | |
|---|---|---:|
| A. | General | ~~128~~118 |
| B. | Certain U.S. Federal Income Tax Consequences to the Debtors | 12~~9~~0 |
| C. | Certain U.S. Federal Income Tax Consequences to U.S. Holders of DIP Claims and Other Relevant Claims | 12~~9~~0 |
| D. | Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Relevant Claims, New Shares and New Convertible Notes | ~~144~~133 |

E.     Information Reporting and Backup Withholding .......................... ~~145~~134

**IX. CERTAIN IRISH TAX CONSEQUENCES OF PLAN** .......................... ~~146~~**135**

A.     Introduction .......................................................................... ~~146~~135

B.     Certain Irish Tax Consequences for Debtors .......................... ~~147~~136

C.     Certain Irish Tax Consequences for Holders of Claims .......... ~~148~~137

**X. CERTAIN SWEDISH TAX CONSEQUENCES OF PLAN** .......................... ~~156~~**143**

A.     Introduction .......................................................................... ~~156~~143

B.     Swedish Debtors .................................................................... ~~156~~144

C.     Holders of Claims .................................................................. ~~159~~146

~~D.~~     ~~Swedish Resident Holders of GUC Trust Interests~~ .................... ~~161~~

~~E~~D.     Holders of Existing Equity Interests and New Shares .............. ~~162~~148

~~F~~E.     Stamp ~~d~~Duty, ~~t~~Transfer ~~t~~Taxes ................................................ ~~165~~151

**XI. VOTING PROCEDURES AND REQUIREMENTS** .......................... ~~165~~**151**

A.     Voting Instructions and Voting Deadline .............................. ~~165~~152

B.     Parties Entitled to Vote ........................................................ ~~166~~153

C.     Change of Vote ...................................................................... ~~167~~154

D.     Waivers of Defects, Irregularities, etc. .................................. ~~168~~154

E.     Requirement to File a Proof of Claim .................................... ~~168~~154

F.     Miscellaneous ........................................................................ ~~168~~154

G.     Trade Claims Exhibit ............................................................ ~~169~~155

**XII. CONFIRMATION OF THE PLAN** .......................................................... ~~169~~**155**

A.     Confirmation Hearing ............................................................ ~~169~~155

B.     Objections to Confirmation .................................................... ~~169~~156

C.     Requirements for Confirmation of the Plan. .......................... ~~170~~156

**XIII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN** .......................................................................................... ~~174~~**160**

A.     Liquidation under Chapter 7 .................................................. ~~174~~160

B.     Alternative Chapter 11 Plans ................................................ ~~175~~161

C.     Sale under Section 363 of the Bankruptcy Code .................... ~~175~~161

D.     Dismissal and Local Liquidation or Dissolution .................... ~~175~~161

**XIV. CONCLUSION AND RECOMMENDATION** .......................................... ~~176~~**162**

## EXHIBITS

**EXHIBIT A**      Plan
**EXHIBIT B**      Organizational Structure
**EXHIBIT C**      Liquidation Analysis
**EXHIBIT D**      Financial Projections
**EXHIBIT E**      Initial List of Trade Claims

# I.
## INTRODUCTION

On July 5, 2022 (the "**Commencement Date**"), SAS AB and its debtor subsidiaries (each, a "**Debtor**" and collectively, the "**Debtors**" and, together with their non-Debtor affiliates, "**SAS**") commenced voluntary cases in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") pursuant to chapter 11 of the Bankruptcy Code (the "**Chapter 11 Cases**"). The Debtors' Chapter 11 Cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b) under the caption *In re SAS AB, et al.*, Case No. 22-10925 (MEW). On July 22, 2022, the Office of the United States Trustee for Region 2 (the "**U.S. Trustee**") appointed the Official Committee of Unsecured Creditors (the "**Creditors' Committee**").

The primary purpose of this Disclosure Statement is to provide holders of Claims entitled to vote on the Plan with adequate information to make an informed decision on whether to vote to accept or reject the Plan. The Disclosure Statement includes summaries of the Plan, certain documents related to the Plan, relevant statutory provisions, and events in the Chapter 11 Cases.[3]

### A.     Overview of Proposed Restructuring

As described in further detail below, the Debtors commenced the Chapter 11 Cases to pursue and implement a comprehensive financial restructuring to deleverage the Debtors' balance sheet to ensure the Debtors' long-term viability. Following the completion of the Debtors' equity solicitation process in these Chapter 11 Cases, the Debtors selected a group of bidders comprised of Castlelake, L.P., on behalf of certain of its funds or affiliates ("**Castlelake**"), Air France-KLM S.A. ("**AFKLM**"), and Lind Invest ApS ("**Lind Invest**" and, collectively with Castlelake and AFKLM, the "**Bidder Consortium**"), together with the Kingdom of Denmark (in its capacity as a new investor, the "**Danish State Investor**" and, together with the Bidder Consortium, the "**Investors**"), as the winning bidders with respect to a transaction involving an investment in, and issuance of new equity interests and secured convertible debt by, reorganized SAS AB ("**Reorganized SAS AB**" and, such transaction, the "**Transaction**"). The Transaction is memorialized in the Investment Agreement, the terms of which are incorporated into the Plan by reference as if fully set forth therein. As a result, the Plan provides for a comprehensive restructuring of the Debtors' balance sheet and a significant investment of new capital from the Investors, which will provide the Debtors with liquidity to support operations as a going concern.

More specifically, the Plan incorporates the Transaction and provides for (among other things):

---

[3] Unless otherwise specified herein, all figures which are converted from USD to SEK herein, or vice versa, are calculated at the foreign exchange rate as of December 18, 2023 being USD/SEK: 10.2079.

- a total investment in Reorganized SAS AB of $1.2 billion, comprised of $475 million in new unlisted equity and $725 million in secured convertible debt;

- the allocation of up to $325 million to fund distributions to general unsecured creditors through a combination of $250 million in cash and the remaining approximately 13.6% of new unlisted equity in Reorganized SAS AB in an amount equal to approximately $75 million, subject to the terms of the Investment Agreement and the Plan, subject to cash to be funded to the GUC ~~Trust~~Entities as set forth in the Plan;

  - for illustrative purposes only, based on the prevailing foreign exchange rate on February 2, 2024 of 10.3538 SEK per USD, the initial distributable value taking into account the Available Cash and the New Shares Distribution Pool available for holders of Allowed General Unsecured Claims will be approximately (i) $61,840,000 at SAS AB, (ii) $42,970,000 at the Consolidated Debtors, (iii) $4,000,000 at the Gorm Entities, and (iv) $10,000 at SANA.[4] These allocations were determined between the Debtors, the Creditors' Committee and the Non-State Investors based on an assessment of the assets and liabilities of each Debtor. The GUC Interests to be distributed to the holders of Allowed General Unsecured Claims against SAS AB, the Consolidated Debtors, and the Gorm Entities will be in the same proportion;

- the allocation of certain percentages of the Available Cash and the New Shares Distribution Pool among SAS AB, the Consolidated Debtors, the Gorm Entities, and SANA;

- the post-confirmation implementation of the Plan, with respect to SAS AB, in Sweden through a Swedish company reorganization (Sw. företagsrekonstruktion) (the "**Swedish Reorganization**" and, such plan, the "**Swedish Reorganization Plan**") pursuant to the Swedish Company Reorganization Act (Sw. lag (2022:964) om företagsrekonstruktion) (the "**Swedish Reorganization Act**"), likely to be filed by SAS AB in 2024;

- the establishment of the GUC ~~Trust~~Entities (to be funded with (i) a portion of the ~~Reserved Funds~~ $250 million in cash from the Investors' subscription of New Shares and New Convertible Notes and (ii) the Escrow Contribution Fees), which will be used by the Reorganized

---

[4] Following distributions under the Plan on account of the Intercompany Claim held by SAS AB against the Consolidated Debtors, SAS AB will have value to distribute to holders of Allowed General Unsecured Claims equal to approximately $86,070,000 and the Consolidated Debtors will have value to distribute to holders of Allowed General Unsecured Claims (excluding the Intercompany Claim held by SAS AB) equal to approximately $18,740,000.

Debtors to (i) (a) defend themselves against any State non-tax claims attributable to the period from 2020 to 2023 that may be raised against the Debtors in national courts (each such claim, a "**State Non-Tax Claim**") and (b) satisfy any costs or expenses that may arise or have arisen from a third party agreeing to pay in full and without recourse to the Reorganized Debtors any State Non-Tax Claim, (ii) in the event of (a) a final decision and non-appealable decision from a competent court requiring any one or more of the Reorganized Debtors to pay ~~or (b) a State under applicable Law being required to~~ *ex officio* ~~demand payment of~~ any State Non-Tax Claim, ~~pay that~~or (b) a determination by the Reorganized Debtors to settle all or a portion of any State Non-Tax Claim or settlement amount, as applicable, when due and payable, to the extent a third party has not already paid, or irrevocably agreed to pay, such State Non-Tax Claim, and (iii) in the event that the funds in the GUC ~~Trust~~Entities exceed any amounts paid pursuant to the preceding clauses (i) and (ii), make distributions to holders of GUC ~~Trust~~ Interests in accordance with the Plan and the Swedish Reorganization Plan;

    o the GUC Interests will be distributed to the holders of Allowed General Unsecured Claims and provide for a right to receive distributions of GUC Cash held by any GUC Entity, in each case, as set forth in the Plan and the GUC Documents;

    o the form of GUC Interests issued by, or evidencing a right or interest in, any GUC Entity will be further detailed in the Plan Supplement;

    o (a) absent any limitation or other restriction arising under applicable law, including applicable securities laws (or unless otherwise agreed among the Debtors, the Required Investors and the Creditor's Committee) or (b) other than GUC Interests to which any Disqualified Person or "ineligible person" (as will be defined in the Plan Supplement), such GUC Interests are expected to be transferable, subject to customary resale restrictions for privately placed securities;

• the allocation of GUC Interests to the holders of Allowed General Unsecured Claims, representing contingent interests to receive distributions from the GUC Cash used to fund the GUC Entities;

    o the GUC Cash will be invested subject to investment guidelines mutually acceptable to the Debtors, the Investors, and the Creditors' Committee and by an investment manager mutually acceptable to those parties;

- o net earnings on the GUC Cash will be distributed annually to holders of GUC Interests in accordance with the Plan and the GUC Documents;

- the cancellation of Debtor SAS AB's existing common shares and other securities;

- a reduction in the Debtors' prepetition debt by approximately $2 billion; and

- approximately $1.1 billion of unrestricted cash on the Reorganized Debtors' go forward balance sheet.

The below chart shows a summary of the expected holdings of (i) New Shares post-emergence from the Chapter 11 Cases but prior to any conversion of the New Convertible Notes and (ii) the New Convertible Notes, in each case upon the consummation of the Transaction.

| Post-Emergence Holdings – New Shares & New Convertible Notes | | |
|---|---|---|
| *Holder* | *New Shares (approx.)* | *New Convertible Notes* |
| Castlelake | 32.0% | 55.2% |
| Danish State Investor | 25.8% | 30% |
| AFKLM | 19.9% | 4.8% |
| Lind Invest | 8.6% | 10% |
| New Shares Distribution Pool | 13.6% | N/A |

In developing the Plan, together with the Investors, the Creditors' Committee, and certain of their other key constituents, and in view of the Equity Solicitation Process described in Section IV.O of the Disclosure Statement, the Debtors conducted a careful review of their existing business operations and compared their projected value as an ongoing business enterprise with their projected value in a liquidation scenario, as well as the estimated recoveries to holders of Allowed Claims in each of these scenarios. The Debtors concluded that the recoveries to holders of Allowed Claims would be maximized by the Debtors' continued operation as a going concern through implementation of the Plan and the Transaction. The Debtors' business and assets have significant value that would not be realized in a liquidation. **Accordingly, it is the Debtors' opinion that confirmation and implementation of the Plan is in the best interests of the Debtors' estates and all parties in interest. Therefore, the Debtors recommend that, to the extent they are entitled to vote, creditors vote to accept the Plan.**

B.     Creditors' Committee Recommendation

**The Creditors' Committee supports the Plan and believes that the Plan is in the best interests of the Debtors' estates and holders of General Unsecured Claims as a whole under the circumstances of the Debtors' chapter 11 cases. Among its many benefits, the Plan allocates up to $325 million to fund distributions to holders of Allowed**

**General Unsecured Claims through a combination of $250 million in cash and the remaining approximately 13.6% of new unlisted equity in Reorganized SAS AB in an amount equal to approximately $75 million. Accordingly, the Creditors' Committee strongly urges holders of General Unsecured Claims to vote to accept the Plan.**

        C.        B. Summary Classification and Estimated Recoveries of Claims and Interests

        The following table summarizes (i) the treatment of Claims and Interests under the Plan, (ii) the Classes that are impaired by the Plan, (iii) the Classes that are entitled to vote on the Plan, and (iv) the estimated recoveries for holders of Allowed Claims and Interests.[5] Although every reasonable effort was made to be accurate, the projections of recoveries are only estimates. The estimated recoveries for each Class of General Unsecured Claims at each of the Debtors are based on estimated claim pools of approximately (i) $1,023,000,000 at SAS AB, (ii) $1,879,000,000 at the Consolidated Debtors (including the $1,059,000,000 net Intercompany Claim held by SAS AB against the Consolidated Debtors), (iii) $440,000,000 at the Gorm Entities and (iv) $1,000,000 at SANA. The final amounts of Claims allowed by the Bankruptcy Court may vary from the estimates contained in this Disclosure Statement. As a result of the foregoing and other uncertainties inherent in the estimates, the estimated recoveries in this Disclosure Statement may vary from the actual recoveries realized. In addition, the ability of holders to receive distributions under the Plan depends upon, among other things, the ability of the Debtors to (i) obtain confirmation of the Plan and (ii) meet the conditions to confirmation and effectiveness of the Plan. The table is qualified in its entirety by reference to the full text of the Plan. For a more detailed summary of the terms and provisions of the Plan, see Section V – Summary of Plan below.

        1.     *Claims Against and Interests in SAS AB*[6]

---

[5] The estimated recoveries for holders of certain Allowed General Unsecured Claims are subject to the Closing FX Rate, which was assumed to be the prevailing foreign exchange rate on February 2, 2024 of 10.3538 SEK per USD for purposes of the below chart.

[6] The estimated recoveries for holders for Allowed General Unsecured Claims against SAS AB include the value SAS AB will receive on account of the distribution it will receive on the Intercompany Claim it holds against the Consolidated Debtors.

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Estimated Recoveries[7] |
|---|---|---|---|
| **Class 1:** Other Secured Claims | Except to the extent that a holder of an Allowed Other Secured Claim against SAS AB agrees to a less favorable treatment, in full and final satisfaction of such Claim, each holder of an Allowed Other Secured Claim against SAS AB shall receive, at the option of the Debtors or the Reorganized Debtors: (i) payment in full in Cash on or as soon as practicable after the later of the Effective Date and the date that is ten Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim; (ii) reinstatement of its Allowed Other Secured Claim; or (iii) other treatment so as to render such holder's Allowed Other Secured Claim Unimpaired. | Unimpaired **(Not entitled to vote** – presumed to accept) | 100% |
| **Class 2:** Other Priority Claims | Except to the extent that a holder of an Allowed Other Priority Claim against SAS AB agrees to a less favorable treatment, in full and final satisfaction of such Claim, each holder of an Allowed Other Priority Claim against SAS AB shall receive, at the option of the Debtors or the Reorganized Debtors, either: (i) payment in full in Cash on or as soon as practicable after the later of the Effective Date and the date that is ten Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim; or (ii) other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. | Unimpaired **(Not entitled to vote** – presumed to accept) | 100% |
| **Class 3:** Aircraft Lease Claims and Trade Claims | As soon as reasonably practicable after the later of the Effective Date and the date on which an Aircraft Lease Claim or Trade Claim against SAS AB becomes, as applicable, an Allowed Aircraft Lease Claim or Allowed Trade Claim against SAS AB, each holder of such Allowed Aircraft Lease Claim or Allowed Trade Claim, as the case may be, shall receive, in full and final satisfaction of such Claim, such holder's Pro Rata share of each of the SAS AB New Shares Distribution Pool, the SAS AB GUC ~~Trust~~ Interests, and any Residual SAS AB Available Cash. | Impaired **(Entitled to vote)** | Effective Date: 6.9% - 9.4% Max: [●]25% |
| **Class 4:** Norwegian Term Loan Claims | On the Effective Date or as soon as reasonably practicable thereafter, each holder of an Allowed Norwegian Term Loan Claim against SAS AB shall receive, in full and final satisfaction of such Claim, such holder's Pro Rata share of each of the SAS AB New Shares Distribution Pool, the SAS AB GUC ~~Trust~~ Interests, and any Residual SAS AB Available Cash. | Impaired **(Entitled to vote)** | Effective Date: 6.9% - 9.4% Max: [●]25% |

[7] The estimated recoveries reflect both the estimated value that will be distributed on the Effective Date as well as the maximum estimated value that will be distributed if all GUC Cash from the GUC Entities is released to holders of GUC Interests.

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Estimated Recoveries[7] |
|---|---|---|---|
| **Class 5:** Commercial Hybrid Bond Claims, Other General Unsecured Claims, and Intercompany Claims | As soon as reasonably practicable after the later of the Effective Date and the date on which a Commercial Hybrid Bond Claim, Other General Unsecured Claim, or Intercompany Claim against SAS AB becomes, as applicable, an Allowed Commercial Hybrid Bond Claim (to the extent allowed as a debt claim under Swedish Law), Allowed Other General Unsecured Claim, or Allowed Intercompany Claim against SAS AB, each holder of such Allowed Commercial Hybrid Bond Claim, Allowed Other General Unsecured Claim, or Allowed Intercompany Claim, as the case may be, shall receive, in full and final satisfaction of such Claim, such holder's Pro Rata share of each of the Remaining SAS AB Available Cash and the SAS AB GUC ~~Trust~~ Interests. | Impaired **(Entitled to vote)** | Effective Date: 6.9% - 9.4% Max: [●]25% |
| **Class 8:** Swiss Bond Claims | On the Effective Date, all Swiss Bond Claims shall be discharged, cancelled, released, and extinguished, and the holders of such Claims will not receive any distribution on account of such Claims. | Impaired **(Not entitled to vote** – deemed to reject) | 0% |
| **Class 10:** State Hybrid Bond Claims and Danish State Hybrid Bond Claims | On the Effective Date, all State Hybrid Bond Claims and Danish State Hybrid Bond Claims shall be discharged, cancelled, released, and extinguished, and the holders of such Claims will not receive any distribution on account of such Claims. | Impaired **(Not entitled to vote** – deemed to reject) | 0% |
| **Class 11:** Existing Equity Interests | All Existing Equity Interests shall be discharged, cancelled, released, and extinguished on the Effective Date (to be registered with the Swedish Companies Registration Office as soon as reasonably practicable thereafter), and the holders of such Interests shall not receive any distribution on account of such Interests. | Impaired **(Not entitled to vote** – deemed to reject) | 0% |

2.      *Claims Against and Interests in the Consolidated Debtors*

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Estimated Recoveries |
|---|---|---|---|
| **Class 1:** Other Secured Claims | Except to the extent that a holder of an Allowed Other Secured Claim against the Consolidated Debtors agrees to a less favorable treatment, in full and final satisfaction of such Claim, each holder of an Allowed Other Secured Claim against the Consolidated Debtors shall receive, at the option of the Debtors or the Reorganized Debtors: (i) | Unimpaired **(Not entitled to vote** – presumed to accept) | 100% |

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Estimated Recoveries |
|---|---|---|---|
| | payment in full in Cash on or as soon as practicable after the later of the Effective Date and the date that is ten Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim; (ii) reinstatement of its Allowed Other Secured Claim; or (iii) other treatment so as to render such holder's Allowed Other Secured Claim Unimpaired. | | |
| **Class 2:** Other Priority Claims | Except to the extent that a holder of an Allowed Other Priority Claim against the Consolidated Debtors agrees to a less favorable treatment, in full and final satisfaction of such Claim, each holder of an Allowed Other Priority Claim against the Consolidated Debtors shall receive, at the option of the Debtors or the Reorganized Debtors, either: (i) payment in full in Cash on or as soon as practicable after the later of the Effective Date and the date that is ten Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim; or (ii) other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. | Unimpaired **(Not entitled to vote** – presumed to accept) | 100% |
| **Class 3:** Aircraft Lease Claims, Trade Claims, and Union Claims | As soon as reasonably practicable after the later of the Effective Date and the date on which an Aircraft Lease Claim, Trade Claim, or Union Claim becomes, as applicable, an Allowed Aircraft Lease Claim, Allowed Trade Claim, or Allowed Union Claim against the Consolidated Debtors, each holder of such Allowed Aircraft Lease Claim, Allowed Trade Claim, or Allowed Union Claim against the Consolidated Debtors, as the case may be, shall receive, in full and final satisfaction of each of such Claim, such holder's Pro Rata share of each of the Consolidated Debtors New Shares Distribution Pool, and the Consolidated Debtors GUC ~~Trust~~ Interests~~, and any Residual Consolidated Debtors Available Cash~~; *provided, however*, that the distribution on account of the Allowed Pilot Union Claim will be capped at SEK 100,000,000 with any ~~amount~~recovery that would have been distributed on account thereof (but for this proviso) being added to the Consolidated Debtors ~~Available Cash~~New Shares Distribution Pool and the Consolidated Debtors GUC Interests for distribution in accordance with the terms of this Plan. | Impaired **(Entitled to vote)** | Effective Date: 1.7% - 2.7% Max: [●]7.7% |
| **Class 4:** Danish Term Loan Claims, Trade Claims, Swedish Term Loan Claims, and Norwegian Term Loan Claims | On the Effective Date or as soon as reasonably practicable thereafter, each holder of an Allowed Swedish Term Loan Claim, Allowed Danish Term Loan Claim, or Allowed Norwegian Term Loan Claim against the Consolidated Debtors, as the case may be, shall receive, in full and final satisfaction of such Claim, such holder's Pro Rata share of each of the Consolidated Debtors New Shares Distribution Pool, and the Consolidated Debtors GUC ~~Trust~~ Interests, | Impaired **(Entitled to vote)** | Effective Date: 1.7% - 2.7% Max: [●]7.7% |

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Estimated Recoveries |
|---|---|---|---|
| | ~~and any Residual Consolidated Debtors Available Cash~~. | | |
| **Class 5:** Other General Unsecured Claims | As soon as reasonably practicable after the later of the Effective Date and the date on which an Other General Unsecured Claim against the Consolidated Debtors becomes an Allowed Other General Unsecured Claim against the Consolidated Debtors, each holder of such Allowed Other General Unsecured Claim shall receive, in full and final satisfaction of such Claim, subject to a proportionate distribution on account of the Intercompany Claim against the Consolidated Debtors held by SAS AB pursuant to Section 4.2(g)(i) of the Plan, such holder's Pro Rata share of each of the ~~Remaining~~ Consolidated Debtors Available Cash, the Consolidated Debtors New Shares Distribution Pool, and the Consolidated Debtors GUC ~~Trust~~ Interests. | Impaired **(Entitled to vote)** | Effective Date: 1.7% - 2.7% Max: [●]7.7% |
| **Class 6:** Convenience Class Claims | As soon as reasonably practicable after the later of the Effective Date and the date on which an Other General Unsecured Claim against the Consolidated Debtors becomes an Allowed Other General Unsecured Claim against the Consolidated Debtors, each holder of an Allowed Convenience Class Claim shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to [●]10% of such Allowed Convenience Class Claim to be funded from the Convenience Class Funding Amount. | Impaired **(Entitled to vote)** | [●]10% |
| **Class 7:** Intercompany Claims | Intercompany Claims shall be paid, adjusted, continued, settled, reinstated, discharged, or eliminated in a manner to obtain the most efficient structure for the Debtors at the election of the Debtors or the Reorganized Debtors, with such election to be reasonably acceptable to the Required Investors and made in consultation with the Creditors' Committee; *provided, however,* that any payment, adjustment, continuation, settlement, or reinstatement on account of an Intercompany Claim shall not reduce the amount of the Consolidated Debtors Available Cash, Consolidated Debtors GUC ~~Trust~~ Interests, or Consolidated Debtors New Shares Distribution Pool available to holders of Allowed Claims against the Consolidated Debtors as set forth in the Plan, other than as a result of making a Pro Rata distribution on account of an Intercompany Claim; *provided, further,* that the Intercompany Claim against the Consolidated Debtors held by SAS AB shall receive a distribution from the Consolidated Debtors Available Cash, the Consolidated Debtors GUC ~~Trust~~ Interests, and the Consolidated Debtors New Shares Distribution Pool in amounts such that the Intercompany Claim receives a recovery proportionate to Other General Unsecured Claims against | Unimpaired / Impaired **(Not Entitled to vote** – presumed to accept / deemed to reject) | N/A |

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Estimated Recoveries |
|---|---|---|---|
| | the Consolidated Debtors solely for purposes of distributions under the Plan. | | |
| **Class 8:** Swiss Bond Claims | On the Effective Date, all Swiss Bond Claims shall be discharged, cancelled, released, and extinguished, and the holders of such Claims will not receive any distribution on account of such Claims. | Impaired **(Not entitled to vote** – deemed to reject) | 0% |
| **Class 9:** Intercompany Interests | Intercompany Interests in the Consolidated Debtors shall be reinstated. | Unimpaired **(Not Entitled to vote** – presumed to accept) | N/A |

3.      *Claims Against and Interests in Gorm Dark Blue Limited*

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Estimated Recoveries |
|---|---|---|---|
| **Class 1:** Other Secured Claims | Except to the extent that a holder of an Allowed Other Secured Claim against Gorm Dark Blue Limited agrees to a less favorable treatment, in full and final satisfaction of such Claim, each holder of an Allowed Other Secured Claim against Gorm Dark Blue Limited shall receive, at the option of the Debtors or the Reorganized Debtors: (i) payment in full in Cash on or as soon as practicable after the later of the Effective Date and the date that is ten Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim; (ii) reinstatement of its Allowed Other Secured Claim; or (iii) other treatment so as to render such holder's Allowed Other Secured Claim Unimpaired. | Unimpaired **(Not entitled to vote** – presumed to accept) | 100% |
| **Class 2:** Other Priority Claims | Except to the extent that a holder of an Allowed Other Priority Claim against Gorm Dark Blue Limited agrees to a less favorable treatment, in full and final satisfaction of such Claim, each holder of an Allowed Other Priority Claim against Gorm Dark Blue Limited shall receive, at the option of the Debtors or the Reorganized Debtors, either: (i) payment in full in Cash on or as soon as practicable after the later of the Effective Date and the date that is ten Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim; or (ii) other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. | Unimpaired **(Not entitled to vote** – presumed to accept) | 100% |
| **Class 3:** Aircraft Lease | As soon as reasonably practicable after the later of the Effective Date and the date on which an Aircraft Lease Claim against Gorm Dark Blue Limited becomes an | Impaired **(Entitled to vote)** | Effective Date: |

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Estimated Recoveries |
|---|---|---|---|
| Claims | Allowed Aircraft Lease Claim against Gorm Dark Blue Limited, each holder of such Allowed Aircraft Lease Claim shall receive, in full and final satisfaction of such Claim, such holder's Pro Rata share of each of the Gorm Dark Blue New Shares Distribution Pool and the Gorm Dark Blue GUC ~~Trust~~ Interests. | | <u>0.8% - 1.2%</u><br><br><u>Max:</u><br><br>~~[●]~~3.7% |
| **Class 5:**<br>Other General Unsecured Claims | As soon as reasonably practicable after the later of the Effective Date and the date that is ten Business Days after the date on which an Other General Unsecured Claim against Gorm Dark Blue Limited becomes an Allowed Other General Unsecured Claim against Gorm Dark Blue Limited, each holder of such Allowed Other General Unsecured Claim shall receive, in full and final satisfaction of such Claim, such holder's Pro Rata share of each of the Gorm Dark Blue New Shares Distribution Pool and the Gorm Dark Blue GUC ~~Trust~~ Interests. | Impaired<br><br>**(Entitled to vote)** | <u>Effective Date:</u><br><u>0.8% - 1.2%</u><br><br><u>Max:</u><br><br>~~[●]~~3.7% |
| **Class 7:**<br>Intercompany Claims | Intercompany Claims shall be paid, adjusted, continued, settled, reinstated, discharged, or eliminated in a manner to obtain the most efficient structure for the Debtors at the election of the Debtors or the Reorganized Debtors, with such election to be reasonably acceptable to the Required Investors and made in consultation with the Creditors' Committee; *provided, however*, that any payment, adjustment, continuation, settlement, or reinstatement on account of an Intercompany Claim will not reduce the amount of the Gorm Dark Blue New Shares Distribution Pool or Gorm Dark Blue GUC ~~Trust~~ Interests available to holders of Allowed Claims against Gorm Dark Blue Limited as set forth in the Plan. | Unimpaired / Impaired<br><br>**(Not Entitled to vote** – presumed to accept / deemed to reject) | N/A |
| **Class 9:**<br>Intercompany Interests | Intercompany Interests in Gorm Dark Blue Limited shall be reinstated. | Unimpaired<br><br>**(Not Entitled to vote** – presumed to accept) | N/A |

4.      *Claims Against and Interests in Gorm Deep Blue Limited*

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Estimated Recoveries |
|---|---|---|---|
| **Class 1:**<br>Other Secured Claims | Except to the extent that a holder of an Allowed Other Secured Claim against Gorm Deep Blue Limited agrees to a less favorable treatment, in full and final satisfaction of such Claim, each holder of an Allowed Other Secured Claim against Gorm Deep Blue Limited shall receive, at the option of the Debtors or the Reorganized Debtors: (i) | Unimpaired<br><br>**(Not entitled to vote** – presumed to accept) | 100% |

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Estimated Recoveries |
|---|---|---|---|
| | payment in full in Cash on or as soon as practicable after the later of the Effective Date and the date that is ten Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim; (ii) reinstatement of its Allowed Other Secured Claim; or (iii) other treatment so as to render such holder's Allowed Other Secured Claim Unimpaired. | | |
| **Class 2:** Other Priority Claims | Except to the extent that a holder of an Allowed Other Priority Claim against Gorm Deep Blue Limited agrees to a less favorable treatment, in full and final satisfaction of such Claim, each holder of an Allowed Other Priority Claim against Gorm Deep Blue Limited shall receive, at the option of the Debtors or the Reorganized Debtors, either: (i) payment in full in Cash on or as soon as practicable after the later of the Effective Date and the date that is ten Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim; or (ii) other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. | Unimpaired **(Not entitled to vote** – presumed to accept) | 100% |
| **Class 3:** Aircraft Lease Claims. | As soon as reasonably practicable after the later of the Effective Date and the date on which such Aircraft Lease Claim against Gorm Deep Blue Limited becomes an Allowed Aircraft Lease Claim against Gorm Deep Blue Limited, each holder of such Allowed Aircraft Lease Claim shall receive, in full and final satisfaction of such Claim, at the election of the holder of such Claim, such holder's Pro Rata share of each of the Gorm Deep Blue New Shares Distribution Pool and the Gorm Deep Blue GUC ~~Trust~~ Interests. | Impaired **(Entitled to vote)** | Effective Date: 0.8% - 1.2% Max: ~~[●]~~3.7% |
| **Class 5:** Other General Unsecured Claims | As soon as reasonably practicable after the later of the Effective Date and the date on which such Other General Unsecured Claim against Gorm Deep Blue Limited becomes an Allowed Other General Unsecured Claim against Gorm Deep Blue Limited, each holder of such Allowed Other General Unsecured Claim shall receive, in full and final satisfaction of such Claim, such holder's Pro Rata share of each of the Gorm Deep Blue New Shares Distribution Pool and the Gorm Deep Blue GUC ~~Trust~~ Interests. | Impaired **(Entitled to vote)** | Effective Date: 0.8% - 1.2% Max: ~~[●]~~3.7% |
| **Class 7:** Intercompany Claims | Intercompany Claims will be paid, adjusted, continued, settled, reinstated, discharged, or eliminated in a manner to obtain the most efficient structure for the Debtors at the election of the Debtors or the Reorganized Debtors, with such election to be reasonably acceptable to the Required Investors and made in consultation with the Creditors' Committee; *provided, however,* that any payment, adjustment, continuation, settlement, or reinstatement on | Unimpaired / Impaired **(Not Entitled to vote** – presumed to accept / deemed to reject) | N/A |

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Estimated Recoveries |
|---|---|---|---|
| | account of an Intercompany Claim will not reduce the amount of the Gorm Deep Blue New Shares Distribution Pool or Gorm Deep Blue GUC ~~Trust~~ Interests available to holders of Allowed Claims against Gorm Deep Blue Limited as set forth in the Plan. | | |
| **Class 9:** Intercompany Interests | Intercompany Interests in Gorm Deep Blue Limited shall be reinstated. | Unimpaired **(Not Entitled to vote** – presumed to accept) | N/A |

5. *Claims Against and Interests in Gorm Light Blue Limited*

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Estimated Recoveries |
|---|---|---|---|
| **Class 1:** Other Secured Claims | Except to the extent that a holder of an Allowed Other Secured Claim against Gorm Light Blue Limited agrees to a less favorable treatment, in full and final satisfaction of such Claim, each holder of an Allowed Other Secured Claim against Gorm Light Blue Limited shall receive, at the option of the Debtors or the Reorganized Debtors: (i) payment in full in Cash on or as soon as practicable after the later of the Effective Date and the date that is ten Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim; (ii) reinstatement of its Allowed Other Secured Claim; or (iii) other treatment so as to render such holder's Allowed Other Secured Claim Unimpaired. | Unimpaired **(Not entitled to vote** – presumed to accept) | 100% |
| **Class 2:** Other Priority Claims | Except to the extent that a holder of an Allowed Other Priority Claim against Gorm Light Blue Limited agrees to a less favorable treatment, in full and final satisfaction of such Claim, each holder of an Allowed Other Priority Claim against Gorm Light Blue Limited shall receive, at the option of the Debtors or the Reorganized Debtors, either: (i) payment in full in Cash on or as soon as practicable after the later of the Effective Date and the date that is ten Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim; or (ii) other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. | Unimpaired **(Not entitled to vote** – presumed to accept) | 100% |
| **Class 3:** Aircraft Lease Claims | As soon as reasonably practicable after the later of the Effective Date and the date on which an Aircraft Lease Claim against Gorm Light Blue Limited becomes an Allowed Aircraft Lease Claim against Gorm Light Blue Limited, each holder of such Allowed Aircraft Lease | Impaired **(Entitled to vote)** | Effective Date: 0.8% - 1.2% |

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Estimated Recoveries |
|---|---|---|---|
| | Claim shall receive, in full and final satisfaction of such Claim, at the election of the holder of such Claim, such holder's Pro Rata share of each of the of each of the Gorm Light Blue New Shares Distribution Pool and the Gorm Light Blue GUC ~~Trust~~ Interests. | | Max: <br> [~~●~~]3.7% |
| **Class 5:** <br> Other General Unsecured Claims | As soon as reasonably practicable after the later of the Effective Date and the date on which an Other General Unsecured Claim against Gorm Light Blue Limited becomes an Allowed Other General Unsecured Claim against Gorm Light Blue Limited, each holder of such Allowed Other General Unsecured Claim shall receive, in full and final satisfaction of such Claim, such holder's Pro Rata share of each of the Gorm Light Blue New Shares Distribution Pool and the Gorm Light Blue GUC ~~Trust~~ Interests. | Impaired <br> **(Entitled to vote)** | Effective Date: <br> 0.8% - 1.2% <br> Max: <br> [~~●~~]3.7% |
| **Class 7:** <br> Intercompany Claims | Intercompany Claims will be paid, adjusted, continued, settled, reinstated, discharged, or eliminated in a manner to obtain the most efficient structure for the Debtors at the election of the Debtors or the Reorganized Debtors, with such election to be reasonably acceptable to the Required Investors and made in consultation with the Creditors' Committee; *provided, however,* that any payment, adjustment, continuation, settlement, or reinstatement on account of an Intercompany Claim will not reduce the amount of the Gorm Light Blue New Shares Distribution Pool or Gorm Light Blue GUC ~~Trust~~ Interests available to holders of Allowed Claims against Gorm Light Blue Limited as set forth in the Plan. | Unimpaired / Impaired <br> **(Not Entitled to vote** – presumed to accept / deemed to reject) | N/A |
| **Class 9:** <br> Intercompany Interests | Intercompany Interests in Gorm Light Blue Limited shall be reinstated. | Unimpaired <br> **(Not Entitled to vote** – presumed to accept) | N/A |

6.     *Claims Against and Interests in Gorm Ocean Blue Limited*

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Estimated Recoveries |
|---|---|---|---|
| **Class 1:** <br> Other Secured Claims | Except to the extent that a holder of an Allowed Other Secured Claim against Gorm Ocean Blue Limited agrees to a less favorable treatment, in full and final satisfaction of such Claim, each holder of an Allowed Other Secured Claim against Gorm Ocean Blue Limited shall receive, at the option of the Debtors or the Reorganized Debtors: (i) payment in full in Cash on or as soon as practicable after | Unimpaired <br> **(Not entitled to vote** – presumed to accept) | 100% |

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Estimated Recoveries |
|---|---|---|---|
| | the later of the Effective Date and the date that is ten Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim; (ii) reinstatement of its Allowed Other Secured Claim; or (iii) other treatment so as to render such holder's Allowed Other Secured Claim Unimpaired. | | |
| **Class 2:** Other Priority Claims | Except to the extent that a holder of an Allowed Other Priority Claim against Gorm Ocean Blue Limited agrees to a less favorable treatment, in full and final satisfaction of such Claim, each holder of an Allowed Other Priority Claim against Gorm Ocean Blue Limited shall receive, at the option of the Debtors or the Reorganized Debtors, either: (i) payment in full in Cash on or as soon as practicable after the later of the Effective Date and the date that is ten Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim; or (ii) other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. | Unimpaired **(Not entitled to vote** – presumed to accept) | 100% |
| **Class 3:** Aircraft Lease Claims | As soon as reasonably practicable after the later of the Effective Date and the date on which an Aircraft Lease Claim against Gorm Ocean Blue Limited becomes an Allowed Aircraft Lease Claim against Gorm Ocean Blue Limited, each holder of such Allowed Aircraft Lease Claim shall receive, in full and final satisfaction of such Claim, such holder's Pro Rata share of each of the Gorm Ocean Blue New Shares Distribution Pool and the Gorm Ocean Blue GUC ~~Trust~~ Interests. | Impaired **(Entitled to vote)** | Effective Date: 0.8% - 1.2% Max: [●]3.7% |
| **Class 5:** Other General Unsecured Claims. | As soon as reasonably practicable after the later of the Effective Date and the date on which an Other General Unsecured Claim against Gorm Ocean Blue Limited becomes an Allowed Other General Unsecured Claim against Gorm Ocean Blue Limited, each holder of such Allowed Other General Unsecured Claim shall receive, in full and final satisfaction of such Claim, such holder's Pro Rata share of each of the Gorm Ocean Blue New Shares Distribution Pool and the Gorm Ocean Blue GUC ~~Trust~~ Interests. | Impaired **(Entitled to vote)** | Effective Date: 0.8% - 1.2% Max: [●]3.7% |
| **Class 7:** Intercompany Claims | Intercompany Claims will be paid, adjusted, continued, settled, reinstated, discharged, or eliminated in a manner to obtain the most efficient structure for the Debtors at the election of the Debtors or the Reorganized Debtors, with such election to be reasonably acceptable to the Required Investors and made in consultation with the Creditors' Committee; *provided, however,* that any payment, adjustment, continuation, settlement, or reinstatement on account of an Intercompany Claim will not reduce the amount of the Gorm Ocean Blue New Shares Distribution | Unimpaired / Impaired **(Not Entitled to vote** – presumed to accept / deemed to reject) | N/A |

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Estimated Recoveries |
|---|---|---|---|
| | Pool or Gorm Ocean Blue GUC ~~Trust~~ Interests available to holders of Allowed Claims against Gorm Ocean Blue Limited as set forth in the Plan. | | |
| **Class 9:** Intercompany Interests | Intercompany Interests in Gorm Ocean Blue Limited shall be reinstated. | Unimpaired (**Not Entitled to vote** – presumed to accept) | N/A |

7. *Claims Against and Interests in Gorm Sky Blue Limited*

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Estimated Recoveries |
|---|---|---|---|
| **Class 1:** Other Secured Claims | Except to the extent that a holder of an Allowed Other Secured Claim against Gorm Sky Blue Limited agrees to a less favorable treatment, in full and final satisfaction of such Claim, each holder of an Allowed Other Secured Claim against Gorm Sky Blue Limited shall receive, at the option of the Debtors or the Reorganized Debtor: (i) payment in full in Cash on or as soon as practicable after the later of the Effective Date and the date that is ten Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim; (ii) reinstatement of its Allowed Other Secured Claim; or (iii) other treatment so as to render such holder's Allowed Other Secured Claim Unimpaired. | Unimpaired (**Not entitled to vote** – presumed to accept) | 100% |
| **Class 2:** Other Priority Claims | Except to the extent that a holder of an Allowed Other Priority Claim against Gorm Sky Blue Limited agrees to a less favorable treatment, in full and final satisfaction of such Claim, each holder of an Allowed Other Priority Claim against Gorm Sky Blue Limited shall receive, at the option of the Debtors or the Reorganized Debtors, either: (i) payment in full in Cash on or as soon as practicable after the later of the Effective Date and the date that is ten Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim; or (ii) other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. | Unimpaired (**Not entitled to vote** – presumed to accept) | 100% |
| **Class 3:** Aircraft Lease Claims | As soon as reasonably practicable after the later of the Effective Date and the date on which an Aircraft Lease Claim against Gorm Sky Blue Limited becomes an Allowed Aircraft Lease Claim against Gorm Sky Blue Limited, each holder of such Aircraft Lease Claim shall receive, in full and final satisfaction of such Claim, such holder's Pro Rata share of each of the Gorm Sky Blue | Impaired (**Entitled to vote**) | Effective Date: 0.8% - 1.2% Max: [●]3.7% |

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Estimated Recoveries |
|---|---|---|---|
| | New Shares Distribution Pool and the Gorm Sky Blue GUC ~~Trust~~ Interests. | | |
| **Class 5:** Other General Unsecured Claims | As soon as reasonably practicable after the later of the Effective Date and the date on which an Other General Unsecured Claim against Gorm Sky Blue Limited becomes an Allowed Other General Unsecured Claim against Gorm Sky Blue Limited, each holder of such Allowed Other General Unsecured Claim shall receive, in full and final satisfaction of such Claim, such holder's Pro Rata share of each of the Gorm Sky Blue New Shares Distribution Pool and the Gorm Sky Blue GUC ~~Trust~~ Interests. | Impaired **(Entitled to vote)** | Effective Date: 0.8% - 1.2% Max: [●]3.7% |
| **Class 7:** Intercompany Claims | Intercompany Claims will be paid, adjusted, continued, settled, reinstated, discharged, or eliminated in a manner to obtain the most efficient structure for the Debtors at the election of the Debtors or the Reorganized Debtors, with such election to be reasonably acceptable to the Required Investors and made in consultation with the Creditors' Committee; *provided, however,* that any payment, adjustment, continuation, settlement, or reinstatement on account of an Intercompany Claim will not reduce the amount of the Gorm Sky Blue New Shares Distribution Pool or Gorm Sky Blue GUC ~~Trust~~ Interests available to holders of Allowed Claims against Gorm Sky Blue Limited as set forth in the Plan. | Unimpaired / Impaired **(Not Entitled to vote** – presumed to accept / deemed to reject) | N/A |
| **Class 9:** Intercompany Interests | Intercompany Interests in Gorm Sky Blue Limited shall be reinstated. | Unimpaired **(Not Entitled to vote** – presumed to accept) | N/A |

8.      *Claims Against and Interests in Gorm Asset Management Limited*

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Estimated Recoveries |
|---|---|---|---|
| **Class 1:** Other Secured Claims | Except to the extent that a holder of an Allowed Other Secured Claim against Gorm Asset Management Limited agrees to a less favorable treatment, in full and final satisfaction of such Claim, each holder of an Allowed Other Secured Claim against Gorm Asset Management Limited shall receive, at the option of the Debtors or the Reorganized Debtors: (i) payment in full in Cash on or as soon as practicable after the later of the Effective Date and the date that is ten Business Days after the date on which | Unimpaired **(Not entitled to vote** – presumed to accept) | 100% |

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Estimated Recoveries |
|---|---|---|---|
| | such Other Secured Claim becomes an Allowed Other Secured Claim; (ii) reinstatement of its Allowed Other Secured Claim; or (iii) other treatment so as to render such holder's Allowed Other Secured Claim Unimpaired. | | |
| **Class 2:** Other Priority Claims | Except to the extent that a holder of an Allowed Other Priority Claim against Gorm Asset Management Limited agrees to a less favorable treatment, in full and final satisfaction of such Claim, each holder of an Allowed Other Priority Claim against Gorm Asset Management Limited shall receive, at the option of the Debtors or the Reorganized Debtors, either: (i) payment in full in Cash on or as soon as practicable after the later of the Effective Date and the date that is ten Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim; or (ii) other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. | Unimpaired **(Not entitled to vote** – presumed to accept) | 100% |
| ~~**Class 5:** Other General Unsecured Claims~~ | ~~As soon as reasonably practicable after the later of the Effective Date and the date on which an Other General Unsecured Claim against Gorm Asset Management Limited becomes an Allowed Other General Unsecured Claim against Gorm Asset Management Limited, each holder of such Allowed Other General Unsecured Claim shall receive, in full and final satisfaction of such Claim, such holder's Pro Rata share of each of the Gorm Asset Management New Shares Distribution Pool and the Gorm Asset Management GUC Trust Interests.~~ | ~~Impaired **(Entitled to vote)**~~ | ~~[•]~~ |
| **Class 7:** Intercompany Claims | Intercompany Claims will be paid, adjusted, continued, settled, reinstated, discharged, or eliminated in a manner to obtain the most efficient structure for the Debtors at the election of the Debtors or the Reorganized Debtors, with such election to be reasonably acceptable to the Required Investors and made in consultation with the Creditors' Committee~~; provided, however, that any payment, adjustment, continuation, settlement, or reinstatement on account of an Intercompany Claim will not reduce the amount of the Gorm Asset Management New Shares Distribution Pool or Gorm Asset Management GUC Trust Interests available to holders of Allowed Claims against Gorm Asset Management Limited as set forth in the Plan~~. | Unimpaired / Impaired **(Not Entitled to vote** – presumed to accept / deemed to reject) | N/A |
| **Class 9:** Intercompany Interests | Intercompany Interests in Gorm Asset Management Limited shall be reinstated. | Unimpaired **(Not Entitled to vote** – presumed to accept) | N/A |

9. *Claims Against and Interests in Gorm Engine Management Limited*

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Estimated Recoveries |
|---|---|---|---|
| **Class 1:** Other Secured Claims | Except to the extent that a holder of an Allowed Other Secured Claim against Gorm Engine Management Limited agrees to a less favorable treatment, in full and final satisfaction of such Claim, each holder of an Allowed Other Secured Claim against Gorm Engine Management Limited shall receive, at the option of the Debtors or the Reorganized Debtors: (i) payment in full in Cash on or as soon as practicable after the later of the Effective Date and the date that is ten Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim; (ii) reinstatement of its Allowed Other Secured Claim; or (iii) other treatment so as to render such holder's Allowed Other Secured Claim Unimpaired. | Unimpaired **(Not entitled to vote** – presumed to accept) | 100% |
| **Class 2:** Other Priority Claims | Except to the extent that a holder of an Allowed Other Priority Claim against Gorm Engine Management Limited agrees to a less favorable treatment, in full and final satisfaction of such Claim, each holder of an Allowed Other Priority Claim against Gorm Engine Management Limited shall receive, at the option of the Debtors or the Reorganized Debtors, either: (i) payment in full in Cash on or as soon as practicable after the later of the Effective Date and the date that is ten Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim; or (ii) other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. | Unimpaired **(Not entitled to vote** – presumed to accept) | 100% |
| ~~**Class 5:** Other General Unsecured Claims~~ | ~~As soon as reasonably practicable after the later of the Effective Date and the date on which an Other General Unsecured Claim against Gorm Engine Management Limited becomes an Allowed Other General Unsecured Claim against Gorm Engine Management Limited, each holder of such Allowed Other General Unsecured Claim shall receive, in full and final satisfaction of such Claim, such holder's Pro Rata share of each of the Gorm Engine Management New Shares Distribution Pool and the Gorm Engine Management GUC Trust Interests.~~ | ~~Impaired~~ ~~**(Entitled to vote)**~~ | ~~[●]~~ |
| **Class 7:** Intercompany Claims | Intercompany Claims will be paid, adjusted, continued, settled, reinstated, discharged, or eliminated in a manner to obtain the most efficient structure for the Debtors at the election of the Debtors or the Reorganized Debtors, with such election to be reasonably acceptable to the Required Investors and made in consultation with the Creditors' Committee~~; *provided, however, that any payment,*~~ | Unimpaired / Impaired **(Not Entitled to vote** – presumed to accept / deemed to reject) | N/A |

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Estimated Recoveries |
|---|---|---|---|
| | ~~adjustment, continuation, settlement, or reinstatement on account of an Intercompany Claim will not reduce the amount of the Gorm Engine Management New Shares Distribution Pool or Gorm Engine Management GUC Trust Interests available to holders of Allowed Claims against Gorm Engine Management Limited as set forth in the Plan.~~ | | |
| **Class 9:** Intercompany Interests | Intercompany Interests in Gorm Engine Management Limited shall be reinstated. | Unimpaired **(Not Entitled to vote** – presumed to accept) | N/A |

10.    *Claims Against and Interests in Gorm Warm Red Limited*

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Estimated Recoveries |
|---|---|---|---|
| **Class 1:** Other Secured Claims | Except to the extent that a holder of an Allowed Other Secured Claim against Gorm Warm Red Limited agrees to a less favorable treatment, in full and final satisfaction of such Claim, each holder of an Allowed Other Secured Claim against Gorm Warm Red Limited shall receive, at the option of the Debtors or the Reorganized Debtors: (i) payment in full in Cash on or as soon as practicable after the later of the Effective Date and the date that is ten Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim; (ii) reinstatement of its Allowed Other Secured Claim; or (iii) other treatment so as to render such holder's Allowed Other Secured Claim Unimpaired. | Unimpaired **(Not entitled to vote** – presumed to accept) | 100% |
| **Class 2:** Other Priority Claims | Except to the extent that a holder of an Allowed Other Priority Claim against Gorm Warm Red Limited agrees to a less favorable treatment, in full and final satisfaction of such Claim, each holder of an Allowed Other Priority Claim against Gorm Warm Red Limited shall receive, at the option of the Debtors or the Reorganized Debtors, either: (i) payment in full in Cash on or as soon as practicable after the later of the Effective Date and the date that is ten Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim; or (ii) other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. | Unimpaired **(Not entitled to vote** – presumed to accept) | 100% |

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Estimated Recoveries |
|---|---|---|---|
| Class 5: Other General Unsecured Claims | As soon as reasonably practicable after the later of the Effective Date and the date on which an Other General Unsecured Claim against Gorm Warm Red Limited becomes an Allowed Other General Unsecured Claim against Gorm Warm Red Limited, each holder of such Allowed Other General Unsecured Claim shall receive, in full and final satisfaction of such Claim, such holder's Pro Rata share of each of the Gorm Warm Red New Shares Distribution Pool and the Gorm Warm Red GUC Trust Interests. | Impaired (Entitled to vote) | [●] |
| Class 7: Intercompany Claims | Intercompany Claims will be paid, adjusted, continued, settled, reinstated, discharged, or eliminated in a manner to obtain the most efficient structure for the Debtors at the election of the Debtors or the Reorganized Debtors, with such election to be reasonably acceptable to the Required Investors and made in consultation with the Creditors' Committee; *provided, however,* that any payment, adjustment, continuation, settlement, or reinstatement on account of an Intercompany Claim will not reduce the amount of the Gorm Warm Red New Shares Distribution Pool or Gorm Warm Red GUC Trust Interests available to holders of Allowed Claims against Gorm Warm Red Limited as set forth in the Plan. | Unimpaired / Impaired (**Not Entitled to vote** – presumed to accept / deemed to reject) | N/A |
| Class 9: Intercompany Interests | Intercompany Interests in Gorm Warm Red Limited shall be reinstated. | Unimpaired (**Not Entitled to vote** – presumed to accept) | N/A |

11. *Claims Against and Interests in SANA*

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Estimated Recoveries |
|---|---|---|---|
| Class 1: Other Secured Claims | Except to the extent that a holder of an Allowed Other Secured Claim against SANA agrees to a less favorable treatment, in full and final satisfaction of such Claim, each holder of an Allowed Other Secured Claim against SANA shall receive, at the option of the Debtors or the Reorganized Debtors: (i) payment in full in Cash on or as soon as practicable after the later of the Effective Date and the date that is ten Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim; (ii) reinstatement of its Allowed Other Secured Claim; or (iii) other treatment so as to render such holder's Allowed Other Secured Claim Unimpaired. | Unimpaired (**Not entitled to vote** – presumed to accept) | 100% |

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Estimated Recoveries |
|---|---|---|---|
| **Class 2:** Other Priority Claims | Except to the extent that a holder of an Allowed Other Priority Claim against SANA agrees to a less favorable treatment, in full and final satisfaction of such Claim, each holder of an Allowed Other Priority Claim against SANA shall receive, at the option of the Debtors or the Reorganized Debtors, either: (i) payment in full in Cash on or as soon as practicable after the later of the Effective Date and the date that is ten Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim; or (ii) other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. | Unimpaired <br><br> **(Not entitled to vote** – presumed to accept) | 100% |
| **Class 5:** Other General Unsecured Claims against Scandinavian Airlines of North America, Inc. | As soon as reasonably practicable after the later of the Effective Date and the date on which an Other General Unsecured Claim against SANA becomes an Allowed Other General Unsecured Claim against SANA, each holder of such Allowed Other General Unsecured Claim shall receive, in full and final satisfaction of such Claim, such holder's Pro Rata share of ~~each of~~ the SANA ~~New Shares Distribution Pool and the SANA GUC Trust Interests~~Available Cash. | Impaired <br><br> **(Entitled to vote)** | ~~[●]~~0.5% - 1.5% |
| **Class 7:** Intercompany Claims | Intercompany Claims shall be paid, adjusted, continued, settled, reinstated, discharged, or eliminated in a manner to obtain the most efficient structure for the Debtors at the election of the Debtors or the Reorganized Debtors, with such election to be reasonably acceptable to the Required Investors and made in consultation with the Creditors' Committee; *provided, however,* that any payment, adjustment, continuation, settlement, or reinstatement on account of an Intercompany Claim shall not reduce the amount of the SANA ~~New Shares Distribution Pool or SANA GUC Trust Interests~~Available Cash available to holders of Allowed Other General Unsecured Claims against SANA as set forth in the Plan. | Unimpaired / Impaired <br><br> **(Not Entitled to vote** – presumed to accept / deemed to reject) | N/A |
| **Class 9:** Intercompany Interests | Intercompany Interests in SANA shall be reinstated | Unimpaired <br><br> **(Not Entitled to vote** – presumed to accept) | N/A |

**D.** ~~C.~~Inquiries

If you have any questions regarding this Disclosure Statement or the packet of materials you have received in connection herewith, please contact Kroll Restructuring Administration LLC, the Debtors' claims and noticing agent, and administrative advisor (the "**Claims and Solicitation Agent**"), at (844) 242-7491 (for holders of Claims or Interests in

the U.S. and Canada; toll-free) or +1 (347) 338-6450 (for holders of Claims or Interests located outside of the U.S. and Canada) or via e-mail message (with "SAS AB Solicitation Inquiry" in the subject line) to:

**SASinfo@ra.kroll.com**

Copies of this Disclosure Statement, the Plan, and the Plan Supplement (when filed) are available on the Claims and Solicitation Agent's case website, https://cases.ra.kroll.com/SAS/.

**PLEASE DO NOT DIRECT INQUIRIES TO THE BANKRUPTCY COURT**.

## II.
## DEBTORS' OPERATIONS, CORPORATE, AND CAPITAL STRUCTURE

A.     Debtors' History and Operations

SAS was founded in 1946 by national aircraft companies owned by the Kingdom of Denmark, the Kingdom of Norway, and the Kingdom of Sweden.  In February 1951, SAS was reorganized into a single entity, Scandinavian Airlines System Denmark–Norway–Sweden (the "**Consortium**"), owned by limited liability companies that are now known as SAS Danmark A/S ("**SASD**"), SAS Norge AS ("**SASN**"), and SAS Sverige AB ("**SASS**" and, collectively with SASD and SASN, the "**Consortium Constituents**").[48]  The Consortium is SAS' main operating entity and historically has operated the vast majority of flights sold by SAS.

By 1980, SASD, SASN, and SASS were listed on the Copenhagen, Oslo, and Stockholm stock exchanges, respectively, and were 50% owned by their respective governments and 50% owned by private interests.

In 2001, SAS completed a restructuring by creating a holding company, SAS AB, which made three parallel public offers to the shareholders of each of the Consortium Constituents to exchange their shares for the same number of newly issued shares in SAS AB. As a result, SAS AB currently owns 100% of the shares in each of the Consortium Constituents. On July 6, 2001, SAS AB was listed on the Stockholm Stock Exchange (now known as Nasdaq Stockholm) with secondary listings in Copenhagen and Oslo.

Since its formation more than 75 years ago, SAS has grown to be one of Scandinavia's leading airlines and is the flag carrier of Denmark, Norway, and Sweden.

---

[48] The Consortium Constituents' obligations with respect to the Consortium are governed by that certain *Consortium Agreement*, dated as of February 8, 1951 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof, the "**Consortium Agreement**") among the Consortium and the Consortium Constituents.  Under the Consortium Agreement, the Consortium Constituents are jointly and severally liable for the obligations of the Consortium.

1. *SAS' Fleet*

As of the Commencement Date, SAS' fleet comprised 102 aircraft, including 22 owned aircraft, 65 aircraft leased under operating leases, 15 aircraft subject to Japanese operating leases with a call option ("**JOLCO**"), and two aircraft financed under finance leases. On average, SAS' aircraft were approximately 8 years old. These aircraft consisted of the following:

i. Owned – seven Boeing 737s, four Airbus A319s, two Airbus A320s, four Airbus A321s, and three Airbus A330s;

ii. Leased – 41 Airbus A320neos, nine Airbus A320s, three Airbus A321s, three Airbus A321LR's, five Airbus A330s, one Airbus A350, one Boeing 737s, and two Embraer 195s, each of which was leased by one of the following Debtors: the Consortium, Gorm Dark Blue Limited, Gorm Deep Blue Limited, Gorm Light Blue Limited, or Gorm Sky Blue Limited;

iii. JOLCOs – nine Airbus A320neos, three Airbus A350s, and three Boing 737s, each of which was leased by either of two Debtor entities the Consortium or Gorm Ocean Blue Limited (together with Gorm Dark Blue Limited, Gorm Deep Blue Limited, Gorm Light Blue Limited, and Gorm Sky Blue Limited, the "**Gorm Leasing Entities**"); and

iv. Financing Leases –two Airbus A350s, which were leased by Debtor Gorm Dark Blue Limited.

The aircraft leased to the Gorm Leasing Entities were subject to head leases with third-party leasing companies. The Gorm Leasing Entities then subleased the aircraft to the Consortium and non-Debtor affiliates Scandinavian Airlines Ireland Limited (d/b/a SAS Connect) and SAS Link AB. SAS Connect "wet leases" certain of its subleased aircraft to the Consortium.

Prior to the Commencement Date, SAS paid approximately SEK 342 million ($33.5 million) each month on account of operating leases, JOLCO leases, and finance leases. As of the end of fiscal year 2023, SAS' aircraft lease liabilities were approximately SEK 11.915 billion ($1.167 billion) and its aircraft finance liabilities were approximately SEK 7.480 billion ($733 million). SAS AB guarantees all of the Consortium's and the Gorm Leasing Entities' obligations under aircraft financing and lease agreements.

SAS has taken measures to modernize its fleet and entered into several agreements to receive new deliveries of aircraft in the coming years. As of the end of fiscal year 2023, SAS had aircraft orders for delivery through 2025 of 18 Airbus A320neo, 2 Airbus A350, and 1 Embraer E195 aircraft. The remaining contracted future purchase commitment for those aircraft orders totaled approximately $955 million (SEK 9,749 million), as of the end of fiscal year 2023.

As set forth in more detail herein, a restructured fleet is the cornerstone of SAS FORWARD and the Debtors' reorganization, and the Debtors have negotiated with their aircraft counterparties throughout the Chapter 11 Cases to redesign their fleet to fit the Debtors' go-forward business plan.  As a result of these negotiations, SAS' near-term fleet, upon emergence from the Chapter 11 Cases, will consist of 139 aircraft, of which 35 are wet-leased from third parties, 25 are owned, and 79 are subject to various financing arrangements.  For a more detailed description of the fleet restructuring, see Section IV.K below.

## 2. *SAS' Route Network*

SAS operates an extensive route network that included approximately 125 destinations in 31 countries in fiscal year 2023.  In total, SAS operated 285 scheduled routes among these destinations in fiscal year 2023, reflecting an 8.0% increase from 214 routes in fiscal year 2021 and a decrease from 301 routes in fiscal year 2019 before the COVID-19 pandemic.  SAS also maintains relationships with partner airlines to expand its network footprint.

SAS' main operations are at Copenhagen Airport, Oslo Airport, and Stockholm Arlanda Airport.  As of the end of fiscal year 2023, SAS offered passenger service to locations in the following countries:

| Region | Countries[59] |
| --- | --- |
| Scandinavia | Denmark, Norway, Sweden |
| Europe (other than Scandinavia) | Austria, Belgium, Croatia, Cyprus, Czech Republic, Estonia, Finland, France, Germany, Greece, Ireland, Iceland, Italy, Lithuania, Montenegro, The Netherlands, Poland, Portugal, Spain, Switzerland, Türkiye, United Kingdom |
| North America | Canada, United States (including New York) |
| Asia and Other | China, Japan, Lebanon, Thailand |

## 3. *SAS' Passenger Operations*

Through its extensive route network, SAS operated, on average, more than 500 daily scheduled flights and served approximately 22.7 million passengers in fiscal year 2023, an increase of 33.5% from fiscal year 2022.  These passenger operations generated approximately SEK 32.236 billion ($3.158 billion) in revenue in fiscal year 2023, representing approximately 76.7% of SAS' total revenue.

SAS prioritizes traffic flows to, from, and within Scandinavia.  In 2019, prior to the COVID-19 pandemic, SAS' percentage share of seat capacity to, from, and within Denmark, Norway, and Sweden was 34%, 38%, and 35%, respectively, which was more than any other

---

[59] Immediately prior to the Commencement Date, SAS offered passenger service to Ukraine and Russia but SAS currently is not flying to either country as a result of Russia's invasion of Ukraine.

airline in those markets. In fiscal year 2023, approximately 63.2% of passenger revenue was generated from sales originating in Denmark, Norway, and Sweden. Norway accounted for 26.5%, Sweden accounted for 23.9%, and Denmark accounted for 12.8%. The chart below sets forth the geographical distribution of SAS' passenger revenue for fiscal years 2019 through 2022.



Passenger revenue has been significantly impacted by the COVID-19 pandemic. In fiscal year 2019, prior to the pandemic, SAS carried more than 30 million passengers, averaged nearly 800 daily scheduled flights, and its passenger revenue totaled approximately SEK 35.479 billion ($3.476 billion).

4. *SAS' Charter Operations*

SAS also generates significant revenue through the sale of charter flights. SAS sells charters to individuals and businesses as well as private charter companies. Revenue from charter operations totaled approximately SEK 2.096 billion ($205 million) in fiscal year 2023, representing approximately 5.0% of SAS' total revenue. Charter revenue has also been negatively impacted by the COVID-19 pandemic. In fiscal year 2019, prior to the pandemic, SAS generated approximately SEK 2.117 billion ($207 million) in revenue from charter operations.

5. *SAS' Cargo Operations*

In addition to passenger and charter operations, SAS generates revenue from its cargo operations. SAS operates its cargo business through non-Debtor SAS Cargo Group A/S ("**SAS Cargo**"). SAS Cargo is the leading provider of airfreight solutions to, from, and within Scandinavia. SAS uses the belly space on its passenger flights to transport cargo between airports. SAS Cargo purchases the belly capacity from the Consortium pursuant to a belly agreement.

In fiscal year 2022, SAS' cargo operations served approximately 144 destinations in 28 countries. During such time, SAS transported, on average, 161 tons of cargo daily. In fiscal year 2023, SAS' cargo operations generated approximately SEK 1.183 billion ($116 million) in revenue, representing approximately 2.8% of total revenue. In fiscal year

2019, prior to the pandemic, SAS generated approximately SEK 1.506 billion ($148 million) in revenue from cargo operations, representing approximately 3.6% of total revenue.

### 6. *Other Traffic Revenue*

SAS also generates revenue through fees charged for advanced seat selections, fees charged for extra bags, unused tickets, and revenue adjustments ("**Other Traffic Revenue**"). In fiscal year 2022, Other Traffic Revenue totaled approximately SEK 2.992 billion ($293 million). In fiscal year 2019, SAS generated approximately SEK 2.936 billion ($288 million) in Other Traffic Revenue.

### 7. *SAS EuroBonus*

SAS operates Scandinavia's largest and most recognized loyalty program—SAS EuroBonus ("**EuroBonus**"). EuroBonus was established in 1992 and has grown to more than 5 million members in Scandinavia and more than 7 million members worldwide. EuroBonus membership has more than doubled since 2014.

EuroBonus is owned and operated by non-Debtor SAS EuroBonus AB, a corporation organized under the laws of Sweden and wholly owned by Debtor SAS AB. SAS EuroBonus AB purchased EuroBonus from the Consortium in October 2020. To fund the purchase, SAS AB loaned SAS EuroBonus AB approximately SEK 2.600 billion ($255 million), of which approximately SEK 1.435 billion ($141 million) remained outstanding as of the end of fiscal year 2023.

Through EuroBonus, members earn points when making purchases through one of SAS EuroBonus AB's more than 100 partners, which include airlines, hotels, rental car companies, and various stores and restaurants, or when making purchase using a co-branded SAS EuroBonus Credit Card. Points can be redeemed for a variety of benefits, including flights, hotel stays, lounge access, and flight upgrades.

### 8. *SAS Employees*

In fiscal year 2023, SAS employed, on average, 7,961 employees, most of whom (approximately 98%) were located in either Denmark, Norway, or Sweden. In fiscal year 2023, SAS employed, on average, 188 employees located outside Scandinavia, including approximately 25 in the United States. Approximately 80% of SAS' employees are members of unions. There are currently 38 unions representing SAS employees, with some unions representing more than one category of employees. Substantially all of SAS' pilots and a large percentage of the cabin crew and ground crew are members of unions, as are many of its corporate employees (with the exception of senior managers). SAS has collective bargaining agreements with these unions.

The reduced demand for flights caused by the COVID-19 pandemic in turn caused SAS to undergo workforce reductions. In 2020 and 2021, SAS furloughed approximately 11,000 employees, including approximately 5,000 employees who were eventually laid off. A large majority of the furloughed employees were located in Denmark, Norway, and Sweden. Many of the furloughs were instituted in connection with newly passed

legislation and with state support. The layoffs were instituted in January through September 2020. Layoffs, consistent with applicable labor law practices, were typically based on seniority with a last in, first out policy, and employees were generally entitled to a notice period prior to having their employment officially terminated. A significant number of the furloughed employees have since returned to SAS' workforce.

9.  *Regulation of SAS' Business*

The airline industry is subject to a number of national, European Union ("**EU**"), and international regulatory regimes. SAS flies and operates in more than 30 countries, which means that SAS must comply with a large number of national, regional, and international laws and regulations, including in relation to licensing, ticket taxes, airport and airspace infrastructure, safety and security measures and passenger rights (including those rights relating to canceled or delayed flights).

B.  Organizational Structure

SAS AB is the ultimate parent entity of the Debtors and their non-Debtor affiliates, and is a publicly traded corporation with its primary listing on Nasdaq Stockholm and secondary listings on Nasdaq Copenhagen and Oslo Børs. SAS AB's two largest shareholders are the Kingdom of Denmark and the Kingdom of Sweden, which each own approximately 21.8% of SAS AB's outstanding and issued shares. SAS AB's next largest shareholder is Wallenberg Investments AB, which owns approximately 3.4% of SAS AB's outstanding and issued shares. All of the other Debtors are direct or indirect wholly-owned subsidiaries of SAS AB. An organizational chart showing SAS' corporate structure is annexed hereto as **Exhibit B.**

C.  Directors and Senior Management

SAS AB's board of directors (the "**Board**") is comprised of seven directors elected by the general meeting of shareholders as well as three ordinary employee representatives and six deputy employee representatives appointed by the labor unions, and is led by Carsten Dilling, Chairman of the Board. The Board members are:

| Name | Position |
| --- | --- |
| Carsten Dilling | Chairman |
| Lars-Johan Jarnheimer | Vice Chairman |
| Nina Bjornstad | Board Member |
| Michael Friisdahl | Board Member |
| Henriette Hallberg Thygesen | Board Member |
| Kay Kratky | Board Member |
| Oscar Stege Unger | Board Member |
| Kim John Christiansen | Board Member (employee representative) |
| Jens Lippestad | Board Member (employee representative) |
| Tommy Nilsson | Board Member (employee representative) |
| William Nielsen | Deputy Member (employee representative) |
| Henrik Thyregod | Deputy Member (employee representative) |

| Name | Position |
|------|----------|
| Pål Gisle Andersen | Deputy Member (employee representative) |
| Daniel Emanuelsen | Deputy Member (employee representative) |
| Hans Ahlberg | Deputy Member (employee representative) |
| Lennart Selggren | Deputy Member (employee representative) |

SAS' Senior Management is responsible for business management, preparing the financial reporting, acquisitions/disposals, financing, communication and other corporate matters. The President is appointed by the Board and the other members of SAS' Senior Management are appointed by the President in consultation with the Board. The Senior Management members are:

| Name | Position |
|------|----------|
| Anko van der Werff | President & Chief Executive Officer |
| Anna Almén | Chief Legal Officer |
| Kjetil Håbjørg | ~~Executive Vice President Airline~~Chief Services Officer |
| Erno Hildén | Chief Financial Officer |
| Ginger Hughes | Chief Transformation Officer |
| Jason Mahoney | Chief Operating Officer |
| Charlotte Svensson | Chief Information Officer (effective until March 1, 2024) |
| Pernille Ormholt Vang | Chief People Officer |
| Paul Verhagen | Chief Commercial Officer |
| Erik Westman | Chief Revenue Officer |

On November 1, 2023, SAS announced that Charlotte Svensson will leave her position in March 2024. The recruitment process for her successor is ongoing.

On November 28, 2023, SAS announced that Carina Malmgren Heander will leave her position on February 1, 2024, and that Pernille Ormholt Vang has been appointed as Executive Vice President & Chief People Officer, and member of SAS' Senior Management, effective as of January 1, 2024.

D.    Capital Structure[610]

As of the Commencement Date, the Debtors had outstanding funded debt obligations in the aggregate principal amount of approximately $1.35 billion, excluding claims against guarantors and co-liable parties. All of the Debtors' prepetition funded debt obligations are unsecured. The below charts set forth the Debtors' funded debt obligations by borrower/issuer and seniority. Each funded debt obligation is described in more detail below.

---

[610] All conversions in this section are based on foreign exchange rates as of the Commencement Date.

| SAS AB | Outstanding Principal | Guarantor/Co-Liable Party |
|---|---|---|
| Norwegian Term Loan | $152 million | Consortium/Consortium Constituents |
| Commercial Hybrid Bonds | $158 million | |
| Swiss Bonds[711] | $133 million | Consortium/Consortium Constituents |
| State Hybrid Bonds 1 | $489 million | |
| State Hybrid Bonds 2 | $98 million | |
| **Total Funded Debt** | **$1.030 billion** | |

| Consortium | Outstanding Principal | Guarantor/Co-Liable Party |
|---|---|---|
| Danish Term Loan | $152 million | Consortium Constituents |
| Swedish Term Loan | $147 million | Consortium Constituents |
| Norwegian Term Loan[812] | $152 million | SAS AB/Consortium Constituents |
| Swiss Bonds | $133 million | SAS AB/Consortium Constituents |
| **Total Funded Debt** | **$584 million** | |

| Consortium Constituents[913] | Outstanding Principal | Guarantor/Co-Liable Party |
|---|---|---|
| Danish Term Loan | $152 million | Consortium |
| Swedish Term Loan | $147 million | Consortium |
| Norwegian Term Loan | $152 million | SAS AB/Consortium |
| Swiss Bonds | $133 million | SAS AB/Consortium |
| **Total Funded Debt** | **$584 million** | |

Norwegian Term Loan. SAS AB is party to that certain *Facility Agreement regarding a NOK 1,497,500,000 term loan facility*, dated as of December 18, 2020 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof, the "**Norwegian Term Loan**") among SAS AB, as borrower, the Consortium, as guarantor, Nordea Bank Abp, filial i Sverige, as facility agent and documentation agent (the "**Agent**"), and the lenders party to the Norwegian Term Loan (the "**Norwegian Term Loan Lenders**"). The aggregate outstanding principal amount under the Norwegian Term Loan facility is NOK 1,497,500,000 (approximately $152 million), with interest accruing at a rate of NIBOR plus a margin of 0.55% per annum. Accrued interest on each loan made under the facility is payable on the last day of the Interest Period selected by SAS AB for the applicable loan. The Interest Period can be three months or any such shorter period as may be agreed between SAS AB and the Agent. The Interest Period cannot extend beyond the applicable loan's repayment date, or the termination date of the loan facility, which is the earlier of (i) the

---

[711] SAS AB is liable for the Consortium's obligations with respect to the Swiss Bonds under the Irrevocable Undertaking (as defined below). The guarantee claims under the Swiss Bonds are senior to the State Hybrid Bonds 1 and State Hybrid Bonds 2, but subordinated to the claims under the Norwegian Term Loan and the Commercial Hybrid Bonds.

[812] The Consortium guaranteed SAS AB's obligations with respect to the Norwegian Term Loan.

[913] As explained above, under the Consortium Agreement, the Consortium Constituents are jointly and severally liable for the obligations of the Consortium.

date falling three years after the date of the most recent loan (occurring in January 2024) and (ii) June 30, 2024 (the "**Termination Date**").

Loans made under the Norwegian Term Loan facility must be repaid on the earlier of the third anniversary of when the relevant loan was advanced, and the Termination Date of the loan facility.

Claims of the Norwegian Term Loan Lenders under the Norwegian Term Loan rank (i) *pari passu* with claims of other unsecured and unsubordinated creditors of SAS AB, the Consortium, and the Consortium Constituents, except for those mandatorily preferred by law and (ii) senior to the guarantee claims under the Swiss Bonds and the State Hybrid Bonds (as defined below).

SAS AB's obligations under the Norwegian Term Loan are guaranteed by the Consortium. In addition, under the Consortium Agreement, the Consortium Constituents are jointly and severally liable for the Consortium's obligations as guarantor.

The Norwegian Guarantee Institute for Export Credits ("**Eksfin**"), previously known as Garantiinstituttet for Eksportkreditt (GIEK), also issued guarantee policies in favor of the Norwegian Term Loan Lenders pursuant to which Eksfin agreed to guarantee, as principal obligor, the payment obligations of SAS AB under the Norwegian Term Loan facility, up to an aggregate amount of NOK 1,497,500,000 (approximately $152 million), plus the amount of any accrued but unpaid interest and expenses, subject to a limit of NOK 1,500,000,000 (approximately $152 million). SAS is also obligated to pay a guarantee fee of 2% of the aggregate principal amount to Eksfin.

On June 23, 2022, Eksfin purchased the position of each Norwegian Term Loan Lender under the Norwegian Term Loan and also replaced the Agent as agent.

Commercial Hybrid Bonds. On October 23, 2020, SAS AB issued SEK 1.615 billion (approximately $158 million) in aggregate principal amount of unsubordinated perpetual bonds, pursuant to those certain *Terms and Conditions for SAS AB (publ) SEK 1,615,000,000 Unsubordinated Perpetual Floating Rate Callable Capital Securities* (ISIN SE0014957999) (the "**Commercial Hybrid Bonds**"). The Commercial Hybrid Bonds are perpetual and have no specified maturity date. They accrue interest at a variable rate, which increases at various intervals over a 10-year period, before reaching a rate of STIBOR plus a margin of 15.90% per annum on October 23, 2030 through redemption. Interest is due twice per year on April 23 and October 23 of each year. SAS AB has deferred the interest payment due since April 2022, which is permissible under the terms of the Commercial Hybrid Bonds.

SAS AB, at any time, may redeem all, but not some, of the outstanding Commercial Hybrid Bonds in full at a price per bond equal to 100% of the outstanding principal amount of each bond plus deferred interest and any other unpaid accrued interest up to (and including) the redemption. SAS AB, at any time, may redeem less than all of the outstanding Commercial Hybrid Bonds by reducing the outstanding nominal amount of each bond *pro rata* at a price equal to 100% of the nominal amount of each bond plus deferred interest and any other unpaid accrued interest up to (and including) the redemption on the redeemed amount.

The Commercial Hybrid Bonds rank (i) senior to the guarantee claims under the Swiss Bonds, the State Hybrid Bonds, and any other obligation expressed to rank as junior to the Commercial Hybrid Bonds, and (ii) *pari passu* with other unsubordinated and unsecured obligations of SAS AB.

State Hybrid Bonds 1.  On October 26, 2020, SAS AB issued SEK 5 billion (approximately $489 million) in aggregate principal amount of subordinated perpetual bonds to the Kingdom of Denmark and the Kingdom of Sweden, pursuant to those certain *Terms and Conditions for SAS AB (publ) SEK 5,000,000,000 Subordinated Perpetual Floating Rate Callable Capital Securities* (ISIN SE0014958005) (the "**State Hybrid Bonds 1**").  The State Hybrid Bonds 1 are perpetual and have no specified maturity date.  The State Hybrid Bonds 1 accrue interest at a variable rate, which increases at various intervals over a 7-year period, before reaching a rate of STIBOR plus a margin of 10.40% per annum on October 26, 2027 through redemption.  Interest is due twice per year on April 26 and October 26 of each year. SAS AB has deferred the interest payment due since April 2022, which is permissible under the terms of the State Hybrid Bonds 1.

SAS AB, at any time, may redeem all, but not some, of the outstanding State Hybrid Bonds 1 in full at a price per bond equal to 100% of the outstanding nominal amount of the bond plus deferred interest and any other unpaid accrued interest up to (and including) the redemption.  SAS AB, at any time, may redeem less than all of the outstanding State Hybrid Bonds 1 by reducing the outstanding nominal amount of each bond pro rata at a price equal to 100% of the outstanding nominal amount of each bond plus deferred interest and any other unpaid accrued interest up to (and including) the redemption on the redeemed amount.

The State Hybrid Bonds 1 rank (i) *pari passu* with obligations expressed to rank *pari passu*, including the State Hybrid Bonds 2, and (ii) junior to all unsubordinated obligations and subordinated indebtedness of SAS AB, including the Norwegian Term Loan, the Commercial Hybrid Bonds, the guarantee claims under the Swiss Bonds, and lessor guarantee claims.

State Hybrid Bonds 2.  On October 26, 2020, SAS AB issued SEK 1 billion (approximately $98 million) in aggregate principal amount of subordinated perpetual bonds to the Kingdom of Denmark, pursuant to those certain *Terms and Conditions for SAS AB (publ) SEK 1,000,000,000 Subordinated Perpetual Floating Rate Callable Capital Securities* (ISIN SE0014958013) (the "**State Hybrid Bonds 2**" and, together with the State Hybrid Bonds 1, the "**State Hybrid Bonds**").  The State Hybrid Bonds 2 are perpetual and have no specified maturity date.  They accrue interest at a variable rate, which increases at various intervals over a seven-year period, before reaching a rate of STIBOR plus a margin of 11.40% per annum on October 26, 2027 through redemption.  Interest is due twice per year on April 26 and October 26 of each year.  SAS AB deferred the interest payment due in April 2022, which is permissible under the terms of the State Hybrid Bonds 2.

SAS AB, at any time, may redeem all, but not some, of the outstanding State Hybrid Bonds 2 in full at a price per bond equal to 100% of the outstanding nominal amount of the bond plus deferred interest and any other unpaid accrued interest up to (and including) the redemption.  SAS AB, at any time, may redeem less than all of the outstanding State Hybrid

Bonds 2 by reducing the outstanding nominal amount of each bond pro rata at a price equal to 100% of the outstanding nominal amount of each bond plus deferred interest and any other unpaid accrued interest up to (and including) the redemption on the redeemed amount.

The State Hybrid Bonds 2 rank (i) *pari passu* with obligations expressed to rank *pari passu*, including the State Hybrid Bonds 1, and (ii) junior to all unsubordinated obligations and subordinated indebtedness of SAS AB, including the Norwegian Term Loan, the Commercial Hybrid Bonds, the guarantee claims under the Swiss Bonds, and lessor guarantee claims.

Danish Term Loan.  The Consortium is party to that certain *On-Lending Facility Agreement*, dated as of July 8, 2021 among the Consortium, as borrower, the central bank of Denmark (Danmarks Nationalbank), and the Kingdom of Denmark, as lender (as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof, the "**Danish Term Loan**").  The aggregate outstanding principal amount under the Danish Term Loan is DKK 1,099,050,000 (approximately $152 million), with interest accruing at a rate that is the aggregate of the interest rate of the government bonds issued to fund loans under the Danish Term Loan plus a margin of 3.14% per annum, subject to a minimum interest rate of 2.11% per annum.

Loans advanced under the Danish Term Loan were funded by the Kingdom of Denmark (acting through the Danish Ministry of Finance) issuing government bonds in Danish Kroner.  The loans advanced under the Danish Term Loan must be repaid in accordance with the terms and conditions set out in the government bonds issued to fund such loans, provided that all amounts outstanding must be repaid by the termination date of December 31, 2026.

Except with the written consent of Danmarks Nationalbank, the Consortium may not prepay any loans advanced under the Danish Term Loan.  If the Consortium makes any prepayment under the Swedish Term Loan (as defined below), then it must also repay the same amount under the Danish Term Loan on the same date.

Claims of the Kingdom of Denmark under the Danish Term Loan rank (i) *pari passu* with claims of other unsecured and unsubordinated creditors of the Consortium, including claims under the Swedish Term Loan and Norwegian Term Loan guarantee, and (ii) senior to the Swiss Bonds.

Under the Consortium Agreement, the Consortium Constituents are jointly and severally liable for the Consortium's obligations under the Danish Term Loan.

Swedish Term Loan.  The Consortium is party to that certain *Term Facility Agreement*, dated as of July 16, 2021 among the Consortium, as borrower, and the Swedish National Debt Office (Riksgälden), as lender (as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof, the "**Swedish Term Loan**" and, together with the Danish Term Loan, the "**State Term Loans**").  The aggregate outstanding principal amount under the Swedish Term Loan is SEK 1,500,000,000 (approximately $147 million), with interest accruing at the "Base Rate" plus a margin of 3.14% per annum, subject to a minimum interest rate of 2.11% per annum.  Interest is payable quarterly.

Loans advanced under the Swedish Term Loan must be repaid in full on December 31, 2026. Except with the written consent of the Swedish National Debt Office, the Consortium may not prepay any loans advanced under the Swedish Term Loan. If the Consortium makes any prepayment under the Danish Term Loan, then it must also repay the same amount under the Swedish Term Loan on the same date.

Claims of the Kingdom of Sweden under the Swedish Term Loan rank (i) *pari passu* with claims of other unsecured and unsubordinated creditors of the Consortium, including claims under the Danish Term Loan and the Norwegian Term Loan guarantee, and (ii) senior to the Swiss Bonds.

Under the Consortium Agreement, the Consortium Constituents are jointly and severally liable for the Consortium's obligations under the Swedish Term Loan.

Swiss Bonds. In 1986, the Consortium issued CHF 200 million (approximately $209 million) in aggregate principal amount of 5.34% subordinated bonds pursuant to that certain prospectus, dated as of December 6, 1985, between the Consortium, as issuer, and Citicorp Bank (Switzerland), as principal paying agent (the "**Swiss Bonds**"). Since their issuance, the Consortium has repurchased some of the Swiss Bonds, resulting in a current aggregate outstanding principal amount of CHF 127,195,000 (approximately $133 million).

The Swiss Bonds have a variable interest rate that adjusts every ten years. The interest rate is the mean of the SBC-Foreign Bonds Index and the Pictet-new foreign Bond Issue Index, rounded up if necessary to the nearest $\frac{1}{8}$%, as determined on the tenth business day prior to the beginning of each ten year period. The current interest rate is 0.625% per annum. It will next adjust on January 14, 2026. Interest is paid annually in arrears on January 14 of each year.

The maturity date of the Swiss Bonds must be at least two business days after a resolution has been passed by the Consortium Constituents to liquidate the Consortium. The Swiss Bonds otherwise have no maturity. The Consortium has the option to redeem all of the Swiss Bonds on (i) the fifth anniversary of the Closing Date (i.e., January 14, 1986) and thereafter on the date that is five years following each tenth anniversary of the Closing Date at a price of 102.5% of the then outstanding principal amount of the bonds and (ii) each tenth anniversary of the Closing Date at a price of 100% of the then outstanding principal amount of the bonds.

The Swiss Bonds rank junior to all other indebtedness of the Consortium that is not expressly subordinated to, or expressed to rank *pari passu* with, the Swiss Bonds, including the State Term Loans and claims under the Norwegian Term loan guarantee.

Under the Consortium Agreement, the Consortium Constituents are jointly and severally liable for the Consortium's obligations, which includes amounts owing under the Swiss Bonds. In addition, SAS AB, pursuant to the Irrevocable Undertaking (as defined below), is liable for the Consortium's obligations under the Swiss Bonds.

The Irrevocable Undertaking. SAS AB was party to that certain Irrevocable Undertaking, dated as of February 11, 2004 (the "**Irrevocable Undertaking**"), pursuant to which SAS AB undertook to be liable for all interest bearing liabilities, leasing obligations, and

other financial obligations of the Consortium then in existence or arising in the future.  Under the Irrevocable Undertaking, any liabilities and obligations subordinated by contract against other creditors of the Consortium are subordinated to the same extent and on the same terms against creditors of SAS AB.  The Irrevocable Undertaking became effective as of December 31, 2003 and continues in effect with respect to all obligations incurred through September 30, 2020.  The Irrevocable Undertaking does not apply to any interest bearing liabilities, leasing obligations, and other financial obligations of the Consortium incurred after September 30, 2020.

# III.
# EVENTS LEADING TO COMMENCEMENT OF CHAPTER 11 CASES

The COVID-19 pandemic has resulted in significant disruptions for the airline industry, including SAS.  SAS' revenue has experienced significant deterioration since the pandemic began, including a decline in total revenue in fiscal years 2020, 2021, and 2022 by approximately 56%, 70%, and 32%, respectively, as compared to 2019.

SAS has also faced increased pressure from competitors in the low-cost carrier and ultra-low cost carrier segments, and from network carriers in its long-haul market.  From December 2016 to January 2020, low cost carriers expanded their intra-European seat capacity from SAS' three main operations by approximately 30% on a rolling 12-months basis.  In the same period, full-service carriers, including SAS, expanded their seat capacity by less than 5% at those airports.  Low-cost carriers have been able to acquire a large portion of the growth in seat capacity at SAS' three main operations as compared to SAS, and SAS expects low-cost carriers to increase their capacity further in the future.  With respect to its long-haul markets, Finnair, Delta, and United began operating out of Stockholm Arlanda Airport in 2021, 2022, and 2023, respectively.  Finnair has since ceased at-risk long-haul flying out of Stockholm Arlanda Airport.

A.    State Aid Overview

European Union law vests the European Commission (the "**Commission**") with the exclusive powers to assess the compatibility of any "State aid",[10][14] granted by the EU Member States (who must comply with prior notification and standstill obligations until the authorization by the Commission), with the EU internal market.  In response to the COVID-19 outbreak, the Commission adopted specific guidelines describing how the EU State aid rules set forth in the *Treaty on the Functioning of the European Union* ("**TFEU**" – Article 107 and 108 TFEU) will be construed and applied with a flexible approach justified by the COVID-19 crisis,

---

[10][14] "State aid" is governed under EU law by Articles 107 and 108 TFEU.  State aid is not strictly defined and is determined by specific case-law.  However, Article 107(1) TFEU provides cumulative criteria that have been very broadly construed by the EU case-law since the 1960s as follows: (i) an economic advantage (i.e., a measure that does not comply with normal market conditions) granted to an "undertaking" (specific concept of "enterprise" under EU competition law), (ii) with a selective character, (iii) granted through a transfer of State resources and by a decision "imputable" to the State, (iv) which threatens to distort, or distorts EU competition, and (v) which is likely to affect trade between Member States.

under the ultimate judicial review of the Court of Justice of the European Union (the "**General Court**" in the first instance, with appeals, on points of law only, before the "**Court of Justice**").

These guidelines were provided for by the "*Temporary Framework for State aid measures to support the economy in the current COVID-19 outbreak*" ("**COVID-19 TF**"), adopted by the Commission on March 19, 2020.  The COVID-19 TF enabled Member States to use the full flexibility foreseen under State aid rules to support the economy in that crisis context.  The COVID-19 TF was amended six times from March 2020 until November 2021 and expired on June 30, 2022.

B.    2020 Recapitalization[14][15]

In the early stages of the COVID-19 pandemic, SAS took various measures to address the challenges facing the business.  In particular, in early 2020, key stakeholders, including the Kingdom of Denmark and the Kingdom of Sweden, came together to provide approximately $1.2 billion of financial support to SAS (the "**2020 Recapitalization**"), which included:

- a directed issuance of common shares of approximately SEK 2 billion (approximately $228 million) to the Kingdom of Denmark and the Kingdom of Sweden;

- a rights issuance of common shares amounting to approximately SEK 4 billion (approximately $456 million);

- an issuance of new hybrid notes in an aggregate amount of SEK 5 billion (approximately $570 million) to the Kingdom of Denmark and the Kingdom of Sweden (the State Hybrid Bonds 1); and

- an issuance of new hybrid notes in the amount of SEK 1 billion (approximately $114 million) to the Kingdom of Denmark (the State Hybrid Bonds 2).

In addition, the 2020 Recapitalization included the conversion of (i) SEK 1.5 billion (approximately $171 million) in existing hybrid notes into common shares at 90% nominal value, and (ii) an aggregate amount of SEK 2.25 billion (approximately $257 million) in existing senior bonds into a combination of (a) approximately SEK 635 million (approximately $72.4 million) in common shares and (b) approximately SEK 1.6 billion (approximately $183 million) in new commercial hybrid notes (i.e., the Commercial Hybrid Bonds).  In total, the 2020 Recapitalization increased SAS AB's available liquidity by SEK 12 billion (approximately $1.37 billion), decreased liabilities by SEK 2.25 billion (approximately $257 million), and strengthened existing equity by approximately SEK 14.25 billion (approximately $1.626 billion).  Furthermore, in July 2021, the Consortium entered into the

---

[14][15] All conversions in this section are based on USD/SEK 8.7649 as of October 23, 2020 when the 2020 Recapitalization was implemented (Source: Sveriges Riksbank)

State Term Loans, which provided additional liquidity of approximately SEK 3 billion (approximately $342 million).

The long-term success of the 2020 Recapitalization was predicated on an assumed rapid recovery from COVID-19, including an expected 90% recovery in air travel in 2022 and onwards, and achieving annual cost improvements of approximately SEK 4 billion (approximately $456 million). The targeted cost reductions were not achieved because of, among other reasons, a lack of concessions from labor and aircraft lessors. As of the end of the fiscal year 2021, SAS had only achieved roughly 50% of the cost improvements contemplated in connection with the 2020 Recapitalization. Additionally, as set forth on the below chart, passenger traffic did not recover as quickly as anticipated.



Furthermore, prior to the Commencement Date, SAS was not able to achieve sufficient concessions from aircraft lessors, original equipment manufacturers, and labor unions on renegotiated agreements. The ongoing war in Ukraine has also had a negative impact on SAS' business, including through increased operating costs. Due to the closure of Russian airspace to SAS in March 2022 and resultant extensions of viable flight times, SAS was forced to significantly reduce flights to Asia. Additionally, the conflict has contributed to sustained higher jet fuel prices.

C.     SAS FORWARD[1216]

To further address these challenges and instill a culture of continuous improvement to enable SAS to compete within the highly competitive commercial aviation industry, SAS developed a comprehensive transformation plan—SAS FORWARD—which was announced on February 22, 2022. The key elements of the plan include:

- a profit enhancement focus including initiatives to reduce annual costs by SEK 7.5 billion (approximately $750 million), with comprehensive burden sharing across all major stakeholder and creditor groups;

---

[1216] All conversions in this section are based on foreign exchange rates as of the Commencement Date.

- a redesigned fleet, network, and product offerings;

- a strengthened balance sheet through deleveraging and raising new capital;

- a digital transformation that will deliver major improvement in customer experience; and

- a continued emphasis on sustainability efforts, including modern fuel-efficient aircraft and sustainable aviation fuels.

Each of these key initiatives is summarized in more detail below.

Annual Cost Reductions of SEK 7.5 billion.  SAS FORWARD expands on the 2020 Recapitalization to include an additional SEK 3.5 billion (approximately $350 million) in annual cost savings for a total of SEK 7.5 billion (approximately $750 million) in savings between fiscal years 2019 and 2026 (the full SEK 7.5 billion savings are aimed at being realized in 2026).  SAS seeks these cost reductions to lower its cost per available seat kilometers and better defend its market position at its main operations.

Redesigned Fleet, Network, and Product Offerings.  SAS continues to refine its network to optimize resource allocation, reduce complexity, and capitalize on the shifting travel demand coming out of the COVID-19 pandemic.  SAS is further developing its product offerings including unbundling services to increase customer choice (e.g., tickets, seats, and check-in luggage separately), as well as its ancillary services.

Deleveraging and Capital Raise.  SAS FORWARD initially contemplated the conversion of approximately SEK 20 billion ($2 billion) of existing debt and hybrid notes to common equity.  Since SAS FORWARD was announced and as a result of negotiations with key stakeholders, the plan now contemplates that SAS' existing funded debt and claims will be discharged under the Plan in exchange for a combination of cash, GUC ~~Trust~~ Interests, and New Shares, as the case may be, in accordance with the Plan.

In addition, as set forth in greater detail in Section IV.O, SAS has obtained committed exit capital of $1.2 billion from the Investors in connection with the Transaction. This capital infusion is projected to provide sufficient liquidity to fund SAS' path to sustained profitability.

Digital Transformation.  SAS' digital transformation is focused on (i) meeting changing consumer demands, (ii) improving SAS' position in the leisure market, (iii) delivering smooth customer-centric end-to-end travel experience, and (iv) ensuring efficient service operation and process.  SAS intends to build out a new in-house department to implement this "digital-first" approach throughout SAS.

Sustainability Efforts.  SAS seeks to position itself as among the leaders in sustainable aviation.  Its goals include (i) reducing $CO_2$ emissions in 2025 by 25% as compared to 2005, (ii) increasing usage of sustainable aviation fuels, and (iii) net zero carbon emissions

by 2050. SAS will achieve these goals by investing in modern fuel-efficient aircraft, sustainable aviation fuels, and other emerging technologies and products.

D.    Political Mandates

On June 10, 2022, prior to the Commencement Date, a coalition of political parties in the Kingdom of Denmark entered into a political agreement pursuant to which they agreed to support, under certain conditions, SAS FORWARD, including (i) a write down and conversion of the Kingdom of Denmark's financial instruments in SAS on market terms and (ii) an equity investment by the Kingdom of Denmark (including in its capacity as Danish State Investor) in SAS to obtain an ownership share in reorganized SAS ranging from approximately 21.8% to 29.9%. The support from the Danish State Investor pursuant to the political agreement is conditioned on, among other things, a satisfactory shareholder agreement, including with respect to SAS' continued contribution to Danish international connectivity and the hub in Copenhagen Airport. The parties to the agreement, constitute a broad majority of the Danish Parliament, and the agreement provides that the parties' members would vote in favor of the necessary funding and legal provisions needed to implement the agreement.

In addition, prior to the Commencement Date, the Swedish Parliament (Riksdagen) and the government of Norway also announced their intentions to support SAS FORWARD, including an agreement to convert their debt holdings to equity. On December 20, 2023, the Swedish Parliament resolved to expand the mandate to include a write down of debt held by the Kingdom of Sweden.

E.    Pilot Unions' Strike

SAS initially sought to implement SAS FORWARD out of court. Despite efforts by management and SAS' advisors, however, SAS was unable to obtain the concessions needed from aircraft lessors on renegotiated lease terms prior to the Commencement Date. SAS was also unsuccessful in reaching agreements with its labor unions on reduced labor costs.

The lack of progress on SAS FORWARD led to the Debtors commencing preparations for a chapter 11 filing, with the goal of implementing SAS FORWARD through the chapter 11 process. While these preparations were ongoing, on July 4, 2022, the SAS Scandinavia pilots' unions formally instituted a strike involving approximately 900 pilots. The strike resulted in the cancellation of approximately 50% of flights, and the Debtors estimated they would lose approximately $9.5 to 12.5 million (SEK 97 to 128 million) each day that the strike continued. Accordingly, on July 5, 2022, the Debtors commenced the Chapter 11 Cases to preserve liquidity and implement SAS FORWARD.

F.    Ryanair Litigation

The participation of the Kingdom of Denmark and the Kingdom of Sweden (collectively, the "**States**") in the 2020 Recapitalization constituted State aid under EU law, and thus could only legally be provided with the prior approval of the Commission Such approval was obtained in August 2020, but the decision granting approval was challenged in court by low-cost carrier Ryanair, a competitor of SAS. In May 2023, the General Court set aside the Commission's decision approving the participation of the States in the 2020

Recapitalization.[13][17]  The basis of the General Court's judgement was that the Commission had failed to require that the States impose upon SAS, as a condition for the recapitalization, a so-called "step-up mechanism" that would incentivize the exit of the States from the equity component of the recapitalization (the "**2020 Share Investments**").

Following the General Court's judgment, on July 4, 2023, the Commission decided to open an investigation concerning the participation of the States in the recapitalization to comply with the General Court's judgment.[14][18]  In this opening decision, the Commission concluded that the States' participation in the 2020 Recapitalization was generally consistent with EU law but that, following the General Court's judgment, it had doubts concerning the absence of a step-up mechanism for the 2020 Share Investments.

After completing the investigation, on November 29, 2023, the Commission again approved the States' participation in the 2020 Recapitalization and found that it was in accordance with EU law, subject to the introduction of a new step-up mechanism.  The step-up mechanism entails unilateral commitments from Debtor SAS AB to implement a "step-up" in relation to the 2020 Share Investments through the issuance of new hybrid notes ("**New State Hybrid Notes**") to the States without any consideration under certain conditions.  The step-up will be triggered if the portion of the relevant State's shareholdings related to the 2020 Share Investments in excess of such State's pro rata portion immediately prior to the 2020 Share Investments (the "**Recapitalization Shareholding**")[15][19] has not been reduced by a certain percentage on specified dates, as set out below:

- a step-up will be triggered if the relevant State's Recapitalization Shareholding has not been reduced by at least 40% on October 26, 2024; and

- an additional step-up will be triggered if the relevant State's Recapitalization Shareholding has not been fully reduced on October 26, 2026.

Provided that a step-up is triggered, New State Hybrid Notes will be issued to the relevant State in a principal amount corresponding to 10% of the portion of such State's Recapitalization Shareholding *still remaining at the time of the step-up*, multiplied by the higher of (i) SEK 1.16 (being the share subscription price for the 2020 Share Investments) or (ii) the volume-weighted average price paid for the common shares on Nasdaq Stockholm during a period of 20 trading days immediately preceding the fifth trading day prior to the step-up date.

---

[13][17] Judgment of May 10, 2023 in case T-238/21.

[14][18] Decision in of the Commission of July 4, 2023 SA.57543 and SA.58342 (2020/NN) (ex 2020/N).

[15][19] The Kingdom of Denmark's and the Kingdom of Sweden's current respective Recapitalization Shareholdings correspond to 1,039,542,124 common shares and 1,017,296,144 common shares (based on the States' current shareholdings of 1,584,296,144 common shares each and their respective shareholdings prior to the 2020 Share Investments (but after the States' participation in SAS AB's 2020 rights issue) of 544,754,020 common shares and 567,000,000 common shares, respectively).

Assuming (i) that the States do not change their current respective Recapitalization Shareholdings prior to October 26, 2026 and (ii) that the share price of Debtor SAS AB's shares does not exceed SEK 1.16, the step-up mechanism would be triggered on both step-up dates and the undertakings would entail the issuance of New State Hybrid Notes in a total principal amount of SEK 241,173,773 to the Danish State Investor and SEK 236,012,705 to the Kingdom of Sweden (corresponding to an aggregate amount of SEK 477,186,478 to the States).

Under Chapter 16(a), section 7 of the Swedish Companies Act (2005:551), significant transactions between listed companies and their related parties, including shareholders holding more than 20% of a company's shares, must be submitted to the general meeting for approval (unless certain exemptions are applicable). Consequently, on January 10, 2024, an Extraordinary General Meeting of Debtor SAS AB's shareholders was held and resolved to approve SAS AB's unilateral commitments towards the State to effect the step-up mechanism. The unilateral commitments were consequently entered into by SAS AB on January 11, 2024.

As explained above, the States provided a loan guarantee during the first weeks of the COVID-19 pandemic, which was also deemed to be State aid and was approved as such by the Commission.[20] The decision approving the States' provision of the loan guarantees was unsuccessfully challenged by Ryanair in the General Court as well as the Court of Justice and is therefore now definitive.[21]

## IV.
## OVERVIEW OF CHAPTER 11 CASES

A.   First Day Motions

On the Commencement Date, the Debtors filed multiple motions seeking various relief from the Bankruptcy Court to facilitate a smooth transition into chapter 11 and minimize any disruptions to the Debtors' operations (the "**First Day Motions**"). The Bankruptcy Court granted substantially all of the relief requested in the First Day Motions and entered various orders authorizing the Debtors to, among other things:

- enforce various protections of the Bankruptcy Code, including the automatic stay, with respect to non-U.S. creditors [ECF No. 51];

- pay prepetition claims of critical vendors, non-U.S. vendors, and lien claimants [ECF Nos. 52, 168];

---

[20] Cases SA.56795 (2020/N) and SA.5761 (2020/N).

[21] Judgments of April 14, 2021 in cases T-378/20 and T-379/20 and judgments of September 28, 2023 in cases C-320/21 P and C-321/21 P.

- continue their insurance and surety bond programs and pay prepetition obligations related thereto [ECF Nos. 53, 175];

- pay certain prepetition taxes and fees [ECF Nos. 55, 91, 176, 615];

- maintain and administer their customer programs and honor certain prepetition obligations related thereto [ECF Nos. 58, 173];

- pay prepetition amounts owed to fuel supply parties and perform under fuel supply arrangements [ECF Nos. 54, 92, 170];

- continue performing under foreign currency hedging agreements and emission rights allowance transactions and enter into and perform under new postpetition arrangements related to the foregoing [ECF Nos. 56, 171];

- assume certain critical airline agreements and honor certain prepetition obligations related thereto [ECF Nos. 59, 172];

- continue using their existing cash management system, including the continued maintenance of existing bank accounts, and to honor certain prepetition obligations related thereto [ECF Nos. 44, 169, 478, 640, 879];

- pay prepetition employee obligations and continue their employee benefit programs [ECF Nos. 57, 93, 174] (such motion the "**Employee Obligations Motion**"); and

- provide adequate assurance of future payment to utility providers [ECF No. 167].

B.    Procedural Motions

The Debtors also filed various motions relating to procedural issues that are common to chapter 11 cases of similar size and complexity as the Chapter 11 Cases. The Bankruptcy Court granted the relief requested in such motions and entered various orders providing for, among other things:

- joint administration of the Chapter 11 Cases [ECF No. 18];

- waiver of SAS AB's requirement to file a list of equity security holders and authority to file a consolidated creditor matrix and a consolidated list of the 30 largest unsecured claims [ECF No. 50];

- procedures for the interim compensation and reimbursement of expenses of professionals [ECF No. 285];

- employment of professionals used by the Debtors in the ordinary course of business [ECF No. 284]; and

- certain notice and case management procedures (the "**Case Management Procedures Order**") [ECF No. 292].

C.    Retention of Professionals

The Debtors retained the following advisors in the Chapter 11 Cases:  (i) Weil, Gotshal & Manges LLP, as global legal counsel; (ii) Seabury Securities LLC ("**Seabury**"), as co-investment banker and restructuring advisor; (iii) Skandinaviska Enskilda Banken AB ("**SEB**"), as co-investment banker; (iv) FTI Consulting, Inc., as financial advisor; (v) Mannheimer Swartling Advokatbyrå AB, as special Swedish counsel; (vii) Norton Rose Fulbright US LLP and Norton Rose Fullbright LLP, as special aircraft finance counsel; (viii) Advokatfirmaet Schjødt AS, as special Norwegian counsel, and (ix) Ernst & Young AB, as tax advisor.

The Debtors also employ other professionals in the ordinary course of their business pursuant to the *Order Authorizing Debtors to Employ Professionals Utilized in Ordinary Course of Business* [ECF No. 284].

D.    Appointment of Creditors' Committee

On July 22, 2022, the U.S. Trustee appointed the Creditors' Committee pursuant to section 1102 of the Bankruptcy Code to represent the interests of unsecured creditors in the Chapter 11 Cases [ECF No. 75].  The members of the Creditors' Committee are (i) Airbus SAS, (ii) Dr. Malte Daniels, (iii) Jackson Square Aviation Ireland Limited, and (iv) Flying Food Group, LLC.  The Creditors' Committee retained the following advisors in the Chapter 11 Cases: (i) Willkie Far & Gallagher LLP, as legal counsel; (ii) DLA Piper Denmark, DLA Piper Sweden, and DLA Piper Norway, as Scandinavian local counsel, and DLA Piper LLP (US), as U.S. administrative counsel; (iii) Jefferies LLC, as investment banker; (iv) AlixPartners, LLP, as financial advisor; and (v) Alton Aviation Consultancy LLC, as specialized aviation financial advisor.

E.    Payment of Eligible Employees Under AIS Program

As disclosed in the Debtors' Employee Obligations Motion, the Debtors in the ordinary course of business, maintain an annual incentive-based compensation program for certain members of their senior executive team and other key personnel (the "**AIS Program**"). The Debtors did not seek relief to make payments under the AIS Program in the Employee Obligations Motion as (i) the Debtors were required to repay certain government issued debt instruments prior to paying certain employees under the AIS Program and (ii) the Debtors did not know if the 2022 performance metrics of the AIS Program would be satisfied.  However, in fiscal year 2022, twenty-four non-insider employees who are not members of the Debtors' management and six employees who are members of the Debtors' management qualified for bonuses under the AIS Program.  Accordingly the Debtors filed a motion [ECF No. 810] and

received Bankruptcy Court approval to make certain payments to non-insider employees under the AIS Program [ECF No. 880].

F.     Pilot Unions Agreement

On March 31, 2022, prior to the Commencement Date, the Consortium's collective labor agreements with four of its pilot unions, Svensk Pilotförening, Norske SAS-flygeres Forening, SAS Norge Pilotforening, and Dansk Pilotforening (the "**Pilot Unions**"), expired. On June 9, 2022, after the Consortium and Pilot Unions were unable to reach agreement on the terms of new collective labor agreements, the Pilot Unions issued a strike warning for no earlier than June 29, 2022. On July 4, 2022, the Pilot Unions instituted a strike, which resulted in the cancellation of approximately 50% of scheduled flights for the duration of the strike and caused the Debtors to lose $9.5 to 12.5 million each day, for cumulative losses of approximately $165 million.

On July 19, 2022, the Consortium and Pilot Unions reached agreement on new collective labor agreements (the "**New CLAs**"), which ended the 15-day strike. The agreement also settled certain litigation commenced by the Pilot Unions against the Consortium and resolved related claims. On August 5, 2022, the members of each Pilot Union voted in favor of entering into the New CLAs, which provided for new terms through September 30, 2027. As part of the negotiations concerning the New CLAs, the Consortium and the Pilot Unions agreed on terms of a restructuring support agreement (the "**Labor RSA**"). The Labor RSA among other things, granted the Debtors' pilots who are union members (the "**Pilots**") an allowed general, non-priority, unsecured claim in the aggregate amount of SEK 1,000,000,000 (approximately $100,000,000) against the Consortium (the "**Allowed Pilot Union Claim**")[18][22] and required each Pilot Union, on behalf of the Pilots, to timely submit a ballot in respect of the Labor Claim voting in favor of the Plan.

On September 3, 2022, the Debtors filed a motion seeking authority for the Consortium to enter into and perform under the New CLAs and the Labor RSA [ECF No. 309]. The Bankruptcy Court held an initial hearing on the motion on September 28, 2022. Subsequent to the hearing, on December 5, 2022, the Debtors filed the *Amended and Restated Agreement*, dated as of November 15, 2022, by and among the Consortium and the Pilot Unions, which amended the Labor RSA (the "**A&R Agreement**") [ECF No. 680, at Ex. A]. The A&R Agreement removed the obligation of the Pilot Unions to vote in favor of the Plan. On December 8, 2022, the Bankruptcy Court entered an order authorizing the Consortium to enter into the New CLAs and the A&R Agreement and approving the Allowed Pilot Union Claim [ECF No. 686].

G.     DIP Financing

1.     *Original DIP Financing*

On August 16, 2022, the Debtors filed a motion (the "**Original DIP Motion**") [ECF No. 226] seeking authority to execute and enter into a credit agreement (the "**Original**

---

[18][22] The Allowed Pilot Union Claim is subject to a distribution cap of 100,000,000 SEK ($9,796,334).

**DIP Credit Agreement**") for senior secured superpriority loans in the aggregate amount of $700 million (the "**Original DIP Loans**") provided by Apollo Management Holdings, L.P., on behalf of one or more affiliates and/or funds or separate accounts managed by it or its affiliates (collectively, "**Apollo**"). The Consortium was the borrower under the Original DIP Credit Agreement and the obligations thereunder were guaranteed by SAS AB and each subsidiary of SAS AB that is a Debtor in the Chapter 11 Cases (collectively, the "**Guarantors**" and, together with the Consortium, the "**Obligors**"). The Original DIP Credit Agreement included (i) $350 million of Original DIP Loans made available upon entry of an order approving the Original DIP Motion and satisfaction of certain other conditions to the effectiveness of the Original DIP Credit Agreement and such Original DIP Loans and (ii) an additional $350 million of Original DIP Loans made available upon the satisfaction of all other conditions for such borrowing set forth in the Original DIP Credit Agreement, including the substantial achievement of certain cost-savings objectives. All amounts owing by the Consortium under the Original DIP Credit Agreement were secured by valid and perfected security interests in, and liens on, all property of the Obligors (other than certain excluded assets), including (i) all shares in each limited liability company wholly-owned by SAS AB, (ii) certain slots at Heathrow Airport, (iii) all shares in the limited liability company that owns all rights to the EuroBonus loyalty program, (iv) all material registered intellectual property, and (v) certain unencumbered aircraft, spare parts, and engines, among other collateral.

On September 12, 2022, the Bankruptcy Court entered an order authorizing the Debtors to, among other things, enter into the Original DIP Credit Agreement (the "**Original DIP Order**") [ECF No. 331]. On September 26, 2022, the parties closed the Original DIP Credit Agreement and the Debtors made the initial draw of approximately $350 million (SEK 3,573 million). On April 17, 2023, SAS announced that it would not make the second draw under the Original DIP Credit Agreement.[~~19~~23]

The Original DIP Credit Agreement contained two equity-linked provisions—the Call Option and the Tag Right—each as defined in the Original DIP Credit Agreement.

- Call Option: Under the Call Option, for a 28-day period beginning on the day on which the Debtors filed definitive documentation with the Bankruptcy Court with respect to an alternative transaction described in the Original DIP Credit Agreement, Apollo had an option to convert some or all of its outstanding Original DIP Loans to equity or to purchase equity for cash assuming a total enterprise value of $3.2 billion (approximately SEK 32.7 billion)calculated in accordance with the methodology described in the Original DIP Credit Agreement. If Apollo exercised the Call Option but the Debtors terminated it, Apollo would be owed a fee of either (i) $19.52 million (SEK 199 million) if such termination occurred within 12 months from the closing date under the Original DIP Credit Agreement or (ii) a dollar amount that would result in Apollo receiving an all-in internal rate of return of 23.2% under the

---

[~~19~~23]    *Update     on     SAS'     Debtor-In-Possession     Term     Loan*,     available     at https://www.sasgroup.net/newsroom/press-releases/2023/update-on-sas-debtor-in-possession-term-loan.

Original DIP Credit Agreement if terminated thereafter (the "**Call Option Termination Fee**"). The Call Option, however, did not arise (and no Call Option Termination Fee was payable) because (i) the Debtors did not satisfy all conditions precedent set forth in the Original DIP Credit Agreement for the second draw and (ii) Apollo did not otherwise fund any amounts in excess of the first draw.

- Tag Right: Under the Tag Right provision, Apollo had the right to subscribe for up to 30% of the new-money equity interests provided by any third party on the same terms and conditions made available to any such third party. If the Debtors terminated the Tag Right, however, Apollo would be owed an additional exit fee equal to 3.0% of the commitments under the Original DIP Credit Agreement (i.e., approximately $21 million (SEK 214 million)) (the "**Tag Right Termination Fee**").

2. *DIP Refinancing*

In connection with the Investors' winning bid, Castlelake, committed to provide a secured, superpriority debtor-in-possession term loan facility (the "**Replacement DIP Facility**") through an affiliate in the aggregate principal amount of $500,000,000 (approximately SEK 5,104 million) (the "**Replacement DIP Commitments**") to enable the Debtors to repay all outstanding Original DIP Loans, coupled with a significant maturity extension (as compared to the Original DIP Facility), which affords the Debtors with sufficient runway until emergence from the Chapter 11 Cases. On November 4, 2023, the Debtors filed a motion (the "**Replacement DIP Motion**") [ECF No. 1580] seeking authority to execute and enter into a credit agreement with the Castlelake affiliate to refinance amounts owed under the Original DIP Credit Agreement (the "**Replacement DIP Credit Agreement**"). The Replacement DIP Facility will be repaid in connection with emergence from the Chapter 11 Cases and is subject to upfront and exit fees in the amount of 1.75% of the funding amounts and 4.5% of the Replacement DIP Commitments, respectively. The Replacement DIP Facility accrues interest at 8% per annum plus Term SOFR, subject to a 1% Term SOFR floor, with a default interest rate at an additional 2% per annum.

On November 9, 2023, the Bankruptcy Court entered an interim order authorizing the Debtors to draw $450 million (SEK 4,594 million) under the Replacement DIP Facility [ECF No. 1602], which was drawn on November 15, 2023 (the "**Closing Date**"). On November 21, 2023, the Bankruptcy Court approved the Replacement DIP Facility on a final basis, enabling the Debtors to draw the remaining $50 million (SEK 510 million) under the Replacement DIP Facility [ECF No. 1644], which was drawn on November 27, 2023.

The Replacement DIP Facility has a maturity date of nine months following the Closing Date with the potential for two three-month extensions subject to fees of (i) 0.75% of the Replacement DIP Commitments with respect to the first extension request and (ii) 1.25% of the Replacement DIP Commitments with respect to the second extension request.

Upon the signing of the Replacement DIP Credit Agreement, on November 4, 2023, the Debtors gave notice to Apollo of their intent to terminate the Tag Right in accordance with the Call Option and Tag Right Procedures [ECF No. 1581]. In conjunction with the Original DIP Loan refinancing, the Investors agreed to allow the Debtors to access a portion of the escrow established in connection with the Investment Agreement to hold a portion of the subscription price for the New Convertible Notes to pay the Tag Right Termination Fee. On November 21, 2023, the Bankruptcy Court entered an order authorizing the Debtors to pay the Tag Right Termination Fee [ECF No. 1645], which was paid on November 27, 2023.

H.     Commercial Hybrid Forbearance Agreement

On January 16, 2023, the Debtors entered into an agreement with Intertrust (Sweden) AB as agent (the "**Agent**") to the Commercial Hybrid Bonds (the "**Commercial Hybrid Forbearance Agreement**"), preventing such the Agent from (i) bringing any action against the Debtors for reimbursement of the cost of the Agent's advisors (the "**Commercial Hybrid Bonds Advisors**") and (ii) filing any objection in or otherwise interfering with the Debtors' Chapter 11 Cases. In exchange, the Debtors agreed to pay the fees of the Commercial Hybrid Bonds Advisors, subject to certain limitations. On March 2, 2023, the Bankruptcy Court entered an order approving the Commercial Hybrid Forbearance Agreement [ECF No. 950]. The Commercial Hybrid Forbearance Agreement has been extended to January 31, 2024, without prejudice to the parties' ability to further extend the agreement.

I.     Vendor Contract Negotiations

To optimize operations and achieve greater profitability, the Debtors engaged in the process of identifying executory contracts that are critical to their operations and consistent with the earnings improvement measures set forth in SAS FORWARD as well as executory contracts that no longer fit their go-forward business plan. To realize cost savings, the Debtors negotiated amendments to certain executory contracts with service providers critical to the Debtors' operations. The Debtors prepared motions for authority to assume such executory contracts, as amended, and received Bankruptcy Court approval of the relief requested therein [ECF Nos. 996, 1010, 1213, 1283, 1458, 1475, 1476, 1657, and 1702]. Additionally, the Debtors determined that executory contracts with certain service providers no longer provided value to the Debtors' estates. Accordingly, the Debtors prepared motions to reject such executory contracts and received Bankruptcy Court approval to reject such contracts [ECF Nos. 898 and 979]. The Debtors continue to finalize negotiations with remaining executory contract counterparties and will seek further assumptions and rejections.

J.     Unexpired Leases of Non-Residential Real Property

Following a comprehensive assessment of the terms of the Debtors' unexpired leases of nonresidential real property against respective market terms and the role of each lease in the reorganized business, the Debtors determined which of their unexpired leases of nonresidential real property they should retain and which leases required modifications to support cost savings initiatives and optimize the Debtors' business operations to achieve greater profitability in connection with SAS FORWARD. To support such efforts, on January 26, 2023, the Debtors filed a motion seeking approval of an extension of the time to assume or

reject unexpired leases of nonresidential real property pursuant to section 365(d)(4) of the Bankruptcy Code (the "**365(d)(4) Deadline**") [ECF No. 852]. On February 6, 2023, the Bankruptcy Court entered an order extending the 365(d)(4) Deadline to May 1, 2023 [ECF No. 890].

After largely concluding the assessment and negotiations with respect to unexpired leases of nonresidential real property, on May 1, 2023, the Debtors filed two omnibus motions seeking authority to (i) assume certain unexpired leases of nonresidential real property and (ii) further extend the 365(d)(4) Deadline for one unexpired lease of nonresidential real property [ECF Nos. 1132 & 1133]. Additionally, on May 1, 2023, the Debtors filed a motion to reject an unexpired lease of nonresidential real property [ECF No. 1134] (the "**Lease Rejection Motion**").

On May 15, 2023, the Bankruptcy Court entered orders [ECF Nos. 1156 & 1157] authorizing the Debtors to assume the unexpired leases of nonresidential real property included on schedules annexed to such orders and extending the 365(d)(4) Deadline with respect to the lease that covers the Debtors' headquarters in Stockholm, Sweden (the "**HQ Lease**") to December 31, 2023. On June 12, 2023, as a result of a consensual agreement with the applicable lessor and the Debtors, the Bankruptcy Court entered an order providing for procedures to assume or reject the leases subject to the Lease Rejection Motion. Such lease was terminated pursuant to such procedures as of October 31, 2023.

On December 29, 2023, the Debtors filed a motion to amend and assume the HQ Lease prior to the December 31, 2023 deadline [ECF No. 1134] (the "**HQ Lease Assumption Motion**"). Among other things, the Amendments consolidate the space the Debtors lease pursuant to the HQ Lease. The deadline for parties to object to the relief requested in the HQ Lease Assumption Motion was January 8, 2024 (unless otherwise extended). No objections have been filed to the HQ Lease Assumption Motion.

K.     Fleet Restructuring

Prior to the Commencement Date, the Debtors and their advisors initiated a comprehensive review of the Debtors' fleet of aircraft. This process resulted in the Debtors identifying certain aircraft subject to leases that were determined to be above prevailing market rates or that were no longer needed for the Debtors' go-forward business plan. Throughout the Chapter 11 Cases, the Debtors and their advisors engaged the lessors of those aircraft in negotiations regarding amended lease terms. On January 13, 2023, the Debtors announced they concluded negotiations with lessors as part of the chapter 11 process and reached agreements for renegotiated lease terms with 15 lessors with respect to 59 aircraft, including seven wide-body aircraft and 52 narrow-body aircraft. Through the amended lease agreements, the Debtors expect to achieve annual cost savings of at least SEK 1 billion (approximately $98 million), which would exceed the Debtors' targeted annual cost savings of SEK 850 million to SEK 1 billion ($83 to $98 million) in reduced aircraft lease and capital costs under SAS FORWARD.

The Debtors expect their near-term fleet upon emergence from the Chapter 11 Cases will consist of 134 aircraft, including 35 wet-leased aircraft, 22 owned aircraft, and 77

aircraft subject to various lease and financing arrangements.  The following chart compares the Debtors' fleet as of the Commencement Date to the Debtors' anticipated fleet upon emergence from the Chapter 11 Cases:

| Type | Aircraft Model | Fleet as of Commencement Date | Anticipated Fleet upon Emergence |
|---|---|---|---|
| Owned | Airbus 319 | 4 | 4 |
| | Airbus 320 | 2 | - |
| | Airbus 321 | 5 | 4 |
| | Airbus 330 | 3 | 3 |
| | Boeing 737 | 16 | - |
| Operating Lease | Airbus 320 | 9 | 9 |
| | Airbus 320neo | 41 | 63 |
| | Airbus 321 | 3 | - |
| | Airbus 321neo | 3 | 3 |
| | Airbus 330 | 5 | 5 |
| | Airbus 350 | 3 | 4 |
| | Boeing 737 | 1 | - |
| | Embraer 195 | 1 | 11 |
| JOLCO | Airbus 320neo | 9 | 9 |
| | Airbus 350 | 3 | - |
| | Boeing 737 | 3 | - |
| Finance Lease | Boeing 737 | 2 | - |
| Wet Lease | Airbus 220 | 4 | - |
| | ATR 72 | 7 | 6 |
| | Bombardier CRJ900 | 29 | 20 |

1.    *Aircraft Lease Rejection Motions*

In addition to amended lease terms, as part of their fleet restructuring, the Debtors also rejected certain unexpired leases for surplus aircraft and engines, including leases for eight aircraft and six engines.

- On August 25, 2022, the Bankruptcy Court entered an order [ECF No. 250] approving a stipulation and the rejection of an operating lease for an A321-200 aircraft (MSN 1848) leased from IC Airlease One Limited.

- On August 29, 2022, the Bankruptcy Court entered an order [ECF No. 283] approving the rejection of a lease for a CFM56-7 engine (ESN 963429) leased from Aviator IV 963429, Limited.

- On September 9, 2022, the Bankruptcy Court entered an order [ECF No. 325] approving a stipulation and the rejection of an operating lease for an A321-200 aircraft (MSN 1657) leased from IC Airlease One Limited.

- On September 20, 2022, the Bankruptcy Court entered an order [ECF No. 372] approving the rejection of a lease for a Boeing 737-700 aircraft (MSN 32734) leased from ACS 18-Pack Irish DAC, a lease for an A350-900 aircraft (MSN 391) leased from FS World Leasing Co., Ltd, a lease for a CFM56-5C4 engine (ESN 567180) leased from Willis Lease Finance Corp., a lease for a CFM56-5C4/P engine (ESN 567192) leased from Willis Lease Finance Corp., a lease for a CFM56-5C4 engine (ESN 567177) leased from Willis Lease Finance Corp., and a lease for a CFM56-5C4 engine (ESN 741475) leased from Willis Lease Finance Corp.

- On October 18, 2022, the Bankruptcy Court entered an order [ECF No. 519] approving a stipulation providing for the rejection of an operating lease for an A321-200 aircraft (MSN 1619) leased from IC Airlease One Limited.

- On January 18, 2023, the Bankruptcy Court entered an order [ECF No. 812] approving the rejection of a lease for an A350-900 aircraft (MSN 378) leased from FLIP No.247 Co. Ltd., FLIP No.248 Co., Ltd., and FLIP No.249 Co., Ltd.

- On January 30, 2023, the Bankruptcy Court entered an order [ECF No. 860] approving the rejection of a lease for an A330-300 aircraft (MSN 1660) leased from JPA No.137 Co., Ltd. and a lease for an A320-251N aircraft (MSN 9173) leased from Wilmington Trust SP Services (Dublin) Limited.

- On January 31, 2023, the Bankruptcy Court entered an order [ECF No. 871] approving the rejection of a lease for an A350-900 aircraft (MSN 358) leased from JPA No.183 Co., Ltd.

2. *PDP Financing Motions*

As of the Commencement Date, the Debtors were party to certain aircraft purchase agreements, including a purchase agreement with Airbus S.A.S. ("**Airbus**") for the purchase of certain A320-200NEO aircraft (as amended, modified, or novated from time to time, the "**A320 Purchase Agreement**") and a purchase agreement for certain A350-900 aircraft (as amended, modified, or novated from time to time, the "**A350 Purchase Agreement**" and together with the A320 Purchase Agreement, the "**Aircraft Purchase Agreements**"). Under the Aircraft Purchase Agreements, the Debtors are required to make certain scheduled payments to Airbus prior to delivery of an aircraft. These payments are known as pre-delivery payments or "**PDPs**".

Prior to the Commencement Date, the Debtors entered into arrangements to finance certain of the pre-delivery payments under the A320 Purchase Agreement, including an arrangement with entities affiliated with Carlyle Aviation Management Limited ("**Carlyle**"). The arrangement with Carlyle provides for a facility of $102,940,025.39 (SEK

1,050,801,485.18) (as amended, restated, or supplemented from time to time, the "**PDP Facility**") to finance PDPs related to ten A320-200NEO aircraft under the A320 Purchase Agreement. On August 8, 2022, the Debtors filed a motion seeking authority to honor and perform their obligations in relation to the PDP Facility [ECF No. 209]. On September 12, 2022, the Bankruptcy Court entered an order authorizing the requested relief [ECF No. 333].

### 3. *Griffin Sale-Leaseback Transaction*

On September 20, 2022, the Bankruptcy Court entered an order [ECF No. 373] authorizing the Consortium to execute a sale and leaseback of six new Airbus A320neo aircraft, each equipped with two CFMI LEAP-1A26 aircraft engines. Pursuant to the sale-leaseback transaction, Griffin Global Asset Management DAC agreed to lease the purchased aircraft back to Gorm Light Blue Limited.

### 4. *Aircraft Purchase Option Motion*

On December 4, 2022, the Bankruptcy Court entered an order [ECF No. 675] authorizing the Consortium to exercise purchase options with respect to three Boeing 737-800 aircraft (MSNs 35706, 35707, and 35708). The Debtors were required under the Original DIP Credit Agreement to exercise the purchase options. The Consortium's exercise of the purchase options is part of the Debtors' planned phase out of their Boeing 737 fleet. Subsequent to the purchase of the three aircraft, the Consortium sold the aircraft to Debtor Gorm Engine Management Limited, which then leased the aircraft along with a fourth Boeing 737-800 aircraft (MSN 34546) to Jet2.com Limited.

### 5. *ACG Sale-Leaseback Transaction*

On January 30, 2023, the Bankruptcy Court entered an order [ECF No. 861] authorizing the Debtors to execute a sale and leaseback of ten new Airbus A320-251N aircraft, each equipped with two CFM LEAP-1A26 aircraft engines, which the Debtors ordered from Airbus pursuant to the A320 Purchase Agreement. Pursuant to the sale-leaseback transaction, Aviation Capital Group LLC agreed to purchase the ten aircraft from a subsidiary of Debtor Gorm Asset Management Limited on specified delivery dates and lease the aircraft back to the subsidiary.

### 6. *Sale of Airbus A321 Airframes*

On July 26, 2023, the Debtors filed a motion seeking to execute a sale of four surplus Airbus A321-200 airframes without engines bearing manufacturer's serial numbers 1587, 1642, 1798, and 1817 to Spectre Air Capital LLC [ECF No. 1316] (the "**A321 Airframe Sale Motion**"). On August 14, 2023, the Bankruptcy Court entered an order granting the relief requested in the A321 Airframe Sale Motion [ECF No. 1341].

### 7. *AerDragon Sale-Leaseback Transaction*

On October 17, 2023, the Bankruptcy Court entered an order [ECF No. 1523] authorizing the Debtors to execute a sale and leaseback of two new Airbus A320-251Neo aircraft, each equipped with two CFM LEAP-1A26 aircraft engines, which the Debtors ordered

from Airbus pursuant to the A320 Purchase Agreement. Pursuant to the sale-leaseback transaction, AerDragon Aviation Partners Limited agreed to purchase the two aircraft from a subsidiary of Debtor Gorm Asset Management Limited on specified delivery dates and lease the aircraft back to the subsidiary.

L.    Swedish Tax Respite Program

Prior to the Commencement Date, the Swedish Tax Agency (Skatteverket) introduced a measure (the "**Tax Respite Program**") to support companies that were affected financially by the COVID-19 pandemic. The Debtors had participated in the Tax Respite Program prior to the Commencement Date and sought to submit an application for reimbursements (the "**Tax Respite Application**") after Skatteverket extended the Tax Respite Program to cover taxes paid during April 2022 to June 2022. To this end, the Debtors (i) amended the Original DIP Credit Agreement to incur indebtedness in order to submit the Tax Respite Application as stated in the motion to amend the Original DIP Facility [ECF No. 1329] and (ii) obtained Bankruptcy Court approval to submit the Tax Respite Application [ECF No. 1404]. The Tax Respite Application has since been approved, and the Debtors have been reimbursed by Skatteverket for approximately SEK 250 million ($24.5 million) in certain taxes paid from April to June 2022. The Debtors are required to repay such amounts to Skatteverket over a five-year period (comprising a two-year deferral and subsequent three-year amortization of the payments) at an interest rate of 5% per annum, subject to possible adjustments, plus a 0.1% fee per calendar month, with no additional fees.

M.    Claims

1.    *Schedules of Assets and Liabilities and Statements of Financial Affairs*

Pursuant to section 521 of the Bankruptcy Code, Bankruptcy Rule 1007, and orders of the Bankruptcy Court granting extensions of time, between August 3, 2022 and August 4, 2022, each Debtor filed its (i) schedule of assets and liabilities (collectively, the "**Schedules**") and (ii) statement of financial affairs (collectively, the "**Statements**") [ECF Nos. 139-66, 177-91]. On November 3, 2022, each Debtor filed amended Schedules and certain of the Debtors filed amended Statements [ECF Nos. 576-92]. On January 23, 2023, certain of the Debtors filed further amended Statements [ECF Nos. 821-30] and the Consortium filed a further amended Schedule [ECF No. 831].

2.    *Claims Bar Dates*

On November 8, 2022, the Bankruptcy Court entered an order [ECF No. 605] (the "**Bar Date Order**") establishing the following dates for filing proofs of claim:

- January 10, 2023 at 5:00 p.m. (Prevailing Eastern Time) as the deadline for each entity (as defined in section 101(15) of the Bankruptcy Code), other than a Governmental Unit, to file a proof of claim (each, a "**Proof of Claim**") in respect of any Claim, including secured claims, priority

claims, and claims arising under section 503(b)(9) of the Bankruptcy Code, against any Debtor (the "**General Bar Date**");

- January 10, 2023 at 5:00 p.m. (Prevailing Eastern Time) as the deadline for Governmental Units to file a Proof of Claim in respect of a Claim against any Debtor (the "**Governmental Bar Date**");

- the later of (a) the General Bar Date or the Governmental Bar Date, as applicable, or (b) 5:00 p.m. (Prevailing Eastern Time) on the date that is 30 days from the date on which the Debtors provide notice of a previously unfiled schedule of assets and liabilities or an amendment or supplement to a schedule of asset and liabilities as the deadline by which claimants holding Claims affected by such filing, amendment, or supplement must file Proofs of Claim with respect to such Claims; and

- the later of (a) the General Bar Date or the Governmental Bar Date, as applicable, or (b) 5:00 p.m. (Prevailing Eastern Time) on the date that is 30 days following service of an order approving the rejection of any executory contract or unexpired lease of the Debtors as the deadline by which claimants asserting Claims resulting from the Debtors' rejection of an executory contract or unexpired lease must file Proofs of Claim for damages arising from such rejection.

3.    *Filed Claims and Reconciliation Process*

Approximately 1202 Proofs of Claim asserting Claims against the Debtors have been received by Kroll or filed with the Bankruptcy Court to date. In addition, the Debtors have scheduled approximately 1790 liquidated, noncontingent, and undisputed Claims. As of the date hereof, the aggregate amount of Claims filed against and scheduled by the Debtors that have not been Disallowed is $26,361,693,398.38 (SEK 269,097,530,041.32) (including certain disputed amounts and excluding any estimated amounts for contingent Claims). The Debtors are evaluating these Claims to determine whether to allow certain Claims, object to their allowance, seek to settle certain Claims through negotiations with creditors, or whether certain Claims require other actions. The Debtors anticipate resolving a substantial amount of Claims consensually, but anticipate filing objections to Claims where consensual resolution with the applicable claimant cannot be achieved.

N.    Exclusivity

On November 15, 2022, the Bankruptcy Court entered an order [ECF No. 624], pursuant to section 1121(d) of the Bankruptcy Code, granting extensions of the Debtors' exclusive periods to file a chapter 11 plan and solicit acceptances thereof through and including April 1, 2023 and June 1, 2023, respectively, without prejudice to the right of the Debtors to seek further extensions of such periods.

On April 13, 2023, the Bankruptcy Court entered an order [ECF No. 1078] granting further extensions of the Debtors' exclusive periods to file a chapter 11 plan and solicit

acceptances thereof through and including July 31, 2023 and September 29, 2023, respectively, without prejudice to the right of the Debtors to seek further extensions of such periods.

On August 10, 2023, the Bankruptcy Court entered an order [ECF No. 1335] granting further extensions of the Debtors' exclusive periods to file a chapter 11 plan and solicit acceptances thereof through and including November 8, 2023 and January 8, 2024, respectively, without prejudice to the right of the Debtors to seek further extensions of such periods.

On November 21, 2023, the Bankruptcy Court entered an order [ECF No. 1647] granting further extensions of the Debtors' exclusive periods to file a chapter 11 plan and solicit acceptances thereof through and including January 5, 2024 and March 5, 2024, respectively, which is the maximum amount of time such periods may be extended in accordance with section 1121(d) of the Bankruptcy Code. Accordingly, such periods may not be further extended.

O.   Equity Solicitation Procedures and Selection of Investors

1.   *Overview of Equity Solicitation Process*

On April 5, 2023, the Debtors filed a motion (the "**Equity Solicitation Procedures Motion**") [ECF No. 1061] seeking approval of procedures (the "**Equity Solicitation Procedures**") to solicit proposals from third parties regarding an investment transaction involving Reorganized SAS AB. On May 15, 2023, the Bankruptcy Court entered an order approving the Equity Solicitation Procedures Motion [ECF No. 1155], which, among other things, approved the Equity Solicitation Procedures. The equity solicitation process provided a Bankruptcy Court-approved, transparent framework to facilitate competitive bidding, ensuring a fair and reasonable marketing and diligence process for potential financial and strategic investors, with clear qualification and selection guidelines, and corresponding deadlines to support the Debtors' timely emergence from the Chapter 11 Cases.

As described in more detail in the *Motion of Debtors for Authority to Enter into Investment Agreement, Perform Obligations Thereunder, and Pay Transaction Fees and Expenses* [ECF No. 1579], Seabury and SEB commenced an expansive equity solicitation process with the goal of identifying third-party investors for the Debtors' reorganized business. In preparation for the first round of the equity solicitation process, Seabury and SEB contacted over 200 potential investors across international capital markets, including a significant number of private equity firms, asset managers, strategic buyers, hedge funds, institutional investors, and family offices. Seabury and SEB formally launched the first round on May 15, 2023, and contacted parties they believed, based on their experience, may be interested in (i) taking a lead position as the plan sponsor for a transaction, as one or more bidders working together with the prior written consent of the Debtors (each, a "**Category One Bidder**"), or (ii) making an investment in Reorganized SAS AB alongside, and subject to the terms and conditions set forth by, a Category One Bidder or another bidder (each, a "**Category Two Bidder**"). Category One Bidders and Category Two Bidders were instructed to submit non-binding indications of interest (each, a "**First Round LOI**") by July 17, 2023 (the "**LOI Bid Deadline**"), with final bids to be submitted by September 25, 2023 (the "**Final Bid Deadline**").²⁰²⁴

---

²⁰²⁴ Originally, the LOI Bid Deadline was June 26, 2023 and the Final Bid Deadline was August 14, 2023. Pursuant to the *Notice of Amendment to Key Events Related to Equity Solicitation Procedures* [ECF No. 1223] and

After the launch of the equity solicitation process and prior to the LOI Bid Deadline, the Debtors and their advisors determined that alternative forms of capital should be solicited to gain further interest from potential investors to increase competitive dynamics. Given a ruling by the General Court of the European Union,[21][25] Seabury and SEB communicated to potential investors that the Debtors would consider convertible debt solutions (the "**Alternative Structure**").

On the LOI Bid Deadline, seven potential investors submitted First Round LOIs, two of which were Category One Bidders and five of which were Category Two Bidders, with such bids from a variety of types of bidders, including global private equity funds, alternative investors, and strategic investors. Three of the First Round LOIs included proposed transactions involving equity investments and four of the First Round LOIs proposed transactions involving the Alternative Structure, in each case with a range of implied plan equity values.

Following the LOI Bid Deadline, the Debtors and their advisors reviewed the submitted First Round LOIs. To narrow down the First Round LOIs to the most attractive bids, Seabury and SEB requested that potential bidders interested in the Alternative Structure submit revised bids by August 7, 2023 (the "**Revised LOI Bid Deadline**"), to include either (i) at least $500 million of capital (SEK 5,104 million) (minimum of 33% in common equity and the remaining in convertible debt) or (ii) at least $150 million of capital (SEK 1,531 million) (minimum of 33% in common equity and the remaining in convertible debt) and be willing to partner with other Alternative Structure bidders that would in the aggregate offer a proposal equal to or in the excess of $500 million (SEK 5,104 million) in exit capital. Seabury and SEB also notified potential bidders interested in the Alternative Structure that they would pair such potential bidders together into co-investor groups following the Revised LOI Bid Deadline. Thereafter, Seabury and SEB requested that potential bidders interested in the Alternative Structure submit a markup of a governance term sheet by August 14, 2023 and a markup of a proposed chapter 11 plan term sheet by August 28, 2023.

Following this outreach to the potential bidders interested in the Alternative Structure, the Debtors received two revised First Round LOIs by the Revised LOI Bid Deadline, including from Castlelake. After extensive discussions with the Debtors, the Creditors' Committee, the Danish State Investor, and each of their respective advisors, Seabury and SEB paired together Castlelake and AFKLM and invited them, as well as the other third-party Category One Bidder that was selected following the Revised LOI Bid Deadline, to submit final bids (each, a "**Final Bid**").

On September 25, 2023, the Debtors received two Final Bids satisfying the criteria under the Equity Solicitation Procedures of a "Qualified Third-Party Bid." The Danish

---

Pursuant to the *Notice of Amendment to Key Events Related to Equity Solicitation Procedures* [ECF No. 1223] and the Notice of Second Amendment to Key Events Related to Equity Solicitation Procedures [ECF No. 1415], the LOI Bid Deadline was extended to July 17, 2023 and the Final Bid Deadline was extended to September 25, 2023.

[21][25] Please see Section III.A above for a detailed discussion regarding the 2020 Recapitalization and Section III.C for a discussion on the related litigation.

State Investor also submitted a Final Bid to invest in equity in Reorganized SAS AB on the same economic terms and enterprise valuation as the Successful Third-Party Bidder (as defined in the Equity Solicitation Procedures) in an amount that would provide the Danish State Investor with an aggregate ownership of 21.8% - 29.9% of the fully diluted New Shares.

2. *Selection of Plan Sponsor*

Over the course of the final week of September, the Debtors and their advisors engaged in further discussions with both sets of bidders that submitted Final Bids as well as with the Danish State Investor through various teleconferences and letters regarding requests for revised proposals with improved economics. Both sets of bidders submitted revised Final Bids on September 29, 2023, and the Bidder Consortium submitted a further revised Final Bid on October 1, 2023.

Following the final bid deadline, SAS AB's board of directors, together with the Debtors' management team, met several times with the Debtors and their advisors to fully assess the Final Bids.

On October 3, 2023 the Debtors (through a determination by the Board) selected the bids submitted by the Investors as the Successful Third Party Bid (as defined in the Equity Solicitation Procedures). The Debtors filed a notice [ECF No. 1483] and published a formal press release providing further details on the winning bid.

3. *Plan Sponsor Investment Agreement*

Following the announcement of the selection of the Successful Third-Party Bid, the Debtors and Investors engaged in several weeks of extensive good-faith negotiations and finalized the terms of that certain Investment Agreement, dated November 4, 2023 (the "**Investment Agreement**") and a term sheet setting forth the key terms and conditions of the Plan. Upon executing the Investment Agreement, the Debtors filed a motion seeking approval to enter into the Investment Agreement, perform obligations thereunder, and pay certain transaction fees and expenses (including a commitment fee) [ECF No. 1579]. On November 21, 2023, the Bankruptcy Court approved this motion [ECF No. 1646] (the "**Investment Agreement Order**").

The Investment Agreement requires the Debtors to pay the following transaction fees and expenses:

(a) Termination Fee

In the event the Transaction is not ultimately implemented, the Debtors will be required to pay a termination fee of $24.71 million (SEK 252.2 million) (the "**Termination Fee**") to the Investors, subject to the terms of the Investment Agreement. Specifically, the Termination Fee is payable if (i) the Investment Agreement is terminated by the consent of the Required Investors (as defined in the Investment Agreement) (x) following a material breach by Reorganized SAS AB of the "No Shop" provision in the Investment Agreement or (y) if any of the Debtors enter into a binding agreement for an alternative transaction (the "Alternative Transaction"), (ii) the Investment Agreement is terminated by Reorganized SAS AB to enter

into an Alternative Transaction that is determined by the board of directors of Reorganized SAS AB to be a Superior Proposal (as defined in the Investment Agreement), or (iii) the Investment Agreement is terminated for (x) material breach other than a material breach of the "No Shop" provision by the Debtors or (y) at the Outside Date (as defined in the Investment Agreement) and such termination primarily arose from a material breach by Reorganized SAS AB, and the Debtors enter into a binding agreement for an Alternative Transaction within 18 months of such termination.

The Termination Fee will, if triggered, constitute allowed administrative expenses against each of the Debtors' estates under sections 503(b) and 507(a) of the Bankruptcy Code. The Termination Fee will be payable within two business days of the termination of the Investment Agreement by the Investors or concurrently with (i) termination of the Investment Agreement by SAS AB or (ii) the consummation of an Alternative Transaction entered into during the 18 month tail period.

Additionally, the Investment Agreement contains a "fiduciary out" permitting the Board to consider unsolicited Alternative Transaction proposals under certain terms and conditions of the Investment Agreement to the extent the Board's failure to consider such Alternative Transaction proposal would be inconsistent with the Board's fiduciary duties.

(b)     Consortium Fees and Expenses

In connection with the Investment Agreement, the Debtors have agreed to pay all reasonable and documented fees and expenses (including professional fees) incurred by certain advisors to the Bidder Consortium related to due diligence investigation, negotiation, execution and performance of any transaction contemplated by the Investment Agreement, including a Swedish Reorganization, the Chapter 11 Cases, and the Plan (together with the Termination Fee, the "**Consortium Fees and Expenses**"). The Consortium Fees and Expenses must be paid by the Debtors on the later of (x) the first Business Day following each "Expense Reimbursement Milestone" that next occurs and (y) the tenth Business Day following the date on which the applicable summary invoice setting forth such accrued and unpaid fees and out of pocket expenses is received by the Debtors. "Expense Reimbursement Milestones" include (i) the entry by the Bankruptcy Court of the Investment Agreement Order, (ii) the filing of the Plan and the Disclosure Statement, (iii) the Bankruptcy Court's approval of the Disclosure Statement, (iv) the entry by the Bankruptcy Court of the Confirmation Order, and (v) Effective Date.[2226]

---

[2226] In connection with the Bidder Consortium's preparation and negotiation of the Successful Third-Party Bid, the Debtors agreed to reimburse the Bidder Consortium in an aggregate amount up $3 million (the "**Initial Consortium Expense Reimbursement**"). On October 25, 2023, the Bankruptcy Court entered an order authorizing the Debtors to pay the Initial Consortium Expense Reimbursement [ECF No. 1547]. For the avoidance of doubt, the Consortium Fees and Expenses relate only to expenses and fees that exceed the Initial Consortium Expense Reimbursement.

(c)  Commitment Fee

In exchange for the Danish State Investor's commitment to invest, the Debtors agreed to pay a commitment fee in an amount equal to 3% of the Danish State Investor's portion of the Total Share Subscription Amount (as defined in the Investment Agreement), subject to a cap no greater than SEK 500,000,000 ($48,981,671) (the "**Commitment Fee**").  The Commitment Fee is projected to total $4,260,750.00 (approximately SEK 43,493,310) and was payable upon entry of the Investment Agreement Order.

(d)  Danish State Investor Expense Reimbursement

The Debtors have also agreed to pay the Danish State Investor's out-of-pocket expenses (including reasonable and documented fees and disbursements of external counsel and financial advisors) incurred in connection with the Debtors' restructuring efforts up to an aggregate amount equal to the lesser of (i) 2.0% of the Danish State Investor's portion of (A) the Total Share Subscription Amount (as defined in the Investment Agreement) and (B) the principal amount of the New Convertible Notes and (ii) SEK 62,500,000 (converted to U.S. Dollars using the Closing FX rate, as defined in the Investment Agreement).  Such expense reimbursement was payable upon entry of the Investment Agreement Order.

# V.
# SUMMARY OF THE PLAN

This section of the Disclosure Statement summarizes the Plan, a copy of which is annexed hereto as **Exhibit A**.  This summary is qualified in its entirety by reference to the Plan.

> **YOU SHOULD READ THE PLAN IN ITS ENTIRETY**
> **BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

A.  Classification of Claims and Interests

1.  *Classification in General*

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

2.  *Summary of Classification of Claims and Interests*

As provided in the tables included in section I.B above, the Plan specifies which Classes are (i) Impaired and Unimpaired under the Plan, (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (iii) presumed to accept or deemed to reject the Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code,

Administrative Expense Claims, Priority Tax Claims, DIP Claims, and Fee Claims have not been classified.

### 3. *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors or the Reorganized Debtors, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

### 4. *Subordinated Claims*

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective Plan Distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors and the Reorganized Debtors reserve the right to reclassify or subordinate any Disputed or Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto, or on any other grounds.

### 5. *Elimination of Vacant Classes*

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of acceptance or rejection of the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

### 6. *Presumed Acceptance by Classes entitled to Vote but No Votes Cast*

With respect to each Debtor, if a Class contained Claims or Interests eligible to vote and no holder of such Claims or Interests, as applicable, votes to accept or reject the Plan, the Plan shall be presumed accepted by the holders of such Claims or Interests, as applicable, in such Class.

### B.     Treatment of Claims and Interests

*See* Section I.B above.

C. <u>Means for Implementation</u>

1. *Substantive Consolidation*

The Plan provides for the substantive consolidation only of the Consolidated Debtors exclusively for the purposes set forth in the Plan, and otherwise shall be implemented without any substantive consolidation.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to sections 105(a) and 1123(a)(5)(C) of the Bankruptcy Code of the substantive consolidation of the Consolidated Debtors exclusively for voting and distribution purposes, on the basis that the substantive consolidation of the Consolidated Debtors to the extent set forth in the Plan is (i) in exchange for good and valuable consideration provided by each of the Consolidated Debtors (including performance of the terms of the Plan), (ii) in the best interests of the Debtors, the Reorganized Debtors, the Estates, and all holders of Claims, and (iii) fair, equitable, and reasonable. In furtherance of the foregoing, (a) all assets and liabilities of the Consolidated Debtors shall be treated as though they are pooled, (b) each Claim filed or to be filed against any Consolidated Debtor shall be deemed filed as a single Claim against, and a single obligation of, the Consolidated Debtors, (c) any joint or several liability of any Consolidated Debtor shall be one obligation of the Consolidated Debtors and any Claims based upon such joint or several liability shall be treated as one Claim against the Consolidated Debtors, and (d) any guarantee of a Consolidated Debtor of the payment, performance, or collection of an obligation of another Consolidated Debtor shall be eliminated and cancelled.

The deemed substantive consolidation of the Consolidated Debtors under the Plan shall not (other than for purposes related to voting and distribution) affect the legal and organizational structure of the Debtors or the Reorganized Debtors.

2. *Implementation of Restructuring*

Subject to the satisfaction of the conditions set forth in Article VIII of the Investment Agreement or the waiver thereof by the party entitled to waive that condition, on the Effective Date Reorganized SAS AB shall issue New Shares and New Convertible Notes to the Investors for an aggregate purchase price equal to the Total Share Subscription Amount and the New Convertible Notes Amount, respectively, subject to and in accordance with the terms and conditions of the Plan, the Investment Agreement, the New Convertible Notes Indenture, the Governance Term Sheet, the Shareholders' Agreement, the ~~Minority~~<u>Recipient</u> Shareholders' Agreement, the Articles, and any consents or approvals required under each of the foregoing. Accordingly, the Restructuring shall include:

(i) a total investment in Reorganized SAS AB corresponding to $~~1.2 billion~~<u>1,200,000,000</u> (SEK 12.249 billion), comprised of $~~475 million~~<u>475,000,000</u> (SEK 4.849 billion) in New Shares and $~~725 million~~<u>725,000,000</u> (SEK 7.401 billion) in New Convertible Notes;

(ii) the allocation of up to $~~325 million~~<u>325,000,000</u> (SEK 3.318 billion) in value to holders of Allowed General Unsecured Claims as set forth in the Plan, subject to the establishment of ~~a~~<u>one or more</u> GUC ~~Trust with~~

60

respect to the GUC Trust Amount,Entities through a combination of the Available Cash, the GUC Trust Interests (including, for the avoidance of doubt, any value distributed on account thereof), and the New Shares Distribution Pool.

Following the Closing (as defined in the Investment Agreement), but prior to any conversion of the New Convertible Notes, the New Shares and the New Convertible Notes are expected to be held as follows:

| Party | New Shares (Approx.) | New Convertible Notes |
|---|---|---|
| Castlelake | 32.0% | 55.2% |
| Danish State Investor | 25.8% | 30.0% |
| Air France-KLM | 19.9% | 4.8% |
| Lind Invest | 8.6% | 10.0% |
| Holders of certain Allowed Claims | 13.6% | 0.0% |

Subject to the terms and conditions of the Plan (including, for the avoidance of doubt, receipt by Reorganized SAS AB of any deliverables required pursuant to section 5.16(b) of the Plan) and the Investment Agreement, on the Effective Date, or as soon as practicable thereafter, Reorganized SAS AB shall issue New Shares to the holders of certain Allowed Claims that are entitled to receive a recovery from the New Shares Distribution Pool subject to section 6.11 and section 6.12 of the Plan. Each New Share shall be issued at the Share Subscription Price (as defined in the Investment Agreement).

Unless otherwise determined by the Investors and the Debtors (including, for the avoidance of doubt, the board of SAS AB), the Debtors intend in accordance with the conditions precedent provided for in the Investment Agreement, following the Confirmation Date, to implement the Restructuring in Sweden pursuant to the Swedish SAS AB Reorganization and, in connection therewith, cancel, and cause a delisting of, the Existing Equity Interests and other applicable Securities. The Debtors and, the Investors, and the Creditors' Committee shall cooperate in good faith regarding the actions to be taken in the Swedish SAS AB Reorganization.

Upon the Confirmation Date, the Debtors shall be authorized to take any and all actions necessary to consummate the Transaction, including the commencement of the Swedish SAS AB Reorganization, subject to any conditions provided for in the Swedish Reorganization Plan and any orders or resolutions of the Swedish Court, without the need for any further order of the Bankruptcy Court, and without any further action by holders of Claims or Interests.

3.    *Contribution Fees*

On the Effective Date, the States shall receive the Initial Contribution Fees from the Convertible Notes Purchasers, in each case in accordance with the Investment Agreement (subject to adjustments on the Effective Date for the Closing FX Rate and as provided in Section 6.3 of the Investment Agreement) and the Escrow Contribution Fees shall be deposited in the Contribution Fee Escrow Account.  Following the Effective Date, the Escrow Contribution Fees shall be paid from the Contribution Fee Escrow Account, after taking into account the payments and adjustments made pursuant to the Investment Agreement, in accordance with the Contribution Fee Escrow Agreement.

4.    *Reserved Funds, GUC ~~Trust~~Entity, and Contribution Fee Escrow Account*

On the Effective Date, (i) ~~the~~one or more GUC ~~Trust~~Entities shall be established and, as soon as practically possible thereafter in order to allow for the SCRO Registration, shall be funded by the ~~Debtors or the~~ Reorganized Debtors~~, as applicable,~~ with a portion of the GUC Cash in accordance with the Plan and the GUC Documents and (ii) the Contribution Fee Escrow Account shall be established and shall be funded by the Convertible Notes Purchasers with the Escrow Contribution Fees, in each case in accordance with the Investment Agreement, this Plan, and the Swedish Reorganization Plan.  The ~~GUC Trust~~Reorganized Debtors shall pay all costs related to the establishment of the GUC Entities up to a maximum of $200,000 (including any mutually agreeable reserves, as shall be agreed in the Plan Supplement).  The GUC Entities and the Contribution Fee Escrow Account shall be funded with Cash in the aggregate amount of the Reserved Funds, with a portion of the GUC Cash and the Escrow Contribution Fees used to constitute the Reserved Funds to be allocated to the GUC Entities, on the one hand, and the Contribution Fee Escrow Account, on the other hand, in amounts relatively proportionate to the amount of the Total Distributable Value as compared to the amount of the Contribution Fees.

~~The Available Cash shall be increased, with a corresponding reduction to the GUC Cash funded to the GUC Trust, up to an amount as agreed with the consent of the Required Investors, in the event that the Consolidated Debtors Available Cash and the SAS AB Available Cash, as applicable, to be allocated to holders of Allowed Other General Unsecured Claims against the Consolidated Debtors, SAS AB on account of its Allowed Intercompany Claim against the Consolidated Debtors, and Allowed Commercial Hybrid Bond Claims, Allowed Other General Unsecured Claims, and Allowed Intercompany Claims against SAS AB, respectively, would provide such holders of Allowed Claims, as applicable, with a percentage recovery less than the percentage recovery provided to holders of Allowed Aircraft Lease Claims, Allowed Trade Claims, Allowed Union Claims, Allowed Danish Term Loan Claims, Allowed Swedish Term Loan Claims, and Allowed Norwegian Term Loan Claims against the Consolidated Debtors and Allowed Aircraft Lease Claims, Allowed Trade Claims, and Allowed Norwegian Term Loan Claims against SAS AB, respectively~~

~~The~~Subject to Section 5.4(h) of the Plan, the Reserved Funds shall be utilized and released as follows, as set forth in order of priority of payment:

(i)    First, for amounts required by the Debtors or the Reorganized Debtors ~~to~~ (A) after the Effective Date to defend themselves against a State Non-Tax

Claim; *provided, however, that the Reorganized Debtors shall be solely responsible for and fund the first SEK 25,000,000 in amounts payable pursuant to this Section 5.4(c)(i)(A)* and (B) to satisfy any costs or expenses related to a third party irrevocably agreeing to pay in full, without recourse to the Reorganized Debtors, any State Non-Tax Claim, as set forth in section 5.4(d)(iii) of the Plan;

(ii)     Second, in the event of (A) a final and non-appealable decision from a competent court requiring any one or more of the Reorganized Debtors to pay ~~or (B) a State under applicable Law being required to ex officio demand payment (including any election to do so as a result of or with reference to Applicable Law or similar)~~any State Non-Tax Claim, or (B) a determination by the Reorganized Debtors to settle all or a portion of any State Non-Tax Claim, the Reserved Funds shall be released for the Reorganized Debtors to pay that State Non-Tax Claim or settlement amount, as applicable, when due and payable, to the extent a third party as contemplated in section 5.4(d)(iii) of the Plan has not already paid, or irrevocably agreed to pay, such State Non-Tax Claim~~; and~~ *provided, however, that, in the event of a determination to settle any State Non-Tax Claim prior to entry of a final order requiring any Reorganized Debtor to pay any State Non-Tax Claim, any release of the Reserved Funds pursuant to this section shall require the consent of the Creditor Oversight Committee, which consent shall not be unreasonably withheld, conditioned, or delayed; and*

(iii)    Third, in the event the Reserved Funds exceed ~~any~~all amounts paid pursuant to clause (i) above and any and all payments by the Reorganized Debtors described in clause (ii) above, any residual amount of GUC Cash (and any earnings thereon) in the GUC ~~Trust~~Entities shall be released for distribution to holders of GUC ~~Trust~~ Interests in accordance with this Plan and any residual amount in the Contribution Fee Escrow Account shall be released to the Kingdom of Sweden and the Danish State Investor for payment of any unpaid portion of the Contribution Fees in accordance with Section 5.4(f) of the Plan and the Swedish Reorganization Plan; *provided, however*, that if there is an interim distribution from the Reserved Funds in accordance with Section 5.4(h) of the Plan, the remainder of the Reserved Funds shall remain intact unless and until the occurrence of any event pursuant to Section 5.4(c)(i) of the Plan or Section 5.4(c)(ii) of the Plan that would trigger the use of such remaining Reserved Funds.

Notwithstanding the foregoing any Cash remaining in any of the GUC ~~Trust~~Entities after the utilization of any amounts required pursuant to section 5.4(c)(i) or section 5.4(c)(ii) of the Plan, to the extent applicable, shall be released to the holders of GUC ~~Trust~~ Interests on the earliest to occur of:

(i)    ~~i.~~ December 31, 2033, if the States have not in any way asserted any State Non-Tax Claim within the meaning of section 5 of the Swedish Statute of Limitations (Sw. 5 § Preskriptionslagen (1981:130)), or Chapter 5 or Chapter 6 of the Danish Statute of Limitations (Da. Forældelsesloven); ~~and~~

(ii)    ~~ii.~~ the final resolution of all State Non-Tax Claims as determined by Reorganized SAS AB~~;~~, it being understood and agreed that the GUC Documents may contain provisions identifying the conditions under which a final resolution of all State Non-Tax Claims shall be deemed to have occurred, which provisions shall, notwithstanding anything to the contrary herein, be acceptable to the Required Investors in their sole and absolute discretion.

(iii)    ~~iii.~~ a third party agreement, acceptable to the Debtors and the Investors, with such consent not to be unreasonably withheld, ~~irreovacably~~irrevocably providing for payment in full, without recourse to the Reorganized Debtors, of any and all State Non-Tax Claims; and

(iv)    ~~iv.~~ an agreement between the Reorganized Debtors and the Investors to release the Reserved Funds.

Subject to the availability and release of the GUC Cash in the GUC ~~Trust~~Entities as set forth above, the holders of GUC ~~Trust~~Interests shall be entitled to distributions of any GUC Cash in the applicable GUC ~~Trust~~Entity to which their GUC Interests relate in accordance with the Plan and the terms of the GUC ~~Trust Agreement~~Documents. The GUC ~~Trust~~Entities shall be governed by the applicable GUC ~~Trust Agreement~~Documents and administered by an independent manager or trustee or appropriate governing body of such GUC Entity as set forth in the GUC ~~Trustee~~Documents. The GUC ~~Trust~~Interests shall be passive and shall not have voting, consent, or other shareholder-like control rights with respect to the GUC ~~Trust~~Entities or the Reorganized Debtors.

Upon the occurrence of a distribution of the GUC Cash in the GUC ~~Trust from the GUC Trust~~Entities to the holders of the applicable GUC ~~Trust~~Interests, there shall be a corresponding distribution from the Contribution Fee Escrow Account to pay the applicable remaining amounts of the Contribution Fees pursuant to a joint release instruction delivered by the applicable Reorganized Debtor and the States based on the gross amount of the ~~Cash from the~~ GUC ~~Trust~~Cash distributed from all GUC Entities, in the aggregate, to holders of GUC ~~Trust~~Interests *plus* the amount of GUC Cash used from the GUC ~~Trust used~~Entities pursuant to section 5.4(c)(i) of the Plan. For the avoidance of doubt, the amount distributed to the States on account of the Contribution Fees shall not include any portion of the Cash held by the Holding Period Trustee.

To the extent no or no further distributions can be made from the Contribution Fee Escrow Account, the remaining funds in the Contribution Fee Escrow Account shall be

distributed to the Reorganized Debtors pursuant to a joint release instruction delivered by the applicable Reorganized Debtor and the States.

The GUC Trust Interests, and any right to receive a distribution from the GUC Trust, shall not be evidenced by any certificate, security, receipt, or in any other form or manner whatsoever, except as maintained on the books and records of the GUC Trust by the GUC Trustee. Further, the GUC Trust Interests, and any right to receive a Plan Distribution from the GUC Trust, shall be nontransferable and nonassignable.

For all United States federal income tax purposes, the GUC Trust is intended to qualify as a liquidation trust pursuant to Treasury Regulations section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary and consistent with, the purpose of the GUC Trust

Notwithstanding anything to the contrary in Section 5.4 of the Plan, any interest or investment income accrued or earned by any GUC Entity during the period beginning on the Effective Date and ending on the date of any final distribution of the GUC Cash pursuant to Section 5.4 of the Plan, may be used and released by the GUC Entity in the following order: (1) to pay costs and expenses associated with establishing, operating, and administering the GUC Entities (2) to establish a reserve for future costs and expenses associated with establishing, operating, and administering the GUC Entities; and (3) on an annual basis, as a distribution to holders of such GUC Entities' GUC Interests, in each case, as set forth in the applicable GUC Documents. Prior to any such payment or distribution, such interest and investment income shall be held by the applicable GUC Entity in accounts segregated from the principal amount of the Reserved Funds.

The GUC Cash in the GUC Entities shall be invested to earn interest or investment income pursuant to investment guidelines agreed to between Reorganized SAS, the Creditors' Committee, and the Required Investors and shall be set forth in the GUC Agreement.

As may be necessary or advisable to comply with applicable law, including applicable securities laws, as determined by the Debtors (but subject to the applicable consent or consultation rights of the Investors or the Creditors' Committee as set forth herein):

(i)     unless waived by the Debtors, each holder of an Allowed General Unsecured Claim in (A) Classes 3, 4, and 5 with respect to SAS AB and the Consolidated Debtors and (B) Classes 3 and 5 with respect to the Gorm Blue Entities, in each case, shall be required to deliver to the Debtors prior to the Effective Date, as conditions precedent to the receipt of any GUC Interests such certifications regarding such Person's identity, residence, and level of sophistication (for example, a U.S. Person vs. non-U.S. Person, an "accredited investor" or a "qualified purchaser") and supporting documentation as reasonably requested by the Debtors to determine such Person's eligibility to receive GUC Interests;

(ii) if any Person is a Disqualified Person, the Debtors may elect, and may direct any applicable GUC Entity, not to distribute any GUC Interests to such Disqualified Person unless and until the requirements of Section 5.4(j)(i) of the Plan have been satisfied;

(iii) to the extent set forth in or required by the GUC Documents, on or after the Effective Date, pursuant to the terms and conditions as will be set forth in the Plan Supplement, the Debtors or any GUC Entity, as applicable, may deliver GUC Interests to which a Disqualified Person or ineligible person (as will be defined in the Plan Supplement)[27] might otherwise be entitled under this Plan to the Holding Period Trustee to, among other things, hold such GUC Interests in trust for the benefit of any Disqualified Person or ineligible person (as will be defined in the Plan Supplement) and, if applicable, sell such GUC Interests and distribute the Cash proceeds of such GUC Interests to such Disqualified Person or ineligible person (as will be defined in the Plan Supplement), in accordance with the terms of the GUC Holding Period Trust Agreement;

(iv) to the extent set forth in or required by the GUC Documents, to the extent any GUC Interests shall be transferrable, the Debtors may elect to, or direct the GUC Entities to, distribute to such ineligible person (as will be defined in the Plan Supplement) alternative GUC Interests (which interests, for the avoidance of doubt, shall be non-transferable); and

(v) The distribution of the GUC Interests shall occur or be deemed to have occurred in accordance with the GUC Implementation Steps.

5. *Compromise and Settlement of Claims, Interests and Controversies*

Subject to approval by the Bankruptcy Court in connection with confirmation of the Plan, the provisions of the Plan and other documents entered into in connection with the Plan constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies resolved pursuant to the Plan. The Plan shall be deemed a motion to approve the compromises and settlements contained in the Plan and the good faith compromise and settlement of all of the Claims, Interests, Causes of Action, and controversies described in the foregoing sentence pursuant to sections 363 and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromises and settlements, as well as a finding by the Bankruptcy Court that the compromises and settlements are fair, equitable, reasonable, and in the best interests of the Debtors and their Estates. Transfers of such securities will also be subject to the

---

[27] For informational purposes only, at the present time, it is currently anticipated that "Ineligible Person" shall be defined as any holder of Allowed General Unsecured Claims in (i) Classes 3, 4, and 5 with respect to SAS AB and the Consolidated Debtors and (ii) Classes 3 and 5 with respect to the Gorm Blue Entities that is (a) a "U.S. Person" as such term is defined in Section 902(k)(1) of Regulation S of the Securities Act of 1933, as amended and (b) not a "qualified purchaser" (within the meaning of the Investment Company Act of 1940, as amended).

transfer provisions, if any, and other applicable provisions set forth in the Shareholders' Agreement.

6. *Continued Corporate Existence, Effectuating Documents, Further Transactions*

Except as otherwise provided in the Plan, the Debtors shall continue to exist after the Effective Date as Reorganized Debtors in accordance with the applicable laws of the respective jurisdictions in which they are incorporated or organized and pursuant to their respective organizational documents in effect prior to the Effective Date, except to the extent such documents are amended by the Plan or otherwise.

On or after the Effective Date, each Reorganized Debtor may, in its sole discretion, take such action as permitted by applicable Law and such Reorganized Debtor's Amended Organizational Documents, as such Reorganized Debtor may determine is reasonable and appropriate, including causing (i) a Reorganized Debtor to be dissolved, (ii) the legal name of a Reorganized Debtor to be changed, or (iii) the closure of a Reorganized Debtor's Chapter 11 Case on the Effective Date or any time thereafter, and such action and documents shall require (and are deemed to require) no further notice to or action, order, or approval of the Bankruptcy Court or any other court of competent jurisdiction (other than any requisite filings required under applicable Law).

On or after the Effective Date, the Reorganized Debtors are authorized to and may issue, execute, deliver, file or record such contracts, Securities, instruments, releases, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan in the name of and on behalf of the Reorganized Debtors without the need for any approvals, authorization, or consents, except for those expressly required pursuant to the Plan and applicable Swedish Law.

On the Effective Date or as soon as reasonably practicable thereafter, the Debtors or the Reorganized Debtors, as applicable, may take all actions consistent with the Plan as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring under and in connection with the Plan, including (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable Law and have other terms to which the applicable parties agree, (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree, and (iii) all other actions that the Debtors or Reorganized Debtors, as applicable, determine to be necessary, desirable, or appropriate to implement, effectuate, and consummate the Plan or the transactions contemplated hereby.

7. *Corporate Action*

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified, in each case without any requirement for further action by holders of Claims or Interests, the Debtors, or any other Entity or Person. All matters provided for in the Plan involving the corporate structure of the Debtors, and any corporate action required by the Debtors in connection therewith, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Debtors or the Estates.

On or (as applicable) before the Effective Date, the appropriate directors, officers, and managers of the Debtors shall be authorized and directed to issue, execute, and deliver the agreements, documents, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan, including the Transaction) in the name of and on behalf of the Reorganized Debtors. The authorizations and approvals contemplated by section 5.7 of the Plan shall be effective notwithstanding any requirements under nonbankruptcy Law, unless otherwise determined by the Debtors or the Reorganized Debtors, as applicable, to comply with any applicable corporate authorizations or approvals that may be required in accordance with Danish, Irish, Norwegian, or Swedish Law.

8. *Cancellation of Existing Securities, Liens, and Agreements*

Except (i) for the purpose of evidencing a right to a distribution under the Plan, (ii) as otherwise set forth in the Plan, including with respect to executory contracts or unexpired leases that shall be assumed by the Reorganized Debtors, (iii) as it relates to Existing Letters of Credit, surety bonds, insurance bonds, financial assurances, and other similar instruments (as amended, restated, renewed, modified, supplemented, extended, confirmed, or counter-guaranteed from time to time) issued to or on behalf of the Debtors, and (iv) as otherwise set forth in the Definitive Documents or the Confirmation Order, on the Effective Date, all agreements, instruments, notes, certificates evidencing debt of the Debtors, indentures, Securities, mortgages, and other documents evidencing any Claim or Interest (other than Intercompany Claims and Intercompany Interests, to the extent they are not modified by the Plan) and any rights of any holder in respect thereof shall be deemed cancelled and of no force or effect and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged *provided, however*, that, in the case of the applicable DIP Loan Documents, the foregoing shall apply upon satisfaction in full of all DIP Obligations in accordance with the applicable DIP Loan Documents. The holders of or parties to such cancelled instruments, debt, Interests, Securities, and other documentation shall have no rights arising from or related to such instruments, debt, Interests, Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to the Plan.

Upon the full payment or other satisfaction of an Allowed Other Secured Claim (or other treatment hereunder that results in the release of a Lien), or promptly thereafter, the holder of such Allowed Other Secured Claim shall deliver to the Debtors or Reorganized Debtors, as applicable, any collateral or other property of a Debtor held by such holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Other Secured Claim that may be reasonably required to terminate

any related financing statements, mortgages, mechanics' or other statutory Liens, or lis pendens, or similar interests or documents.

Subject to section 3.02 of the DIP Credit Agreement and any security documents governed by Danish, English, Irish, Norwegian, or Swedish Law, upon the satisfaction of all DIP Claims in accordance with the Plan, (i) all DIP Claims shall be automatically and irrevocably released and discharged, (ii) all DIP Liens and all related instruments, agreements, and other documents executed by any of the Debtors shall be automatically, absolutely, unconditionally, irrevocably, and forever terminated, released, re-assigned, and discharged, and (iii) the DIP Agent shall deliver a customary payoff letter reasonably acceptable to the DIP Agent, DIP Lenders, and the Reorganized Debtors, pursuant to which the Reorganized Debtors shall be authorized, and the DIP Agent will be obligated, to take all steps and/or execute and/or deliver all instruments or documents, in each case, required to effect the release of the DIP Liens and/or reflect on the public record the consummation of the payoff, releases, and terminations contemplated thereby.

Notwithstanding the foregoing, any provision in any agreement, instrument, note, certificate evidencing debt of the Debtors, indenture, mortgage, Security, or other document that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtors of their interests as a result of the cancellations, terminations, satisfaction, releases, or discharges provided for in section 5.8 of the Plan shall be (and be deemed) null and void and shall be of no force and effect.

## 9. *Authorization and Issuance of New Shares*

Upon the Closing Date, subject to applicable Swedish Law, Reorganized SAS AB is authorized to issue or cause to be issued and shall issue the New Shares (which, as soon as practicable thereafter, shall be registered with the SCRO) and the New Convertible Notes for distribution in accordance with the terms of the Plan and the Investment Agreement without the need for any further corporate or shareholder action. All of the New Shares and New Convertible Notes issuable under the Plan, when so issued, shall be duly authorized, validly issued, fully paid, and non-assessable.

## 10. *Exemption from Securities Laws*

The offer, issuance, and distribution of the New Shares pursuant to the Plan, including pursuant to the Transaction, except for the Non-1145 Equity and the Non-1145 Convertible Notes, shall be exempt, pursuant to section 1145 of the Bankruptcy Code, without further act or actions by any Person, from registration under the Securities Act, and all rules and regulations promulgated thereunder, any state or local Law requiring registration for the offer, issuance, or distribution of such New Shares, and any other applicable securities laws, to the fullest extent permitted by section 1145 of the Bankruptcy Code. Such New Shares issued pursuant to section 1145(a) of the Bankruptcy Code may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, subject to (i) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an "underwriter" in section 2(a)(11) of the Securities Act; (ii) the holder (a) not being an "affiliate" of Reorganized SAS AB as defined in

Rule 144(a)(1) under the Securities Act, (b) not having been such an "affiliate" within 90 days of such transfer and/or (c) not having acquired such securities from an "affiliate" within one year of such transfer (other than, with respect to clause (ii), such resales as may be permitted by and subject to the conditions of Rule 144 of the Securities Act); (iii) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments; (iv) compliance with Swedish securities laws and other applicable securities laws; (v) the transfer provisions, if any, and other applicable provisions contained in the Shareholders' Agreement and the ~~Minority~~Recipient Shareholders' Agreement; and (vi) any applicable regulatory approval.  In addition, such section 1145 exempt Securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.  Transfers of such securities will also be subject to the transfer restrictions, if any, and other applicable provisions set forth in the Shareholders' Agreement and the ~~Minority~~Recipient Shareholders' Agreement.

The offer, issuance, and distribution of the Non-1145 Equity and Non-1145 Convertible Notes pursuant to the Plan, including pursuant to the Transaction, is being made outside of the United States in accordance with Swedish securities laws and other applicable securities laws.  To the extent any Non-1145 Equity or Non-1145 Convertible Notes are issued to U.S. Persons on the Closing Date or any later date pursuant to the Plan, such issuance is being made in reliance on the exemption from registration set forth in section 4(a)(2) of the Securities Act.  Such securities will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act, such as, under certain conditions, the resale provisions of Rule 144 of the Securities Act.  Transfers of such securities will also be subject to the transfer restrictions, if any, and other applicable provisions set forth in the Shareholders' Agreement and the ~~Minority~~Recipient Shareholders' Agreement.

The Plan Supplement shall set forth the securities law considerations, if any, applicable to any GUC Interests.

11.  *Officers and Boards of Directors*

The identities of the directors and officers shall, to the extent known, be disclosed in the Plan Supplement.  The composition of the New Boards shall be identified no later than the Confirmation Hearing.  Nothing herein shall alter any party's rights under the Governance Term Sheet.

Except as otherwise provided in the Plan Supplement, the officers of the respective Reorganized Debtors immediately before the Effective Date, as applicable, shall serve as the initial officers of each of the respective Reorganized Debtors on and after the Effective Date.  After the Effective Date, the selection of officers of the Reorganized Debtors shall be as provided by their respective Amended Organizational Documents.

Except to the extent that a member of the board of directors or a manager, as applicable, of a Debtor continues to serve as a director or manager of such Debtor on and after the Effective Date, the members of the board of directors or managers, as applicable, of each Debtor prior to the Effective Date, in their capacities as such, shall have no continuing

obligations or duties to the Reorganized Debtors on or after the Effective Date and each such director or manager shall be deemed to have resigned or shall otherwise cease to be a director or manager of the applicable Debtor on the Effective Date. Commencing on the Effective Date, each of the directors and managers, as applicable, of each of the Reorganized Debtors shall be deemed elected and serve pursuant to the terms of the applicable Amended Organizational Documents of such Reorganized Debtor and may be replaced or removed in accordance with such Amended Organizational Documents and applicable non-bankruptcy Law.

12. *Separate Plans*

Notwithstanding the combination of separate plans of reorganization for the Debtors set forth in the Plan for purposes of economy and efficiency, the Plan constitutes a separate chapter 11 plan for each Debtor, other than with respect to the Consolidated Debtors. Accordingly, other than with respect to the Consolidated Debtors, if the Bankruptcy Court does not confirm the Plan with respect to one or more Debtors, it may still confirm the Plan with respect to any other Debtor that satisfies the confirmation requirements of section 1129 of the Bankruptcy Code.

13. *Tax Structure*

To the extent reasonably practicable and as far as is legally possible, the Restructuring and the Transaction (including, for the avoidance of doubt, the structuring, formation and any other transactions in respect of the GUC Entities) shall be structured in a manner to obtain the most efficient structure for the Debtors and the Post-Closing Company Shareholders (as defined in the Investment Agreement), as determined by the Debtors and the Investors in consultation with the Creditors' Committee.

14. *Closing of Chapter 11 Cases*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases. As of the Effective Date, the Reorganized Debtors may submit separate orders to the Bankruptcy Court under certification of counsel closing certain individual Chapter 11 Cases and changing the caption of the Chapter 11 Cases accordingly. Matters concerning Claims may be heard and adjudicated in a Debtor's Chapter 11 Case that remains open regardless of whether the applicable Claim is against a Debtor in a chapter 11 case that is closed. Nothing in the Plan shall authorize the closing of any case *nunc pro tunc* to a date that precedes the date any such order is entered. Any request for *nunc pro tunc* relief shall be made on motion served on the United States Trustee, and the Bankruptcy Court shall rule on such request after notice and a hearing. Upon the filing of a motion to close the last Chapter 11 Case remaining open, the Reorganized Debtors shall file a final report with respect to all of the Chapter 11 Cases pursuant to Local Rule 3022-1(c).

15. *Amended Organizational Documents*

The prohibition of the issuance of non-voting equity securities, to the extent required by section 1123(a)(6) of the Bankruptcy Code, shall be addressed in the Amended

Organizational Documents, the Shareholders' Agreement, the ~~Minority~~Recipient Shareholders' Agreement, or pursuant to an undertaking by the shareholders of each Debtor, in each case, to the extent permitted pursuant to applicable non-U.S. Law governing each Debtor. After the Effective Date, the Reorganized Debtors may amend and restate their respective Amended Organizational Documents and other related documents as permitted by the laws of their respective states or countries of incorporation or formation, and their respective Amended Organizational Documents, without further order of the Bankruptcy Court.

16.     *New Shares*

The Investors shall enter into the Shareholders' Agreement on or after the Effective Date. Any Entity that will receive New Shares pursuant to this Plan ~~will~~shall be required to deliver to the Debtors, as conditions precedent to the receipt of the New Shares, (i) a signature page to the ~~Minority~~Recipient Shareholders' Agreement, *provided, however*, that such requirement may be removed if determined to be unnecessary by the Debtors and the Required Investors based on the terms of the Articles of Reorganized SAS AB; (ii) any documentation reasonably requested by the Debtors in order to effect the issuance and registration of the New Shares with the SCRO, including (A) a signed subscription list, provided by the Debtors by a reasonable deadline prior to the Effective Date and (B) any documentation required for the payment of the aggregate Share Subscription Price for the New Shares, including evidence that the relevant Allowed Claim has been contributed to SAS AB either through set-off (Sw. *kvittning*) or payment-in-kind (Sw. *apport*) and that any portion of such Allowed Claim in excess of the amount recovered in accordance with the Plan and the Swedish Reorganization Plan has been forgiven (in each case as applicable); and (iii) the account number of the securities account (being either a VPC account (Sw. *VP-konto*) kept in the Entity's own name or a custody account (Sw. *förvaltarkonto*) kept with a Swedish bank/broker) affiliated with Euroclear Sweden, the Swedish Central Securities Depositary, to which the New Shares shall be distributed. ~~The Debtors shall request that a~~Any Entity receiving New Shares shall deliver to the Debtors such signature page, documentation, and account number (as applicable ) prior to the Effective Date. However, to the extent such signature page, documentation, or account number is not received by the Effective Date, then such Entity ~~will~~shall not receive any New Shares under this Plan, unless waived by the Debtors and the Required Investors. The Debtors and the Required Investors ~~will~~shall continue to negotiate the terms of the foregoing in good faith.

17.     ~~*United States Federal Income Tax Treatment of the GUC Trust*~~*Creation of Creditor Oversight Committee*

~~For all United States federal income tax purposes, all parties shall treat the transfer of the funds contributed to the GUC Trust as being for the benefit of the GUC Trust Beneficiaries, whether their Claims are Allowed on or after the Effective Date, including any amounts or other assets subsequently transferred to the GUC Trust (but only at such time as actually transferred) as (i) a transfer of such funds (subject to any obligations relating to such fund's status as Reserved Funds) to the GUC Trust Beneficiaries and, to the extent any such funds are allocable to Disputed Claims that are the responsibility of the GUC Trust to resolve, to the Disputed Claims Reserve (described further in section 7.8 in the Plan), followed by (ii) the transfer by the GUC Trust Beneficiaries to the GUC Trust of such funds (other than any~~

funds otherwise allocable to the Disputed Claims Reserve) in exchange for GUC Trust Interests. Accordingly, the GUC Trust Beneficiaries shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of such funds (other than the portion of such funds, if any, as may be allocable to any Disputed Claims Reserve). The foregoing treatment shall apply, to the extent permitted by applicable Law, for applicable U.S. state and local income tax purposes.

The GUC Trust is intended to be structured to qualify as a "liquidating trust" under Treasury Regulations section 301.7701-4 (other than with respect to any Disputed Claims Reserve), with the GUC Trust Beneficiaries treated as the grantors and owners of the GUC Trust. The "taxable year" of the GUC Trust shall be the "calendar year" as such terms are defined in section 441 of the U.S. Tax Code. The GUC Trustee shall file tax returns for the GUC Trust treating the GUC Trust as a grantor trust pursuant to section 671 through 679 of the U.S. Tax Code to the extent permitted by applicable Law (other than any portion allocable to a "disputed ownership fund" or other separate entity as discussed further below). The GUC Trustee shall also annually send or make available to each GUC Trust Beneficiary of record, in accordance with applicable law, a separate statement setting forth such holder's share of items of income, gain, loss, deduction or credit (including the receipts and expenditures of the GUC Trust) as relevant for U.S. federal income tax purposes and will instruct all such GUC Trust Beneficiaries to use such information in preparing their U.S. federal income tax returns (including with respect to withholding tax) or to forward the appropriate information to such GUC Trust Beneficiary's underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns. The GUC Trustee also shall file (or cause to be filed) any other statements, returns, or disclosures relating to the GUC Trust that are required by any Governmental Unit.

Subject to contrary definitive guidance from the IRS (as determined by the GUC Trustee in its reasonable discretion), including the receipt by the GUC Trustee of a private letter ruling if the GUC Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the GUC Trustee, or a court of competent jurisdiction, the GUC Trustee may (i) timely elect to treat any assets allocable to any Disputed Claims, if applicable, as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 or elect to report as a separate trust or sub-trust or other entity and (ii) to the extent permitted by applicable Law, report consistently with the foregoing for applicable U.S. state and local income tax purposes. All parties (including the Reorganized Debtors, the GUC Trust, the GUC Trustee, and the GUC Trust Beneficiaries) shall report for U.S. federal and applicable U.S. state and local income tax purposes consistently with the foregoing.

The Creditor Oversight Committee shall be a committee of up to three members appointed on the Effective Date as selected by the Creditors' Committee. The Creditor Oversight Committee, its members, and Representatives shall not have any liability to any creditor of the Debtors, or holder of a GUC Interest, on account of any action taken in good faith in accordance with this Plan or the GUC Documents.

In the event of a vacancy on the Creditor Oversight Committee, the remaining members of the Creditor Oversight Committee may select an acceptable successor member to the Creditor Oversight Committee.

On the Effective Date, the Creditor Oversight Committee shall have consultation rights with respect to any litigation regarding the State Non-Tax Claims as described in the GUC Documents, including any briefing submitted by the Reorganized Debtors in connection with such litigation.

The Reorganized Debtors shall support and the Investors shall not object to a request by the Creditor Oversight Committee or its designee (which designee may be the GUC Entity) to participate in any litigation regarding the State Non-Tax Claims; provided, however, that the governing body of any GUC Entity participating in such litigation shall take direction from the Creditor Oversight Committee. The legal fees incurred by such participation in the litigation regarding the State Non-Tax Claims shall be paid solely with funds from interest or investment income accrued or earned by the applicable GUC Entity.

The Creditor Oversight Committee shall have a consent right over any settlement (not to be unreasonably withheld, conditioned or delayed) in the event the Reorganized Debtors voluntarily determine to pay a portion of the Reserved Funds to settle the State Non-Tax Claims prior to entry of a final order requiring any Reorganized Debtor to pay any State Non-Tax Claim.

The Creditor Oversight Committee shall have any other consent and consultation rights as set forth in the GUC Documents.

D.    Distributions

1.    *Distributions Generally*

The Disbursing Agent shall make all Plan Distributions to the appropriate holders of Allowed Claims in accordance with the terms of the Plan, or any authority granted to the Debtors to make payments pursuant to applicable orders of the Bankruptcy Court, including the Critical Vendors Order, the Disbursing Agent shall make all Plan Distributions to the appropriate holders of Allowed Claims in accordance with the Plan.

2.    *No Postpetition Interest on Claims*

Unless otherwise provided in the Plan, the Definitive Documents, the Confirmation Order, or other order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on any Claim and no holder of a Claim shall be entitled to interest accruing on or after the Commencement Date on any such Claim; provided, however, that, in accordance with the Swedish Reorganization Act, solely for the purpose of calculating the Pro Rata share of Plan Distributions for holders of certain Allowed Claims against SAS AB, such Allowed Claims against SAS AB shall accrue interest on and after the Commencement Date to the extent such Allowed Claims are entitled to interest under applicable Swedish Law.

### 3. *Date of Distributions*

Unless otherwise provided in the Plan, the initial distribution to be made to holders of Allowed Claims under the Plan shall be made on the Effective Date or as soon as reasonably practicable thereafter.  Any subsequent distributions shall be made from time to time as reasonably determined by the Disbursing Agent or as set forth in the GUC ~~Trust Agreement~~Documents with respect to distributions on account of GUC ~~Trust~~ Interests.  As described in section 12.4 of the Plan, in the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in ARTICLE VII of the Plan.

### 4. *Distribution Record Date*

As of the close of business on the Distribution Record Date, the various lists of holders of Claims in each Class, as maintained by the Debtors or their agents, shall be deemed closed, and there shall be no further changes in the record holders of any Claims after the Distribution Record Date; *provided, however*, that such Distribution Record Date does not apply to the Debtors' public securities—the holders of which will receive their distributions pursuant to the standard and customary procedures of Euroclear Sweden and any other applicable securities depositories.  Neither the Debtors nor the Disbursing Agent shall have any obligation to recognize any transfer of a Claim occurring after the close of business on the Distribution Record Date.

### 5. *Distributions after Effective Date*

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date, but which later become Allowed Claims, shall be deemed to have been made on the Effective Date.

### 6. *Disbursing Agent.*

All Plan Distributions shall be made by the Disbursing Agent on and after the Effective Date as provided in the Plan.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties.  The Reorganized Debtors shall use commercially reasonable efforts to provide the Disbursing Agent (if other than the Reorganized Debtors) with a record of the amounts of Claims and the identities and addresses of holders of Claims, in each case, as set forth in the Debtors' or Reorganized Debtors' books and records.  The Reorganized Debtors shall cooperate in good faith with the applicable Disbursing Agent (if other than the Reorganized Debtors) to comply with the reporting and withholding requirements outlined in section 6.18 of the Plan.

### 7. *Delivery of Distributions.*

Subject to Bankruptcy Rule 9010, the Disbursing Agent shall make all distributions to any holder of an Allowed Claim as and when required by the Plan at (i) the

address of such holder on the books and records of the Debtors or their agents or (ii) at the address in any written notice of address change delivered to the Debtors or the Disbursing Agent, including any addresses included on any transfers of Claim filed pursuant to Bankruptcy Rule 3001. Subject to section 6.8 of the Plan, in the event that any distribution to any holder is returned as undeliverable, no distribution or payment to such holder shall be made unless and until the Disbursing Agent has been notified of the then-current address of such holder, at which time or as soon thereafter as reasonably practicable, such distribution shall be made to such holder without interest.

As set forth in section 5.2(a) of the Plan, the Investor Equity and the New Convertible Notes shall be distributed in accordance with the terms set forth in the Investment Agreement. The remaining New Shares, the aggregate value of which shall correspond to the New Shares Distribution Pool, shall be distributed to holders of certain Allowed Claims that are entitled to receive a recovery from the New Shares Distribution Pool in accordance with the terms set forth in the Plan.

## 8. *Unclaimed Property*

One year from the later of: (i) the Effective Date and (ii) the date that is ten Business Days after the date a Claim is first Allowed, all distributions payable on account of such Claim that are not claimed or accepted by such date shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall revert to the Reorganized Debtors or their successors or assigns, and all claims of any other Person (including the holder of a Claim in the same Class) to such distribution shall be discharged and forever barred. The Reorganized Debtors and the Disbursing Agent shall have no obligation to attempt to locate any holder of an Allowed Claim other than by reviewing the Debtors' books and records and the Bankruptcy Court's filings.

A distribution shall be deemed unclaimed if a holder has not (i) accepted a particular distribution or, in the case of distribution made by check by 90 days after issuance, negotiated such check, (ii) given notice to the Reorganized Debtors of an intent to accept a particular distribution, (iii) responded to the Debtors' or Reorganized Debtors', as applicable, request for information necessary to facilitate a particular distribution, or (iv) taken any other action necessary to facilitate such distribution.

## 9. *Satisfaction of Claims*

Unless otherwise provided in the Plan, any distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims.

## 10. *Manner of Payment under Plan*

Except as specifically provided in the Plan, at the option of the Debtors or the Reorganized Debtors, as applicable, any Cash payment to be made under the Plan may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors or Reorganized Debtors, as applicable. Any wire transfer

fees incurred by the Disbursing Agent in connection with the transmission of a wire transfer shall be deducted from the amount of the recipient holder's Allowed Claim.

11. *Fractional Shares*

No fractional shares of New Shares shall be distributed. When any distribution would otherwise result in the issuance of a number of shares of New Shares that is not a whole number, the New Shares subject to such distribution shall be rounded to the next lowest whole number. The total number of New Shares to be distributed on account of Allowed Claims or Interests shall be adjusted as necessary to account for the rounding provided for in the Plan. No consideration shall be provided in lieu of fractional shares that are rounded down.

12. *Minimum Distribution*

The Reorganized Debtors and the Disbursing Agent, as applicable, shall have the right to determine, based on, among other things, efficiency and whether the distribution costs exceed the recovery amount, whether to make (i) a distribution pursuant to the Plan that is less than the value of one New Share or $50.00 in Cash; provided, however, that to the extent any distribution is not made pursuant to section 6.12 of the Plan, such distribution shall be added to any subsequent distribution to be made on account of the holder's Allowed Claim and (ii) any final distributions of less than the value of one New Share or Cash less than $10 to any holder of an Allowed Claim. If either (a) all Plan Distributions on Allowed Claims (other than those whose Plan Distributions are deemed undeliverable hereunder) otherwise have been paid in full or (b) the amount of any final distributions to holders of Allowed Claims would be (1) less than the value of one New Share or (2) $10 or less and the aggregate amount of Cash available for distributions to holders of Allowed General Unsecured Claims is less than $25,000, then the Reorganized Debtors and the Disbursing Agent, as applicable, shall have the right to determine whether any further distribution shall be made by the Reorganized Debtors. Any surplus Cash shall revert to the Reorganized Debtors.

13. *No Distribution in Excess of Amount of Allowed Claim*

Notwithstanding anything to the contrary in the Plan, no holder of an Allowed Claim shall receive, on account of such Allowed Claim, Plan Distributions in excess of the Allowed amount of such Claim (plus any postpetition interest on such Claim solely to the extent permitted by section 6.2 of the Plan).

14. *Allocation of Distributions between Principal and Interest*

Except as otherwise required by Law (as determined by the Debtors or Reorganized Debtors), distributions with respect to an Allowed Claim shall be allocated first to the principal portion of such Allowed Claim (as determined for United States federal income tax purposes) and, thereafter, to the remaining portion of such Allowed Claim, if any.

15. *Setoffs and Recoupments*

Except as otherwise provided in section 10.10 of the Plan, each Debtor or Reorganized Debtor, or such Entity's designee as instructed by such Debtor or Reorganized

Debtor, may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy Law, set-off or recoup against any Allowed Claim, and the distributions to be made pursuant to the Plan on account of such Allowed Claim, any and all claims, rights, and Causes of Action of any nature whatsoever that a Debtor or Reorganized Debtor or its successors may hold against the holder of such Allowed Claim after the Effective Date; provided, however, that neither the failure to effect a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Debtor or Reorganized Debtor or its successor of any claims, rights, or Causes of Action that a Debtor or Reorganized Debtor or its successor or assign may possess against the holder of such Claim.

16. *Rights and Powers of Disbursing Agent*

The Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder, (ii) make all applicable distributions or payments provided for under the Plan, (iii) employ professionals to represent it with respect to its responsibilities, and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court (including any Final Order issued after the Effective Date) or pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

17. *Expenses of Disbursing Agent*

To the extent the Disbursing Agent is a Person other than a Debtor or Reorganized Debtor or as otherwise ordered by the Bankruptcy Court, subject to the written agreement of the Reorganized Debtors, the amount of any reasonable fees and out-of-pocket expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and out-of-pocket expense reimbursement Claims (including for reasonable attorneys' fees and other professional fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors in the ordinary course of business. For the avoidance of doubt, any provisions in section 6.17 of the Plan, or elsewhere in the Plan, entitling a Person to a reimbursement of fees and expenses shall not include any recoverable value added tax (or similar tax).

18. *Withholding and Reporting Requirements*

*Withholding Rights*. In connection with the Plan, any Person issuing any instrument or making any distribution or payment (including any payments or distributions made by or from ~~the~~any GUC ~~Trust~~Entities) in connection therewith, shall comply with all applicable withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority and, as applicable, any other federal, state, local or foreign Laws as necessary to implement the Restructuring set forth in the Plan and the Swedish Reorganization Plan. In the case of a non-Cash distribution that is subject to withholding, the distributing party may either (i) require the intended recipient of such distribution to provide the withholding agent with an amount of Cash sufficient to satisfy such withholding tax as a condition to receiving such distribution or (ii) withhold an appropriate portion of such distributed property and either (A) sell such withheld property to generate Cash necessary to pay over the withholding tax (or reimburse the distributing party for any advance payment of the withholding

tax) or (B) pay the withholding tax using its own funds and retain such withheld property. Any amounts so withheld shall be remitted to the appropriate Governmental Unit. Any amounts withheld pursuant to the preceding sentence shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan. Notwithstanding the foregoing, each holder of an Allowed Claim or any other ~~E~~entity that receives a distribution pursuant to the Plan shall have responsibility for any taxes imposed by any Governmental Unit, including income, withholding, and other taxes, on account of such distribution. Any party issuing any instrument or making any distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

*Forms*. Any party entitled to receive any property as an issuance or distribution under the Plan shall, upon request, deliver to the applicable Disbursing Agent or such other ~~E~~entity designated by the Reorganized Debtors (which Entity shall subsequently deliver to the applicable Disbursing Agent any applicable IRS Form W-8 or Form W-9 received) or ~~the~~any GUC ~~Trustee, as applicable~~Entities, an appropriate IRS Form W-9 or (if the payee is a foreign ~~E~~entity) an appropriate IRS Form W-8 and any other forms or documents reasonably requested by any Reorganized Debtor ~~or the~~, any GUC ~~Trustee~~Entities or other designated entity, as applicable, to reduce or eliminate any withholding required by any taxing authority. If such request is made by the Reorganized Debtors, the Disbursing Agent, the GUC ~~Trustee~~Entities, or such other ~~E~~entity designated by the Reorganized Debtors, the GUC ~~Trustee~~Entities, or a Disbursing Agent and such party fails to comply before the date that is 180 days after the request is made, the amount of such distribution shall irrevocably revert to the applicable Reorganized Debtor ~~or~~, the GUC ~~Trust~~Entities or other designated entity, as applicable, and any Claim in respect of such distribution shall be discharged and forever barred from assertion against such Reorganized Debtor ~~or~~, the GUC ~~Trust~~Entities or other designated entity, as applicable, or their respective property.

Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such holder by any Governmental Unit, including income, withholding, and other tax obligations, on account of such Plan Distribution.

19. *Indefeasible Distribution*

Any and all distributions made under the Plan shall be indefeasible and not subject to clawback or turnover.

E. Procedures for Disputed Claims

1. *Objections to Claims*

Except as provided in section 7.3 of the Plan, the Debtors, the Reorganized Debtors, and the Creditors' Committee, as applicable, shall be entitled to object to Claims; provided, however, that the Creditors' Committee shall only be entitled to object to Claims prior to the Effective Date. After the Effective Date, the Reorganized Debtors shall have and retain any and all rights and defenses that the Debtors had with respect to any Claim

immediately before the Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is Allowed or deemed Allowed pursuant to the Plan or a Final Order, including the Confirmation Order, allowing such Claim. Any objection to Claims shall be served and filed on or before the Claims Objection Deadline, as such deadline may be extended from time to time.

2. *Resolution of Disputed Claims*

Except as provided in section 7.3 of the Plan, or as otherwise provided in an order of the Bankruptcy Court and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, on and after the Effective Date, the Reorganized Debtors shall have the authority to (i) file, withdraw, or litigate to judgment objections to Claims, (ii) settle or compromise any Disputed Claims, without further notice to or action, order, or approval by the Bankruptcy Court, and (iii) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. For the avoidance of doubt, prior to the Effective Date, the Creditors' Committee shall have the authority to file, withdraw, or litigate to judgment objections to Claims.

3. *Estimation of Claims*

The Debtors or the Reorganized Debtors, as applicable, in consultation with the Creditors' Committee, may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtors had previously objected to or otherwise disputed such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on any potential Allowed amount of such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on any potential Allowed amount of such Claim, the Debtors or the Reorganized Debtors, as applicable, may pursue supplementary proceedings to object to the allowance of such Claim.

4. *Adjustment to Claims Register without Objection*

Any duplicate Claim or any Claim that has been paid, satisfied, or settled, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Debtors or the Reorganized Debtors, as applicable, upon stipulation between the parties in interest without a Claims objection having to be filed and without any further notice or action, order, or approval of the Bankruptcy Court.

5. *Claim Resolution Procedures Cumulative*

All of the objection, estimation, and resolution procedures in the Plan are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently settled, compromised, withdrawn, or resolved in accordance with the Plan without further notice or Bankruptcy Court approval.

6. *No Distributions Pending Allowance*

Except with respect to Fee Claims, which are governed by the Interim Compensation Procedures Order, if an objection, motion to estimate, or other challenge to a Claim is filed, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

7. *Distributions after Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the holder of such Allowed Claim from the Disputed Claims Reserve in accordance with the provisions of the Plan. As soon as reasonably practicable after the date on which the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the holder of such Claim the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date.

8. *Disputed Claims Reserve*

Amounts or property that would be distributable in respect of any Disputed Claim had such Disputed Claim been Allowed on the Effective Date, together with all earnings thereon (net of any taxes imposed thereon or otherwise payable by the Disputed Claims Reserve), shall be deposited in the Disputed Claims Reserve. The amount of, or the amount of property constituting, the Disputed Claims Reserve shall be determined prior to the Effective Date based on the Debtors' good faith estimates or an order of the Bankruptcy Court estimating such Disputed Claims, and shall be established on or about the Effective Date.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, or the receipt of a determination by the IRS, the Disbursing Agent shall treat the Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 and to the extent permitted by applicable Law, report consistently with the foregoing for state and local income tax purposes. All parties (including the Debtors, the Reorganized Debtors, the Disbursing Agent, and the holders of Disputed Claims) shall be required to report for tax purposes consistently with the foregoing.

The Disbursing Agent shall hold in the Disputed Claims Reserve all distributions to be made on account of Disputed Claims for the benefit of holders of Disputed Claims whose Claims are subsequently Allowed. All taxes imposed on assets or income of the Disputed

Claims Reserve shall be payable by the Disbursing Agent from the assets of the Disputed Claims Reserve.

In the event the remaining assets in the Disputed Claims Reserve are insufficient to satisfy all the Disputed Claims that have become Allowed, such Allowed Claims shall be satisfied Pro Rata from such remaining assets. After all assets have been distributed from the Disputed Claims Reserve, no further distributions shall be made in respect of Disputed Claims. At such time as all Disputed Claims have been resolved, any remaining assets in the Disputed Claims Reserve shall be distributed to all holders of Allowed General Unsecured Claims Pro Rata and in proportion to the Class-specific allocations provided for in the Plan.

F.    Executory Contracts and Unexpired Leases

1.    *General Treatment*

As of and subject to the occurrence of the Effective Date, all executory contracts and unexpired leases to which any of the Debtors are parties shall be rejected and deemed rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such contract or lease (i) was previously assumed or rejected by the Debtors, pursuant to a Final Order of the Bankruptcy Court, (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto, (iii) is the subject of a motion to assume filed by the Debtors on or before the Confirmation Date, or (iv) is specifically designated as a contract or lease to be assumed on the Schedule of Assumed Contracts.

The Debtors shall identify the executory contracts and unexpired leases to be assumed; *provided, howeve*r, that:

(i)     the Investors (other than Air France-KLM) shall have a consent right with respect to assumption or rejection of any Material Non-Aircraft Executory Contract or Lease;

(ii)    the Investors shall not have a consultation or consent right with respect to assumption or rejection of any executory contract or unexpired lease related to the Debtors' aircraft, engines, and related equipment and arrangements; and

(iii)   the Debtors shall deliver to the Investors copies of all Material Contracts prior to closing the Transaction.

Subject to (i) satisfaction of the conditions set forth in section 8.1(a)-(c) of the Plan, (ii) resolution of any disputes in accordance with section 8.2 of the Plan with respect to the contracts or leases subject to such dispute, and (iii) the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions or rejections provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Each executory contract and unexpired lease assumed pursuant to the Plan shall vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with

its terms, except as modified by the provisions of the Plan, any Final Order of the Bankruptcy Court authorizing and providing for its assumption, or applicable Law.

The Debtors shall file, as part of the Plan Supplement, the Schedule of Assumed Contracts, which may be amended, supplemented, or otherwise modified through the Effective Date; provided, however, that the Debtors may file an amended Schedule of Assumed Contracts after the Effective Date with the consent of the lessors or contract counterparties affected by such amended Schedule of Assumed Contracts.

With respect to Aircraft Leases that were not previously assumed, have not previously expired or terminated pursuant to their terms, or are not subject to a motion to assume filed on or before the Confirmation Date, the Debtors shall assume only those Aircraft Leases and related executory contracts that are designated on the Schedule of Assumed Contracts. For the avoidance of doubt, any executory contracts or unexpired leases that are ancillary to Aircraft Leases that have been previously assumed or are being assumed under the Plan shall be and shall be deemed assumed. Notwithstanding anything to the contrary in the Plan, to the extent certain of the Aircraft Leases identified on the Schedule of Assumed Contracts include finance leases of the Debtors that were amended during the course of these Chapter 11 Cases, the obligations associated with such lease shall be provided the treatment agreed between the applicable Debtor(s) and the lease counterparties and lenders in the applicable governing amendment documents.

2. *Determination of Cure Disputes and Deemed Consent*

Any Cure Amount shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Amount, as reflected on the applicable Cure Notice, in Cash on the Effective Date, or as soon as reasonably practicable thereafter, subject to the limitations described below, or on such other terms as the counterparties to such executory contracts or unexpired leases and the Debtors (subject to section 8.1(b)(i) of the Plan) may otherwise agree.

The Debtors shall serve a Cure Notice on counterparties to executory contracts and unexpired leases no later than 21 days before the commencement of the Confirmation Hearing in accordance with the order approving the Disclosure Statement and Solicitation and Voting Procedures. If a counterparty to any executory contract or unexpired lease is not listed on the applicable Cure Notice, the proposed Cure Amount for such executory contract or unexpired lease shall be deemed to be zero dollars ($0).

Any counterparty to an executory contract or unexpired lease shall have the time prescribed by the order approving the Disclosure Statement and Solicitation and Voting Procedures to object to the proposed assumption or related Cure Amount listed on the Cure Notice.

Any counterparty to an executory contract or unexpired lease that fails to object timely to the proposed assumption or Cure Amount (i) shall be deemed to have assented to such assumption or Cure Amount, notwithstanding any provision thereof that purports to (1) prohibit, restrict, or condition the transfer or assignment of such contract or lease or (2) terminate or

permit the termination of a contract or lease as a result of any direct or indirect transfer or assignment of the rights of the Debtors under such contract or lease or a change, if any, in the ownership or control to the extent contemplated by the Plan, and shall forever be barred and enjoined from asserting such objection against the Debtors or terminating or modifying such contract or lease on account of transactions contemplated by the Plan and (ii) shall be forever barred, estopped, and enjoined from challenging the validity of such assumption thereafter.

If there is a dispute presented in a timely objection regarding (i) any Cure Amount, (ii) the ability of the Debtors (or the Reorganized Debtors) to provide adequate assurance of future performance (within the meaning of section 365 of the Bankruptcy Code) under such contract or lease to be assumed, or (iii) any other matter pertaining to assumption, such dispute shall be heard by the Bankruptcy Court prior to such assumption being effective. Notwithstanding the foregoing, to the extent the dispute relates solely to any Cure Amounts, the applicable Debtor (subject to section 8.1(b)(i) of the Plan) may assume the executory contract or unexpired lease prior to the resolution of any such dispute, as long as that Debtor reserves Cash in an amount sufficient to pay the full amount reasonably asserted as the required Cure Amount by the contract counterparty. Following entry of a Final Order resolving any such dispute, the Debtors (subject to section 8.1(b)(i) of the Plan) shall have the right to reject any executory contract or unexpired lease within thirty (30) days of such resolution.

Subject to resolution of any dispute regarding any Cure Amount, all Cure Amounts shall be satisfied by the Debtors or Reorganized Debtors, as the case may be, upon assumption of the underlying contracts and unexpired leases. Assumption of any executory contract or unexpired lease pursuant to the Plan, or otherwise, shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure Amount, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the effective date of the assumption. Any Claims arising from an executory contract or unexpired lease that has been assumed shall be deemed Disallowed and expunged from the Claims Register, without further notice to or action, order or approval of the Bankruptcy Court or any other Person, upon the deemed assumption of such contract or unexpired lease.

3.      *Rejection Damages Claims*

Any counterparty to an executory contract or unexpired lease that is rejected by the Debtors pursuant to the Plan must file and serve a Proof of Claim on the applicable Debtor that is party to the contract or lease to be rejected no later than 30 days after the later of (i) the Confirmation Date or (ii) the effective date of rejection of such executory contract or unexpired lease.

4.      *Survival of the Debtors' Indemnification Obligations*

Any and all obligations of the Debtors pursuant to corporate charters, bylaws, limited liability company agreements, or other organizational documents to indemnify current and former officers, members, managers, directors, agents, or employees with respect to all present and future actions, suits, and proceedings against the Debtors or such directors, officers,

members, managers, agents, or employees based upon any act or omission for or on behalf of the Debtors shall not be discharged or impaired by confirmation of the Plan. All such obligations shall be deemed and treated as executory contracts to be assumed by the Debtors under the Plan and shall continue as obligations of the Reorganized Debtors, as applicable. Any Claim based on the Debtors' obligations with respect thereto shall be an Allowed Claim.

5. *Employment, Compensation and Benefit Plans*

Unless otherwise modified prior to the Effective Date, all employment policies, local labor agreements, collective bargaining agreements, and all compensation and benefits plans, policies, and programs of the Debtors applicable to their respective employees, retirees, and nonemployee directors, including all savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, and life and accidental death and dismemberment insurance plans, are deemed to be, and shall be treated as, executory contracts under the Plan and, on the Effective Date, shall be assumed pursuant to sections 365 and 1123 of the Bankruptcy Code; provided, however, that no employee equity or equity-based incentive plans, or any provisions set forth in any compensation and benefit plans that provide for rights to acquire equity interests in any of the Debtors, shall be assumed by the Debtors or Reorganized Debtors.

6. *Insurance Policies*

All insurance policies to which any Debtor is a party as of the Effective Date, including any directors' and officers' insurance policies, shall be deemed to be and treated as executory contracts and shall be assumed by the applicable Debtor or Reorganized Debtor and shall continue in full force and effect thereafter in accordance with their respective terms. All insurance policies shall vest in the Reorganized Debtors.

In addition, after the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including any "tail policy") in effect or purchased as of the Commencement Date. Any individuals covered by such insurance policies, including all members, managers, directors, officers, agents, and employees of the Debtors who served in such capacity at any time prior to the Effective Date, shall be entitled to the full benefits of any such policy for the full term of the policy regardless of whether such members, managers, directors, officers, or other individuals remain in such positions after the Effective Date.

7. *Intercompany Agreements*

Notwithstanding anything to the contrary in the Plan or in the Plan Supplement, but subject to section 8.1(b)(i) of the Plan, all Intercompany Agreements are deemed to be, and shall be treated as, executory contracts under the Plan and, on the Effective Date, shall be deemed assumed pursuant to sections 365 and 1123 of the Bankruptcy Code (in each case, as amended prior to or on the Effective Date) unless any such Intercompany Agreement is specifically rejected pursuant to a separate order of the Bankruptcy Court or is the subject of a separate rejection motion filed by the Debtors.

8.    *Assumed Credit Card Processing Agreements*

Notwithstanding anything herein to the contrary, Elavon may exercise its normal recoupment, setoff, reserve, and processing procedures in respect of claims and the netting of fees, chargebacks, and other amounts in accordance with the terms and conditions of the Assumed Credit Card Processing Agreements.  All obligations of the Debtors and all operations, rights, and remedies of Elavon, including the netting of prepetition and postpetition sales, refunds, fees, and chargebacks, arising under and pursuant to the Assumed Credit Card Processing Agreements shall remain fully enforceable against the Reorganized Debtors.

9.    *Reservation of Rights*

Neither the exclusion nor the inclusion by the Debtors of any contract or lease on any exhibit, schedule, or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is or is not an executory contract or unexpired lease or that the Debtors or the Reorganized Debtors or their respective Affiliates have any liability thereunder.

Except as explicitly provided in the Plan, nothing in the Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtors or the Reorganized Debtors under any executory or non-executory contract or unexpired or expired lease.

Nothing in the Plan shall increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Reorganized Debtors, as applicable, under any executory or non-executory contract or unexpired or expired lease.

If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of its assumption under the Plan, and subject to section 8.1(b)(i) of the Plan, the Debtors or Reorganized Debtors, as applicable, shall have 30 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

G.    <u>Conditions Precedent to the Effective Date</u>

1.    *Conditions Precedent to the Effective Date*

The Effective Date shall not occur unless all of the following conditions precedent have been satisfied:

(a)    the Key Transaction Documents shall be consistent with the Plan in all material respects, and otherwise be acceptable to the Investors pursuant to Investor Consent;

(b)    the Bankruptcy Court shall have entered the Confirmation Order in relation to the Plan as to every Debtor, except as set forth in the Plan with respect to a Gorm Entity, and such Confirmation Order shall have become a Final Order; *provided, however*, that if a Confirmation Order is not entered with respect to any Gorm Entities, the effectiveness of

the Plan shall be conditioned upon a resolution of the assets and executory contracts attributable to such Gorm Entities, which resolution shall be subject to Investor Consent;

(c)     the Swedish Reorganization Plan Confirmation shall have occurred and the Existing Equity Interests shall be cancelled and, as a result, delisted as soon as practicable following the SCRO Registration;

(d)     the documents related to the New Convertible Notes, including the New Convertible Notes Indenture, shall have been duly executed, all conditions precedent to effectiveness of the New Convertible Notes shall have been satisfied or waived in accordance with the terms thereof, and the closing of the New Convertible Notes shall have occurred;

(e)     all conditions precedent to the Investment Agreement shall have been satisfied or waived in accordance with the terms thereof, and the Investment Agreement shall not have been terminated;

(f)     all conditions precedent to the GUC Documents, as applicable, shall have been satisfied or waived in accordance with the terms thereof, as applicable, and the GUC Documents shall be reasonably acceptable to the Debtors, Required Investors, and Creditors' Committee;

(g)     (f) the Debtors shall have received Bankruptcy Court approval and, if required, counterparty approval for the assumption or rejection of the Material Contracts identified by the Required Investors (other than Air France-KLM) upon closing in a manner reasonably acceptable to the Investors, and the cure amounts for any such contracts shall be reasonably acceptable to the Required Investors (other than Air France-KLM);

(h)     (g) all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan shall have been obtained, including as set forth in the Investment Agreement;

(i)     (h) one or more decisions by the European Commission declaring compatible with the internal market the recapitalization measures granted by the States during the 2020 COVID-19 recapitalization of SAS AB (cases SA.57543 and SA.58342), which decisions shall be deemed acceptable to the Investors; provided, however, that, to the extent that any such decision constitutes a Material State Aid Decision, it shall have been approved by each of the Investors;

(j)     (i) one or more decisions by the European Commission declaring compatible with the internal market the restructuring aid granted by the States through their participation in the Restructuring, which decisions shall be deemed acceptable to the Investors; provided, however, that, to the extent that any such decision constitutes a Material State Aid Decision, it shall have been approved by each of the Investors;

(k)     (j) one or more by the EFTA Surveillance Authority declaring compatible with the functioning of the EEA Agreement the restructuring aid granted by the Norwegian State through its contribution to the Restructuring, which decisions shall be deemed

acceptable to the Investors; provided, however, that, to the extent that any such decision constitutes a Material State Aid Decision, it shall have been approved by each of the Investors;

(l)    ~~(k)~~ the current slot portfolio of the Debtors (including their affiliate carriers) shall be substantially the same (both in terms of number and location) on the Effective Date as on the date hereof;

(m)    ~~(l)~~ regulatory approvals, including foreign direct investment approvals and approvals from the relevant civil aviation authorities (or any other relevant authorities) confirming that all operating licenses, air operator certificates, traffic rights, and any other authorizations, approvals, licenses, or rights required for the Debtors (including their affiliate carriers) to operate its existing network shall be preserved following the Restructuring and the Effective Date as set forth on Schedule 7.3(a)(i) of the Investment Agreement;

(n)    ~~(m)~~ all other actions, documents, and agreements necessary to implement and effectuate the Plan shall have been effected or executed, including as set forth in the Investment Agreement;

(o)    ~~(n)~~ all Allowed Fee Claims approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date shall have been placed in the Fee Escrow Account pending approval by the Bankruptcy Court;

(p)    ~~(o)~~ subject to the Overall Cap, the Commitment Fee, the Contribution Fees, and the Expense Reimbursement shall have been paid;

(q)    ~~(p)~~ the Debtors shall have paid all trade payables in the ordinary course of business arising from the provision of goods and services on or after the Commencement that are due and payable at or before the Effective Date, other than such amounts (A) which are disputed by the Debtors in good faith for which adequate reserves have been created and (B) which are not allowed to be paid in full pursuant to the Swedish Reorganization Act;

(r)    ~~(q)~~ the Bankruptcy Court orders approving the Key Transaction Documents and the transactions contemplated thereby shall have provided for the release of any and all encumbrances on the Debtors' assets, other than those expressly permitted by the Key Transaction Documents, and the Investors shall have received such documents or instruments as may be required to demonstrate that, effective as of the Effective Date, the assets of the Debtors and their subsidiaries are released from any and all encumbrances other than those expressly permitted by the Key Transaction Documents;

(s)    ~~(r)~~ the Debtors shall have implemented the Restructuring and all transactions contemplated in the Plan and the Investment Agreement, including through any supplemental proceedings, in a manner consistent with the Plan and the Investment Agreement and otherwise reasonably acceptable to the Investors;

(t)    ~~(s)~~ all reasonable and documented fees and out-of-pocket expenses of (x) Skadden, Arps, Slate, Meagher & Flom LLP, White & Case LLP, Bech-Bruun

Law Firm P/S and Latham & Watkins LLP, as respective counsel to the Investors (other than the Danish State Investor), (y) Rothschild & Co. as financial advisor to Castlelake, and (z) all other legal counsel, accountants, financial advisors, and other professionals, advisors, and consultants retained by any one or more Investors (other than the Danish State Investor) in connection with the Chapter 11 Cases, the Transaction, the Plan, or the Swedish Reorganization Plan (as permitted pursuant to the terms of the Investment Agreement), shall have been paid in full in accordance with the Investment Agreement; and

(u) (t) the DIP Orders shall remain Final Orders, the Swedish Reorganization Plan Confirmation shall be final and binding (Sw. lagakraftvunnen), and the EPCA Approval Order shall not have been stayed, modified, reversed, or be subject to appeal.

## 2. *Waiver of Conditions Precedent*

Each of the conditions precedent to the occurrence of the Effective Date, other than the condition set forth in section 9.1(b) of the Plan, may be waived in writing by the Debtors, with the consent of the Required Investors and in consultation with the Creditors' Committee, without leave of or order of the Bankruptcy Court. If any such condition precedent is waived pursuant to section 9.2 of the Plan and the Effective Date occurs, each party agreeing to waive such condition precedent shall be estopped from withdrawing such waiver after the Effective Date or otherwise challenging the occurrence of the Effective Date on the basis that such condition was not satisfied, the waiver of such condition precedent shall benefit from the "equitable mootness" doctrine, and the occurrence of the Effective Date shall foreclose any ability to challenge the Plan in any court. If the Plan is confirmed for fewer than all of the Debtors, only the conditions applicable to the Debtor or Debtors for which the Plan is confirmed must be satisfied or waived for the Effective Date to occur.

Except as otherwise provided in the Plan, all actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action.

## H. Effect of Confirmation

## 1. *Binding Effect*

Subject to Section 12.4 and Section 12.12 of the Investment Agreement and the occurrence of the Effective Date, except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, the provisions of the Plan and the Definitive Documents shall bind the Debtors, the Estates, the Reorganized Debtors, and every holder of a Claim or Interest, and inure to the benefit of and be binding on such holder's respective successors and assigns, regardless of whether the Claim or Interest of such holder is Impaired under the Plan and whether such holder has accepted the Plan. Except as expressly provided in the Plan, all agreements, instruments and other documents filed in connection with the Plan shall be given full force and effect, and shall bind all parties referred to in the Plan as of the Effective Date, whether or not such agreements are actually issued, delivered, or recorded on the Effective Date or thereafter and whether or not a party has actually executed such agreement.

2. *Vesting of Assets*

Except as otherwise provided in the Plan, or any Definitive Document, on and after the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property dealt with by the Plan, including all claims, rights, and Causes of Action and any property acquired by the Debtors under or in connection with the Plan or the Plan Supplement, shall vest in the applicable Reorganized Debtor free and clear of all Claims, Liens, encumbrances, charges, and other interests, other than those provided for in the Plan. Subject to the terms of the Plan, on and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property and prosecute, compromise, or settle any Claims (including any Administrative Expense Claims) and Causes of Action without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by the Plan or the Confirmation Order. Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur on or after the Confirmation Date for Professional Persons' fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

3. *Discharge of Claims against and Interests in Debtors*

Upon the Effective Date and in consideration of the distributions to be made under the Plan, except as otherwise expressly provided in the Plan or in the Confirmation Order, each holder (as well as any trustee or agents on behalf of each holder) of a Claim or Interest and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interest, rights, and liabilities that arose prior to the Effective Date. Except as otherwise provided in the Plan, upon the Effective Date, all such holders of Claims and Interests and their affiliates shall be forever precluded and enjoined, pursuant to sections 105, 524, and 1141 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Interest in any Debtor or Reorganized Debtor.

4. *Pre-Confirmation Injunctions and Stays*

Unless otherwise provided in the Plan or a Final Order of the Bankruptcy Court, all injunctions and stays arising under or entered during the Chapter 11 Cases, whether under sections 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the date of entry of the Confirmation Order, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

5. *Injunction against Interference with Plan*

Upon the entry of the Confirmation Order, all holders of Claims and Interests and all other parties in interest, along with their respective present and former affiliates, employees, agents, officers, directors, and principals, shall be enjoined from taking any action to interfere with the implementation or the occurrence of the Effective Date.

6.    *Plan Injunction*

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, IN THE DEFINITIVE DOCUMENTS, OR IN THE CONFIRMATION ORDER, AS OF THE ENTRY OF THE CONFIRMATION ORDER BUT SUBJECT TO THE OCCURRENCE OF THE EFFECTIVE DATE, **(I)** ALL PERSONS WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS OR INTERESTS AND THEIR RESPECTIVE RELATED PERSONS, ARE PERMANENTLY ENJOINED AFTER THE ENTRY OF THE CONFIRMATION ORDER FROM (~~I~~**A**) COMMENCING, CONDUCTING, OR CONTINUING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY SUIT, ACTION, OR OTHER PROCEEDING OF ANY KIND (INCLUDING ANY PROCEEDING IN A JUDICIAL, ARBITRAL, ADMINISTRATIVE, OR OTHER FORUM) AGAINST OR AFFECTING, DIRECTLY OR INDIRECTLY, A DEBTOR, A REORGANIZED DEBTOR, OR AN ESTATE OR THE PROPERTY OF ANY OF THE FOREGOING, OR ANY DIRECT OR INDIRECT TRANSFEREE OF ANY PROPERTY OF, OR DIRECT OR INDIRECT SUCCESSOR IN INTEREST TO, ANY OF THE FOREGOING PERSONS MENTIONED IN THIS CLAUSE (~~I~~**A**) OR ANY PROPERTY OF ANY SUCH TRANSFEREE OR SUCCESSOR, (~~II~~**B**) ENFORCING, LEVYING, ATTACHING (INCLUDING ANY PREJUDGMENT ATTACHMENT), COLLECTING, OR OTHERWISE RECOVERING IN ANY MANNER OR BY ANY MEANS, WHETHER DIRECTLY OR INDIRECTLY, ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST A DEBTOR, A REORGANIZED DEBTOR, OR AN ESTATE OR ITS PROPERTY, OR ANY DIRECT OR INDIRECT TRANSFEREE OF ANY PROPERTY OF, OR DIRECT OR INDIRECT SUCCESSOR IN INTEREST TO, ANY OF THE FOREGOING PERSONS MENTIONED IN THIS CLAUSE (~~II~~**B**) OR ANY PROPERTY OF ANY SUCH TRANSFEREE OR SUCCESSOR, (~~III~~**C**) CREATING, PERFECTING, OR OTHERWISE ENFORCING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY ENCUMBRANCE OF ANY KIND AGAINST A DEBTOR, A REORGANIZED DEBTOR, OR AN ESTATE OR ANY OF ITS PROPERTY, OR ANY DIRECT OR INDIRECT TRANSFEREE OF ANY PROPERTY OF, OR SUCCESSOR IN INTEREST TO, ANY OF THE FOREGOING PERSONS MENTIONED IN THIS CLAUSE (~~III~~**C**) OR ANY PROPERTY OF ANY SUCH TRANSFEREE OR SUCCESSOR, (~~IV~~**D**) ACTING OR PROCEEDING IN ANY MANNER, IN ANY PLACE WHATSOEVER, THAT DOES NOT CONFORM TO OR COMPLY WITH THE PROVISIONS OF THE PLAN AND THE DEFINITIVE DOCUMENTS, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, AND (~~V~~**E**) COMMENCING OR CONTINUING, IN ANY MANNER OR IN ANY PLACE, ANY ACTION THAT DOES NOT COMPLY WITH OR IS INCONSISTENT WITH THE PROVISIONS OF THE PLAN AND THE DEFINITIVE DOCUMENTS~~.~~**, AND (II) ALL PERSONS ARE PERMANENTLY ENJOINED FROM TAKING OR CONTINUING TO TAKE IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY ACTION TO CAUSE A PERSON DESCRIBED IN THE FOREGOING CLAUSE (I) TO TAKE OR CONTINUE TO TAKE ANY ACT DESCRIBED IN ANY OF CLAUSES (A) THROUGH (E) OF THE FOREGOING CLAUSE (I).**

BY ACCEPTING DISTRIBUTIONS PURSUANT TO THE PLAN, EACH HOLDER OF AN ALLOWED CLAIM OR INTEREST SHALL BE DEEMED TO

**HAVE AFFIRMATIVELY AND SPECIFICALLY CONSENTED TO BE BOUND BY THEPLAN, INCLUDING THE INJUNCTIONS SET FORTH IN SECTION 10.6 OF THE PLAN.**

7.    *Releases*

(a)    Releases by Debtors

AS OF THE EFFECTIVE DATE, EXCEPT FOR THE RIGHTS, REMEDIES, AND CAUSES OF ACTION THAT ARE PRESERVED AND REMAIN IN EFFECT FROM AND AFTER THE EFFECTIVE DATE, INCLUDING TO ENFORCE THE PLAN AND THE OBLIGATIONS CONTEMPLATED BY THE RESTRUCTURING, FOR GOOD AND VALUABLE CONSIDERATION, ON AND AFTER THE EFFECTIVE DATE, THE RELEASED PARTIES SHALL BE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED AND DISCHARGED, TO THE MAXIMUM EXTENT PERMITTED BY LAW, BY THE DEBTORS, THE REORGANIZED DEBTORS, AND THE ESTATES, IN EACH CASE ON BEHALF OF THEMSELVES AND THEIR RESPECTIVE RELATED ENTITIES AND ANY AND ALL OTHER ENTITIES THAT MAY PURPORT TO ASSERT ANY CAUSE OF ACTION DERIVATIVELY, BY OR THROUGH THE FOREGOING ENTITIES, FROM ANY AND ALL CAUSES OF ACTION (INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS, THE REORGANIZED DEBTORS, OR THE ESTATES) THAT THE DEBTORS, THE REORGANIZED DEBTORS, THE ESTATES, OR THEIR AFFILIATES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST OR OTHER ENTITY, BASED ON, RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART: THE DEBTORS (INCLUDING THE MANAGEMENT, DIRECT OR INDIRECT OWNERSHIP, OR OPERATION THEREOF) OR THEIR ESTATES; THE REORGANIZED DEBTORS; THE CHAPTER 11 CASES; THE PLAN; THE CONFIRMATION ORDER; THE RESTRUCTURING; THE TRANSACTION; THE EQUITY SOLICITATION PROCESS; ANY DEBT OR SECURITY OF OR IN THE DEBTORS AND THE OWNERSHIP THEREOF; THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY DEBT OR SECURITY OF OR IN THE DEBTORS OR THE REORGANIZED DEBTORS, INCLUDING THE NEW SHARES AND THE NEW CONVERTIBLE NOTES; THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN; THE BUSINESS OR CONTRACTUAL ARRANGEMENTS OR OTHER INTERACTIONS BETWEEN ANY DEBTOR AND ANY RELEASED PARTY; THE RESTRUCTURING OF ANY CLAIM OR INTEREST BEFORE OR DURING THE CHAPTER 11 CASES; ANY OTHER IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS OF THE DEBTORS; ANY INTERCOMPANY TRANSACTION; THE NEGOTIATION, FORMULATION, PREPARATION, DISSEMINATION, OR CONSUMMATION OF THE PLAN AND ANY RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS OR ANY OTHER CONTRACT, INSTRUMENT, RELEASE, OR DOCUMENT CREATED

OR ENTERED INTO IN CONNECTION WITH THE PLAN OR ANY RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS (INCLUDING THE INVESTMENT AGREEMENT); THE SOLICITATION OF VOTES WITH RESPECT TO, OR CONFIRMATION OF, THE PLAN; OR ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE RELATED TO ANY OF THE FORGOING AND TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE. NOTWITHSTANDING ANYTHING IN THE PLAN TO THE CONTRARY, THE RELEASES CONTAINED IN THIS SECTION 10.7(A) SHALL NOT (I) AFFECT THE LIABILITY OF ANY ENTITY FROM CAUSES OF ACTION BASED ON WILLFUL MISCONDUCT, GROSS NEGLIGENCE OR INTENTIONAL FRAUD AS DETERMINED BY A FINAL ORDER, (II) RELEASE POST-EFFECTIVE DATE OBLIGATIONS OF ANY ENTITY UNDER THE PLAN, THE RESTRUCTURING, THE DEFINITIVE DOCUMENTS OR ANY OTHER DOCUMENT, INSTRUMENT, OR AGREEMENT EXECUTED TO IMPLEMENT THE PLAN (UNLESS EXPRESSLY CANCELLED BY THE PLAN), OR (III) AFFECT THE RELEASING PARTIES' RIGHTS THAT REMAIN IN EFFECT FROM AND AFTER THE EFFECTIVE DATE TO ENFORCE THE PLAN, THE DEFINITIVE DOCUMENTS, AND THE OBLIGATIONS CONTEMPLATED BY THE TRANSACTION OR AS OTHERWISE PROVIDED IN ANY ORDER OF THE BANKRUPTCY COURT.

(b)     Releases by Holders of Claims or Interests

AS OF THE EFFECTIVE DATE, EXCEPT FOR THE RIGHTS, REMEDIES, AND CAUSES OF ACTION THAT ARE PRESERVED AND REMAIN IN EFFECT FROM AND AFTER THE EFFECTIVE DATE, INCLUDING TO ENFORCE THE PLAN AND THE OBLIGATIONS CONTEMPLATED BY THE RESTRUCTURING, FOR GOOD AND VALUABLE CONSIDERATION, ON AND AFTER THE EFFECTIVE DATE, THE RELEASED PARTIES SHALL BE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED AND DISCHARGED, TO THE MAXIMUM EXTENT PERMITTED BY LAW, BY THE RELEASING PARTIES, IN EACH CASE FROM ANY AND ALL CAUSES OF ACTION (INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS, THE REORGANIZED DEBTORS, OR THEIR ESTATES) THAT SUCH RELEASING PARTIES OR THEIR RESPECTIVE RELATED ENTITIES, AND ANY OTHER ENTITIES CLAIMING UNDER OR THROUGH THEM WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST OR OTHER ENTITY, BASED ON, RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART: THE DEBTORS (INCLUDING THE MANAGEMENT, DIRECT OR INDIRECT OWNERSHIP, OR OPERATION THEREOF) OR THEIR ESTATES; THE REORGANIZED DEBTORS; THE CHAPTER 11 CASES; THE PLAN; THE CONFIRMATION ORDER; THE RESTRUCTURING; THE TRANSACTION; THE EQUITY SOLICITATION PROCESS; ANY DEBT OR SECURITY OF OR IN THE DEBTORS AND THE OWNERSHIP THEREOF; THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY DEBT OR SECURITY OF OR IN THE DEBTORS OR

**THE REORGANIZED DEBTORS, INCLUDING THE NEW SHARES AND THE NEW CONVERTIBLE NOTES; THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN; THE BUSINESS OR CONTRACTUAL ARRANGEMENTS OR OTHER INTERACTIONS BETWEEN ANY DEBTOR AND ANY RELEASED PARTY; THE RESTRUCTURING OF ANY CLAIM OR INTEREST BEFORE OR DURING THE CHAPTER 11 CASES; ANY OTHER IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS OF THE DEBTORS; ANY INTERCOMPANY TRANSACTION; THE NEGOTIATION, FORMULATION, PREPARATION, DISSEMINATION, OR CONSUMMATION OF THE PLAN AND ANY RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS OR ANY OTHER CONTRACT, INSTRUMENT, RELEASE, OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE PLAN OR ANY RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS (INCLUDING THE INVESTMENT AGREEMENT); THE SOLICITATION OF VOTES WITH RESPECT TO, OR CONFIRMATION OF, THE PLAN; OR ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE RELATED TO ANY OF THE FORGOING AND TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE. NOTWITHSTANDING ANYTHING IN THE PLAN TO THE CONTRARY, THE RELEASES CONTAINED IN SECTION 10.7(B) OF THE PLAN SHALL NOT (I) AFFECT THE LIABILITY OF ANY ENTITY FROM CAUSES OF ACTION BASED ON WILLFUL MISCONDUCT, GROSS NEGLIGENCE OR INTENTIONAL FRAUD AS DETERMINED BY A FINAL ORDER, (II) RELEASE POST-EFFECTIVE DATE OBLIGATIONS OF ANY ENTITY UNDER THE PLAN, THE RESTRUCTURING, THE DEFINITIVE DOCUMENTS OR ANY OTHER DOCUMENT, INSTRUMENT, OR AGREEMENT EXECUTED TO IMPLEMENT THE PLAN (UNLESS EXPRESSLY CANCELLED BY THE PLAN), OR (III) AFFECT THE RELEASING PARTIES' RIGHTS THAT REMAIN IN EFFECT FROM AND AFTER THE EFFECTIVE DATE TO ENFORCE THE PLAN, THE DEFINITIVE DOCUMENTS, AND THE OBLIGATIONS CONTEMPLATED BY THE TRANSACTION OR AS OTHERWISE PROVIDED IN ANY ORDER OF THE BANKRUPTCY COURT. FOR THE AVOIDANCE OF DOUBT, THE ONLY PARTIES THAT ARE BOUND BY THE RELEASES CONTAINED IN SECTION 10.7(B) OF THE PLAN ARE THE RELEASING PARTIES.**

8.    *Exculpation*

**TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, FROM AND AFTER THE EFFECTIVE DATE, NO EXCULPATED PARTY SHALL HAVE OR INCUR, AND EACH SUCH ENTITY SHALL BE RELEASED AND EXCULPATED FROM, ANY CAUSE OF ACTION BASED ON, IN WHOLE OR IN PART: THE NEGOTIATION, EXECUTION, AND IMPLEMENTATION OF ANY TRANSACTIONS APPROVED BY THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES ON OR AFTER THE COMMENCEMENT DATE THROUGH THE EFFECTIVE DATE, INCLUDING THE DIP CREDIT AGREEMENT AND THE INCURRENCE OF THE DIP OBLIGATIONS, THE NEW COLLECTIVE LABOR AGREEMENTS WITH THE DEBTORS' PILOT UNIONS AS CONTEMPLATED IN**

**THE CLA ORDER, STIPULATIONS RELATING TO THE AIRCRAFT LEASE CLAIMS, THE PRE-DELIVERY PAYMENT FINANCING AS CONTEMPLATED BY THE PDP FACILITY ORDER, THE RESTRUCTURING, THE DISCLOSURE STATEMENT, THE PLAN AND ANY PLAN SUPPLEMENT(S), THE CONFIRMATION ORDER, OR OTHER DOCUMENTS OR ANY OTHER CONTRACT, INSTRUMENT, RELEASE, OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE DISCLOSURE STATEMENT OR THE PLAN OR ANY RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS (INCLUDING THE INVESTMENT AGREEMENT), THE FILING OF THE CHAPTER 11 CASES, THE SOLICITATION OF VOTES WITH RESPECT TO, OR CONFIRMATION OF, THE PLAN, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OF ANY DEBT OR SECURITIES, INCLUDING THE NEW SHARES, THE NEW CONVERTIBLE NOTES, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, AND THE IMPLEMENTATION OF THE RESTRUCTURING CONTEMPLATED BY THE PLAN.  NOTWITHSTANDING ANYTHING IN THE PLAN TO THE CONTRARY, THE EXCULPATION PROVIDED IN SECTION 10.8 OF THE PLAN SHALL NOT (I) AFFECT THE LIABILITY OF ANY ENTITY FROM CAUSES OF ACTION BASED ON WILLFUL MISCONDUCT, GROSS NEGLIGENCE OR INTENTIONAL FRAUD AS DETERMINED BY A FINAL ORDER, BUT IN ALL RESPECTS SUCH ENTITIES SHALL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES PURSUANT TO THE PLAN, (II) RELEASE OR BE AN EXCULPATION WITH RESPECT TO POST-EFFECTIVE DATE OBLIGATIONS OF ANY ENTITY UNDER THE PLAN, THE RESTRUCTURING, THE DEFINITIVE DOCUMENTS OR ANY OTHER DOCUMENT, INSTRUMENT, OR AGREEMENT EXECUTED TO IMPLEMENT THE PLAN (UNLESS EXPRESSLY CANCELLED BY THE PLAN), OR (III) AFFECT THE RELEASING PARTIES' RIGHTS THAT REMAIN IN EFFECT FROM AND AFTER THE EFFECTIVE DATE TO ENFORCE THE PLAN, THE DEFINITIVE DOCUMENTS, AND THE OBLIGATIONS CONTEMPLATED BY THE TRANSACTION OR AS OTHERWISE PROVIDED IN ANY ORDER OF THE BANKRUPTCY COURT.  THE EXCULPATION PROVIDED IN SECTION 10.8 OF THE PLAN SHALL BE IN ADDITION TO, AND NOT IN LIMITATION OF, ALL OTHER RELEASES, INDEMNITIES, EXCULPATIONS, AND ANY OTHER APPLICABLE LAW OR RULES PROTECTING THE EXCULPATED PARTIES FROM LIABILITY.**

9. *Injunction Related to Releases and Exculpation*

The Confirmation Order shall permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively, or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, or liabilities released pursuant to the Plan, including, without limitation, the claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities released or exculpated in the Plan or the Confirmation Order.

10.    *Avoidance Actions*

On the Effective Date, the Reorganized Debtors shall be deemed to waive and release all Avoidance Actions (other than those listed on the Schedule of Retained Causes of Action to be filed with the Plan Supplement) that the Reorganized Debtors may have in relation to any creditor affected by the Plan; provided, however, that the Reorganized Debtors shall retain the right to assert such Avoidance Actions (i) as defenses or counterclaims with respect to any proofs of claim or in any Cause of Action brought by any creditor or (ii) where stipulated by mandatory insolvency law in the jurisdiction of the relevant Reorganized Debtor's establishment.

11.    *Retention of Causes of Action and Reservation of Rights*

Except as otherwise provided in the Plan, including sections 10.6, 10.7, 10.8, 10.9, and 10.10, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the Debtors had immediately prior to the Effective Date on behalf of the Estates or of themselves in accordance with any provision of the Bankruptcy Code or any applicable nonbankruptcy Law.  The Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

12.    *Ipso Facto and Similar Provisions Ineffective*

Any term of any prepetition policy, prepetition contract, or other prepetition obligation applicable to a Debtor shall be void and of no further force or effect with respect to any Debtor or Reorganized Debtor to the extent that such policy, contract, or other obligation is conditioned on, creates an obligation of the Debtor or Reorganized Debtor as a result of, or gives rise to a right of any Entity based on (i) the insolvency or financial condition of a Debtor, (ii) the commencement of the Chapter 11 Cases, (iii) the confirmation or consummation of the Plan, including any change of control that shall occur as a result of such consummation, or (iv) the Restructuring.

I.    Retention of Jurisdiction

1.    *Retention of Jurisdiction*

Subject to Section 12.4 and Section 12.12 of the Investment Agreement, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction, pursuant to 28 U.S.C. §§ 1334 and 157, over all matters arising in, arising under, or related to the Chapter 11 Cases for, among other things, the following purposes:

(i)    to hear and determine motions or applications for the assumption or rejection of executory contracts or unexpired leases and the allowance,

classification, priority, compromise, estimation, or payment of Claims resulting therefrom (including any disputes over Cure Amounts);

(ii) to determine any motion, adversary proceeding, application, contested matter, or other litigated matter pending on or commenced after the Confirmation Date;

(iii) to ensure that distributions to holders of Allowed Claims and Interests are accomplished as provided in the Plan and in the Confirmation Order and to adjudicate any and all disputes arising from or relating to distributions under the Plan and the Confirmation Order;

(iv) to consider Claims or the allowance, subordination, classification, priority, compromise, estimation, or payment of any Claim, including any Administrative Expense Claim;

(v) to enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(vi) to issue and enforce injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(vii) to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code or approve any modification of the Confirmation Order or any contract, instrument, release, or other agreements or document created in connection with the Plan, the Disclosure Statement, or the Confirmation Order (in each case, to the extent Bankruptcy Court approval is necessary), or to remedy any defect or omission or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(viii) to hear and determine all Fee Claims;

(ix) to resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

(x) to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, any transactions or payments in furtherance of either, or any agreement, instrument, or other document governing or related to any of the foregoing;

(xi)     to take any action and issue such orders, including any such action or orders as may be necessary after entry of the Confirmation Order or the occurrence of the Effective Date, as may be necessary to construe, interpret, enforce, implement, execute, and consummate the Plan;

(xii)    to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(xiii)   to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code with respect to the Debtors for all taxable periods through the Effective Date);

(xiv)    to adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

(xv)     to hear and determine any other matters related to the Chapter 11 Cases and not inconsistent with the Bankruptcy Code or title 28 of the United States Code;

(xvi)    to resolve any disputes concerning whether a Person had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, the Bar Date, or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose of determining whether a Claim or Interest is discharged hereunder or for any other purposes;

(xvii)   to hear, adjudicate, decide, or resolve any and all matters related to ARTICLE X of the Plan, including, without limitation, the releases, discharges, exculpations, and injunctions issued thereunder;

(xviii)  to hear and determine any rights, Claims, or Causes of Action held by or accruing to the Reorganized Debtors pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory;

(xix)    to recover all assets of the Debtors and property of the Estates, wherever located; and

(xx)     to enter a final decree closing each of the Chapter 11 Cases;

*provided, however*, that the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement or any Definitive Documents, in each case, that have a jurisdictional, forum selection or dispute resolution clause that refers disputes to or permits a Person to bring disputes to a different court and any disputes concerning documents contained in the Plan Supplement or any other Definitive Documents that contain such clauses shall be governed in accordance with the provisions of such documents.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, the provisions of section 11.1 of the Plan shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

### 2. *Submission to Jurisdiction*

Consistent with section 12.4 and section 12.12 of the Investment Agreement, while the Danish State Investor and the Danish State Noteholder support the Plan, the Danish State Investor and the Danish State Noteholder are not consenting to the jurisdiction of the Bankruptcy Court and, therefore, the Danish State Noteholder is not voting on the Plan. Further, neither the Danish State Investor nor the Danish State Noteholder is consenting to the jurisdiction of the Bankruptcy Court as a result of the (i) submission of any bid pursuant to the Equity Solicitation Procedures, (ii) Equity Solicitation Procedures Motion, (iii) Equity Solicitation Procedures, (iv) subscription for New Shares and receipt of New Convertible Notes, (v) status of the Danish State Noteholder as a Consultation Party (as defined in the Equity Solicitation Procedures Motion), (vi) negotiation of any of the foregoing, (vii) releases and exculpations granted or afforded pursuant to or in connection with the Plan and the Transaction, (viii) entry into the Investment Agreement or any other Key Transaction Documents, or (ix) otherwise. The Debtors and the Non-State Investors shall not take a position in the Chapter 11 Cases that is contrary or inconsistent with the foregoing.

### J. Miscellaneous Provisions

### 1. *Statutory Fees*

All Statutory Fees due and payable prior to the Effective Date shall be paid by the Debtors or the Reorganized Debtors. On and after the Effective Date, the Reorganized Debtors shall pay any and all Statutory Fees when due and payable, and shall file with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. Each Debtor or Reorganized Debtor, as applicable, shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's, or Reorganized Debtor's, as applicable, Chapter 11 Case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code, notwithstanding the substantive consolidation of the Consolidated Debtors for purposes of the Plan.

### 2. *Exemption from Certain Transfer Taxes*

To the fullest extent permitted by section 1146 of the Bankruptcy Code, (i) the issuance, transfer or exchange of any Securities, instruments or documents, (ii) the creation of any Lien, mortgage, deed of trust or other security interest, (iii) all sale transactions consummated by the Debtors and approved by the Bankruptcy Court on and after the Confirmation Date through and including the Effective Date, including any transfers effectuated under the Plan, (iv) any assumption, assignment, or sale by the Debtors of their interests in unexpired leases of nonresidential real property or executory contracts pursuant to section 365(a) of the Bankruptcy Code, and (v) the issuance, renewal, modification, or securing of

indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax or other similar tax or governmental assessment, in each case, imposed under any U.S. federal, state, or local law.  Consistent with the foregoing, each recorder of deeds or similar official (or any other Person with authority over any of the foregoing, other than in, each case, in respect of any tax, stamp or fee imposed under the Law of any jurisdiction other than the United States) for any county, city or Governmental Unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

3.      *Request for Expedited Determination of Taxes*

The Debtors shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Commencement Date through the Effective Date.

4.      *Dates of Actions to Implement Plan*

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day but shall be deemed to have been completed as of the required date.

5.      *Amendments*

*Plan Modifications*.  The Plan may be amended, modified, or supplemented by the Debtors, in consultation with the Investors and the Creditors' Committee, in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by Law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Bankruptcy Court.  In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims pursuant to the Plan, the Debtors may remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes and effects of the Plan, and any holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan as amended, modified, or supplemented.

*Certain Technical Amendments*.  Prior to the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court, as long as such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or Interests under the Plan; *provided, however*, that the Creditors' Committee shall have a consultation right with respect to any technical adjustments and modifications to the Plan.

*Investor Consent*.  Investor Consent is required as to any modification of the Plan, including under section 12.5, whether material or immaterial, that impacts the terms of the Transaction or other rights or entitlements of the Investors.

6. *Revocation or Withdrawal of Plan*

The Debtors reserve the right, subject to consultation with the Creditors' Committee, to revoke or withdraw the Plan prior to the Effective Date as to any or all of the Debtors.  If, with respect to a Debtor, the Plan has been revoked or withdrawn prior to the Effective Date, or if confirmation or the occurrence of the Effective Date as to such Debtor does not occur on the Effective Date, then, with respect to such Debtor (i) the Plan shall be null and void in all respects, (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void, and (iii) nothing contained in the Plan shall (a) constitute a waiver or release of any claim by, Claim against, or any Interest in, such Debtor, or claim by or against, or interest in, any other Person, (b) prejudice in any manner the rights of such Debtor or any other Person, or (c) constitute an admission of any sort by any Debtor or any other Person.

7. *Severability*

If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation by the Bankruptcy Court, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with section 12.7 of the Plan, is (i) valid and enforceable pursuant to its terms, (ii) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the Reorganized Debtors (as the case may be); provided, however, that Investor Consent is required as to any modification of the Plan, whether material or immaterial, that impacts the terms of the Transaction or other rights or entitlements of the Investors, and (iii) nonseverable and mutually dependent.

8. *Dissolution of Creditors' Committee*

On the Effective Date, the Creditors' Committee shall be deemed to have been dissolved, and the members thereof, and their respective counsel, advisors and agents, shall be released and discharged of and from all further authority, duties, responsibilities, and obligations related to and arising from and in connection with the Chapter 11 Cases, except with respect to (i) any continuing confidentiality obligations, (ii) prosecuting requests for allowances of compensation and reimbursement of expenses incurred prior to the Effective Date, (iii) in the

event that the Bankruptcy Court's entry of the Confirmation Order is appealed, participating in such appeal, (iv) reviewing and responding to inquiries from holders of Claims regarding implementation of the Plan, and (v) all issues relating to the Swedish Reorganization Plan and any appeals of the Swedish Reorganization Plan Confirmation. From and after the Effective Date, the Reorganized Debtors shall continue to pay, when due and payable in the ordinary course of business, the reasonable and documented fees and expenses of the Creditors' Committee's professionals solely to the extent arising out of or related to the foregoing without further order of the Bankruptcy Court.

## VI.
## CERTAIN RISK FACTORS TO BE CONSIDERED

Prior to voting to accept or reject the Plan, holders of Claims should read and carefully consider the risk factors set forth below, in addition to the other information set forth in this Disclosure Statement together with any attachments, exhibits, or documents incorporated by reference hereto. The factors below should not be regarded as the only risks associated with the Plan or its implementation.

A.  Certain Bankruptcy Law Considerations

1.  *Non-Confirmation of the Plan*

Although the Debtors believe the Plan satisfies all requirements necessary for confirmation by the Bankruptcy Court in accordance with the Bankruptcy Code, there can be no assurance the Bankruptcy Court will reach the same conclusion.

The Bankruptcy Code requires that a plan of reorganization comply with certain requirements (including the requirements of section 1129 of the Bankruptcy Code) for a plan of reorganization to be confirmed. The Bankruptcy Court may determine that one or more of those requirements is not satisfied with respect to the Plan. If the Bankruptcy Court were to make such a determination, the Debtors could be required to restart the solicitation process. In such a situation, the Debtors could be required to (i) seek approval of a new disclosure statement, (ii) solicit or re-solicit votes from holders of Claims or Interests, as applicable, or (iii) seek confirmation of a newly-proposed plan.

Moreover, the Debtors can make no assurances they will receive the requisite votes for acceptance to confirm the Plan. Even if all Voting Classes (as defined below) vote in favor of the Plan or the requirements for "cramdown" are met with respect to any Class that rejects the Plan, the Bankruptcy Court could decline to confirm the Plan if it finds that any of the statutory requirements for confirmation are not met.

2.  *Possible Objections to the Plan*

There is a risk that certain parties could oppose and object to either the entirety of the Plan or specific provisions of the Plan. Although the Debtors believe the Plan complies with all relevant Bankruptcy Code provisions, there can be no guarantee that a party in interest

will not file an objection to the Plan or that the Bankruptcy Court will not sustain such an objection.

### 3.    *Objections to Amount or Classification of Claims*

Except as otherwise provided in the Plan or by an order of the Bankruptcy Court, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any holder of a Claim where such Claim is subject to an objection. Thus, any holder of a Claim that is subject to an objection may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 4.    *Non-Consensual Confirmation*

If any Impaired Class of Claims or Interests does not accept or is deemed not to accept the Plan, the Bankruptcy Court may nevertheless confirm the Plan if at least one impaired class has voted to accept the Plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each Impaired Class that has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable". The Debtors believe the Plan satisfies these requirements, to the extent applicable.

### 5.    *Failure to Consummate the Plan*

As of the date of this Disclosure Statement, there can be no assurance that the conditions to consummation of the Plan will be satisfied or waived. Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and the restructuring completed. If the Confirmation Order is vacated, no distributions would be made under the Plan, the Debtors and all holders of Claims or Interests would be restored to the *status quo* as of the day immediately preceding the Confirmation Date, and the Debtors' obligations with respect to Claims and Interests would remain unchanged.

### 6.    *Withdrawal of the Plan*

Subject to, and without prejudice to, the rights of any party in interest (including under the Investment Agreement), the Plan may be revoked or withdrawn before the Confirmation Date by the Debtors.

### 7.    *Replacement DIP Facility*

In the event of the occurrence of an event of default under the Replacement DIP Credit Agreement, the DIP Lender may seek, among other things, to exercise remedies with respect to the collateral securing the Replacement DIP Facility and to take certain other actions against the Debtors. Such actions likely would adversely harm the Debtors, their financial position, and their ability to confirm and consummate the Plan.

8. *Conversion into Chapter 7 Cases and Parallel Local Bankruptcy Proceedings*

If no chapter 11 plan can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of creditors or the Debtors, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. As further described in the liquidation analysis attached hereto as **Exhibit C**, liquidation under chapter 7 would result in smaller distributions being made to the Debtors' creditors than those provided for in the Plan.

Such a liquidation under chapter 7 of the Bankruptcy Code would likely take place in parallel with corresponding bankruptcy proceedings in Sweden (Sw. *konkurs*) or in other jurisdictions in which the Debtors are incorporated and registered (as discussed in more detail below). Conducting such parallel proceedings in different jurisdictions, in which the legal systems and applicable regulations to some extent differ, may materially impact potential distributions and recoveries for creditors. Accordingly, there is a possibility that the Debtors' creditors may receive a lesser distribution than they would under the Plan and if such liquidation were only conducted under chapter 7 of the Bankruptcy Code.

9. *Claims Could Be More than Projected*

There can be no assurance that the estimated Allowed amount of Claims in certain Classes will not be significantly more than projected, which, in turn, could cause the value of distributions to be reduced substantially. Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the ultimate results. Therefore, the actual amount of Allowed Claims may vary from the Debtors' projections and the variation may be material.

As discussed below with respect to a Swedish implementation, there are certain differences between chapter 11 of the Bankruptcy Code and a Swedish Reorganization. Accordingly, there is no guarantee that the same outcome will occur in a Swedish Reorganization due to, among other things, the fact that the universe of creditors may be different in a Swedish process.

10.  *Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary*

Certain of the information contained in this Disclosure Statement is, by nature, forward-looking, and contains estimates and assumptions, which might ultimately prove to be incorrect, and projections, which may be materially different from actual future experiences. Many of the assumptions underlying the projections are subject to significant uncertainties that are beyond the control of the Debtors or Reorganized Debtors, including the timing, confirmation, and consummation of the Plan, the Debtors' customer relationships, inflation, and other unanticipated market and economic conditions. There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds that will be available under the Plan. Some assumptions may not materialize and unanticipated events and circumstances may affect the actual results. Projections are inherently subject to substantial and numerous uncertainties and to a wide variety of significant business, economic, and competitive risks, and the assumptions underlying the projections may be inaccurate in material respects, which may impact the value of the New Shares. In addition, unanticipated events and circumstances occurring after the approval of this Disclosure Statement by the Bankruptcy Court, including any natural disasters, terrorist attacks, or health epidemics may affect the actual financial results achieved. Such results may vary significantly from the forecasts and such variations may be material.

B.  Risks Relating to Transaction and Investment Agreement

1.  *Conditions to Consummation of Transaction and Failure to Secure Necessary Governmental Approvals*

Although the Debtors believe they will be able to consummate the Transaction, there are conditions to the closing of the proposed Transaction, including that the Plan be confirmed on or before March 23, 2024, and that certain regulatory approvals are received. Accordingly, the Debtors are not certain that the Transaction will be consummated as planned.

Although the Debtors believe they will be able to secure the necessary government approvals to consummate the Transaction, the Debtors are not certain whether certain Governmental Units, including the applicable antitrust authorities, will approve the consummation of the Transaction or any material portion thereof. Any delay in consummating the Transaction due to governmental approval processes, or the failure to obtain such approvals, could result in the Transaction not consummating, prolong the Chapter 11 Cases, and/or reduce recoveries available to creditors.

2.  *Swedish Reorganization*

As stated above, there are certain conditions to consummation of the Plan that must either be satisfied or waived. One such condition relates to the implementation of the Plan for SAS AB in Sweden. The Debtors currently intend to accomplish this through a Swedish Reorganization of Debtor SAS AB, which may give rise to certain risks.

The Swedish Reorganization regime is governed by the Swedish Company Reorganization, enacted by the Swedish Parliament in 2022. Thus, it is a new legislation with

limited precedents and case law. A Swedish Reorganization is, to some extent, the Swedish equivalent to chapter 11 of the Bankruptcy Code. However, the provisions of the Swedish Company Reorganization Act are not fully compatible with the provisions of chapter 11 of the Bankruptcy Code; meaning it is not certain that the same result will be achieved in a Swedish Reorganization. For example, the Swedish rules on class composition and voting thresholds and the rules on cross-class cramdown are not entirely consistent with the corresponding rules under the Bankruptcy Code. Accordingly, fully implementing the Plan in Sweden by way of a Swedish Reorganization proceeding may pose challenges if these thresholds or rules are not met or complied with to the extent required. The consequences for the Debtors' creditors in such a scenario may be that the distributions to creditors provided for in the Plan may not be realized in the manner envisaged and, in the event of a failure to obtain confirmation of a Swedish Reorganization Plan, that the Plan cannot be consummated at all, which may lead to the effects described above in connection with a possible chapter 7 conversion. Furthermore, there are differences in what is considered an Allowed Claim under chapter 11 of the Bankruptcy Code compared to the Swedish Company Reorganization Act (e.g. as the Swedish Reorganization would be initiated significantly after the Commencement Date, which may have the effect that the distributions to creditors provided for in the Plan may not be realized in the manner set forth therein).

Further, the Debtors currently only intend to initiate a Swedish Reorganization proceeding in relation to the Debtors' parent company, SAS AB. There is a risk that certain creditors that may not be subject to or bound by the Chapter 11 Cases may threaten to take actions against the remaining Debtors with local authorities and, as a result, such Debtors may need to initiate further parallel proceedings, including in other jurisdictions to implement the Plan. Accordingly, there is no guarantee that implementation of the Plan in Sweden would be successful as a measure to effectuate the Plan for enforcement purposes, and there may be a need for additional implementation measures in Sweden or elsewhere, which will likely further complicate and delay the process to implement the Plan.

C.    <u>Risks Relating to Debtors' Businesses and Financial Condition</u>

1.    *Extreme Weather, Natural Disasters, and Disease Outbreak (including COVID-19)*

The occurrence of extraordinary events such as volcanic eruptions, natural or man-made disasters, or extreme weather conditions, in particular if such events occur in the European airspace or otherwise in the regions around any of the Debtors' flight destinations, typically have adverse impacts on the Debtors' operations. In addition, the airline industry is generally vulnerable to the effects of climate change and extreme weather conditions. Should climate changes lead to more extreme weather conditions in regions where the Debtors operate (such as more frequent and severe storms, wildfires, and floods), such changes could lead to the closure of airports and delayed or canceled flights, resulting in the Debtors potentially having to refund or otherwise compensate affected passengers.

Moreover, any future outbreak of epidemics and other severe diseases would likely negatively impact travel behavior and travel demand. If a future outbreak were to result in governmental authorities imposing travel restrictions in regions where the Debtors conduct

business, it would result in the cancelation or loss of bookings, which would negatively impact the Debtors' revenue. Accordingly, natural disasters and disease outbreak could have a material adverse impact on the Debtors' financial condition and results of operations.

The COVID-19 pandemic created a global crisis for the airline industry, including the Debtors. Since the start of the pandemic in early 2020, governments took measures to reduce the spread of COVID-19, including measures that directly and significantly impacted the demand for air travel, such as travel bans, closure of borders, and social distancing policies. As a result of the COVID-19 pandemic, and the measures put in place to reduce its spread, the demand for international air travel and business air travel was essentially non-existent in the beginning of the COVID-19 pandemic, and has since continued to be significantly reduced compared to pre-COVID-19 levels. As a consequence, the Debtors have experienced significant reductions in revenue in fiscal years 2020, 2021, and 2022, as compared to fiscal year 2019. It remains uncertain when the Debtors' revenue will return pre-COVID-19 levels, if ever. There is a risk that demand for air travel will continue to be adversely affected for a substantial period of time, thus presenting a threat to the Debtors' operations, revenues, cash flow, liquidity, and results of operations.

2.    *Fuel Prices*

Jet fuel is one of the single largest expense items for the Debtors. Jet fuel prices have historically fluctuated widely and are likely to continue to do so in the future. The sources and prices of jet fuel are susceptible to significant fluctuations due to supply and demand trends, transportation costs, government regulations and tariffs, changes in currency exchange rates, price controls, inflation and the economic climate, oil price conflicts, hostilities or terrorist attacks, and other unforeseen circumstances. Only limited hedging measures are in place with respect to jet fuel. Accordingly, jet fuel prices present a significant risk to the Debtors' financial performance.

3.    *Geopolitics*

The global reach of the Debtors' business means the Debtors are sensitive to adverse changes in the international political landscape, particularly in Europe where the Debtors conduct the majority of their business, as adverse changes in the political landscape can quickly affect demand and conditions for air travel between different countries. There is a risk that geopolitical tensions and conflicts negatively impact the demand for leisure and business travel as well as the Debtors' supply of fuel, cost of fuel, and other inputs. Geopolitical uncertainties that significantly affect demand for the Debtors' services would have a material adverse effect on the Debtors' business, revenues and results of operations.

4.    *Economic Conditions*

Demand for the Debtors' services depends to a significant extent on general economic and industry conditions, especially in geographical areas where the Debtors conduct their business, such as inflation levels, unemployment levels, consumer confidence, and the availability of consumer and business credit. Accordingly, the airline industry tends to experience significant adverse financial results during general economic downturns. Economic

downturns in the airline industry generally result in a lower number of passengers, which, in turn, leads to excess capacity (or increased existing excess capacity) and price pressure in the affected markets, which presents a significant risk to the Debtors' revenue and results of operations.

5.      *Competition*

The Debtors operate in a highly competitive market and are in competition with a number of other air carriers for both leisure and business travelers. In recent years, changes in customer behavior and the emergence of low-cost airlines in the Debtors' markets have increased competition and resulted in a significant price pressure, affecting the Debtors' margins and revenues. The Debtors, through the restructuring outlined in this Disclosure Statement, are taking measures to address potential competitive disadvantages, including labor cost reductions, fleet rationalization, network redesign, and financial restructuring. However, failure to respond successfully to competitive pressure or an altered competitive landscape, whether in the wake of the COVID-19 pandemic or otherwise, would have a material adverse effect on the Debtors' market position as well as their revenues, financial condition, and results of operation.

6.      *Seasonal Demand Fluctuations*

The airline industry tends to be seasonal in nature and the Debtors, like other airlines, have historically experienced substantial seasonal fluctuations in demand, earnings, and cash flow. The seasonality effects tend to be larger in relation to leisure travel than business travel. Because passenger revenue is recognized when the Debtors provide the transportation, revenue generation typically peaks in the period from May to October, and is relatively lower in the period from November to April. Because a substantial share of the Debtors' costs are fixed, earnings are disproportionately impacted by the fluctuations in revenue levels.

The Debtors historically have launched a number of summer routes to accommodate demand from leisure travelers and are likely to continue to do so. There is a risk that measures undertaken to meet seasonal fluctuations in customer demand are not successful or sufficient, and that the Debtors' new routes and destinations do not meet or create customer demand. With respect to new destinations, there is a risk that customers deem such destinations unattractive and turn to competitors who offer flights to other destinations. Such failures could lead to a decreased customer demand and, ultimately, lower revenues for the Debtors.

7.      *Capacity*

The capacity of airlines is important to their profitability. Due to the long delivery time, aircraft orders are based on long-term forecasts. There is a risk that aircraft orders lead to the Debtors having too much or too little capacity, which could have a negative impact on margins and profitability. Adjustments to capacity are based on different assumptions and estimates made by the industry in general as well as by individual airlines in relation to the expected development in demand for air travel and market trends. Assumptions and estimates are, and will continue to be, subject to significant uncertainties. If the

assumptions and estimates are, to a significant extent, incorrect, it would have a material impact on the Debtors' revenues, financial condition, and results of operation.

### 8. *Aircraft Acquisition*

The Debtors' operations depend on a competitive aircraft fleet, which requires significant investment in new aircraft. Investment in new aircraft involves long delivery times with associated risks of delays. Because the delivery time for new aircraft is several years, it is not certain that new aircraft will adequately meet the Debtors' capacity needs (as discussed above) or the customers' preferences at the time they are delivered, which presents a risk to travel demand.

There is also a risk of new aircraft becoming outdated quickly, if, for example, new technology has been developed before the time of delivery or revised environmental requirements come into force. Such new technology or new requirements may decrease the value of the outdated aircraft. Acquisitions of new aircraft and maintenance of existing aircraft require significant capital investments. Accordingly, there are several risks associated with investing in new aircraft that should they materialize would have a material adverse effect on the Debtors' revenues and operating expenses and, consequently, their financial condition and results of operations.

### 9. *Airport, Transit, and Landing Fees*

Airport, transit, and landing fees and security charges represent significant operating costs of the Debtors. The degree to which these fees and charges increase are difficult to predict and pose a risk to the Debtors' expenses, in particular, because the Debtors may not be able to pass the increased costs onto customers.

### 10. *Taxes, Aviation and License Fees, and Charges and Surcharges*

The airline industry is subject to extensive fees and costs, including taxes (such as ticket tax, passenger tax, and value added taxes), aviation and license fees, and various charges and surcharges (such as take-off charges, emission charges, noise charges, terminal navigation charges, and security charges), which are typically levied on the basis of national legislation and thus vary among countries and represent a significant part of the Debtors' operational costs. The Debtors may not be able to reduce the impact of such fees and costs on their financial results by passing the costs on to passengers. Consequently, the fees and costs could have a significant impact on the Debtors' cash flows, financial condition, and results of operations.

### 11. *Aircraft Incidents*

Airlines risk suffering significant losses if an aircraft is lost or subject to an accident, major defect, or operational malfunction. Accidents may be caused by several factors, including human error, design defects, operational malfunctions, meteorological and other environmental factors, and deferred maintenance. The occurrence of any substantial accident in

relation to the Debtors' fleet would likely result in harm to the Debtors' revenue and operations, reputation, and customer confidence.

The Debtors have certain insurance to reduce the financial impact of aircraft accidents and similar events. However, there is a risk that the Debtors' insurance is not sufficiently adequate to cover the losses resulting from an aircraft accident or similar events, and certain other risks may be uninsurable. Furthermore, the occurrence of an event (whether or not the Debtors are involved in such event) for which the Debtors have insurance coverage would typically cause an increase in the insurance premium paid by the Debtors.

12. *Terrorist Attacks, Armed Conflicts, Acts of War, and Other Incidents*

Acts of terrors, political uprisings, armed conflicts, acts of war, and other serious incidents, or any actual or perceived risk thereof, could cause reductions in demand for air travel, limitations on the availability of insurance coverage, increase in insurance premium, increase in cost associated with additional security precautions, and the imposition of flight restrictions over conflict zones normally crossed by the Debtors' flights. Accordingly, occurrences or risks relating to terrorist and other attacks, acts of war, serious incidents, uprisings, or conflicts in the markets in which the Debtors operate or fly over could have a material adverse effect on the Debtors' revenues, expenses, and results of operations.

13. *Labor Unrest*

The majority of the Debtors' employees are represented by unions, including substantially all of the Debtors' pilots, a large percentage of the Debtors' cabin crew and ground crew, and many white-collar employees. The Debtors have collective bargaining agreements with the unions. Strikes, work interruptions, stoppages, labor disputes, labor claims, or any prolonged dispute between the Debtors and their employees may adversely affect the Debtors' ability to conduct business. If the Debtors are unable to reach agreement with any of their unionized work groups on future negotiations regarding the terms of their collective bargaining agreements, then the Debtors may experience labor actions, including strikes, and such negotiations may result in revenue losses, in addition to wage increases and a consequent increase in operating expenses.

14. *Labor Costs*

Primarily due to higher salary levels, pension costs, and allowances for pilots and cabin crews, as well as administrative costs, social welfare taxes, and other indirect labor costs, the Debtors' annual cost base has historically significantly exceeded the annual cost base of their principal low-cost carrier competitors after taking into account differences in the products and services provided. If the Debtors are not able to successfully achieve their targeted cost saving goals, this would negatively affect their competitiveness. In contrast, should the Debtors decrease their labor costs, they face risks that employees perceive the working environment as having deteriorated due to the effect of such decreases, including, for example, longer working hours, less time between flights, and decreased number of benefits, which would harm the Debtors' ability to retain talented and motivated managers and employees. Accordingly, any

inability to obtain labor costs at fair and competitive levels presents a significant risk to the Debtors' personnel expenses and financial performance.

## 15. *Employee Recruitment and Retention*

The Debtors' operations are labor intensive and dependent on being able to attract and retain highly qualified and motivated personnel. There is intense competition for engineers, revenue managers, mechanical staff, and digital talent within the airline industry. Historically, there have been periods when pilots have been in short supply in the European airline industry and the Debtors have, therefore, had to expend significant amounts of time and expense in recruiting and training new pilots. There is a risk that the Debtors in the future will be unable to retain key personnel or recruit a sufficient number of new employees with appropriate skills at a reasonable and/or competitive cost to satisfy the Debtors' business needs.

## 16. *Bilateral Air Transport Agreements*

Bilateral air transport agreements between states generally govern the designation of airlines and airports for the operation of specified routes, airline capacity, and fare-approval procedures. Pursuant to these agreements, contracting states give designated airlines the right to operate scheduled passenger and air-freight services on certain routes between those states (traffic rights). Most bilateral air transport agreements between the Scandinavian states and non-EU member states require that the Debtors remain majority owned or controlled by Scandinavian or EU (as the case may be) states, citizens or corporations at all times. Although the Debtors anticipate satisfying these requirements in connection with the Transaction with respect to all jurisdictions where they currently conduct business, caveat that such majority Scandinavian ownership may not be upheld, contracting states could deny the Debtors' landing rights or the right to fly on certain routes under the terms of the bilateral agreements if such conditions are not satisfied. This would have a material adverse effect on the variety and number of routes operated by the Debtors and, ultimately, the Debtors' revenues and results of operations.

## 17. *Primary Airport Operations*

The success of the Debtors' business depends on, among other things, the operation and development of the Debtors' three main operating locations: the Copenhagen – Kastrup Airport, the Stockholm – Arlanda Airport, and the Oslo – Gardermoen Airport. The Debtors' business would be harmed by any circumstances causing a reduction in demand for, or access to, air transportation at any of these three airports. Adverse changes in transportation links to these airports, reduced investments in airport infrastructure, deterioration in local economic conditions, the occurrence of a terrorist attack or other security concerns, and price increases associated with airport access costs or fees imposed on passengers are examples of such circumstances which present a risk to the Debtors' business, revenues, and expenses.

## 18. *Suppliers and Other Third Parties*

As is increasingly standard for the airline industry, the Debtors have become more dependent upon the services of suppliers and other third parties, such as aircraft manufacturers, airport operators, information technology ("**IT**") service providers, maintenance

support providers, ground services, aircraft leasing companies, wet lease operators, and distributors, including travel agencies. A significant interruption, whether temporary or permanent, in the provision of any goods or services, an inability to renew or renegotiate contracts with third-party providers on commercially reasonable terms, or action by regulatory bodies having jurisdiction over suppliers would have an adverse impact on the Debtors' business, financial condition, and results of operations. In addition, some of the Debtors key suppliers operate in a concentrated market, which makes finding equivalent suppliers on short notice and on commercially reasonable terms challenging.

19. *Regulations*

The airline industry is subject to a number of European Union and international regulatory regimes. The Debtors fly and operate in more than 30 countries, which means they must comply with a large number of national, regional, and international laws and regulations, including in relation to licensing, ticket taxes, airport and airspace infrastructure, safety and security measures, and passenger rights. Any alleged or actual non-compliance with currently applicable regulations, the adoption of new regional, national, and international regulations, or the revision of existing regulations or the imposition of additional administrative charges or costs may result in significant expenses, which could have a material adverse effect on the Debtors' business, financial condition, and results of operations.

20. *Legal Proceedings*

The Reorganized Debtors are and may, in the future, become parties to litigation. In general litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims and Interests under the Plan. Despite the discharge and injunction provisions provided in the Plan, parties outside of the United States may nevertheless choose to proceed with claims against the Reorganized Debtors in non-U.S. jurisdictions. It is not possible to predict the potential litigation that the Reorganized Debtors may become party to, nor the final resolution of such litigation. The impact of any such litigation on the Reorganized Debtors' businesses and financial stability, however, could be material.

21. *Brand Name*

The Debtors' brand name and reputation have significant commercial value and the Debtors rely on positive brand recognition as part of their overall business model. Any damage to the Debtors' brand name or reputation likely would have a negative impact on the Debtors' ability to market their services and retain customers and employees. Events that risk bringing damage to the Debtors' brand or reputation include noncompliance with laws and regulations, internal rules and policies, labor unrest, aircraft accidents, legal proceedings and investigations, unsatisfied customers, poor working conditions, significant operational disruptions and interruptions, and a failure to achieve communicated sustainability targets, satisfy evolving customer expectations, and comply with emission regulations.

22.     *IT Systems*

The Debtors are increasingly dependent on their and their subcontractors' and partners' IT systems and procedures for the efficient and secure operation of, among other things, their website, app, reservations, departure control, online booking, revenue management systems, and systems for the Debtors' loyalty program, EuroBonus. The performance and reliability of the Debtors' IT systems and related data are critical to the Debtors' ability to attract and retain customers and for the Debtors' ability to compete effectively. The Debtors' IT systems, as well as external integrated partners' systems and related data, can be vulnerable to, and can be disrupted or damaged by, among other things, internal error, sabotage, cyber-related fraud, false-invoice fraud, computer viruses, ransomware, software error, physical damage or other events beyond the Debtors' or their subcontractors' control. There is a risk that the Debtors' cybersecurity measures are insufficient or inappropriate to detect or prevent all attempts to compromise their IT systems. The degree to which any prolonged or severe disruptions to the Debtors' IT systems may affect the Debtors is uncertain and presents a significant risk to the Debtors' daily operations and revenues.

23.     *Personal Data, Credit Cards, and Hold-Backs*

A large portion of the Debtors' ticket sales are purchased on the Debtors' own website through credit card payments, thereby presenting risks related to credit card fraud and other cyber-crimes. If credit card details and other personal data pertaining to the Debtors' customers were hacked in connection with such ticket sales, there would be a risk that such a breach may harm customer confidence in the Debtors and result in potential liabilities owed to credit card companies. Furthermore, there is a risk that payments of the Debtors' tickets are made with credit cards acquired through fraud or crime, presenting a risk that the Debtors may need to refund such payments to the cardholder or credit card company. The degree to which risks relating to credit fraud and other crimes may affect the Debtors is uncertain, and presents a significant risk to the Debtors' reputation and business.

Under the contractual agreements in place between the Debtors and applicable credit card companies, the credit card companies may decide to forward a portion of the payment to the Debtors upon booking and the remaining part upon travel. Accordingly, there is a risk that credit card acquirers may hold-back payments to the Debtors, and subsequently increase any such hold-back, thereby negatively affecting the Debtors' cash flow. In addition, the contractual agreements between the Debtors and applicable credit card companies, as well as certain other contractual parties, permit such counterparties to request cash or collateral from the Debtors in certain circumstances. Such requests, depending on the timing and magnitude, could put significant constraints on the Debtors' liquidity and cash flow.

24.     *Currency Exchange Rates*

With respect to foreign exchange fluctuations, the Debtors face numerous risks. The Debtors encounter both transaction risk, which arises from exchange-rate changes that impact the size of commercial revenue and costs, thereby reducing operating income, and translation risk, which occurs during conversion of balance-sheet items in foreign currencies due to currency fluctuations. The Debtors are established in multiple countries, including

Sweden, Denmark, Norway, Ireland, and the United States, which have different local currencies. Additionally, the Debtors operate on a global basis, and a significant portion of their assets, liabilities, revenues, and expenses are denominated in currencies other than SEK, particularly in USD, NOK, DKK, EUR, and GBP, which means the Debtors' financial results are affected by changes in foreign exchange rates. Further, on the cost side, the Debtors are exposed to foreign exchange risks arising from fuel and aircraft purchases, acquisition of spare parts, divestment of aircraft, and aircraft lease payments, most of which are denominated in USD. Please also refer to Section VI.E.4 for additional risks related to foreign exchange rates.

In addition, the Debtors do not hedge all currency risks that might arise from their operational cash flows in foreign currencies or their liabilities denominated in foreign currencies. Therefore, there is a risk that unfavorable exchange-rate fluctuations might negatively affect the Debtors' margins due to currency risks which are (i) hedged but such hedging turns out to be imperfect or insufficient or (ii) not hedged. Accordingly, fluctuations in currency exchange rates present a significant risk to the Debtors' financial performance.

### 25. *Interest Rates*

The airline industry is capital-intensive, and the Debtors are exposed to interest rate movements through their variable rate financing arrangements. For instance, movements in the yield curve (market interest rates at different maturities) impact the market value of the Debtors' financial net debt (interest-bearing assets and liabilities). A decrease in interest rates would cause a part of such liabilities to increase. Interest rates are sensitive to numerous factors beyond the Debtors' control, including government and central bank monetary policy and inflation in the jurisdictions in which the Debtors operate. The Debtors are not hedging all interest rate risks to which they may be exposed. Therefore, there is a risk that unfavorable fluctuations in interest rates may adversely affect the Debtors' interest costs and, accordingly, their margins. Fluctuations in interest rates thus present a significant risk to the Debtors' financial performance.

### D. Risks Related to Ownership of New Shares

#### 1. *A Trading Market for New Shares May Not Develop*

There is currently no contemplated market for the New Shares and there can be no assurance as to the development or liquidity of any market for any such securities. The New Shares may, therefore, be illiquid securities without an active trading market. The Reorganized Debtors are under no obligation to list the New Shares on any national securities exchange. There can be no assurance that an active trading market for the New Shares will develop, nor can any assurance be given as to the prices at which the New Shares might be traded, even if an active trading market develops. Accordingly, holders of the New Shares may bear certain risks associated with holding securities for an indefinite period of time.

#### 2. *New Shares May Be Subject to Restrictions on Transfers*

Any New Shares issued to an entity that is an "underwriter," as defined in section 1145(b) of the Bankruptcy Code, will be "restricted securities" subject to resale restrictions and may be resold, exchanged, assigned, or otherwise transferred only pursuant to registration or an

applicable exemption from registration under the Securities Act and other applicable law. In addition, the New Shares will not be freely tradable if, at the time of a transfer, the holder is an "affiliate" of the Reorganized Debtor as defined in Rule 144(a)(1) under the Securities Act or had been such an "affiliate" within 90 days of the transfer. "Affiliate" holders will be permitted to sell New Shares without registration only if they comply with an exemption from registration, including Rule 144 under the Securities Act.

The New Shares will not be registered under the Securities Act or any other securities laws in the United States or elsewhere, and the Debtors make no representation regarding the right of any holder to freely resell securities.

See Section VII – Transfer Restrictions and Consequences under Federal Securities Laws for additional information regarding restrictions on resale of New Shares.

3. *New Shares May Become Diluted*

The ownership percentage represented by the New Shares distributed on the Effective Date will be subject to dilution from (i) any conversion of the New Convertible Notes, (ii) any equity issued pursuant to any employee or management incentive plans, or (iii) any other shares that may be issued after emergence from the Chapter 11 Cases in accordance with SAS AB's applicable governance documents, including the Shareholders' Agreement. Such dilution may be significant.

4. *New Shares will be Subordinated to Reorganized SAS AB's Indebtedness*

In any subsequent reorganization, liquidation, dissolution, or winding up of Reorganized SAS AB, the New Shares would rank below all debt claims against Reorganized SAS AB. As a result, holders of the New Shares would not be entitled to receive any payment or other distribution upon the reorganization, liquidation, dissolution, or winding up of Reorganized SAS AB until after all of Reorganized SAS AB's obligations to its debt holders have been satisfied.

5. *No Intention to Pay Dividends*

Reorganized SAS AB might not pay any dividends on the New Shares and may instead retain any future cash flows for debt reduction and to support its operations. As a result, the success of an investment in the New Shares may depend entirely upon any future appreciation in the value of the New Shares. There is no guarantee that the New Shares will appreciate in value or even maintain their initial value.

6. *Possible Treatment of Reorganized SAS AB as a Passive Foreign Investment Company*

A foreign corporation will be treated as a "passive foreign investment company," or "PFIC," for U.S. federal income tax purposes if either (i) 75% or more of the gross income for a taxable year constitutes passive income for purposes of the PFIC rules, or (ii) 50% or more

of such foreign corporation's assets in any taxable year is attributable to assets, including cash, that produce passive income or are held for the production of passive income. Passive income generally includes dividends, interest, royalties, and certain rents. U.S. shareholders of a PFIC are subject to a disadvantageous U.S. federal income tax regime with respect to the income derived by the PFIC, the distributions they receive from the PFIC, and the gain, if any, they derive from the sale or other disposition of their interests in the PFIC.

The Debtors do not expect to be classified as a PFIC for its taxable year that includes the Effective Date or, to the best of its knowledge, for subsequent taxable years. However, because this determination is made annually at the end of each taxable year and is dependent upon a number of factors, some of which are beyond the Debtors' (or, post-Effective Date, the Reorganized Debtors') control, such as the value of its assets (including goodwill and the income and assets of applicable subsidiaries) and the amount and type of its income, there can be no assurance that the Debtors or the Reorganized Debtors will not be a PFIC in any taxable year or that the IRS will agree with such a conclusion regarding its PFIC status in any taxable year. In addition, the PFIC determination also depends on the application of complex U.S. federal income tax rules that are subject to differing interpretations or may change significantly (possibly with retroactive effect) in future years.

U.S. holders are urged to consult their tax advisers regarding the application of the PFIC rules, including the related reporting requirements and the advisability of making any available election under the PFIC rules, with respect to their ownership and disposition of New Shares. For additional discussion, see the Section titled "Certain U.S. Federal Income Tax Considerations – Certain U.S. Federal Income Tax Consequences to U.S. Holders of Relevant Claims – Ownership and Disposition of New Shares – Passive Foreign Investment Company Rules."

E.    Additional Considerations

1.    *State Aid*

Certain aspects of the Debtors' restructuring described in this Disclosure Statement, including the Danish State Investor's participation in the Transaction and the Kingdom of Denmark's and the Kingdom of Sweden's participation through the write down of their existing debt, or the exchange of such debt for the distributions set forth in the Plan, are subject to approval by the Commission under EU State aid rules. An approval decision will be subject to certain conditions which may have an effect on SAS' business. To what extent the Commission will include such conditions is currently not known.

The Debtors believe the restructuring described in this Disclosure Statement complies with the relevant State aid rules and that the Commission will issue a decision approving the Kingdom of Denmark's (including in its capacity as Danish State Investor) and the Kingdom of Sweden's participation in the restructuring, subject to certain conditions which may have an effect on SAS' business. However, it cannot be excluded that obtaining Commission approval will require more time than anticipated and that the effectiveness of the Chapter 11 Plan will be delayed. Further, at this time, the Debtors cannot determine how the

Commission will ultimately rule and therefore cannot with certainty conclude whether the necessary approval will be possible to obtain.

Even if approval is granted, it is possible for a third party to challenge a State aid decision. Thus, it is possible that a third party may challenge either a decision to approve the Kingdom of Denmark's (including in its capacity as Danish State Investor) and the Kingdom of Sweden's participation in the Debtors' restructuring or (again) their participation in the 2020 recapitalization, *i.e.*, the new decision of November 29, 2023 (*See* Section III.F above). Any such administrative or legal proceedings could be lengthy, take up management resources, and result in additional costs for the Debtors. In addition, if the Commission grants approval of the treatment of the Kingdom of Denmark's (including in its capacity as Danish State Investor) and Kingdom of Sweden's participation in the Debtors' restructuring, there can be no guarantee that the Commission's approval will be sustained on appeal. As noted above in Section III.F, several State aid approval decisions concerning the Kingdom of Denmark's (including in its capacity as Danish State Investor) and the Kingdom of Sweden's participation in previous financings and recapitalizations of SAS have been challenged, one of them successfully.

If the applicable action before the EU Courts conclude that the Commission committed an error in approving the relevant State aid (in this case, the States' participation in the Debtors' restructuring or, as the case may be, the 2020 Recapitalization), the approval by the Commission would be set aside. If no such approval is provided, the State aid would be considered ~~illegal ("unlawful" in EU~~ incompatible with applicable law ~~terms)~~, and subject to repayment unless approved again by the Commission.~~23~~28 It could also give rise to an obligation to pay interest on any aid amount granted. If an approval decision is annulled following a challenge, the Commission would again be required to make a new assessment of the compatibility of that aid with the internal market (in this case, the States' participation in the Debtors' restructuring or, as the case may be, the 2020 Recapitalization). That new examination, if required following a formal investigation procedure, could lead to the conclusion either that the State aid was provided in accordance with EU law ("compatible aid"), or that it was not ("incompatible aid").~~24~~29

In a scenario where the Commission concludes, after having conducted a renewed assessment, that the State aid received was "incompatible", the beneficiaries are required to repay the aid. In monetary terms, the repayment obligation could in this case equal the economic value to SAS of the States' contribution to the restructuring, or as the case may be, the 2020 Recapitalization (solely with respect to its State aid aspects), plus interest.

---

~~23~~28 Specifically, in this case, such aid will become an "unlawful" aid (*i.e.*, an aid "illegal" in "procedural terms", not in substantive terms), since, by virtue of the retroactive effect of its annulment, the aid will be regarded as having been granted without a prior authorization of the Commission (thus constituting a violation of Article 108(3) TFEU, requiring prior notification by the Member State and standstill obligations). An unlawful aid can also become an unlawful and "compatible" aid if the Commission approves it later, while correcting the errors of fact or of law which justified its initial annulment (as it happened for the 2020 Recapitalization aid, approved again on November 29, 2023).

~~24~~29 Irrespective of the outcome, such a decision could be challenged again.

In a scenario where the Commission concludes, after having conducted a renewed assessment, that the State aid received was "compatible," the beneficiaries are not required to repay the aid, but may be required to pay interest on the aid amount to the State that has granted the aid for the period under which it has been ~~unlawful~~incompatible, *i.e.* from the date the aid was granted until the date of the new Commission decision declaring the aid compatible. Additional information regarding any amounts the Debtors may owe arising from incompatible State aid, and the potential release of the Reserved Funds to satisfy such amounts or for distribution to the holders of GUC Interests in accordance with the Plan, will be provided and made available in the Plan Supplement when available.

## 2. EU Ownership Requirements

Regulation (EC) No. 1008/2008 on the common rules for the operation of air services in the EU (the "**ASR**") provides that an airline may hold an EU operating licen~~ce~~se only if, among other things, EU member states and/or nationals of EU member states ("**EU Shareholders**")[25][30] (i) own more than 50% of the undertaking and (ii) "effectively control" the undertaking (whether directly or indirectly through one or more intermediate undertaking(s)).

An airline may comply with the EU ownership requirement if 50% plus one share of the equity capital is owned by EU shareholders. Equity capital means instruments in which the holder has the right to participate in decisions affecting the operations of the undertaking or the right to obtain a share of the residual profits. Ownership is assessed in light of the nationality of the physical persons (or identity of the state(s)) holding the shares, or owning the company which holds the shares. Where shares are held by a nominee, trust, fund or other institutional investor, the ownership requirement may be satisfied when the nominee or trustee or other registered owner is an EU Shareholder. In this analysis, it is necessary to consider the actual economic owner of the interest, which typically means the ultimate beneficiary of the voting and pecuniary rights referred to above.

The requirement of effective control mandates that the most important decisions regarding the management of the airline must ultimately be decided by EU shareholders only, without having to rely on non-EU shareholders. EU shareholders must, therefore, exercise control with respect to key strategic decisions of the business.

The Debtors believe the contemplated Transaction structure complies with the ASR. However, at this time, the Debtors cannot determine how the relevant national authorities will ultimately rule with respect to the Debtors' compliance with EU ownership requirements and the Debtors cannot predict the risk of any future non-compliance.

## 3. ~~2.~~ Ability to Enforce Bankruptcy Court Orders Outside of the U.S.

All of the Debtors, except for SANA, were formed or organized outside the United States, and a majority of their assets are located outside the United States. While legal

---

[25][30] In the context of the ASR, note that Switzerland, Norway, Iceland, and Liechtenstein are considered member states, and their nationals are considered nationals of member states.

grounds may exist to assert that orders issued by the Bankruptcy Court in the Chapter 11 Cases are binding outside the United States, third parties may nevertheless attempt to argue that such orders are unenforceable outside the United States or that separate orders from non-U.S. courts would be required to make such orders enforceable in non-U.S. jurisdictions. While the Debtors may assert that orders issued by the Bankruptcy Court in the Chapter 11 Cases are enforceable in the relevant jurisdictions, there is no guarantee those efforts will be successful. Accordingly, it is also possible that orders issued by the Bankruptcy Court in the Chapter 11 Cases may be unenforceable against persons or assets in non-U.S. jurisdictions.

4. 3. *Fluctuations in FX Rates Could Reduce Available Cash and New Shares Distribution Pool to be Distributed to Certain Holders of General Unsecured Claims*

The Closing FX Rate (as defined in the Investment Agreement) is fixed at the European Central Bank exchange reference rate of SEK per USD as of one Business Day prior to the Closing (as defined in the Investment Agreement). As a result, the Closing FX Rate will fluctuate prior to the closing, as compared to the foreign exchange rate in effect as of the date the Investment Agreement was entered into, which will impact the calculations used to determine the value of Available Cash under the Plan. Available cash is determined after GUC Cash is allocated to the Reserved Funds, which is set at SEK 2.42.325 billion. A portion of the Reserved Funds will be comprised of the Contribution Fees after deducting the amount payable on the Effective Date based on the Total Distributable Value made available to holders of General Unsecured Claims as of such date. Accordingly, a fluctuation in the foreign exchange rate may adversely affect the value the Debtors' estates will receive from the Investors' subscription for New Shares and New Convertible Notes for distribution to General Unsecured Creditors, as more GUC Cash will be needed to comprise the Reserved Funds, which would result in lower USD recoveries for creditors than the Debtors' current estimates.

The Debtors are considering the options available to them to address certain risks posed by foreign exchange rate fluctuations, including entering into a financial hedging arrangement. However, such financial hedging arrangement may be prohibitively costly, further reduce creditor recoveries, or not be readily available.

A sensitivity table showing the results of foreign exchange rate fluctuations is included below.



(Modified graphics)

## 5. ~~4.~~ *Debtors Have No Duty to Update*

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified in the Plan, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth in the Plan since that date. The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

## 6. ~~5.~~ *No Representations Outside This Disclosure Statement Are Authorized*

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure acceptance or rejection of the Plan that are other than those contained in, or included with, this Disclosure Statement should not be relied upon in making the decision to accept or reject the Plan.

## 7. ~~6.~~ *No Legal or Tax Advice Is Provided by This Disclosure Statement*

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each holder of a Claim or Interest should consult their own legal

counsel and accountant as to legal, tax, and other matters concerning their Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

### 8. ~~7.~~ *No Admission Made*

Nothing contained in this Disclosure Statement or in the Plan will constitute an admission of, or will be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or holders of Claims or Interests.

### 9. ~~8.~~ *Implementation of the Plan may Result in Adverse Tax Consequences to Holders of Claims*

The Debtors are not providing tax advice to any holder of a Claim in connection with the Plan and each holder of a Claim should consult its own tax advisor regarding tax consequences of the Plan.

Uncertainty may exist with respect to some of the Swedish/Irish/Etc. federal income tax consequences described in Section "Certain Swedish/Irish Income Tax Consequences of the Plan," including but not limiting to withholding obligations and applicable tax withholding rates. No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from any tax authorities as to any of the tax consequences of the Plan. The discussion contained in each of the Sections "Certain Swedish/Irish Income Tax Consequences of the Plan" and "Certain U.S. Federal Income Tax Consequences of the Plan" is based on the relevant legislation, guidance judicial decisions, and applicable tax treaties, as in effect on the date of this Disclosure Statement, and all of which are subject to change or differing interpretations, possibly with retroactive effect. Such discussion is not binding upon the applicable tax authorities or the courts. No assurance can be given that the applicable tax authorities would not assert, or that a court would not sustain, a different position than any position discussed therein.

### 10. ~~9.~~ *No Waiver of Right to Object or Right to Recover Transfers and Assets*

The vote by a holder of a Claim for or against the Plan does not constitute a waiver or release of any claims, causes of action, or rights of the Debtors (or any entity, as the case may be) to object to such holder's Claim, or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any claims or causes of action of the Debtors or their respective Estates are specifically or generally identified in this Disclosure Statement.

### 11. ~~10.~~ *Information Was Provided by Debtors and Relied upon by Debtors' Advisors*

The Debtors' advisors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although the Debtors' advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement.

# VII.
## TRANSFER RESTRICTIONS AND CONSEQUENCES UNDER FEDERAL SECURITIES LAWS

A.     1145 Securities

The offering, issuance and distribution of the 1145 Securities will be exempt to the fullest extent permitted by section 1145 of the Bankruptcy Code, without further act or actions by any entity, from registration under section 5 of the Securities Act and any U.S. state or local law requiring registration for the offer, issuance and distribution of the New Shares. Further, section 1145 of the Bankruptcy Code generally exempts from registration under the Securities Act and state and local securities laws the offer or sale under a chapter 11 plan of a security of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under a plan, if such securities are offered or sold in exchange for a claim (including a claim for an administrative expense) against, or an interest in, the debtor or such affiliate, or principally in such exchange and partly for cash.   Section 1145 of the Bankruptcy Code also exempts from registration (i) the offer of a security through any right to subscribe that is sold in the manner provided in the prior sentence, and (ii) the sale of a security upon the exercise of such right.   In reliance upon this exemption, the 1145 Securities will be exempt from the registration requirements of the Securities Act, and state and local securities laws.   These securities may be resold without registration under the Securities Act or other federal or state securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code.   In addition, 1145 Securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

Section 1145(b) of the Bankruptcy Code defines "underwriter" for purposes of the Securities Act as one who, except with respect to ordinary trading transactions, (a) purchases a claim with a view to distribution of any security to be received in exchange for the claim, (b) offers to sell securities issued under a plan for the holders of such securities, (c) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution or (d) is an issuer, as used in section 2(a)(11) of the Securities Act, with respect to such securities, which includes control persons of the issuer.

Resales of 1145 Securities by holders deemed to be "underwriters" (which includes controlling persons of the issuer) are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law, even though such securities are not "restricted" securities.

Under certain circumstances, control person underwriters may be able to sell securities without registration pursuant to the resale limitations of Rule 144 of the Securities Act which, in effect, permit the resale of securities received by such underwriters pursuant to a chapter 11 plan, subject to applicable volume limitations, notice and manner of sale requirements, and certain other conditions.   Whether any particular person would be deemed to be an "underwriter" (including whether the person is a control person of the issuer) with respect to 1145 Securities would depend upon various facts and circumstances applicable to that

person.  Parties who believe they may be statutory underwriters as defined in section 1145 of the Bankruptcy Code are advised to consult with their own legal advisers as to the availability of the exemption provided by Rule 144.

B.     Section 4(a)(2) Securities

Section 4(a)(2) of the Securities Act provides that the issuance of securities by an issuer in transactions not involving a public offering is exempt from the registration requirements under the Securities Act.  The offering, issuance, and sale of the New Shares and New Convertible Notes that are not 1145 Securities is being made outside of the United States in accordance with Swedish securities laws and other applicable securities laws.  To the extent any New Shares and New Convertible Notes that are not 1145 Securities are issued to U.S. Persons on the Closing Date, such issuance is being made in reliance on the exemption from registration set forth in section 4(a)(2) of the Securities Act (i.e. 4(a)(2) Securities) or, solely to the extent section 4(a)(2) of the Securities Act is not available, any other available exemption from registration under the Securities Act.  Such securities will be considered "restricted securities" (within the meaning of Rule 144 under the Securities Act), will bear customary legends and transfer restrictions, and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act, such as, under certain conditions, the resale provisions of Rule 144 under the Securities Act.

Rule 144 provides a limited safe harbor for the public resale of restricted securities if certain conditions are met.  These conditions vary depending on whether the holder of the restricted securities is an "affiliate" of the issuer.  Rule 144 defines an affiliate of the issuer as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer."

*****

Legends.  To the extent certificated or issued by way of direct registration on the records of Reorganized SAS AB's transfer agent, certificates evidencing 1145 Securities held by holders of 10% or more of the outstanding New Shares, or who are otherwise underwriters as defined in section 1145(b) of the Bankruptcy Code, and all 4(a)(2) Securities will bear a legend substantially in the form below:

THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [DATE OF ISSUANCE], HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER.

The Reorganized Debtors reserve the right to reasonably require certification, legal opinions, or other evidence of compliance with Rule 144 as a condition to the removal of such legend or to any resale of the 4(a)(2) Securities.  The Reorganized Debtors also reserve the

right to stop the transfer of any 4(a)(2) Securities if such transfer is not in compliance with Rule 144, pursuant to an effective registration statement, or pursuant to another available exemption from the registration requirements of applicable securities laws. All persons who receive 4(a)(2) Securities will be required to acknowledge and agree, that (a) they will not offer, sell, or otherwise transfer any 4(a)(2) Securities except in accordance with an exemption from registration, including under Rule 144 under the Securities Act, if and when available, or pursuant to an effective registration statement, and (b) the 4(a)(2) Securities will be subject to the other restrictions described above.

In any case, recipients of securities issued under or in connection with the Plan are advised to consult with their own legal advisers as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

C.      GUC Interests

The Plan Supplement shall set forth the securities law considerations, if any, applicable to the GUC Interests.

\* \* \* \* \*

BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE AND THE HIGHLY FACT-SPECIFIC NATURE OF THE AVAILABILITY OF EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT, INCLUDING THE EXEMPTIONS AVAILABLE UNDER SECTION 1145 OF THE BANKRUPTCY CODE AND RULE 144 UNDER THE SECURITIES ACT, NONE OF THE DEBTORS MAKE ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN. THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES AND THE CIRCUMSTANCES UNDER WHICH THEY MAY RESELL SUCH SECURITIES.

**VIII.**
**CERTAIN U.S. FEDERAL TAX CONSEQUENCES OF PLAN**

A.      General

The following discussion summarizes certain material U.S. federal income tax consequences of the implementation of the Plan to the Debtors and to certain U.S. holders (as defined below) of Relevant Claims (as defined below). This summary does not address the U.S. federal income tax consequences to (1) holders of Claims who are deemed to have rejected the Plan in accordance with the provisions of section 1126(g) of the Bankruptcy Code, (2) holders whose Claims are Unimpaired or otherwise entitled to payment in full in Cash under the Plan or (3) purchasers of Claims following the Effective Date. Thus, this summary applies only to U.S. holders of DIP Claims, General Unsecured Claims and Unsecured Convenience Class Claims

(collectively, the "**Relevant Claims**").  This summary does not address the U.S. federal income tax consequences to holders of a Claim that is not treated as debt for U.S. federal income tax purposes and, therefore, this summary does not provide any discussion related to the U.S. federal income tax consequences to holders of Aircraft Lease Claims and Pilot Union Claims, which are assumed to not constitute debt for U.S. federal income tax purposes.  Accordingly, Holders of Aircraft Lease Claims and Pilot Union Claims are urged to consult their own tax advisors regarding the U.S. federal income tax consequences arising to them under the Plan.

This summary is based on the Internal Revenue Code of 1986, as amended (the "**Code**"), existing and proposed U.S. Treasury regulations thereunder (the "**Treasury Regulations**"), judicial decisions, published administrative rules, pronouncements of the Internal Revenue Service (the "**IRS**") and the income tax treaty between the United States and Sweden (the "**U.S.-Sweden Tax Treaty**"), all as in effect on the date of this Disclosure Statement and all of which are subject to change, possibly on a retroactive basis.  Any such change could significantly affect the U.S. federal income tax consequences described below.

The U.S. federal income tax consequences of the Plan are complex and subject to significant uncertainties.  The Debtors have not requested an opinion of counsel or a ruling from the IRS with respect to any of the tax aspects of the Plan. This summary does not address state, local, or foreign income or other tax consequences of the Plan, nor does it purport to address the U.S. federal income tax consequences of the Plan to special classes of taxpayers (such as non-U.S. persons, broker-dealers, banks, mutual funds, insurance companies, financial institutions, thrifts, small business investment companies, regulated investment companies, real estate investment trusts, tax-exempt organizations, retirement plans, individual retirement and other tax-deferred accounts, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes, any other Debtor entity, persons holding Claims as part of a hedging, straddle, conversion or constructive sale transaction or other integrated investment, traders in securities that elect to use a mark-to-market method of accounting for their security holding, dealers in securities or foreign currencies, persons whose functional currency is not the U.S. dollar, certain expatriates or former long term residents of the United States, persons who received their Claim as compensation or who acquired their Claim in the secondary market, persons who use the accrual method of accounting and report income on an "applicable financial statement," and persons subject to the alternative minimum tax or the "Medicare" tax on net investment income).  Additionally, this discussion does not address the Foreign Account Tax Compliance Act. Finally, this discussion does not address U.S. federal taxes other than income taxes, nor does it apply to any person that acquires any of the New Shares or New Convertible Notes in the secondary market.

This discussion assumes that the applicable U.S. holder has not claimed a bad debt deduction with respect to a Claim (or any portion thereof) in the current or any prior year and that such Claim did not become completely or partially worthless in a prior taxable year.  Additionally, this discussion assumes that (1) the various debt and other arrangements to which any of the Debtors is a party will be respected for U.S. federal income tax purposes in accordance with their forms and (2) except where otherwise indicated, the Claims are held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the Code. In the event that an instrument denominated as debt were treated as equity for U.S.

federal income tax purposes, the tax consequences described herein could be materially different.

**The material tax consequences of the implementation of the Plan to holders of Allowed General Unsecured Claims depends, in pertinent part, on the types of GUC Entities used and GUC Interests issued under the Plan. As the types of GUC Entities and GUC Interests may take one or more forms as will be set forth in the Plan Supplement and, therefore, the material U.S. federal income tax consequences to the holders of Allowed General Unsecured Claims in respect of such GUC Entities and GUC Interests cannot be determined at this time and are not discussed herein. A supplemental tax disclosure will be filed containing a discussion of the material U.S. federal income tax consequences associated with the GUC Entities utilized and the GUC Interests to be distributed all such holders of Allowed General Unsecured Claims pursuant to the Plan.**

ACCORDINGLY, THE FOLLOWING SUMMARY IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING OR FOR ADVICE BASED UPON THE PARTICULAR CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. EACH HOLDER OF A CLAIM SHOULD CONSULT ITS OWN TAX ADVISORS FOR THE U.S. FEDERAL, STATE, LOCAL, AND NON-U.S. INCOME AND OTHER TAX CONSEQUENCES APPLICABLE TO IT UNDER THE PLAN.

B.    Certain U.S. Federal Income Tax Consequences to the Debtors

Generally, the Plan is not expected to have any material U.S. federal income tax consequences to the Debtors. Accordingly, this discussion does not address any U.S. federal income tax consequences relevant to the implementation of the Plan to the Debtors.

C.    Certain U.S. Federal Income Tax Consequences to U.S. Holders of DIP Claims and Other Relevant Claims

The discussion below applies only to U.S. holders. As used herein, the term "**U.S. holder**" means a beneficial owner of DIP Claims, General Unsecured Claims or Unsecured Convenience Class Claims that is for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial

decisions, or if the trust has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. person.

If a partnership or other entity or arrangement taxable as a partnership for U.S. federal income tax purposes holds a Relevant Claim, the U.S. federal income tax treatment of a partner in such partnership generally will depend upon the status of the partner and the activities of the partnership. If you are a partner in such partnership holding any of such Claims, you are urged to consult your tax advisor.

<p style="text-align:center">1.     <em>Consequences to U.S. Holders of DIP Claims</em></p>

Pursuant to the Plan, in complete and final satisfaction of their respective Claims, holders of DIP Claims will receive cash in an amount equal to such Claims on the Effective Date. In addition, certain DIP Lenders may potentially convert some portion of their DIP Claims into either New Shares or New Convertible Notes, which, if converted, would have the effect of reducing such DIP Lender's DIP Claims by a corresponding amount. While it is uncertain as to whether any DIP Lenders will ultimately decide to convert some portion of their DIP Claims in either New Shares or New Convertible Notes, this summary nonetheless provides a general overview of the anticipated U.S. tax consequences associated with such scenario.

<p style="text-align:center">(a)     <u>Treatment of Gain or Loss</u></p>

The U.S. federal income tax consequences of the Plan to a U.S. holder of a DIP Claim depends on whether (i) such holder receives, at least in part, New Shares and/or New Convertible Notes; (ii) such U.S. holder's DIP Claims constitute "securities" for U.S. federal income tax purposes; (iii) the New Convertible Notes, if applicable, constitute "securities" for U.S. federal income tax purposes; and (iv) the exchange qualifies as a reorganization for U.S. federal income tax purposes, such as a recapitalization, under section 368 of the Code (with respect to such transaction, a "**Reorganization**").

With respect to the foregoing, the term "security" is not defined in the Code or in the Treasury Regulations issued thereunder and has not been clearly defined by judicial decisions. The determination of whether a particular debt obligation constitutes a "security" depends on an overall evaluation of the nature of the debt, including whether the holder of such debt obligation is subject to a material level of entrepreneurial risk and whether a continuing proprietary interest is intended or not. One of the most significant factors considered in determining whether a particular debt obligation is a security is its original term. In general, debt obligations issued with a weighted average maturity at issuance of less than five (5) years do not constitute securities, whereas debt obligations with a weighted average maturity at issuance of ten (10) years or more constitute securities. Additionally, the IRS has ruled that new debt obligations with a term of less than five years issued in exchange for and bearing the same terms (other than interest rate) as securities should also be classified as securities for this purpose, since the new debt represents a continuation of the holder's investment in the corporation in substantially the same form. The treatment of a debt instrument with an initial

<div style="text-align:center">127</div>

term of five to ten years is uncertain. There are a number of other factors that could be taken into account in determining whether a debt instrument is a security.

For purposes of the following discussion, no assumption has been made as to whether the DIP Claims or the New Convertible Notes constitute securities for U.S. federal income tax purposes. Accordingly, U.S. holders are urged to consult their own tax advisors to determine whether, given their particular circumstances, such DIP Claim and, if applicable, any New Convertible Notes received in exchange (or partial exchange) therefor constitutes a security for U.S. federal income tax purposes.

(i)     *Fully Taxable Exchange*

If a DIP Claim (i) is not treated as a security for U.S. federal income tax purposes and is exchanged for either New Shares or New Convertible Notes, (ii) is exchanged for New Convertible Notes and such New Convertible Notes are not treated as a security for U.S. federal income tax purposes or (iii) is exchanged solely for cash, a U.S. holder of such a DIP Claim generally should be treated as exchanging its DIP Claim for any such cash and/or New Shares or New Convertible Notes received in exchange therefor in a fully taxable exchange.

In the case of a taxable exchange, a U.S. holder of a DIP Claim should recognize gain or loss in an amount equal to the difference, if any, between (i) the sum of the cash received, the fair market value of the New Shares (as of the date such New Shares are issued to the U.S. holder), and the "issue price" (or possibly the fair market value), as defined below, of any portion of the New Convertible Notes received in satisfaction of its Claim (other than in respect of any Claim for accrued but unpaid interest and possibly accrued OID), and (ii) the holder's adjusted tax basis in the Claim exchanged therefor (other than any tax basis attributable to accrued but unpaid interest and possibly accrued OID). See the Section entitled "—Character of Gain or Loss" below. For the treatment of distributions in respect of a Claim for accrued but unpaid interest and possibly OID, see the Section entitled "—Distributions in Respect of Accrued Interest," below.

A U.S. holder's tax basis in any New Shares received generally should equal the fair market value of such New Shares on the Effective Date, and its tax basis in the portion of any New Convertible Notes received should equal the amount taken into account in determining gain or loss. The U.S. holder's holding period in any New Shares and/or any portion of a New Convertible Note received should begin on the day following the Effective Date.

(ii)    *Reorganization Treatment*

If the exchange by a U.S. holder of a DIP Claim qualifies for Reorganization treatment, such holder generally should not recognize loss, but generally should recognize gain (computed as described above in the case of a fully taxable exchange), if any, to the extent of any cash and/or any other "non-qualified property" received in satisfaction of such Claims (other than in respect of any Claim for accrued but unpaid interest and possible accrued OID). See the Section entitled "—Character of Gain or Loss," below. Any consideration received in respect of any DIP Claims for accrued but unpaid interest (and possibly OID) is treated

separately, see the Section entitled "—Distributions in Respect of Accrued But Unpaid Interest," below.  For purposes of the foregoing, "**non-qualified property**" means any New Convertible Notes to the extent such instrument does not constitute a security for U.S. federal income tax purposes.

In a Reorganization exchange, a U.S. holder's aggregate tax basis in any non-recognition property received should equal the U.S. holder's aggregate adjusted tax basis in the DIP Claims exchanged therefor, increased by any gain and interest income recognized in the exchange, and decreased by (i) the fair market value of any cash or non-qualified property received by the holder and (ii) any deductions claimed by the holder in respect of any previously accrued but unpaid interest.  A U.S. holder's holding period in the non-recognition property (which, depending on the circumstances, may include New Shares, New Convertible Notes or both) received should include its holding period in the DIP Claims exchanged therefor, except to the extent of any consideration received in respect of accrued but unpaid interest or OID, and the U.S. holder's holding period in any non-qualified property received should begin on the day following the Effective Date.

U.S. holders of DIP Claims are urged to consult their own tax advisors regarding the U.S. federal income tax consequences to them under the Plan.

(b)      Character of Gain or Loss

Where gain or loss is recognized by a U.S. holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the applicable Claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the Claim was acquired at a market discount, and whether and to what extent the holder previously claimed a bad debt deduction.  If any recognized gain is capital gain, it generally would be long-term capital gain if the U.S. holder held its Claim for more than one year at the time of the exchange.  The deductibility of capital losses is subject to certain limitations.  Each U.S. holder of a DIP Claim should consult its own tax advisor to determine whether gain or loss recognized by such U.S. holder will be long-term capital gain or loss and the specific tax effect thereof on such U.S. holder.

In addition, U.S. holders of Relevant Claims may be affected by the market discount provisions of sections 1276 through 1278 of the Code.  Under these rules, some or all of any gain realized by a U.S. holder may be treated as ordinary income (instead of capital gain) to the extent of the amount of market discount on such Relevant Claims.  In general, a debt obligation with a fixed maturity of more than one year that is acquired by a holder on the secondary market (or, in certain circumstances, upon original issuance) is considered to be acquired with market discount as to that holder if the debt obligation's stated redemption price at maturity (or revised issue price, in the case of a debt obligation issued with OID) exceeds the tax basis of the debt obligation in the holder's hands immediately after its acquisition.  However, a debt obligation will not be a market discount obligation if such excess is less than a statutory de minimis amount (equal to 0.25% of the debt obligation's stated redemption price at maturity or revised issue price, in the case of a debt obligation issued with OID, multiplied by

the number of complete years remaining to maturity as of the time the holder acquired the debt obligation).

Under these rules, gain recognized on the exchange of a Relevant Claim (other than in respect of a Relevant Claim for accrued but unpaid interest) generally should be treated as ordinary income to the extent of the market discount accrued (on a straight line basis or, at the election of the holder, on a constant yield basis) during the holder's period of ownership, unless the holder elected to include the market discount in income as it accrued. If a U.S. holder of Claims did not elect to include market discount in income as it accrued and, thus, under these rules, was required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry its Claims, such deferred amounts would become deductible at the time of the exchange but, if the exchange is entitled to Reorganization treatment, only up to the amount of gain that the holder recognizes in the exchange.

In the event of Reorganization treatment, the Code indicates that, under Treasury Regulations to be issued, any accrued market discount in respect of the Claims that qualify as a "security" that is in excess of the gain recognized in the exchange should not be currently includable in income. However, such accrued market discount should carry over to any non-recognition property received in exchange therefor. Any gain recognized by a U.S. holder upon a subsequent disposition of the non-recognition property would be treated as ordinary income to the extent of any accrued market discount carried over and not previously included in income. To date, specific Treasury Regulations implementing this rule have not been issued.

(c)     Distributions in Respect of Accrued Interest

In general, to the extent that any consideration received pursuant to the Plan by a U.S. holder of a Relevant Claim is received in satisfaction of accrued interest during the holder's holding period, such amount should be taxable to the U.S. holder as interest income (if not previously included in the U.S. holder's gross income). Conversely, a U.S. holder may recognize a deductible loss to the extent any accrued interest or accrued OID was previously included in its gross income and is not paid in full.

If the fair market value of the consideration received by the U.S. holder is not sufficient to fully satisfy all principal and interest on its Claim, the extent to which such consideration will be attributable to accrued but unpaid interest is unclear. Under the Plan, the aggregate consideration to be distributed to U.S. holders of Claims treated for U.S. federal income tax purposes as indebtedness should be allocated first to the principal amount of the Claims, with any excess allocated to other amounts (such as accrued but unpaid interest or deemed interest thereon), if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a Chapter 11 plan of reorganization is binding for U.S. federal income tax purposes. The IRS could take the position, however, that the consideration received by the U.S. holder should be allocated in some way other than as provided in the Plan. Thus, there is no assurance that the IRS will respect such allocation for U.S. federal income tax purposes. U.S. holders of Relevant Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

(d)     Relevant Claims That Are Denominated in Foreign Currency

The rules applicable to a Relevant Claim that is denominated in any currency other than the U.S. dollar ("**Foreign Currency**") could require some or all of the gain or loss realized on the exchange of a Relevant Claim that is attributable to fluctuations in currency exchange rates, to be treated as ordinary income or loss. The rules applicable to a Relevant Claim that is denominated in any foreign currency are complex, and their application may depend on the circumstances of the applicable U.S. holder. For example, various elections are available under these rules, and whether a U.S. holder has made (or makes) any of these elections may affect the U.S. holder's tax treatment. Each U.S. holder of a Relevant Claim that is denominated in any foreign currency should consult its own tax advisor regarding the U.S. federal income tax consequences of the exchange of such Relevant Claim, including the proper method for establishing the U.S. holder's tax basis in the Relevant Claim and in any New Shares, if any, received pursuant to these rules.

2.     *Consequences to U.S. Holders of Other Relevant Claims*

Pursuant to the Plan, a U.S. holder of a Relevant Claim (excluding DIP Claims, which are discussed in the preceding sections) will receive in full and final satisfaction of their respective Claims: (i) cash, (ii) New Shares, (iii) GUC ~~Trust~~ Interests or (iv) some combination of the consideration described in (i) through (iii).

As discussed above, the types of GUC Entities and GUC Interests may take one or more forms as will be set forth in the Plan Supplement and, therefore, the material U.S. federal income tax consequences to the holders of Allowed General Unsecured Claims in respect of such GUC Entities and GUC Interests cannot be determined at this time and are not discussed further herein. A supplemental tax disclosure will be filed containing a discussion of the material U.S. federal income tax consequences associated with the GUC Entities utilized and the GUC Interests to be distributed all such holders of Allowed General Unsecured Claims pursuant to the Plan.

(a)     Treatment of Gain or Loss

Subject to the discussion below in respect of holders of certain Relevant Claims in SAS AB, U.S. holders of the aforementioned Relevant Claims generally should recognize gain or loss equal to the difference, if any, between the sum of (i) the Cash received, the fair market value of the New Shares (as of the date such New Shares are distributed to the U.S. holder) received in exchange for their Claim ~~and the fair market value of their respective undivided interests in the Reserve Funds transferred to the GUC Trust and treated as received in respect of its Claim~~, and (ii) the U.S. holder's adjusted basis, if any, in such Relevant Claim(s) (subject to the separate treatment of any amounts received and tax basis allocable to accrued but unpaid interest or amortized original issue discount). The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. holder, the nature of the Claim in such U.S. holder's hands and whether the Claim was purchased at a discount. If any recognized gain is capital gain, it generally would be long-term capital gain if the U.S. holder held its Claim for more than one year at the time of the exchange. The deductibility of capital losses is subject to certain

limitations.  Each U.S. holder of a Trade Claim should consult its own tax advisor to determine whether gain or loss recognized by such U.S. holder will be long-term capital gain or loss and the specific tax effect thereof on such U.S. holder.

A U.S. holder's tax basis in any New Shares received generally should equal the fair market value of such New Shares on the Effective Date~~, and a U.S. holder's tax basis in their undivided interest in the underlying Reserved Funds of the GUC Trust equal to the fair market value of such assets taken into account in determining their gain or loss~~.  The U.S. holder's holding period in any New Shares received should begin on the day following the Effective Date.

Notwithstanding the foregoing, a U.S. holder of a Relevant Claim may qualify for Reorganization treatment to the extent that (i) such holder receives, at least in part, New Shares; (ii) such U.S. holder's Relevant Claim constitutes a "security" (as defined above) for U.S. federal income tax purposes; (iii) such Relevant Claim is treated as a "security" of SAS AB (as opposed to any other Debtor); and (iv) the restructuring of the Debtors qualifies as a Reorganization.  If the exchange by a U.S. holder of a Relevant Claim qualifies for Reorganization treatment, such holder generally should not recognize loss, but generally should recognize gain (computed as described above), if any, to the extent of any cash ~~and/or any GUC Interests~~or other consideration (excluding the New Shares) received in satisfaction of such Relevant Claims (other than in respect of any Claim for accrued but unpaid interest and possible accrued OID).  See the Section entitled "—Character of Gain or Loss," above.  Any consideration received in respect of any Relevant Claims for accrued but unpaid interest (and possibly OID) is treated separately, see the Section entitled "—Distributions in Respect of Accrued But Unpaid Interest," above.

In a Reorganization exchange, such U.S. holder's aggregate tax basis in any non-recognition property received should equal the U.S. holder's aggregate adjusted tax basis in the Relevant Claims exchanged therefor, increased by any gain and interest income recognized in the exchange, and decreased by (i) the fair market value of any cash ~~and/or GUC Interests~~or other consideration (excluding the New Shares) received by the holder and (ii) any deductions claimed by the holder in respect of any previously accrued but unpaid interest.  A U.S. holder's holding period in the non-recognition property received should include its holding period in the Relevant Claims exchanged therefor, except to the extent of any consideration received in respect of accrued but unpaid interest or OID, and the U.S. holder's holding period in any non-qualified property received should begin on the day following the Effective Date.  U.S. holders of Relevant Claims of SAS AB receiving, at least in part, New Shares are urged to consult their own tax advisors regarding the U.S. federal income tax consequences to them under the Plan.

For the treatment of the exchange to the extent a portion of the consideration received is allocable to accrued but unpaid interest, OID or market discount or if the Relevant Claims are denominated in foreign currency, see the Sections entitled "—Distributions in Respect of Accrued Interest", "—Character of Gain or Loss" and "—Relevant Claims That Are Denominated in Foreign Currency" above.  For ~~a further discussion of the U.S. tax classification of the GUC Trust as well as the U.S. federal income tax treatment and reporting associated with U.S. holders of GUC Trust Interests, see the Sections below entitled "—Tax~~

Classification of the GUC Trust as a 'Liquidating Trust'" and "— Tax Reporting by the GUC Trust and Holders of GUC Trust Interests". For the treatment of the ownership and subsequent disposition of New Shares by any holders of Relevant Claims, see the Section entitled "—Ownership and Disposition of New Shares".

(b) Tax Classification of the GUC Trust as a "Liquidating Trust"

The GUC Trust is intended to qualify as a "liquidating trust" for U.S. federal income tax purposes. In general, a liquidating trust is not a separate taxable entity but rather is treated for U.S. federal income tax purposes as a "grantor" trust (i.e., a pass-through entity). Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Debtors believe the GUC Trust should be treated as a "liquidating trust" for U.S. federal income tax purposes pursuant to Treasury Regulation section 301.7701-4(d), and the Plan provides that the trustee of the GUC Trust will so treat the GUC Trust as a liquidating trust on the GUC Trust's U.S. federal income tax return. The Plan further provides that all parties shall treat any transfer of Reserve Funds to the GUC Trust, for U.S. federal income purposes, as (i) a first-step transfer of such portion of the Reserved Funds (subject to any obligations relating to such Reserved Funds) directly to such holders of Relevant Claims (other than any such assets treated as held by a "disputed ownership fund" or other separate entity as discussed below), followed by (ii) a second-step transfer by such holders to the GUC Trust of such Reserved Funds in exchange for GUC Trust Interests. Accordingly, and except in the event of contrary definitive guidance, holders of GUC Trust Interests should be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the Reserved Funds transferred by the Debtors to the GUC Trust (other than any Reserved Funds treated as held by a "disputed ownership fund" or other separate entity as discussed below).

No ruling is currently being requested from the IRS concerning the tax status of the GUC Trust as a "liquidating trust" and thus as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the GUC Trust as a grantor trust. If the IRS were to challenge successfully such classification, the U.S. federal income tax consequences to the GUC Trust and holders of GUC Trust Interests could vary significantly from those discussed herein.

(c) Tax Reporting by the GUC Trust and Holders of GUC Trust Interests

In accordance with the intended treatment of the GUC Trust as a liquidating trust for U.S. federal income tax purposes, the Plan provides that all parties shall report consistently with such treatment. Accordingly, as described above, all parties must treat the GUC Trust as a grantor trust of which the holders of GUC Trust Interests are the owners and grantors, and treat such beneficiaries as the direct owners of an undivided interest in the Reserved Funds transferred to the GUC Trust, for all U.S. federal income tax purposes (other than with respect to any assets treated as held by a disputed ownership fund or other separate entity, as discussed in the next section).

The GUC Trustee will file tax returns for the GUC Trust treating the GUC Trust as a grantor trust pursuant to Treasury Regulations section 1.671-4(a). The GUC Trustee also shall annually send or make available to each holder of GUC Trust Interests a separate

statement regarding the receipts and expenditures of the GUC Trust as relevant for U.S. federal income tax purposes. To the extent any taxable income and loss is generated by the GUC Trust, such taxable income or loss (if any) will be allocated among, and treated as directly earned and incurred by, the holders of GUC Trust Interests with respect to such holder's interest in the GUC Trust (and not as income or loss with respect to its prior Claims). The character of any income and the character and ability to use any loss would depend on the particular situation of the holder.

The U.S. federal income tax obligations of a holder of GUC Trust Interests are not dependent on the GUC Trust distributing any cash, subject to any portion of the assets of the GUC Trust treated as held by a disputed ownership fund or other separate entity. Thus, a holder of GUC Trust Interests may incur a U.S. federal income tax liability with respect to its allocable share of the GUC Trust's income (if any) even if the GUC Trust does not make a concurrent distribution to the beneficiary. In general, other than in respect of cash treated as owned by a disputed ownership fund or other separate entity (the subsequent distribution of which still relates to a holder's Claim), a distribution of cash by the GUC Trust should not be separately taxable to a beneficiary of the GUC Trust since the beneficiary is already regarded for U.S. federal income tax purposes as owning the underlying assets (and was taxed at the time the cash was earned or received by the GUC Trust).

The GUC Trust will comply with all applicable governmental withholding requirements.

### (d) Tax Reporting for Assets Allocable to Disputed Claims

In accordance with the Plan, the GUC Trustee may elect to treat the assets of the GUC Trust that are allocable to Disputed Claims (including, but not limited to, a disputed claims reserve) as a "disputed ownership fund" or other separate entity governed by Treasury Regulations section 1.468B-9, and all parties (including, without limitation, the Debtors, the Reorganized Debtors, the GUC Trustee and GUC Trust Beneficiaries) will be required to report for tax purposes consistently with such treatment. If a disputed ownership fund or other separate entity election is made, such regarded fund will be subject to tax annually on a separate entity basis on any net income earned with respect to the assets allocable to the disputed ownership fund or other separate entity, including any income or gain recognized upon the disposition of such assets or the deemed distribution of the assets out of the disputed ownership fund or other separate entity to holder(s) of Allowed Claims. The GUC Trust will be responsible for payment from the assets of the disputed ownership fund or other separate entity of any taxes imposed on or with respect to such assets.

All distributions of assets out of a disputed ownership fund or other separate entity to holder(s) of Allowed Claims (which distributions will be net of the expenses, including taxes, relating to the retention or disposition of such assets) will be treated as received by holders in respect of their Claims as if distributed by the Debtors.

(b)        (a) Distributions on New Shares

Subject to the discussion below under the Section entitled "Passive Foreign Investment Company Rules," the gross amount of any distribution on New Shares generally should be taxable to a U.S. holder as ordinary dividend income on the date such distribution is actually or constructively received, but only to the extent that the distribution is paid out of Reorganized SAS AB's current or accumulated earnings and profits (as determined under U.S. federal income tax principles). Distributions in excess of current and accumulated earnings and profits should constitute a return of capital that should be applied against and reduce (but not below zero) the U.S. holder's adjusted tax basis in such holder's New Shares. Any remaining excess should be treated as gain realized on the sale or other disposition of New Shares. The Debtors have not maintained and do not currently expect to maintain calculations of earnings and profits for U.S. federal income tax purposes. As a result, a U.S. holder may need to include the entire amount of any such distribution in income as a dividend.

The amount of any distribution to a U.S. holder on New Shares made in a currency other than U.S. dollars is the U.S. dollar value of the amount distributed translated at the spot rate of exchange on the date such distribution is received by such U.S. holder. Such U.S. holder generally should have a basis in such other currency equal to the U.S. dollar value of such currency on the date of such receipt. Any gain or loss on a conversion or other disposition of such other currency by such U.S. holder generally should be treated as ordinary income or loss from sources within the United States.

A distribution on New Shares that is treated as a dividend generally should constitute income from sources outside the United States and generally should be categorized for U.S. foreign tax credit purposes as "passive category income" or, in the case of some U.S. holders, as "general category income". Such dividend will not be eligible for the "dividends received" deduction generally allowed to corporate shareholders with respect to dividends received from U.S. corporations. A U.S. holder may be eligible to elect to claim a U.S. foreign tax credit against its U.S. federal income tax liability, subject to applicable limitations and holding period requirements, for any non-U.S. tax withheld from distributions received in respect of its New Shares. A U.S. holder that does not elect to claim a U.S. foreign tax credit for non-U.S. income tax withheld may instead claim a deduction for such withheld tax, but only for a taxable year in which the U.S. holder elects to do so with respect to all non-U.S. income taxes paid or accrued by such U.S. holder in such taxable year. The rules relating to U.S. foreign tax credits are very complex, and each U.S. holder should consult its own tax advisor regarding the application of such rules.

With respect to non-corporate U.S. holders, dividends should be taxed at the lower applicable long-term capital gains rate (see the Section entitled "Sale, Exchange or Other Disposition of New Shares" below) if the New Shares are readily tradable on an established securities market and certain other requirements are met, including that Reorganized SAS AB is not classified as a passive foreign investment company during the taxable year in which the dividend is paid or the preceding taxable year. U.S. holders should consult their own tax

advisors regarding the potential availability of the lower rate for any dividends paid with respect to New Shares.

<p style="text-align:center">(c) <s>(b)</s> Sale, Exchange, or Other Disposition of New Shares</p>

In general, unless a nonrecognition provision applies to a future disposition, and subject to the discussion below under the Section entitled "Passive Foreign Investment Company Rules," U.S. holders generally should recognize gain or loss for U.S. federal income tax purposes upon the sale, exchange or other disposition of New Shares in an amount equal to the difference between (i) the sum of the cash and the fair market value of any property received from such sale, exchange or other disposition and (ii) the U.S. holder's adjusted tax basis in the New Shares held. Any gain or loss so recognized generally should be capital gain or loss and should be long-term capital gain or loss if such U.S. holder has held such New Shares for more than one year at the time of such sale, exchange or other disposition. Net long-term capital gain of certain non-corporate U.S. holders generally is subject to preferential rates of tax. The deductibility of capital losses is subject to limitations. Such gain or loss generally will be from sources within the United States.

A U.S. holder that receives currency other than U.S. dollars from the sale, exchange or other disposition of New Shares generally should realize an amount equal to the U.S. dollar value of such other currency translated at the spot rate of exchange on the settlement date of such sale, exchange or other disposition if (i) such U.S. holder is a cash basis or electing accrual basis taxpayer and the New Shares are treated as being "traded on an established securities market" or (ii) such settlement date is also the date of such sale, exchange or other disposition. Such U.S. holder generally should have a basis in such other currency equal to the U.S. dollar value of such currency on the settlement date. Any gain or loss on a conversion or other disposition of such currency by such U.S. holder generally should be treated as ordinary income or loss from sources within the United States. Each U.S. holder should consult its own tax advisor regarding the U.S. federal income tax consequences of receiving currency other than U.S. dollars from the sale, exchange or other disposition of New Shares.

<p style="text-align:center">(d) <s>(c)</s> Passive Foreign Investment Company Rules</p>

In general, a corporation organized outside the United States will be treated as a passive foreign investment company ("**PFIC**") in any taxable year in which either (i) at least 75% of its gross income is "passive income" or (ii) on average at least 50% of the value of its assets is attributable to assets that produce passive income or are held for the production of passive income. Passive income for this purpose generally includes, among other things, dividends, interest, royalties, rents, and net gains from commodities transactions and from the sale or exchange of property that gives rise to passive income. The determination of whether a non-U.S. corporation is a PFIC is based upon the composition of such non-U.S. corporation's income and assets (including, among others, its proportionate share of the income and assets of any other corporation in which it owns, directly or indirectly, 25% or more (by value) of the stock or interest in a partnership), and the nature of such non-U.S. corporation's activities. A separate determination must be made after the close of each taxable year as to whether a non-U.S. corporation was a PFIC for that year. Once a non-U.S. corporation qualifies as a PFIC it is, with respect to a shareholder during the time it qualifies as a PFIC, and subject to certain

exceptions, always treated as a PFIC with respect to such shareholder, regardless of whether it satisfied either of the qualification tests in subsequent years.

The Debtors do not expect Reorganized SAS AB to be classified as a PFIC for its taxable year that includes the Effective Date or, to the best of its knowledge, for subsequent taxable years. However, because this determination is made annually at the end of each taxable year and is dependent upon a number of factors, some of which are beyond the Debtors' control, such as the value of their assets (including goodwill and the income and assets of applicable subsidiaries) and the amount and type of its income, there can be no assurance that Reorganized SAS AB will not be a PFIC in any taxable year or that the IRS will agree with the Debtors' conclusion regarding Reorganized SAS AB's PFIC status in any taxable year.

If, contrary to expectation, SAS AB (or, following the effective date, Reorganized SAS AB) were a PFIC for any taxable year during a U.S. holder's holding period for New Shares and such holder does not make a valid QEF Election or Mark-to-Market Election (each as defined below), the U.S. holder would be subject to special tax rules with respect to (i) any gain realized on a sale or other disposition (including a pledge) of its New Shares, and (ii) any "excess distributions" it receives on its New Shares (generally, any distributions in excess of 125% of the average of the annual distributions on New Shares during the preceding three years or the U.S. holder's holding period, whichever is shorter). Generally, under this excess distribution regime:

- the gain or excess distribution will be allocated ratably over the period during which the U.S. holder held SAS AB's securities;

- the amount allocated to the current taxable year will be treated as ordinary income; and

- the amount allocated to prior taxable years will be subject to the highest tax rate in effect for that taxable year and the interest charge generally applicable to underpayments of tax will be imposed on the resulting tax attributable to each such year.

In addition, if Reorganized SAS AB were classified as a PFIC with respect to a U.S. holder, to the extent any of Reorganized SAS AB subsidiaries were also PFICs, the U.S. holder might be deemed to own shares in any such lower-tier PFICs directly or indirectly owned by Reorganized SAS AB in that proportion which the value of the New Shares owned by the holder bears to the value of all of Reorganized SAS AB's outstanding securities, and the holder therefore might be subject to the adverse tax consequences described above with respect to the shares of such lower-tier PFICs deemed owned by the U.S. holder.

Certain elections may be available to mitigate the adverse tax consequences of PFIC status described above. If a U.S. holder were to elect to treat its interest in Reorganized SAS AB as a "qualified electing fund" (the "**QEF Election**") for the first year the holder were treated as holding such interest, then in lieu of the tax consequences described above, the holder would be required to include in income each year a portion of the ordinary earnings and net capital gains of Reorganized SAS AB, even if not distributed to the holder. A QEF Election

must be made by a U.S. holder on an entity-by-entity basis.  However, a U.S. holder may make a QEF Election with respect to its New Shares or shares of any lower-tier PFICs only if the Reorganized SAS AB furnished certain tax information to such holder annually, and there can be no assurance that such information will be provided.

Subject to certain exceptions, a U.S. person who owns an interest in a PFIC generally is required to file an annual report on IRS Form 8621, and the failure to file such report could result in the imposition of penalties on the U.S. person and the extension of the statute of limitations with respect to federal income tax returns filed by the U.S. person.  The rules relating to PFICs are complex and, therefore, U.S. holders are urged to consult their tax advisers regarding the application of the PFIC rules, including the foregoing filing requirements and the advisability of making any available election under the PFIC rules, with respect to their ownership and disposition of New Shares.

<div align="center">3.  4. *Ownership and Disposition of New Convertible Notes*</div>

The Debtors intend to treat the New Convertible Notes as debt for U.S. federal income tax purposes and the discussion below assumes such treatment.  In addition, the Debtors also intend that any New Convertible Notes received in exchange for a DIP Claim to not be treated as a "contingent payment debt instrument" under the applicable Treasury Regulations.  The taxation of contingent payment debt instruments, however, is complex and there can be no assurance that the IRS would not take a contrary position as to the classification of the New Convertible Notes as a "contingent payment debt instrument".  If these rules applied, such rules could require a holder to accrue ordinary income at a higher rate than the stated interest rate and the rate that would otherwise be imputed under the OID rules, and to treat as ordinary income (rather than capital gain) any gain recognized on the taxable disposition of the New Convertible Notes.  Ultimately, whether to treat any New Convertible Notes as a contingent payment debt instrument will be made based on the facts and circumstances on the Effective Date.  All U.S. holders are urged to consult their tax advisors regarding the tax treatment of any New Convertible Notes received as part of the Plan, including with respect to the application of the contingent payment debt rules to any such New Convertible Notes.

<div align="center">(a)  OID and Issue Price</div>

The New Convertible Notes will be considered issued with OID in an amount equal to the excess of the "stated redemption price at maturity" of the New Convertible Notes over its "issue price," if such excess exceeds a de minimis amount.  In general, the stated redemption price at maturity of a debt instrument is the sum of all payments provided by the debt instrument other than payments of "qualified stated interest."  To the extent any portion of the stated interest on the New Convertible Notes is unconditionally required to be paid in cash at a fixed annual rate, such portion of the stated interest would be "qualified stated interest." Generally, payments of qualified stated interest will be includible in a U.S. holder's income in accordance with the holder's regular method of accounting for U.S. federal income tax purposes.  The remaining portion of the stated interest (even if payable in kind and whether or not the issuer has the option of paying such interest in cash) will not be qualified stated interest, and thus should be included in the stated redemption price at maturity.  As a result, such interest should be taken into account in determining the amount of OID with respect to the New

Convertible Notes, and taxed as OID as it accrues rather than in accordance with the U.S. holder's regular method of accounting. Accordingly, a U.S. holder could be treated as receiving interest income in advance of a corresponding receipt of cash. Any OID that a holder includes in income should increase the holder's adjusted tax basis in its interest in the New Convertible Notes. A U.S. Holder generally should not be required to include separately in income cash payments (other than in respect of qualified stated interest) received on its interest in the New Convertible Notes; instead, such payments should reduce the holder's adjusted tax basis in such interest by the amount of the payment.

The "issue price" of a New Convertible Note will depend on whether the New Convertible Note is traded on an established market or, if not so traded, possibly on whether the respective Claims for which such instrument was exchanged for were considered traded on an established market. A debt will be treated as traded on an established market for U.S. federal income tax purposes only if it is traded on an established market during the 31-day period ending 15 days after the Effective Date. Pursuant to applicable Treasury regulations, an "established market" need not be a formal market. It is sufficient if there is a readily available sales price for an executed purchase or sale of the Claims, or if there is one or more "firm quotes" or "indicative quotes" for such debt, in each case as such terms are defined in applicable Treasury Regulations. If neither the New Convertible Notes nor DIP Claims are considered traded on an established market, the issue price of the New Convertible Notes generally should be its stated principal amount. If the reorganized company determines that the applicable trading market exists, such determination will be binding on a holder unless such holder discloses, on a timely filed U.S. federal income tax return for the taxable year that includes the Effective Date, that such holder's determination is different from the reorganized company's determination, the reasons for such holder's different determination and, if applicable, how such holder determined the fair market value.

The rules regarding the determination of issue price are complex and U.S. holders are urged to consult their own tax advisors regarding the determination of the issue price of any New Convertible Notes received under the Plan.

(b)     Accrual and Amortization of OID

A U.S. holder generally must include any OID in gross income as it accrues over the term of the New Convertible Notes using the "constant yield method" without regard to its regular method of accounting for U.S. federal income tax purposes, and in advance of the receipt of cash payments attributable to that income. The amount of OID includible in income for a taxable year by a U.S. holder generally should equal the sum of the "daily portions" of the total OID on the New Convertible Notes for each day during the taxable year (or portion thereof) on which such U.S. holder held an interest in the New Convertible Notes. Generally, the daily portion of the OID is determined by allocating to each day during an accrual period a ratable portion of the OID on such interest in the New Convertible Notes that is allocable to the accrual period in which such day is included. The amount of OID allocable to each accrual period generally will be an amount equal to the excess of (i) the product of (x) "adjusted issue price" of such interest in the New Convertible Notes at the beginning of such accrual period and (y) its "yield to maturity" over (ii) the aggregate amount of any qualified stated interest payments allocable to the accrual period. The "adjusted issue price" of such interest in the New

Convertible Notes at the beginning of any accrual period will equal the issue price, increased by the total OID accrued for each prior accrual period, less any cash payments made on such interest in the New Convertible Notes on or before the first day of the accrual period (other than qualified stated interest). The "yield to maturity" of such interest in the New Convertible Notes will be computed on the basis of a constant annual interest rate and compounded at the end of each accrual period.

The rules regarding the determination of OID are complex, and the OID rules described above may not apply in all cases. Accordingly, U.S. holders are urged to consult your own tax advisor regarding the application of the OID rules.

<div align="center">(c)     <u>Acquisition and Bond Premium</u></div>

The amount of OID includible in a U.S. holder's gross income with respect to a New Convertible Note should be reduced if the debt is acquired (or deemed to be acquired) at an "acquisition premium" or with "bond premium." A U.S. holder may have an "acquisition premium" or "bond premium" only if an exchange qualifies for Reorganization treatment. Otherwise, a U.S. holder's initial tax basis in the New Convertible Notes will equal the issue price of such U.S. holder's portion of such debt.

A debt instrument is acquired at an "acquisition premium" if the holder's tax basis in the debt is greater than the adjusted issue price of the debt at the time of the acquisition, but is less than or equal to the stated redemption price at maturity of the debt. If a U.S. holder has acquisition premium, the amount of any OID includible in its gross income in any taxable year with respect to the portion of the New Convertible Notes to which such acquisition premium relates will be reduced by an allocable portion of the acquisition premium (generally determined by multiplying the annual OID accrual with respect to such portion of the New Convertible Notes by a fraction, the numerator of which is the amount of the acquisition premium, and the denominator of which is the total OID).

If a U.S. holder has a tax basis in any portion of the New Convertible Notes received that exceeds the stated redemption price at maturity of such debt, that portion of the New Convertible Notes should be treated as having "bond premium" and the U.S. holder should not include any OID attributable to such portion of the New Convertible Notes in income. A U.S. holder may elect to amortize any bond premium over the period from its acquisition of such portion of the New Convertible Notes to the maturity date of such portion of the New Convertible Notes, in which case the U.S. holder should have an ordinary deduction (and a corresponding reduction in tax basis in such portion of the New Convertible Notes for purposes of computing gain or loss) in the amount of such bond premium upon the sale or other disposition of such portion of the New Convertible Notes, including the repayment of principal. If such an election to amortize bond premium is not made, a U.S. holder will receive a tax benefit from the premium only in computing such holder's gain or loss upon the sale or other taxable disposition of the New Convertible Notes, including the repayment of principal.

An election to amortize bond premium will apply to amortizable bond premium on all notes and other bonds the interest on which is includible in the U.S. holder's gross

income and that are held at, or acquired after, the beginning of the U.S. holder's taxable year as to which the election is made. The election may be revoked only with the consent of the IRS.

(d)      Sale, Redemption or Repurchase

Subject to the discussion above with respect to the potential carryover of accrued market discount to a New Convertible Note in the case of Reorganization treatment (see the Section entitled "Character of Gain or Loss," above), U.S. holders generally should recognize capital gain or loss upon the sale, redemption or other taxable disposition of their interest in the New Convertible Notes in an amount equal to the difference between (i) the sum of the cash plus the fair market value of any property received from such disposition (other than amounts attributable to accrued but unpaid stated interest, which will be taxable as ordinary income for U.S. federal income tax purposes to the extent not previously so taxed) and (ii) the U.S. holder's adjusted tax basis in the New Convertible Notes, which, (as discussed above, see the Section entitled "—Acquisition and Bond Premium" above) will be reduced by any amortizable bond premium that such U.S. holder previously deducted with respect to the New Convertible Notes or used to offset qualified stated interest on the New Convertible Notes. Any capital gain or loss generally should be long-term if the U.S. holder's holding period for the New Convertible Notes is more than one year at the time of disposition. A reduced tax rate on long-term capital gain may apply to non-corporate U.S. holders. The deductibility of capital loss is subject to significant limitations. Such gain or loss generally will be from sources within the United States. U.S. holders are urged to consult your own tax advisor regarding the U.S. federal income tax consequences of any sale, redemption or repurchase of their New Convertible Notes.

(e)      Conversion of New Convertible Notes and Constructive Distributions

Upon conversion of the New Convertible Notes, a U.S. holder should not recognize any income, gain or loss upon such conversion, except with respect to any cash received in lieu of a fractional share of stock (which should be treated as if such fractional share had been received and then sold and the sale should be treated as described under the Section entitled "Ownership and Disposition of New Shares" above) and with respect to any stock attributable to accrued interest. A U.S. holder's tax basis in the stock received upon conversion generally will equal such holder's tax basis in the note converted plus any income attributable to accrued interest, reduced by the portion of the tax basis that is allocable to any fractional share, and the U.S. holder's holding period for such stock generally would include the period during which the U.S. holder held the note.

Holders of convertible debt instruments such as the New Convertible Notes may, in certain circumstances that increase a holder's proportionate interest in the Reorganized Debtors' assets or earnings and profits, be deemed to have received constructive distributions where the conversion rate of such instrument is adjusted. Adjustments to the conversion rate made pursuant to a bona fide reasonable adjustment formula that has the effect of preventing the dilution of the interest of the holders of the debt instruments will generally not be considered to result in a constructive distribution of stock. However, certain adjustments, including, without limitation, adjustments in respect of taxable dividends to stockholders, will not qualify as being pursuant to a bona fide reasonable adjustment formula. If such adjustments are made, the

holders of New Convertible Notes should be deemed to have received constructive distributions in amounts based on the value of such holders' increased interests in the Reorganized Debtors' equity resulting from such adjustments, even though they have not received any cash or property as a result of such adjustments, except that it is unclear whether such deemed distributions would be eligible for the reduced tax rate applicable to certain dividends paid to non-corporate holders or the dividend-received deduction applicable to certain dividends paid to corporate holders. Generally, a U.S. holder's tax basis in a note should be increased to the extent any such constructive distribution is treated as a dividend. An increase in the conversion rate for notes converted in connection with a make-whole fundamental change may also be treated as a taxable constructive distribution. In certain circumstances, the failure to make a conversion rate adjustment may result in a deemed distribution to the holders of the New Convertible Notes, if, as a result of such failure, the proportionate interest of the note holders in the Reorganized Debtors' assets or earnings is increased.

U.S. holders are urged to consult their own tax advisors concerning the potential for and tax consequences of receiving constructive distributions, including any potential consequences of such distributions for the tax basis and holding period of their New Shares.

D.    Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Relevant Claims, New Shares and New Convertible Notes

The section applies to you if you are a non-U.S. holder. For purposes of this discussion, a "**non-U.S. holder**" is a beneficial owner (other than a partnership or an entity or arrangement characterized as a partnership for U.S. federal income tax purposes) of Relevant Claims that is not a U.S. holder, including a nonresident alien individual (other than certain former citizens and residents of the United States), a non-U.S. corporation, or a non-U.S. estate or trust. This section generally does not apply to an individual who is present in the United States for 183 days or more in a taxable year.

1.    *In General*

In the case of the delivery of Cash, New Shares or New Convertible Notes as the case may be, in full satisfaction, settlement, discharge and release of a Relevant Claim, a non-U.S. holder of Relevant Claims generally should not be subject to U.S. federal income tax on any capital gain recognized as a result of the exchange, unless (i) the non-U.S. holder is an individual present in the United States for 183 days or more in the taxable year of the disposition and certain other conditions are met, or (ii) the gain is effectively connected with the non-U.S. holder's conduct of a trade or business in the United States (or if required by an applicable tax treaty, is attributable to a permanent establishment maintained by the non-U.S. holder in the United States).

As described above, the GUC Trust is intended to qualify as a "grantor trust" for U.S. federal income tax purposes, to the extent permitted by applicable law, of which the holders of such GUC Trust Interests would be treated as the grantors and owners thereof. With respect to any GUC Trust Beneficiaries that are not U.S. persons, the trustee of the GUC Trust may be required to withhold up to 30% of the income or proceeds (if any) allocable to such persons, depending on the circumstances (including whether the type of income is subject to a

lower treaty rate). ~~Non-U.S. holders receiving GUC Trust Interests should consult their tax advisors concerning the U.S. federal income tax consequences to them of holding GUC Trust Interests.~~

2. *Ownership and Disposition of New Shares by Non-U.S. Holders*

A non-U.S. holder of New Shares or New Convertible Notes will not be subject to U.S. federal income or withholding tax on dividends received or interest paid with respect to the New Shares or New Convertible Notes, unless such income is effectively connected with the conduct by the non-U.S. holder of a trade or business in the United States. A non-U.S. holder of New Shares or New Convertible Notes should not be subject to U.S. federal income or withholding tax on any gain realized on the sale or other taxable disposition of New Shares unless (i) the holder is an individual present in the United States for 183 days or more in the taxable year of the disposition and certain other conditions are met, or (ii) the gain is effectively connected with the holder's conduct of a trade or business in the United States (or if required by an applicable tax treaty, is attributable to a permanent establishment maintained by the non-U.S. holder in the United States).

E.    Information Reporting and Backup Withholding

Distributions or payments made (or treated as made) to a U.S. holder of a Relevant Claim, New Shares or New Convertible Notes may be subject to information reporting to the IRS and U.S. backup withholding.

A U.S. holder may be eligible for an exemption from backup withholding if the U.S. holder furnishes a correct taxpayer identification number and makes any other required certification or is otherwise exempt from backup withholding. U.S. holders who are required to establish their exempt status may be required to provide such certification on IRS Form W-9. U.S. holders should consult their tax advisors regarding the application of the U.S. information reporting and backup withholding rules.

Backup withholding is not an additional tax. Amounts withheld as backup withholding may be credited against a U.S. holder's U.S. federal income tax liability, and such U.S. holder may obtain a refund of any excess amounts withheld under the backup withholding rules by timely filing an appropriate claim for refund with the IRS and furnishing any required information.

In addition, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. U.S. holders are urged to consult their own tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the U.S. holders' tax returns.

U.S. holders should also be aware that additional reporting requirements may apply with respect to the holding of certain non-U.S. financial assets (including stock of

non-U.S. issuers which is not held in an account maintained by certain financial institutions). U.S. holders are encouraged to consult their own tax advisors regarding the application of the information reporting rules to the New Shares and the application of these additional reporting requirements to their particular situations.

**The U.S. federal income tax consequences of the Plan are complex. The foregoing summary does not discuss all aspects of U.S. federal income taxation that may be relevant to a particular holder in light of such holder's circumstances and income tax situation. All holders of Claims and interests should consult with their tax advisors as to the particular tax consequences to them of the transactions contemplated by the Plan, including the applicability and effect of any state, local, or foreign tax laws, and of any change in applicable tax laws.**

## IX.
## CERTAIN IRISH TAX CONSEQUENCES OF PLAN

A.  <u>Introduction</u>

The comments below are based on current Irish tax legislation and the published practices of the Revenue Commissioners of Ireland (the "**Irish Revenue**") at the date of this document, both of which may be subject to change, possibly with retrospective effect.

Specifically, the Irish Government published Finance (No.2) Bill 2023 on 19 October 2023 which was signed into law as Finance (No.2) Act 2023 on 18 December 2023 and introduces legislation to implement in Ireland the OECD BEPS Pillar 2 measures. The rules relating to OECD BEPS Pillar 2 seek to ensure a global minimum level of taxation for multinational groups, such that the effective tax rate due on the income of an enterprise in a multinational group in a given jurisdiction is at least 15%. These rules are complex and fundamentally change the international and Irish tax landscape for entities in scope and therefore should be carefully considered by all Irish corporate taxpayers in a multinational group, their creditors and their investors.

The comments below are of a general nature and are not intended to be an exhaustive summary of all Irish tax consequences of the Plan. They set out certain material Irish tax consequences of the Plan for the Irish Debtors (as defined below) and for holders of Claims, <u>or</u> New Shares ~~or GUC Trust Interests~~, as the case may be.

The comments below do not purport to constitute legal or tax advice.

~~**As the terms of the GUC Trust Agreement are not yet agreed, the material Irish tax consequences for holders of GUC Trust Interests have been assessed based on certain assumptions in relation to the effect of the GUC Trust Agreement, as set out below. To the extent that any such facts or assumptions related to the terms and administration of the GUC Trust change prior to the Effective Date, a supplemental disclosure is expected to be filed containing an updated discussion of the certain tax consequences for holders of GUC Trust Interests.**~~

**The material tax consequences of the implementation of the Plan to holders of Allowed General Unsecured Claims depends, in pertinent part, on the types of GUC Entities used and GUC Interests issued under the Plan. As the types of GUC Entities and GUC Interests may take one or more forms as will be set forth in the Plan Supplement and, therefore, the material Irish tax consequences to the holders of Allowed General Unsecured Claims in respect of any such GUC Entities and GUC Interests cannot be determined at this time and are not discussed further herein. A supplemental tax disclosure will be filed containing a discussion of the material Irish tax consequences associated with the GUC Entities utilized and the GUC Interests to be distributed all such holders of Allowed General Unsecured Claims pursuant to the Plan.**

Any holders of Claims, or New Shares ~~or GUC Trust Interests~~ who are resident in Ireland or otherwise subject to Irish tax (see below) should consult their own tax advisors regarding the tax consequences of the Plan in Ireland (and elsewhere, if they are subject to tax in a jurisdiction outside Ireland).

B.  Certain Irish Tax Consequences for Debtors

Certain of the Debtors, including the Consortium, Reorganized SAS AB, the Consortium Constituents, and SANA are not resident in Ireland for the purposes of Irish tax by virtue of being incorporated and managed and controlled outside Ireland, nor do they carry on a trade in Ireland through a branch or agency. On this basis, the Plan is not expected to have any material Irish tax consequences for these Debtors.

Certain of the Debtors, including Gorm Asset Management Limited, Gorm Engine Management Limited, Gorm Dark Blue Limited, Gorm Deep Blue Limited, Gorm Light Blue Limited, Gorm Ocean Blue Limited, Gorm Sky Blue Limited and Gorm Warm Red Limited (each an "**Irish Debtor**" and together, the "**Irish Debtors**") are resident in Ireland for the purposes of Irish tax by virtue of being incorporated and managed and controlled in Ireland. Accordingly, the Debtors have set out below the material Irish tax consequences of the Plan for the Irish Debtors.

For Irish tax purposes, each of the Irish Debtors is carrying on a trade in Ireland. To the extent that a Claim is made with respect to debts incurred by an Irish Debtor in the course of the carrying on of its trade, any forgiveness, write-off or cancellation of that debt, where that debt is revenue in nature and when incurred was in respect of a tax-deductible expense (e.g. operating lease rentals payable or certain interest payments, if applicable), should generally give rise to taxable income of the trade for the Irish Debtor in the taxable period in which the debt is forgiven, written off or cancelled. However, in the usual way, any tax losses incurred in the same trade of such Irish Debtor and carried forward from prior periods or any tax losses incurred in the current taxable period in the trade of such Irish Debtor or certain other tax losses arising for the Irish Debtor in the current taxable period that are revenue in nature (i.e. tax losses other than capital losses), may be utilized to offset that taxable income of that Irish Debtor.

To the extent that a Claim against an Irish Debtor is capital in nature (e.g., the principal outstanding on a loan or the capital subscribed for shares) and is forgiven, written off

or cancelled, taxable income should generally not arise for the Irish Debtor. However, with respect to calculating any capital gain or loss on the disposal of an asset (if applicable), if the acquisition or enhancement expenditure in relation to such asset was funded in whole or in part by debt that has been (in whole or in part) forgiven, written off or cancelled, then the cost of the asset for capital gains tax purposes should be restricted by the amount of the debt that has been forgiven, written off or cancelled, as the case may be.

To the extent that a Claim against an Irish Debtor is settled in money (e.g., cash) or money's-worth (e.g., the issue of New Shares ~~or distribution of GUC Trust Interests~~) by or on behalf of the Irish Debtor, the debt should not be regarded as forgiven, written off or cancelled.

To the extent that a Claim against an Irish Debtor is settled in money or money's worth by Reorganized SAS AB, whether as guarantor or otherwise, (the "**Reorganized SAS AB-settled Claim**"), Reorganized SAS AB may be regarded as having made a capital contribution to the relevant Irish Debtor in an amount equal to the Reorganized SAS AB-settled Claim. This is unless an amount equal to the Reorganized SAS AB-settled Claim is recognized as owing by such Irish Debtor to Reorganized SAS AB in exchange for the settlement of the Reorganized SAS AB-settled Claim.

Specifically, to the extent that a Reorganized SAS AB-settled Claim against an Irish Debtor is settled by the issuance of New Shares by Reorganized SAS AB ~~or the distribution of GUC Trust Interests~~ to the creditor of the Irish Debtor, Reorganized SAS AB may be regarded as having made a capital contribution in specie to the relevant Irish Debtor in an amount equal to the market value of such New Shares ~~or GUC Trust Interests~~. This is unless such New Shares ~~or GUC Trust Interests~~ are provided by Reorganized SAS AB to the creditor of the Irish Debtor for market value consideration in money or money's worth payable by the Irish Debtor to Reorganized SAS AB.

In relation to any amount owing by an Irish Debtor to Reorganized SAS AB on account of a Reorganized SAS AB-settled Claim, if it were to be forgiven, written off or cancelled, this would have the same Irish tax consequences for such Irish Debtor as if the Reorganized SAS AB-settled Claim had been forgiven, written off or cancelled.

C.     Certain Irish Tax Consequences for Holders of Claims

The Irish tax treatment of holders of Claims or prospective holders of the New Shares ~~or GUC Trust Interests~~, as the case may be, depends on such holder's individual circumstances and may be subject to change in the future.

The comments below relate only to the position of holders who are:

(i)     the absolute beneficial owners of their Claims, or New Shares ~~or GUC Trust Interests~~, as the case may be, and any interest, dividends or other payment or distributions payable thereon (if applicable); and

(ii)    in the case of New Shares ~~or GUC Trust Interests, as the case may be,~~ they hold them as a capital investment.

Certain classes of holders (such as charities, trustees, brokers, dealers, market makers, depositaries, clearance services, certain professional investors, persons connected with the Debtors or persons who acquire or are deemed to acquire the New Shares ~~or GUC Trust Interests~~ by reason of an office or employment) may be subject to special rules and the comments below do not apply to such holders.

**Any holders of Claims, or New Shares ~~or GUC Trust Interests~~ who are resident in Ireland or otherwise subject to Irish tax (see below) should consult their own tax advisors regarding the tax consequences of the Plan in Ireland (and elsewhere, if they are subject to tax in a jurisdiction outside Ireland).**

~~**As the terms of the GUC Trust Agreement are not yet agreed, the material Irish tax consequences for holders of GUC Trust Interests have been assessed based on certain assumptions in relation to the effect of the GUC Trust Agreement, as set out below. To the extent that any such facts or assumptions related to the terms and administration of the GUC Trust change prior to the Effective Date, a supplemental disclosure is expected to be filed containing an updated discussion of the certain tax consequences for holders of GUC Trust Interests.**~~

1.    *Irish Withholding Tax*

(a)    <u>Claims</u>

Whether a payment of an amount due is made on foot of a Claim (or not) is not relevant in determining whether or not a payer has an obligation to make a deduction from that payment on account of the obligation to withhold Irish tax. Therefore, the withholding tax position with respect to payments made by (or on behalf of) Irish Debtors to holders of Claims in settlement of the debt to which the Claim relates should not change solely on account of the Plan.

(b)    <u>New Shares</u>

Irish withholding tax applies to certain payments including payments of distributions, including dividends, made by companies that are resident in Ireland for the purposes of Irish tax.

Where applicable, Irish withholding tax applies at a prescribed rate of 25% to payments of distributions.

On the basis that Reorganized SAS AB is not resident in Ireland for the purposes of Irish tax then to the extent that dividends arise on the New Shares, such payments should not be within the scope of Irish dividend withholding tax.

Separately, for as long as the New Shares do not derive the greater part of their value from Irish land, buildings, mineral or exploration rights or other similar assets, a holder

should not be obliged to deduct any amount on account of Irish tax from a payment made or deemed to be made by that holder in connection with the purchase of New Shares.

(c) GUC Trust Interests

For the purpose of the Irish tax analysis the Debtors have assumed, and it is expected that: (i) the GUC Trust will be established in the U.S.; (ii) the GUC Trust Agreement will be governed by U.S. law; (iii) the property of the GUC Trust (the "**GUC Trust Property**") at the time the GUC Trust is established will be cash; (iv) all the Trustees of the GUC Trust Agreement will: (a) neither be resident nor ordinarily resident in Ireland for tax purposes, (b) be professional trustees acting in the ordinary course of business, and (c) not be operating in Ireland through a branch or agency with which its role as Trustee of the GUC Trust is connected; (v) the administration of the GUC Trust is carried on outside of Ireland; and (vi) the settlors of the GUC Trust are neither resident nor ordinarily resident in Ireland for tax purposes.

Accordingly, it is expected that any distributions of cash made out of the GUC Trust should not be regarded as having an Irish source and should not be within the scope of Irish withholding tax

2. *Irish Encashment Tax*

(a) Claims

Irish encashment tax should not be relevant to the payment of cash or the issue of New Shares or distribution of GUC Trust Interests in settlement of Claims.

(b) New Shares

Payments on any New Shares paid by a paying agent in Ireland or collected or realized by an agent in Ireland acting on behalf of the beneficial owner of New Shares may be subject to Irish encashment tax at a prescribed rate of 25%. This is unless: (i) it is proven, on a claim made in the required manner to the Irish Revenue, that the beneficial owner of the New Shares entitled to the distribution is not resident in Ireland for the purposes of Irish tax; and (ii) such distribution is not deemed, under the provisions of Irish tax legislation, to be the income of another person that is resident in Ireland.

Separately, an exemption will apply where the payment is made to a company, where that company is beneficially entitled to that income and is or will be, within the charge to Irish corporation tax in respect of that income.

(c) GUC Trust Interests

Distributions made under the GUC Trust to holders of GUC Trust Interests paid by a paying agent in Ireland or collected or realized by an agent in Ireland may be subject to Irish encashment tax at a prescribed rate of 25%. This is unless: (i) it is proven, on a claim made in the required manner to the Irish Revenue, that the beneficial owner of the New Shares entitled to the distribution is not resident in Ireland for the purposes of Irish tax; and (ii) such

distribution is not deemed, under the provisions of Irish tax legislation, to be the income of another person that is resident in Ireland.

Separately, an exemption will apply where the payment is made to a company, where that company is beneficially entitled to that income and is or will be, within the charge to Irish corporation tax in respect of that income

3. *Irish Income Tax and Corporation Tax*

A person (other than a company) that is resident in Ireland for the purposes of Irish tax is liable to Irish income tax on their worldwide income. A person (other than a company) who is neither resident nor ordinarily resident in Ireland for the purposes of Irish tax is only liable to Irish income tax on their Irish source income. A natural person could be subject to (i) Irish income tax up to the higher rate of income tax (currently 40%), (ii) the universal social charge (currently up to 11%), and (iii) Pay Related Social Insurance ("**PRSI**"), if applicable, at a rate up to 4% (4.1% from 1 October 2024), in each case, on taxable income exceeding a certain threshold, the level of which depends on their individual circumstances.

A company that is resident in Ireland for the purposes of Irish tax is subject to Irish corporation tax on its worldwide profits wherever they arise. A company's profits comprise its income and gains. A company that is not resident in Ireland for the purposes of Irish tax but is carrying on a trade in Ireland through a branch or agency (an "**Irish Branch**") is subject to Irish corporation tax on the profits attributable to that Irish Branch. In general, Irish corporation tax applies (i) at a rate of 12.5% on the profits of a trade carried on in Ireland, and (ii) at a rate of 25% on profits other than the profits of a trade carried on in Ireland.

A company that: (i) is not resident in Ireland for the purposes of Irish tax; and (ii) is not carrying on a trade in Ireland through an Irish Branch, is liable to Irish income tax on its Irish source income only.

Where applicable, a company is liable to Irish income tax at the standard rate of income tax (currently 20%).

All persons are under a statutory obligation to account for Irish tax on a self-assessment basis and there is no requirement for the Irish Revenue to issue or raise an assessment. Credit is available for any Irish tax withheld from income on account of the related tax liability.

(a)    Claims

Where a Claim is made with respect to a debt and that debt is comprised of income or capital as the case may be, any forgiveness, write-off or cancellation of that debt should reduce the amount of income or capital, as the case may be, received for Irish income tax or Irish corporation tax purposes, as applicable.

Where a payment in money is provided in settlement of a debt, that amount of money should be taken into account in determining the amount of that debt that has been settled

and therefore the amount of the debt that has not been settled and has instead been forgiven, written-off or cancelled for Irish tax purposes (if applicable).

Where New Shares ~~or GUC Trust Interests~~ are issued in settlement of a debt, the market value of those New Shares ~~or GUC Trust Interests~~ should be taken into account in determining the amount of that debt that has been settled and therefore the amount of the debt that has not been settled and has instead been forgiven, written-off or cancelled for Irish tax purposes (if applicable).

(b)     New Shares

(i)     *Non-Irish Holders*

On the basis that Reorganized SAS AB: (i) is not resident in Ireland for the purposes of Irish tax; and (ii) the New Shares are not held in Ireland through a depository or otherwise located in Ireland, then to the extent that payments of dividends arise on the New Shares, such dividend payments should not be regarded as Irish source income.

Accordingly, pursuant to general Irish tax rules, such dividends should not be within the scope of Irish income tax (or the universal social charge if received by an individual), for a holder of New Shares or PRSI that: (i) is not resident in Ireland for the purposes of Irish tax; and (ii) does not carry on business in Ireland through an Irish Branch of such holder to which the New Shares are attributable, (a "**Non-Irish Holder**").

(ii)     *Irish Holders*

A holder of New Shares that: (i) is resident in Ireland for the purposes of Irish tax; or (ii) carries on business in Ireland through an Irish Branch of such holder to which the New Shares are attributable, (an "**Irish Holder**"), should be liable to Irish tax on dividends on New Shares, as set out below.

An Irish Holder that is a natural person should generally be liable to (i) Irish income tax at a rate of income tax up to 40%, (ii) universal social charge at a rate up to 11%, and (iii) PRSI, if applicable, at a rate up to 4% (4.1% from 1 October 2024), in each case, on taxable income exceeding a certain threshold, the level of which depends on their individual circumstances. For this purpose, dividends on New Shares should be taxable income for such Irish holders.

An Irish holder that is a company that: (i) is holding the New Shares, otherwise than in the course of a securities dealing trade; (ii) does not own, directly or indirectly, either alone or together with a person who is connected with them for Irish tax purposes, more than 5% of the share capital of Reorganized SAS AB; and (iii) does not hold more than 5% of the voting rights in Reorganized SAS AB, may be subject to Irish corporation tax on distributions at a rate of 12.5% on the basis that Reorganized SAS AB is resident in Sweden for the purposes of Swedish tax.

In addition, credit for foreign tax suffered (if applicable) may be available to reduce the Irish corporation tax attributable to the income on which that foreign tax has been suffered.

(c) GUC Trust Interests

(i) *General*

In addition to the assumptions set out above in relation to the GUC Trust and ancillary matters, it is expected that the effect of the GUC Trust Agreement under its governing law will be such that: (i) the GUC Trustee will not have any discretion in relation to the distribution of the GUC Trust Property to holders of GUC Trust Interests; (ii) the holders of GUC Trust Interests will not be entitled absolutely to any of the GUC Trust Property until such time as they become entitled absolutely to the GUC Trust Interests; (iii) the holders of GUC Trust Interests will only have an interest in the residue of the GUC Trust Property after settlement of certain contingent liabilities to be set out in the GUC Trust Agreement. Specifically, at the time they become holders of GUC Trust Interests, there is no certainty that there will be any GUC Trust Property to which a holder of the GUC Trust Interests will become entitled absolutely; (iv) even if there is such a residue, the holders of GUC Trust Interests will not become entitled absolutely to their pro rata share of the residue until such time as is prescribed in the GUC Trust Agreement, shortly after which time it is expected that such pro rata share is to be distributed to holders of GUC Trust Interests; and (v) the GUC Trust Property will at all times be cash held at a bank account outside Ireland.

(ii) *Non-Irish Holders*

On the basis of the assumptions set out herein in relation to the GUC Trust, distributions of cash from the GUC Trust should not be considered Irish source income.

Accordingly, pursuant to general Irish tax rules, such distributions should not be within the scope of Irish income tax (or the universal social charge or PRSI if received by an individual), for a holder of GUC Trust Interests that: (i) is not resident in Ireland for the purposes of Irish tax; and (ii) does not carry on business in Ireland through an Irish Branch of such holder to which the GUC Trust Interests are attributable, (also, a "**Non-Irish Holder**").

(iii) *Irish Holders*

A holder of GUC Trust Interests that: (i) is resident in Ireland for the purposes of Irish tax; or (ii) carries on business in Ireland through an Irish Branch of such holder to which the GUC Trust Interests are attributable, (also, an "**Irish Holder**"), should be liable to Irish tax on income from the GUC Trust to which it is entitled absolutely.

An Irish Holder that is a natural person should generally be liable to (i) Irish income tax at a rate of income tax up to 40%, (ii) universal social charge at a rate up to 11%, and (iii) PRSI, if applicable, at a rate up to 4% (4.1% from 1 October 2024), in each case, on taxable income exceeding a certain threshold, the level of which depends on their individual

circulumstances. For this purpose, income to which the holder of GUC Trust Interests is entitled absolutely, should be taxable income for such Irish Holder.

An Irish Holder that is a company should generally be liable to Irish corporation tax at a rate of 12.5% where the income from the GUC Trust to which it is entitled absolutely is earned in the course of carrying on its trade in Ireland, or otherwise at a rate of 25%.

In addition, credit for foreign tax suffered (if applicable) may be available to reduce the Irish corporation tax attributable to the income on which that foreign tax has been suffered

4. *Irish Capital Gains Tax*

(a) Claims

(i) *Non-Irish Holders*

Provided a Claim (or debt in relation to a Claim) that is a capital asset is not: (i) an interest in Irish land (*e.g.* a loan secured by way of mortgage over Irish property); or (ii) an unlisted security that derives the greater part of their value from certain Irish land or mineral rights, then a Non-Irish Holder should not be chargeable to Irish capital gains tax on any gain arising to that holder on a disposal of such Claim (or debt in relation to such Claim). Similarly, of particular relevance to the Plan, any loss on a disposal of such Claim (or debt in relation to such Claim) which would include a loss on settlement of the Claim (or settlement of the debt in relation to such Claim) should not give rise to an allowable loss for Irish capital gains tax purposes for that Non-Irish Holder.

(ii) *Irish Holders*

In relation to an Irish Holder, if the Claim (or debt in relation to a Claim) is a capital asset, the Claim (or debt in relation to a Claim) may be regarded as a chargeable asset for capital gains tax purposes whereby any capital loss arising should, subject to certain conditions, be an allowable loss for capital gains tax purposes that is: (i) available to offset capital gains arising for such Irish Holder in the same period; or (ii) to carry forward against capital gains arising to such Irish Holder in future periods.

(b)     New Shares

(i)      *Non-Irish Holders*

Provided that the New Shares do not derive the greater part of their value from certain Irish land or mineral rights, a Non-Irish Holder should not be chargeable to Irish capital gains tax on any gain arising to that Non-Irish Holder on a disposal of the New Shares.

(ii)     *Irish Holders*

An Irish Holder that is a: (i) natural person should be subject to Irish capital gains tax; and (ii) company should be subject to Irish corporation tax on chargeable gains, in each case, on any gain arising on a disposal of New Shares a rate of 33%.

~~(c) GUC Trust Interests~~

~~(i) *Non-Irish Holders*~~

~~Provided that the GUC Trust Interests are not considered for Irish tax purposes to be securities that derive the greater part of their value from certain Irish land or mineral rights, a Non-Irish Holder should not be chargeable to Irish capital gains tax on any gain arising to that Non-Irish Holder on a disposal or deemed disposal of the GUC Trust Interests, if applicable~~

~~(ii) *Irish Holders*~~

~~An Irish Holder that is a: (i) natural person should be subject to Irish capital gains tax; and (ii) company should be subject to Irish corporation tax on chargeable gains, in each case, on any gain arising on a disposal or deemed disposal of GUC Trust Interests, at a rate of 33%.~~

5.     *Irish Capital Acquisitions Tax*

If the New Shares are comprised in a gift or inheritance (i) taken from a disponer that is resident or ordinarily resident in Ireland for tax purposes at the date of disposition; or (ii) if the beneficiary or recipient is resident or ordinarily resident in Ireland for tax purposes at the date of disposition; or (iii) if the New Shares are regarded as property situated in Ireland (that is, in the case of bearer instruments, if physically located in Ireland or, in the case of registered instruments, if the principal proprietary register is maintained in Ireland), the beneficiary or recipient may be liable to Irish capital acquisitions tax.

For the purposes of Irish capital acquisitions tax, a non-domiciled person shall not be treated as resident or ordinarily resident in Ireland except where that person has been resident in Ireland for tax purposes for five consecutive years of assessment immediately preceding the year of assessment in which the date of the gift or inheritance falls. Irish capital acquisition tax, where applicable, applies at a rate of 33% above certain prescribed thresholds, the quantum of which depends on the relationship between disponer and disponer's successor. This analysis would equally apply to a Claim ~~or a GUC Trust Interest~~ if it is the case that a

Claim ~~or a GUC Trust Interest~~ is, on its terms, capable of being comprised in a gift or inheritance.

### 6. *Irish Stamp Duty*

No Irish stamp duty (i) should arise on settlement of a Claim for cash, or (ii) is payable on the issue of ~~(a)~~ the New Shares~~, or (b) the GUC Trust Interests~~.

Irish stamp duty arises on any instrument (including certain deemed instruments) that gives effect to a conveyance or transfer of stocks or marketable securities (which would include the New Shares) where the instrument is executed in Ireland or, wherever executed, where the instrument relates to Irish property or any matter done, or to be done in Ireland, unless otherwise exempted.

An exemption from stamp duty may apply so that no Irish stamp duty is chargeable on a written transfer of the New Shares, however, this would need to be examined at the date of transfer.

Where an exemption does not apply, the instrument of transfer is liable to stamp duty at the rate of 1% in the case of a transfer of stock or marketable securities or a rate of 7.5% where the transfer relates to an interest other than stock or marketable securities of the consideration paid in respect of the transfer (or if greater, the market value thereof) which must be paid in euro by the transferee (assuming an arm's-length transfer) within 30 days of the date on which the transfer instrument is executed, after which interest and penalties will apply.

**THE IRISH TAX CONSIDERATIONS RELATING TO THE PLAN ARE COMPLEX AND NOT FREE FROM DOUBT. THE FOREGOING COMMENTS DO NOT ADDRESS ALL ASPECTS OF IRISH TAX THAT MAY BE RELEVANT TO A PARTICULAR HOLDER. ALL HOLDERS OF CLAIMS, <u>OR</u> NEW SHARES ~~OR GUC TRUST INTERESTS~~ SHOULD CONSULT WITH THEIR OWN TAX ADVISORS AS TO THE TAX CONSEQUENCES OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY CHANGE IN IRISH TAX LAW OR THE PUBLISHED PRACTICE OF THE IRISH REVENUE.**

## X.
## CERTAIN SWEDISH TAX CONSEQUENCES OF PLAN

### A. Introduction

The following is a general description of certain Swedish tax considerations of the Plan for the Swedish Debtors (as defined below), holders of Claims, and holders of Existing Equity Interests in relation to the Plan. Further, the following does not purport to be a complete analysis of all tax considerations in Sweden that may be relevant for the Swedish Debtors, holders of Claims, and holders of Existing Equity Interests. The tax treatment of each individual party depends on the party's particular circumstances and the tax laws in the country where the party is resident for tax purposes. Each party should therefore consult its own tax adviser with regard to the specific tax consequences that may arise in the individual case. This summary is based upon the laws and regulations in effect as of the date of this Disclosure

Statement and does not consider changes in laws or regulations effective, sometimes with retroactive effect, after such date.

Unless otherwise stated, the description in relation to Swedish resident parties includes individuals and limited liability companies (Sw. *aktiebolag*) tax resident in Sweden and limited liability companies not tax resident in Sweden but that conduct business operations through a permanent establishment in Sweden to which the claims/shareholding is attributable. Correspondingly, unless otherwise stated, the description in relation to non-Swedish resident parties includes individuals and entities not tax resident in Sweden and that do not conduct business operations through a permanent establishment in Sweden to which the claims/shareholding/loans are attributable. The summary does not cover (i) instruments held as current assets in business operations (Sw. *lagertillgångar*), (ii) instruments held by limited partnerships or partnerships, (iii) the specific rules that could be applicable to holdings in companies that are or have previously been closely held companies or instruments acquired on the basis of such holdings, (iv) instruments that are held in an investment savings account (Sw. *investeringssparkonto*) or endowment insurance (Sw. *kapitalförsäkring*) and that are subject to special rules on annual yield taxation, or (v) special rules that apply to certain categories of taxpayers, for example, investment companies and insurance companies.

**The material tax consequences of the implementation of the Plan to the Debtors and holders of Allowed General Unsecured Claims depends, in pertinent part, on the types of GUC Entities used and GUC Interests issued under the Plan. As the types of GUC Entities and GUC Interests may take one or more forms as will be set forth in the Plan Supplement and, therefore, the material Swedish tax consequences to the Debtors and holders of Allowed General Unsecured Claims cannot be determined at this time and are not discussed further herein. A supplemental tax disclosure will be filed containing a discussion of the material Swedish tax consequences associated with the GUC Entities utilized and the GUC Interests to be distributed to all such holders of Allowed General Unsecured Claims pursuant to the Plan.**

**The following summary of certain Swedish tax consequences is for information purposes only and is not a substitute for careful tax advice based on the individual circumstances pertaining to the Swedish Debtors, a holder of Claims, or a holder of Existing Equity Interests, respectively. All parties are urged to consult their own tax advisors regarding Swedish tax consequences of the Plan.**

B.     Swedish Debtors

The below concerns Swedish tax considerations in relation to SAS AB and SAS Sverige AB (the "**Swedish Debtors**").

1.     *Tax considerations in relation to share structure*

(a)     Redemption of Shares in SAS AB

A redemption of the Existing Equity Interests in SAS AB without consideration should not result in any Swedish tax consequences for SAS AB.

(b)     Change of Control Situations

To the extent that any transaction (e.g. issue or redemption of New Shares, New Convertible Notes, conversion of Claims to New Shares or other instruments etc.) results in changes of the ownership in a way which entails a change of control in SAS AB, tax losses carried forward may be forfeited.  Tax losses carried forward in a company are forfeited in a change of control situation to the extent the tax losses carried forward exceed twice the purchase price paid for acquiring control of the company.

A change of control occurs if another company acquires the decisive influence of the company with tax losses carried forward.  This is *e.g.* the case where a company acquires or obtains control over more than 50% of the votes in the company, obtains the power to appoint or dismiss more than half of the board members, or otherwise obtains the right to conduct the decisive influence over the company under a shareholder agreement or a provision in the articles of association.  A change of control also occurs if a number of individuals each acquires shares representing at least 5% of the votes in the company and together acquire shares representing more than 50% of the total votes in the company (shares acquired by companies controlled by such individuals and by closely related persons shall be considered as acquired by the individual in this assessment).

2.     *Tax considerations in relation to Claims (including DIP Claims)*

(a)     Interest Payments

Any amounts paid by the Swedish Debtors which are considered to be interest for Swedish tax purposes are generally deductible for the Swedish Debtors in accordance with the overall interest deduction limitation rule (the EBITDA-rule), provided that no specific restriction apply.  Specific restrictions apply e.g. in relation to interest on certain types of instruments, loans between affiliated companies and in hybrid-mismatch situations.

In accordance with the EBITDA-rule, net interest expenses (i.e. the difference between interest income and interest expenses) on all loans may be deducted up to a maximum of 30% of the borrower's tax EBITDA, which corresponds to the tax result before interest, tax, depreciation and appreciation in accordance with a specific calculation.  As an alternative, a safe harbor rule also exists under which net interest expenses up to SEK ~~5 million~~5,000,000 ($489,817) are deductible (however, being calculated combining the net interest expenses of all associated companies).  Non-deductible negative net interest expenses can be carried forward for six years and are lost in the event of a change of control, please refer to Section X.B.1(b).  However, if the safe harbor rule is applied, it is not possible to carry forward negative net interest expenses.

There is generally an obligation for a Swedish payor to withhold Swedish preliminary tax on interest paid to a Swedish individual (or an estate of a deceased individual).  SAS AB should not be obliged to withhold any Swedish preliminary tax or Swedish withholding tax on interest paid to a non-Swedish resident DIP Lender.

(b) Repayment of Debt by Way of Cash Payments and/or Issuance of New Shares to Holders of Claims

In general, there may be an obligation for a Swedish payor to withhold Swedish preliminary income tax or Swedish withholding tax on certain distributions. However, there should be no such obligation for the Swedish Debtors in relation to any repayment of debt by way of cash payments and/or issuance of New Shares. Note that the DIP Claims may potentially be converted to New Shares or New Convertible Notes instead of being repaid, please refer to Section X.B.2(c).

(c) Potential Conversion of DIP Claims to New Shares or New Convertible Notes

A potential conversion of the DIP Lenders' DIP Claims to New Shares or New Convertible Notes should not be taxable for SAS AB, but it will ultimately depend on the exact terms of the conversion (e.g. if it involves any debt cancellation, the considerations set out in Section X.B.2(d) apply in relation to the debt cancellation).

(d) Debt Cancellation/Redemption

The starting point is that a cancellation of debt may entail that the Swedish Debtors have to recognize a taxable income corresponding to the cancellation. However, provided that the Swedish Debtors are considered either insolvent or that the debt cancellation occurs within a reorganization plan within a Swedish Reorganization, the debt cancellation income should not be taxable, but will reduce any tax losses carried forward with a corresponding amount.

If the Swedish Debtors would not be considered insolvent or the cancellation would not occur within a Swedish Reorganization, the debt cancellation income would be taxable for the Swedish Debtors, but can be off-set against any tax losses carried forward or current year tax losses.

If some of the Claims against the Swedish Debtors would not be classified as debt for Swedish income tax purposes but as equity, a cancellation/redemption of such Claims should not entail any debt cancellation income. A cancellation/redemption of such instruments should not result in any taxable income for the Swedish Debtors or affect tax losses carried forward.

3.    *Tax Considerations for New Convertible Notes*

SAS AB will issue New Convertible Notes (i.e. debt with an option for the holder to convert the debt into shares) to the Investors (non-Swedish institutional investors) and, potentially, in respect of certain DIP Lenders' DIP Claims.

(a) Interest Payments

Please refer to Section X.B.2(a).

(b)    Repayment of Principal Amounts

There should be no obligation for SAS AB to withhold any Swedish preliminary tax or Swedish withholding tax on any repayment of the New Convertible Notes (please note that the New Convertible Notes may be converted to New Shares instead of repaid, please refer to Section X.B.3(c)).

(c)    Conversion of New Convertible Notes to New Shares

A conversion of the New Convertible Notes to New Shares in SAS AB should not be taxable for SAS AB.  In the event that the conversion of the New Convertible Notes would result in a change of control in SAS AB, tax losses carried forward may be forfeited. Please refer to Section X.B.1(b) for further information on change of control situations.

C.    Holders of Claims

1.    *Swedish Resident Holders of Claims*

(a)    Interest payments

Payments of any amount that is considered to be interest for Swedish tax purposes to individuals and limited liability companies are generally taxable.  Swedish preliminary tax is normally withheld on payments of interest to an individual (or an estate of a deceased individual).

(b)    Repayment of Debt by Way of Cash Payments and/or Issuance of New Shares to Holders of Claims

Generally, for individuals (and estates of deceased individuals) and limited liability companies, all capital income under the Claims will be taxable.  However, a repayment of principal is not subject to Swedish income tax and there is no withholding tax on repayments of principal.

In relation to a capital loss on the Claims, please refer to Section X.C.1(c) below.

If repayment is made by way of issuance of shares, the market value of the shares must be established to determine if a capital gain or a capital loss under the Claims arise.

In relation to repayment by way of GUC Trust Interests, please refer to Section X.D.

(c)    Debt Cancellation

A definitive cancellation (i.e. a true, unconditional and binding cancellation, such as a Swedish Reorganization) of the holders' debt Claims without consideration should be considered as a disposal of the Claims.  A holder of Claims should generally be entitled to deduct the capital loss resulting from a cancellation of debt Claims.  The capital loss is computed as the difference between the consideration (which may be zero) and the tax basis.

When computing the capital loss, the tax basis for all claims of the same class and type is calculated together in accordance with the so-called average cost method (Sw. *genomsnittsmetoden*).

For individuals, a capital loss should be fully deductible in the capital income tax category. If there is a net loss in the capital income category, a tax reduction is allowed against municipal and national income tax, as well as against real estate tax and municipal real estate charges. This tax deduction is granted at 30% on the portion of such net loss that does not exceed SEK 100,000 ($9,726) and at 21% on any remaining loss. Such net loss cannot be carried forward to future fiscal years.

For limited liability companies, a capital loss should normally be fully deductible against the companies' business income. However, capital losses on claims established when the lender and the borrower were affiliated companies are non-deductible.

Certain deduction limitations may apply with respect to losses on equity-related securities (Sw. *delägarrätter*) for Swedish tax purposes, please refer to Section X.E.1(b)(i) for individuals and Section X.E.1(b)(ii) for limited liability companies.

2.   *Non-Swedish Resident Holders of Claims (Including DIP Claims)*

(a)   Interest Payments

Payments of any amount that is considered to be interest for Swedish tax purposes to a non-Swedish resident holder of Claims should not be subject to Swedish income tax or Swedish withholding tax.

(b)   Repayment of Debt by Way of Cash Payments and/or Issuance of Shares to Holders of Claims

Repayments of any principal amount to a non-Swedish resident holder should not be subject to Swedish income tax or Swedish withholding tax. However, note that the DIP Claims may potentially be converted to New Shares or New Convertible Notes instead of repaid, please refer to Section X.C.2(c).

Individuals who have been tax residents or have had an habitual abode in Sweden at any time during the calendar year of disposal or redemption of certain financial instruments, or during the ten calendar years preceding the year of disposal or redemption of certain financial instruments, may be liable to capital gains taxation in Sweden depending on the classification of the particular instrument for Swedish income tax purposes. However, this rule should generally not cover ordinary debt claims. Also in the current situation no capital gain should arise due to the repayment provided that the repayment does not exceed the nominal amount of the Claim.

(c)     Potential Conversion of DIP Claims to New Shares or New Convertible Notes

A potential conversion of the DIP Claims to New Shares or New Convertible Notes by a non-Swedish resident holder such as the DIP Lenders should not be subject to Swedish income tax or Swedish withholding tax. It should be noted that any amount which is considered to be interest for Swedish tax purposes under the DIP Claims or New Convertible Notes to a non-Swedish resident holder of Claims should not be subject to Swedish withholding tax (please refer to Section X.C.2(a)), whereas any amount which is considered to be a dividend for Swedish tax purposes under any New Shares to a non-Swedish resident holder of Claims may be subject to Swedish withholding tax, please refer to Section X.E.2(b)(i).

(d)     Debt Cancellation/Redemption

There should be no Swedish tax consequences due to a debt cancellation/redemption for a non-Swedish resident holder of Claims.

D. Swedish Resident Holders of GUC Trust Interests

Trusts as a concept are not recognized in the Swedish legal system, neither in civil law nor tax law. As a starting point, the tax treatment depends on if the trust can be considered to correspond to a Swedish foundation (Sw. *stiftelse*) or not, which, in turn, depends on the circumstances in the specific situation. As a result, the Swedish tax consequences of holdings in foreign trusts are generally complex and subject to uncertainty. As the terms of the GUC Trust Agreement are not yet agreed, the material Swedish tax consequences for holders of GUC Trust Interests have been assessed based on certain assumptions in relation to the effect of the GUC Trust Agreement, as set out below. To the extent that any such facts or assumptions related to the terms of the GUC Trust change prior to the Effective Date, a supplemental disclosure is expected to be filed containing an updated discussion of the certain tax consequences for holders of GUC Trust Interests.

Based on the assumption that the assets on the GUC Trust would not be separated from the grantors/owners, the grantors/owners should generally still be deemed to hold the assets for Swedish tax purposes, please refer to the Section X.C and subsections with respect to the tax treatment of interest payments, repayment of the Claims and debt cancellation. Please note, however, that it remains uncertain when and to what extent repayment and/or additional debt cancellation may occur in relation to the GUC Trust Interests, and there may be timing aspects to certain taxable events, *e.g.*, when a capital loss can be recognized. Given the uncertainty and complexity associated with the Swedish tax consequences associated with foreign trusts, no assurance can be given that Swedish resident holders would be deemed to hold the assets of the GUC Trust for Swedish tax purposes and, therefore, all holders of GUC Trust Interests are urged to consult their own tax advisors regarding the Swedish tax treatment of the GUC Trust Interests.

All holders of GUC Trust Interests are urged to consult their own tax advisors regarding the Swedish tax treatment of the GUC Trust Interests.

160

D. E. Holders of Existing Equity Interests and New Shares

        1.    *Consequences to Swedish Resident holders of Existing Equity Interests and Holders of New Shares*

      (a)    Redemption of the Shares in SAS AB

A redemption of shares is generally considered as a disposal of the shares which may result in a capital gain or loss. When a redemption of shares is made without compensation, the shares should generally be considered to have been disposed of for SEK 0.

A capital loss from a redemption of shares is generally deductible provided that it can be considered as a "real" capital loss. A capital loss is usually not considered to be real if the shareholders financial position is not affected, which e.g. can be the case where all shares in one share class are redeemed but the shareholders also have a corresponding ownership in another share class in the company. Any capital loss from a redemption of the shares in SAS AB should be considered a real capital loss which may be deductible. For the tax treatment of a capital loss on shares, please refer to section X.E.1(b)(i) for individuals and Section X.E.1(b)(ii) for limited liability companies.

      (b)    Dividends and Capital Gains/Losses

        (i)    *Individuals*

For individuals, *dividends* on listed shares are taxed as income from capital at a tax rate of 30%. For unlisted shares in Swedish companies and foreign equivalents, only 5/6 of dividends are taxable which results in an effective tax rate of 25%.

Swedish preliminary tax of 30% is generally withheld on dividends paid to individuals. The preliminary tax is withheld by Euroclear Sweden provided that the company is registered at Euroclear Sweden or, regarding nominee-registered shares, by the Swedish nominee.

Upon the sale or other disposal of shares, a taxable *capital gain* or deductible *capital loss* may arise. Capital gains on listed shares are taxed as income from capital at a tax rate of 30%. For unlisted shares in Swedish companies and foreign equivalents, only 5/6 of the gains are taxable which results in an effective tax rate of 25%. The capital gain or loss is calculated as the difference between the sales proceeds, after deducting sales costs, and the tax basis. The tax basis for all shares of the same class and type is calculated together in accordance with the average cost method. Alternatively, upon the sale of listed shares, the tax basis may be determined as 20% of the sales proceeds, after deducting sales costs, under the so-called standard method (Sw. *schablonmetoden*).

Capital losses on listed shares are fully deductible while capital losses on unlisted shares in Swedish companies and foreign equivalents are only deductible to 5/6. Capital losses on both listed and unlisted shares are deductible against taxable capital gains on listed and unlisted shares and against other listed equity-related securities realized during the same fiscal year, except for units in securities funds or special funds that consist solely of

Swedish receivables (Sw. *räntefonder*). Capital losses on shares not absorbed by these set-off rules are deductible at 5/6 of 70% in respect of unlisted shares in Swedish companies and foreign equivalents and at 70% in respect of listed shares, both in the capital income category. If there is a net loss in the capital income category, a tax reduction is allowed against municipal and national income tax, as well as against real estate tax and municipal real estate charges. This tax deduction is granted at 30% on the portion of such net loss that does not exceed SEK 100,000 ($9,726) and at 21% on any remaining loss. Such net loss cannot be carried forward to future fiscal years.

<div align="center">

(ii) *Limited Liability Companies*

</div>

For a Swedish limited liability company, all income, including taxable capital gains and dividends, is taxed as business income at a tax rate of 20.6%. However, dividends and capital gains on shares held for business purposes (Sw. *näringsbetingade andelar*) are tax exempt under the Swedish participation exemption regime. The tax exemption applies to shares held by a Swedish limited liability company, in another Swedish limited liability company or a foreign equivalent provided that the shares are held as capital assets (i.e. not as stock in trade) and one of the following conditions are met: (i) the shares are unlisted (regardless of size and time of holding) or (ii) the shares are listed and the holding amounts to at least 10% of the votes in the company or the holding is dependent on the business of the owner company or an affiliated company. Additionally, the listed shares must be held for a period of at least 12 months. Special rules apply if shares held for business purposes change character and cease to be covered by the participation exemption or if shares which are not covered by the participation exemption change and meet the requirements to be covered by the exemption.

Capital gains and capital losses are calculated in the same manner as set forth above with respect to individuals, please refer to Section X.E.1(b)(i). Deductible capital losses on shares or other equity-related securities may only be deducted against taxable capital gains on such securities. Under certain circumstances, such capital losses may also be deducted against capital gains in another company in the same group, provided that the companies are entitled to tax consolidate (Sw. *koncernbidragsrätt*). A capital loss that cannot be utilized during a given year may be carried forward and deducted against taxable capital gains on shares and other equity-related securities during subsequent fiscal years without any limitation in time. Capital losses on shares covered by the Swedish participation exemption regime (i.e. where any capital gain is tax exempt in accordance with the above) are however not deductible. In respect of listed shares, this applies provided that the shares have been held for a period of at least 12 months (if this time requirement is not met, a capital gain may be deductible since a capital gain would also be taxable).

<div align="center">

2. *Non-Swedish Resident Holders of Existing Equity Interests and Holders of New Shares*

(a) <u>Redemption of Shares in SAS AB</u>

</div>

A redemption of shares is considered as a dividend for Swedish withholding tax purposes which means that a distribution in connection with a redemption is generally subject to

Swedish withholding tax. However, in this situation the redemption will be made without compensation and consequently no Swedish withholding tax should be imposed.

Individuals who have been tax residents or have had a habitual abode in Sweden at any time during the calendar year of disposal or redemption of the shares, or during the ten calendar years preceding the year of disposal or redemption of the shares, may be liable to capital gains taxation in Sweden. However, in this situation, the redemption will be made without compensation and consequently no capital gain should arise due to the redemption.

<div align="center">(b)    Dividends and Capital Gains/Losses</div>

<div align="center">(i)    <em>Dividends</em></div>

Dividends paid on shares to shareholders who are not tax resident in Sweden are generally subject to 30% Swedish withholding tax (however, for a shareholder that is an individual and holds unlisted shares, the withholding tax rate is 25%). However, the tax rate is often reduced for shareholders who are resident in jurisdictions with which Sweden has entered into a tax treaty. The majority of Sweden's tax treaties enable an at-source reduction of the Swedish withholding tax to the tax rate stipulated in the treaty at the time of payments of dividends. If the company is registered with Euroclear Sweden, any withholding tax will be withheld by Euroclear Sweden and an at-source reduction under an applicable treaty is possible provided that necessary information is made available to Euroclear Sweden in relation to the person entitled to such dividends.

However, there is an exemption from withholding tax under Swedish domestic law for distributions on (i) unlisted shares and (ii) listed shares if the holding amounts to at least 10% of the votes in the company and the listed shares are held for a period of at least 12 months, in a Swedish company to a foreign company which could be considered to correspond to a Swedish limited liability company. For a company to be covered by the exemption, the company must meet the conditions under Swedish tax law for being a foreign company, i.e. being a legal taxable person that is either resident in a country with which Sweden has concluded a tax treaty (which is not restricted to include only certain income) which the company is covered by or subject to similar taxation as a Swedish company. The foreign company should also correspond to a Swedish limited liability company from a civil law and tax perspective. There is no legal definition as to what the criteria are for being similar to a Swedish limited liability company from a civil law perspective but this is generally considered to be the case if, under local law, (i) the company has separate legal personality, (ii) the shareholders in the company are not liable for the company's obligations (limited liability), and (iii) the company has a fixed share capital divided into shares. Moreover, from a tax perspective, the company must be a taxable entity (i.e. not tax transparent) and generally be subject to income tax.

Also, dividends to legal persons resident in another EU member state may be exempt from Swedish withholding tax provided that the receiving company holds at least 10% of the share capital in the Swedish company and meets the requirement under article 2 of

Council Directive 2011/96/EU of 30 November 2011 on the common system of taxation applicable in the case of parent companies and subsidiaries of different Member States.

If a 30% withholding tax is withheld from a payment to a shareholder who is entitled to be taxed at a lower rate, or if too much withholding tax has otherwise been withheld, a refund can be claimed from the Swedish Tax Agency prior to the expiry of the fifth calendar year following the dividend distribution.

(ii)     *Capital Gains Taxation*

Shareholders who are not tax resident in Sweden and whose shareholding is not attributable to a permanent establishment in Sweden are generally not liable for Swedish capital gains taxation upon the disposal of shares.  Under a specific tax rule, individuals who are not tax resident in Sweden may, however, be subject to tax in Sweden upon the disposal of shares, if they have been resident or stayed permanently in Sweden at any time during the calendar year of such disposal or during any of the previous ten calendar years.  The applicability of this rule may be limited by tax treaties between Sweden and other countries.

E.     ~~F.~~ Stamp Duty, Transfer Taxes

There is generally no Swedish stamp duty or transfer taxes payable by the Swedish Debtors, a holder of Claims, or a holder of Existing Equity Interests in connection with the acquisition, holding or disposal of the Claims or Existing Equity Interests.

**XI.**
**VOTING PROCEDURES AND REQUIREMENTS**

Before voting to accept or reject the Plan, all holders of Claims entitled to vote on the Plan ("**Eligible Holders**") should carefully review the Plan attached hereto as **Exhibit A**. All descriptions of the Plan set forth in this Disclosure Statement are subject to the terms and provisions of the Plan.

A.     Voting Instructions and Voting Deadline

The Debtors are providing copies of (i) the notice of Confirmation Hearing (the "**Confirmation Hearing Notice**"), (ii) a Ballot customized for such holder and conforming to Official Bankruptcy Form No. B 314, with a postage-prepaid return envelope, and (iii) a USB flash drive containing (a) this Disclosure Statement (including all exhibits and appendices), (b) the order approving the Disclosure Statement, and (c) the Plan (the "**Solicitation Package**") to all record holders of Aircraft Lease Claims, Trade Claims, and Union Claims, Danish Term Loan Claims, Swedish Term Loan Claims, and Norwegian Term Loan Claims, Commercial Hybrid Claims, Other General Unsecured Claims, and Intercompany Claims, and Convenience Class Claims (each, a "**Voting Class**" and, collectively, the "**Voting Classes**").  Holders of Claims in Voting Classes must comply with the voting instructions detailed on their respective Ballots.  Further, special procedures are set forth in the relevant Ballots for the beneficial holders of Commercial Hybrid Bond Claims against SAS AB ("**Beneficial Holders**") that hold

such securities through a broker, dealer, commercial bank, trust company, or other agent or nominee ("**Nominee**").

**Each Ballot contains clear instructions on how to complete and return the Ballot. Each Ballot also prominently features the Voting Deadline and clearly and unequivocally state that Ballots received after the Voting Deadline may not be counted. The Voting Record Date for determining which holders are entitled to vote on the Plan is January 26, 2024. Eligible holders should complete the information requested on the Ballot, sign, date, and indicate a vote on the Ballot, and return the completed Ballot in the manner specified on the Ballot received.**

**FOR A VOTE TO BE COUNTED, A COMPLETED BALLOT OR A MASTER BALLOT WITH YOUR VOTE MUST BE ACTUALLY RECEIVED BY THE CLAIMS AND SOLICITATION AGENT NO LATER THAN THE VOTING DEADLINE OF MARCH 1, 2024 AT 4:00 P.M. (PREVAILING EASTERN TIME). HOWEVER, THE VOTING DEADLINE MAY BE EXTENDED IN THE SOLE DISCRETION OF THE DEBTORS, AFTER CONSULTATION WITH THE CREDITORS' COMMITTEE AND THE INVESTORS.**

**IF YOU ARE A BENEFICIAL HOLDER, YOU MUST RETURN YOUR BALLOT (OR OTHERWISE CONVEY YOUR VOTE) TO YOUR NOMINEE WITH SUFFICIENT TIME FOR YOUR NOMINEE TO PROCESS YOUR VOTE AND RETURN A MASTER BALLOT INCORPORATING YOUR VOTE TO THE CLAIMS AND SOLICITATION AGENT BEFORE THE VOTING DEADLINE. IF INDICATED ON YOUR BALLOT OR BY YOUR NOMINEE, YOU MAY ALSO RETURN YOUR COMPLETED BALLOT TO THE CLAIMS AND SOLICITATION AGENT DIRECTLY.**

**ANY BALLOT THAT IS EXECUTED AND RETURNED BUT WHICH DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN OR INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED IN DETERMINING ACCEPTANCE OF THE PLAN.**

If a holder of a Claim in a Voting Class did not receive a Ballot, received a damaged Ballot, or lost a Ballot, or if a holder has any question concerning the procedures for voting on the Plan, please contact the Claims and Solicitation Agent at (i) by phone at (844) 242-7491 (for holders of Claims or Interests in the U.S. and Canada; toll-free) or +1 (347) 338-6450 (for holders of Claims or Interests located outside of the U.S. and Canada) or (ii) by email at SASinfo@ra.kroll.com (with "SAS Solicitation Inquiry" in the subject line).

B.   <u>Parties Entitled to Vote</u>

Under the Bankruptcy Code, only holders of claims or interests in "impaired" classes are entitled to vote on a proposed plan. Pursuant to section 1124 of the Bankruptcy Code, a class of claims or interests is "impaired" under a plan unless (i) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or

interest, the Plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

If, however, the holder of an impaired claim or interest will not receive or retain any distribution under a plan on account of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan, and, accordingly, holders of such claims and interests are not entitled to vote on a plan and will not receive a ballot. If a claim or interest is not impaired by a plan, the Bankruptcy Code presumes the holder of such claim or interest to have accepted the plan and, accordingly, holders of such claims and interests are not entitled to vote on a plan, and also will not receive a ballot.

Accordingly, only holders of allowed claims or interests in classes of claims or interests that are impaired and that are not deemed to have rejected a proposed plan are entitled to vote to accept or reject such proposed plan.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

Voting Classes. Each Voting Class is Impaired and entitled to receive distributions under the Plan and, therefore, is entitled to vote to accept or reject the Plan. Accordingly, the votes of the holders of Claims in Classes 3, 4, 5, and 6 will be solicited in connection with the Plan.

Non-Voting Classes. The Plan does not impair holders of Other Secured Claims, Other Priority Claims, and Intercompany Interests. The holders of such Claims and Interests are therefore presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote (such Classes, the "**Unimpaired Classes**"). Further, the holders of Intercompany Claims, Swiss Bond Claims, State Hybrid Bond Claims and Danish State Hybrid Bond Claims, and Existing Equity Interests (collectively, the "**Non-Voting Impaired Classes**") are not entitled to receive or retain any property under the Plan. Therefore, pursuant to section 1126(g) of the Bankruptcy Code, the Non-Voting Impaired Classes are deemed to reject the Plan and, accordingly, are not entitled to vote. Accordingly, no holders of Claims against, and Interests in, the Debtors in the Non-Voting Impaired Classes will be solicited in connection with the Plan. The holders of Claims against, and Interests in, the Unimpaired Classes and Non-Voting Impaired Classes will, however, receive notice of such holder's non-voting status and the Confirmation Hearing Notice.

C.    Change of Vote

Any Eligible Holder who has submitted a properly completed Ballot to the Claims and Solicitation Agent prior to the Voting Deadline may revoke such Ballot and change its vote by submitting to the Claims and Solicitation Agent prior to the Voting Deadline a subsequent, properly completed, valid Ballot for acceptance or rejection of the Plan.

D.    Waivers of Defects, Irregularities, etc.

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawals of Ballots will be determined by the Claims and Solicitation Agent or the Debtors, as applicable, in their sole discretion, which determination will be final and binding.  The Debtors reserve the right to reject any and all Ballots that are not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, as applicable, be unlawful.  The Debtors further reserve their rights to waive any defects or irregularities or conditions of delivery as to any particular Ballot.  The interpretation (including the Ballot and the respective instructions thereto) by the Debtors, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties.  Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determines.  Neither the Debtors, the Claims and Solicitation Agent, nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots, nor will any of them incur any liabilities for failure to provide such notification.  Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived.  Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

E.    Requirement to File a Proof of Claim

Any Entity that was required to timely file a Proof of Claim in the form and manner specified by the Bar Date Order and who failed to do so on or before the applicable bar date associated with such Claim shall not, with respect to such Claim, be treated as a creditor of the Debtors for the purposes of voting on the Plan.

F.    Miscellaneous

Unless otherwise ordered by the Bankruptcy Court, Ballots that are signed, dated, and timely received, but on which a vote to accept or reject the Plan has not been indicated, will not be counted in determining acceptance or rejection of the Plan.  The Debtors, in their sole discretion, may request that the Claims and Solicitation Agent attempt to contact Eligible Holders who submit such Ballots to cure any such defects in the Ballots.  Eligible Holders are required to vote all of their Claims either to accept or reject the Plan.  An otherwise properly executed Ballot that attempts to partially accept and partially reject the Plan will not be counted.  Moreover, if an Eligible Holder returns more than one Ballot voting different Claims within the same Class with the Ballots reflecting different votes, and such holder does not correct this before the Voting Deadline, neither Ballot will be counted.

Unless the Ballot is timely submitted to the Claims and Solicitation Agent before the Voting Deadline, together with any other documents required by such Ballot, the Debtors may, in their sole discretion, reject such Ballot as invalid and, therefore, decline to utilize it in connection with seeking confirmation of the Plan.

The Bankruptcy Code defines "acceptance" of a plan by a class of (i) claims as acceptance by creditors in that class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the claims that cast ballots for acceptance or rejection of the plan and (ii) interests as acceptance by interest holders in that class that hold at least two-thirds (2/3) in amount of the interests that cast ballots for acceptance or rejection of the plan.

Under the Bankruptcy Code, for purposes of determining whether the requisite acceptances have been received, only Eligible Holders in the Voting Classes (not including an individual or entity determined to be an "insider" pursuant to relevant provisions of the Bankruptcy Code) who actually vote will be counted. The failure of an Eligible Holder to deliver a duly executed Ballot to the Claims and Solicitation Agent will be deemed to constitute an abstention by such holder with respect to voting on the Plan and such abstention will not be counted as a vote for or against the Plan.

G.     Trade Claims Exhibit

Attached hereto as **Exhibit E** is a schedule of all unsecured, prepetition Claims held by a third-party provider of goods and services to a Debtor that facilitates such Debtor's operations in the ordinary course of business and will continue to do so after the Effective Date (each such Claim a "**Trade Claim**"). The initial list of Trade Claims, attached as **Exhibit E** may be updated prior to the Confirmation Date. To the extent that any executory contract or unexpired lease giving rise to a Trade Claim is rejected in accordance with the terms hereof after a vote has been cast with respect to such Claim, such Claim will be reclassified as an Other General Unsecured Claim and the applicable holder will either (i) be provided with a new Ballot to cast a vote on the Plan or (ii) if the Voting Deadline has passed, be deemed to reject the Plan.

## XII.
## CONFIRMATION OF THE PLAN

A.     Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a chapter 11 plan. The Debtors request the Confirmation Hearing to commence on **March 19, 2024 at 11:00 a.m. (Prevailing Eastern Time)** subject to the Bankruptcy Court's availability. The Confirmation Hearing may be adjourned from time to time by the Debtors or the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

B.     Objections to Confirmation

Section 1128 of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan. Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014.

Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the Local Bankruptcy Rules for the Bankruptcy Court, must state the name and address of the objecting party and the amount and nature of the Claim or Interest of such party, state with particularity the basis and nature of any objection to confirmation of the Plan, and must be filed with the Bankruptcy Court no later than **March 11, 2024 at 4:00 p.m. (Prevailing Eastern Time)**.

C.     Requirements for Confirmation of the Plan.

1.     *Requirements of Section 1129(a) of the Bankruptcy Code.*

(a)     General Requirements.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the confirmation requirements specified in section 1129(a) of the Bankruptcy Code have been satisfied, including whether:

(i)     the Plan complies with the applicable provisions of the Bankruptcy Code;

(ii)     the Debtors have complied with the applicable provisions of the Bankruptcy Code;

(iii)     the Plan has been proposed in good faith and not by any means forbidden by law;

(iv)     any payment made or promised by the Debtors, for services or for costs and expenses in or in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

(v)     the Debtors have disclosed, to the extent known, the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Reorganized Debtors, an affiliate of the Debtors participating in the Plan with the Debtors, or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the holders of Claims and Interests and with public policy, and the Debtors have disclosed the identity of any insider who will be employed or retained by the Reorganized Debtors, and the nature of any compensation for such insider;

(vi)     with respect to each Class of Claims or Interests, each holder of an Impaired Claim or Impaired Interest has either accepted the Plan or will receive or retain under the Plan, on account of such holder's Claim or Interest, property of a value, as of the Effective Date of the Plan, that is

not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date of the Plan under chapter 7 of the Bankruptcy Code;

(vii)    except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code, each Class of Claims or Interests either accepted the Plan or is not Impaired under the Plan;

(viii)    except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Expense Claims, Other Priority Claims, and Priority Tax Claims will be paid in full or receive such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code;

(ix)    at least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class;

(x)    confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan; and

(xi)    all fees payable under section 1930 of title 28, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

The Debtors believe the Plan meets all of the applicable requirements of section 1129 of the Bankruptcy Code.

(b)    <u>Best Interests Test</u>

With respect to each impaired class of claims and interests, confirmation of a plan requires that each such holder either (i) accept the plan or (ii) receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the value such holder would receive or retain if the debtors were liquidated under chapter 7 of the Bankruptcy Code. This requirement is referred to as the "best interests test."

This test requires a bankruptcy court to determine what the holders of allowed claims and allowed equity interests in each impaired class would receive from a liquidation of the debtor's assets and properties in the context of liquidation under chapter 7 of the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the liquidation of the debtor's assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of claims and equity interests under the plan.

The Debtors believe that under the Plan all holders of Impaired Claims and Interests will receive property with a value not less than the value such holder would receive in

a liquidation under chapter 7 of the Bankruptcy Code. The Debtors' belief is based primarily on (i) consideration of the effects that a chapter 7 liquidation would have on the proceeds available for distribution to holders of Impaired Claims and Interests and (ii) the Liquidation Analysis attached hereto as **Exhibit C**.

The Debtors believe that any liquidation analysis is speculative, as it is necessarily premised on assumptions and estimates that are inherently subject to significant uncertainties and contingencies, many of which are beyond the control of the Debtors. The Liquidation Analysis provided in **Exhibit C** is solely for the purpose of disclosing the effects of a hypothetical chapter 7 liquidation of the Debtors, subject to the assumptions set forth therein. There can be no assurance as to values that would actually be realized in a chapter 7 liquidation nor can there be any assurance that a bankruptcy court will accept the Debtors' conclusions in determining whether section 1129(a)(7) of the Bankruptcy Code is satisfied.

(c)     Feasibility

The Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization unless contemplated by the Plan. As part of this analysis, the Debtors prepared consolidated financial projections for the Reorganized Debtors (the "**Financial Projections**") for fiscal years 2024 through 2027. The Financial Projections are attached hereto as **Exhibit D**. Based upon such Financial Projections, the Debtors conclude they will have sufficient resources to make all payments required pursuant to the Plan and that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

The Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated business plans or Financial Projections to parties in interest after the Confirmation Date or otherwise make such information public. In connection with the planning and development of the Plan, the Financial Projections were prepared by the Debtors, with the assistance of their professionals, to present the anticipated impact of the Plan. The Financial Projections assume that the Plan will be implemented in accordance with its stated terms. The Financial Projections are based on forecasts of key economic variables and may be significantly impacted by a variety of factors. Consequently, the estimates and assumptions underlying the Financial Projections are inherently uncertain and are subject to material business, economic, and other uncertainties. Therefore, such Financial Projections, estimates, and assumptions are not necessarily indicative of current values or future performance, which may be significantly less or more favorable than set forth herein.

The Financial Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in this Disclosure Statement, the Plan, and the Plan Supplement, in their entirety, and the historical consolidated financial statements (including the notes and schedules thereto).

2.      *Requirements of Section 1129(b) of the Bankruptcy Code.*

The Bankruptcy Court may confirm the Plan over the rejection or deemed rejection of the Plan by a class of Claims or Interests if the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such class.

(a)      No Unfair Discrimination

The "no unfair discrimination" test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under a plan. A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class of claims or equity interests receives more than it legally is entitled to receive for its claims or equity interests. This test does not require that the treatment be the same or equivalent, but that such treatment is "fair."

The Debtors believe that, under the Plan, all Impaired Classes of Claims and Interests are treated in a manner that is fair and consistent with the treatment of any and all other Classes of Claims and Interests having the same priority. Accordingly, the Debtors believe the Plan does not discriminate unfairly as to any Impaired Class of Claims or Interests, to the extent section 1129(b) of the Bankruptcy Code is applicable to confirmation of the Plan.

(b)      Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class. The test sets forth different standards for what is fair and equitable, depending on the type of claims or interests in such class. In order to demonstrate that a plan is "fair and equitable," the plan proponent must demonstrate the following:

<div align="center">

(i)    *Secured Creditors*

</div>

With respect to a class of impaired secured claims, a proposed plan must provide the following: (a) that the holders of secured claims retain their liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims, and receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estates' interest in such property; (b) for the sale, subject to section 363 of the Bankruptcy Code, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale; or (c) that the holders of secured claims receive the "indubitable equivalent" of their allowed secured claim.

<div align="center">

(ii)    *Unsecured Creditors*

</div>

With respect to a class of impaired unsecured claims, a proposed plan must provide the following:  either (a) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed claim or (b) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

<div align="center">

(iii)    *Holders of Equity Interests*

</div>

With respect to a class of equity interests, a proposed plan must provide the following: (a) that each holder of an equity interest receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest, or (b) that the holder of any interest that is junior to the interests of the class of equity interests will not receive or retain under the plan on account of such junior interest any property.

The Debtors believe the Plan satisfies the "fair and equitable" test with respect to all Impaired Classes of Claims and Interests, to the extent section 1129(b) of the Bankruptcy Code is applicable to confirmation of the Plan.

<div align="center">

**XIII.**
**ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN**

</div>

If the Plan is not confirmed, alternatives include (i) liquidation of the Debtors under chapter 7 of the Bankruptcy Code, (ii) formulation of an alternative plan (or alternative plans) of reorganization or liquidation in the Chapter 11 Cases, (iii) a sale of substantially all assets under section 363 of the Bankruptcy Code, or (iv) dismissal of the Chapter 11 Cases in contemplation of liquidation or dissolution under non-U.S. law.  Each of these possibilities is discussed below.  The Debtors have concluded that the Plan is the best alternative and will maximize recoveries to parties in interest, assuming that it is confirmed and consummated.

A.    Liquidation under Chapter 7

If the Plan is not confirmed, the Chapter 11 Cases could be converted to liquidation cases under chapter 7 of the Bankruptcy Code. In chapter 7, a trustee would be appointed to promptly liquidate the Debtors' assets.

Although it is impossible to predict precisely how the proceeds of a liquidation would be distributed to the respective holders of Claims, the Debtors believe the value of their Estates would be substantially diminished in a chapter 7 liquidation, due to additional administrative expenses involved in the appointment of a trustee and attorneys, accountants, and other professionals to assist such trustee, along with an increase in the amount of unsecured Claims. The assets available for distribution to creditors would be reduced by those additional expenses and by Claims, some of which would be entitled to priority that would arise by reason of the liquidation and from the rejection of leases and executory contracts in connection with the cessation of the Debtors' operations.

The Debtors believe that any liquidation is a much less attractive alternative for creditors than the Plan because of the greater recoveries that the Debtors anticipate will be provided under the Plan. The Debtors believe that the Plan affords substantially greater benefits to holders of Claims than would liquidation under any chapter of the Bankruptcy Code. However, *See* Section XIII.D below regarding the risk of conducting a parallel proceedings in different jurisdictions which could potentially lead to lower distributions being made to the Debtors' creditors than what follows from the Plan or a chapter 7 liquidation.

In the Liquidation Analysis the Debtors have considered the nature, status, and underlying value of their assets, the ultimate realizable value of such assets, and the extent to which the assets are subject to liens and security interests. Based on this analysis, it is likely that a liquidation of the Debtors' assets would produce less value for distribution to creditors and equity interest holders than that recoverable in each instance under the Plan.

B.    Alternative Chapter 11 Plans

If the Plan is not confirmed, the Debtors could attempt to formulate a different plan. Such a plan might involve (i) a reorganization and continuation of the Debtors' businesses or (ii) an orderly liquidation of their assets. However, the Debtors believe the Plan, as described herein, enables their creditors to realize the most value under the circumstances.

C.    Sale under Section 363 of the Bankruptcy Code

If the Plan is not confirmed, the Debtors could seek from the Bankruptcy Court, after notice and hearing, authorization to sell their assets under section 363 of the Bankruptcy Code. Under such circumstances, the DIP Lender and any other secured creditors would be entitled to credit bid on any property to which their security interests are attached to the extent of the value of their security interests, and to offset their Claims against the purchase price of the property. In addition, the security interests in the Debtors' assets held by secured creditors would attach to the proceeds of any sale of the Debtors' assets to the extent of the security

interests in those assets. The Debtors do not believe a sale of their assets under section 363 of the Bankruptcy Code would yield a higher recovery for the holders of Claims under the Plan.

D.    Dismissal and Local Liquidation or Dissolution

If the Plan is not confirmed, the Chapter 11 Cases could be dismissed, in which case separate liquidation or dissolution proceedings may be commenced in the various jurisdictions where the Debtors are organized. Such proceedings may be lengthy, are unlikely to be effectively coordinated across national borders, and are unlikely to preserve the value of the Debtors' enterprise. Conducting such parallel proceedings in different jurisdictions, in which the legal systems and applicable regulations will to some extent differ, means that, among other things, potential distributions and potential recoveries for creditors may be affected by such differences. Furthermore, because such proceedings would not be carried out in accordance with the Plan, and likely in a less controlled manner, it is possible that such liquidation or dissolution proceedings may have material adverse consequences for the Debtors, particularly in relation to potential distributions and recoveries for the Debtors' creditors. Accordingly, the Debtors believe that dismissal of the Chapter 11 Cases in favor of local proceedings is a much less attractive alternative for creditors as compared to the Plan.

As discussed above and in Section VI.B.2, the Debtors envisage local in-court proceedings by means of a Swedish Reorganization in SAS AB in order to implement Plan in Sweden. However, this proceeding will be carried out in a controlled manner and structured as a necessary implementation measure, rather than as an effect of the Plan not being confirmed. Thus, the purpose of the Swedish Reorganization is not to liquidate the assets because the confirmation of the Plan has failed, but instead as a step towards implementing the confirmed Plan. For these reasons, it is necessary to distinguish between a liquidation due to the inability to confirm the Plan and the planned necessary implementation measures that will be carried out in the context of the implementation of the Plan in Sweden.

## XIV.
## CONCLUSION AND RECOMMENDATION

The Debtors believe the Plan is in the best interests of all stakeholders and urge the holders of Claims in the Voting Classes to vote in favor thereof.

Dated: January 23, 2024
       Stockholm, Sweden

Dated: ~~January 23~~February 4, 2024 Stockholm, Sweden

By: /s/ _____

**SAS AB**

**SCANDINAVIAN AIRLINES SYSTEM DENMARK-NORWAY-SWEDEN**

By: /s/

Name: Erno Hilden
Title: EVP & CFO

By: /s/ _____

Name: Ginger Hughes
Title: Chief Transformation Officer

*[Signature Page for Disclosure Statement for <u>Second</u> Amended Joint Chapter 11 Plan of Reorganization of SAS AB and Its Affiliated Debtors]*

**SAS DANMARK A/S**

**SAS NORGE AS**

**SAS SVERIGE AB**

**SCANDINAVIAN AIRLINES OF NORTH AMERICA INC.**

By: /s/ _____
Name: Anna Almén
Title: Vice President & General Counsel

*[Signature Page for Disclosure Statement for Amended Joint Chapter 11 Plan of Reorganization of SAS AB and Its Affiliated Debtors]*

*[Signature Page for Disclosure Statement for Second Amended Joint Chapter 11 Plan of Reorganization of SAS AB and Its Affiliated*

**GORM ASSET MANAGEMENT LIMITED**



**TED**

By: _____ /s/ 

~~By:~~ ~~/s/~~
~~Name: Marian Doherty~~

Name: Ciaran Connolly
Title: Director

**GORM DARK BLUE LIMITED**

~~Name: Marian Doherty~~

By: /s/

Name: Ciaran Connolly

lly

Title: Direct
or

**GORM SKY BLUE LIMITED**

By:    /s/

~~Name: Marian Doherty~~

Name:

(Mod)

Ciaran Connolly
Title: Direct

(Mod)

or

**GORM LIGHT BLUE LIMITED**

By:    /s/

Name:
~~Marian Doherty~~ Ciaran Connolly
Title: Director

**GORM DEEP BLUE LIMITED**

By: /s/

~~Name: Marian Doherty~~

Name: Ciaran Connolly
Title: Director

(Mod) 
~~rian Doherty~~

**GORMWARMRE**



**DLIMITED**



By: /s/

By: /s

Name: ~~Marian Dohert y~~ Ciaran Connolly

Title: Director

**GORM OCEAN BLUE LIMITED**

By:     /s/

Name: ~~Marian Doherty~~ Ciaran Connolly

Title: Director

_____

**GORM ENGINE MANAGEMENT LIMITED**

(Add)

By:     /s/

Name: Ciaran Connolly

~~Name: Marian Doherty~~ Title: Director

**<u>Exhibit A</u>**

**Plan**

**(Filed Separately)**

**Exhibit B**

**Organizational Chart**





Legend

(Add) Nordea Term Loan Borrower

Nordea Term Loan

Guarantor

Commercial Hybrid Bonds Issuer

State Hybrid Bonds 1 Issuer

State Hybrid Bonds 2 Issuer

Danish Term Loan Borrower

(Add) Swedish Term Loan Borrower

Swiss Bonds Issuer

(Del) Liable for Swiss Bond Obligations (Irrev. Under.)

Debtor

Jointly and Severally Liable for Consortium's Obligations

■ Liable for Consortium's Obligations Incurred Through September 30, 2020 (Irrev. Under.)

+ - Aircraft Lessee/Finance Counterparty

● Holder of Air Operator's Certificate

**100%** **Linjeflyg Aktiebolag (Sweden)**

Malmö Flygfraktterminal KB (Sweden)

● +-

Denm

## This organizational chart excludes certain direct and



**SAS Ejendom Danmark (Denmark)**

**100%** SASOil Denmark A/S (Denmark)

**100%** SAS Oil Norway AS (Norway)

SAS Oil Sweden AB (Sweden)

**50%** Danish Tankage Services I/S (Denmark)

**33%** Oslo Lufthavns Tankanlegg A/S (Norway)

**25%** Stockholm Fuelling Service AB (Sweden)

**20.84%** Brændstoflagret, København Lufthavn I/S (Denmark)

**33%** Gardermoen Fuelling Services AS (Norway)

**25%** A Flygbränsle Hantering AB (Sweden)

**50%** Danish Refuelling Service I/S (Denmark)



**100%** **Scandinavian Airlines of North America Inc. (USA)**

**100%**

**Other Subsidiaries**

<u>Exhibit C</u>

**Liquidation Analysis**

<u>Introduction</u>

SAS AB and its subsidiary debtors (collectively, the "**Debtors**"), with the assistance of certain of their legal and financial advisors, have prepared this hypothetical liquidation analysis (the "**Liquidation Analysis**") in connection with the *Amended Joint Chapter 11 Plan of Reorganization of SAS AB and its Subsidiary Debtors* (as may be amended, modified, or supplemented from time to time, the "**Plan**")[1] and related disclosure statement (as may be amended, modified, or supplemented from time to time, the "**Disclosure Statement**") pursuant to chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").

The Liquidation Analysis permits parties in interest to evaluate whether the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code, also referred to as the "best interests of creditors" test. Under this test, the Bankruptcy Court must find, as a condition to confirmation of the Plan, that each holder of an impaired Claim against or Interest in the Debtors either (i) has accepted the Plan or (ii) will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such Person would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. The Liquidation Analysis is based upon certain assumptions discussed in the Disclosure Statement and in the accompanying notes to the Liquidation Analysis.

To demonstrate satisfaction of the "best interests of creditors" test, the Debtors have:

  i.   estimated the cash proceeds (the "**Liquidation Proceeds**") a chapter 7 trustee (the "**Trustee**") would generate if each Debtor's chapter 11 case was converted to a case under chapter 7 and the assets of such Debtor's Estate were liquidated;

  ii.  determined the distribution (the "**Liquidation Distribution**") each holder of a Claim or Interest would receive from the Liquidation Proceeds under the priority scheme dictated under chapter 7 of the Bankruptcy Code; and

  iii. compared each holder's Liquidation Distribution to such holder's distribution under the Plan if it were confirmed and consummated.

Accordingly, asset values discussed herein may be different than amounts referred to in the Plan and the Disclosure Statement, which illustrate the value of the Debtors' business as a going concern.

THE DEBTORS MAKE NO REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THE ESTIMATES AND ASSUMPTIONS CONTAINED HEREIN OR IN THE DISCLOSURE STATEMENT OR A CHAPTER 7 TRUSTEE'S ABILITY TO ACHIEVE FORECASTED RESULTS. IF THE CHAPTER 11 CASES ARE CONVERTED TO CASES

---

[1] Capitalized terms used but not otherwise defined herein shall have the same meanings ascribed to such terms in the Plan.

UNDER CHAPTER 7 OF THE BANKRUPTY CODE, ACTUAL RESULTS COULD VARY MATERIALLY FROM THE ESTIMATES AND PROJECTIONS SET FORTH IN THIS LIQUIDATION ANALYSIS.  THE DEBTORS RESERVE ALL RIGHTS TO SUPPLEMENT, MODIFY, OR AMEND THIS LIQUIDATION ANALYSIS. NOTHING CONTAINED IN THIS LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION, ADMISSION, OR ALLOWANCE BY THE DEBTORS (OR ANY OTHER PARTY) OR OF ANY CLAIMS BY OR AGAINST THE DEBTORS.  THE ESTIMATED AMOUNT OF ALLOWED CLAIMS SET FORTH HEREIN SHOULD NOT BE RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING ANY DETERMINATION OF THE VALUE OF ANY DISTRIBUTION TO BE MADE ON ACCOUNT OF ALLOWED CLAIMS UNDER THE PLAN, OTHER THAN THE PRESENTATION OF A HYPOTHETICAL LIQUIDATION ANALYSIS.  ACCORDINGLY, THE ASSET VALUES, AMOUNTS, AND PRIORITY OF ALLOWED CLAIMS IN THIS LIQUIDATION ANALYSIS COULD DIFFER MATERIALLY FROM THE AMOUNTS SET FORTH IN THE PLAN OR THE DISCLOSURE STATEMENT.

<u>Basis of Presentation</u>

The Liquidation Analysis was prepared by the Debtors, with the assistance of certain of their advisors, and assumes that the Debtors' assets would be liquidated in a jointly administered but nonconsolidated basis.  The Liquidation Analysis further assumes that the Debtors' chapter 11 cases are converted into cases under chapter 7 cases of the Bankruptcy Code on April 30, 2024 (the "**Liquidation Date**").  All calculations put forth in the Liquidation Analysis are based on the unaudited book values as of October 30, 2023, except for Cash and cash equivalents, outstanding amounts under the DIP Facility, unearned transportation revenue, and unearned transportation revenue holdbacks, which are as of the Liquidation Date.  These values, in total, are assumed to be representative of the Debtors' assets and liabilities as of the Liquidation Date.

The Liquidation Analysis assumes that, on the Liquidation Date, the Bankruptcy Court would appoint the Trustee who would sell the assets of the Estates. The Trustee would oversee the orderly process of liquidating the Debtors' assets and the distribution of proceeds to the Debtors' creditors. The Debtors have assumed that the liquidation process would take approximately 12 – 18 months.

The Liquidation Analysis includes an estimate of the amount of Claims that could ultimately be allowed under a hypothetical chapter 7 liquidation.  Nothing contained in these valuation assumptions is intended to be or constitutes a concession or admission of the Debtors for any other purpose nor is it intended to bind any other party.  No recovery or related litigation costs have been attributed to any potential avoidance actions under the Bankruptcy Code, including potential preferences or fraudulent transfer actions due to, among other issues, the cost of such litigation, the uncertainty of the outcome, and anticipated disputes regarding these matters.  Additionally, the Liquidation Analysis does not include estimates for tax consequences that may be triggered upon the liquidation and sale of the Debtors' assets. The tax consequences could be material.

In preparing the Liquidation Analysis, the amount of Allowed Claims have been projected based upon a review of scheduled claims and all Proofs of Claims associated with prepetition and postpetition obligations.  The cessation of business in a liquidation under chapter 7 of the Bankruptcy Code is likely to trigger certain Claims against the Estates that otherwise would not exist under a Plan absent the liquidation.  These potential Claims may include Claims related to

assumed executory contracts (including Claims relating to damages for breach of contracts and leases that were assumed during the chapter 11 cases), various potential employee Claims (such as potential severance claims), pension and related obligations, and Claims related to the rejection of executory contracts and unexpired leases. Such Claims could be material and may be entitled to administrative or priority payment status. Priority Claims would be paid in full from the Liquidation Proceeds before the balance would be made available for distribution to holders of General Unsecured Claims. Further, in the event litigation were necessary to resolve Claims asserted in a chapter 7 liquidation, distributions to holders of Claims may be further delayed, which both decreases the present value of those distributions and increases administrative expenses that could diminish the Liquidation Proceeds available. The effects of this potential delay on the value of distributions under this Liquidation Analysis have not been considered in this analysis.

In the event of a liquidation of the Debtors, parallel liquidation proceedings would likely need to be conducted in multiple jurisdictions. As set forth in the Disclosure Statement, such proceedings may have material adverse consequences for the Debtors, particularly in relation to potential distributions and recoveries for the Debtors' creditors. The effects of the local proceedings have not been considered in this analysis.

The Debtors have not had an opportunity to fully evaluate potential Claims against the Estates or to adjudicate such Claims before the Bankruptcy Court. Accordingly, the amount of the final Allowed Claims against the Debtors' Estates may differ substantially from the Claim amounts used in this Liquidation Analysis. Additionally, no order or finding has been entered by the Bankruptcy Court estimating or otherwise fixing the amount of Claims at the estimated amounts set forth in the Liquidation Analyses.

<u>Distribution of Net Proceeds</u>

Any liquidation proceeds would be allocated to holders of Claims and Interests in accordance with section 726 of the Bankruptcy Code, which provides for the following priority scheme:

- *Liquidation Adjustments*: includes estimated fees paid to the U.S. Trustee, wind-down costs, Trustee fees, and fees and expenses of advisors and other professionals retained by the Trustee;

- *DIP Claims*: includes any Claim held by the DIP Lenders or the DIP Agent on account of, arising under, or relating to the DIP Credit Agreement, the DIP Facility, or the DIP Orders, including Claims for all principal amounts outstanding, and any and all fees, interest, expenses, indemnification obligations, reimbursement obligations, and other amounts due under the DIP Loan Documents;

- *Other Priority and Other Secured Claims*: includes Claims from counterparties that are able to assert senior priority liens on the Debtors' assets, including certain trade vendors, taxing authorities, and other holders of potential Other Priority Claims;

- *General Unsecured Claims*: includes Aircraft Lease Claims, Trade Claims, Norwegian Term Loan Claims, Commercial Hybrid Bond Claims, Swedish Term Loan Claims, Danish Term Loan Claims, Union Claims, Swiss Bond Claims, State Hybrid Bond Claims, Danish

State Hybrid Bond Claims, Intercompany Claims, and Other General Unsecured Claims; and

- *Interests*: includes Interests in the Debtors.

Under the absolute priority rule, no junior creditor shall receive any distribution until all senior creditors are paid in full, and no equity holder shall receive any distribution until all creditors are paid in full. The assumed distributions to creditors as reflected in the Liquidation Analysis are estimated in accordance with the absolute priority rule.

Conclusion

The determination of hypothetical Liquidation Proceeds is a highly uncertain process involving the use of numerous estimates and assumptions, which, while considered reasonable by the Debtors and the Debtors' advisors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors. The Debtors have determined, as summarized in the table below, that upon the Effective Date, the Plan will provide all holders of Claims against and Interests in the Debtors with a recovery (if any) that is not less than what they would otherwise receive pursuant to a liquidation of the Debtors' assets under chapter 7 of the Bankruptcy Code and thus believe the Plan satisfies the requirement of section 1129(a)(7) of the Bankruptcy Code.

| (US$ millions) | SAS AB | Consolidated Debtors | Gorm Asset Management Limited | Gorm Engine Management Limited | Gorm Dark Blue Limited | Gorm Deep Blue Limited | Gorm Light Blue Limited | Gorm Ocean Blue Limited | Gorm Sky Blue Limited | Gorm Warm Red Limited | Scandinavian Airlines of North America Inc. | Total Debtors |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Available assets and estimated realization** | | | | | | | | | | | | |
| Cash and cash equivalents | $ 0 | $ 658 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ - | $ - | $ 659 |
| Restricted cash | - | - | - | - | - | - | - | - | - | - | - | - |
| Short term investments and deposits | - | - | - | - | - | - | - | - | - | - | - | - |
| Accounts receivable | 1 | 23 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | - | - | 28 |
| Intercompany receivables | - | - | - | - | - | - | - | - | - | - | - | - |
| Tax assets | - | - | - | - | - | - | - | - | - | - | - | - |
| Expendable spare parts and inventories | - | 3 | - | 0 | - | - | - | - | - | - | - | 3 |
| Property and equipment | - | 5 | - | 85 | - | - | - | 219 | - | - | - | 309 |
| RoU | - | - | - | - | - | - | - | - | - | - | - | - |
| Prepaid expenses | - | - | - | - | - | - | - | - | - | - | - | - |
| Intangibles | 17 | 607 | - | - | - | - | - | - | - | - | - | 624 |
| Shares in other companies / entities | - | - | - | - | - | - | - | - | - | - | - | - |
| Other assets | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total assets / proceeds available for distribution** | $ 18 | $ 1,296 | $ 5 | $ 86 | $ 0 | $ 0 | $ 0 | $ 219 | $ 0 | $ 0 | $ - | $ 1,624 |
| (-) Assumed liquidation costs | (1) | (46) | (0) | (3) | (0) | (0) | (0) | (0) | (0) | (0) | - | (50) |
| **Amounts available to creditors** | $ 17 | $ 1,250 | $ 4 | $ 83 | $ 0 | $ 0 | $ 0 | $ 219 | $ 0 | $ 0 | $ - | $ 1,574 |
| **Amounts available to satisfy claims** | | | | | | | | | | | | |
| *Secured claims* | | | | | | | | | | | | |
| Aircraft | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 501 | $ - | $ - | $ - | $ 501 |
| Non-Aircraft | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total secured claims** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 501 | $ - | $ - | $ - | $ 501 |
| Aircraft | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 219 | $ - | $ - | $ - | $ 219 |
| Non-Aircraft | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total value of assets encumbered by secured claims** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 219 | $ - | $ - | $ - | $ 219 |
| Aircraft | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Non-Aircraft | - | - | - | - | - | - | - | - | - | - | - | - |
| **Excess distributable value** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Aircraft | $ 282 | $ - | $ - | $ - | $ - | $ - | $ - | $ 282 | $ - | $ - | $ - | $ 563 |
| Non-Aircraft | - | - | - | - | - | - | - | - | - | - | - | - |
| **Additional general unsecured claims** | $ 282 | $ - | $ - | $ - | $ - | $ - | $ - | $ 282 | $ - | $ - | $ - | $ 563 |
| **Amounts available to creditors after satisfaction of secured claims** | $ 17 | $ 1,250 | $ 4 | $ 83 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ - | $ 1,355 |
| **Amounts re-allocated due to intercompany claims** | $ - | $ 51 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 51 |
| *Senior secured super priority claims (DIP financing facility)* | | | | | | | | | | | | |
| **Allocated DIP claims** | $ 7 | $ 510 | $ 2 | $ 32 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ - | $ 551 |
| Amounts available to creditors after satisfaction of secured claims | $ 17 | $ 1,301 | $ 4 | $ 83 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ - | $ 1,406 |
| (-) DIP satisfaction | (7) | (510) | (2) | (32) | (0) | (0) | (0) | (0) | (0) | (0) | - | (551) |
| **Amounts available to creditors after satisfaction of secured claims and DIP claims** | $ 10 | $ 791 | $ 3 | $ 50 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ - | $ 854 |
| *Administrative claims* | | | | | | | | | | | | |
| **Administrative claims** | $ 1,035 | $ 1,176 | $ 0 | $ 1 | $ 71 | $ 26 | $ 770 | $ 32 | $ 36 | $ 35 | $ - | $ 3,180 |
| Amounts available to creditors after satisfaction of secured and DIP claims | $ 10 | $ 791 | $ 3 | $ 50 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ - | $ 854 |
| (-) Administrative claim satisfaction | (10) | (791) | (0) | (1) | (0) | (0) | (0) | (0) | (0) | (0) | - | (802) |
| **Amounts available to creditors after satisfaction of secured, DIP, and administrative claims** | $ - | $ - | $ - | $ 3 | $ 49 | $ - | $ - | $ - | $ - | $ - | $ - | $ 52 |
| *Priority claims* | | | | | | | | | | | | |
| **Priority claims** | $ 7 | $ 208 | $ - | $ 0 | $ 1 | $ 5 | $ 2 | $ 5 | $ 0 | $ 1 | $ - | $ 229 |
| Amounts available to creditors after satisfaction of secured, DIP, and administrative claims | $ - | $ - | $ - | $ 3 | $ 49 | $ - | $ - | $ - | $ - | $ - | $ - | $ 52 |
| (-) Priority claim satisfaction | - | - | - | (0) | (1) | - | - | - | - | - | - | (1) |
| **Amounts available to creditors after satisfaction of secured, DIP, administrative, and priority claims** | $ - | $ - | $ - | $ 2 | $ 48 | $ - | $ - | $ - | $ - | $ - | $ - | $ 51 |
| *General unsecured claims* | | | | | | | | | | | | |
| **General unsecured claims** | $ 2,312 | $ 1,479 | $ - | $ - | $ 571 | $ 140 | $ 425 | $ 431 | $ 183 | $ 100 | $ 0 | $ 5,641 |
| **Intercompany general unsecured claims** | $ - | $ 1,059 | $ 186 | $ 85 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 1,331 |
| Amounts available to creditors after satisfaction of secured, DIP, administrative, and priority claims | $ - | $ - | $ - | $ 2 | $ 48 | $ - | $ - | $ - | $ - | $ - | $ - | $ 51 |
| (-) General unsecured claim satisfaction | - | - | - | (2) | (48) | - | - | - | - | - | - | (51) |
| **Amounts available to creditors after satisfaction of secured, DIP, administrative, priority and general unsecured claims** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 0 |
| % recovery | 0.0% | 0.0% | 1.3% | 56.8% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.7% |

# SPECIFIC NOTES TO THE LIQUIDATION ANALYSIS

The following notes detail the assumed treatment and estimated value of (i) the Debtors' assets, (ii) costs associated with the liquidation of these assets and (iii) any Claims that have been asserted or could be asserted against these assets.

### Note 1: Cash and Cash Equivalents

Cash and cash equivalents include any Cash balances and cash equivalent securities that are held by any of the Debtors as of April 30, 2024. The estimated recovery for this asset is 100%.

### Note 2: Restricted Cash

Restricted Cash includes collateral for aircraft purchases and leases as well as various bank guarantees for operational needs. The estimated recovery for this asset is 0%.

### Note 3: Short-Term Investments

Short-term investments consist of escrow accounts, which were segregated for employee tax and security deposits for lessors and wet leases. The estimated net recovery for this asset is 0%.

### Note 4: Accounts Receivable

Accounts receivable include typical airline receivables (such as receivables from Charter/EuroBonus Partners, income taxes receivables, alternative forms of payment, agent sales and other) related to the Debtors' transportation business. This item also includes amounts receivable from credit card acquirers for passenger tickets purchased but not yet flown (referred to as "unearned transportation revenue holdbacks"). Unearned transportation revenue holdbacks are included on a pro forma basis as of April 30, 2024. The expected recovery for the unearned transportation revenue holdbacks is 0%, whereas for the rest of the accounts receivable the recovery is estimated at approximately 20%.

### Note 5: Intercompany Receivables

Includes all amounts owed to each Debtor by another Debtor. The estimated recovery for this asset is 0%.

### Note 6: Tax Assets

Consists of deferred tax assets the Debtors have on their books. The estimated recovery for this asset is 0%.

### Note 7: Expendable Spare Parts and Inventories

Expendable spare parts and inventories consists of serviced flight equipment parts, expendable spare parts, and miscellaneous materials and supplies consumed in normal airline operations. The estimated recovery for this asset class is 10% of book value. Expendable values are typically very low in liquidations, due primarily to the high volume and logistical limitations of their sale.

### Note 8: Property and Equipment

Property and equipment is comprised of aircraft and related installed engines, servicing equipment and machinery, spare engines, aircraft improvements, related spare parts, and prepayments to related suppliers.

If the Debtors were to liquidate, that liquidation would negatively impact market values across all aircraft types operated by the Debtors. The average estimated recovery for these assets is 32% of book value.

### Note 9: Right of Use Assets

Includes the total assets recognized on the Debtors' books for leased equipment according to IFRS 16. The estimated recovery for this asset is 0% of book value.

### Note 10: Prepaid Expenses

Prepaid expenses include items such as prepaid fuel, rent, and other prepaid amounts. All prepayments are assumed to be consumed during the normal course of the Debtors' operations in chapter 11 prior to the Liquidation Date. The estimated recovery for this asset is 0%.

### Note 11: Intangibles

Intangibles consist largely of the Debtor's London Heathrow slots, the Debtors' loyalty program EuroBonus, and the Debtors' brand, inclusive of all owned trademarks and associated domain names. Certain intangible assets have been appraised by reputable third-party appraisers and adjusted to reflect a liquidation scenario. The estimated recovery for this asset is 247% of book value.

### Note 12: Shares in Other Companies

Mainly includes shares in group companies but also shares in affiliated companies and other shares and participations. The estimated recovery for this asset is 0%.

### Note 13: Other Assets

Includes security deposits and a significant amount of pension fund assets. The estimated recovery for this asset is 0% of book value.

### Note 14: Assumed Liquidation Costs

Assumed liquidation costs include Trustee and professional fees estimated to be $50 million, incorporating professional fees associated with the wind-down of the Estates (e.g. liquidation and recovery of assets and claims reconciliation), as well as estimated expenses that would be incurred during the wind-down period, including wages and benefits for employed personnel, aircraft storage costs, and general overhead costs.

### Note 15: Senior Secured Super Priority Claims (DIP Facility)

This amount includes the total value of the DIP Facility, including the paid-in-kind interest and the exit fee as of April 30, 2024.

### Note 16: Secured Claims

This amount includes Claims secured by certain aircraft and other equipment and assets. The allowed Claim amount is equal to the liquidation value ascribed to the underlying collateral with any shortfall recognized as General Unsecured Claims. Recoveries for specific secured Claims may vary widely depending on the nature and value of the collateral that secures each Claim.

***Note 17: Administrative Claims***

This amount includes Administrative Expense Claims that are senior to Priority and General Unsecured Claims, including post-petition accounts payable, post-petition aircraft lease Claims, accrued expenses, damage Claims for termination of assumed contracts, and net unearned transportation revenue (air traffic liabilities minus unearned transportation revenue holdbacks) as of April 30, 2024.

***Note 18: Priority Claims***

This amount includes estimated Priority Tax Claims as well as employee benefits.

***Note 19: General Unsecured Claims***

This amount includes Claims arising from approved settlement agreements, management's estimation of General Unsecured Claims based on Claims that have been schedule or filed but not yet resolved, shortfall of collateral value of secured Claims, as well as General Unsecured Claims arising from the rejection of executory contracts and unexpired leases as a result of the liquidation.

<u>Exhibit D</u>

**Financial Projections**

<u>Introduction</u>

Pursuant to section 1129(a)(11) of the Bankruptcy Code, among other things, the Bankruptcy Court must determine that confirmation of the *Amended Joint Chapter 11 Plan of Reorganization of SAS AB and its Subsidiary Debtors* (as may be amended, modified, or supplemented from time to time, the "**Plan**"),[1] is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors. This confirmation condition is referred to as the "feasibility" of the Plan. In connection with the planning and development of a plan of reorganization, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources to operate their business.

Accordingly, for purposes of demonstrating feasibility of the Plan SAS AB and its subsidiaries (collectively, "**SAS**") have prepared consolidated financial projections (the "**Financial Projections**") for the period of November 1, 2023 through October 31, 2027 (the "**Projection Period**"), which reflect SAS's fiscal year 2024 through fiscal year 2027. The Financial Projections are accompanied by key assumptions and commentary for the Financial Projections (the "**Notes**"). Such Notes reflect management's good faith judgments and expectations regarding SAS's future operations and financial positions, which SAS believes are reasonable and reflect the best information currently available to SAS. The Financial Projections and the Notes should be read in conjunction with the risk factors set forth in the Disclosure Statement.

The Financial Projections are subject to inherent risks and uncertainties, most of which are difficult to predict and many of which are beyond management's control. Should one or more of the risks or uncertainties referenced herein or in the Disclosure Statement occur, or should underlying assumptions prove incorrect, actual results could differ materially from those expressed in the Financial Projections. Further, new factors could cause actual results to differ materially from those described in the Financial Projections, and it is not possible to predict all such factors, or the extent to which any such factor or combination of factors may cause actual results to differ from those contained in the Financial Projections. The Financial Projections herein are not, and must not be viewed as, a representation of fact, prediction, or guaranty of SAS's future performance.

SAS generally does not publish its business plans, market strategies, anticipated future financial position, or results of operations in the level of detail and in the format set forth herein. Accordingly, SAS does not anticipate that it will, and disclaims any obligation to, furnish updated business plans or projections to holders of Claims or Interests, or to otherwise make public such information.

---

[1] Capitalized terms used but not otherwise defined herein shall have the same meanings ascribed to such terms in the Plan.

<u>Accounting Policies and Disclaimers</u>

THE FINANCIAL PROJECTIONS BY THEIR NATURE ARE NOT FINANCIAL STATEMENTS PREPARED IN ACCORDANCE WITH INTERNATIONAL FINANCIAL REPORTING STANDARDS. SAS'S INDEPENDENT ACCOUNTANTS HAVE NEITHER EXAMINED NOR COMPILED THE ACCOMPANYING FINANCIAL PROJECTIONS AND ACCORDINGLY DO NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE FINANCIAL PROJECTIONS, ASSUME NO RESPONSIBILITY FOR THE FINANCIAL PROJECTIONS, AND DISCLAIM ANY ASSOCIATION WITH THE FINANCIAL PROJECTIONS.

THE FINANCIAL PROJECTIONS DO NOT REFLECT THE FULL IMPACT OF ACCOUNTING FOR THE IMPACT OF THE CONSUMMATION OF THE PLAN, WHICH, WHEN REFLECTED ON THE EFFECTIVE DATE, MIGHT MATERIALLY DIFFER FROM THE ENCLOSED PROJECTIONS. THE FINANCIAL PROJECTIONS CONTAIN CERTAIN STATEMENTS THAT ARE FORWARD-LOOKING STATEMENTS. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF SAS. IMPORTANT ASSUMPTIONS AND OTHER FACTORS THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY INCLUDE THOSE RISKS AND UNCERTAINTIES DESCRIBED IN SECTION VI UNDER THE HEADING "CERTAIN RISK FACTORS TO BE CONSIDERED" IN THE DISCLOSURE STATEMENT.

ALL FORWARD-LOOKING STATEMENTS ARE AS OF THE DATE MADE, ARE BASED ON SAS'S BELIEFS, INTENTIONS, AND EXPECTATIONS AS OF SUCH DATE, AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTORS AND REORGANIZED DEBTORS UNDERTAKE NO DUTY TO UPDATE ANY SUCH STATEMENTS. THE DEBTORS AND REORGANIZED DEBTORS DO NOT INTEND TO UPDATE OR OTHERWISE REVISE ANY FORWARD-LOOKING STATEMENTS, INCLUDING THE FINANCIAL PROJECTIONS, TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE OF THE DISCLOSURE STATEMENT OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS OR OTHERWISE.

THE FINANCIAL PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS, WHICH, THOUGH CONSIDERED REASONABLE BY SAS, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE CONTROL OF SAS. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE OR ARE MADE AS TO SAS'S ABILITY TO ACHIEVE THE PROJECTED RESULTS. IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF

CLAIMS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE FINANCIAL PROJECTIONS.

THESE FINANCIAL PROJECTIONS WERE DEVELOPED SOLELY FOR PURPOSES OF THE FORMULATION OF THE PLAN AND TO ENABLE THE HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE UNDER THE PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF SECURITIES OF, OR CLAIMS OR INTERESTS IN, THE DEBTORS OR ANY OF THEIR AFFILIATES.

General Assumptions in Financial Projections and Notes

The Financial Projections have been prepared based on the assumption that the Effective Date of the Plan is July 31, 2024. The Financial Projections are based on, and assume, among other things, the Debtors' successful reorganization, continued implementation of the Debtors' profitability enhancement program, and implementation of the Debtors' business plan. Although the Debtors presently expect the Effective Date to occur as soon as practicable following the Confirmation Date and approval of the Swedish Reorganization Plan, there can be no assurance as to when the Effective Date will actually occur. If the Effective Date is delayed, the Debtors will continue to incur reorganization costs, which may be significant.

**Consolidated Statement of Income (projected)**
**(unaudited)**

| SEK millions | actuals FY-23 | forecast FY-24 | forecast FY-25 | forecast FY-26 | forecast FY-27 |
|---|---|---|---|---|---|
| Revenue | **42,041** | **48,101** | **54,064** | **59,412** | **64,100** |
| Fuel | (10,940) | (11,052) | (11,102) | (11,024) | (11,934) |
| Personnel costs | (8,072) | (9,182) | (10,243) | (11,009) | (12,168) |
| Depreciation | (4,440) | (4,550) | (4,908) | (5,091) | (4,931) |
| Other operating expenses | (21,440) | (22,233) | (23,853) | (25,705) | (27,397) |
| **EBIT before items affecting comparability** | **(2,850)** | **1,084** | **3,959** | **6,583** | **7,670** |
| Financial items and other non-operating expenses | (2,673) | (1,965) | 106 | (235) | (1,505) |
| Taxes | (232) | (0) | (95) | (244) | (389) |
| **Net Income** | **(5,748)** | **(882)** | **3,970** | **6,104** | **5,776** |

* excludes gains and losses related to the reorganization under chapter 11

Please read in conjunction with associated Notes.  Figures shown may not tie due to rounding.

## Consolidated Balance Sheet (projected)
## (unaudited)

| SEK millions | *actuals*<br>FY-23 | *forecast*<br>FY-24 | *forecast*<br>FY-25 | *forecast*<br>FY-26 | *forecast*<br>FY-27 |
|---|---|---|---|---|---|
| Intangible assets | 663 | 661 | 661 | 661 | 661 |
| Tangible assets<br>*(includes aircraft, engines, parts, pre-payments and other)* | 14,202 | 10,726 | 13,741 | 16,703 | 22,984 |
| Right-of-use assets | 17,164 | 19,138 | 19,564 | 16,636 | 16,851 |
| Deferred tax assets | 1,854 | 1,842 | 1,842 | 1,842 | 1,842 |
| Participations in affiliated companies | 20 | 20 | 20 | 20 | 20 |
| Other non-interest-bearing assets | 1,490 | 1,840 | 1,917 | 2,038 | 2,042 |
| Pension funds, net | 8,001 | 8,080 | 8,188 | 8,295 | 8,402 |
| Other interest-bearing assets | 572 | 572 | 528 | 528 | 528 |
| Accounts receivable, prepaid exp. & accrued inc. | 5,277 | 4,379 | 3,942 | 4,211 | 4,392 |
| Inventories and expendable spare parts | 444 | 478 | 494 | 515 | 515 |
| Cash and cash equivalents | 6,159 | 12,801 | 14,258 | 18,188 | 17,375 |
| **Total Assets** | **55,845** | **60,538** | **65,155** | **69,638** | **75,614** |
| Total shareholders' equity | (6,111) | 2,930 | 7,461 | 14,341 | 19,859 |
| Interest-bearing liabilities | 20,248 | 13,105 | 13,419 | 11,920 | 11,193 |
| Interest-bearing lease liabilities | 21,427 | 20,810 | 19,547 | 15,586 | 16,529 |
| Deferred tax liabilities | 571 | 571 | 571 | 571 | 571 |
| Provisions | 3,751 | 5,167 | 6,246 | 8,032 | 7,601 |
| Other interest-bearing liabilities | 817 | 832 | 484 | 229 | 136 |
| Other non interest-bearing liabilities | 2,098 | 2,157 | 2,171 | 2,293 | 2,260 |
| Accounts payable, accrued exp. & prepaid inc. | 6,368 | 7,021 | 6,879 | 7,592 | 8,134 |
| Unearned transportation revenue | 6,676 | 7,946 | 8,377 | 9,074 | 9,330 |
| **Total Equity & Liabilities** | **55,845** | **60,538** | **65,155** | **69,638** | **75,613** |

Please read in conjunction with associated Notes. Figures shown may not tie due to rounding.

**Consolidated Cash-Flow Statement (projected)**
**(unaudited)**

| SEK millions | forecast FY-24 | forecast FY-25 | forecast FY-26 | forecast FY-27 |
|---|---|---|---|---|
| **Income before tax (EBT)** | **(882)** | **4,065** | **6,348** | **6,165** |
| **Add-back of non-cash items:** | | | | |
| Depreciation | 4,550 | 4,908 | 5,091 | 4,931 |
| Exchange rate impact on lease liabilities | (992) | (1,950) | (1,384) | - |
| Other Items | 237 | (97) | (48) | (53) |
| **Net Adjustment for Non-Cash Items** | **3,794** | **2,860** | **3,659** | **4,878** |
| Tax payments | (0) | (95) | (244) | (389) |
| Net cash from working capital | 4,060 | 2,104 | 2,901 | 211 |
| **Cash Flow from Operations** | **6,973** | **8,935** | **12,664** | **10,865** |
| Capital expenditures | (5,056) | (6,859) | (4,515) | (8,016) |
| Income from asset sales and sale-leasebacks | 4,033 | 1,801 | - | - |
| **Cash Flow from Investments** | **(1,024)** | **(5,057)** | **(4,515)** | **(8,016)** |
| Proceeds from borrowings | 14,596 | 1,998 | - | - |
| Repayment of borrowings | (10,088) | (506) | (539) | (771) |
| Amortization of lease liabilities | (3,605) | (3,279) | (3,092) | (2,456) |
| Proceeds from equity issuance (net) | 2,360 | - | - | - |
| Pensions, deferred social tax and other | (2,570) | (634) | (588) | (435) |
| **Cash Flow from Financing** | **693** | **(2,421)** | **(4,219)** | **(3,662)** |
| **Net Cash Flow** | **6,642** | **1,456** | **3,930** | **(813)** |
| Cash and equivalents at start of period | 6,159 | 12,801 | 14,258 | 18,188 |
| **Cash and equivalents at end of the period** | **12,801** | **14,258** | **18,188** | **17,375** |

Please read in conjunction with associated Notes. Figures shown may not tie due to rounding.

<u>Notes to Financial Projections</u>

*Overview*

As outlined in the Disclosure Statement, the Debtors are implementing a robust transformation plan that features improvements in aircraft and employee productivity, savings from restructured contracts with vendors, and other profitability enhancements that are expected to significantly improve the Debtors' operating performance. In addition, through the restructuring, the Debtors will substantially reduce their debt and lease liabilities while significantly increasing their liquidity position.

The SAS FORWARD plan is a continuous improvement program, including targeted profit enhancement initiatives – many of which are currently being implemented or have already been implemented. The initiatives forecast in these projections include, among many others, savings from eliminating surplus facilities, increasing productivity of staff, renegotiating aircraft leases and support agreements, and adjusting the planned schedule to significantly increase aircraft utilization.

The Debtors are also in the final stages of a fleet renewal program, in which the Debtors' older-technology 737 and A320CEO aircraft will be replaced with more fuel-efficient A320NEO aircraft. In addition to lower fuel consumption, the fleet renewal program will substantially simplify the Debtors' narrowbody fleet, as multiple different fleet types and variants (e.g., A319, A320, A321, 737-700, 737-800) are replaced with a single new-generation fleet type (A320 NEO). This simplification leads to increased efficiencies throughout the organization, including in flight scheduling, maintenance, sparing and training.

*Foreign Exchange*

While SAS reports its results in SEK, many of its revenues and expenses are incurred in other currencies – notably in USD, EUR, DKK, and NOK, among others. In addition, certain assets and liabilities on SAS's balance sheet are denominated in foreign currencies and converted into SEK for reporting purposes. The Financial Projections are based on assumed foreign exchange rates for each of the relevant currencies. The most significant foreign currency in SAS's operations is the USD, as most of SAS's fuel expense, maintenance expense, and aircraft financing costs are denominated in USD. The Financial Projections assume a SEK per USD rate of 10.49 in FY24, 9.48 in FY25, and 8.75 in FY26.

*Operating Revenue*

SAS's primary source of revenue is the sale of passenger tickets and ancillary services on its extensive network of scheduled flights that connect many points within Scandinavia to major cities across Europe, North America, and Asia. In addition to passenger revenue, SAS also earns revenue from the transportation of cargo on its scheduled flights – most heavily concentrated on its long-haul widebody flights – and from charter flights, operated on behalf of tour operators, and other entities. Revenues are also generated from other non-flying activities, including the sale of

Eurobonus loyalty points and third-party ground handling and maintenance services provided to other airlines at select airports.

Passenger revenue has been projected by SAS based on market- or region-level forecasts of traffic demand and passenger fare levels. This forecast considers the current demand seen by the SAS in its existing markets, along with SAS's expectations of the future growth in traffic, competitive capacity, and market stimulation. Ancillary revenues include certain fees and charges earned from passengers for supplemental services related to passenger flights, including excess baggage charges, seat selection fees, and cabin upgrade fees. These revenues have been projected based on passenger volumes and expected ancillary fee rates per passenger by region.

Cargo revenue has been projected based on SAS's outlook for cargo volumes and yields in its primary long-haul markets. Charter revenue has been forecast based on existing charter contracts and SAS's expectation for growth in charter demand over the Projection Period.

Revenues from other non-flying activities have been projected based on SAS's outlook for demand growth based on recent history in each of the other revenue segments.

### Operating Expenses

Operating expenses in the Financial Projections have been calculated using production statistics from SAS's network plan and cost rates derived from SAS's latest budget. Operating expenses have been adjusted to account for assumed inflation or contractual escalation, and for cost reduction initiatives, where applicable.

- *Fuel:* Fuel expense includes the cost of jet fuel needed to operate SAS's flights, along with the cost of carbon emissions rights for flights conducted from or within Europe and the cost of sustainable aviation fuel, based on requirements of certain EU governments. Jet fuel expense is based on a projection of fuel consumption multiplied by an assumed jet fuel price by station. Fuel consumption has been estimated using historical fuel burn rates by fleet type applied to the planned utilization of each aircraft type from the production plan, while fuel prices are based on a jet fuel price forward curve along with an assumed fuel price differential by station or by region.

- *Personnel costs:* SAS has projected its labor expenses by workgroup, with assumptions of productivity or staffing level combined with the projected development of average wage rates and allowances based on labor contracts and expected inflation.

- *Depreciation:* Depreciation includes depreciation of physical assets (including owned aircraft, engines, and spare parts), as well as capitalized maintenance expense and aircraft operating lease right-of-use assets (capitalized per IFRS-16).

- *Other operating expense:* Other operating costs are projected based on current unit cost adjusted for contractual escalations for those costs incurred under long-term contracts, anticipated inflation, fleet aging, and anticipated changes in SAS's operations. These other operating costs also include the cost of legal and financial advisors related to the restructuring.

- *Net Financial Items:* Net financial items includes projected interest income and accrued interest expense on the existing and assumed future debt. In addition, net financial items also includes an estimate of certain debt fees and expenses related to debt issuance, including professional fees. In addition, SAS's fleet includes a number of aircraft that are financed with operating leases denominated in foreign currencies (primarily USD). The IFRS-16 lease liability associated with these foreign-currency-denominated contracts are converted into SEK on SAS's balance sheet at each reporting period – with any gain or loss from the currency conversion booked as an expense to the P&L.

- *Income Taxes:* SAS has estimated income tax expense and cash income tax payments based on its outlook for the use of tax loss carryforwards and the projected profitability allocated to its primary income tax jurisdictions.

<u>Notes to Projected Consolidated Balance Sheets</u>

### *Capital Structure*

- *New Equity*: The Financial Projections assume SAS receives net proceeds at emergence of $225 million through the issuance of new shares to the Investors through the Transaction.

- *New Convertible Debt*: The Financial Projections include the issuance of $725 million of convertible debt at emergence. In the Financial Projections, the convertible debt is assumed to remain outstanding through the Projection Period, with cash interest payments assumed to be made quarterly.

- *DIP Loan*: The Financial Projections assume the DIP Facility is repaid in full at emergence, which may include the conversion of amounts owed on account of any DIP Claims into New Shares or New Convertible Notes.

- *Secured Debt*: Upon emergence, some aircraft loans are assumed to be converted to operating leases that will be capitalized under IFRS-16 accounting rules, while others are assumed to remain in their current debt structures. The Financial Projections also assume that certain future aircraft deliveries will be financed with debt.

- *IFRS-16 Lease Liabilities*: At emergence, lease amendments for many of SAS's aircraft operating leases will become effective, leading to a reduction in IFRS-16 lease liabilities. Certain future aircraft deliveries are assumed to be financed with operating leases under a sale-leaseback structure.

## Exhibit E

**Initial List of Trade Claims**
~~**(To Be Filed at a Later Date)**~~

AIRBUS
ARINC INCORPORATED
ASCENT AVIATION SERVICES
BAYERISCHE GLASWERKE GMBH
BRAATHENS IT AS
CAE CENTRE COPENHAGEN A/S
CAE CENTRE OSLO AS
CAE CENTRE STOCKHOLM AB
CFM INTERNATIONAL SA
CHOICE AVIATION SERVICES INC.
COFORGE U.K. LIMITED
ELBE FLUGZEUGWERKE GMBH
FLIGHT OPERATIONS HOLDINGS, LLC
FLYING FOOD GROUP
GATE GOURMET, INC
GILMORE GLOBAL LOGISTIC SERVICES
GOODRICH-MESSIER INC
HACOR, INC.
HP INC DANMARK APS
HP NORGE AS
HP PPS SVERIGE AB
JEPPESEN SYSTEMS AB
KP AVIATION
KUEHNE & NAGEL A/S
L&T TECHNOLOGIES SERVICED LIMITED
LUFTHANSA SYSTEMS GMBH & CO. KG
MACH II MAINTENANCE
MATRIX AVIATION
MOREGROUP GMBH.
MTU MAINTENANCE HANNOVER GMBH
NEWREST GROUP HOLDING, S.A.
NEWREST HELLAS CATERING SERVICES S.A
PANASONIC AVIONICS CORP
PAXIA, INC.
PFA BLUE STAR EJENDOMME P/S
QUALITAIR AVIATION SERVICES LIMITED
ROHR, INC., OPERATING AS GOODRICH AEROSTRUCTURES
ROLLS ROYCE PLC
SAFRAN LANDING SYSTEMS
SAFRAN NACELLES
SAFRAN PASSENGER INNOVATIONS, LLC
SATAIR A/S
SCANAEROTECH APS
SWISSPORT CANADA INC.
SWISSPORT GB LTD

SWISSPORT USA, INC.
TESTORI AERO SUPPLY S.R.L.
THE BOEING COMPANY
VISTAIR SYSTEMS LIMITED