**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | **Chapter 11** |
| | : | |
| **SAS AB**, *et al.*, | : | **Case No. 22-10925 (MEW)** |
| | : | |
| **Debtors.**[1] | : | **(Jointly Administered)** |

-----------------------------------------------------------------x

## DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION OF SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF SAS AB AND ITS SUBSIDIARY DEBTORS

**WEIL, GOTSHAL & MANGES LLP**
Gary T. Holtzer
Kelly DiBlasi
David Griffiths
Lauren Tauro
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for the Debtors*
*and Debtors in Possession*

Dated:    March 15, 2024
          New York, NY

---

[1] The Debtors in these chapter 11 cases are SAS AB, SAS Danmark A/S, SAS Norge AS, SAS Sverige AB, Scandinavian Airlines System Denmark-Norway-Sweden, Scandinavian Airlines of North America Inc. (2393), Gorm Asset Management Ltd., Gorm Dark Blue Ltd., Gorm Deep Blue Ltd., Gorm Sky Blue Ltd., Gorm Warm Red Ltd., Gorm Light Blue Ltd., Gorm Ocean Blue Ltd., and Gorm Engine Management Ltd.  The Debtors' mailing address is AVD kod: STOUU-T, SE-195 87 Stockholm, Sweden.

**<u>TABLE OF CONTENTS</u>**

<u>Page</u>

PRELIMINARY STATEMENT ................................................................................1

BACKGROUND ....................................................................................................2

   I.     CHAPTER 11 CASES....................................................................2

   II.    SUPPORTING DECLARATIONS ................................................3

   III.   PLAN SOLICITATION, TABULATION, AND OBJECTIONS RECEIVED ......4

      1.    Solicitation ................................................................................4

      2.    Tabulation ................................................................................8

      3.    Objections Received ................................................................10

ARGUMENT .......................................................................................................10

   I.     PLAN SATISFIES BANKRUPTCY CODE'S REQUIREMENTS FOR CONFIRMATION AND SHOULD BE APPROVED.........................10

      1.    Section 1129(a)(1): Plan Complies With All Applicable Bankruptcy Code Provisions .......................................11

         a.    Section 1122: Plan's Classification Structure is Proper ...............11

         b.    Section 1123(a):  Plan's Content is Appropriate ...........................17

         c.    Section 1123(b): Plan's Content is Permitted...............................19

            i.    Plan Releases, Exculpation Provision, and Injunction Provision Should Be Approved ...........................21

      2.    Section 1129(a)(2): Debtors have Complied with Bankruptcy Code ........30

         a.    Section 1125: Disclosure Statement and Solicitation ...................30

         b.    Section 1126: Acceptance of the Plan ...........................................31

      3.    Section 1129(a)(3):  Plan Proposed in Good Faith and Not by Means Forbidden by Law................................32

      4.    Section 1129(a)(4): Plan Requires Court Approval of Professional Persons' Fee Claims................................34

      5.    Section 1129(a)(5): Debtors have Disclosed All Necessary Information Regarding Directors, Officers, and Insiders ...............35

      6.    Section 1129(a)(6): Plan Does Not Contain Any Rate Changes ..............36

      7.    Section 1129(a)(7): Plan Satisfies Best Interests Test ..............................37

      8.    Section 1129(a)(8): Plan Has Been Accepted by Impaired Voting Classes................................40

      9.    Section 1129(a)(9): Plan Provides for Payment in Full of All Allowed Priority Claims................................41

i

# TABLE OF CONTENTS
(cont'd)

**Page**

10. Section 1129(a)(10): Plan Has Been Accepted By At Least One Class of Impaired Claims ........................................................................................42

11. Section 1129(a)(11): Plan is Feasible ........................................................43

12. Section 1129(a)(12): All Statutory Fees Have Been Or Will Be Paid.......45

13. Section 1129(a)(13): All Retiree Benefits Continued Under Plan............45

14. Section 1129(a)(14), (a)(15), and (a)(16): Inapplicable Provisions..........45

15. Plan Satisfies "Cram Down" Requirements under Section 1129(b) of the Bankruptcy Code for Non-Accepting Classes ............................................46

    a. The Plan Does Not Discriminate Unfairly....................................47

    b. The Plan is Fair and Equitable ......................................................48

16. Section 1127: Modifications to Plan..........................................................49

II. SUBSTANTIVE CONSOLIDATION OF CONSOLIDATED DEBTORS IS APPROPRIATE.....................................................................................................50

III. U.S. TRUSTEE OBJECTION SHOULD BE OVERRULED AND PLAN CONFIRMED ........................................................................................................53

    a. Exculpation Provision....................................................................53

    b. Debtors' Releases...........................................................................55

    c. Section 1129(a)(5) of Bankruptcy Code ........................................56

    d. Convenience Class .........................................................................57

    e. Objection to Claims…………………......…………….........…57

CONCLUSION.............................................................................................................58

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 599 Consumer Elecs., Inc.*,
    195 B.R. 244 (S.D.N.Y. 1996)............................................................................56

*ACC Bondholder Grp. v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns
    Corp.)*,
    361 B.R. 337 (S.D.N.Y. 2007).............................................................................37

*In re Adelphia Bus. Sols., Inc.*,
    341 B.R. 415 (Bankr. S.D.N.Y. 2003)....................................................................49

*In re Adelphia Commc'ns Corp.*,
    368 B.R. 140 (Bankr. S.D.N.Y. 2007)...............................................11, 23, 25, 37

*In re Aegean Marine Petroleum Network Inc.*,
    599 B.R. 717 (Bankr. S.D.N.Y 2019)...............................................................29, 59

*In re Aegerion Pharms., Inc.*,
    605 B.R. 22 (Bankr. S.D.N.Y 2019)....................................................................15

*In re Affiliated Foods, Inc.*,
    249 B.R. 770 (Bankr. W.D. Mo. 2000)..................................................................37

*Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
    526 U.S. 434 (1999)........................................................................................32, 37

*Beal Bank, S.S.B. v. Way Apts., D.T. (In re Way Apts., D.T.)*,
    201 B.R. 444 (N.D. Tex. 1996)..............................................................................15

*In re Beker Indus.*,
    58 B.R. 725 (Bankr. S.D.N.Y. 1986)......................................................................37

*In re BearingPoint, Inc.*,
    453 B.R. 486 (Bankr. S.D.N.Y. 2011)....................................................................28

*In re Bush Indus., Inc.*,
    315 B.R. 292 (Bankr. W.D.N.Y. 2004)...................................................................33

*In re Buttonwood Partners, Ltd.*,
    111 B.R. 57 (Bankr. S.D.N.Y. 1990 .......................................................................52

*In re Calpine Corp.*,
    Case No. 05-60200 (BRL), 2007 WL 4565223 (Bankr. S.D.N.Y. Dec. 19,
    2007) ...............................................................................................23, 25, 28

## TABLE OF AUTHORITIES
(cont'd)

**Page(s)**

*In re Chassix Holdings, Inc.*,
533 B.R. 64 (Bankr. S.D.N.Y. 2015)........................................................................25

*In re Chemtura Corp.*,
439 B.R. 561 (Bankr. S.D.N.Y. 2010)........................................................28, 33, 60

*In re Crowthers McCall Pattern, Inc.*,
120 B.R. 279 (Bankr. S.D.N.Y. 1990)....................................................................37

*In re DBSD N. Am., Inc.*,
419 B.R. 179 (Bankr. S.D.N.Y. 2009)........................................................23, 28, 60

*Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber
Network, Inc.)*, 416 F.3d 136 (2d Cir. 2005)...........................................................25

*In re Donut Queen, Ltd.*,
41 B.R. 706 (Bankr. E.D.N.Y. 1984)......................................................................56

*In re Drexel Burnham Lambert Grp., Inc.*,
138 B.R. 714 (Bankr. S.D.N.Y. 1992)....................................................................47

*In re Drexel Burnham Lambert Grp., Inc.*,
138 B.R. 723 (Bankr. S.D.N.Y. 1992)............................................................ *passim*

*In re Finlay Enters., Inc.*,
No. 09-14873 (JMP), 2010 WL 6580628 (Bankr. S.D.N.Y. June 29, 2010) .........54

*In re Genco Shipping & Trading Ltd.*,
513 B.R. 233 (Bankr. S.D.N.Y. 2014)....................................................................25

*In re Granite Broad. Corp.*,
369 B.R. 120 (Bankr. S.D.N.Y. 2007)....................................................................59

*In re Greate Bay Hotel & Casino, Inc.*,
251 B.R. 213 (Bankr. D.N.J. 2000) ..................................................................15, 54

*Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd., II (In re Briscoe
Enters., Ltd. II)*,
994 F.2d 1160 (5th Cir. 1993) ................................................................................15

*In re HR Joint Venture*,
187 B.R. 202 (Bankr. S.D. Ohio 1995)...................................................................15

*In re Invs. Fla. Aggressive Growth Fund, Ltd.*,
168 B.R. 760 (Bankr. N.D. Fla. 1994) ...................................................................48

*In re J. Reg. Co.*,
407 B.R. 520 (Bankr. S.D.N.Y 2009) .....................................................................34

# TABLE OF AUTHORITIES

(cont'd)

**Page(s)**

*In re Johns-Manville Corp.*,
  68 B.R. 618 (Bankr. S.D.N.Y. 1986) ......................................................................................52

*JP Morgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns)*,
  419 B.R. 221 (Bankr. S.D.N.Y. 2009) ........................................................... *passim*

*Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*,
  843 F.2d 636 (2d Cir. 1988)..................................................................................11, 48, 49

*Koelbl v. Glessing (In re Koelbl)*,
  751 F.2d 137 (2d Cir. 1984)..............................................................................................32

*In re Lear Corp.*,
  Case No. 09-14326 (ALG), 2009 WL 6677955 (Bankr. S.D.N.Y. Nov. 5,
  2009) ..............................................................................................................................23, 25

*In re Leslie Fay Cos.*,
  207 B.R. 764 (Bankr. S.D.N.Y. 1997) ..............................................................................33

*In re LightSquared Inc.*,
  513 B.R. 56 (Bankr. S.D.N.Y. 2014) ...........................................................................12, 52

*MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*,
  837 F.2d 89 (2d Cir. 1988)............................................................................................22, 61

*In re Madison Hotel Assocs.*,
  749 F.2d 410 (7th Cir. 1984) ............................................................................................32

*In re Motors Liquidation Co.*,
  447 B.R. 198 (Bankr. S.D.N.Y. 2011) ....................................................................22, 23, 61

*In re New Midland Plaza Assocs.*,
  247 B.R. 877 (Bankr. S.D. Fla. 2000)................................................................................15

*In re One Times Square Assocs. Ltd. P'ship*,
  159 B.R. 695 (Bankr. S.D.N.Y. 1993)..........................................................................11, 15

*Pizza of Haw., Inc. v. Shakey's, Inc. (In re Pizza of Haw., Inc.)*,
  761 F.2d 1374 (9th Cir. 1985) ...........................................................................................48

*In re Republic Airways Holdings, Inc.*,
  565 B.R. 710 (Bankr. S.D.N.Y. 2017) .........................................................................57, 58

*In re Residential Cap., LLC*,
  Case No. 12-12020 (MG), 2013 WL 12161584 (Bankr. S.D.N.Y. Dec. 11,
  2013) ............................................................................................................................28, 60

v

## TABLE OF AUTHORITIES

(cont'd)

**Page(s)**

*In re Resorts Int'l, Inc.*,
  145 B.R. 412 (Bankr. D.N.J. 1990) ......................................................................34

*In re Sabine Oil & Gas Corp.*,
  555 B.R. 180 (Bankr. S.D.N.Y. 2016) ........................................................ *passim*

*In re Texaco Inc.*,
  84 B.R. 893 (Bankr. S.D.N.Y. 1988) ..............................................................34, 49

*Union Sav. Bank v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.)*,
  860 F.2d 515 (2d Cir. 1988).............................................................56, 57, 58

*United States v. Energy Res. Co.*,
  495 U.S. 545 (1990)................................................................................48

*Upstream Energy Servs. v. Enron Corp. (In re Enron Corp.)*,
  326 B.R. 497 (S.D.N.Y. 2005)....................................................................60

*In re U.S. Truck Co.*,
  47 B.R. 932 (E.D. Mich. 1985)...................................................................49

*In re W.R. Grace & Co.*,
  475 B.R. 34 (D. Del. 2012).......................................................................38

*In re Worldcom, Inc.*,
  Case No. 02-13533 (AJG), 2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31,
  2003) ...............................................................................10, 52, 57, 58

*In re Young Broadcasting Inc.*,
  430 B.R. 99 (Bankr. S.D.N.Y. 2010)............................................................48

**Statutes**

Fed. R. Bankr. P. 1015(b) ..............................................................................3

Fed. R. Bankr. P. 2002 ..................................................................................9

Fed. R. Bankr. P. 3019(a) ............................................................................55

11 U.S.C. § 105(a) ......................................................................................56

11 U.S.C. § 365(b) ......................................................................................20

11 U.S.C. § 503(b) ......................................................................................46

11 U.S.C. § 507(a) ....................................................................17, 46, 47, 50

11 U.S.C. § 541(a)(1) ..................................................................................22

## TABLE OF AUTHORITIES
(cont'd)

Page(s)

11 U.S.C. § 1114 ........................................................................................................50

11 U.S.C. § 1107(a) ......................................................................................................3

11 U.S.C. § 1108 ...........................................................................................................3

11 U.S.C. § 1122 .........................................................................................11, 17, 52

11 U.S.C. § 1122(a) ................................................................................................11, 12

11 U.S.C. § 1122(b) ...............................................................................................16, 17

11 U.S.C. § 1123 ....................................................................................................29, 55

11 U.S.C. § 1123(a) ..........................................................................................17, 18, 19

11 U.S.C. § 1123(b) ...............................................................................19, 20, 21, 22

11 U.S.C. § 1125 ................................................................................................ *passim*

11 U.S.C. § 1126(c) ........................................................................................... *passim*

11 U.S.C. § 1126(d) ...................................................................................................32

11 U.S.C. § 1127 ........................................................................................................55

11 U.S.C. § 1129 .............................................................................3, 10, 11, 47

11 U.S.C. § 1129(a) ......................................................................................... *passim*

11 U.S.C. § 1129(b) ......................................................................................... *passim*

**Other Authorities**

H.R. Rep. No. 95-595 (1977) .................................................................................11, 30

S. Rep. No. 95-989 (1978) ...........................................................................................11

*In re Aegean Marine Petroleum Network Inc.*,
    No. 18-13374 (MEW), (Bankr. S.D.N.Y. Mar. 29, 2019) (ECF Nos. 503 &
    503-1) .................................................................................................................60

*In re Celsius Network LLC*,
    No. 22-10964 (MG), (Bankr. S.D.N.Y. November 9, 2023) (ECF No. 3972) .......................26

*In re Charter Commc'ns, Inc.*,
    No. 09-11435 (JMP), (Bankr. S.D.N.Y. Nov. 17, 2009) (ECF No. 921) ...............................59

**TABLE OF AUTHORITIES**

(cont'd)

Page(s)

*In re Eastman Kodak Co.*,
  No. 12-10202 (ALG), (Bankr. S.D.N.Y. Aug. 23, 2013) (ECF No. 4966-1) .........................59

*In re Genco Shipping & Trading Ltd.*,
  No. 14-11108 (SHL), (Bankr. S.D.N.Y. July 2, 2014) (ECF No. 322) ..................................59

*In re GTT Commc'ns, Inc.*,
  No. 21-11880 (MEW), (Bankr. S.D.N.Y. December 28, 2022) (ECF No. 821) ....................26

*In re Hawker Beechcraft, Inc.*,
  No. 12-11873 (SMB), (Bankr. S.D.N.Y. Feb. 15, 2013) (ECF No. 1306) .............................59

*In re Neff Corp.*,
  No. 10-12610 (SCC), (Bankr. S.D.N.Y. Sept. 21, 2010) (ECF No. 451)...............................59

*In re SunEdison, Inc.*,
  No. 16-10992 (SMB), (Bankr. S.D.N.Y. July 28, 2017) (ECF No. 3735) .............................59

*In re Voyager Digit. Holdings, Inc.*,
  No. 22-10943 (MEW), (Bankr. S.D.N.Y. March 8, 2023) (ECF No. 1159) ..........................25

*In re Waypoint Leasing Holdings, Inc.*,
  No. 18-13648 (SMB), (Bankr. S.D.N.Y. July 31, 2019) (ECF No. 893) ...............................59

SAS AB and its debtor subsidiaries, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), submit this memorandum of law and reply (the "**Memorandum**") in support of confirmation of the *Second Amended Joint Chapter 11 Plan of Reorganization of SAS AB and Its Subsidiary Debtors*, dated February 7, 2024 [ECF No. 1936] (as may be amended, modified, or supplemented from time to time, the "**Plan**"),[2] including the agreements and other documents set forth in the Plan Supplement [ECF Nos. 2254, 2258, 2283, and 2291], and respectfully represent as follows:

## PRELIMINARY STATEMENT

1.      The Debtors commenced these chapter 11 cases to pursue and implement a comprehensive financial restructuring to deleverage the Debtors' balance sheet and ensure the Debtors' long-term viability.  The Plan represents the successful achievement of that goal.  The Plan is the product of an extensive, court-approved equity solicitation process that culminated in the Debtors selecting a group of bidders comprised of Castlelake, L.P., on behalf of certain of its funds or affiliates ("**Castlelake**"), Air France-KLM S.A. ("**Air France-KLM**"), and Lind Invest ApS, together with the Kingdom of Denmark (collectively, the "**Investors**"), as the winning bidders for a transaction involving an investment in, and issuance of new equity interests and convertible debt by, Reorganized SAS AB (the "**Transaction**").  The Plan incorporates the Transaction, which provides for a total investment in Reorganized SAS AB of $1.2 billion, including an allocation of up to $325 million in value to fund distributions to holders of Allowed General Unsecured Claims through a combination of cash and approximately 13.6% of equity in Reorganized SAS AB (subject to the terms of the Investment Agreement and the Plan).

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

2.      The Plan is supported by the Official Committee of Unsecured Creditors appointed in the Debtors' chapter 11 cases (the "**Creditors' Committee**") and the overwhelming majority of creditors who voted on the Plan, which speaks to the Plan's fairness, the good-faith efforts that led to its filing, and its compliance with chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").

3.      The only party objecting to confirmation of the Plan is the Office of the United States Trustee for Region 2 (the "**U.S. Trustee**").[3]    The U.S. Trustee's objection [ECF No. 2287] (the "**Objection**") is addressed in Section III of this Memorandum.

4.      For the reasons provided herein and in the Supporting Declarations (as defined below), the Plan satisfies the requirements for confirmation set forth in section 1129 of the Bankruptcy Code, achieves the objectives of chapter 11, and should be confirmed.  A proposed order confirming the Plan (the "**Proposed Confirmation Order**") will be filed contemporaneously with this Memorandum.

## BACKGROUND

## I.    CHAPTER 11 CASES

5.      On July 5, 2022 (the "**Commencement Date**"), each Debtor commenced with the Court a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner

---

[3] The Debtors received two additional limited objections to confirmation of the Plan related to Cure Amount disputes (*see* ECF Nos. 2285 and 2286).  One such objection has been consensually resolved.  The Debtors expect to resolve the second of such objections, which does not need to be addressed in connection with confirmation of the Plan. Section 8.2(e) of the Plan provides, in pertinent part, that "to the extent the dispute relates solely to any Cure Amounts, the applicable Debtor may assume the executory contract or unexpired lease prior to the resolution of any such dispute, as long as that the Debtor reserves Cash in an amount sufficient to pay the full amount reasonably asserted as the required Cure Amount by the contract counterparty."

has been appointed in these chapter 11 cases.  On July 22, 2022, the U.S. Trustee appointed the Creditors' Committee [ECF No. 75].  On July 27, 2022, the U.S. Trustee filed an amended notice of appointment removing Cityjet DAC Indus House and CFM International SA from the Creditors' Committee [ECF No. 94].  On June 13, 2023, the U.S. Trustee filed a second amended notice of appointment removing Viasat, Inc. from the Creditors' Committee [ECF No. 1219].

6.    The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

## II.    SUPPORTING DECLARATIONS

7.    Prior to or contemporaneously with the filing of this Memorandum, the Debtors also filed the following documents in support of confirmation of the Plan:

- the *Certificate of Publication* [ECF No. 2265], filed on March 6, 2024 (the "**Publication Affidavit**");

- the *Affidavit of Service of Solicitation Materials* [ECF No. 2284], filed on March 9, 2024 (the "**Solicitation Affidavit**");

- the *Affidavit of Service of the Plan Supplement* [ECF No. 2301], filed on March 13, 2024, (the "**Plan Supplement Affidavit**");

- the *Affidavit of Service of the Amended Plan Supplement* [ECF No. 2308], filed on March 14, 2024 (the "**Amended Plan Supplement Affidavit**");

- the *Affidavit of Service of the Second Amended Plan Supplement* [ECF No. 2313], filed on March 15, 2024 (the "**Second Amended Plan Supplement Affidavit**");

- the *Affidavit of Service of the Third Amended Plan Supplement* [ECF No. 2312], filed on March 15, 2024 (the "**Third Amended Plan Supplement Affidavit**" and, together with the Plan Supplement Affidavit, the Amended Plan Supplement Affidavit, and the Second Amended Plan Supplement Affidavit, the "**Plan Supplement Affidavits**");

- the *Declaration of Craig E. Johnson of Kroll Restructuring Administration LLC Regarding Solicitation of Votes and Tabulation of Ballots Cast on Second Amended Joint Chapter 11 Plan of Reorganization of SAS AB and*

*Its Subsidiary Debtors* [ECF No. 2311], filed on March 14, 2024 (the "**Voting Certification**"); and

- the *Declaration of Ginger Hughes in Support of Confirmation of Second Amended Joint Chapter 11 Plan of Reorganization of SAS AB and Its Subsidiary Debtors*, filed contemporaneously herewith (the "**Hughes Declaration**" and, collectively with the foregoing declarations and affidavits, the "**Supporting Declarations**").

## III.    PLAN SOLICITATION, TABULATION, AND OBJECTIONS RECEIVED

### 1.    <u>Solicitation</u>

8.    On February 7, 2024, the Court entered the *Order (I) Approving (A) Disclosure Statement, (B) Solicitation, Voting, and Related Procedures, and (C) Proposed Cure Procedures, (II) Scheduling Confirmation Hearing, (III) Establishing Notice and Objection Procedures for Confirmation of Debtors' Amended Chapter 11 Plan, and (IV) Granting Related Relief* [ECF No. 1932] (together with any schedules and exhibits thereto, the "**Disclosure Statement and Solicitation Order**").

9.    Among other things, the Disclosure Statement and Solicitation Order (i) approved the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code, (ii) scheduled the hearing to consider confirmation of the Plan for March 19, 2024 at 11:00 a.m. (Prevailing Eastern Time) (the "**Confirmation Hearing**"), (iii) established March 11, 2024 at 4:00 p.m. (Prevailing Eastern Time) as the deadline to object to confirmation of the Plan (the "**Objection Deadline**") and to vote to accept or reject the Plan (the "**Voting Deadline**"), (iv) approved the proposed solicitation, tabulation, and related activities in connection with voting on and confirmation of the Plan (the "**Solicitation and Voting Procedures**"), the form of ballots with voting instructions for the Voting Classes (as defined below) (the "**Ballots**") and certain other notices, and (v) approved the form of notice of the Confirmation Hearing (the "**Confirmation Hearing Notice**").  *See* Disclosure Statement and

Solicitation Order, at ¶¶ 2, 5-31, 37, 39, 42.  As established by the Disclosure Statement and Solicitation Order, the holders of Claims in the following Classes were entitled to vote on the Plan (collectively, the "**Voting Classes**" and all such holders, the "**Voting Parties**"):

| Class | Description |
|---|---|
| **SAS AB** | |
| **Class 3** | Aircraft Lease Claims and Trade Claims |
| **Class 4** | Norwegian Term Loan Claims |
| **Class 5** | Commercial Hybrid Bond Claims, Other General Unsecured Claims, and Intercompany Claims |
| **Consolidated Debtors** | |
| **Class 3** | Aircraft Lease Claims, Trade Claims, and Union Claims |
| **Class 4** | Danish Term Loan Claims, Swedish Term Loan Claims, and Norwegian Term Loan Claims |
| **Class 5** | Other General Unsecured Claims |
| **Class 6** | Convenience Class Claims |
| **Gorm Dark Blue Limited, Gorm Deep Blue Limited, Gorm Light Blue Limited, Gorm Ocean Blue Limited, and Gorm Sky Blue Limited** | |
| **Class 3** | Aircraft Lease Claims |
| **Class 5** | Other General Unsecured Claims |
| **Scandinavian Airlines of North America, Inc.** | |
| **Class 5** | Other General Unsecured Claims |

*See* Disclosure Statement and Solicitation Order, at ¶ F.

10.     On February 9, 2024, in accordance with the Disclosure Statement and Solicitation Order, the Debtors commenced the solicitation of votes on the Plan by causing Kroll Restructuring Administration LLC ("**Kroll**"), the Debtors' claims, noticing, and solicitation agent, to distribute copies of the Disclosure Statement and Solicitation Order, the Plan, the Disclosure Statement, the Confirmation Hearing Notice, and the applicable Ballots (collectively, a "**Solicitation Package**") to the Voting Parties.[4]  *See* Solicitation Affidavit ¶¶ 1-2.

11.     The Disclosure Statement and Ballots directed the Voting Parties to cast a vote to accept or reject the Plan by following the instructions contained in the Ballots.  Each Ballot also contained detailed instructions on how to complete the Ballot as well as the full text of the third-party release provisions set forth in Section 10.7(b) of the Plan.

12.     Pursuant to the Disclosure Statement and Solicitation Order, holders of Claims or Interests in the following Classes were not provided with a Solicitation Package, as such holders were not entitled to vote on the Plan (collectively, the "**Non-Voting Classes**"):

| Class | Description |
|-------|-------------|
| **SAS AB** | |
| **Class 1** | Other Secured Claims |
| **Class 2** | Other Priority Claims |
| **Class 8** | Swiss Bond Claims |
| **Class 10** | State Hybrid Bond Claims and Danish State Hybrid Bond Claims |
| **Class 11** | Existing Equity Interests |
| **Consolidated Debtors** | |
| **Class 1** | Other Secured Claims |

---

[4] The Debtors also included with the Solicitation Packages a cover letter (the "**Cover Letter**") with instructions in English, Swedish, Danish, and Norwegian for parties to obtain translations of the Confirmation Hearing Notice available on Kroll's website for these chapter 11 cases.

6

| Class | Description |
|-------|-------------|
| **Class 2** | Other Priority Claims |
| **Class 7** | Intercompany Claims |
| **Class 8** | Swiss Bond Claims |
| **Class 9** | Intercompany Interests |
| **Gorm Dark Blue Limited, Gorm Deep Blue Limited, Gorm Light Blue Limited, Gorm Ocean Blue Limited, Gorm Sky Blue Limited, Gorm Asset Management Limited, Gorm Engine Management Limited, Gorm Warm Red Limited, and Scandinavian Airlines of North America, Inc.** | |
| **Class 1** | Other Secured Claims |
| **Class 2** | Other Priority Claims |
| **Class 7** | Intercompany Claims |
| **Class 9** | Intercompany Interests |

*See* Disclosure Statement and Solicitation Order, at ¶¶ G and 17.

13.    In lieu of furnishing holders of Claims and Interests in the Non-Voting Classes with a copy of the Plan and the Disclosure Statement, and consistent with the Disclosure Statement and Solicitation Order, on February 9, 2024 the Debtors caused Kroll to serve such holders with either a *Notice of Non-Voting Status For Unimpaired Classes* or a *Notice of (I) Non-Voting Status for Impaired Classes and (II) Opportunity to Opt-In to Third-Party Releases* (together, the "**Notices of Non-Voting Status**"), along with the Cover Letter and the Confirmation Hearing Notice, which set forth (i) the date, time, and place of the Confirmation Hearing, (ii) instructions for obtaining copies of the Disclosure Statement and Plan, (iii) the Objection Deadline and the procedures for filing objections to confirmation of the Plan, and (iv) the full text of the release, exculpation, and injunction provisions set forth in Article X of the Plan. *See* Solicitation Affidavit ¶ 2.

14.    On February 7, 2024, the Debtors also filed the Confirmation Hearing

Notice [ECF No. 1939].  A shortened version of the Confirmation Hearing Notice was published

in the national edition of *The New York Times* and a banner ad was run on *Aviation Week*'s website

for two weeks, from February 12, 2024 through February 26, 2024.  *See* Publication Affidavit.

Additionally, the Confirmation Hearing Notice was published in *The Swedish Official Gazette*,

*Svenska Dagbladet*, *Berlingske*, and *Aftonposten*, in the local language of each publication, on

February 14, 2024.  *See* Publication Affidavit.

15.    On March 1, 2024, March 4, 2024, March 8, 2024, and March 11, 2024, the

Debtors filed the Plan Supplement.  The Plan Supplement included (i) the GUC Documents, (ii) the

Amended Organizational Documents, (iii) certain disclosures regarding the selection and

composition of the members of the New Boards, (iv) the Schedule of Assumed Contracts, (v) the

Schedule of Retained Causes of Action, (vi) the Recipient Shareholders' Agreement, and (vii) the

Post-Closing Articles.  *See* Plan Supplement, Ex. A-I.  The Plan Supplement was served on all

parties entitled to receive notice pursuant to the Bankruptcy Rules.  *See* Plan Supplement

Affidavits.

**2.    Tabulation**

16.    After the Voting Deadline, and following a complete review by Kroll of all

Ballots received, Kroll finalized the tabulation of the Ballots.  *See* Voting Certification, at ¶¶ 9-10.

The Voting Classes at each Debtor voted to accept the Plan in compliance with the requirements

set forth in section 1126 of the Bankruptcy Code.  Below is a chart summarizing the results:[5]

---

[5] Note that Gorm Asset Management Limited, Gorm Engine Management Limited, and Gorm Warm Red Limited are
not included in this chart because all Classes of Claims or Interests at these Debtors are Unimpaired under the Plan,
and, thus, were deemed to accept the Plan.

| Class | Accept | | Reject | | Result |
|---|---|---|---|---|---|
| | Amount (% of Amount Voted) | Number (% of Number Voted) | Amount (% of Amount Voted) | Number (% of Number Voted) | |
| **SAS AB** | | | | | |
| Class 3 | 100% | 100% | 0% | 0% | ACCEPT |
| Class 4 | N/A | N/A | N/A | N/A | ACCEPT[6] |
| Class 5 | 100% | 100% | 0% | 0% | ACCEPT |
| **Consolidated Debtors** | | | | | |
| Class 3 | 99.70% | 93.33% | 0.30% | 6.67% | ACCEPT |
| Class 4 | N/A | N/A | N/A | N/A | ACCEPT |
| Class 5 | 100% | 100% | 0% | 0% | ACCEPT |
| Class 6 | 99.41% | 97.37% | 0.59% | 2.63% | ACCEPT |
| **Gorm Dark Blue Limited** | | | | | |
| Class 3 | 100% | 100% | 0% | 0% | ACCEPT |
| Class 5 | N/A | N/A | N/A | N/A | ACCEPT |
| **Gorm Deep Blue Limited** | | | | | |
| Class 3 | 100% | 100% | 0% | 0% | ACCEPT |
| Class 5 | N/A | N/A | N/A | N/A | ACCEPT |
| **Gorm Light Blue Limited** | | | | | |
| Class 3 | 100% | 100% | 0% | 0% | ACCEPT |
| Class 5 | N/A | N/A | N/A | N/A | ACCEPT |
| **Gorm Ocean Blue Limited** | | | | | |
| Class 3 | 100% | 100% | 0% | 0% | ACCEPT |
| Class 5 | N/A | N/A | N/A | N/A | ACCEPT |
| **Gorm Sky Blue Limited** | | | | | |
| Class 3 | 100% | 100% | 0% | 0% | ACCEPT |
| Class 5 | N/A | N/A | N/A | N/A | ACCEPT |
| **Scandinavian Airlines of North America, Inc.** | | | | | |
| Class 5 | 100% | 100% | 0% | 0% | ACCEPT |

---

[6] Where no creditors in a Class voted on the Plan, pursuant to Section 3.6 of the Plan, such Class is presumed to accept the Plan.

3.      **Objections Received**

17.     As noted above, the Debtors received only one objection to confirmation of the Plan.[7]  Generally, the Objection is based on, among other things, the scope of the Debtors' Releases and the Exculpation Provision provided in the Plan, which the Debtors submit are appropriate and consistent with applicable law (as set forth in more detail below).

## ARGUMENT

18.     This Memorandum is divided into three sections.  Section I addresses the requirements for confirmation of the Plan under section 1129 of the Bankruptcy Code and demonstrates the satisfaction of each requirement and achievement of the objectives of chapter 11.  Section II addresses the substantive consolidation of the Consolidated Debtors.  Section III addresses the Debtors' response to the Objection, demonstrating why the Objection should be overruled.

## I.      PLAN SATISFIES BANKRUPTCY CODE'S REQUIREMENTS FOR CONFIRMATION AND SHOULD BE APPROVED

19.     To achieve confirmation of the Plan, the Debtors must demonstrate that the Plan satisfies section 1129(a) of the Bankruptcy Code by a preponderance of the evidence.  *In re Worldcom, Inc.*, Case No. 02-13533 (AJG), 2003 WL 23861928, at *46 (Bankr. S.D.N.Y. Oct. 31, 2003).  For the reasons set forth below, the Plan satisfies all applicable provisions of section 1129 of the Bankruptcy Code and should be confirmed.

---

[7] The Debtors also received several informal comments from various parties with respect to the Plan.  The Debtors have addressed such comments either through discussions or the addition of clarifying language in the Proposed Confirmation Order.

1.    **Section 1129(a)(1): Plan Complies With All Applicable Bankruptcy Code Provisions**

20.    Pursuant to section 1129(a)(1) of the Bankruptcy Code, a plan of reorganization must comply with the applicable provisions of the Bankruptcy Code. *See* 11 U.S.C. § 1129(a)(1). The legislative history of section 1129(a)(1) explains that this provision encompasses the requirements of sections 1122 and 1123 of the Bankruptcy Code governing classification of claims and interests and the contents of the plan, respectively. *See* H.R. Rep. No. 95-595, at 412 (1977); S. Rep. No. 95-989, at 126 (1978); *see also Kane v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*), 843 F.2d 636, 648-49 (2d Cir. 1988); *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992).

    *a.    Section 1122: Plan's Classification Structure is Proper*

21.    Section 1122(a) of the Bankruptcy Code provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a). Section 1122(a) does not require all similarly situated claims to be classified together; rather, it "merely requires that claims classified together be 'substantially similar.'" *In re One Times Square Assocs. Ltd. P'ship*, 159 B.R. 695, 703 (Bankr. S.D.N.Y. 1993), *aff'd*, 165 B.R. 773 (S.D.N.Y.), *aff'd*, 41 F.3d 1502 (2d Cir. 1994) (unpublished table decision).

22.    Courts in the Second Circuit have endorsed a flexible approach to classification of claims. *See, e.g.*, *In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 311 (Bankr. S.D.N.Y. 2016) (finding the plan's classification of claims and interests satisfied the "flexible requirements of section 1122"); *see also In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 147 (Bankr. S.D.N.Y. 2007) (holding that classification scheme in plan was legitimate so long as it "does not offend one's sensibility of due process and fair play" (quoting *In re One Times Square*

*Assocs. Ltd. P'ship*, 159 B.R. at 703)); *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. at 757

("A plan proponent is afforded significant flexibility in classifying claims under § 1122(a) if there

is a reasonable basis for the classification scheme and if all claims within a particular class are

substantially similar.").

23.    Importantly, a debtor is entitled to broad deference from the court where

there is a rational or reasonable basis for the classification.  *See In re Sabine Oil & Gas Corp.*, 555

B.R. at 310; *see also In re LightSquared Inc.*, 513 B.R. 56, 83 (Bankr. S.D.N.Y. 2014) ("[S]eparate

classification of otherwise substantially similar claims and interests is appropriate so long as the

plan proponent can articulate a 'reasonable' (or 'rational') justification for separate

classification."); *In re Charter Commc'ns*, 419 B.R. 221, 265 n.35 (Bankr. S.D.N.Y. 2009)

(explaining that debtors "enjoy considerable discretion when classifying similar claims in different

classes").

24.    Here, the Debtors have rational and reasonable reasons for the

classifications set forth in the Plan.  The Plan provides for the following Classes of Claims against,

and Interests in, each Debtor:

| Class | Type of Claim or Interest |
|-------|---------------------------|
| **SAS AB** | |
| Class 1 | Other Secured Claims |
| Class 2 | Other Priority Claims |
| Class 3 | Aircraft Lease Claims and Trade Claims |
| Class 4 | Norwegian Term Loan Claims |
| Class 5 | Commercial Hybrid Bond Claims, Other General Unsecured Claims, and Intercompany Claims |
| Class 6 | [Reserved – No Class at this Debtor] |
| Class 7 | [Reserved – No Class at this Debtor] |
| Class 8 | Swiss Bond Claims |
| Class 9 | [Reserved – No Class at this Debtor] |

| Class | Type of Claim or Interest |
|---|---|
| Class 10 | State Hybrid Bond Claims and Danish State Hybrid Bond Claims |
| Class 11 | Existing Equity Interests |
| **Consolidated Debtors** | |
| Class 1 | Other Secured Claims |
| Class 2 | Other Priority Claims |
| Class 3 | Aircraft Lease Claims, Trade Claims, and Union Claims |
| Class 4 | Danish Term Loan Claims, Swedish Term Loan Claims, and Norwegian Term Loan Claims |
| Class 5 | Other General Unsecured Claims |
| Class 6 | Convenience Class Claims |
| Class 7 | Intercompany Claims |
| Class 8 | Swiss Bond Claims |
| Class 9 | Intercompany Interests |
| Class 10 | [Reserved – No Class at this Debtor] |
| Class 11 | [Reserved – No Class at this Debtor] |
| **Gorm Dark Blue Limited, Gorm Deep Blue Limited, Gorm Light Blue Limited, Gorm Ocean Blue Limited, Gorm Sky Blue Limited, and Gorm Asset Management Limited** | |
| Class 1 | Other Secured Claims |
| Class 2 | Other Priority Claims |
| Class 3 | Aircraft Lease Claims |
| Class 4 | [Reserved – No Class at this Debtor] |
| Class 5 | Other General Unsecured Claims |
| Class 6 | [Reserved – No Class at this Debtor] |
| Class 7 | Intercompany Claims |
| Class 8 | [Reserved – No Class at this Debtor] |
| Class 9 | Intercompany Interests |
| Class 10 | [Reserved – No Class at this Debtor] |
| Class 11 | [Reserved – No Class at this Debtor] |
| **Gorm Engine Management Limited and Gorm Warm Red Limited** | |
| Class 1 | Other Secured Claims |
| Class 2 | Other Priority Claims |
| Class 3 | [Reserved – No Class at this Debtor] |
| Class 4 | [Reserved – No Class at this Debtor] |
| Class 5 | [Reserved – No Class at this Debtor] |

| Class | Type of Claim or Interest |
|---|---|
| Class 6 | [Reserved – No Class at this Debtor] |
| Class 7 | Intercompany Claims |
| Class 8 | [Reserved – No Class at this Debtor] |
| Class 9 | Intercompany Interests |
| Class 10 | [Reserved – No Class at this Debtor] |
| Class 11 | [Reserved – No Class at this Debtor] |
| **Scandinavian Airlines of North America, Inc.** | |
| Class 1 | Other Secured Claims |
| Class 2 | Other Priority Claims |
| Class 3 | [Reserved – No Class at this Debtor] |
| Class 4 | [Reserved – No Class at this Debtor] |
| Class 5 | Other General Unsecured Claims |
| Class 6 | [Reserved – No Class at this Debtor] |
| Class 7 | Intercompany Claims |
| Class 8 | [Reserved – No Class at this Debtor] |
| Class 9 | Intercompany Interests |
| Class 10 | [Reserved – No Class at this Debtor] |
| Class 11 | [Reserved – No Class at this Debtor] |

25.    The classification structure of the Plan complies with the Bankruptcy Code. The Plan incorporates a classification and distribution scheme that adheres to the statutory priorities prescribed by the Bankruptcy Code.  All Claims and Interests within each Class are substantially similar to the other Claims and Interests in such Class at each Debtor.

26.    Further, the Plan provides for the separate classification of Claims against and Interests in each Debtor based upon the different legal nature and priority of such Claims and Interests, the underlying instruments giving rise to such Claims and Interests, and the distinct interests of the holders of such Claims and Interests.  In some instances, Claims of equal priority are classified in different Classes.  Courts have identified a number of independent bases for separate classification of similarly situated claims.  *See e.g., In re One Times Square Assocs. Ltd.*

14

*P'ship*, 159 B.R. at 703 (finding unique "underlying legal nature of a creditor's claim as it relates to the assets of a debtor" provides justification for separate classification of similarly situated claims); *see also In re Aegerion Pharm., Inc.*, 605 B.R. 22 (Bankr. S.D.N.Y 2019) (confirming a plan that separately classified trade claims from claims of former employees because debtor needed to provide trade creditors with preferential treatment to continue operating); *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 225 (Bankr. D.N.J. 2000) (finding reasonable business justification existed to separately classify deficiency claims of secured noteholders and general unsecured creditors to maximize distributions by providing certain noteholders with new notes and equity in the reorganized debtor and general unsecured creditors with cash); *see also In re Way Apts., D.T.*, 201 B.R. 444 (N.D. Tex. 1996) (permitting separate classification of Department of Housing and Urban Development Claims because federal agency was motivated to vote out of responsibility to public interest as well as its interests as a creditor); *In re HR Joint Venture*, 187 B.R. 202 (Bankr. S.D. Ohio 1995) (permitting separate classification of a city's claim because city had unique interest in maintaining the debtor's hotel property for the benefit of citizens); *In re Briscoe Enters., Ltd. II*, 994 F.2d 1160, 1167 (5th Cir. 1993) (upholding confirmation of a plan that separately classified the City of Fort Worth's claims in part because the City had "non-creditor interests relating to its urban housing program").

27.    As set forth herein and in the Hughes Declaration, reasonable business, factual, and/or legal reasons exist for the separate classification of similarly situated Claims as provided in the Plan. *See* Hughes Declaration, ¶¶ 11-13.

28.    For example, Class 3 (Aircraft Lease and Trade Claims), Class 4 (Norwegian Term Loan Claims), and Class 5 (Commercial Hybrid Bond Claims, Other General Unsecured Claims, and Intercompany Claims) are separate Classes of General Unsecured Claims

against Debtor SAS AB.  Class 3 includes General Unsecured Claims held by parties with whom

SAS AB will have go-forward business relationships, including trade claimants and lessors with

assumed Aircraft Leases.  Class 4 includes General Unsecured Claims held by a Governmental

Unit.  Such creditor may have interests (for example, a responsibility for public interest) that may

differ from its interests as a creditor.  Class 5 includes General Unsecured Claims arising from

prepetition funded debt that is widely held as well as Intercompany Claims and General Unsecured

Claims of parties that are not expected to have go-forward business relationships with SAS AB.

29.    Moreover, this classification scheme is necessary to implement the

Transaction by providing different forms of consideration to the various parties in interest.

Specifically, New Shares will be distributed to holders of Claims in Classes 3 and 4 at SAS AB,

while Cash will be distributed to holders of Claims in Class 5 at this Debtor.  Providing different

forms of consideration to such Classes will ensure that each Class receives equivalent value under

the Plan and that the New Shares are held by a limited group of creditors that are contributing to,

and motivated to promote, the success of the Reorganized Debtors.

30.    Claims against and Interests in the Consolidated Debtors have been

similarly classified.  Further, for administrative convenience, as permitted by section 1122(b) of

the Bankruptcy Code, the Plan also provides for a convenience class—Class 6 (Convenience Class

Claims—at the Consolidated Debtors.[8]  *See* 11 U.S.C. § 1122(b) (permitting a debtor to "designate

a separate class of claims consisting only of every unsecured claim that is less than or reduced to

---

[8] Convenience Class Claims are comprised of Allowed General Unsecured Claims against the Consolidated Debtors that are not entitled to priority of payment under section 507(a) of the Bankruptcy Code, other than Norwegian Term Loan Claims, Commercial Hybrid Bond Claims, Swedish Term Loan Claims, Danish Term Loan Claims, Union Claims, Swiss Bond Claims, State Hybrid Bond Claims, Danish State Hybrid Bond Claims, and Intercompany Claims, but including Aircraft Rejection Claims, Trade Rejection Claims, Aircraft Lease Claims, and Trade Claims, in an amount equal to or less than $1,499,000 as of the Commencement Date.  There are approximately 801 Convenience Class Claims that were solicited as such in accordance with the Disclosure Statement and Solicitation Order.

an amount that the court approves as reasonable and necessary for administrative convenience"). Under the Plan, each Allowed Convenience Class Claim will recover Cash in an amount equal to 10% of such Allowed Convenience Class Claim. Providing a fixed recovery on account of such Claims, as opposed to a recovery from a limited pool of consideration as is otherwise available to holders of Allowed General Unsecured Claims, will allow the Debtors to make distributions on account of Allowed Convenience Class Claims more efficiently and without needing to establish reserves for any Disputed Claims. Further, use of the Convenience Class avoids the need for the Debtors to distribute New Shares to an additional 800 claimants, which would be time consuming and costly given the requirements holders of Claims must satisfy to receive New Shares under the Plan.

31.    As set forth above, the Debtors have legitimate legal bases and business purposes for separately classifying certain Classes of General Unsecured Claims. Accordingly, the Debtors' classification scheme complies with section 1122 of the Bankruptcy Code.

### b.    Section 1123(a):  Plan's Content is Appropriate

32.    Section 1123(a) of the Bankruptcy Code sets forth seven applicable requirements that a proponent of a chapter 11 plan must satisfy.[9]  *See* 11 U.S.C. § 1123(a).  The Plan fully complies with each such requirement, as set forth in more detail below.

- Section 1123(a)(1).  The Plan designates Classes of Claims and Classes of Interests as required by section 1123(a)(1) of the Bankruptcy Code.  *See* Plan, at § 3.2.

- Sections 1123(a)(2) and 1123(a)(3).  The Plan specifies whether each Class of Claims or Interests is Impaired or Unimpaired under the Plan and the treatment of each such Class, as required by sections 1123(a)(2) and 1123(a)(3) of the Bankruptcy Code, respectively.  *See id*., at § 3.2 and Art. IV.

---

[9] The requirements set forth in section 1123(a)(8) of the Bankruptcy Code do not apply.  Section 1123(a)(8) only applies in a case in which the debtor is an individual and, thus, is inapplicable.

- <u>Section 1123(a)(4)</u>.  Except as otherwise agreed to by a holder of a particular Claim or Interest, the treatment of each Claim or Interest in each particular Class is the same as the treatment of each other Claim or Interest in such Class, as required by section 1123(a)(4) of the Bankruptcy Code. *See id*., at Art. IV.

- <u>Section 1123(a)(5)</u>.  The Plan provides adequate means for its implementation as required by section 1123(a)(5) of the Bankruptcy Code through, among other things, the (i) substantive consolidation of the Consolidated Debtors for the limited purposes set forth in the Plan, *see id*., at § 5.1, (ii) issuance of the New Shares and New Convertible Notes to the Investors for an aggregate purchase price equal to the Total Share Subscription Amount and the New Convertible Notes Amount, *see id.*, § 5.2, (iii) effectuation of the Restructuring for Debtor SAS AB in Sweden pursuant to the Swedish SAS AB Reorganization, *see id.*, § 5.2, (iv) payment of the Initial Contribution Fees by the Convertible Notes Purchasers to the States on the Effective Date, *see id.*, § 5.3, (v) establishment of the GUC Entity (as defined in the Plan Supplement) and funding for the Reserved Funds, including funding the Escrow Contribution Fees into the Contribution Fee Escrow Account, each on the Effective Date, *see id*., at § 5.4, (vi) enactment of the Amended Organizational Documents, *see id*., at § 5.6, (vii) cancellation of the Existing Equity Interests, other existing Securities, and Liens, *see id*., at § 5.8, (viii) preservation of certain claims and Causes of Action of the Debtors, *see id*., at § 10.11; *see also* Plan Supplement, Ex. H, (ix) provisions for distributions to holders of Allowed General Unsecured Claims, *see* Plan, at Art. VI, (x) assumption of executory contracts and unexpired leases included on the Schedule of Assumed Contracts as well as the cure of defaults for all such executory contracts and unexpired leases, *see id*., at § 8.1, and (xi) vesting of property of the Estates in the Reorganized Debtors, *see id*., at § 10.2.

- <u>Section 1123(a)(6)</u>.  The prohibition of the issuance of non-voting equity securities has been or will be addressed on or prior to the Effective Date in the Amended Organizational Documents, to the extent permitted pursuant to applicable non-U.S. law governing each Debtor, or as otherwise reflected in an undertaking of shareholders or an acknowledgement for each Debtor that cannot include an express prohibition on the issuance of non-voting equity securities in its applicable Amended Organizational Documents, as indicated in the Plan Supplement.  Such documents included in the Plan Supplement will prohibit the issuance of non-voting equity securities as intended by section 1123(a)(6) of the Bankruptcy Code.

- <u>Section 1123(a)(7))</u>.  The composition of the New Boards will be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code to the extent known and determined at the time of confirmation.  Certain disclosures regarding the selection and composition of the members of the Reorganized

> SAS AB Board were filed with the Plan Supplement. The Plan provisions governing the manner of selection of any officer, director, or manager under the Plan are consistent with the interests of creditors and equity security holders and with public policy in accordance with section 1123(a)(7) of the Bankruptcy Code. *See* Plan, at § 5.11; *see also* Plan Supplement, Ex. F.

33.     For the foregoing reasons, the requirements of section 1123(a) of the Bankruptcy Code have been satisfied.

### c.     *Section 1123(b): Plan's Content is Permitted*

34.     Section 1123(b) of the Bankruptcy Code sets forth permissive provisions that may be incorporated into a chapter 11 plan. Each provision of the Plan is consistent with section 1123(b), as set forth in more detail below.

- Section 1123(b)(1). Pursuant to Articles III and IV of the Plan, holders of (A) Claims against or Interests in, as applicable, (i) SAS AB in Class 1 (Other Secured Claims) and Class 2 (Other Priority Claims) and (ii) the Consolidated Debtors, Gorm Dark Blue Limited, Gorm Deep Blue Limited, Gorm Light Blue Limited, Gorm Ocean Blue Limited, Gorm Sky Blue Limited, Gorm Asset Management Limited, Gorm Engine Management Limited, Gorm Warm Red Limited, and SANA in Class 1 (Other Secured Claims), Class 2 (Other Priority Claims), Class 7 (Intercompany Claims), and Class 9 (Intercompany Interests) are Unimpaired under the Plan (the "**Unimpaired Classes**") and (B) Claims against or Interests in, as applicable, (i) SAS AB in Class 3 (Aircraft Lease Claims and Trade Claims), Class 4 (Norwegian Term Loan Claims), Class 5 (Commercial Hybrid Bond Claims, Other General Unsecured Claims, and Intercompany Claims), Class 8 (Swiss Bond Claims), Class 10 (State Hybrid Bond Claims and Danish State Hybrid Bond Claims), and Class 11 (Existing Equity Interests), (ii) the Consolidated Debtors in Class 3 (Aircraft Lease Claims, Trade Claims, and Union Claims), Class 4 (Danish Term Loan Claims, Swedish Term Loan Claims, and Norwegian Term Loan Claims), Class 5 (Other General Unsecured Claims), Class 6 (Convenience Class Claims), and Class 8 (Swiss Bond Claims), (iii) Gorm Dark Blue Limited, Gorm Deep Blue Limited, Gorm Light Blue Limited, Gorm Ocean Blue Limited, and Gorm Sky Blue Limited in Class 3 (Aircraft Lease Claims) and Class 5 (Other General Unsecured Claims), and (iv) SANA in Class 5 (Other General Unsecured Claims) are Impaired under the Plan (the "**Impaired Classes**").

- Section 1123(b)(2). The Plan provides that, as of and subject to the occurrence of the Effective Date, all executory contracts and unexpired leases to which any of the Debtors are parties will be rejected and deemed

19

rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such contract or lease (i) was previously assumed or rejected by the Debtors, pursuant to a Final Order of the Bankruptcy Court, (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto, (iii) is the subject of a motion to assume filed by the Debtors on or before the Confirmation Date, or (iv) is specifically designated as a contract or lease to be assumed on the Schedule of Assumed Contracts. *See* Plan, at § 8.1(a). Section 8.2 of the Plan provides for, pursuant to section 365(b)(1) of the Bankruptcy Code, payment of an applicable Cure Amount, as reflected on the applicable Cure Notice, in Cash on the Effective Date, or as soon as reasonably practicable thereafter, subject to the limitations described in Section 8.2 of the Plan, or on such other terms as the counterparties to such executory contracts or unexpired leases and the Debtors may otherwise agree.  Accordingly, the Plan is consistent with section 1123(b)(2) of the Bankruptcy Code.

- <u>Section 1123(b)(3)(B)</u>.  Except as the Plan otherwise provides, section 10.11 of the Plan and the Schedule of Retained Causes of Action preserve for the Reorganized Debtors any claims, Causes of Action, rights of setoff or recoupment, and other legal or equitable defenses that the Debtors had immediately prior to the Effective Date on behalf of the Estates or themselves in accordance with the Bankruptcy Code and applicable non-bankruptcy law.  *See* Plan Supplement, Ex. H.

- <u>Section 1123(b)(5)</u>.  As permitted by section 1123(b)(5) of the Bankruptcy Code, the Plan modifies the rights of holders of Claims and Interests in the Impaired Classes and leaves unaffected the rights of holders of Claims and Interests in the Unimpaired Classes.  *See* Plan, at Art. IV.

- <u>Section 1123(b)(6)</u>.  Section 1123(b)(6) of the Bankruptcy Code is a "catch all" provision that permits inclusion in a plan of any appropriate provision as long as such provision is not inconsistent with applicable sections of the Bankruptcy Code.  In accordance with section 1123(b)(6) of the Bankruptcy Code, the Plan contains certain release, exculpation, and injunction provisions essential to the reorganization and consistent with the applicable provisions of the Bankruptcy Code and law in the Second Circuit, which are addressed in detail below.  No provisions of the Plan are inconsistent with the Bankruptcy Code.

35.    Accordingly, each of the foregoing permissive provisions are consistent with section 1123(b) of the Bankruptcy Code.

> ### *i.*        *Plan Releases, Exculpation Provision, and Injunction Provision Should Be Approved*

36.      The Plan provides for (i) the release of claims and Causes of Action by (a) the Debtors and their Estates as set forth in Section 10.7(a) of the Plan (the "**Debtors' Releases**") and (b) certain non-Debtor third-parties—the Releasing Parties[10]—against the Released Parties[11] as set forth in Section 10.7(b) of the Plan (the "**Third-Party Releases**," and together with the Debtors' Releases, the "**Plan Releases**"), (ii) the exculpation of certain parties as set forth in Section 10.8 of the Plan (the "**Exculpation Provision**"), and (iii) the injunction of certain actions as set forth in Section 10.9 of the Plan (the "**Injunction Provision**").

37.      The Plan Releases, Exculpation Provision, and Injunction Provision are integral components of the Plan, were negotiated in good faith and at arm's length, are appropriate and necessary under the circumstances, are being provided in exchange for fair consideration, and are consistent with the Bankruptcy Code and comply with applicable law.  As such, each should be approved.

---

[10] "**Releasing Parties**" means, collectively, (i) the Released Parties, other than the Danish State Investor and the Danish State Noteholder, (ii) all holders of Claims who vote to accept the Plan, (iii) all holders of Claims that either vote to reject the Plan or abstain from voting on the Plan and affirmatively opt to grant the releases by checking the appropriate box on the Ballot, and (iv) all holders of Claims and Interests not described in the foregoing clauses (i) – (iii) that affirmatively opt to grant the releases by checking the appropriate box on the notice form; *provided, however*, that the Danish State Investor and the Danish State Noteholder shall provide releases solely pursuant to Section 3.3(f) of the Investment Agreement.

[11] "**Released Parties**" means, collectively, (i) the Debtors, (ii) the DIP Agent and the DIP Lenders, (iii) the Creditors' Committee and each of its present and former members, (iv) the Investors, (v) the Danish State Noteholder, (vi) the Swedish State, (vii) the Swiss Bonds Agent, and (viii) with respect to each of the foregoing Entities in clauses (i) through (vii), such Entities' Related Entities, and their respective heirs, executors, estates, and nominees, in each case in their capacity as such; *provided, however*, that, subject to Section 3.3(f) of the Investment Agreement, any holder of a Claim or Interest that would otherwise constitute a Released Party that does not consent to the releases in the Plan shall not be a Released Party; *provided, further, however*, that, to the extent the Danish State Noteholder gives such a release as contemplated by the Investment Agreement, the Danish State Noteholder shall be a Released Party under the Plan for all purposes; *provided, further, however*, that the Released Parties referenced in clause (viii) are Released Parties solely with respect to work performed for or on behalf of the applicable Entity for which releases are given pursuant to the Plan.

38.    <u>Debtors' Releases</u>.    In accordance with section 1123(b)(3)(A) of the Bankruptcy Code, Section 10.7(a) of the Plan provides for the Debtors' Releases, which include the release of certain claims and Causes of Action of the Debtors and their Estates against the Released Parties.  The Debtors' Releases will not (i) affect the liability of any Entity from Causes of Action based on willful misconduct, gross negligence, or intentional fraud as determined by a Final Order, (ii) release post-Effective Date obligations of any Entity under the Plan, the Restructuring, the Definitive Documents, or any other document, instrument, or agreement executed to implement the Plan (unless expressly cancelled by the Plan), or (iii) affect the Releasing Parties' rights that remain in effect from and after the Effective Date to enforce the Plan, the Definitive Documents, and the obligations contemplated by the Transaction or as otherwise provided in any order of the Court.

39.    Claims held by a debtor against third parties are property of the estate.  11 U.S.C. § 541(a)(1).  Such claims may be released in exchange for settlement.  *See MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.) (Manville I)*, 837 F.2d 89, 91-92 (2d Cir. 1988).  When considering releases by a debtor of non-debtor third parties pursuant to section 1123(b)(3)(A) of the Bankruptcy Code, the appropriate standard in the Second Circuit is whether the release is a valid exercise of the debtor's business judgment and is fair, reasonable, and in the best interests of the estate.  *See In re Motors Liquidation Co*., 447 B.R. 198, 220 (Bankr. S.D.N.Y. 2011) ("Releases by estates involve a give-up of potential rights that are owned by the estate, and are perfectly permissible in a plan, either as parts of plan settlements or otherwise, though the court must satisfy itself (at least if anyone raises the issue) that the give-up is an appropriate exercise of business judgment, and, possibly, in the best interests of the estate.").  Accordingly, debtors have

considerable leeway in issuing releases of their own claims, and such releases are considered "uncontroversial." *See In re Adelphia Commc'ns Corp.*, 368 B.R. at 263 n. 289.

40.    As an exercise of its business judgment, a debtor's decision to release claims against third parties under a plan is afforded deference. *See In re Sabine Oil & Gas Corp.*, 555 B.R. 180 at 309 ("Debtor releases are approved by courts in the Second Circuit when the Debtors establish that such releases are in the 'best interests of the estate[.]'"); *In re Motors Liquidation Co.*, 447 B.R. at 220; *In re DBSD N. Am., Inc.*, 419 B.R. 179, 217 (Bankr. S.D.N.Y. 2009) (approving plan provision that released and discharged claims and causes of action by debtors on the basis that such releases and discharges "represent a valid exercise of the [d]ebtors' business judgment, and are fair, reasonable and in the best interests of the estate"), *aff'd sub nom. Sprint Nextel Corp. v. DBSD N. Am., Inc. (In re DBSD N. Am., Inc.)*, Case No. 90–13061 (REG), 2010 WL 1223109 (S.D.N.Y. Mar. 24, 2010), *aff'd in part, rev'd in part sub nom. DISH Network Corp. v. DBSD N. Am. Inc. (In re DBSD N. Am.)*, 634 F.3d 79 (2d Cir. 2011).  Moreover, releases by a debtor are often in the best interests of its estate where "the costs involved [in pursuing the released claims] likely would outweigh any potential benefit from pursuing such claims." *See In re Lear Corp.*, Case No. 09-14326 (ALG), 2009 WL 6677955, at *7 (Bankr. S.D.N.Y. Nov. 5, 2009); *In re Calpine Corp.*, Case No. 05-60200 (BRL), 2007 WL 4565223, at *9-10 (Bankr. S.D.N.Y. Dec. 19, 2007), *appeal denied sub nom. Compania Internacional Financiera S.A. v. Calpine Corp. (In re Calpine Corp.)*, 390 B.R. 508 (S.D.N.Y. 2008), *aff'd sub nom. Felluss v. Calpine Corp. (In re Calpine Corp.)*, 354 F. App'x 479 (2d Cir. 2009).

41.    Here, the Debtors' Releases—to which only the U.S. Trustee has objected—represent a sound exercise of the Debtors' business judgment.  The Debtors' Releases are an essential component of the Plan as the Released Parties were critical to the Debtors'

reorganization efforts and prosecution of these chapter 11 cases. Without the support and cooperation of each of the Released Parties, the Debtors may not have been able to reach an agreement on the terms of the Plan. *See* Hughes Declaration, at ¶ 27.

42. Additionally, the Debtors' Releases were negotiated at arm's-length and are necessary and integral components of the Debtors' formulation and implementation of the Plan. Without providing the Debtors' Releases, the Debtors would not have been able to secure the substantial benefits of the Plan, including with respect to the Transaction incorporated therein, which provides (i) greater recoveries to holders of Allowed General Unsecured Claims as compared to the recoveries that would otherwise be available in a hypothetical liquidation of the Debtors' business and assets, (ii) payment in full of Administrative Expense Claims, and (iii) the substantial deleveraging of the Debtors' balance sheet. *See id*. Further, such releases are provided in exchange for, and are supported by, fair, substantial, and valuable consideration provided by the Released Parties, including the Investors' investment, and acquisition of a majority of the New Shares, in Reorganized SAS AB for the Total Share Subscription Amount. *See id*. As additional consideration for the Debtors' Releases, the Debtors will receive reciprocal releases from the Releasing Parties as set forth in the Plan.

43. Further, the Debtors' Releases represent a good faith settlement and compromise of the claims and Causes of Action to be released, as such claims have no material value to the Debtors and their estates, and the *de minimis* value of such claims, if any, is significantly outweighed by the value and other benefits provided by the Plan and the Investment Agreement as well as the costs that would be incurred by the Debtors in pursuing any such claims. *See* Hughes Declaration, at ¶¶ 28. Accordingly, the value received by the Debtors in exchange for

the Debtors' Releases exceeds the value of the reasonable outcomes if the Debtors instead pursued such claims and Causes of Action. *See id.*

44.    For these reasons, the Debtors' Releases are justified, fair, reasonable, and in the best interests of their estates and creditors, are an integral part of the Plan, and satisfy the key factors considered by courts in determining whether a debtor release is appropriate.

45.    <u>Third-Party Releases</u>.    Section 10.7(b) of the Plan provides for the Third-Party Releases, which contain releases by the Releasing Parties against the Released Parties, relating to, among other things, the Debtors, the Reorganized Debtors, their Estates, the Plan, the Restructuring, the Transaction, and these chapter 11 cases.

46.    In the Second Circuit, courts have approved third-party releases in a plan where the releasing party consents to such release. *See Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 142 (2d Cir. 2005). Consent may be established by a creditor voting to accept the Plan or affirmatively checking a box on a ballot or notice to "opt in" to granting the releases. *See, e.g., Adelphia Commc'ns,* 368 B.R. at 268 (finding consent established by a vote to accept the plan); *In re Lear*, 2009 WL 6677955, at *2 (finding non-debtor releases for creditors who voted to accept plan permissible); *Calpine*, 2007 WL 4565223, at *10 (approving third-party releases where "[s]uch releases by Holders of Claims and Interests provide for the release by Holders of Claims and Interests that vote in favor of the Plan," and finding such releases consensual); *In re Genco Shipping & Trading Ltd.*, 513 B.R. 233, 271 (Bankr. S.D.N.Y. 2014) (same); *In re Chassix Holdings, Inc.*, 533 B.R. 64, 80 (Bankr. S.D.N.Y. 2015) ("Creditors who rejected the Plan, but who nevertheless 'opted in' to the releases, have consented to those releases. A clearer form of 'consent' can hardly be imagined."); *In re Voyager Dig. Holdings, Inc.*, No. 22-10943 (MEW) (Bankr. S.D.N.Y. March 8, 2023) (ECF No.

1159) (approving third-party releases as consensual where opt-in procedure utilized); *In re Celsius Network LLC*, No. 22-10964 (MG) (Bankr. S.D.N.Y. November 9, 2023) (ECF No. 3972) (same); *In re GTT Commc'ns, Inc.*, No. 21-11880 (MEW) (Bankr. S.D.N.Y. December 28, 2022) (ECF No. 821) (same).

47.     Here, the Third-Party Releases are consensual, as the Releasing Parties are (i) Released Parties who have affirmatively agreed to provide the reciprocal releases as part of the Plan and Investment Agreement, *see* Hughes Declaration, at ¶ 30, (ii) holders of Claims in the Voting Classes who (a) voted in favor of the Plan and thereby affirmatively consented to the Third-Party Releases or (b) abstained from voting or voted to reject the Plan, but have nonetheless affirmatively elected to provide the Third-Party Releases by checking the appropriate box on the Ballot, or (iii) holders of Claims or Interests in the Non-Voting Classes who have affirmatively elected to provide the Third-Party Releases by checking the appropriate box on the applicable Notice of Non-Voting Status.[12]

48.     All potentially affected parties, including those creditors in items (ii) and (iii) above, received notice of the Third-Party Releases.    The Third-Party Releases were conspicuously disclosed in boldface type in the Plan, the Disclosure Statement, the Confirmation Hearing Notice, the Ballots provided to the Voting Classes, and the Notice of Non-Voting Status provided to holders of Claims and Interests in certain of the Impaired Classes.  *See* Plan § 10.7(b), Disclosure Statement, Art. V § H(7), Confirmation Hearing Notice ¶ 13, Solicitation Affidavit, Ex. C-W.  Moreover, the Ballots and the applicable Notice of Non-Voting Status also plainly

---

[12] Pursuant to the Disclosure Statement and Solicitation Order, the Court approved the inclusion of the "opt-in" box in the Ballots and applicable Notices of Non-Voting Status.  *See* Disclosure Statement and Solicitation Order ¶ 29.

notified holders of the requirement to affirmatively opt in to the Third-Party Releases to be bound thereby.

49.     As noted above, the Third-Party Releases are a critical, negotiated term of the Plan, necessary for the resolution of these chapter 11 cases, and important to the success of the Plan and the consummation of the Investment Agreement.  The Released Parties have made substantial contributions to these chapter 11 cases and the Debtors' reorganization efforts and have enabled the Debtors to propose a Plan that provides holders of Allowed General Unsecured Claims with recoveries that are equal to or greater than recoveries that would otherwise be achieved in a hypothetical liquidation scenario.  Importantly, neither the U.S. Trustee nor any economic stakeholder has objected to the Third-Party Releases.

50.     Accordingly, and based on the foregoing, the Third-Party Releases comply with Second Circuit standards and are appropriate and justified under the circumstances.

51.     <u>Exculpation</u>.  In addition to the releases discussed above, Section 10.8 of the Plan contains a customary Exculpation Provision that exculpates the Exculpated Parties[13] for Causes of Action based on, in whole or in part, among other things, the negotiation, execution, and implementation of any transactions approved by the Bankruptcy Court in the chapter 11 cases on or after the Commencement Date through the Effective Date, including the DIP Credit Agreement and the incurrence of the DIP Obligations, the Restructuring, the Disclosure Statement, the Plan, the Plan Supplement, the Confirmation Order, or other documents or any other contract, instrument, release, or document created or entered into in connection with the Disclosure

---

[13] "**Exculpated Parties**" means collectively, (i) the Debtors, (ii) the Investors, (iii) the Creditors' Committee and each of its present and former members (solely in their capacity as such), (iv) the Danish State Noteholder, (v) the Swiss Bonds Agent, (vi) with respect to each of the foregoing Entities in clauses (i) through (v), such Entities' Related Entities, and (vii) with respect to each of the foregoing Entities in clauses (i) through (vi), such Entities' respective heirs, executors, estates, and nominees, and in each case, in such Entities' capacities as such.

Statement or the Plan or any related agreements, instruments, or other documents (including the Investment Agreement), the filing of the chapter 11 cases, the solicitation of votes with respect to, or confirmation of, the Plan, and the implementation of the Restructuring.  Additionally, the Exculpation Provision carves out Causes of Action based on willful misconduct, gross negligence, or intentional fraud of any Exculpated Party, as determined by a Final Order.  *See* Plan, at § 10.8.

52.    Exculpation provisions similar to the provision included in the Plan have been found by courts in the Second Circuit to be permissible where the exculpation is "appropriately tailored to protect the Exculpated Parties from inappropriate litigation and do[es] not relieve any party of liability for gross negligence or willful misconduct." *See Calpine*, 2007 WL 4565223, at *10.  Moreover, courts in the Second Circuit look to whether such provisions are important to a debtor's plan or where the exculpated party has acted to bring a plan to fruition or provided substantial consideration to a debtor's reorganization.  *See Chemtura*, 439 B.R. at 610 – 11 (citing *DBSD*, 419 B.R. at 218); *see also In re Residential Cap., LLC*, Case No. 12-12020 (MG), 2013 WL 12161584, at *13 (Bankr. S.D.N.Y. Dec. 11, 2013) (confirming plan that contained exculpations for parties that were "instrumental to the successful prosecution of the Chapter 11 Cases or their resolution pursuant to the Plan, and/or provided a substantial contribution to the Debtors."); *see also In re BearingPoint, Inc.*, 453 B.R. 486, 494 (Bankr. S.D.N.Y. 2011) ("[E]xculpation provisions are included so frequently in chapter 11 plans because stakeholders all too often blame others for failures to get the recoveries they desire; seek vengeance against other parties, or simply wish to second guess the decisionmakers[.]"); *DBSD*, 419 B.R. at 217 (same).

53.    Here, the Exculpation Provision works to protect the Exculpated Parties who have made substantial contributions to the Debtors' reorganization efforts from collateral attacks related to good faith acts or omissions in connection with the Restructuring, while

maintaining the appropriate carve-out for willful misconduct, gross negligence, or intentional

fraud.  Further, the scope of the Exculpation Provision has been appropriately narrowed to cover

the negotiation, execution, and implementation of any transactions specifically approved by the

Court in these chapter 11 cases on or after the Commencement Date through the Effective Date.

As such, the Exculpation Provision complies with the Court's decision in *In re Aegean Marine*

*Petroleum Network Inc*.  In *Aegean*, the Court stated that an exculpation provision should work to

protect parties from carrying out orders of the Court.  *See In re Aegean Marine Petroleum Network*

*Inc.*, 599 B.R. 717, 720 (S.D.N.Y 2019) (noting that the "exculpation provision is meant to insulate

court-supervised fiduciaries and some other parties from claims that are based on actions that relate

to the restructuring, with the exception of claims that are based on allegations of fraud, willful

misconduct, or gross negligence"); *see also In re Voyager Digital Holdings, Inc.*, at ECF No. 1172

(reinforcing the view expressed in *Aegean*); *Transcript Regarding Hearing Held on February 6,*

*2024, In re SAS AB*, No. 22-10925 (MEW), (Bankr. S.D.N.Y. Feb. 6, 2024) (ECF No. 1954) at

26:7–11 (reinforcing the view expressed in *Aegean* regarding approval of exculpation provisions).

54.     Accordingly, for the reasons stated herein, the Debtors submit that the

Exculpation Provision is reasonable, appropriate, and consistent with applicable law.

55.     Injunction.  The Injunction Provision is an integral component to the Plan.

It is necessary to, among other things, provide certainty to the Debtors, the Investors, and other

key constituents that the Debtors' Plan will be enforced in accordance with its terms, including the

Plan Releases and the Exculpation Provision.  Importantly, the Injunction Provision implements

this by permanently enjoining all persons and entities from commencing or continuing in any

manner any claim that was released or exculpated pursuant to such provisions.  *See id*., at § 10.9.

The Injunction Provision is narrowly tailored to achieve that purpose.

56.     Based upon the foregoing, the Plan complies with the requirements of sections 1122 and 1123 of the Bankruptcy Code, and, therefore, satisfies the requirement of section 1129(a)(1) of the Bankruptcy Code.

## 2.   Section 1129(a)(2): Debtors have Complied with Bankruptcy Code

57.     Section 1129(a)(2) of the Bankruptcy Code requires that plan proponents comply with the applicable provisions of the Bankruptcy Code.  11 U.S.C. § 1129(a)(2).  The legislative history to section 1129(a)(2) of the Bankruptcy Code indicates that this provision is intended to encompass the disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code.  *See* H.R. Rep. No. 95-595, at 412 ("Paragraph (2) [of § 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure."); *see also Drexel Burnham Lambert*, 138 B.R. at 759.

### a.   *Section 1125: Disclosure Statement and Solicitation*

58.     Section 1125(b) of the Bankruptcy Code provides, in pertinent part, that:

> An acceptance or rejection of a plan may not be solicited after the commencement of [a] case under [the Bankruptcy Code] from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information.

11 U.S.C. §  1125(b).

59.     Pursuant to the Disclosure Statement and Solicitation Order, the Court approved the Disclosure Statement as containing "adequate information" in accordance with section 1125(b) of the Bankruptcy Code.  *See* Disclosure Statement and Solicitation Order, at ¶ 2.  Thereafter, as set forth in the Voting Certification, the Debtors solicited votes on the Plan from holders of Claims in the Voting Classes in accordance with the terms of the Disclosure Statement and Solicitation Order.  In accordance with section 1125(b) of the Bankruptcy Code, the Debtors

did not solicit votes after the Commencement Date with respect to the Plan from any party in interest prior to the entry of the Disclosure Statement and Solicitation Order.

### b.    Section 1126: Acceptance of the Plan

60.    Section 1126 of the Bankruptcy Code sets forth the requirements for determining acceptance of the Plan.  Pursuant to section 1126 of the Bankruptcy Code, only holders of Allowed Claims that are Impaired and will receive or retain property under the Plan on account of such Claims or Interests may vote to accept or reject the Plan.  11 U.S.C. § 1126.  In accordance with Articles III and IV of the Plan and section 1126 of the Bankruptcy Code, the Debtors solicited acceptances of the Plan from the holders of Claims in the Voting Classes. Further, in accordance with Articles III and IV of the Plan, the Disclosure Statement and Solicitation Order, and sections 1126(f) and (g) of the Bankruptcy Code, the Debtors did not solicit acceptances from (i) holders of Claims or Interests in the Unimpaired Classes, as the holders of such Claims and Interests are not impaired under the Plan and thus are presumed to accept the Plan, or (ii) the holders of Claims against or Interests in, as applicable, (A) SAS AB in Class 8 (Swiss Bond Claims), Class 10 (State Hybrid Bond Claims and Danish State Hybrid Bond Claims), and Class 11 (Existing Equity Interests) and (B) the Consolidated Debtors in Class 8 (Swiss Bond Claims), as the holders of such Claims and Interests will not receive any distribution or property on account of their Claims and Interests and thus are deemed to reject the Plan.

61.    Sections 1126(c) and 1126(d) of the Bankruptcy Code specify the requirements for acceptance of a plan by impaired classes of claims and interests entitled to vote to accept or reject the plan:

> (c)  A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under

subsection (e) of this section, that have accepted or rejected such plan.

(d) A class of interests has accepted a plan if such plan has been accepted by holders of such interests, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount of the allowed interests of such class held by holders of such interests, other than any entity designated under subsection (e) of this section, that have accepted or rejected such plan.

11 U.S.C. §§ 1126(c) and (d).

62.    As set forth in the Voting Certification, the Plan has been accepted by at least two-thirds in amount and more than one-half in number of Claims in each Voting Class. *See* Voting Certification, at Ex. A.

63.    Based upon the foregoing, the Debtors submit that the requirements of section 1129(a)(2) of the Bankruptcy Code have been satisfied.

### 3.    <u>Section 1129(a)(3): Plan Proposed in Good Faith and Not by Means Forbidden by Law</u>

64.    Section 1129(a)(3) of the Bankruptcy Code requires that a chapter 11 plan be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). The Second Circuit has defined the good faith standard as "requiring a showing that the plan was proposed with 'honesty and good intentions' and with 'a basis for expecting that a reorganization can be effected.'" *Koelbl v. Glessing (In re Koelbl)*, 751 F.2d 137, 139 (2d Cir. 1984). "Good faith is 'generally interpreted to mean that there exists a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code.'" *Chemtura*, 439 B.R. at 608 (quoting *In re Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th Cir. 1984)). The main objectives of chapter 11 are twofold: (i) to preserve debtors' abilities to continue operating as going concerns and (ii) to maximize value available to satisfy creditors. *See Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 453 (1999). Moreover, the

32

examination must be done on a case by case basis, and "[w]hether a [chapter 11] plan has been proposed in good faith must be viewed in the totality of the circumstances, and the requirement of [s]ection 1129(a)(3) speaks more to the process of plan development than to the content of the plan." *Chemtura*, 439 B.R. at 608 (quoting *In re Bush Indus., Inc.*, 315 B.R. 292, 304 (Bankr. W.D.N.Y. 2004)) (internal quotation marks omitted).

65.     First, both indicia of the good faith standard are present.  The Plan has been proposed with honesty and good intentions, with a proper basis for believing that the reorganization can be effectuated.  The framework of the Plan, including consummation of the Transaction embodied in the Court-approved Investment Agreement, is the result of extensive, arm's-length negotiations with the Debtors' key constituents, including the Investors and the Creditors' Committee.  *See In re Leslie Fay Cos.*, 207 B.R. 764, 781 (Bankr. S.D.N.Y. 1997) ("The fact that the plan is proposed by the committee as well as the debtors is strong evidence that the plan is proposed in good faith."); *see also Chemtura*, 439 B.R. at 608 – 09 (finding good faith requirement met because, among other things, the debtor negotiated and reached agreements with several parties in interest to put forward a chapter 11 plan which "in the aggregate . . . demonstrate a good faith effort on the part of the debtor to consider the needs and concerns of all major constituencies in this case") (quotations and citation omitted).  Further, the Debtors have a reasonable basis for believing that the Plan is feasible.  *See Infra* ¶¶ 94-96.

66.     Second, there is a reasonable likelihood that the Plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code.  The Plan maximizes value for the Debtors' stakeholders and promotes the long-term viability of the Debtors' business operations on a go-forward basis by deleveraging the Debtors' balance sheet.  Specifically, implementation of the Plan and the underlying Transaction will allow the Debtors to emerge from

chapter 11 with approximately $1.1 billion of unrestricted cash and $3.3 billion of aggregate debt

and lease obligations, which is approximately $2.2 billion of net debt at emergence (compared to

over $4.2 billion of net debt at the Commencement Date).  *See* Disclosure Statement, at Art. I § A.

Moreover, as set forth below and in the Hughes Declaration, the recoveries to creditors under the

Plan are better than expected recoveries in a hypothetical liquidation scenario.  *See* Hughes

Declaration, at ¶ 36.

67.    Accordingly, the Plan has been filed in good faith and the requirements of

section 1129(a)(3) are satisfied.

### 4.    Section 1129(a)(4): Plan Requires Court Approval of Professional Persons' Fee Claims

68.    Section 1129(a)(4) requires that "any payment made or to be made by the

proponent . . . for services or for costs and expenses in or in connection with the case, or in

connection with the plan and incident to the case, has been approved by, or is subject to the

approval of, the court as reasonable."  11 U.S.C. § 1129(a)(4).  This section has been construed to

require that all payments of professional fees made from estate assets be subject to review and

approval as to their reasonableness by the court.  *See In re J. Reg. Co.*, 407 B.R. 520, 537 (Bankr.

S.D.N.Y 2009), *appeal dismissed sub nom.*, *Freemen v. J. Reg. Co.*, 452 B.R. 367 (S.D.N.Y.

2010); *In re Resorts Int'l, Inc.*, 145 B.R. 412, 475-76 (Bankr. D.N.J. 1990); *In re Texaco Inc.*, 84

B.R. 893, 907-08 (Bankr. S.D.N.Y. 1988), *appeal dismissed sub nom.*, *Trans World Airlines, Inc.*

*v. Texaco, Inc. (In re Texaco Inc.)*, 92 B.R. 38 (S.D.N.Y. 1988).

69.    All payments by the Debtors for services provided to the Debtors during

these chapter 11 cases will be subject to approval by the Court as reasonable in accordance with

section 1129(a)(4) of the Bankruptcy Code.  Specifically, Section 2.4 of the Plan provides that all

Fee Claims must be Allowed by the Court or authorized to be paid in accordance with the order(s)

relating to or allowing any such Fee Claim.  Further, Section 11.1(e) of the Plan provides that the Court will retain jurisdiction to consider, among other things, the allowance or payment of Fee Claims.  Based on the foregoing, the Plan complies with the requirements of section 1129(a)(4) of the Bankruptcy Code.

**5.    Section 1129(a)(5): Debtors have Disclosed All Necessary Information Regarding Directors, Officers, and Insiders**

70.    Section 1129(a)(5) of the Bankruptcy Code requires that the plan proponent disclose the identity and affiliations of the proposed officers and directors of the reorganized debtors, that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy, and, to the extent there are any insiders that will be retained or employed by the reorganized debtors, that there be disclosure of the identity and nature of any compensation of any such insiders. 11 U.S.C. § 1129(a)(5).  If at the time of confirmation, the debtor is unable to identify these individuals by name, the debtor still satisfies the requirements so long as directors will be appointed consistent with the company's organizational documents and applicable law.  *See In re Charter Commc'ns*, 419 B.R. at 260 n.30 ("Although section 1129(a)(5) requires the plan to identify all directors of the reorganized entity, that provision is satisfied by the Debtors' disclosure at this time of the identities of the *known* directors." (emphasis in original)).

71.    The Debtors have satisfied the foregoing through disclosures in Section 5.11 of the Plan and the Plan Supplement.  As set forth in the Plan Supplement, the Reorganized SAS AB Board will consist of seven directors appointed as follows:

> i.    a non-executive chair of the Reorganized SAS AB Board, who will be an independent director nominated by the nomination committee of Reorganized SAS AB in consultation with each Major Shareholder (as defined in the Plan Supplement), in each case, subject to the prior written consent of the Danish State and elected by the vote of holders of

New Shares holding not less than 50% of the issued and outstanding New Shares;

ii.    two directors nominated by the Danish State Investor;

iii.    two directors nominated by Castlelake;

iv.    one director nominated by Air France-KLM; and

v.    one director elected by the vote of holders of at least 65% of the outstanding New Shares.

*See* Plan Supplement, Ex. F.

72.    In addition to the above, employee representatives will be appointed to the New Board of Reorganized SAS AB by the Debtors' employee groups in Denmark, Norway, and Sweden in line with governing legislation and special agreements.  The employee representatives consist of three employee representatives, each with two personal deputies.  *See id.*

73.    In addition, the Plan provides that, except as otherwise provided in the Plan Supplement, the officers of the respective Reorganized Debtors immediately before the Effective Date, as applicable, will serve as the initial officers of each of the respective Reorganized Debtors on and after the Effective Date.  After the Effective Date, the selection of officers of the Reorganized Debtors will be as provided by their respective Amended Organizational Documents.

74.    For the reasons set forth above, the Plan satisfies the requirements under section 1129(a)(5) of the Bankruptcy Code.

**6.    Section 1129(a)(6): Plan Does Not Contain Any Rate Changes**

75.    Section 1129(a)(6) of the Bankruptcy Code provides that "[a]ny governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval."   11 U.S.C. § 1129(a)(6).   Section 1129(a)(6) is inapplicable to these cases, as the Plan does not provide for any rate changes by the Debtors.

7.    **Section 1129(a)(7): Plan Satisfies Best Interests Test**

76.    Section 1129(a)(7) of the Bankruptcy Code requires that a plan be in the best interests of creditors and equity interest holders in each Debtor—commonly referred to as the "best interests" test.  The best interests test focuses on potential individual dissenting creditors rather than classes of claims.  *See Bank of Am. Nat'l Tr. & Sav.*, 526 U.S. at 441 n.13.  It requires that each holder of a claim or equity interest either accept the plan or receive or retain under the plan property having a present value, as of the effective date of the plan, not less than the amount such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

77.    Under the best interests test, "the court must measure what is to be received by rejecting creditors . . . under the plan against what would be received by them in the event of liquidation under chapter 7.  In doing so, the court must take into consideration the applicable rules of distribution of the estate under chapter 7, as well as the probable costs incident to such liquidation."  *In re Adelphia Commc'ns Corp.*, 368 B.R. at 252.  A bankruptcy court must evaluate a debtor's liquidation analysis cognizant of the fact that "the valuation of a hypothetical chapter 7 liquidation is, by nature, inherently speculative and is often replete with assumptions and judgments."  *ACC Bondholder Grp. v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*, 361 B.R. 337, 366-67 (S.D.N.Y. 2007) (internal quotation marks omitted).

78.    Furthermore, courts in the Second Circuit have recognized that "[v]aluation . . . is not an exact science, nor is it a product of mere calculation.  It is an imprecise tool, perhaps the best we currently have, designed to reach a calculated decision on the basis of the hypotheses and assumption in light of a set of facts."  *In re Crowthers*, 120 B.R. at 297 (citing *In re Beker Indus.*, 58 B.R. 725, 739 (Bankr. S.D.N.Y. 1986)); *see also In re Affiliated Foods, Inc.*, 249 B.R. at 788 ("The hypothetical liquidation entails a considerable degree of speculation about a situation

that will not occur unless the case is actually converted to chapter 7.") (citation omitted); *In re Charter Commc'ns*, 419 B.R. at 261 – 62 (discrediting creditors' objection to liquidation analysis because it consisted of a "largely speculative exercise of listing possible incremental recoveries and offered no reliable opinions as to the likelihood that any of these identified sources of possible extra value would ever materialize"); *In re W.R. Grace & Co.*, 475 B.R. 34, 142 (D. Del. 2012) ("[T]he court need only make a well-reasoned estimate of the liquidation value that is supported by the evidence on the record. It is not necessary to itemize or specifically determine precise values during this estimation procedure. Requiring such precision would be entirely unrealistic because exact values could only be found if the debtor actually underwent Chapter 7 liquidation."), *aff'd*, 532 F. App'x 264, 729 F.3d 311, 729 F.3d 332 (3d Cir. 2013).

79.    As section 1129(a)(7) of the Bankruptcy Code makes clear, the liquidation analysis applies only to non-accepting holders of impaired claims or equity interests. *See Drexel Burnham Lambert*, 138 B.R. at 761 ("[T]he liquidation analysis applies only to non-accepting impaired claims or interests."). Accordingly, the best interests test does not apply to the holders of Claims or Interests in the Unimpaired Classes because each holder is (i) Unimpaired under the Plan, (ii) presumed to accept the Plan, and (iii) will receive payment in full, be reinstated and paid in the ordinary course, or have its legal, equitable, or contractual rights unaltered.

80.    As set forth in the liquidation analysis annexed to the Disclosure Statement as Exhibit C (the "**Liquidation Analysis**"), the best interests test is satisfied as to every single holder of a Claim against or Interest in a Debtor. Specifically, the Liquidation Analysis demonstrates that all holders of Claims against the Debtors will receive the same or greater recoveries under the Plan than what such holders would receive in a hypothetical chapter 7 liquidation. Further, the Liquidation Analysis demonstrates that holders of Interests in the Debtors

are not projected to receive any distributions on account of their Interests either under the Plan or in a hypothetical chapter 7 liquidation.  The chart annexed hereto as **Exhibit A** provides the estimated recoveries for Claims against or Interests in each Debtor under the Plan as compared to recoveries that would be received (if any) in a chapter 7 liquidation scenario.

81.    Notably, holders of General Unsecured Claims at each Debtor are not projected to recover any amounts in a hypothetical chapter 7 liquidation, with the exception of holders of Claims in Class 7 (Intercompany Claims) at Gorm Asset Management Limited and Gorm Engine Management Limited, which are projected to recover 1.3% and 56.8%, respectively. Because such Class 7 Intercompany Claims are Unimpaired under the Plan, the best interests test is satisfied as to such Claims.

82.    The Debtors' Liquidation Analysis was prepared by the Debtors with the assistance of their advisors.  The Liquidation Analysis is sound and reasonable and incorporates justified assumptions and estimates regarding (i) the Debtors' assets and Claims, (ii) the additional costs and expenses of a chapter 7 trustee and professionals that would be incurred, (iii) the delay and erosion of value that would result due to the need of the newly appointed chapter 7 trustee and professionals to familiarize themselves with the assets and liabilities of the Debtors, and (iv) the reduced recoveries caused by an accelerated sale or disposition of the Debtors' assets by the chapter 7 trustee.  *See* Liquidation Analysis, at C-2-C-3.

83.    The assumptions and estimates in the Liquidation Analysis are appropriate in the context of these chapter 11 cases and are based upon the knowledge and expertise of the Debtors, with the assistance of their advisors.  The Debtors' advisors have intimate knowledge of the Debtors' businesses and relevant industry and restructuring experience.

84.     Accordingly, the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code (except as indicated above, where section 1129(b) of the Bankruptcy Code applies).

**8.     Section 1129(a)(8): Plan Has Been Accepted by Impaired Voting Classes**

85.     Section 1129(a)(8) of the Bankruptcy Code requires that "[w]ith respect to each class of claims or interests – (A) such class has accepted the plan; or (B) such class is not impaired under the plan."  11 U.S.C. § 1129(a)(8).

86.     Holders of Claims and Interests in Class 1 (Other Secured Claims), Class 2 (Other Priority Claims), and Class 9 (Intercompany Interests) are Unimpaired under the Plan and are, therefore, conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

87.     As set forth in the Voting Certification, the Plan has been accepted by at least two-thirds in amount and one-half in number of holders in the Voting Classes in compliance with section 1126 of the Bankruptcy Code.  *See* Voting Certification, at Ex. A.

88.     Holders of Claims against or Interests in, as applicable, (A) SAS AB in Class 8 (Swiss Bond Claims), Class 10 (State Hybrid Bond Claims and Danish State Hybrid Bond Claims), and Class 11 (Existing Equity Interests) and (B) the Consolidated Debtors in Class 8 (Swiss Bond Claims) will not receive or retain any property on account of their Claims or Interests and, as such, are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  As to these Classes, the Plan may be confirmed over their dissent under the "cram down" provisions of section 1129(b) of the Bankruptcy Code, and the Debtors submit that, for the reasons set forth below, the requirements to "cram down" these Classes have been met.

89.     Accordingly, the Plan satisfies the requirements of section 1129(a)(8) of the Bankruptcy Code.

9.      **Section 1129(a)(9): Plan Provides for Payment in Full of All Allowed Priority Claims**

90.      Section 1129(a)(9) of the Bankruptcy Code requires that persons holding allowed claims entitled to priority under section 507(a) of the Bankruptcy Code receive specified cash payments under the plan unless the holder of a particular claim agrees to a different treatment with respect to such claim.  11 U.S.C. § 1129(a)(9).

91.      The Plan provides that, unless a holder agrees to less favorable treatment, holders of Allowed Administrative Expense Claims under section 503(b) of the Bankruptcy Code will receive, at the option of the Debtors or the Reorganized Debtors (as applicable), either (i) Cash in an amount equal to such Allowed Claim on or as soon as reasonably practicable after the latest of (a) the Effective Date, (b) the date that is ten Business Days after the date on which such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, and (c) the date on which such Administrative Expense Claim would be paid by the Debtors in the ordinary course, or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code; *provided*, *however*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors during the chapter 11 cases shall be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents relating to such transactions. *See* Plan, at § 2.1.  Therefore, the Plan satisfies section 1129(a)(9)(A) of the Bankruptcy Code.

92.      Moreover, the Plan provides that, unless a holder agrees to less favorable treatment, holders of Allowed Other Priority Claims under section 507(a) of the Bankruptcy Code (excluding Priority Tax Claims under sections 502(i) and 507(a)(8) thereof) will receive, at the

41

option of the Debtors or the Reorganized Debtors (as applicable) (i) Cash in an amount equal to such Allowed Claim on or as soon as reasonably practicable after the later of the Effective Date and the date that is ten Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, or (ii) such other treatment consistent with the provisions of section 1129 of the Bankruptcy Code.  *See id*.  The Plan, therefore, satisfies the requirements of section 1129(a)(9)(B) of the Bankruptcy Code.

93.    The Plan also satisfies the requirements of section 1129(a)(9)(C) of the Bankruptcy Code in respect of the treatment of Allowed Priority Tax Claims.  The Plan provides that, except as otherwise may be agreed, each holder of an Allowed Priority Tax Claim will receive, in full and final satisfaction of such Allowed Priority Tax Claim, at the option of the Debtors or the Reorganized Debtors, as applicable, either (i) Cash in an amount equal to such Allowed Priority Tax Claim on or as soon as reasonably practicable after the later of (a) the Effective Date, (b) the date that is ten Business Days after the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, and (c) the date on which such Priority Tax Claim would be paid by the Debtors in the ordinary course, or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.  *See id*., at § 2.2.  Accordingly, the Plan satisfies each of the requirements of section 1129(a)(9) of the Bankruptcy Code.

**10.    Section 1129(a)(10): Plan Has Been Accepted By At Least One Class of Impaired Claims**

94.    Section 1129(a)(10) of the Bankruptcy Code requires, if a class of claims is impaired, the affirmative acceptance of the Plan by at least one impaired class of claims, "determined without including any acceptance of the plan by any insider."  11 U.S.C. § 1129(a)(10).  As discussed above, each Voting Class is Impaired and has voted to accept the

Plan. *See* Voting Certification, at Ex. A. Accordingly, the Plan satisfies section 1129(a)(10) of the Bankruptcy Code.

      **11.**    **Section 1129(a)(11): Plan is Feasible**

      95.    Section 1129(a)(11) of the Bankruptcy Code requires the Court to determine that the Plan is feasible as a condition precedent to confirmation. Specifically, it requires a finding that confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor to the Debtors, unless such liquidation or reorganization is proposed in the plan. 11 U.S.C. § 1129(a)(11). The feasibility test set forth in section 1129(a)(11) requires the Court to determine whether the Plan may be implemented and has a reasonable likelihood of success. *See United States v. Energy Res. Co.*, 495 U.S. 545, 549 (1990); *Kane*, 843 F.2d at 649. "The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtors can possibly attain after confirmation." *In re Young Broadcasting Inc.*, 430 B.R. 99, 128 (Bankr. S.D.N.Y. 2010) (quoting *In re Invs. Fla. Aggressive Growth Fund, Ltd.*, 168 B.R. 760, 765 (Bankr. N.D. Fla. 1994)); *see also Pizza of Haw., Inc. v. Shakey's, Inc. (In re Pizza of Haw., Inc.)*, 761 F.2d 1374, 1382 (9th Cir. 1985). However, just as speculative prospects of success cannot sustain feasibility, speculative prospects of failure cannot defeat feasibility. The mere prospect of financial uncertainty cannot defeat confirmation on feasibility grounds. *In re Young Broadcasting*, 430 B.R. at 129 (citing *In re U.S. Truck Co.*, 47 B.R. 932, 944 (E.D. Mich. 1985), *aff'd*, 800 F.2d 581 (6th Cir. 1986)). Success need not be guaranteed, so long as the plan has a "reasonable likelihood of success." *In re Adelphia Bus. Sols, Inc.*, 341 B.R. at 421 – 22 (citing *Kane*, 843 F.2d at 649 ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success. Success need not be guaranteed.")); *see also In re Texaco Inc.*, 84 B.R. at 910 ("All that is required is that there be a reasonable assurance of commercial viability.").

96.     For purposes of determining whether the Plan satisfies the aforementioned standards, the Debtors analyzed their ability to fulfill their obligations under the Plan.  As part of this analysis, the Debtors, with the assistance of their advisors, developed and prepared the Financial Projections, attached as <u>Exhibit D</u> to the Disclosure Statement, for the period from November 1, 2023 through October 31, 2027.  The Financial Projections are based on, and accompanied by, key assumptions and commentary as to the future operations of the Reorganized Debtors and reflect management's good faith judgments and expectations regarding the Reorganized Debtors' future financial position.  *See* Hughes Declaration, at ¶ 47; *see also* Disclosure Statement, Ex. D. (Financial Projections) at D-1.

97.     The Plan embodies a value maximizing transaction that will provide for the continued viability of the Debtors' business.  The Financial Projections demonstrate that the Reorganized Debtors will generate substantial cash flow over the projection period and be able to meet their obligations under the Plan.  *See* Hughes Declaration, at ¶ 48.  Additionally, the Plan provides for the delivery of distributions to holders of certain Allowed General Unsecured Claims following the consummation of the Transaction.  Upon the closing of the Transaction, the Debtors will be able to perform all of their obligations described in the Plan, including with respect to making distributions to certain holders of Allowed General Unsecured Claims from the New Shares Distribution Pool and Available Cash and funding the Reserved Funds.

98.     Based upon the Financial Projections, and as set forth in the Hughes Declaration, the Debtors submit that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization of any of the Debtors.  Accordingly, the Plan satisfies the feasibility standard of section 1129(a)(11) of the Bankruptcy Code.

**12.    Section 1129(a)(12): All Statutory Fees Have Been Or Will Be Paid**

99.    Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan." 11 U.S.C. § 1129(a)(12).  Section 507 of the Bankruptcy Code provides that "any fees and charges assessed against the estate under [section 1930] of title 28" are afforded priority as administrative expenses.  11 U.S.C. § 507(a)(2).  In accordance with sections 507 and 1129(a)(12) of the Bankruptcy Code, Section 12.1 of the Plan provides that Statutory Fees due and payable prior to the Effective Date will be paid by the Debtors or the Reorganized Debtors, as applicable, and Statutory Fees due on and after the Effective Date will be paid by the Reorganized Debtors when due and payable.

100.    The Proposed Confirmation Order also provides for the payment of all such statutory fees.  *See* Proposed Confirmation Order, at ¶ 23.  The Plan therefore complies with section 1129(a)(12) of the Bankruptcy Code.

**13.    Section 1129(a)(13):  All Retiree Benefits Continued Under Plan**

101.    Section 1129(a)(13) of the Bankruptcy Code requires chapter 11 plans to continue all "retiree benefits" (as defined in section 1114 of the Bankruptcy Code).  11 U.S.C. § 1129(a)(13).  Section 8.5 of the Plan provides that any policies or programs applicable to, among others, retirees shall be assumed pursuant to sections 365 and 1123 of the Bankruptcy Code and continue after the Effective Date in accordance with their terms.  Accordingly, the Plan complies with section 1129(a)(13) of the Bankruptcy Code.

**14.    Section 1129(a)(14), (a)(15), and (a)(16):  Inapplicable Provisions**

102.    Section 1129(a)(14) of the Bankruptcy Code relates to the payment of domestic support obligations, which is inapplicable to the Debtors.  11 U.S.C. § 1129(a)(14).

103.    Section 1129(a)(15) of the Bankruptcy Code applies only in cases in which the debtor is an "individual" (as that term is defined in the Bankruptcy Code). 11 U.S.C. § 1129(a)(15). The Debtors are not "individuals" and, accordingly, section 1129(a)(15) is inapplicable.

104.    Section 1129(a)(16) of the Bankruptcy Code applies to transfers of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust. 11 U.S.C. § 1129(a)(16). The Debtors are each a moneyed, business, or commercial corporation and, accordingly, section 1129(a)(16) is inapplicable. To the extent there are any transfers of property made pursuant to the Plan, such transfers will be made in accordance with applicable nonbankruptcy law.

### 15.    Plan Satisfies "Cram Down" Requirements under Section 1129(b) of the Bankruptcy Code for Non-Accepting Classes

105.    Section 1129(b) of the Bankruptcy Code provides a mechanism (known colloquially as "cram down") for confirmation of a chapter 11 plan in circumstances where the plan is not accepted by all impaired classes of claims. Under section 1129(b), the court may "cram down" a plan over the dissenting vote of an impaired class or classes of claims or interests as long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to such dissenting class or classes.

106.    The Voting Classes have accepted the Plan by the required threshold under the Bankruptcy Code. Therefore, "cram down" is relevant only to those Classes of Claims and Interests that are deemed to have rejected the Plan: (i) Class 8 (Swiss Bond Claims); Class 10 (State Hybrid Bond Claims and Danish State Hybrid Bond Claims); and Class 11 (Existing Equity Interests) at SAS AB and (ii) Class 8 (Swiss Bond Claims) at the Consolidated Debtors. The Plan

may be confirmed as to each of these Classes pursuant to the "cram down" provisions of section
1129(b) of the Bankruptcy Code.

### a.  The Plan Does Not Discriminate Unfairly

107.    The unfair discrimination standard of section 1129(b)(1) ensures that a plan
does not unfairly discriminate against a dissenting class with respect to the value it will receive
under a plan when compared to the value given to all other similarly situated classes.  *See In re
LightSquared Inc.*, 513 B.R. 56, 99 (Bankr. S.D.N.Y. 2014).   Generally, a plan unfairly
discriminates in violation of section 1129(b)(1) of the Bankruptcy Code only if similar classes are
treated differently without a reasonable basis for the disparate treatment.  *See Sabine Oil & Gas*,
555 B.R. at 316 (finding that "Plan does not unfairly discriminate among classes of claims and
interests because holders of claims with similar legal rights will not be receiving materially
different treatment under the Plan."); *WorldCom*, 2003 WL 23861928, at *59 (citing *In re
Buttonwood Partners, Ltd.*, 111 B.R. 57, 63 (Bankr. S.D.N.Y. 1990); *In re Johns-Manville Corp.*,
68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd in part, rev'd in part on other grounds*, 78 B.R.
407 (S.D.N.Y. 1987), *aff'd sub nom*, *Kane v. Johns-Manville Corp., 843 F.2d 636 (2d Cir. 1988)).
Accordingly, as between two classes of claims or two classes of interests, there is no unfair
discrimination if (i) the classes are comprised of dissimilar claims or interests, *see, e.g., Johns-
Manville*, 68 B.R. at 636, or (ii) taking into account the particular facts and circumstances of the
case, there is a reasonable basis for such disparate treatment, *see, e.g., In re Drexel Burnham
Lambert Grp., Inc.*, 138 B.R. 714, 715 (Bankr. S.D.N.Y. 1992) (separate classification and
treatment was rational where members of each class "possess[ed] different legal rights"), *aff'd sub
nom. Lambert Brussels Asocs, L.P. v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham
Lambert Grp., Inc.)*, 140 B.R. 347 (S.D.N.Y. 1992).

108. The Plan does not discriminate unfairly with respect to holders of Claims and Interests in the Classes that are deemed to reject the Plan – (i) Class 8 (Swiss Bond Claims), Class 10 (State Hybrid Bond Claims and Danish State Hybrid Bond Claims), and Class 11 (Existing Equity Interests) at SAS AB and (ii) Class 8 (Swiss Bond Claims) at the Consolidated Debtors – because the Claims and Interests in such Classes are legally distinct in nature and priority from the Claims and Interests in any other Class at such Debtors. Additionally, all Claims and Interests similarly situated to the Claims and Interests in such Classes that are deemed to reject the Plan will receive substantially similar treatment under the Plan. Class 8 (Swiss Bond Claims) at SAS AB and the Consolidated Debtors and Class 10 (State Hybrid Bond Claims and Danish State Hybrid Bond Claims) at SAS AB include Claims that are subordinated to Other General Unsecured Claims pursuant to the terms of the applicable agreements giving rise to such Claims.

109. Accordingly, the Plan does not discriminate unfairly with respect to any dissenting Classes of Claims or Interests.

### b.    *The Plan is Fair and Equitable*

110. To be "fair and equitable" as to holders of unsecured claims, section 1129(b)(2)(B) of the Bankruptcy Code requires a plan to provide either (i) each holder of the nonaccepting class will receive or retain on account of such claim property of a value equal to the allowed amount of such claim, or (ii) a holder of a claim or interest that is junior to the claims of the nonaccepting class will not receive or retain any property under the plan. *See* 11 U.S.C. § 1129(b)(2)(B). The rule is satisfied as to Class 8 (Swiss Bond Claims) at Debtor SAS AB and the Consolidated Debtors and Class 10 (State Hybrid Bond Claims and Danish State Hybrid Bond Claims) at Debtor SAS AB, as no Claims or Interests junior to such Classes will receive or retain any property under the Plan (other than as set forth in the following sentence). While Interests in Class 9 (Intercompany Interests) at the Consolidated Debtors will be reinstated under  the Plan,

where Class 8 (Swiss Bond Claims) at the Consolidated Debtors is deemed to reject the Plan, there is a reasonable basis for such difference in treatment. Reinstating Class 9 (Intercompany Interests) at the Consolidated Debtors preserves the legal structure of the Debtors' business and allows the Investors to efficiently acquire the enterprise pursuant to the Plan and Investment Agreement and is not structured to unfairly prejudice holders of Claims in Class 8 (Swiss Bond Claims), which will not receive or retain any value under the Plan.

111.    To be "fair and equitable" as to holders of interests, section 1129(b)(2)(C) of the Bankruptcy Code requires a plan to provide either (i) that each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest, or (ii) that a holder of an interest that is junior to the nonaccepting class will not receive or retain any property under the plan. *See* 11 U.S.C. § 1129(b)(2)(C). The "fair and equitable" rule is satisfied as to the holders of Class 11 (Existing Equity Interests) at Debtor SAS AB as there are no interests junior to such Class. *See In re Finlay Enters. Inc.*, No. 09-14873 (JMP), 2010 WL 6580628, at *7 (Bankr. S.D.N.Y. June 29, 2010) (finding that fair and equitable test satisfied where no interest junior to the interests of the rejecting class received any property under the plan). Moreover, no senior creditor will receive in excess of the full value of its Claim under the Plan.

112.    As such, the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code as to the Classes of Claims and Interests that are deemed to reject the Plan and may be confirmed despite the rejection by such Classes.

### 16.    <u>Section 1127:  Modifications to Plan</u>

113.    Pursuant to section 1127 of the Bankruptcy Code, a plan proponent may modify a plan at any time before confirmation so long as the plan, as modified, satisfies the

requirements of sections 1122 and 1123 of the Bankruptcy Code and the proponent of the

modification complies with section 1125 of the Bankruptcy Code.  11 U.S.C. § 1127.  In addition,

with respect to modifications made after acceptance but prior to confirmation of the plan,

Bankruptcy Rule 3019 provides, in relevant part:

> [A]fter a plan has been accepted and before its confirmation, the
> proponent may file a modification of the plan. If the court finds after
> hearing on notice to the trustee, any committee appointed under the
> Code, and any other entity designated by the court that the proposed
> modification does not adversely change the treatment of the claim
> of any creditor or the interest of any equity security holder who has
> not accepted in writing the modification, it shall be deemed accepted
> by all creditors and equity security holders who have previously
> accepted the plan.

Fed. R. Bankr. P. 3019(a).

114.    The Debtors have made certain modifications to the Plan, evidenced in the

Proposed Confirmation Order, to, among other things, resolve informal comments that the Debtors

received from various parties in interest and to clarify certain provisions of the Plan.  As discussed

above, the Plan complies with sections 1122 and 1123 of the Bankruptcy Code, and the Debtors

have complied with section 1125 of the Bankruptcy Code, and thus the requirements of section

1127 have been satisfied.  Further, given that the subsequent modifications to the Plan are

clarifying in nature and none of the modifications materially or adversely affect, or alter the

treatment of, any Claims under the Plan without the written consent of the affected holders of such

Claims, the requirements of Bankruptcy Rule 3019(a) have been satisfied.

## II.    SUBSTANTIVE CONSOLIDATION OF CONSOLIDATED DEBTORS IS APPROPRIATE

115.    Courts may exercise equitable powers to substantively consolidate the

assets and liabilities of two or more debtors for the purpose of creating a single common pool of

assets from which creditors may seek recovery on their claims.  *See Union Sav. Bank v.*

*Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.)*, 860 F.2d 515, 518 (2d Cir. 1988) ("*Augie/Restivo*") ("Substantive consolidation has no express statutory basis but is a product of judicial gloss."); *Drexel Burnham Lambert Grp., Inc.*, 138 B.R. at 764; *see also In re Donut Queen, Ltd.*, 41 B.R. 706, 708–09 (Bankr. E.D.N.Y.1984) (holding that the power of the court to substantively consolidate separate corporate debtors arises from section 105(a) of the Bankruptcy Code).

116.    In the Second Circuit, courts apply the so-called *Augie/Restivo* test when assessing the propriety of substantive consolidation.  Under this test, a court may order substantive consolidation over the objection of a party in interest only when the proponent of substantive consolidation establishes one of the following two independent bases:[14]

- creditors dealt with the debtor entities proposed to be substantively consolidated as a single economic unit and did not rely on their separate identities in extending credit; or

- the affairs of the debtor entities proposed to be consolidated are so entangled that substantive consolidation will benefit all creditors of the consolidated estate.

*Augie/Restivo*, 860 F.2d at 518.

117.    Courts have significant discretion to consider various factors, which can be used interchangeably for both prongs of the test, when determining whether substantive consolidation is appropriate.  Those factors include:

- the existence of operational entanglement;[15]

---

[14] "Conceivably, substantive consolidation could be warranted on either ground.  The Second Circuit's use of the conjunction 'or' suggests that the two cited factors are alternatively sufficient criteria." *In re 599 Consumer Electronics, Inc.*, 195 B.R. 244, 248 (S.D.N.Y. 1996).

[15] *See e.g., Drexel Burnham Lambert Grp., Inc.*, 138 B.R. at 741 (approving substantive consolidation where all support functions, including finance, legal, administrative, operations clearing systems, communications, mailroom, internal audit and external audit were provided by one debtor entity); *In re WorldCom, Inc.*, 2003 WL 23861928, at

- the existence of guarantees and intercompany loans;[16]

- public perception of the debtors;[17]

- shared cash management systems and intercompany transfers;[18]

- shared decision-making and control processes;[19] and

- whether substantive consolidation would facilitate a timely confirmation of the debtors' plan and aid the debtors' rehabilitation.[20]

118.    The substantive consolidation of the Consolidated Debtors for voting and distribution purposes as set forth in the Plan satisfies the *Augie/Restivo* standard.  The Consortium Constituents are each joint-and-severally liable for all liabilities of the Consortium.  *See* Hughes Declaration, at ¶ 58.  Further, the Consortium Constituents' only assets are the Intercompany Interests they hold in the Consortium.  *Id*.  As a result, assigning value to the Consortium Constituents, separate and apart from the Consortium, is nearly impossible.  *Id*.

119.    For such reasons, substantive consolidation of the Consolidated Debtors is appropriate under the *Augie/Restivo* standard and should be approved.

---

*37 (noting debtors "operate a single business under a single business plan" and finding that the debtors demonstrated operational and financial entanglement of their business affairs, warranting substantive consolidation).

[16] *See e.g., Drexel Burnham Lambert Grp., Inc.*, 138 B.R. at 741 – 45, 761 – 767 (approving substantive consolidation and noting it was "customary for customers, creditors, and counterparties to seek guarantees of DBL Group."); *In re Republic Airways Holdings, Inc.*, 565 B.R. at 719 (finding significant overlap in creditor pools due to intercompany guarantees to be a factor in favor of consolidation).

[17] *See e.g., Drexel Burnham Lambert Grp., Inc.*, 138 B.R at 744 (noting that debtor entities to be consolidated "did not advertise in their own names and did not hold themselves out to the public as independent entities"); *In re Republic Airways Holdings Inc.*, 565 B.R. 710, 720 (approving substantive consolidation and pointing to testimony of debtor's CEO stating: "We don't hold ourselves out as Shuttle America or Chautauqua or Republic, the airline, or Republic Holdings on our website. We just hold ourselves out as Republic.").

[18] *See e.g., In re Republic Airways Holdings, Inc.*, 565 B.R. at 719 (noting debtors use of the same cash management system in approving substantive consolidation).

[19] *See e.g., In re Republic Airways Holdings, Inc.*, 565 B.R. at 716 – 17 (noting that a factor favoring substantive consolidation is the "common management and control of the Debtors") (citation omitted); *Drexel Burnham Lambert Grp., Inc.*, 138 B.R at 764 (noting directors of subsidiary not acting independently was in interest of subsidiary, but taking direction from parent as factor in considering whether consolidation warranted).

[20] *See e.g., In re Republic Airways Holdings Inc*, 565 B.R. at 721 (finding substantive consolidation appropriate where a delayed confirmation would adversely affect pilot hiring and lead to underperformance, which would lead to diminished unsecured creditor recoveries); *Drexel Burnham Lambert Grp., Inc.*, 138 B.R. at 767.

## III.    U.S. TRUSTEE OBJECTION SHOULD BE OVERRULED AND PLAN CONFIRMED

120.    As set forth herein, the Objection filed by the U.S. Trustee is the only objection to confirmation of the Plan.  Importantly, no economic stakeholder has objected to confirmation.

121.    The U.S. Trustee objects to confirmation of the Plan on the following grounds:

    i.    the Exculpation Provision is overly broad, in violation of section 1125(e) of the Bankruptcy Code, because it (a) functions to protect Exculpated Parties that are not fiduciaries to the Debtors' Estates, and (b) seeks to exculpate conduct that will occur after the Effective Date [*see* Obj., at 1];

    ii.    the Debtors' Releases are (i) improper because they seek to release claims or Causes of Action against certain parties the U.S. Trustee argues have a tenuous connection to these chapter 11 cases, and (ii) disguised third-party releases [*see id.*, at 2];

    iii.    the identities of the officers and directors that will compose the New Boards should be disclosed in advance of the Confirmation Hearing [*see id.*, at 2]; and

    iv.    the Debtors should provide additional information on the Convenience Class [*see id.*, at 2].

122.    The Objection should be overruled for the reasons set forth below.

### a.    *Exculpation Provision*

123.    Despite what is asserted in the Objection, *see* Obj., at 7, exculpated parties can extend beyond estate fiduciaries.  The Court, as well as courts in this and other districts, have approved exculpation provisions similar in scope and application for estate fiduciaries and non-estate fiduciaries.  *See* Hr'g Tr. at 90:4 – 8; *In re Aegean Marine Petroleum Network Inc.*, 599

B.R. at 721 ("[A] proper exculpation provision is a protection not only of court-supervised fiduciaries, but also of court-supervised and court-approved transactions.").[21]

124.    As discussed above, courts have recognized the appropriateness of extending exculpation provisions beyond estate fiduciaries to parties who make a substantial contribution to a debtor's restructuring and, specifically, who play an integral role in building consensus in support of a debtor's restructuring. *See Chemtura*, 439 B.R. at 610 – 11 (citing *DBSD*, 419 B.R. at 218); *see also In re Residential Cap., LLC*, 2013 WL 12161584, at *13. This can include former directors and officers and employees. *See, e.g., In re Aegean Marine Petroleum Network Inc.*, (ECF Nos. 503 & 503-1) (confirming plan that included exculpation for the applicable entities, and each of those entities' "respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors.").

125.    Here, the Exculpation Provision is specifically structured to protect the Exculpated Parties who have made substantial contributions to the Debtors' reorganization efforts, including the Investors and the DIP Lenders, from collateral attacks related to their good faith efforts in contributing to the Restructuring, while maintaining appropriate carve-outs for willful misconduct, gross negligence, or intentional fraud. Provisions such as the Exculpation Provision

---

[21] *See also In re Voyager Digital Holdings, Inc.*, at ECF No. 1172 (reinforcing view expressed in *Aegean* regarding exculpation provisions); *In re Waypoint Leasing Holdings, Inc.*, Case No. 18-13648 (SMB) (Bankr. S.D.N.Y. July 31, 2019) (ECF No. 893) (approving exculpation provision for both estate fiduciaries and non-estate fiduciaries); *In re Genco Shipping & Trading Ltd.*, Case No. 14-11108 (SHL), at ¶ 24(d), (Bankr. S.D.N.Y. July 2, 2014) (ECF No. 322) (same); *In re Eastman Kodak Co.*, Case No. 12-10202 (ALG), at First Amended Plan ¶ 12.7 (Bankr. S.D.N.Y. Aug. 23, 2013) (ECF No. 4966-1) (overruling U.S. Trustee objection to exculpation provision in plan for both estate fiduciaries and non-estate fiduciaries); *In re Neff Corp.*, Case No. 10-12610 (SCC), at 52 (Bankr. S.D.N.Y. Sept. 21, 2010) (ECF No. 451) (approving exculpation provision for both estate fiduciaries and non-estate fiduciaries); *In re Charter Commc'ns, Inc.*, Case No. 09-11435 (JMP), at 44 (Bankr. S.D.N.Y. Nov. 17, 2009) (ECF No. 921) (same).

are essential inducements to cause parties to participate collaboratively in the restructuring process, including plan negotiations.[22]

126.    Further, the scope of the Exculpation Provision has been appropriately narrowed to cover conduct specifically approved by the Court in these chapter 11 cases on or after the Commencement Date *through the Effective Date*.  Indeed, contrary to the U.S. Trustee's assertion, Section 10.8 of the Plan specifically provides that the Exculpation Provision covers conduct related to the "negotiation, execution, and implementation of any transactions approved by the Bankruptcy Court in the Chapter 11 Cases on or after the Commencement Date through the Effective Date."  To the extent Exculpated Parties are required to take action after the Effective Date to implement and consummate the Transaction, such Exculpated Parties will be acting in accordance with a Court-reviewed and approved transaction.  Therefore, the U.S. Trustee's concern that the Exculpation Provision will exculpate parties for actions not subject to Court review is unfounded.

127.    Accordingly, for the reasons stated herein, the Debtors submit that the Exculpation Provision is appropriate and consistent with section 1125(e) of the Bankruptcy Code.

### b.    *Debtors' Releases*

128.    As discussed above, a debtor's ability to release its claims against third-parties in exchange for settlement is permissible so long as such release is a sound exercise of the debtor's business judgement and in the best interests of the debtor's creditors and its estate.  *See In re Johns-Manville Corp. (Manville I)*, 837 F.2d at 91 – 92; *In re Motors Liquidation Co.*, 447

---

[22] *See Upstream Energy Servs. v. Enron Corp. (In re Enron Corp.)*, 326 B.R. 497, 503 (S.D.N.Y. 2005) (finding exculpation necessary to encourage parties to participate in plan negotiations).

B.R. at 220.  Further, such release by a debtor of claims that are property of the estate is afforded

deference.  *See In re Sabine Oil & Gas Corp.*, 555 B.R. 180 at 309.

129.    Here, as discussed above in paragraphs 38-44, the Debtors' Releases

represent a sound exercise of the Debtors' business judgment.  The Debtors' Releases were an

essential element in achieving the consensus and agreements embodied in the Plan and were

negotiated in good faith at arm's-length.  The extension of the Debtors' Releases to release Related

Entities is warranted as the Related Entities often acted on behalf of the Released Parties in

connection with the matters as to which releases are provided in the Plan.  Moreover, the Debtors'

Releases are narrowly tailored in this regard—the release applies to Related Entities only "with

respect to work performed for or on behalf of the applicable Entity for which releases are given

pursuant to this Plan."  Plan § 1.1.

130.    Further, the argument of the U.S. Trustee that the Debtors' Releases are

disguised third-party releases is unfounded.  Only one party is providing the releases of claims and

Causes of Action in the Debtors' Releases and that is the Debtors.

131.    For the reasons stated herein, the Debtors' Releases are justified, fair,

reasonable, and in the best interests of their estates and creditors, are an integral part of the Plan.

### c.    Section 1129(a)(5) of Bankruptcy Code

132.    As set forth above, the Debtors have provided information regarding the

identification and composition of the Reorganized SAS AB Board in the Plan Supplement.

Although the identities of the members of the Reorganized SAS AB Board and the other New

Boards are not yet known, the Debtors are nonetheless in compliance with section 1129(a)(5) of

the Bankruptcy Code.  The Plan and Plan Supplement disclose (i) how the Reorganized SAS AB

Board will be selected and appointed prior to the Effective Date and (ii) that the selection of

officers of the Reorganized Debtors will be as provided by their respective Amended Organizational Documents.

133.    Section 1129(a)(5) of the Bankruptcy Code does not include a temporal requirement for the provision of these disclosures. *See generally In re Charter Commc'ns*, 419 B.R. at 260 n.30. In accordance with this, the Debtors intend to make such disclosures in advance of the Effective Date. Further, the Debtors maintain that the mechanics disclosed in the Plan and the Plan Supplement regarding the appointment and composition of the New Boards are consistent with the interests of creditors and equity security holders and with public policy.

### d.    Convenience Class

134.    The Debtors are not required to make additional disclosures with respect to the Convenience Class, and the Objection does not provide any support for the U.S. Trustee's request for the Debtors to do so in advance of confirmation.

135.    The Debtors maintain they have provided sufficient information with respect to the Convenience Class, including the threshold amount for Allowed Claims to qualify as Convenience Class Claims and the recoveries for holders of Claims in the Class and, as set forth in this Memorandum, the estimated total number of Convenience Class Claims solicited in accordance with the Disclosure Statement and Solicitation Order. The Debtors maintain that no other or further information is necessary.

### e.    Objection to Claims

136.    Finally, the objection of the U.S. Trustee with respect to the ability of the Creditors' Committee to object to Claims, as set forth in the Plan, ignores the express text of the Bankruptcy Code. Section 502(a) of the Bankruptcy Code specifically provides that a claim is deemed allowed "unless a party in interest . . . objects". 11 U.S.C. § 502(a). The Plan simply codifies such authority with respect to the Creditors' Committee.

## **CONCLUSION**

137.    Based on the foregoing, the Plan complies with all of the requirements of

the Bankruptcy Code and the Bankruptcy Rules.  Accordingly, the Debtors respectfully request

that the Court enter the Proposed Confirmation Order to confirm the Plan, to grant related relief

requested herein, and to grant such other and further relief as the Court may deem just and

appropriate.

Dated: March 15, 2024
       New York, New York

                                        /s/  *Gary T. Holtzer*
                                        WEIL, GOTSHAL & MANGES LLP
                                        767 Fifth Avenue
                                        New York, New York 10153
                                        Telephone: (212) 310-8000
                                        Facsimile: (212) 310-8007
                                        Gary T. Holtzer
                                        Kelly DiBlasi
                                        David Griffiths
                                        Lauren Tauro

                                        *Attorneys for Debtors*
                                        *and Debtors in Possession*

**Exhibit A**

| Class and Designation | Estimated Recoveries Under Plan[1] | Estimated Recoveries in Chapter 7 Liquidation |
|---|---|---|
| **SAS AB** | | |
| **Class 1:** Other Secured Claims | 100% | 100% |
| **Class 2:** Other Priority Claims | 100% | 100% |
| **Class 3:** Aircraft Lease Claims and Trade Claims | Effective Date: 6.9% - 9.4% Max: 25% | 0% |
| **Class 4:** Norwegian Term Loan Claims | Effective Date: 6.9% - 9.4% Max: 25% | 0% |
| **Class 5:** Commercial Hybrid Bond Claims, Other General Unsecured Claims, and Intercompany Claims | Effective Date: 6.9% - 9.4% Max: 25% | 0% |
| **Class 8:** Swiss Bond Claims | 0% | 0% |
| **Class 10:** State Hybrid Bond Claims and Danish State Hybrid Bond Claims | 0% | 0% |
| **Class 11:** Existing Equity Interests | 0% | 0% |
| **Consolidated Debtors** | | |
| **Class 1:** Other Secured Claims | 100% | 100% |
| **Class 2:** Other Priority Claims | 100% | 100% |

---

[1] The estimated recoveries reflect both the estimated value that will be distributed on the Effective Date as well as the maximum estimated value that will be distributed if all GUC Cash held by the GUC Entity (as defined in the Plan Supplement) is released to holders of Allowed General Unsecured Claims in accordance with the GUC Documents.

| Class and Designation | Estimated Recoveries Under Plan[1] | Estimated Recoveries in Chapter 7 Liquidation |
|---|---|---|
| **Class 3:** <br> Aircraft Lease Claims, Trade Claims, and Union Claims | <u>Effective Date</u>: <br> 1.7% - 2.7% <br> <u>Max</u>: <br> 7.7% | 0% |
| **Class 4:** <br> Danish Term Loan Claims, Swedish Term Loan Claims, and Norwegian Term Loan Claims | <u>Effective Date</u>: <br> 1.7% - 2.7% <br> <u>Max</u>: <br> 7.7% | 0% |
| **Class 5:** <br> Other General Unsecured Claims | <u>Effective Date</u>: <br> 1.7% - 2.7% <br> <u>Max</u>: <br> 7.7% | 0% |
| **Class 6:** <br> Convenience Class Claims | 10% | 0% |
| **Class 7:** <br> Intercompany Claims | N/A | 0% |
| **Class 8:** <br> Swiss Bond Claims | 0% | 0% |
| **Class 9:** <br> Intercompany Interests | N/A | 0% |
| **Gorm Dark Blue Limited** | | |
| **Class 1:** <br> Other Secured Claims | 100% | 100% |
| **Class 2:** <br> Other Priority Claims | 100% | 100% |
| **Class 3:** <br> Aircraft Lease Claims | <u>Effective Date</u>: <br> 0.8% - 1.2% <br> <u>Max</u>: <br> 3.7% | 0% |

| Class and Designation | Estimated Recoveries Under Plan[1] | Estimated Recoveries in Chapter 7 Liquidation |
|---|---|---|
| **Class 5:** Other General Unsecured Claims | Effective Date: 0.8% - 1.2% Max: 3.7% | 0% |
| **Class 7:** Intercompany Claims | N/A | 0% |
| **Class 9:** Intercompany Interests | N/A | 0% |
| **Gorm Deep Blue Limited** | | |
| **Class 1:** Other Secured Claims | 100% | 100% |
| **Class 2:** Other Priority Claims | 100% | 100% |
| **Class 3:** Aircraft Lease Claims. | Effective Date: 0.8% - 1.2% Max: 3.7% | 0% |
| **Class 5:** Other General Unsecured Claims | Effective Date: 0.8% - 1.2% Max: 3.7% | 0% |
| **Class 7:** Intercompany Claims | N/A | 0% |
| **Class 9:** Intercompany Interests | N/A | 0% |
| **Gorm Light Blue Limited** | | |
| **Class 1:** Other Secured Claims | 100% | 100% |
| **Class 2:** Other Priority Claims | 100% | 100% |
| **Class 3:** Aircraft Lease Claims | Effective Date: 0.8% - 1.2% Max: 3.7% | 0% |

| Class and Designation | Estimated Recoveries Under Plan[1] | Estimated Recoveries in Chapter 7 Liquidation |
|---|---|---|
| **Class 5:** Other General Unsecured Claims | Effective Date: 0.8% - 1.2% Max: 3.7% | 0% |
| **Class 7:** Intercompany Claims | N/A | 0% |
| **Class 9:** Intercompany Interests | N/A | 0% |
| **Gorm Ocean Blue Limited** | | |
| **Class 1:** Other Secured Claims | 100% | 100% |
| **Class 2:** Other Priority Claims | 100% | 100% |
| **Class 3:** Aircraft Lease Claims | Effective Date: 0.8% - 1.2% Max: 3.7% | 0% |
| **Class 5:** Other General Unsecured Claims. | Effective Date: 0.8% - 1.2% Max: 3.7% | 0% |
| **Class 7:** Intercompany Claims | N/A | 0% |
| **Class 9:** Intercompany Interests | N/A | 0% |
| **Gorm Sky Blue Limited** | | |
| **Class 1:** Other Secured Claims | 100% | 100% |
| **Class 2:** Other Priority Claims | 100% | 100% |
| **Class 3:** Aircraft Lease Claims | Effective Date: 0.8% - 1.2% Max: 3.7% | 0% |

| Class and Designation | Estimated Recoveries Under Plan[1] | Estimated Recoveries in Chapter 7 Liquidation |
|---|---|---|
| Class 5:<br>Other General Unsecured Claims | Effective Date:<br>0.8% - 1.2%<br>Max:<br>3.7% | 0% |
| Class 7:<br>Intercompany Claims | N/A | 0% |
| Class 9:<br>Intercompany Interests | N/A | 0% |
| **Gorm Asset Management Limited** | | |
| Class 1:<br>Other Secured Claims | 100% | 100% |
| Class 2:<br>Other Priority Claims | 100% | 100% |
| Class 7:<br>Intercompany Claims | N/A | 1.3% |
| Class 9:<br>Intercompany Interests | N/A | 0% |
| **Gorm Engine Management Limited** | | |
| Class 1:<br>Other Secured Claims | 100% | 100% |
| Class 2:<br>Other Priority Claims | 100% | 100% |
| Class 7:<br>Intercompany Claims | N/A | 56.8% |
| Class 9:<br>Intercompany Interests | N/A | 0% |
| **Gorm Warm Red Limited** | | |
| Class 1:<br>Other Secured Claims | 100% | 100% |
| Class 2:<br>Other Priority Claims | 100% | 100% |
| Class 7:<br>Intercompany Claims | N/A | 0% |
| Class 9:<br>Intercompany Interests | N/A | 0% |
| **Scandinavian Airlines of North America, Inc.** | | |
| Class 1:<br>Other Secured Claims | 100% | 0% |

| Class and Designation | Estimated Recoveries Under Plan[1] | Estimated Recoveries in Chapter 7 Liquidation |
|---|---|---|
| **Class 2:** Other Priority Claims | 100% | 100% |
| **Class 5:** Other General Unsecured Claims against Scandinavian Airlines of North America, Inc. | 0.5% - 1.5% | 0% |
| **Class 7:** Intercompany Claims | N/A | 0% |
| **Class 9:** Intercompany Interests | N/A | 0% |