**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------- x

| | | |
|---|---|---|
| In re | : | **Chapter 11** |
| | : | |
| **SAS AB, *et al.*,** | : | **Case No. 22-10925 (MEW)** |
| | : | |
| Debtors.[1] | : | **(Jointly Administered)** |
| | : | |

-------------------------------------------------------- x

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER CONFIRMING SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF SAS AB AND ITS SUBSIDIARY DEBTORS

SAS AB and its debtor subsidiaries, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), having proposed and filed the *Second Amended Joint Chapter 11 Plan of Reorganization of SAS AB and Its Subsidiary Debtors*, dated February 7, 2024 [ECF No. 1936] (as may be amended, modified, or supplemented from time to time in accordance with the terms thereof and this Order, the "**Plan**"),[2] a copy of which is annexed hereto as **Exhibit A**, and the *Disclosure Statement for Second Amended Joint Chapter 11 Plan of Reorganization of SAS AB and Its Subsidiary Debtors*, dated as of February 8, 2024 [ECF No. 1945] (the "**Disclosure Statement**"); and, on February 7, 2024, this Court having entered the *Order (I) Approving (A) Disclosure Statement, (B) Solicitation, Voting, and Related Procedures, and (C) Proposed Cure Procedures, (II) Scheduling Confirmation Hearing, (III) Establishing Notice and Objection Procedures for Confirmation of Debtors' Chapter 11 Plan, and (IV) Granting Related Relief* [ECF No. 1932] (the "**Disclosure Statement and Solicitation**

---

[1] The Debtors in these chapter 11 cases are SAS AB, SAS Danmark A/S, SAS Norge AS, SAS Sverige AB, Scandinavian Airlines System Denmark-Norway-Sweden, Scandinavian Airlines of North America Inc. (2393), Gorm Asset Management Ltd., Gorm Dark Blue Ltd., Gorm Deep Blue Ltd., Gorm Sky Blue Ltd., Gorm Warm Red Ltd., Gorm Light Blue Ltd., Gorm Ocean Blue Ltd., and Gorm Engine Management Ltd.  The Debtors' mailing address is AVD kod: STOUU-T, SE-195 87 Stockholm, Sweden.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

Order"), which, among other things, (i) approved the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code, (ii) approved the procedures for (a) soliciting, receiving, and tabulating votes to accept or reject the Plan, (b) voting to accept or reject the Plan, and (c) filing objections to the Plan (collectively, the "**Solicitation and Voting Procedures**"), and (iii) scheduled a hearing to consider confirmation of the Plan (the "**Confirmation Hearing**"); and the Debtors, through their claims and noticing agent and administrative advisor, Kroll Restructuring Administration LLC, having served the Disclosure Statement, the Plan, and other related solicitation materials, including copies of the Court-approved ballots (the "**Ballots**") and notice of the Confirmation Hearing (collectively, the "**Solicitation Packages**"), as applicable, on the holders of Claims and Interests in accordance with the Disclosure Statement and Solicitation Order, as described in more detail in the *Affidavit of Service of Solicitation Materials*, dated March 9, 2024 [ECF No. 2284] (the "**Solicitation Affidavit**") as well as the *Declaration of Craig E. Johnson of Kroll Restructuring Administration LLC Regarding Solicitation of Votes and Tabulation of Ballots Cast on Second Amended Joint Chapter 11 Plan of Reorganization of SAS AB and Its Subsidiary Debtors*, filed on March 14, 2024 [ECF No. 2311] (the "**Voting Certification**"); and the Debtors having caused to be published the notice of the Confirmation Hearing (i) in the national edition of *The New York Times* on February 12, 2024, (ii) in *The Swedish Official Gazette, Svenska Dagbladet, Berlingske,* and *Aftonposten* on February 14, 2024, and (iii) on *AviationWeek.com*, starting on February 12, 2024 and continuing through February 26, 2024, in each case in accordance with the Disclosure Statement and Solicitation Order, and as set forth in the *Certificate of Publication*, filed on March 6, 2024 [ECF No. 2265] (the "**Publication Affidavit**"); and due and proper notice of the Confirmation Hearing having been given to holders of Claims against and Interests in the Debtors

and other parties in interest in compliance with chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**"), and the Disclosure Statement and Solicitation Order, as established by the affidavits of service, mailing, and publication filed with this Court, including the Solicitation Affidavit and the Publication Affidavit, and such notice being sufficient under the circumstances and no further notice being required; and the Debtors having filed on (i) March 1, 2024, the *Notice of Filing of Plan Supplement in Connection with Second Amended Joint Chapter 11 Plan of Reorganization of SAS AB and Its Subsidiary Debtors* [ECF No. 2254], (ii) March 4, 2024, the *Notice of Filing of Amendments to Plan Supplement in Connection with Second Amended Joint Chapter 11 Plan of Reorganization of SAS AB and Its Subsidiary Debtors* [ECF No. 2258], (iii) March 8, 2024, the *Notice of Filing of Second Amendment to Plan Supplement in Connection with Second Amended Joint Chapter 11 Plan of Reorganization of SAS AB and Its Subsidiary Debtors* [ECF No. 2283], (iv) March 11, 2024, the *Notice of Filing of Third Amendment to Plan Supplement in Connection with Second Amended Joint Chapter 11 Plan of Reorganization of SAS AB and Its Subsidiary Debtors* [ECF No. 2291], (v) March 15, 2024, the *Notice of Filing of Fourth Amendment to Plan Supplement in Connection with Second Amended Joint Chapter 11 Plan of Reorganization of SAS AB and Its Subsidiary Debtors* [ECF No. 2320], and (vi) March 19, 2024, the *Notice of Filing of Fifth Amendment to Plan Supplement in Connection with Second Amended Joint Chapter 11 Plan of Reorganization of SAS AB and Its Subsidiary Debtors* [ECF No. 2334] (collectively, as may be further amended or supplemented, the "**Plan Supplement**"); and due notice of the Plan Supplement having been given to holders of Claims against and Interests in the Debtors and other parties in interest in compliance with the Bankruptcy Code, the Bankruptcy Rules, and the

Disclosure Statement and Solicitation Order, and such filing and notice thereof being sufficient under the circumstances and no further notice being required; and based upon and after full consideration of the entire record of the Confirmation Hearing, including the Plan, the Plan Supplement, the *Declaration of Ginger Hughes in Support of Confirmation of Second Amended Joint Chapter 11 Plan of Reorganization of SAS AB and Its Subsidiary Debtors* [ECF No. 2318] (the "**Hughes Declaration**"), and the Voting Certification; and any objections to confirmation of the Plan all being withdrawn, resolved, or overruled on the merits by this Court; and this Court having reviewed the Disclosure Statement and the Plan and other relevant factors affecting the Chapter 11 Cases (as defined below); and this Court being familiar with, and having taken judicial notice of, the entire record of the Chapter 11 Cases; and upon the arguments of counsel and the evidence proffered and adduced at the Confirmation Hearing; and this Court having found and determined that the Plan should be confirmed as reflected by this Court's rulings made herein and at the Confirmation Hearing; and after due deliberation and sufficient cause appearing therefor; this Court hereby **FINDS, DETERMINES, AND CONCLUDES** that:

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

A.     <u>Findings of Fact and Conclusions of Law</u>.  The findings and conclusions set forth herein and in the record of the Confirmation Hearing constitute this Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rules 7052 and 9014.  All findings of fact and conclusions of law announced by this Court at the Confirmation Hearing in relation to confirmation of the Plan are hereby incorporated into this Order.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

4

B.      <u>Jurisdiction, Venue, Core Proceeding</u>.  This Court has jurisdiction over the Chapter 11 Cases pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference M-431*, dated January 31, 2012 (Preska, C.J.).  Confirmation of the Plan is a core proceeding pursuant to 28 U.S.C. § 157(b) and this Court has jurisdiction to enter a final order with respect thereto.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  To the extent it is later determined that this Court, absent consent of the parties, cannot enter a final judgment on this matter consistent with Article III of the United States Constitution, the Debtors have consented to entry of a Final Order by this Court.

C.      <u>Chapter 11 Petitions</u>.  On July 5, 2022, each Debtor commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code (collectively, the "**Chapter 11 Cases**").  The Chapter 11 Cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b).  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Chapter 11 Cases.

D.      <u>Creditors' Committee</u>.  On July 22, 2022, the office of the United States Trustee for Region 2 (the "**U.S. Trustee**") appointed the Official Committee of Unsecured Creditors (the "**Creditors' Committee**") [ECF No. 75].  On July 27, 2022, the U.S. Trustee filed an amended notice of appointment removing Cityjet DAC Indus House and CFM International S.A. from the Creditors' Committee [ECF No. 94].  On June 13, 2023, the U.S. Trustee filed a second amended notice of appointment removing Viasat, Inc. from the Creditors' Committee [ECF No. 1219].

E.      <u>Judicial Notice</u>.  This Court takes judicial notice of the docket of the Chapter 11 Cases maintained by the Clerk of this Court, including all pleadings and other

5

documents filed, all orders entered, all hearing transcripts, and all evidence and arguments made, proffered, or adduced at the hearings held before this Court during the pendency of the Chapter 11 Cases. Any resolution of objections to confirmation of the Plan explained on the record at the Confirmation Hearing is hereby incorporated by reference. Except to the extent set forth herein, all unresolved objections, statements, informal objections, and reservations of rights, if any, related to the Plan or confirmation of the Plan are overruled on the merits and denied in their entirety.

F.    Burden of Proof. Based on the record of these Chapter 11 Cases, including as set forth in the Hughes Declaration and the Voting Certification, each Debtor has met the burden of proving each applicable element of, and the Plan satisfies the requirements for confirmation set forth in, section 1129 of the Bankruptcy Code, including all other sections of the Bankruptcy Code referenced therein, by a preponderance of the evidence.

G.    Solicitation. As described in and evidenced by the Solicitation Affidavit and the Voting Certification, transmittal and service of the Solicitation Packages (collectively, the "**Solicitation**") were timely, adequate, appropriate, and sufficient under the circumstances. The Solicitation (i) was conducted in good faith and (ii) complied with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the Disclosure Statement and Solicitation Order. The Released Parties and Exculpated Parties are entitled to the protection of section 1125(e) of the Bankruptcy Code.

H.    Notice. As evidenced by the Solicitation Affidavit, the Publication Affidavit, and the Voting Certification, all parties required to be given notice of the Confirmation Hearing (including the deadline for filing and serving objections to confirmation of the Plan) were given due, proper, adequate, timely, and sufficient notice of the Confirmation Hearing in accordance with the Disclosure Statement and Solicitation Order and in compliance with the

6

Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and all other applicable non-bankruptcy rules, laws, and regulations and such parties had an adequate opportunity to appear and be heard with respect thereto.  No other or further notice is required.

I.      Tabulation.    All procedures used to tabulate the Ballots were fair, reasonable, and conducted in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the Disclosure Statement and Solicitation Order.

J.      Voting.  As described in the Voting Certification, Claims against (i) SAS AB in Class 3 (Aircraft Lease Claims and Trade Claims), Class 4 (Norwegian Term Loan Claims), and Class 5 (Commercial Hybrid Bond Claims, Other General Unsecured Claims, and Intercompany Claims), (ii) the Consolidated Debtors in Class 3 (Aircraft Lease Claims, Trade Claims, and Union Claims), Class 4 (Danish Term Loan Claims, Swedish Term Loan Claims, and Norwegian Term Loan Claims), Class 5 (Other General Unsecured Claims), and Class 6 (Convenience Class Claims), (iii) the Gorm Blue Entities in Class 3 (Aircraft Lease Claims) and Class 5 (Other General Unsecured Claims), and (iv) SANA in Class 5 (Other General Unsecured Claims), in each case, are Impaired under the Plan and holders of such Claims were entitled to vote thereon.  As reflected in the Voting Certification, holders of Claims against (i) SAS AB in Class 3 (Aircraft Lease Claims and Trade Claims) and Class 5 (Commercial Hybrid Bond Claims, Other General Unsecured Claims, and Intercompany Claims), (ii) the Consolidated Debtors in Class 3 (Aircraft Lease Claims, Trade Claims, and Union Claims), Class 5 (Other General Unsecured Claims), and Class 6 (Convenience Class Claims), (iii) the Gorm Blue Entities in Class 3 (Aircraft Lease Claims), and (iv) SANA in Class 5 (Other General Unsecured Claims), in each case, have voted to accept the Plan in the numbers and amounts required by section 1126(c) of the Bankruptcy Code.  As reflected in the Voting Certification, no holder of a Claim against (i) SAS AB in Class 4

(Norwegian Term Loan Claims), (ii) the Consolidated Debtors in Class 4 (Danish Term Loan Claims, Swedish Term Loan Claims, and Norwegian Term Loan Claims), and (iii) the Gorm Blue Entities in Class 5 (Other General Unsecured Claims) voted on the Plan. For the reasons stated on the record at the Confirmation Hearing, the Classes of creditors in which no votes were cast are not "accepting" Classes. Further, as reflected in the Voting Certification, holders of Claims against or Interests in, as applicable, (i) SAS AB in Class 8 (Swiss Bond Claims), Class 10 (State Hybrid Bond Claims and Danish State Hybrid Bond Claims), and Class 11 (Existing Equity Interests) and (ii) the Consolidated Debtors in Class 8 (Swiss Bond Claims), in each case, are deemed to have rejected the Plan in accordance with section 1126(g) of the Bankruptcy Code. Therefore, section 1129(a)(8) of the Bankruptcy Code has not been satisfied with respect to such non-accepting and rejecting Classes. Accordingly, confirmation of the Plan is sought pursuant to section 1129(b) of the Bankruptcy Code with respect to the non-accepting and rejecting Classes.

K. <u>Plan Proposed in Good Faith</u>. The Debtors have proposed the Plan (and all documents necessary to effectuate the Plan) in good faith and not by any means forbidden by law. The Debtors' good faith is evident from the facts and record of these Chapter 11 Cases, the Disclosure Statement, the record of the Confirmation Hearing, and other proceedings held by this Court in these Chapter 11 Cases. The Plan and all documents necessary to effectuate the Plan were negotiated at arm's-length and in good faith among the Debtors, the Investors, the Creditors' Committee, other parties in interest, and their respective advisors, and each of the Investors, the Creditors' Committee, and their respective advisors have pursued the Plan and the transactions contemplated thereby in good faith.

L. <u>Plan Supplement</u>. All documents included in the Plan Supplement are integral to, part of, and incorporated by reference into the Plan. Subject to the terms of the Plan,

the Debtors reserve the right to alter, amend, update, or modify the Plan Supplement before the Effective Date.

        M.    <u>Modifications to the Plan</u>.  The modifications to the Plan contained in this Order do not require additional disclosure under section 1125 of the Bankruptcy Code or the resolicitation of votes under section 1126 of the Bankruptcy Code, nor do they require that the holders of Claims be afforded an opportunity to change previously cast acceptances or rejections of the Plan.  The modifications do not materially and adversely affect, or change the treatment of, any Claims or Interests without the consent of the affected holders of such Claims or Interests, and no parties in interest or party that previously voted on the Plan raised an objection or concern with respect to any modifications.

        N.    <u>Best Interest of Creditors</u>.  The liquidation analysis provided in the Disclosure Statement and the other evidence presented, proffered, or adduced at the Confirmation Hearing (i) are persuasive and credible, (ii) have not been controverted by other evidence, and (iii) establish that each holder of an Impaired Claim or Interest either has accepted the Plan or will receive or retain under the Plan, on account of such Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

        O.    <u>Transaction Value</u>.  The Transaction represents the highest and best offer for the New Shares and the New Convertible Notes, as evidenced by the equity solicitation process run by the Debtors in accordance with the Equity Solicitation Procedures Order, and provides the best measure of value of the Reorganized Debtors' business given the facts and circumstances of these Chapter 11 Cases.

P.    Injunctions, Releases, and Exculpation.  This Court has jurisdiction under

28 U.S.C. §§ 1334(a) and 1334(b) to approve the injunction, release, and exculpation provisions

set forth in Sections 10.5, 10.6, 10.7, 10.8, and 10.9 of the Plan, as modified herein.  Sections

105(a) and 1123(b)(3) and (6) of the Bankruptcy Code permit issuance of the injunction and

approval of the releases set forth in Sections 10.6 and 10.7 of the Plan, respectively.  Based upon

the record in the Chapter 11 Cases and the evidence presented at the Confirmation Hearing and in

the Hughes Declaration, such provisions (i) were integral to the agreement among the various

parties in interest (including the Investors and the Creditors' Committee) and are essential to the

formulation and implementation of the Plan, as provided in section 1123 of the Bankruptcy Code,

(ii) confer substantial benefits on the Debtors' estates, (iii) are fair, equitable, and reasonable, and

(iv) are in the best interests of the Debtors, their estates, and parties in interest.  The releases

contained in Section 10.7(b) of the Plan were disclosed and explained on the Ballots, in the

Confirmation Hearing Notice, in the Disclosure Statement, and in the Plan.  The release provisions

contained in Section 10.7(b) of the Plan are consensual under applicable law because the releases

therein are provided only by parties (i) who are Released Parties, other than the Danish State

Investor, the Danish State Noteholder, the Swedish State, and the Norwegian State, (ii) who voted

to accept the Plan, (iii) who either voted to reject the Plan or abstained from voting on the Plan

and affirmatively opted to grant the releases by checking the appropriate box on the Ballot, or

(iv) who affirmatively opted to grant the releases by checking the appropriate box on the notice

form.  Additionally, such releases are given in exchange for and are supported by fair, sufficient,

and substantial consideration provided by each and all of the parties providing such releases.  The

exculpation provision is appropriate for the reasons expressed on the record at the Confirmation

Hearing.  Accordingly, based upon the record of these Chapter 11 Cases, the representations of the

parties, and the evidence proffered, adduced, or presented at the Confirmation Hearing, as applicable, this Court finds that the injunctions, releases, and exculpation provisions set forth in Article X of the Plan are consistent with the Bankruptcy Code and applicable law. The failure to implement the injunctions, releases, and exculpation would seriously impair the Debtors' ability to confirm the Plan.

Q.    <u>Executory Contracts and Unexpired Leases</u>. The Debtors have exercised reasonable business judgment in determining whether to assume or reject executory contracts and unexpired leases pursuant to the Plan. Each assumption or rejection of an executory contract or unexpired lease pursuant to the Plan is legal, valid, and binding as if such assumption or rejection had been effectuated pursuant to an order of this Court under section 365 of the Bankruptcy Code entered before entry of this Order.

R.    <u>Compromise of Controversies</u>. The compromises and settlements reflected in the Plan are fair, essential, and reasonable. Entry of this Order constitutes approval of such compromises and settlements under Bankruptcy Rule 9019, subject to Section 10.11 of the Plan.

S.    <u>Good Faith</u>. The Debtors, the Released Parties, and Exculpated Parties have been and will be acting in good faith if they proceed to (i) consummate the Plan and the agreements, settlements, transactions, and transfers set forth therein and (ii) take any actions authorized and directed by this Order.

## <u>ORDER</u>

**ACCORDINGLY, IT IS HEREBY ORDERED, ADJUDGED, DECREED, AND DETERMINED THAT:**

1.    <u>Confirmation of Plan</u>. The Plan and each of its provisions is **CONFIRMED** pursuant to section 1129 of the Bankruptcy Code, subject to the terms of this Order. The

documents contained in or contemplated by the Plan are hereby authorized and approved. The terms of the Plan are incorporated herein by reference and are an integral part of this Order. The terms of the Plan, the documents contained in the Plan Supplement, all exhibits thereto, and all other relevant and necessary documents shall be effective and binding as of the Effective Date. Subject to the terms of the Plan, including Section 12.5 of the Plan, the Debtors reserve the right to alter, amend, update, or modify the Plan and the documents contained in the Plan Supplement prior to the Effective Date; *provided, however*, that any material modification is subject to approval by this Court.

2.    <u>Objections</u>.  To the extent any objections (including any reservations of rights contained therein) to confirmation of the Plan or other responses or reservations of rights with respect thereto have not been withdrawn prior to entry of this Order, such objections and responses shall be, and hereby are, overruled on the merits and denied.

3.    <u>Nonconsensual Confirmation</u>.  Holders of Claims against and Interests in, as applicable, (i) SAS AB in Class 8 (Swiss Bond Claims), Class 10 (State Hybrid Bond Claims and Danish State Hybrid Bond Claims), and Class 11 (Existing Equity Interests) and (ii) the Consolidated Debtors in Class 8 (Swiss Bond Claims), in each case, are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Further, holders of Claims against (i) SAS AB in Class 4 (Norwegian Term Loan Claims), (ii) the Consolidated Debtors in Class 4 (Danish Term Loan Claims, Swedish Term Loan Claims, and Norwegian Term Loan Claims), and (iii) the Gorm Blue Entities in Class 5 (Other General Unsecured Claims), in each case, did not vote on the Plan and therefore did not accept the Plan.  Notwithstanding the foregoing, the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code and, accordingly, can be confirmed.  The Plan does not discriminate unfairly because holders of Claims or Interests with

similar legal rights will not receive materially different treatment under the Plan. Additionally, the Plan is fair and equitable with respect to each Class of Claims or Interests that has not accepted the Plan because no holders of Claims or Interests junior to such Classes will receive or retain any property under the Plan on account of such Claims or Interests.

4.     Corporate Action.  On or before the Effective Date, as applicable, the appropriate directors, officers, and managers of the Debtors are authorized and directed to issue, execute, and deliver the agreements, documents, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by this Order and the Plan, including the Transaction) in the name of and on behalf of the Reorganized Debtors, subject to and without limiting any additional authorizations or approvals as may be required to comply with applicable Danish, Irish, Norwegian, or Swedish Law, including, for the avoidance of doubt, with respect to the Swedish Reorganization Plan Confirmation.

5.     Substantive Consolidation. Entry of this Order shall constitute the approval, pursuant to sections 105(a) and 1123(a)(5)(C) of the Bankruptcy Code, of the substantive consolidation of the Consolidated Debtors exclusively for voting and distribution purposes, on the basis that the substantive consolidation of the Consolidated Debtors to the extent set forth in the Plan is (i) in exchange for good and valuable consideration provided by each of the Consolidated Debtors (including performance of the terms of the Plan), (ii) in the best interests of the Debtors, the Reorganized Debtors, the Estates, and all holders of Claims, and (iii) fair, equitable, and reasonable.  In furtherance of the foregoing, (a) all assets and liabilities of the Consolidated Debtors shall be treated as though they are pooled, (b) each Claim filed or to be filed against any Consolidated Debtor shall be deemed filed as a single Claim against, and a single obligation of, the Consolidated Debtors, (c) any joint or several liability of any Consolidated Debtor shall be one

13

obligation of the Consolidated Debtors and any Claims based upon such joint or several liability shall be treated as one Claim against the Consolidated Debtors, and (d) any guarantee of a Consolidated Debtor of the payment, performance, or collection of an obligation of another Consolidated Debtor shall be eliminated and cancelled.  The deemed substantive consolidation of the Consolidated Debtors under the Plan shall not (other than for purposes related to voting and distribution) affect the legal and organizational structure of the Debtors or the Reorganized Debtors.

6.    <u>Implementation of Restructuring</u>.  On or after the Effective Date, the Reorganized Debtors are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Investment Agreement, including all actions in connection with the New Convertible Notes Indenture, in the name of and on behalf of the Reorganized Debtors without the need for any approvals, authorization, or consents, except for those expressly required pursuant to the Plan and applicable Swedish Law, including, for the avoidance of doubt, with respect to the Swedish Reorganization Plan Confirmation.

7.    <u>Swedish SAS AB Reorganization</u>.  Upon the Confirmation Date, the Debtors are authorized to implement the Restructuring in Sweden pursuant to the Swedish SAS AB Reorganization, subject to any conditions provided for in the Swedish Reorganization Plan and any orders or resolutions of the Swedish Court, and, in connection therewith, cancel, and cause a delisting of, the Existing Equity Interests and other applicable Securities, without the need for any further order of this Court or further action by holders of Claims or Interests.  SAS AB is authorized to act (i) as a representative of the Debtors' estates in any judicial or other proceeding

14

outside the U.S., including the Swedish SAS AB Reorganization, and (ii) in any way permitted by applicable non-U.S. Law in connection with such proceeding.

8.    <u>Free and Clear</u>.  Subject to the satisfaction in full of the DIP Claims in accordance with the terms of the DIP Credit Agreement and except as otherwise provided in the Plan, any document contained in the Plan Supplement, or this Order, from and after the Effective Date, the Reorganized Debtors shall be vested with all property of the Estates, free and clear of all Claims, Liens, encumbrances, charges, and other interests.  From and after the Effective Date, the Reorganized Debtors may operate their business and may use, acquire, and dispose of property and prosecute, compromise, or settle any Claims (including any Administrative Expense Claims) and Causes of Action without supervision of or approval by this Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by the Plan or this Order, including Section 5.4 of the Plan.

9.    <u>Transaction</u>.  On the Effective Date or as soon as reasonably practicable thereafter, the Debtors or the Reorganized Debtors, as applicable, may take all actions consistent with the Plan as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring under and in connection with the Plan, including (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable Law and comply with such other terms to which the applicable parties agree, (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and that satisfy the requirements of applicable Law and comply with such other

15

terms to which the applicable parties agree, and (iii) all other actions that the Debtors or Reorganized Debtors, as applicable, determine to be necessary, desirable, or appropriate to implement, effectuate, and consummate the Plan or the transactions contemplated in the Plan or this Order.  Any transfers of Assets, Claims, or Interests effected or any obligations incurred through the Transaction (including as contemplated in the GUC Implementation Steps) are hereby approved and are made on fair and equitable terms and for reasonably equivalent value provided by the Investors or Debtors, as applicable.

10.     <u>Continued Corporate Existence</u>.  The Debtors shall continue to exist after the Effective Date as Reorganized Debtors in accordance with the applicable laws of the respective jurisdictions in which they are incorporated or organized and pursuant to their respective organizational documents in effect prior to the Effective Date, except to the extent such documents are amended by the Plan or otherwise.

11.     <u>Authorization and Issuance of New Shares and New Convertible Notes</u>.

(a)     Upon the Effective Date, subject to applicable Swedish Law, Reorganized SAS AB is authorized to issue or cause to be issued and shall issue the New Shares (which, as soon as practicable thereafter, shall be registered with the SCRO) and the New Convertible Notes for distribution in accordance with the terms of the Plan and the Investment Agreement and to grant the security interests contemplated to secure the obligations under the New Convertible Notes, in each case without the need for any further corporate or shareholder action.

(b)     The offer, issuance, and distribution of the New Shares and New Convertible Notes pursuant to the Plan, including pursuant to the Transaction, except for the Non-1145 Equity and the Non-1145 Convertible Notes, shall be exempt, pursuant to section 1145 of the Bankruptcy Code, without further act or actions by any Person, from registration under the

Securities Act, and all rules and regulations promulgated thereunder, any state or local Law requiring registration for the offer, issuance, or distribution of such New Shares, and any other applicable securities laws, to the fullest extent permitted by section 1145 of the Bankruptcy Code.

12.    <u>Conditions to New Shares</u>.

(a)    Any Person receiving New Shares pursuant to the Plan shall be required to deliver to the Debtors, as conditions precedent to the receipt of the New Shares, prior to the Effective Date on a date established by the Debtors, (i) a signature page to the Recipient Shareholders' Agreement, *provided, however*, that such requirement may be removed if determined to be unnecessary by the Debtors and the Required Investors based on the terms of the Articles of Reorganized SAS AB, (ii) any documentation reasonably requested by the Debtors in order to effect the issuance and registration of the New Shares with the SCRO, including (A) a signed subscription list provided by the Debtors and (B) any documentation required for the payment of the aggregate Share Subscription Price for the New Shares, including evidence that the relevant Allowed Claim has been contributed to SAS AB either through set-off (Sw. *kvittning*) or payment-in-kind (Sw. *apport*) and that any portion of such Allowed Claim in excess of the amount recovered in accordance with the Plan and the Swedish Reorganization Plan has been forgiven (in each case as applicable) (such evidence in clause (B), the "**Claim Delivery Evidence**"), and (iii) the account number of the securities account (being either a VPC account (Sw. *VP-konto*) kept in the Person's own name or a custody account (Sw. *förvaltarkonto*) kept with a Swedish bank/broker) affiliated with Euroclear Sweden, the Swedish Central Securities Depositary, to which the New Shares shall be released.  In the event that the foregoing conditions precedent have not been satisfied, the applicable Person shall not receive any New Shares under the Plan, and all right, title, and interest in such New Shares shall be forfeited as of the Effective

Date.  Notwithstanding the foregoing, in the event that the requisite Claim Delivery Evidence has been received by the Effective Date, but any such signature page, other documentation, or account number is not received by the Effective Date, then the applicable Person shall not receive any New Shares under the Plan, and all right, title, and interest in such New Shares shall be forfeited as of the Effective Date, unless waived by the Debtors and the Required Investors or the Debtors elect otherwise as set forth in this Order, in each case in consultation with the Creditors' Committee.

(b)    The Debtors, at their election with the consent of the Required Investors and in consultation with the Creditors' Committee, shall be permitted to take any action reasonably determined to be necessary to distribute the New Shares, including through a Holding Period Trust (as defined in the Plan Supplement) or such other structure as may be agreed among the Debtors and the Required Investors to hold New Shares otherwise allocable to (i) any GUC (as defined below) so entitled to such New Shares under the Plan who has delivered any necessary documentation set forth in Section 5.16(ii)(B) of the Plan, but not satisfied one or more of the other conditions precedent set forth in Section 5.16 of the Plan, or (ii) any Investor entitled to such New Shares who, in its sole discretion, so elects to direct that a portion of its New Shares is to be held in trust to comply with any relevant regulatory approval.

13.    <u>Non-Voting Equity Securities</u>.  The Debtors shall not issue any non-voting equity securities as of the Effective Date.

14.    <u>Reserved Funds, GUC Entity, and Contribution Fee Escrow Account</u>.

(a)    On or prior to the Effective Date, (i) the Luxembourg private limited liability company (*société à responsabilité limitée*) (the "**GUC Entity**") shall be established and, following the Effective Date, shall be funded by the Reorganized Debtors with a portion of the GUC Cash as set forth in Section 5.4(b) of the Plan (the "**Contributed GUC Cash**") and (ii) the

18

Contribution Fee Escrow Account shall be established and, following the Effective Date, shall be funded by the Convertible Notes Purchasers with the Escrow Contribution Fees, in each case, in accordance with this Order, the Investment Agreement, the Plan, the GUC Documents, and the Swedish Reorganization Plan.

(b)      The GUC Entity and the Contribution Fee Escrow Account shall be funded with Cash in the aggregate amount of the Reserved Funds, with the Contributed GUC Cash and the Escrow Contribution Fees used to constitute the Reserved Funds to be allocated to the GUC Entity, on the one hand, and the Contribution Fee Escrow Account, on the other hand, in amounts relatively proportionate to the amount of the Total Distributable Value as compared to the amount of the Contribution Fees.

(c)      Following the establishment and funding of the GUC Entity by the Reorganized Debtors, any and all rights to the Contributed GUC Cash shall be deemed contributed to the GUC Entity.  Contemporaneously with the receipt of the Contributed GUC Cash, and in accordance with the Plan and the GUC Documents, the GUC Entity shall issue a Contingent Value Note (on the terms set forth in an exhibit to the GUC Agreement, a "**CVN**") in the principal amount equal to the Contributed GUC Cash to the holders of Allowed General Unsecured Claims in (i) Classes 3, 4, and 5 with respect to SAS AB and the Consolidated Debtors and (ii) Classes 3 and 5 with respect to the Gorm Blue Entities, as well as to the holders of general unsecured claims in the Swedish SAS AB Reorganization (collectively, the "**GUCs**") who are either (A) not a "U.S. person" (as defined in Section 902(k)(1) of Regulation S of the Securities Act) or (B) a U.S. person and a "qualified purchaser" (as defined in Section 2(a)(51) of the Investment Company Act of 1940, as amended from time to time, the "**Investment Company Act**"), in exchange for all of the rights of such GUCs under the Plan with respect to receiving payments of the GUC Cash on

account of their Allowed General Unsecured Claims, which rights shall be deemed to be contributed to the GUC Entity under the Plan on the Effective Date in accordance with the GUC Implementation Steps.

(d)    Each of the GUC Documents shall become effective upon the Effective Date, and the CVNs shall be issued as promptly as possible upon the Effective Date to holders of Allowed General Unsecured Claims in accordance with the Plan, the GUC Implementation Steps, and the GUC Documents.

(e)    As a condition precedent to receipt of the CVNs, and to determine the GUCs' eligibility to receive CVNs, the applicable holders of Allowed General Unsecured Claims must deliver to the Debtors, prior to the Effective Date, a certification and any supporting documentation reasonably requested by the Debtors to confirm that each such holder is either (1) not a "U.S. person" (as defined in Section 902(k)(1) of Regulation S of the Securities Act) or (2) a U.S. person and a "qualified purchaser" (as defined in Section 2(a)(51) of the Investment Company Act).  Any Person who does not deliver such certification and supporting documentation reasonably requested by the Debtors shall be deemed a Disqualified Person.

(f)    CVNs that would otherwise be distributable under the Plan to the applicable holders of Allowed General Unsecured Claims that are Disqualified Persons or Ineligible Holders (as defined in the Plan Supplement), in each case, shall be issued to the Holding Period Trustee to be held in trust for the benefit of such Disqualified Persons or Ineligible Holders. Subject to any restrictions on transfer arising under applicable Law, the GUC Holding Period Trust Deed (as defined in the Plan Supplement), and the GUC Agreement, the Holding Period Trustee shall, at the end of the Holding Period (as defined in the Plan Supplement), sell any remaining CVNs held by the Holding Period Trustee as promptly as practicable and, subject to satisfaction

20

of the required conditions set forth in the GUC Holding Period Trust Deed, release the proceeds

from the sale of such CVNs to the respective Disqualified Persons or Ineligible Holders, as

applicable.  Any Disqualified Person or Ineligible Holder who fails to timely and properly claim

its share of the proceeds from the sale of such CVNs shall, in each case, have such proceeds

forfeited and reallocated by way of gift to Reorganized SAS AB in accordance with the GUC

Holding Period Trust Deed.

(g)      Subject to the availability and release of GUC Cash in the GUC

Entity as set forth above, holders of CVNs shall be entitled to distributions of any residual amount

of the Contributed GUC Cash (and any earnings thereon) to which their CVNs relate solely in

accordance with the Plan and the terms of the GUC Documents.  The GUC Entity shall be governed

by the applicable GUC Documents and administered as set forth in the GUC Documents.

(h)      Each of the CVNs issued pursuant to the Plan will be issued without

registration in reliance upon the exemption set forth in Regulation S or Section 4(a)(2) of the

Securities Act.  Any securities issued in reliance on Section 4(a)(2) of the Securities Act and/or

Regulation S will be "restricted securities" and subject to resale restrictions and the applicable

GUC Documents.

(i)      On or prior to the Effective Date, the Creditors' Committee shall

appoint the Creditor Oversight Committee of up to three members.  The Creditor Oversight

Committee shall have those rights set forth in the Plan and GUC Documents.

15.      <u>Release of Liens</u>.

(a)      Upon the full payment or other satisfaction of an Allowed Other

Secured Claim (or other treatment under the Plan that results in the release of a Lien), or promptly

thereafter, the holder of such Allowed Other Secured Claim shall deliver to the Debtors or

Reorganized Debtors, as applicable, any collateral or other property of a Debtor held by such holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Other Secured Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or lis pendens, or similar interests or documents.  The presentation or filing of this Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.  To the extent that any holder of an Allowed Other Secured Claim that has been satisfied or discharged pursuant to the Plan, or any agent for such holder, has filed or recorded any Liens to secure such holder's Allowed Other Secured Claim, then on or as soon as practicable on or after the Effective Date, such holder (or the agent for such holder) shall take any and all steps requested by the Debtors, the Reorganized Debtors, or the applicable agent or trustee, that are necessary to cancel and/or extinguish such Liens, which shall be automatically canceled or extinguished on the Effective Date pursuant to the entry of this Order.

(b)    Subject to the DIP Credit Agreement and any security documents governed by Danish, English, Irish, Norwegian, or Swedish Law, (i) upon the full, indefeasible, and irrevocable satisfaction of all DIP Claims in accordance with the DIP Credit Agreement, the Plan, and the Swedish Reorganization Plan, (A) all of the DIP Lenders' outstanding DIP Claims shall be automatically and irrevocably released and discharged and (B) all DIP Liens and all related instruments, agreements, and other documents executed by any of the Debtors shall be automatically, absolutely, unconditionally, irrevocably, and forever terminated, released, re-assigned, and discharged, and (ii) prior to the satisfaction of all DIP Claims, the DIP Agent shall deliver a customary payoff letter, the form of which shall be agreed upon prior to the Effective

Date and which shall be reasonably acceptable to the DIP Agent, DIP Lenders, and the

Reorganized Debtors, pursuant to which the Reorganized Debtors shall be authorized, and the DIP

Agent will be obligated, to take all steps and/or execute and/or deliver all instruments or

documents, in each case, required to effect the release of the DIP Liens and/or reflect on the public

record the consummation of the payoff, releases, and terminations contemplated thereby.

16.    <u>Executory Contracts and Unexpired Leases</u>.

(a)    Pursuant to Article VIII of the Plan, as of and subject to the

occurrence of the Effective Date, except as otherwise provided herein, all executory contracts and

unexpired leases to which any of the Debtors are parties shall be rejected and deemed rejected

pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such contract or lease (i) was

previously assumed or rejected by the Debtors, pursuant to a Final Order of this Court,

(ii) previously expired or terminated pursuant to its own terms or by agreement of the parties

thereto, (iii) was the subject of a motion to assume filed by the Debtors on or before the

Confirmation Date, or (iv) was specifically designated as a contract or lease to be assumed on the

Schedule of Assumed Contracts.

(b)    Subject to (i) satisfaction of the conditions set forth in

Section 8.1(a)-(c) of the Plan, (ii) resolution of any disputes in accordance with Section 8.2 of the

Plan with respect to the contracts or leases subject to such disputes, and (iii) the occurrence of the

Effective Date, entry of this Order shall constitute approval of the assumptions or rejections

provided for in the Plan and the Plan Supplement pursuant to sections 365(a) and 1123 of the

Bankruptcy Code.  Each executory contract and unexpired lease assumed pursuant to the Plan shall

vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms,

except as modified by the provisions of the Plan, any Final Order of this Court authorizing and providing for its assumption, or applicable Law.

(c)     Notwithstanding anything in the Plan to the contrary, subject to the occurrence of the Confirmation Date and satisfaction of the conditions set forth in Section 8.1(a)-(c) of the Plan, the executory contracts and unexpired leases to which any Debtor is a party listed on the Schedule of Assumed Contracts contained in the Plan Supplement and identified on lines 287 – 291, 294, 533, 630, 1152 – 1163, 1287, 1293, and 1313 – 1321, in each case, shall be deemed assumed as of the Confirmation Date.

(d)     For the avoidance of doubt and notwithstanding anything to the contrary in this Order, the Plan, or the documents contained in the Plan Supplement, any and all corporate discount agreements entered into with the Debtors that entitle a corporate customer to discounts on airline tickets and other benefits based on travel volumes shall be deemed assumed and continue in full force and effect in accordance with the terms of the Plan.

(e)     For the avoidance of doubt, any informal objections received by the Debtors with respect to proposed Cure Amounts set forth in the Cure Notice (as may be amended, supplemented, or otherwise modified from time to time) shall be determined in accordance with Article VIII of the Plan, including Section 8.2(e) thereof, as if such informal objection was timely filed with this Court.

(f)     Pursuant to Section 8.3 of the Plan, any counterparty to an executory contract or unexpired lease that is rejected by the Debtors pursuant to the Plan must file and serve a Proof of Claim against the applicable Debtor that is party to the contract or lease to be rejected no later than 30 days after the later of (i) the Confirmation Date or (ii) the effective date of rejection of such executory contract or unexpired lease.

17. <u>Distribution Record Date</u>. Notwithstanding anything in the Plan to the contrary, the Distribution Record Date shall be approximately two weeks prior to the Effective Date, which Distribution Record Date the Debtors shall disclose in a notice to be filed with this Court. For the avoidance of doubt, as set forth in Section 6.4 of the Plan, the Distribution Record Date does not apply to the Debtors' public securities—the holders of which shall receive their distributions pursuant to the standard and customary procedures of Euroclear Sweden and any other applicable securities depositories to the extent applicable to the distribution to be provided in accordance with the Plan. Neither the Debtors nor the Disbursing Agent shall have any obligation to recognize any transfer of a Claim occurring after the close of business on the Distribution Record Date.

18. <u>Conditions Precedent to Effective Date</u>. The Plan shall not become effective unless and until all conditions set forth in Section 9.1 of the Plan have been satisfied or waived pursuant to Section 9.2 of the Plan.

19. <u>Discharge</u>. Except as otherwise provided in the Plan or in this Order, upon the Effective Date and in consideration of the distributions to be made under the Plan, the Debtors shall be discharged, to the fullest extent permitted by section 1141 of the Bankruptcy Code, from any and all Claims, Interests, rights, and liabilities that arose prior to the Effective Date. Except as otherwise provided in the Plan, upon the Effective Date, all holders of Claims and Interests shall be forever precluded and enjoined, pursuant to sections 105, 524, and 1141 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Interest in any Debtor or Reorganized Debtor.

20. <u>Plan Injunction</u>. Except as otherwise provided in the Plan, the Definitive Documents, or this Order, as of the entry of this Order but subject to the occurrence of the Effective

Date, (i) all Persons are permanently enjoined from (A) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting, directly or indirectly, a Debtor, a Reorganized Debtor, or an Estate or the property of any of the foregoing, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this clause (A) or any property of any such transferee or successor, with respect to any discharged Claim or Interest; (B) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree, or order against a Debtor, a Reorganized Debtor, or an Estate or its property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this clause (B) or any property of any such transferee or successor, with respect to any discharged Claim or Interest; (C) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against a Debtor, a Reorganized Debtor, or an Estate or any of its property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons mentioned in this clause (C) or any property of any such transferee or successor, with respect to any discharged Claim or Interest; (D) seeking relief of any kind with respect to a discharged Claim or Interest that does not conform to or comply with the provisions of the Plan and the Definitive Documents, and (ii) all Persons are permanently enjoined from taking or continuing to take any action, directly or indirectly, to cause a Person described in the foregoing clause (i) to take or continue to take any act described in any of clauses (A) through (D) of the foregoing clause (i).

26

21.    <u>Release, Injunction, and Exculpation Provisions</u>.  As of the Effective Date, subject to the modifications set forth herein, all release, injunction, and exculpation provisions embodied in the Plan, including those contained in Sections 10.5 (Injunction against Interference with Plan), 10.6 (Plan Injunction), 10.7(a) (Releases by Debtors), 10.7(b) (Releases by Holders of Claims or Interests), 10.8    (Exculpation), and 10.9 (Injunction Related to Releases and Exculpation) are hereby approved and shall be effective and binding on all Persons, to the extent provided in the Plan (as modified by this Order), without further order or action by this Court. Additionally, this Order permanently enjoins the commencement or prosecution by any Person, whether directly, derivatively, or otherwise, of any claims or Causes of Action released or exculpated pursuant to the Plan or this Order.

22.    <u>Dissolution of Creditors' Committee</u>.  On the Effective Date, the Creditors' Committee shall be deemed to have been dissolved, and the members thereof, and their respective counsel, advisors and agents, shall be released and discharged of and from all further authority, duties, responsibilities, and obligations related to and arising from and in connection with the Chapter 11 Cases, except with respect to (i) any continuing confidentiality obligations, (ii) prosecuting requests for allowances of compensation and reimbursement of expenses incurred prior to the Effective Date, (iii) in the event that this Court's entry of this Order is appealed, participating in such appeal, (iv) reviewing and responding to inquiries from holders of Claims regarding implementation of the Plan, and (v) all issues relating to the Swedish Reorganization Plan and any appeals of the Swedish Reorganization Plan Confirmation.  From and after the Effective Date, the Reorganized Debtors shall continue to pay, when due and payable in the ordinary course of business, the reasonable and documented fees and expenses of the Creditors'

Committee's professionals solely to the extent arising out of or related to the foregoing without further order of this Court.

23.    <u>Administrative Expense Claims Bar Date</u>.  Except as otherwise provided in this Order or the Plan, requests for payment of Administrative Expense Claims must be filed with this Court by the first Business Day that is 30 days following the Effective Date (the "**Administrative Expense Claims Bar Date**").  Such proof of Administrative Expense Claim must include at a minimum (i) the name of the applicable Debtor that is purported to be liable for the Administrative Expense Claim and if the Administrative Expense Claim is asserted against more than one Debtor, the exact amount asserted to be owed by each such Debtor, (ii) the name of the holder of the Administrative Expense Claim, (iii) the asserted amount of the Administrative Expense Claim, (iv) the basis of the Administrative Expense Claim, and (v) supporting documentation for the Administrative Expense Claim.  Notwithstanding the foregoing, (A) holders of Administrative Expense Claims that arose in the ordinary course of business during the Chapter 11 Cases, (B) the Investors, and (C) holders of DIP Claims shall not be required to file any request for payment of such Administrative Expense Claims or DIP Claims and holders of Fee Claims must comply with Section 2.4 of the Plan.  **FAILURE TO FILE AND SERVE PROOF OF AN ADMINISTRATIVE EXPENSE CLAIM TIMELY AND PROPERLY AS SET FORTH HEREIN SHALL RESULT IN SUCH CLAIM BEING FOREVER BARRED.  IF FOR ANY REASON ANY SUCH ADMINISTRATIVE EXPENSE CLAIM IS INCAPABLE OF BEING FOREVER BARRED AND DISALLOWED, THEN THE HOLDER OF SUCH CLAIM SHALL IN NO EVENT HAVE RECOURSE AGAINST THE DEBTORS OR THE REORGANIZED DEBTORS OR TO ANY PROPERTY TO BE RELEASED PURSUANT TO THE PLAN.**  Notwithstanding Section 7.10(c) of the Investment Agreement or anything

28

contrary in the *Order Authorizing Debtors to Enter Into Investment Agreement, Perform Obligations Thereunder, and Pay Transaction Fees and Expenses* [Docket No. 1646] (the "**Investment Agreement Order**"), the Investors shall be permitted to submit, and the Debtors shall pay, invoices for the Expense Reimbursement and the Danish State Expense Reimbursement (each as defined in the Investment Agreement), on a monthly basis following entry of this Order; *provided, however*, that except with respect to fees payable on or after the Effective Date, such reimbursement requests shall continue to be subject to the review provisions set forth in paragraph 3 of the Investment Agreement Order.

24.     <u>Statutory Fees</u>.  All Statutory Fees due and payable prior to the Effective Date shall be paid by the Debtors or the Reorganized Debtors.  On and after the Effective Date, the Reorganized Debtors shall pay any and all Statutory Fees when due and payable, and shall file with this Court quarterly reports in a form reasonably acceptable to the U.S. Trustee.  Each Debtor or Reorganized Debtor, as applicable, shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's, or Reorganized Debtor's, as applicable, Chapter 11 Case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code, notwithstanding the substantive consolidation of the Consolidated Debtors for purposes of the Plan.

25.     <u>Documents, Mortgages, and Instruments</u>.     Each federal, state, commonwealth, local, foreign, or other governmental agency is authorized and directed to accept for filing or recording any and all documents, mortgages, and instruments necessary or appropriate to effectuate, implement, or consummate the Transaction contemplated by the Plan and this Order, including this Order, to the maximum extent permitted under all applicable Law.

26.     <u>Retention of Jurisdiction</u>.  Notwithstanding the entry of this Order or the occurrence of the Effective Date, and subject to Section 12.4 and Section 12.12 of the Investment Agreement, on and after the Effective Date, this Court shall retain jurisdiction, pursuant to 28 U.S.C. §§ 1334 and 157, over all matters arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in Article XI of the Plan.

27.     <u>Continued Effect of Stays and Injunction</u>.  Unless otherwise provided in the Plan or this Order, any injunction or stay arising under or entered during the Chapter 11 Cases, whether under sections 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the date of entry of this Order, shall remain in full force and effect until the Effective Date.

28.     <u>Provisions of Plan and Order Nonseverable and Mutually Dependent</u>.  The provisions of the Plan and this Order, including the findings of fact and conclusions of law set forth herein, are (i) valid and enforceable pursuant to their terms, (ii) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the Reorganized Debtors (as the case may be); *provided, however*, that Investor Consent is required as to any modification of the Plan, whether material or immaterial, that impacts the terms of the Transaction or other rights or entitlements of the Investors, and (iii) nonseverable and mutually dependent; *provided further*, *however*, that the Debtors shall not, without further order or approval of this Court, make any material modification to the Plan, including any modification that adversely affects in a material way the treatment of holders of Claims or Interests.

29.     <u>Headings</u>.  Headings utilized herein are for convenience of reference only and shall not limit or otherwise affect the provisions of the Plan or this Order.

30.     <u>Governing Law</u>.  Except to the extent that the Bankruptcy Code or other federal law is applicable or to the extent that a Definitive Document provides otherwise, the rights,

duties, and obligations arising under the Plan and the Definitive Documents shall be governed by, and construed and enforced in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflict of laws thereof (other than section 5-1401 and section 5-1402 of the New York General Obligations Law).

31.    <u>Notice of Entry of Order and Effective Date</u>.    In accordance with Bankruptcy Rules 2002 and 3020(c), as soon as reasonably practicable after the Effective Date, the Debtors shall serve notice of the entry of this Order and occurrence of the Effective Date, substantially in the form annexed hereto as **<u>Exhibit B</u>**, on all parties who hold a Claim or Interest in these cases, the U.S. Trustee, and any other parties in interest (the "**Notice of Effective Date**"). The Debtors may cause a summary version of the Notice of Effective Date to be published once in each of (i) the national edition of *The New York Times*, (ii) *The Swedish Official Gazette*, (iii) *Svenska Dagbladet*, (iv) *Berlingske*, and (v) *Aftonposten*, as soon as reasonably practicable after the Effective Date.    Such notice is hereby approved in all respects and shall be deemed good and sufficient notice of entry of this Order, the occurrence of the Effective Date, and the Administrative Expense Claims Bar Date.

32.    <u>Final Order</u>.  This Order is a final order and the period in which an appeal must be filed shall commence upon the entry hereof.

33.    <u>Inconsistency</u>.  To the extent of any irreconcilable inconsistency between this Order and the Plan, this Order shall govern to the extent of such inconsistency.

34.    <u>Substantial Consummation</u>.    On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101(2) and 1127(b) of the Bankruptcy Code.

35.    <u>No Waiver</u>.  The failure to specifically include or refer to any particular article, section, or provision of the Plan in this Order shall not diminish or impair the effectiveness or enforceability of such article, section, or provision nor constitute a waiver thereof, it being the intent of this Court that the Plan is confirmed in its entirety and incorporated herein by this reference.

36.    <u>Closure of Chapter 11 Cases</u>.  The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, file with this Court all documents required by Bankruptcy Rule 3022 and any applicable order of this Court to close the Chapter 11 Cases. As of the Effective Date, the Reorganized Debtors may submit separate orders to this Court under certification of counsel closing certain individual Chapter 11 Cases and changing the caption of the Chapter 11 Cases accordingly.  Matters concerning Claims shall be heard and adjudicated in a Debtor's Chapter 11 Case that remains open regardless of whether the applicable Claim is against a Debtor in a Chapter 11 Case that is closed.  Upon the filing of a motion to close the last Chapter 11 Case remaining open, the Reorganized Debtors shall file a final report with respect to all of the Chapter 11 Cases pursuant to Local Rule 3022-1.

37.    <u>Miscellaneous Provisions</u>.

(a)    ***Plan Modifications***.  All references to the Plan (including the copy of the Plan that is attached hereto) shall be interpreted as references to the Plan as modified by the below provisions.

(i)    The following definitions in Section 1.1 of the Plan are hereby stricken and are deemed to have been replaced in their entirety as follows:

> ***Affiliate*** means any "affiliate" as defined in section 101(2) of the Bankruptcy Code (except as provided otherwise herein); *provided, however*, that for purposes of this Plan the Danish State Noteholder, the

Swedish State, and the Norwegian State[3] shall not be Affiliates of the Debtors.

***Exculpated Parties*** means, collectively, (i) the Debtors, (ii) the Investors, (iii) the Creditors' Committee and each of its present and former members (solely in their capacity as such), (iv) the Danish State Noteholder, (v) the Swedish State, (vi) the Norwegian State, (vii) the Swiss Bonds Agent, (viii) with respect to each of the foregoing Entities in clauses (i) through (vii), such Entities' Related Entities, and (ix) with respect to each of the foregoing Entities in clauses (i) through (viii), such Entities' respective heirs, executors, estates, and nominees, and in each case, in such Entities' capacities as such.

***Related Entities*** means, with respect to an Entity, that Entity's current and former Affiliates, and such Entity's and its current and former Affiliates' predecessors, successors, assigns, and current and former officers, group management, directors, principals, equity holders (regardless of whether such interests are held directly or indirectly), members, partners (including both general and limited partners), managers, employees, agents, advisory board members, management companies, managed accounts or funds, affiliated investment funds or investment vehicles, and Representatives; *provided, however*, that Related Entities of the Danish State Investor and the Danish State Noteholder shall be limited to Representatives of the Danish State Investor and the Danish State Noteholder; *provided, further, however,* that Related Entities of the Swedish State and the Norwegian State shall be limited to Representatives of the Swedish State and the Norwegian State, as applicable.

***Released Parties*** means, collectively, (i) the Debtors, (ii) the DIP Agent and the DIP Lenders, (iii) the Creditors' Committee and each of its present and former members, (iv) the Investors, (v) the Danish State Noteholder, (vi) the Swedish State, (vii) the Norwegian State, (viii) the Swiss Bonds Agent, and (ix) with respect to each of the foregoing Entities in clauses (i) through (viii), such Entities' Related Entities, and their respective heirs, executors, estates, and nominees, in each case in their capacity as such; *provided, however*, that, subject to Section 3.3(f) of the Investment Agreement, any holder of a Claim or Interest that would otherwise constitute a Released Party that does not consent to the releases in this Plan shall not be a Released Party; *provided, further, however*, that, to the extent the Danish State Noteholder gives such a release as contemplated by the Investment Agreement, the Danish State Noteholder shall be a Released Party under this Plan for all purposes; *provided, further, however,* that, to the extent the Swedish State and the Norwegian State provide a separate release agreement on account of the Swedish Term Loan Claims and the

---

[3] ***Norwegian State*** means Norway, including its government and the instrumentalities thereof, including Export Finance Norway (previously known as Garantiinstituttet for Eksportkreditt (GIEK)).

Norwegian Term Loan Claims, as applicable, which shall be acceptable to the Debtors and in a form similar to the release included as Exhibit C to the Investment Agreement, the Swedish State and the Norwegian State shall be Released Parties under the Plan for all purposes; *provided, further, however*, that the Released Parties referenced in clause (ix) are Released Parties solely with respect to work performed for or on behalf of the applicable Entity for which releases are given pursuant to this Plan.

***Releasing Parties*** means, collectively, (i) the Released Parties, other than the Danish State Investor, the Danish State Noteholder, the Swedish State, and the Norwegian State, (ii) all holders of Claims who vote to accept this Plan, (iii) all holders of Claims that either vote to reject this Plan or abstain from voting on this Plan and affirmatively opt to grant the releases by checking the appropriate box on the Ballot, and (iv) all holders of Claims and Interests not described in the foregoing clauses (i) – (iii) that affirmatively opt to grant the releases by checking the appropriate box on the notice form; *provided, however*, that the Danish State Investor and the Danish State Noteholder shall provide releases solely pursuant to Section 3.3(f) of the Investment Agreement; *provided, further, however*, that the Swedish State and the Norwegian State shall provide releases on account of the Swedish Term Loan Claims and the Norwegian Term Loan Claims, as applicable, solely pursuant to a separate release agreement.

***Retained Causes of Action*** means all Causes of Action held by the Debtors that are not expressly settled or released by the Debtors under this Plan, which shall include any Cause of Action specifically listed on the Schedule of Retained Causes of Action; *provided, however*, that the Debtors shall not retain any Causes of Action against the Swedish National Debt Office related to the Swedish Term Loan or against Export Finance Norway or any predecessor or successor thereto related to the Norwegian Term Loan; *provided, further, however*, that the separate release agreement on account of the Swedish Term Loan Claims and the Norwegian Term Loan Claims, as applicable, is in effect.

  (ii)  Section 6.8(a) of the Plan is hereby stricken and is deemed to have

been replaced in its entirety as follows:

One year from the later of: (i) the Effective Date and (ii) the date that is ten Business Days after the date a Claim is first Allowed, all distributions payable on account of such Claim that are not claimed or accepted by such date shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall revert to the Reorganized Debtors or their successors or assigns, and all claims of any other Person (including the holder of a Claim in the same Class) to such distribution shall be discharged and forever barred; *provided, however*, that, prior to such deadline, the Reorganized Debtors and the Disbursing Agent shall make reasonable

efforts to locate any holder of an Allowed Claim that has not claimed or accepted its distributions.

(iii)    Section 8.6 of the Plan is hereby stricken and is deemed to have been

replaced in its entirety as follows:

Notwithstanding anything to the contrary in the Confirmation Order, the Plan (including, without limitation, Section 8.1 of the Plan), the Disclosure Statement, the documents contained in the Plan Supplement, the Definitive Documents, the Key Transaction Documents, the GUC Documents, the Cure Notice, the Bar Date Order, any bar date notice, any claim objection, or any other document related to any of the foregoing or any other order of this Court (including any other provision that purports to be preemptory or supervening or grants an injunction, discharge, or release), (i) on the Effective Date, all Insurance Policies[4] shall be assumed in their entireties by the applicable Debtor or Reorganized Debtor pursuant to sections 105 and 365 of the Bankruptcy Code, (ii) on and after the Effective Date, the applicable Reorganized Debtor shall remain liable in full under the Insurance Policies, regardless of whether the obligations arise on, before, or after the Effective Date, without the need or requirement for the Insurers[5] to file or serve any objection to the Cure Notice, request, application, Proof of Claim, or motion for payment or allowance of any Administrative Expense Claim, subject to the Debtors' and Reorganized Debtors' rights, as applicable, to dispute such obligations in accordance with the Insurance Policies, (iii) nothing shall alter, modify, or impair the legal, equitable, or contractual rights, obligations, and defenses of the Insurers, the Debtors, or the Reorganized Debtors under any of the Insurance Policies, and all such rights and obligations shall be determined under the Insurance Policies and applicable non-bankruptcy Law, and (iv) as of the Effective Date, the automatic stay of section 362(a) of the Bankruptcy Code and the injunctions set forth in Article X of the Plan, if and to the extent applicable, shall be deemed lifted without further order of this Court, solely to permit (A) claimants with valid direct action claims against an Insurer under applicable non-bankruptcy Law to proceed with their claims, (B) the Insurers to administer, handle, defend, settle, or pay, in the ordinary course of business and without further order of this Court, (1) claims where a claimant asserts a direct claim against any Insurer under applicable non-bankruptcy Law, or an order has been entered by this Court granting a

---

[4] *Insurance Policies* means all insurance policies issued or providing coverage at any time to any of the Debtors or any of their predecessors and all agreements, documents, or instruments related thereto, including the D&O Liability Insurance Policies. For the avoidance of doubt, the term Insurance Policies shall not include any surety bonds or any agreements, documents, or instruments related thereto.

[5] *Insurer* means any Person (including any third party administrator) that issued or entered into an Insurance Policy and any respective predecessor or Affiliate thereof, in each instance solely in its capacity as an insurer or third party administrator.

claimant relief from the automatic stay or the injunctions set forth in Article X of the Plan to proceed with its claim, and (2) all costs in relation to each of the foregoing, and (C) the Insurers to cancel any Insurance Policies and take other actions relating to the Insurance Policies (including effectuating a setoff), to the extent permissible under applicable non-bankruptcy Law and in accordance with the terms of the Insurance Policies.

In addition, after the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies[6] in effect or purchased as of the Commencement Date. Any individuals covered by such D&O Liability Insurance Policies, including all members, managers, directors, officers, agents, and employees of the Debtors who served in such capacity at any time prior to the Effective Date, shall be entitled to the full benefits of any such D&O Liability Insurance Policy for the full term of the D&O Liability Insurance Policy in accordance with and subject in all respects to the terms and conditions of such D&O Liability Insurance Policy, which shall not be altered, regardless of whether such members, managers, directors, officers, or other individuals remain in such positions after the Effective Date.

(iv)    Section 10.7(a) of the Plan is hereby stricken and is deemed to have

been replaced in its entirety as follows:

> **Releases by Debtors.  As of the Effective Date, except for the rights, remedies, and Causes of Action that are preserved and remain in effect from and after the Effective Date, including to enforce this Plan and the obligations contemplated by the Restructuring, for good and valuable consideration, on and after the Effective Date, the Released Parties shall be conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, to the maximum extent permitted by Law, by the Debtors, the Reorganized Debtors, and the Estates, in each case on behalf of themselves and their respective Related Entities and any and all other Entities that may purport to assert any Cause of Action derivatively, by or through the foregoing Entities, solely to the extent that the Debtors or Reorganized Debtors, as applicable, have the authority to grant such releases on behalf of their respective Related Entities and other Entities, from any and all Causes of Action (including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or the Estates) that the Debtors, the Reorganized Debtors, the Estates, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other**

---

[6] ***D&O Liability Insurance Policies*** means all insurance policies issued or providing coverage at any time to any of the Debtors or any of their predecessors for current or former directors', managers', and officers' liability, and all agreements, documents, or instruments related thereto (including any "tail policy").

**Entity, based on, relating to, or in any manner arising from, in whole or in part: the Debtors (including the management, direct or indirect ownership, or operation thereof) or their Estates; the Reorganized Debtors; the Chapter 11 Cases; this Plan; the Confirmation Order; the Restructuring; the Transaction; the equity solicitation process; any debt or Security of or in the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of or in the Debtors or the Reorganized Debtors, including the New Shares and the New Convertible Notes; the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan; the business or contractual arrangements or other interactions between any Debtor and any Released Party; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in- or out-of-court restructuring efforts of the Debtors; any intercompany transaction; the negotiation, formulation, preparation, dissemination, or consummation of this Plan and any related agreements, instruments, or other documents or any other contract, instrument, release, or document created or entered into in connection with this Plan or any related agreements, instruments, or other documents (including the Investment Agreement); the solicitation of votes with respect to, or confirmation of, this Plan; or any other act or omission, transaction, agreement, event, or other occurrence related to any of the forgoing and taking place on or before the Effective Date. Notwithstanding anything herein to the contrary, the releases contained in this <u>Section 10.7(a)</u> shall not (i) affect the liability of any Entity from Causes of Action based on willful misconduct, gross negligence or intentional fraud as determined by a Final Order, (ii) release post-Effective Date obligations of any Entity under this Plan, the Restructuring, the Definitive Documents or any other document, instrument, or agreement executed to implement this Plan (unless expressly cancelled by this Plan), or (iii) affect the Releasing Parties' rights that remain in effect from and after the Effective Date to enforce this Plan, the Definitive Documents, and the obligations contemplated by the Transaction or as otherwise provided in any order of the Bankruptcy Court.**

(v)    Section 11.2 of the Plan is hereby stricken and is deemed to have been replaced in its entirety as follows:

(a)    Consistent with Section 12.4 and Section 12.12 of the Investment Agreement, while the Danish State Investor and the Danish State Noteholder support this Plan, the Danish State Investor and the Danish State Noteholder are not consenting to the jurisdiction of the Bankruptcy Court and, therefore, the Danish State Noteholder is not voting on this Plan. Further, neither the Danish State Investor nor the Danish State Noteholder is consenting to the jurisdiction of the

Bankruptcy Court as a result of the (i) submission of any bid pursuant to the Equity Solicitation Procedures, (ii) Equity Solicitation Procedures Motion, (iii) Equity Solicitation Procedures, (iv) subscription for New Shares and receipt of New Convertible Notes, (v) status of the Danish State Noteholder as a Consultation Party (as defined in the Equity Solicitation Procedures Motion), (vi) negotiation of any of the foregoing, (vii) releases and exculpations granted or afforded pursuant to or in connection with this Plan and the Transaction, (viii) entry into the Investment Agreement or any other Key Transaction Documents, or (ix) otherwise. The Debtors and the Non-State Investors shall not take a position in the Chapter 11 Cases that is contrary or inconsistent with the foregoing.

(b)     While the Swedish State supports this Plan, the Swedish State is neither consenting to the jurisdiction of the Bankruptcy Court nor waiving sovereign immunity and, therefore, the Swedish State is not voting on this Plan.  Further, the Swedish State is neither consenting to the jurisdiction of the Bankruptcy Court nor waiving sovereign immunity as a result of the (i) releases and exculpations granted or afforded pursuant to or in connection with this Plan or (ii) otherwise. The Debtors and the Investors shall not take a position in the Chapter 11 Cases that is contrary or inconsistent with the foregoing.

(c)     While the Norwegian State supports this Plan, the Norwegian State is neither consenting to the jurisdiction of the Bankruptcy Court nor waiving sovereign immunity and, therefore, the Norwegian State is not voting on this Plan.  Further, the Norwegian State is neither consenting to the jurisdiction of the Bankruptcy Court nor waiving sovereign immunity as a result of (i) the releases and exculpations granted or afforded pursuant to or in connection with this Plan, (ii) the filing of any Proofs of Claim, (iii) the treatment of their respective claims under this Plan, including the receipt of New Shares or GUC Interests, (iv) entry into the Recipient Shareholders' Agreement, or (v) otherwise.  The Debtors and the Investors shall not take a position in the Chapter 11 Cases that is contrary or inconsistent with the foregoing.

(b)     ***Determination of Cure Amounts for Assumed Aircraft Leases***.

Notwithstanding anything in the Plan or this Order to the contrary, the Cure Amount with respect to each assumed Aircraft Lease shall be equal to (i) the Cure Amount reflected in the Cure Notice with respect to such Aircraft Lease *plus* (ii) regardless of whether an objection to such noticed Cure Amount is timely filed as contemplated by Section 8.2 of the Plan, any additional amounts

required to cure monetary defaults under such Aircraft Lease accruing after service of the Cure Notice and prior to the Effective Date.  Nothing herein shall impair any Aircraft Lessor's right to assert that any obligations accruing under or in respect of any assumed Aircraft Lease between the Commencement Date and the Effective Date, including any amounts referred to in the immediately preceding clause (ii), are entitled to priority as an Administrative Expense Claim.

(c)    *Retention Stipulations*.  Notwithstanding anything to the contrary contained in any *Stipulation and Order between Debtors and Counterparties Concerning Certain Equipment* approved by this Court in the Chapter 11 Cases relating to a Modified Aircraft Lease and its related executory contracts included in the Schedule of Assumed Contracts (each such stipulation, a "**Retention Stipulation**"), solely for purposes of determining the termination date of the Stipulation Period (as defined in the applicable Retention Stipulation), the date of entry of an order of this Court approving the assumption of such Modified Aircraft Lease and related executory contracts shall be deemed to be the Effective Date.

(d)    *BoComm Lessor*.

(i)    Nothing in the Plan or this Order shall modify, impair, or otherwise affect in any manner whatsoever any available rights of setoff or recoupment of Jin Shan 7 Ireland Company Limited (the "**BoComm Lessor**") under applicable Law or any aircraft lease agreements to which the BoComm Lessor and the Debtors are a party relating to the "Equipment" as such term is defined in the *Stipulation and Order Between the Debtors and Counterparties Concerning Certain Equipment* [ECF No. 632] (the "**BoComm Stipulation**"), as such aircraft lease agreements have been amended in accordance with the "Amendments" (as defined in the BoComm Stipulation), and in accordance with the terms of the BoComm Stipulation (collectively, the "**BoComm Leases**").

39

(ii)      The assumption of the BoComm Leases pursuant to the Plan and this Order shall not, and shall not be deemed to, modify, impair, or otherwise affect the BoComm Lessor's rights under the BoComm Leases with respect to any obligations of the Debtors under the BoComm Leases arising or otherwise enforceable from and after the date of assumption of such leases, including, for the avoidance of doubt, any rights of the BoComm Lessor to require the Debtors to replenish the Security Deposits (as defined in the BoComm Leases).

(iii)      All of the BoComm Lessor's and the Debtors' rights, arguments, claims, and defenses under the BoComm Leases and otherwise applicable Law are fully reserved, including all rights, arguments, claims, and defenses with respect to the dispute regarding the reconciliation and treatment of Maintenance Reserves (as defined in the BoComm Leases) and the funding of Security Deposits.

(e)      ***Original DIP Credit Agreement Payoff Letter***.

(i)      Notwithstanding anything to the contrary in the Plan or this Order (i) the "Surviving Obligations" under the Original DIP Credit Agreement Payoff Letter[7] shall continue in full force and effect, subject to this paragraph 38(e), after the Effective Date in accordance with the terms of the Original DIP Credit Agreement Payoff Letter, the Original DIP Credit Agreement[8] and the DIP Orders and (ii) Section 5.8(a) of the Plan shall apply to the Surviving Obligations only once those obligations are satisfied in accordance with the Original

---

[7] ***Original DIP Credit Agreement Payoff Letter*** means that certain Pay-Off of Super Priority Credit Agreement letter, dated November 15, 2023, from the DIP Agent (in its capacity as administrative agent and collateral agent under the DIP Credit Agreement (as defined in the Original DIP Credit Agreement Payoff Letter)).

[8] ***Original DIP Credit Agreement*** means that certain Super-Priority Debtor-In-Possession Term Loan Agreement, dated as of August 13, 2022 (as amended, restated, amended and restated, supplemented and/or otherwise modified from time to time), by and among the Consortium, as borrower, the other Debtors as guarantors, Wilmington Savings Fund Society, FSB, as administrative agent and collateral agent, and the Original DIP Lenders (as defined herein).

DIP Credit Agreement Payoff Letter, the Original DIP Credit Agreement, and the DIP Orders or released in accordance with this paragraph 38(e).

(ii)    If the Debtors object or have objected to any Advisor Fee (as defined in the Original DIP Credit Agreement Payoff Letter) in accordance with the procedures set forth in paragraph 14(b) of the Original DIP Order,[9] and such objection remains unresolved, then the Debtors, each such professional, and the DIP Lenders (as defined in the Original DIP Credit Agreement) (the "**Original DIP Lenders**") shall use reasonable efforts to resolve the objection prior to the Effective Date, if applicable.

(iii)    On or after the Effective Date, if the objection is not resolved, the Reorganized Debtors shall give notice in writing (email being sufficient) to the Original DIP Lenders, with a copy to their primary counsel and the applicable professional, with an outstanding Advisor Fee (an "**Advisor Fee Notice**") requiring the Original DIP Lenders to confirm in writing whether or not they intend to pursue the Advisor Fee. The recipient of an Advisor Fee Notice must respond in writing (email being sufficient) within 10 days of the date of such Advisor Fee Notice. If the Original DIP Lenders (i) do not respond within the required period or (ii) respond that they do not intend to pursue the Advisor Fee, then the Fee Account Lien (as defined in the Original DIP Credit Agreement Payoff Letter) shall be immediately released solely with respect to the amount of such Advisor Fee. If the Original DIP Lenders confirm in writing to the Debtors or Reorganized Debtors, as applicable, that they intend to pursue the Advisor Fee, the Debtors shall, within 30 days of receipt of such response, file a motion with this Court for determination as to the payment of the Advisor Fee (an "**Advisor Fee Objection**"). Prior to filing an Advisor Fee Objection,

---

[9] ***Original DIP Order*** means the *Order (I) Authorizing the Debtors to Obtain Senior Secured, Superpriority, Postpetition Financing, (II) Granting Liens and Superpriority Claims, and (III) Granting Related Relief* [ECF No. 331].

counsel to the Debtors shall meet and confer with counsel to the Original DIP Lenders and the affected professional (if applicable), including as to any redactions or modifications as may be necessary to protect any information subject to attorney-client privilege, any information constituting attorney work product, or any other confidential information.

(iv)     If this Court sustains an Advisor Fee Objection, the Fee Account Lien shall be immediately released on such date to the extent of any disallowed or withdrawn Advisor Fees.  Notwithstanding anything to the contrary in the Case Management Order,[10] (A) any hearing on an Advisor Fee Objection shall be scheduled for no earlier than 21 days after the filing and service of such objection, without prejudice to the right of any party to request an enlargement or reduction of any time period under Bankruptcy Rule 9006(b) and (c), and (B) any replies by the Original DIP Lenders and/or the affected professional in support of the Advisor Fee shall be filed on or before the date that is at least seven days prior to the hearing.  The Case Management Order shall otherwise govern matters relating to an Advisor Fee Objection.  Any additional invoice for an Advisor Fee submitted post-Effective Date shall be subject to the procedures set out herein; *provided, however*, that, if applicable, the Debtors must serve any Advisor Fee Notice 30 days after objecting to any such additional Advisor Fee.

(f)     ***Chubb Surety***.

(i)     Subject to subsection (ii) below, notwithstanding any other provision to the contrary in this Order, the Plan, the documents contained in the Plan Supplement, the Disclosure Statement, the Definitive Documents, the Key Transaction Documents, the GUC Documents, the Cure Notice, the Bar Date Order, any bar date notice, any claim objection, the

---

[10] ***Case Management Order*** means the *Order Implementing Certain Notice and Case Management Procedures* [ECF No. 292].

Swedish Reorganization Plan, or any other agreements, orders of this Court, or documents related thereto (including any provision therein that purports to be preemptory or supervening, grants an injunction, discharge, or release), such documents shall not prime, discharge, impair, modify, or subordinate the rights of Westchester Fire Insurance Company or its past, present, or future affiliated sureties (each as surety in their role as an issuer of bonds individually and collectively referred to herein as "**Chubb Surety**"), relating to:

(1)    any surety bonds or similar instruments issued or executed by Chubb Surety on behalf of any Debtor (collectively, and together with those bonds or similar instruments in which any Reorganized Debtor is becoming the principal, as set forth in subsection (ii)(1) below, the "**Bonds**" and all of the obligations under the Bonds shall hereafter be referred to individually and collectively as the "**Bonded Obligations**");

(2)    any indemnity agreement executed by any Debtor and Chubb Surety, including the *Agreement of Indemnity* executed by SANA on or about May 18, 2015 and guaranteed on or about May 18, 2015 by a *Consortium Guarantee* from the Consortium (the "**Indemnity Agreement**");

(3)    any funds or instruments Chubb Surety is holding or that are being held for or for the benefit of Chubb Surety presently or in the future, including an Irrevocable Standby Letter of Credit, dated August 20, 2020, issued by Nordea Bank ABP, New York Branch, of which Chubb Surety is a beneficiary, whether in trust, as security, or otherwise (and the proceeds thereof), including any payments Chubb Surety receives from an indemnitor or proceeds due or to become due to any Debtor in relation to contracts or obligations for which Chubb Surety has issued or may in the future issue any bond or related instrument, including any Bond;

(4)    any rights, remedies, or defenses Chubb Surety may now or in the future have with respect to any and all Bonds or related instruments issued or executed by Chubb Surety on behalf of any Debtor;

(5)    current or future setoff or recoupment rights, Lien rights, or trust fund claims of Chubb Surety or any party to whose rights Chubb Surety has or may be subrogated as related to the Bonded Obligations, or any existing or future subrogation or other common law rights of Chubb Surety; and

(6)    any documents related to the foregoing (together with any documents referenced in clauses (1) through (5) above, collectively, the "**Chubb Surety Documents**"), including, without limitation, any and all subrogation rights.

(ii)    Notwithstanding anything in the documents listed in subsection (i) above to the contrary:

(1)    any and all active Bonds in place as of the Effective Date shall survive the Effective Date and the applicable Reorganized Debtor (the "**Assuming Reorganized Debtor**") shall become the principal on the Bonds as of the Effective Date;

(2)    the Indemnity Agreement and corresponding *Consortium Guarantee* executed on or about May 18, 2015 shall be assumed by the applicable Assuming Reorganized Debtors and, solely in accordance with and to the extent set forth in the Indemnity Agreement, Chubb Surety shall be entitled to reasonable and documented attorneys' fees and costs and, without duplication, any cure amounts, without having to file an Administrative Expense Claim, request for payment, cure objection, or fee application;

44

(3)      the applicable Assuming Reorganized Debtors shall be bound by all of the terms of the Indemnity Agreement and corresponding *Consortium Guarantee* executed on or about May 18, 2015; and

(4)      Chubb Surety (A) reserves all of its rights to modify, amend, extend, or cancel any active Bond, as permitted by the Chubb Surety Documents and in accordance with applicable law, (B) has no obligation to issue or execute any new bond on behalf of any entity, and (C) has no obligation to extend, modify, renew, or increase the amount of any Bond.

(iii)      For the avoidance of doubt, (A) no third party releases in the Plan shall apply to Chubb Surety or to claims to which Chubb Surety is subrogated and (B) Sections 5.8 and 6.9 of the Plan shall not apply to Chubb Surety, or any of its obligees, as related to the Bonded Obligations.

(iv)      To the extent the Effective Date does not occur, this paragraph 38(f) will be of no force and effect, and the applicable parties' rights are reserved; *provided, however*, that nothing in any other section of this Order shall negate any of the rights of Chubb Surety or of any of the obligees under any of the Bonds.

(g)      ***Salesforce***.  The informal objection asserted by Salesforce, Inc., its affiliates or subsidiaries (collectively, "**Salesforce**") with respect to the identification of executory contracts between the Debtors and Salesforce that may be assumed and the proposed Cure Amounts pertaining to such contracts shall be determined in accordance with Article VIII of the Plan, including Section 8.2(e) thereof, and such informal objection shall be deemed to have been timely filed with this Court.

(h)      ***Société Air France S.A., Koninklijke Luchtvaart Maatschappij N.V., and Martinair Holland N.V.*** (collectively, the "**Air France Contribution**

**Claimants**").  Section 10.7(b) of the Plan shall not operate to release any Claims or Causes of Action of any or all of the Air France Contribution Claimants against non-Debtor SAS Cargo Group S/A for indemnification and/or contribution arising from the facts alleged in any or all of Proofs of Claim numbers 826, 866, 899, 922, 952, 953, 1034, 1042, 1051, 1053, 1084, 1086, 1090, 1101, and 1139 filed in these Chapter 11 Cases nor shall it release any Claims or Causes of Action of SAS Cargo Group S/A against any or all of the Air France Contribution Claimants arising out of the same.

(i)    ***Objections to Claims***.  For the avoidance of doubt, the provision in Section 7.1 of the Plan permitting the Creditors' Committee to object to Claims prior to the Effective Date is consistent with section 502 of the Bankruptcy Code and is not a delegation of authority by the Debtors.

Dated: March 22, 2024
        New York, New York

<u>**s/Michael E. Wiles**</u>
THE HONORABLE MICHAEL E. WILES
UNITED STATES BANKRUPTCY JUDGE

## Exhibit A

**Plan**

*Solicitation Version*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------- x

In re                                                                   :     **Chapter 11**
                                                                        :
**SAS AB**, *et al.*,                                                   :     **Case No. 22-10925 (MEW)**
                                                                        :
                                Debtors.[1]                             :     **(Jointly Administered)**
                                                                        :

-------------------------------------------------------- x

## SECOND AMENDED JOINT CHAPTER 11 PLAN OF
## REORGANIZATION OF SAS AB AND ITS SUBSIDIARY DEBTORS

**WEIL, GOTSHAL & MANGES LLP**
Gary T. Holtzer
Kelly DiBlasi
David Griffiths
Lauren Tauro
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for the Debtors*
*and Debtors in Possession*

Dated:     February 7, 2024
           New York, NY

---

[1] The Debtors in these chapter 11 cases are SAS AB, SAS Danmark A/S, SAS Norge AS, SAS Sverige AB, Scandinavian Airlines System Denmark-Norway-Sweden, Scandinavian Airlines of North America Inc. (2393), Gorm Asset Management Ltd., Gorm Dark Blue Ltd., Gorm Deep Blue Ltd., Gorm Sky Blue Ltd., Gorm Warm Red Ltd., Gorm Light Blue Ltd., Gorm Ocean Blue Ltd., and Gorm Engine Management Ltd. The Debtors' mailing address is AVD kod: STOUU-T, SE-195 87 Stockholm, Sweden.

**Table of Contents**

**ARTICLE I.  DEFINITIONS AND INTERPRETATION.** ...................................................1

    **1.1**    Definitions. ............................................................................................1

    **1.2**    Interpretation; Application of Definitions; Rules of Construction. .......................24

    **1.3**    Reference to Monetary Figures. .................................................................25

    **1.4**    Controlling Document. ............................................................................25

**ARTICLE II.  ADMINISTRATIVE EXPENSE CLAIMS, PRIORITY TAX CLAIMS, DIP CLAIMS, AND FEE CLAIMS.** ...........................................**25**

    **2.1**    Treatment of Administrative Expense Claims. ........................................25

    **2.2**    Treatment of Priority Tax Claims. ...........................................................26

    **2.3**    Treatment of DIP Claims. ........................................................................26

    **2.4**    Treatment of Fee Claims. .........................................................................27

**ARTICLE III.  CLASSIFICATION OF CLAIMS AND INTERESTS.** .............................**28**

    **3.1**    Classification in General. .........................................................................28

    **3.2**    Summary of Classification of Claims and Interests. ..............................28

    **3.3**    Special Provision Governing Unimpaired Claims. .................................34

    **3.4**    Subordinated Claims. ...............................................................................34

    **3.5**    Elimination of Vacant Classes. ...............................................................34

    **3.6**    Voting Classes; Presumed Acceptance by Non-Voting Classes. ...........34

    **3.7**    No Waiver. ...............................................................................................35

**ARTICLE IV.  TREATMENT OF CLAIMS AND INTERESTS.** ........................................**35**

    **4.1**    Claims Against and Interests in SAS AB. ...............................................35

    **4.2**    Claims Against and Interests in the Consolidated Debtors. ...................37

    **4.3**    Claims Against and Interests in Gorm Dark Blue Limited. ....................41

    **4.4**    Claims Against and Interests in Gorm Deep Blue Limited. ...................43

    **4.5**    Claims Against and Interests in Gorm Light Blue Limited. ...................45

    **4.6**    Claims Against and Interests in Gorm Ocean Blue Limited. ..................47

    **4.7**    Claims Against and Interests in Gorm Sky Blue Limited. .....................49

    **4.8**    Claims Against and Interests in Gorm Asset Management Limited. ......51

    **4.9**    Claims Against and Interests in Gorm Engine Management Limited. ..................52

    **4.10**    Claims Against and Interests in Gorm Warm Red Limited. ...................53

    **4.11**    Claims Against and Interests in SANA. ..................................................55

i

**ARTICLE V.    MEANS FOR IMPLEMENTATION**..............................................................56

    **5.1**    Substantive Consolidation. .................................................................56

    **5.2**    Implementation of Restructuring. .......................................................57

    **5.3**    Contribution Fees...............................................................................58

    **5.4**    Reserved Funds, GUC Entity, and Contribution Fee Escrow Account. ...............59

    **5.5**    Compromise and Settlement of Claims, Interests, and Controversies...................62

    **5.6**    Continued Corporate Existence; Effectuating Documents; Further Transactions. ........................................................................................63

    **5.7**    Corporate Action................................................................................64

    **5.8**    Cancellation of Existing Securities, Liens, and Agreements. ................64

    **5.9**    Authorization and Issuance of New Shares. ........................................65

    **5.10**    Exemption from Securities Laws. .......................................................65

    **5.11**    Officers and Boards of Directors. .......................................................66

    **5.12**    Separate Plans. ...................................................................................67

    **5.13**    Tax Structure......................................................................................67

    **5.14**    Closing of Chapter 11 Cases. .............................................................67

    **5.15**    Amended Organizational Documents. .................................................68

    **5.16**    New Shares. ........................................................................................68

    **5.17**    Creation of Creditor Oversight Committee.........................................68

**ARTICLE VI.    DISTRIBUTIONS. ..............................................................................69**

    **6.1**    Distributions Generally.......................................................................69

    **6.2**    No Postpetition Interest on Claims. ....................................................69

    **6.3**    Date of Distributions...........................................................................70

    **6.4**    Distribution Record Date. ...................................................................70

    **6.5**    Distributions after Effective Date. ......................................................70

    **6.6**    Disbursing Agent. ..............................................................................70

    **6.7**    Delivery of Distributions. ...................................................................70

    **6.8**    Unclaimed Property. ...........................................................................71

    **6.9**    Satisfaction of Claims. .......................................................................71

    **6.10**    Manner of Payment under Plan...........................................................71

    **6.11**    Fractional Shares................................................................................72

    **6.12**    Minimum Distribution. .......................................................................72

    **6.13**    No Distribution in Excess of Amount of Allowed Claim.....................72

ii

**6.14** Allocation of Distributions between Principal and Interest.................................72

**6.15** Setoffs and Recoupments...................................................................................72

**6.16** Rights and Powers of Disbursing Agent.............................................................73

**6.17** Expenses of Disbursing Agent............................................................................73

**6.18** Withholding and Reporting Requirements.........................................................73

**6.19** Indefeasible Distribution....................................................................................74

**ARTICLE VII.   PROCEDURES FOR DISPUTED CLAIMS. ...............................74**

**7.1** Objections to Claims...........................................................................................74

**7.2** Resolution of Disputed Claims............................................................................75

**7.3** Estimation of Claims...........................................................................................75

**7.4** Adjustment to Claims Register without Objection. ............................................75

**7.5** Claim Resolution Procedures Cumulative. .........................................................75

**7.6** No Distributions Pending Allowance. .................................................................76

**7.7** Distributions after Allowance. ............................................................................76

**7.8** Disputed Claims Reserve. ...................................................................................76

**ARTICLE VIII. EXECUTORY CONTRACTS AND UNEXPIRED LEASES. ...................77**

**8.1** General Treatment. ..............................................................................................77

**8.2** Determination of Cure Disputes and Deemed Consent. ......................................78

**8.3** Rejection Damages Claims. .................................................................................79

**8.4** Survival of the Debtors' Indemnification Obligations.........................................79

**8.5** Employment, Compensation and Benefit Plans...................................................79

**8.6** Insurance Policies. ..............................................................................................80

**8.7** Intercompany Agreements. ..................................................................................80

**8.8** Assumed Credit Card Processing Agreements. ...................................................80

**8.9** Reservation of Rights...........................................................................................80

**ARTICLE IX.   CONDITIONS PRECEDENT TO OCCURRENCE OF
EFFECTIVE DATE..........................................................................81**

**9.1** Conditions Precedent to Effective Date...............................................................81

**9.2** Waiver of Conditions Precedent to Effective Date..............................................83

**ARTICLE X.    EFFECT OF CONFIRMATION.........................................................84**

**10.1** Binding Effect......................................................................................................84

**10.2** Vesting of Assets. ...............................................................................................84

**10.3** Discharge of Claims against and Interests in Debtors. .......................................84

iii

**10.4**  Pre-Confirmation Injunctions and Stays. .................................................85

**10.5**  Injunction against Interference with Plan. ...........................................85

**10.6**  Plan Injunction. ..................................................................................85

**10.7**  Releases...............................................................................................86

**10.8**  Exculpation. ........................................................................................88

**10.9**  Injunction Related to Releases and Exculpation....................................88

**10.10**  Avoidance Actions .............................................................................89

**10.11**  Retention of Causes of Action and Reservation of Rights. ..................89

**10.12**  Ipso Facto and Similar Provisions Ineffective. ...................................89

**ARTICLE XI.    RETENTION OF JURISDICTION. ...................................................89**

**11.1**  Retention of Jurisdiction. ....................................................................89

**11.2**  Submission to Jurisdiction. .................................................................92

**ARTICLE XII.  MISCELLANEOUS PROVISIONS.....................................................92**

**12.1**  Statutory Fees......................................................................................92

**12.2**  Exemption from Certain Transfer Taxes. .............................................92

**12.3**  Request for Expedited Determination of Taxes.....................................93

**12.4**  Dates of Actions to Implement Plan. ....................................................93

**12.5**  Amendments. .......................................................................................93

**12.6**  Revocation or Withdrawal of Plan........................................................94

**12.7**  Severability. ........................................................................................94

**12.8**  Governing Law. ...................................................................................94

**12.9**  Successors and Assigns........................................................................95

**12.10**  Entire Agreement. ...............................................................................95

**12.11**  Computing Time. .................................................................................95

**12.12**  Exhibits to Plan. ..................................................................................95

**12.13**  Notices. ...............................................................................................95

**12.14**  Dissolution of Creditors' Committee....................................................99

**12.15**  Reservation of Rights...........................................................................99

Each of SAS AB, SAS Danmark A/S, SAS Norge AS, SAS Sverige AB, Scandinavian Airlines System Denmark-Norway-Sweden, Scandinavian Airlines of North America Inc., Gorm Asset Management Limited, Gorm Dark Blue Limited, Gorm Deep Blue Limited, Gorm Sky Blue Limited, Gorm Warm Red Limited, Gorm Light Blue Limited, Gorm Ocean Blue Limited, and Gorm Engine Management Limited (each, a "***Debtor***" and, collectively, the "***Debtors***") proposes the following second amended joint chapter 11 plan of reorganization pursuant to section 1121(a) of the Bankruptcy Code.  Capitalized terms used herein shall have the meanings set forth in Section 1.1 below.

## ARTICLE I.    DEFINITIONS AND INTERPRETATION.

### 1.1    *Definitions.*

***Adjusted Distributable Value*** means an amount equal to the Available Cash *plus* the value of the New Shares Distribution Pool *less* the SANA Available Cash *less* the Gorm Blue New Shares Distribution Pool.

***Administrative Expense Claim*** means any right to payment constituting a cost or expense of administration incurred during the Chapter 11 Cases of a kind specified under section 503(b) of the Bankruptcy Code and entitled to priority under sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including (i) the actual and necessary costs and expenses incurred after the Commencement Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors and (ii) Fee Claims.

***Administrative Expense Claims Bar Date*** means the first Business Day that is 30 days following the Effective Date.

***Affiliate*** means any "affiliate" as defined in section 101(2) of the Bankruptcy Code (except as provided otherwise herein); *provided, however*, that for purposes of this Plan the Danish State Noteholder shall not be an Affiliate of the Debtors.

***Aircraft Lease*** means any unexpired lease for the use or operation of an aircraft, engine, or other aircraft parts to which any Debtor is a party, including those subject to assumption or rejection under section 365 of the Bankruptcy Code.

***Aircraft Lease Claim*** means an unsecured Claim of an Aircraft Lessor arising under any stipulations or amendments entered into with the Debtors in respect of a Modified Aircraft Lease against (x) the Debtor party to such Aircraft Lease or (y) SAS AB on account of any guarantee of the obligations arising under such Aircraft Lease.

***Aircraft Lessor*** means a lessor under an Aircraft Lease.

***Aircraft Rejection Claim*** means any and all Claims of an Aircraft Lessor arising from the rejection of an Aircraft Lease.

***Air France-KLM*** means Air France-KLM S.A.

**Allowed** means, with reference to any Claim or Interest, (i) any Claim or Interest arising on or before the Effective Date (a) as to which no objection to allowance has been interposed within the time period set forth in this Plan or is expected, (b) as to which any objection has been resolved by a Final Order of the Bankruptcy Court to the extent such objection is determined in favor of the respective holder, (c) as to which the liability of the Debtors and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court and is not disallowed by Final Order of the Bankruptcy Court or by operation of the Bankruptcy Code, or (d) that has been compromised, settled, or otherwise resolved by the Debtors; (ii) any Claim or Interest expressly allowed under this Plan or a Final Order of the Bankruptcy Court; or (iii) any Claim that is listed in the Debtors' Schedules as liquidated, non-contingent, and undisputed for which (a) no Proof of Claim has been filed or (b) a Proof of Claim has been filed in the same amount as such Claim is listed in the Debtors' Schedules.

**Allowed Pilot Union Claim** means the Allowed Claim that was approved pursuant to the CLA Order, which authorized the Debtors to, among other things, enter into, and perform all obligations under, the *Amended and Restated Agreement*, dated as of November 10, 2022, by and among the Consortium, Svensk Pilotförening, Norsk SAS-flygeres Forening, SAS Norge Pilotforenging, and Dansk Pilotforening.

**Amended Organizational Documents** means the respective forms of certificate of incorporation, certificate or articles of formation, bylaws, limited liability company agreement, or other similar organizational documents, including the Articles, as applicable, of each of the Reorganized Debtors.

**Articles** means the articles of association of Reorganized SAS AB, as may be amended from time to time.

**Assumed Credit Card Processing Agreements** means, as amended, the agreements relating to credit card and debit transactions and processing, among Elavon and certain of the Debtors, to be assumed by the Reorganized Debtors.

**Available Cash** means an aggregate amount of Cash equal to the GUC Cash *less* the portion of GUC Cash funded to the GUC Entities in SEK in accordance with this Plan and the GUC Agreement *less* the portion of the GUC Cash, if any, required to fund the Convenience Class Funding Amount.[2]

**Avoidance Action** means any and all avoidance, recovery, subordination, or other Claims, actions, Causes of Action, or remedies that any Debtor or its Estate has asserted or may assert under sections 502, 510, 542, 544, 545, 547 through 553, or section 724(a) of the Bankruptcy Code or under similar or related state, federal, or non-U.S. statutes and common law.

**Ballot** means a ballot providing for the acceptance or rejection of this Plan and to make an election with respect to the releases by holders of Claims provided by Section 10.7(b).

---

[2] For illustrative purposes only, Available Cash is approximately $33,820,000 based on the prevailing foreign exchange rate on February 2, 2024 of 10.3538 SEK per USD.

**Bankruptcy Code** means title 11 of the United States Code, as amended from time to time.

**Bankruptcy Court** means the United States Bankruptcy Court for the Southern District of New York or any other court having jurisdiction over the Chapter 11 Cases.

**Bankruptcy Rules** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, and any local rules of the Bankruptcy Court, including the Local Bankruptcy Rules for the Southern District of New York.

**Bar Date** means the dates by which Proofs of Claim must be or must have been filed, as ordered by the Bankruptcy Court pursuant to the Bar Date Order, other applicable order of the Bankruptcy Court, or this Plan.

**Bar Date Order** means the *Order (I) Establishing Deadlines for Filing Proofs of Claim and (II) Approving Form and Manner of Notice Thereof* [ECF No. 605].

**Business Day** means any day of the year that is not a Saturday, Sunday, or other day on which (i) commercial banks in New York City are authorized or required by law or other governmental action to remain closed, (ii) commercial banks in Stockholm, Sweden are not open for business (being public holidays, including Midsommer Eve (Sw. *midsommarafton*), Christmas Eve (Sw. *julafton*), and New Year's Eve (Sw. *nyårsafton*)), or (iii) commercial banks in Copenhagen, Denmark, Paris, France, or Amsterdam, the Netherlands are not open for business.

**Business Plan** means the business plan entitled "v467" provided by the Debtors to the Non-State Investors on December 15, 2023.

**Cash** means legal tender of the United States of America or equivalents thereof (as well as any and all foreign currencies), including payment in such tender by check, wire transfer, or any other customary payment method.

**Castlelake** means Castlelake, L.P., on behalf of certain of its funds or affiliates.

**Cause of Action** means any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, demand, right, lien, indemnity, contribution, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, license, and franchise of any kind or character whatsoever, whether liquidated or unliquidated, contingent or non-contingent, matured or unmatured, known or unknown, foreseen or unforeseen, suspected or unsuspected, asserted or unasserted, assertable directly or derivatively (including any alter ego theories), accrued or unaccrued, disputed or undisputed, secured or unsecured, existing or hereinafter arising, arising before, on, or after the Commencement Date, in contract or tort, in law, equity, or pursuant to any other theory of law (including under any securities laws), and whether arising under federal law, state law, common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise.  For the avoidance of doubt, "Cause of Action" includes (i) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (ii) the right to object to

Claims or Interests, (iii) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code, (iv) any claim or defense including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code, and (v) any state or non-U.S. law fraudulent transfer claim.

*Chapter 11 Case* means, with respect to a Debtor, such Debtor's case under chapter 11 of the Bankruptcy Code commenced on the Commencement Date in the Bankruptcy Court, jointly administered with all other Debtors' cases under the caption *In re SAS AB, et al.*, Ch. 11 Case No. 22-10925 (MEW).

*Claim* means a "claim," as defined in section 101(5) of the Bankruptcy Code, as against any Debtor.

*Claims and Noticing Agent* means Kroll Restructuring Administration LLC, the claims, noticing, and solicitation agent retained by the Debtors.

*Claims Objection Deadline* means the deadline for objecting to a Claim, which shall be on the date that is the later of (i) 180 days after the Effective Date and (ii) such later date as may be fixed by the Bankruptcy Court, after notice and a hearing, upon a motion by the Reorganized Debtors filed before the day that is 180 days after the Effective Date in respect of the initial extension of such deadline or before the expiration of any extension thereof.

*Claims Register* means the official register of Claims maintained by the Claims and Noticing Agent in the Chapter 11 Cases.

*Class* means any group of Claims or Interests classified under this Plan pursuant to section 1122(a) of the Bankruptcy Code.

*CLA Order* means the *Order Authorizing Debtors to (I) Enter Into and Perform Under (A) New Collective Labor Agreements and (B) Amended and Restated Agreement with Pilot Unions and (II) Compromise and Settle Certain Claims Related Thereto* [ECF No. 686].

*Closing Date* means the Closing Date (as defined in the Investment Agreement).

*Closing FX Rate* means the European Central Bank exchange reference rate of SEK per USD as of one Business Day prior to the Closing (as defined in the Investment Agreement).

*Commencement Date* means July 5, 2022.

*Commercial Hybrid Bond Claims* means Claims in the principal amount of $163,101,765.81 arising and payable under the *Terms and Conditions for SEK 1,615,000,000 Unsubordinated Perpetual Floating Rate Callable Capital Securities*, dated as of October 23, 2020, by and between SAS AB, as Issuer, and Intertrust (Sweden) AB, as Agent, ISIN SE0014957999.

**Commitment Fee** means a fee payable by the Debtors to the Danish State Investor in an amount equal to 3.0% of the Danish State Investor's portion of the Total Share Subscription Amount, which is set forth opposite its name on <u>Schedule 2.1</u> of the Investment Agreement.

**Confirmation Date** means the date on which the Bankruptcy Court enters the Confirmation Order.

**Confirmation Hearing** means the hearing held by the Bankruptcy Court regarding confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

**Confirmation Order** means the order of the Bankruptcy Court confirming this Plan, the proposed form of which shall be subject to consultation rights of the Creditors' Committee with respect to the provisions that materially impact the rights of holders of General Unsecured Claims.

**Consolidated Debtors** means the Consortium and Consortium Constituents.

**Consolidated Debtors Available Cash** means Available Cash allocated to the Consolidated Debtors in the amount necessary to ensure that the Consolidated Debtors receive 41% of the Adjusted Distributable Value, when taking into account Available Cash plus the Consolidated Debtors New Shares Distribution Pool, to fund distributions under this Plan to holders of Allowed Claims against the Consolidated Debtors.[3]

**Consolidated Debtors GUC Interests** means GUC Interests representing the percentage of the aggregate value of all GUC Interests distributable to holders of Allowed General Unsecured Claims under this Plan and the GUC Documents equal to the percentage of the combined value attributable to the Consolidated Debtors Available Cash and Consolidated Debtors New Shares Distribution Pool as compared to the total combined value attributable to the Available Cash and New Shares Distribution Pool.

**Consolidated Debtors New Shares Distribution Pool** means New Shares from the New Shares Distribution Pool allocated to the Consolidated Debtors in the amount necessary to ensure that the Consolidated Debtors receive 41% of the Adjusted Distributable Value, when taking into account the New Shares Distribution Pool plus the Consolidated Debtors Available Cash, to fund distributions under this Plan to holders of Allowed Claims against the Consolidated Debtors.[4]

---

[3] For illustrative purposes only, before any distribution on account of the Intercompany Claim SAS AB holds against the Consolidated Debtors, the Consolidated Debtors Available Cash is approximately $10,500,000 based on the prevailing foreign exchange rate on February 2, 2024 of 10.3538 SEK per USD. After distributions on account of the Intercompany Claim SAS AB holds against the Consolidated Debtors, the Consolidated Debtors Available Cash is approximately $1,370,000.

[4] For illustrative purposes only, before any distribution on account of the Intercompany Claim SAS AB holds against the Consolidated Debtors, the Consolidated Debtors New Shares Distribution Pool includes New Shares in an amount equal to approximately $32,470,000 based on the prevailing foreign exchange rate on February 2, 2024 of 10.3538 SEK per USD. After distributions on account of the Intercompany Claim SAS AB holds against the Consolidated

*Consortium* means Scandinavian Airlines System Denmark-Norway-Sweden.

*Consortium Constituents* means SAS Danmark A/S, SAS Norge AS, and SAS Sverige AB.

*Contribution Fee Escrow Account* means a joint escrow account to be established pursuant to the Contribution Fee Escrow Agreement.

*Contribution Fee Escrow Agreement* means an escrow agreement to be entered into by and among the Debtors, the Convertible Notes Purchasers, and an escrow agent to be reasonably acceptable to such parties, which agreement shall be in form and substance reasonably acceptable to the parties thereto.

*Contribution Fees* means the Danish Contribution Fee and the Swedish Contribution Fee.

*Convenience Class Claim* means an Allowed General Unsecured Claim against the Consolidated Debtors that is not entitled to priority of payment under section 507(a) of the Bankruptcy Code, other than Norwegian Term Loan Claims, Commercial Hybrid Bond Claims, Swedish Term Loan Claims, Danish Term Loan Claims, Union Claims, Swiss Bond Claims, State Hybrid Bond Claims, Danish State Hybrid Bond Claims, and Intercompany Claims, but including Aircraft Rejection Claims, Trade Rejection Claims, Aircraft Lease Claims, and Trade Claims, in an amount equal to or less than $1,499,000 as of the Commencement Date.

*Convenience Class Funding Amount* means the aggregate amount of Cash to satisfy Convenience Class Claims under this Plan in an amount equal to 10% of such Allowed Convenience Class Claims, which shall be funded as follows, to the extent applicable and necessary hereunder: (i) *first*, from the Reorganized Debtors, in an amount not to exceed $1,500,000, (ii) *second*, from the GUC Cash, in an additional amount not to exceed $1,500,000 (to fund distributions from $1,500,001 to $3,000,000), (iii) *third,* from the Reorganized Debtors, in an additional amount not to exceed $750,000 (to fund distributions from $3,000,001 to $3,750,000), (iv) *and thereafter*, from the GUC Cash (to fund distributions in excess of $3,750,000).

*Convertible Notes Purchasers* means the Investors purchasing the New Convertible Notes.

*Creditor Oversight Committee* means the oversight committee created pursuant to Section 5.17 of this Plan, appointed by the Creditors' Committee to discharge certain duties in accordance with this Plan and the GUC Documents.

*Creditors' Committee* means the statutory committee of unsecured creditors appointed by the U.S. Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code [ECF No. 75].

---

Debtors, the Consolidated Debtors New Shares Distribution Pool includes New Shares in amount equal to approximately $17,370,000.

**Critical Vendors Order** means the *Final Order (I) Authorizing Payment of Certain Prepetition Claims of Critical Vendors, non-U.S. Vendors, and Lien Claimants and (II) Granting Related Relief* [ECF No. 168].

**Cure Amount** means the payment of Cash or the distribution of other property (as the parties may agree or the Bankruptcy Court may order) as necessary to (i) cure a monetary default by the Debtors in accordance with the terms of an executory contract or unexpired lease of the Debtors and (ii) permit the Debtors to assume such executory contract or unexpired lease under section 365(a) of the Bankruptcy Code.

**Cure Notice** means the notice of proposed Cure Amounts to be paid in connection with an executory contract or unexpired lease that may be assumed by the Debtors pursuant to this Plan.

**Danish Contribution Fee** means a fee to be paid to the Danish State Investor by the Convertible Notes Purchasers in accordance with the Investment Agreement, on or after the Effective Date, in an amount equal to 50% of the sum of (i) 10% of Total Distributable Value provided to holders of Allowed General Unsecured Claims pursuant to this Plan up to SEK 1,250,000,000 (converted to USD (truncated to two decimal places) using the Closing FX Rate) and (ii) 5% of the positive difference of the Total Distributable Value provided to the holders of Allowed General Unsecured Claims pursuant to this Plan and SEK 1,250,000,000 (converted to USD (truncated to two decimal places) using the Closing FX Rate). In all circumstances, the Danish Contribution Fee shall be at least SEK 25,000,000. The Danish Contribution Fee shall be rounded to two decimal places.

**Danish State Hybrid Bond Claims** means Claims in the principal amount of $101,640,888.39 arising and payable under that certain *Terms and Conditions for SEK 1,000,000,000 subordinated Perpetual Floating Rate Callable Capital Securities*, dated as of October 26, 2020, issued by SAS AB, as Issuer, with Intertrust (Sweden) AB, as Agent, to the Danish State Noteholder, ISIN SE0014958013.

**Danish State Investor** means the Kingdom of Denmark, as represented by the Danish Ministry of Finance in its capacity as a subscriber of New Shares under the Investment Agreement or Convertible Notes Purchaser under the Investment Agreement and the New Convertible Notes Indenture (as applicable), in each case, to the extent provided in <u>Section 12.12</u> of the Investment Agreement.

**Danish State Noteholder** means the Kingdom of Denmark, as represented by the Danish Ministry of Finance and not any other governmental agency or instrumentality thereof, solely in its capacity as a holder of Danish Term Loan Claims, State Hybrid Bond Claims, and Danish State Hybrid Bond Claims.

**Danish Term Loan Claims** means Claims in the principal amount of $154,868,955.13 arising and payable under that certain *On-Lending Facility Agreement*, dated as of July 8, 2021, by and among the Consortium, as Borrower, Danmarks Nationalbank, as National Bank, and the Danish State Noteholder, as Lender.

**Debtor(s)** means "Debtor(s)," as defined in the introductory paragraph of this Plan.

***Definitive Documents*** means, collectively, all agreements, instruments, pleadings, orders, and other documents (including all exhibits, schedules, supplements, appendices, annexes, instructions, and attachments thereto) that are utilized to implement or effectuate the Restructuring, including the Investment Agreement, and the documents in the Plan Supplement.

***DIP Agent*** means Wilmington Savings Fund Society, FSB, as administrative agent and collateral agent under the DIP Credit Agreement, its successors, assigns, or any replacement agent appointed pursuant to the terms of the DIP Credit Agreement.

***DIP Claim*** means any Claim held by the DIP Lenders or the DIP Agent on account of, arising under, or relating to the DIP Credit Agreement, the DIP Facility, or the DIP Orders, including Claims for all principal amounts outstanding, and any and all fees, interest, expenses, indemnification obligations, reimbursement obligations, and other amounts due under the DIP Loan Documents, which, for the avoidance of doubt, shall include all "DIP Obligations" as such term is defined in the DIP Credit Agreement.

***DIP Credit Agreement*** means the *Super-Priority Replacement Debtor-in-Possession Term Loan Agreement*, dated as of November 4, 2023 (as may be amended, restated, amended and restated, extended, supplemented, waived, or otherwise modified from time to time in accordance with the terms thereof), by and among the Consortium, as borrower, the other Debtors and the other parties thereto as guarantors, the DIP Lenders, and the DIP Agent.

***DIP Facility*** means the debtor-in-possession financing facility provided by the DIP Lenders in an aggregate principal amount of up to $500,000,000, made available pursuant to the terms and conditions of the DIP Credit Agreement.

***DIP Lenders*** means the lenders from time to time party to the DIP Credit Agreement.

***DIP Liens*** means "DIP Liens," as defined in Section 3.01 of the DIP Credit Agreement.

***DIP Loan Documents*** means the DIP Credit Agreement, the DIP Orders, any instrument or agreement that is designated as a "DIP Loan Document" under the DIP Credit Agreement, in each case as amended, supplemented, or otherwise modified from time to time in accordance with the terms thereof.

***DIP Orders*** means the *Interim Order (I) Authorizing the Debtors to Refinance their Senior Secured Superpriority, Postpetition Financing Obligations, (II) Granting Liens and Superpriority Claims, and (III) Granting Related Relief* [ECF No. 1602] and the *Final Order (I) Authorizing the Debtors to Refinance their Senior Secured Superpriority, Postpetition Financing Obligations, (II) Granting Liens and Superpriority Claims, and (III) Granting Related Relief* [ECF No. 1644].

***Disallowed*** means a Claim, or any portion thereof, (i) that has been disallowed by a Final Order of the Bankruptcy Court, a settlement, or this Plan, (ii) that is listed in the Schedules as zero amount or as contingent, disputed, and/or unliquidated and as to which a Bar Date has been established but no Proof of Claim has been timely filed or deemed timely filed with the Bankruptcy

Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or applicable Law, or (iii) that is not listed in the Schedules and as to which a Bar Date has been established but no Proof of Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or under applicable Law.

**Disbursing Agent** means any Entity in its capacity as a disbursing agent under Section 6.6 of this Plan, including any Debtor or Reorganized Debtor, as applicable, which acts in such capacity to make distributions pursuant to this Plan.

**Disclosure Statement** means the disclosure statement in respect of this Plan, including all exhibits and schedules thereto, as approved or ratified by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code, as may be modified from time to time in accordance with the Bankruptcy Code and the terms hereof.

**Disputed** means, with respect to a Claim, that such Claim is (i) neither Allowed nor Disallowed or (ii) held by a Person or Entity against whom or which any of the Debtors or Reorganized Debtors has commenced a proceeding, including an objection to such Claim.

**Disputed Claims Reserve** means the reserve established in accordance with Section 7.8 of this Plan to provide for distributions to holders of Disputed Claims in the event such Disputed Claims become Allowed Claims.

**Disqualified Person** means any Person that fails to timely deliver the certifications and supporting documentation required pursuant to Section 5.4(j)(i) of this Plan.

**Distribution Record Date** means the Effective Date.

**EBITDA** means earnings before interest, taxes, depreciation, and amortization.

**Effective Date** means the date upon which all conditions to the effectiveness of this Plan set forth in Section 9.1 have been satisfied or waived in accordance with the terms hereof and this Plan becomes effective.

**Elavon** means, collectively, and together with any affiliates, U.S. Bank National Association, Elavon, Inc., and Elavon Financial Services DAC, Norway Branch.

**Entity** means an "entity," as defined in section 101(15) of the Bankruptcy Code.

**EPCA Approval Order** means the *Order Authorizing Debtors to Enter into Investment Agreement, Perform Obligations Thereunder, and Pay Transaction Fees and Expenses* [ECF No. 1646], which shall survive entry of the Confirmation Order and consummation of this Plan.

**Equity Solicitation Procedures** means the *Equity Solicitation Procedures* attached to the Equity Solicitation Procedures Order as Exhibit 1.

**Equity Solicitation Procedures Motion** means the *Motion of Debtors for Approval of (I) Equity Solicitation Procedures and (II) Form and Manner of Notice Related Thereto* [ECF No. 1061].

**Equity Solicitation Procedures Order** means the *Order Approving (I) Equity Solicitation Procedures and (II) Form and Manner of Notice Related Thereto* [ECF No. 1155].

**Escrow Contribution Fees** means the remaining portion of the Contribution Fees after deducting the Initial Contribution Fees.[5]

**Estate(s)** means, individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code.

**Exculpated Parties** means, collectively, (i) the Debtors, (ii) the Investors, (iii) the Creditors' Committee and each of its present and former members (solely in their capacity as such), (iv) the Danish State Noteholder, (v) the Swiss Bonds Agent, (vi) with respect to each of the foregoing Entities in clauses (i) through (v), such Entities' Related Entities, and (vii) with respect to each of the foregoing Entities in clauses (i) through (vi), such Entities' respective heirs, executors, estates, and nominees, and in each case, in such Entities' capacities as such.

**Existing Equity Interests** means common shares in SAS AB (ISIN: SE0003366871) existing as of immediately prior to the Effective Date.

**Existing Letters of Credit** means all outstanding wholly or partially undrawn prepetition and postpetition letters of credit issued to or at the request of any Debtor, in each case as amended, restated, renewed, modified, supplemented, extended, confirmed, or counter-guaranteed from time to time.

**Expense Reimbursement** means an expense reimbursement payable by the Debtors to the Danish State Investor in an amount equal to the lesser of (A) 2.0% of the Danish State Investor's portion of (i) the Total Share Subscription Amount and (ii) the New Convertible Notes Amount, both of which as set forth opposite its name in columns I and II, respectively, on Schedule 2.1 of the Investment Agreement, and (B) SEK 62,500,000 (converted to USD using the Closing FX Rate).

**Fee Claim** means a Claim for professional services rendered or costs incurred on or after the Commencement Date through the Effective Date by Professional Persons to the extent such costs have not been paid pursuant to an order of the Bankruptcy Court.

**Fee Escrow Account** means an account funded by the Debtors with Cash in an amount equal to the total estimated amount of Fee Claims.

**Final Order** means a judgment or order of any court of competent jurisdiction entered on the docket maintained by the clerk of such court, which has not been materially modified, amended, reversed, vacated, or stayed (other than such material modifications that are

---

[5] For illustrative purposes only, the Escrow Contribution Fees are approximately $11,130,000 based on the prevailing foreign exchange rate on February 2, 2024 of 10.3538 SEK per USD.

approved by Investor Consent) and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument, or rehearing has expired, and as to which no appeal, petition for certiorari, or other proceeding for a new trial, shall then be pending or (b) if an appeal, writ for certiorari, new trial, stay, reargument, or rehearing thereof has been sought, such judgment or order shall have been affirmed in full by the highest court to which such judgment or order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied, and the time to make any further appeal, petition, writ for certiorari, or move for a new trial, reargument, or rehearing shall have expired.  Notwithstanding anything herein to the contrary, no order or judgment shall fail to be a Final Order solely because of the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed relating to such judgment or order.

*General Unsecured Claim* means any unsecured Claim that is not entitled to priority of payment under section 507(a) of the Bankruptcy Code, including Aircraft Lease Claims, Trade Claims, Norwegian Term Loan Claims, Commercial Hybrid Bond Claims, Swedish Term Loan Claims, Danish Term Loan Claims, Union Claims, Swiss Bond Claims, State Hybrid Bond Claims, Danish State Hybrid Bond Claims, Intercompany Claims, and Other General Unsecured Claims.

*Gorm Dark Blue GUC Interests* means GUC Interests representing the percentage of the aggregate value of all GUC Interests distributable to holders of Allowed General Unsecured Claims under this Plan and the GUC Documents equal to the percentage of the value attributable to the Gorm Dark Blue New Shares Distribution Pool as compared to the total combined value attributable to the Available Cash and New Shares Distribution Pool.

*Gorm Dark Blue New Shares Distribution Pool* means approximately $1,410,000 of the New Shares from the New Shares Distribution Pool to fund distributions under this Plan to holders of Allowed Claims against Gorm Dark Blue Limited.

*Gorm Deep Blue GUC Interests* means GUC Interests representing the percentage of the aggregate value of all GUC Interests distributable to holders of Allowed General Unsecured Claims under this Plan and the GUC Documents equal to the percentage of the value attributable to the Gorm Deep Blue New Shares Distribution Pool as compared to the total combined value attributable to the Available Cash and New Shares Distribution Pool.

*Gorm Deep Blue New Shares Distribution Pool* means approximately $230,000 of the New Shares from the New Shares Distribution Pool to fund distributions under this Plan to holders of Allowed Claims against Gorm Deep Blue Limited.

*Gorm Blue Entity* means each of Gorm Dark Blue Limited, Gorm Sky Blue Limited, Gorm Light Blue Limited, Gorm Deep Blue Limited, and Gorm Ocean Blue Limited.

*Gorm Blue New Shares Distribution Pool* means the aggregate value of the Gorm Dark Blue New Shares Distribution Pool *plus* the Gorm Deep Blue New Shares Distribution Pool *plus* the Gorm Light Blue New Shares Distribution Pool *plus* the Gorm Ocean Blue New Shares Distribution Pool *plus* the Gorm Sky Blue New Shares Distribution Pool.

*Gorm Entity* means each of Gorm Asset Management Limited, Gorm Dark Blue Limited, Gorm Sky Blue Limited, Gorm Light Blue Limited, Gorm Deep Blue Limited, Gorm Warm Red Limited, Gorm Ocean Blue Limited, and Gorm Engine Management Limited.

*Gorm Light Blue GUC Interests* means GUC Interests representing the percentage of the aggregate value of all GUC Interests distributable to holders of Allowed General Unsecured Claims under this Plan and the GUC Documents equal to the percentage of the value attributable to the Gorm Light Blue New Shares Distribution Pool as compared to the total combined value attributable to the Available Cash and New Shares Distribution Pool.

*Gorm Light Blue New Shares Distribution Pool* means approximately $230,000 of the New Shares from the New Shares Distribution Pool to fund distributions under this Plan to holders of Allowed Claims against Gorm Light Blue Limited.

*Gorm Ocean Blue GUC Interests* means GUC Interests representing the percentage of the aggregate value of all GUC Interests distributable to holders of Allowed General Unsecured Claims under this Plan and the GUC Documents equal to the percentage of the value attributable to the Gorm Ocean Blue New Shares Distribution Pool as compared to the total combined value attributable to the Available Cash and New Shares Distribution Pool.

*Gorm Ocean Blue New Shares Distribution Pool* means approximately $1,360,000 of the New Shares from the New Shares Distribution Pool to fund distributions under this Plan to holders of Allowed Claims against Gorm Ocean Blue Limited.

*Gorm Sky Blue GUC Interests* means GUC Interests representing the percentage of the aggregate value of all GUC Interests distributable to holders of Allowed General Unsecured Claims under this Plan and the GUC Documents equal to the percentage of the value attributable to the Gorm Sky Blue New Shares Distribution Pool as compared to the total combined value attributable to the Available Cash and New Shares Distribution Pool.

*Gorm Sky Blue New Shares Distribution Pool* means approximately $770,000 of the New Shares from the New Shares Distribution Pool to fund distributions under this Plan to holders of Allowed Claims against Gorm Sky Blue Limited.

*Governance Term Sheet* means the *Equity and Governance Term Sheet*, dated as of November 4, 2023, which sets forth the key terms of the Investors' investment in Reorganized SAS AB and the rights to be granted with respect to the governance of the Reorganized Debtors.

*Governmental Unit* means "governmental unit," as defined in section 101(27) of the Bankruptcy Code.

*GUC Agreement* means, to the extent necessary, that certain GUC Agreement, to be entered as of the Effective Date, among Reorganized SAS AB, on behalf of itself and the Reorganized Consortium and each Reorganized Gorm Blue Entity, and each GUC Entity, which agreement shall (a) set forth, among other things, (i) the portion of the GUC Cash to be funded to each GUC Entity, (ii) the obligations of the GUC Entities with respect to the GUC Cash, including the obligation to release the GUC Cash (which release shall be solely in accordance with Section 5.4 of this Plan), and (iii) certain consent rights of Reorganized SAS AB with respect to

12

the activities of the GUC Entities, (b) be substantially in the form to be included in the Plan Supplement (or for which a term sheet shall be included in the Plan Supplement), and (c) be consistent with this Plan and otherwise in form reasonably acceptable to the Debtors, Required Investors, and Creditors' Committee.

*GUC Cash* means Cash proceeds in the aggregate amount of $250,000,000 from a portion of the Investors' subscription for, and purchase of, the Investor Equity and the Convertible Notes Purchasers' purchase of the Convertible Notes.

*GUC Documents* means the GUC Agreement, the GUC Implementation Steps, the GUC Interest Agreement (if any), the GUC Holding Period Trust Agreement (if any), and any other agreement or document necessary to give effect to the distribution and terms of GUC Interests in accordance with this Plan, which agreement(s) shall be included in the Plan Supplement (or for which term sheets shall be included in the Plan Supplement) and be in a form reasonably acceptable to the Debtors, Required Investors, and Creditors' Committee.

*GUC Entities* means the entities formed for purposes of acquiring, holding, investing, distributing, and releasing the GUC Cash in accordance with this Plan and the GUC Documents, as shall be agreed between the Debtors, the Required Investors, and the Creditors' Committee.

*GUC Holding Period Trust Agreement* means a deed, agreement, or other document entered into among the Holding Period Trustee and Reorganized SAS and/or the GUC Entities, as applicable, setting forth the obligations of the parties thereto with respect to, among other things, any GUC Interests to which any ineligible person (as will be defined in the Plan Supplement) or Disqualified Person may be entitled to under this Plan.

*GUC Implementation Steps* means the implementation steps according to which the GUC Entities shall be established and capitalized and the GUC Interests shall be distributed, as set forth in the Plan Supplement, which steps shall be in form and substance reasonably acceptable to the Debtors, the Required Investors, and the Creditors' Committee.

*GUC Interest* means any instrument (which may include a trust interest, contingent value instrument, or limited recourse note) issued by, or evidencing a right or interest in, any GUC Entity to be distributed to the holders of Allowed General Unsecured Claims that provides for a right to receive distributions of GUC Cash held by such GUC Entity, in each case, as set forth in this Plan and in accordance with the GUC Documents.

*GUC Interest Agreement(s)* means, with respect to each GUC Entity, one or more agreement(s) substantially in the form(s) to be included in the Plan Supplement (or for which term sheet(s) shall be included in the Plan Supplement), which shall govern, among other things, the administration, governance, and distribution of that portion of the GUC Cash allocated to such GUC Entity, and which agreement(s) shall be consistent with this Plan and otherwise in form(s) reasonably acceptable to the Debtors, Required Investors, and Creditors' Committee.

*Holding Period Trustee* means a third-party, in its capacity as holding period trustee.

*Impaired* means, with respect to a Claim, Interest, or a Class of Claims or Interests, "impaired" within the meaning of such term in sections 1123(a)(4) and 1124 of the Bankruptcy Code.

*Initial Contribution Fees* means the Contribution Fees payable to the States on the Effective Date based on the Total Distributable Value made available to holders of General Unsecured Claims as of such date.[6]

*Intercompany Agreement* means a contract, unexpired lease, or other agreement solely between a Debtor and (i) any other Debtor or (ii) any subsidiary or Affiliate of a Debtor.

*Intercompany Claim* means a Claim against a Debtor held by another Debtor or an Affiliate of a Debtor.

*Intercompany Interest* means an Interest in a Debtor held by another Debtor or an Affiliate of a Debtor other than an Existing Equity Interest.

*Interim Compensation Procedures Order* means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* [ECF No. 285].

*Interest* means any equity security (as defined in section 101(16) of the Bankruptcy Code) in a Debtor (including any ordinary shares, units, common stock, preferred stock, membership interest, partnership interest, or other instrument evidencing any fixed or contingent ownership interest in the Debtor, whether or not transferable, including any option, warrant, or other right, contractual or otherwise, to subscribe for any such equity security in such Debtor) that existed immediately before the Effective Date.

*Investment Agreement* means the *Investment Agreement*, dated as of November 4, 2023 (as amended, modified or supplemented from time to time in accordance with its terms), by and between SAS AB, CL-S Holdings Lux S.à r.l., Air France-KLM, Lind Invest, and the Danish State Investor, attached hereto as **Exhibit A**, the terms of which are incorporated by reference as if fully set forth herein.

*Investor Consent* means the prior written consent of each of the Required Investors (which may include the prior written consent of Lind Invest to the extent so required by the definition of Required Investors), with such consent as solely determined by each Required Investor.

*Investor Equity* means the New Shares subscribed for by the Investors in connection with the Transaction pursuant to the Investment Agreement.

*Investors* means, collectively, Castlelake, Air France-KLM, the Danish State Investor, and Lind Invest.

---

[6] For illustrative purposes only, the Initial Contribution Fees are approximately $11,160,000 based on the prevailing foreign exchange rate on February 2, 2024 of 10.3538 SEK per USD.

*Irrevocable Undertaking* means the *Irrevocable Undertaking*, dated as of February 11, 2004, pursuant to which SAS AB undertook to be liable for all interest-bearing liabilities, leasing obligations, and other financial obligations of the Consortium then existing or arising in the future through September 30, 2020.

*IRS* means the Internal Revenue Service.

*Key Transaction Documents* means the Investment Agreement, this Plan, the Confirmation Order, the DIP Credit Agreement, the DIP Orders, the New Convertible Notes, the New Convertible Notes Indenture, and the Swedish Reorganization Plan.

*Law* means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

*Lien* means "lien," as defined in section 101(37) of the Bankruptcy Code.

*Lind Invest* means Lind Invest ApS.

*Material Contract* means any executory contract or unexpired lease with an annual value (either on an asset, income, liability, or expense basis) during any 12-month period in excess of $10,000,000, including Material Non-Aircraft Executory Contracts or Leases and executory contracts and unexpired leases related to the Debtors' aircraft, engines, and related equipment and arrangements.

*Material Non-Aircraft Executory Contract or Lease* means any executory contract or unexpired lease with an annual value (either on an asset, income, liability, or expense basis) during any 12-month period in excess of $10,000,000, other than executory contracts and unexpired leases related to the Debtors' aircraft, engines, and related equipment and arrangements.

*Material State Aid Decision* means, with respect to all State aid decisions, a decision that is reasonably likely to (i) create a potential total negative impact of $100,000,000 or greater (when combined with all other State aid decisions) on the Debtors' projected EBITDA, as set forth in the Business Plan, over a total period of five years, (ii) place material limitations on the ability of the Debtors to undertake expansion or growth activities after the Effective Date, (iii) limit the ability of the Debtors to freely operate a worldwide network from a hub in Copenhagen (including to Air France-KLM's and its partners' gateways), or limit the Debtors' ability to enter into commercial arrangements with Air France-KLM and its joint venture partners providing for any form of code sharing, network coordination, pricing coordination, joint marketing, frequent flyer / loyalty program cooperation, or revenue sharing, and (iv) otherwise impact the material terms of any Key Transaction Document; *provided, however*, that any decision related to the participation by the States in the recapitalization of the Debtors in 2020 shall not be a Material State Aid Decision.

*Modified Aircraft Lease* means an Aircraft Lease that has been (i) amended and restated after the Commencement Date and assumed or (ii) reinstated by the Debtors as of the Effective Date.

***New Boards*** means the Reorganized SAS AB Board and the Subsidiary Boards.

***New Convertible Notes*** means senior secured convertible exit notes issued by Reorganized SAS AB in the aggregate principal amount of $725,000,000 and having the terms set forth in the New Convertible Notes Indenture.

***New Convertible Notes Amount*** means the aggregate principal amount of $725,000,000 of the New Convertible Notes.

***New Convertible Notes Indenture*** means an indenture reflecting the terms and conditions of the New Convertible Notes, substantially as set forth in the term sheet attached as Exhibit B to the Investment Agreement.

***New Shares*** means the equity interests in Reorganized SAS AB.

***New Shares Distribution Pool*** means New Shares to be distributed to certain holders of Allowed General Unsecured Claims as set forth in this Plan in an aggregate value equal to approximately $75,000,000 (converted to SEK using the Closing FX Rate).

***Non-1145 Convertible Notes*** means New Convertible Notes issued to any Convertible Notes Purchaser in exchange for Cash under the Investment Agreement.

***Non-1145 Equity*** means Investor Equity issued to any Investor in exchange for Cash under the Investment Agreement.

***Non-State Investors*** means, collectively, Castlelake, Air France-KLM, and Lind Invest.

***Norwegian Term Loan Claims*** means Claims in the principal amount of $149,906,563.11 arising and payable under that certain *Facility Agreement*, dated as of December 18, 2020, by and among SAS AB, as Borrower, the Consortium, as Guarantor, and Export Finance Norway (Eksfin) as lender and administrative agent.

***Other General Unsecured Claims*** means unsecured Claims that are not entitled to priority of payment under section 507(a) of the Bankruptcy Code, other than Aircraft Lease Claims, Trade Claims, Norwegian Term Loan Claims, Commercial Hybrid Bond Claims, Convenience Class Claims, Swedish Term Loan Claims, Danish Term Loan Claims, Union Claims, Swiss Bond Claims, State Hybrid Bond Claims, Danish State Hybrid Bond Claims, and Intercompany Claims, but including Aircraft Rejection Claims and Trade Rejection Claims.

***Other Priority Claim*** means any Claim, other than an Administrative Expense Claim or a Priority Tax Claim, that is entitled to priority of payment as specified in section 507(a) of the Bankruptcy Code.

***Other Secured Claim*** means a Secured Claim other than a Priority Tax Claim.

**Overall Cap** means a cap in the aggregate amount of SEK 500,000,000 on the fees and expenses the Danish State Investor and the Swedish State may receive pursuant to the Contribution Fees, the Commitment Fee, and the Expense Reimbursement.

**PDP Facility Order** means the *Order (I) Authorizing Debtors to Honor and Perform Their Obligations Under PDP Facility, (II) Granting Superpriority Administrative Expense Status to Obligations Under PDP Facility, (III) Modifying Automatic Stay, and (IV) Granting Related Relief* [ECF No. 333].

**Person** means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited partnership, trust, estate, unincorporated organization, Governmental Unit, or other Entity.

**Plan** means this second amended joint chapter 11 plan of reorganization, including all appendices, exhibits, schedules, and supplements hereto (including any appendices, schedules, and supplements to this Plan contained in the Plan Supplement), as may be modified from time to time in accordance with the Bankruptcy Code and the terms hereof.

**Plan Distribution** means the payment or distribution of consideration to holders of Allowed Claims and Allowed Interests under this Plan.

**Plan Supplement** means a supplement or supplements to this Plan containing certain documents relevant to the implementation of this Plan, to be filed with the Bankruptcy Court no later than seven days before the Voting Deadline, which shall include (i) to the extent provided for in this Plan, the Amended Organizational Documents, (ii) to the extent known and applicable, the identities of the members of the New Boards, (iii) with respect to the members of the New Boards, information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code, (iv) the Schedule of Assumed Contracts, (v) the Schedule of Retained Causes of Action, (vi) the Recipient Shareholders' Agreement, and (vii) the GUC Documents (or term sheets identifying the material terms thereof); *provided, however*, that, through the Effective Date, the Debtors shall have the right to amend documents contained in, and exhibits to, the Plan Supplement in accordance with the terms of this Plan; *provided, further, however*, that the Creditors' Committee shall have a consultation right with respect to (a) all documents contained in the Plan Supplement and (b) any amendments thereto, in each case, solely to the extent such documents or amendments materially impact the rights of holders of Allowed General Unsecured Claims.

**Prior DIP Agent** means Wilmington Savings Fund Society, FSB, solely in its capacity as administrative agent and collateral agent under the Prior DIP Credit Agreement, its successors, assigns, or any replacement agent appointed pursuant to the terms of the Prior DIP Credit Agreement.

**Prior DIP Credit Agreement** means the *Super-Priority Debtor-in-Possession Term Loan Agreement*, dated as of August 13, 2022 (as amended, restated, amended and restated, extended, supplemented, waived or otherwise modified from time to time), by and among SAS AB, the Consortium, the guarantors party thereto, the Prior DIP Lenders, and the Prior DIP Agent.

***Prior DIP Facility*** means the debtor-in-possession financing facility provided by the Prior DIP Lenders in an aggregate principal amount of up to $700,000,000, made available pursuant to the terms and conditions of the Prior DIP Credit Agreement.

***Prior DIP Lenders*** means the lenders from time to time party to the Prior DIP Credit Agreement.

***Priority Tax Claim*** means any Secured Claim or unsecured Claim of a Governmental Unit of the kind entitled to priority of payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

***Pro Rata*** means (i) the proportion that an Allowed General Unsecured Claim entitled to Plan Distributions against a particular Debtor bears to the aggregate amount of Allowed General Unsecured Claims entitled to receive Plan Distributions against such Debtor or (ii) the proportion that an Allowed General Unsecured Claim in a particular Class bears to the aggregate amount of all Allowed General Unsecured Claims in that Class, as the context requires.

***Professional Person*** means any Person retained by the Debtors or the Creditors' Committee by order of the Bankruptcy Court in connection with these Chapter 11 Cases pursuant to sections 327, 328, 329, 330, 331, 503(b) or 1103 of the Bankruptcy Code, excluding any ordinary course professional retained pursuant to an order of the Bankruptcy Court.

***Proof of Claim*** means a proof of Claim filed against a Debtor in the Chapter 11 Cases.

***Recipient Shareholders' Agreement*** means an agreement to be entered into by the Investors and, to the extent provided for in Section 5.16 of this Plan, holders of Allowed Claims receiving New Shares to govern the relationship among such parties thereto, in each case, in their respective capacities as holders of New Shares.

***Related Entities*** means, with respect to an Entity, that Entity's current and former Affiliates, and such Entity's and its current and former Affiliates' predecessors, successors, assigns, and current and former officers, group management, directors, principals, equity holders (regardless of whether such interests are held directly or indirectly), members, partners (including both general and limited partners), managers, employees, agents, advisory board members, management companies, managed accounts or funds, affiliated investment funds or investment vehicles, and Representatives; *provided, however*, that Related Entities of the Danish State Investor and the Danish State Noteholder shall be limited to Representatives of the Danish State Investor and the Danish State Noteholder.

***Released Parties*** means, collectively, (i) the Debtors, (ii) the DIP Agent and the DIP Lenders, (iii) the Creditors' Committee and each of its present and former members, (iv) the Investors, (v) the Danish State Noteholder, (vi) the Swedish State, (vii) the Swiss Bonds Agent, and (viii) with respect to each of the foregoing Entities in clauses (i) through (vii), such Entities' Related Entities, and their respective heirs, executors, estates, and nominees, in each case in their capacity as such; *provided, however*, that, subject to Section 3.3(f) of the Investment Agreement, any holder of a Claim or Interest that would otherwise constitute a Released Party that does not consent to the releases in this Plan shall not be a Released Party; *provided, further, however*, that,

18

to the extent the Danish State Noteholder gives such a release as contemplated by the Investment Agreement, the Danish State Noteholder shall be a Released Party under this Plan for all purposes; *provided, further, however*, that the Released Parties referenced in clause (viii) are Released Parties solely with respect to work performed for or on behalf of the applicable Entity for which releases are given pursuant to this Plan.

*Releasing Parties* means, collectively, (i) the Released Parties, other than the Danish State Investor and the Danish State Noteholder, (ii) all holders of Claims who vote to accept this Plan, (iii) all holders of Claims that either vote to reject this Plan or abstain from voting on this Plan and affirmatively opt to grant the releases by checking the appropriate box on the Ballot, and (iv) all holders of Claims and Interests not described in the foregoing clauses (i) – (iii) that affirmatively opt to grant the releases by checking the appropriate box on the notice form; *provided, however*, that the Danish State Investor and the Danish State Noteholder shall provide releases solely pursuant to <u>Section 3.3(f)</u> of the Investment Agreement.

*Remaining SAS AB Available Cash* means SAS AB Available Cash *less* any Residual SAS AB Available Cash (solely to the extent any Residual SAS AB Available Cash is available on the Effective Date).

*Reorganized Consortium* means the Consortium as reorganized on the Effective Date in accordance with this Plan.

*Reorganized Debtors* means the Debtors as reorganized on the Effective Date in accordance with this Plan.

*Reorganized Gorm Blue Entities* means the Gorm Blue Entities as reorganized on the Effective Date in accordance with this Plan.

*Reorganized SAS AB* means SAS AB as reorganized on the Effective Date in accordance with this Plan.

*Reorganized SAS AB Board* means the initial board of directors of Reorganized SAS AB.

*Representative* means any Entity's attorneys, accountants, investment bankers, consultants, professional advisors, independent auditors, trustees, agents, Affiliates (and any such Affiliates' attorneys, professional advisors, independent auditors, trustees or agents), fund advisors, investment managers, investment advisors, sub-advisors, sub-managers, and other professionals, and each of their respective current and former officers, directors, principals, equity holders (regardless of whether such interests are held directly or indirectly), members, partners (including both general and limited partners), managers, employees, agents, and advisory board members, each in their capacity as such.

*Required Investors* means Castlelake, Air France-KLM, and the Danish State Investor; *provided, however*, that any consent by the Required Investors that adversely affects Lind Invest's rights or obligations as compared to the other Investors shall also require Lind Invest's prior written consent (not to be unreasonably withheld, conditioned or delayed).

19

**Reserved Funds** means Cash in an aggregate amount equal to SEK 2,325,000,000.

**Residual SAS AB Available Cash** means the portion, if any, of SAS AB Available Cash necessary to distribute to holders of Allowed Aircraft Lease Claims, Allowed Trade Claims, and Allowed Norwegian Term Loan Claims against SAS AB to provide them with approximately the same percentage recovery on account of such Allowed Claims (taking into account the other distributions provided to them pursuant to Section 4.1 of this Plan) as is to be distributed to the holders of Allowed Commercial Hybrid Bond Claims, Allowed Other General Unsecured Claims, and Allowed Intercompany Claims against SAS AB (taking into account the other distributions provided to them pursuant to Section 4.1 of this Plan).

**Restructuring** means the restructuring of the Debtors' existing debt and other obligations on the terms and conditions set forth in, and to be implemented pursuant to, this Plan and the Swedish Reorganization Plan.

**Retained Causes of Action** means all Causes of Action held by the Debtors that are not expressly settled or released by the Debtors under this Plan, which shall include any Cause of Action specifically listed on the Schedule of Retained Causes of Action.

**SANA** means Scandinavian Airlines of North America Inc.

**SANA Available Cash** means a portion of the Available Cash in an amount equal to $10,000 to fund distributions under this Plan to holders of Allowed Claims against SANA.

**SAS AB Available Cash** means (i) Available Cash allocated to SAS AB in the amount necessary to ensure that SAS AB receives 59% of the Adjusted Distributable Value, when taking into account Available Cash plus the SAS AB New Shares Distribution Pool, and (ii) any Available Cash SAS AB receives under this Plan on account of distributions on Intercompany Claims it holds against the Consolidated Debtors, which Available Cash shall be used to fund distributions under this Plan to holders of Allowed Claims against SAS AB.[7]

**SAS AB GUC Interests** means GUC Interests representing the percentage of the aggregate value of all GUC Interests distributable to holders of Allowed General Unsecured Claims under this Plan and the GUC Documents equal to the percentage of the value attributable to the SAS AB Available Cash and the SAS AB New Shares Distribution Pool as compared to the total value attributable to the Available Cash and the New Shares Distribution Pool.

**SAS AB New Shares Distribution Pool** means (i) New Shares from the New Shares Distribution Pool allocated to SAS AB in the amount necessary to ensure that SAS AB receives 59% of the Adjusted Distributable Value, when taking into account the New Shares Distribution Pool plus the SAS AB Available Cash, and (ii) any New Shares SAS AB would receive under this Plan on account of distributions on Intercompany Claims it holds against the Consolidated

---

[7] For illustrative purposes only, before any distribution on account of the Intercompany Claim SAS AB holds against the Consolidated Debtors, the SAS AB Available Cash is approximately $23,310,000 based on the prevailing foreign exchange rate on February 2, 2024 of 10.3538 SEK per USD.  After distributions on account of the Intercompany Claim SAS AB holds against the Consolidated Debtors, the SAS AB Available Cash is approximately $32,440,000.

Debtors, which New Shares shall be used to fund distributions under this Plan to holders of Allowed Claims against SAS AB.[8]

**Schedule of Assumed Contracts** means the schedule of executory contracts and unexpired leases to be assumed by the Reorganized Debtors on the Effective Date pursuant to this Plan, as the same may be amended, modified, or supplemented from time to time.

**Schedule of Retained Causes of Action** means the schedule of certain Retained Causes of Action to be filed with the Plan Supplement; *provided, however*, that the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Retained Causes of Action, regardless of whether such Retained Causes of Action are specifically enumerated in the Schedule of Retained Causes of Action.

**Schedules** means the schedules of assets and liabilities and statements of financial affairs filed by the Debtors under section 521 of the Bankruptcy Code, Bankruptcy Rule 1007, and the Official Bankruptcy Forms of the Bankruptcy Rules, as such schedules and statements have been or may be supplemented or amended from time to time.

**SCRO** means the Swedish Companies Registration Office (Sw. *Bolagsverket*).

**Secured Claim** means a Claim (i) secured by a Lien on an interest of a Debtor in property to the extent of the value of such interest as (a) set forth in this Plan, (b) agreed to by the holder of such Claim and the Debtors, or (c) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code, or (ii) secured by the amount of any right of setoff of the holder thereof against a Debtor in accordance with section 553 of the Bankruptcy Code.

**Securities Act** means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

**Security** means any "security" as such term is defined in section 101(49) of the Bankruptcy Code.

**SEK** means the legal tender of the Kingdom of Sweden.

**Shareholders' Agreement** means the shareholders' agreement to be entered into by the Investors, in a form that incorporates the terms and conditions set forth in the Governance Term Sheet in all material respects, to govern the relationship among the parties thereto, in each case, in their respective capacity as Post-Closing Company Shareholders (as defined in the Investment Agreement).

---

[8] For illustrative purposes only, before any distribution on account of the Intercompany Claim SAS AB holds against the Consolidated Debtors, the SAS AB New Shares Distribution Pool includes New Shares in an amount equal to approximately $38,530,000 based on the prevailing foreign exchange rate on February 2, 2024 of 10.3538 SEK per USD. After distributions on account of the Intercompany Claim SAS AB holds against the Consolidated Debtors, the SAS AB New Shares Distribution Pool includes New Shares in amount equal to approximately $53,630,000.

*Solicitation* means the solicitation of votes for this Plan pursuant to, and in compliance with, the Bankruptcy Code and the order approving the Disclosure Statement.

*Solicitation and Voting Procedures* means the procedures for (i) soliciting, receiving, and tabulating votes to accept or reject this Plan, (ii) voting to accept or reject this Plan, and (iii) filing objections to this Plan, as described in the *Motion of Debtors for Entry of an Order (I) Approving (A) Disclosure Statement, (B) Solicitation, Voting, and Related Procedures, and (C) Proposed Cure Procedures, (II) Scheduling Confirmation Hearing, (III) Establishing Notice and Objection Procedures for Confirmation of Debtors' Chapter 11 Plan, and (IV) Granting Related Relief* [ECF No. 1733].

*State Hybrid Bond Claims* means Claims in the principal amount of $504,744,669.97 arising and payable under that certain *Terms and Conditions for SEK 5,000,000,000 subordinated Perpetual Floating Rate Callable Capital Securities*, dated as of October 26, 2020, issued by SAS AB, as Issuer, with Intertrust (Sweden) AB, as Agent, to the States, ISIN SE0014958005.

*State Non-Tax Claim* means a Claim raised in national courts requiring the Debtors to pay any State non-tax Claim arising in the period from 2020 to 2023.

*States* means, together, the Danish State Noteholder and the Swedish State.

*Statutory Fees* means all fees and charges assessed against the Estates pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code.

*Subsidiary Boards* means the initial boards of directors or managers, as applicable, for the Reorganized Debtors other than Reorganized SAS AB.

*Swedish Contribution Fee* means a fee to be paid to the Swedish State by the Convertible Notes Purchasers in accordance with the Investment Agreement, on or after the Effective Date, in an amount equal to 50% of the sum of (i) 10% of Total Distributable Value provided to holders of Allowed General Unsecured Claims pursuant to this Plan up to SEK 1,250,000,000 (converted to USD (truncated to two decimal places) using the Closing FX Rate) and (ii) 5% of the positive difference of the Total Distributable Value provided to the holders of Allowed General Unsecured Claims pursuant to this Plan and SEK 1,250,000,000 (converted to USD (truncated to two decimal places) using the Closing FX Rate). In all circumstances, the Swedish Contribution Fee shall be at least SEK 25,000,000. The Swedish Contribution Fee shall be rounded to two decimal places.

*Swedish Court* means the District Court of Stockholm (Sw. *Stockholms tingsrätt*) (or any relevant court of appeal), contemplated to approve and confirm the Swedish Reorganization Plan.

*Swedish Reorganization Act* means the Swedish Reorganization Act (Sw. *lag (2022:964) om företagsrekonstruktion*).

*Swedish Reorganization Plan* means the reorganization plan to be filed with the Swedish Court, approved by the affected parties (or a sufficient majority of classes), and ultimately approved and confirmed by the Swedish Court as part of the Swedish SAS AB Reorganization.

*Swedish Reorganization Plan Confirmation* means the decision by the Swedish Court approving and confirming the Swedish Reorganization Plan, which approval and confirmation shall be final and binding (Sw. *lagakraftvunnen*), consistent with the Key Transaction Documents and their contents, and otherwise reasonably acceptable to each of the Required Investors.

*Swedish SAS AB Reorganization* means a company reorganization proceeding of SAS AB under the Swedish Reorganization Act.

*Swedish State* means the Kingdom of Sweden, including its government and the instrumentalities thereof.

*Swedish Term Loan Claims* means Claims in the principal amount of $146,840,894.12 arising and payable under that certain *Term Facility Agreement*, dated as of July 16, 2021, by and between the Consortium, as Borrower, and the Swedish National Debt Office, as Lender.

*Swiss Bonds Agent* means Citigroup Bank (Switzerland), Geneva, as principal paying agent for holders of the Swiss Bond Claims.

*Swiss Bond Claims* means Claims in the principal amount of approximately $133,000,000 arising and payable under those certain *Subordinated Bonds*, dated as of January 14, 1986, issued by the Consortium to Citicorp Bank (Switzerland), Geneva, Kredietbank (Suisse) S.A. Geneva, and a consortium of banks, as initial bondholders, and the Swiss Bonds Agent against (x) the Consortium or (y) SAS AB in respect of the Irrevocable Undertaking.

*Total Distributable Value* means an aggregate amount of up to $325,000,000 in value from the Available Cash, the New Shares Distribution Pool, and the portion of the GUC Cash required to fund the Convenience Class Funding Amount to be distributed to holders of Allowed General Unsecured Claims pursuant to this Plan. For the avoidance of doubt, to the extent distributions are made from the GUC Entities to the holders of GUC Interests in accordance with this Plan and the GUC Documents, upon the distribution of such GUC Cash held by the GUC Entities, such funds shall be deemed Available Cash and included in the calculation of Total Distributable Value.

*Total Share Subscription Amount* means an aggregate subscription amount for the Investor Equity equal to $475,000,000, payable by the Investors in cash and/or by set-off pursuant to the Investment Agreement, this Plan, and the Swedish Reorganization Plan. For the purposes of this Plan, any references to "set-off" shall, insofar as it relates to set-off against the subscription amounts payable for the New Shares, also include payment in kind (Sw. *apport*), as required.

*Trade Claim* means an unsecured Claim that is not entitled to priority of payment under section 507(a) of the Bankruptcy Code and that is held by a third-party provider of goods or services to a Debtor that facilitates such Debtor's operations in the ordinary course of business and

will continue to do so after the Effective Date. An initial list of Trade Claims is set forth on Exhibit F to the Disclosure Statement, which may be amended or supplemented prior to the Confirmation Date. To the extent that any executory contract or unexpired lease giving rise to a Trade Claim is rejected in accordance with the terms of this Plan after a vote has been cast with respect to such Claim, such Claim will be reclassified as an Other General Unsecured Claim and the applicable holder will either (i) be provided with a new Ballot to cast a vote on this Plan or (ii) if the Voting Deadline has passed, be deemed to reject this Plan.

*Trade Rejection Claim* means any Claim of a third party arising from the rejection of an executory contract or unexpired lease between such third party and a Debtor for goods or services that facilitate a Debtor's operations in the ordinary course of business.

*Transaction* means a transaction for a new investment in, and issuance of New Shares and New Convertible Notes by, Reorganized SAS AB, as contemplated by the Investment Agreement, this Plan, the Confirmation Order, and the Swedish Reorganization Plan.

*Treasury Regulations* means the regulations promulgated under the U.S. Tax Code by the United States Department of the Treasury.

*Unimpaired* means, with respect to a Claim, Interest, or a class of Claims or Interests, not "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

*Union Claims* means an unsecured Claim held by a labor union of the Debtors, including the Allowed Pilot Union Claim.

*USD or $* means the legal tender of the United States of America.

*U.S. Tax Code* means the U.S. Internal Revenue Code of 1986, as amended.

*U.S. Trustee* means the United States Trustee for Region 2.

*Voting Deadline* means March 11, 2024 at 4:00 p.m. (Prevailing Eastern Time), or such other date and time as may set by the Bankruptcy Court.

## 1.2    *Interpretation; Application of Definitions; Rules of Construction.*

Unless otherwise specified, all section or exhibit references in this Plan are to the respective section in or exhibit to this Plan, as the same may be amended, waived, or modified from time to time in accordance with the terms hereof. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained therein and have the same meaning as "in this Plan," "of this Plan," "to this Plan," and "under this Plan," respectively. The words "includes" and "including" are not limiting. The headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. For purposes herein: (i) in the appropriate context, each term, whether stated in the singular or plural, shall include both the singular and plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (ii) unless otherwise specified herein, any

reference herein to a contract, lease, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (iii) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply, except that the meaning of "or" shall be governed by the context in which it is used; (iv) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (v) all references herein to consent, acceptance, or approval may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail; and (vi) all references herein to dates and times shall refer to prevailing Eastern Time.

### 1.3    *Reference to Monetary Figures*.

All references in this Plan to monetary figures shall refer to USD unless otherwise expressly provided. Except as otherwise provided, all amounts included herein reflect, to the extent applicable, the applicable conversion rate for each currency as of the Commencement Date.

### 1.4    *Controlling Document*.

In the event of an inconsistency between this Plan (excluding the Plan Supplement) and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control unless otherwise specified in such Plan Supplement document. In the event of an inconsistency between this Plan and the Investment Agreement (other than the term sheet attached thereto as Exhibit A), the terms of the Investment Agreement (other than the term sheet attached thereto as Exhibit A) shall control. In the event of an inconsistency between this Plan and any other instrument or document created or executed pursuant to, or in connection with, this Plan, or between this Plan and the Disclosure Statement, this Plan shall control. This Plan, the Plan Supplement, and the Confirmation Order shall be construed in a manner such that provisions of each are consistent with those of the others so as to effectuate the purposes of each to the extent reasonably possible. If there is any inconsistency between any provision of this Plan, including any provision of the Plan Supplement, and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of this Plan and the Plan Supplement, as applicable.

## ARTICLE II.    ADMINISTRATIVE EXPENSE CLAIMS, PRIORITY TAX CLAIMS, DIP CLAIMS, AND FEE CLAIMS.

### 2.1    *Treatment of Administrative Expense Claims*.

(a)    Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to a less favorable treatment, in full and final satisfaction of such Claim, each holder of an Allowed Administrative Expense Claim shall receive, at the option of the Debtors or the Reorganized Debtors, either:

(i)    Cash in an amount equal to such Allowed Claim on or as soon as reasonably practicable after the latest of (1) the Effective Date,

(2) the date that is ten Business Days after the date on which such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, and (3) the date on which such Administrative Expense Claim would be paid by the Debtors in the ordinary course of business; or

(ii)    other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

(b)    Except as otherwise provided in this <u>Section 2.1</u> and with respect to Fee Claims and Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors during the Chapter 11 Cases, which shall be paid by the Debtors or Reorganized Debtors (as applicable) in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such transactions, requests for payment of Allowed Administrative Expense Claims must be filed pursuant to the procedures specified in the Confirmation Order and any notice related thereto no later than the Administrative Expense Claims Bar Date.

## 2.2    *Treatment of Priority Tax Claims*.

(a)    Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction of such Claim, each holder of an Allowed Priority Tax Claim shall receive, at the option of the Debtors or the Reorganized Debtors, either:

(i)    Cash in an amount equal to such Allowed Claim on or as soon as reasonably practicable after the latest of (1) the Effective Date, (2) the date that is ten Business Days after the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, and (3) the date on which such Priority Tax Claim would be paid by the Debtors in the ordinary course of business; or

(ii)    other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

## 2.3    *Treatment of DIP Claims*.

(a)    Each holder of an Allowed DIP Claim shall receive, in full and final satisfaction of such DIP Claim:

(i)    Cash in an amount equal to such Claim on the Effective Date, or as soon as reasonably practicable thereafter; or

(ii)    such other treatment as agreed to by the DIP Lenders and the Debtors and as reasonably acceptable to the Investors (including in accordance with the Investment Agreement).

(b)      To the extent a DIP Lender converts some or all of its DIP Obligations into New Shares or New Convertible Notes on the Effective Date in accordance with the terms of the Investment Agreement, its DIP Claims shall be reduced by a corresponding amount.

(c)      Notwithstanding anything to the contrary in this Plan or the Confirmation Order, the provisions of the DIP Loan Documents that expressly survive termination or maturity of the DIP Facility (including those provisions relating to the rights of the DIP Agent and the DIP Lenders to expense reimbursement, indemnification, and other similar terms) shall continue in full force and effect after the Effective Date in accordance with the terms thereof.

## 2.4    *Treatment of Fee Claims*.

(a)      All Professional Persons seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date shall file, on or before the date that is 60 days after the Effective Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred.  For the avoidance of doubt, the foregoing shall not affect any professional-service Entity that the Debtors are permitted to pay without seeking authority from the Bankruptcy Court in the ordinary course of the Debtors' businesses (and in accordance with any relevant prior order of the Bankruptcy Court), which payments may continue notwithstanding the occurrence of the Confirmation Date or the Effective Date.

(b)      No later than five Business Days after the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall establish and fund the Fee Escrow Account.  The Debtors, after consultation with the Creditors' Committee, shall fund the Fee Escrow Account with Cash equal to the Professional Persons' good faith estimates of the Fee Claims.  Funds held in the Fee Escrow Account shall not be considered property of the Debtors' Estates or property of the Reorganized Debtors but shall revert to the Reorganized Debtors only after all Allowed Fee Claims have been irrevocably paid in full.  The Fee Escrow Account shall be held in trust for Professional Persons and for no other parties until all Allowed Fee Claims have been paid in full.  The Fee Escrow Account may be an interest-bearing account.

(c)      Fee Claims shall be paid in full, in Cash from funds held in the Fee Escrow Account, in such amounts as are Allowed by the Bankruptcy Court (i) as soon as reasonably practicable after the date upon which an order relating to any such Allowed Fee Claim is entered by the Bankruptcy Court or (ii) in accordance with any other order of the Bankruptcy Court, including the Interim Compensation Procedures Order.  The Reorganized Debtors' obligations with respect to Fee Claims shall not be limited by nor deemed limited to the balance of funds held in the Fee Escrow Account.  To the extent that funds held in the Fee Escrow Account are insufficient to satisfy the amount of Allowed Fee Claims owing to the Professional Persons, such Professional Persons shall have an Allowed Administrative Expense Claim for any such deficiency, which shall be satisfied in accordance with Section 2.1 of this Plan.  When Allowed Fee Claims have been paid in full, any remaining amount in the Fee Escrow Account shall be promptly returned to the Reorganized Debtors without any further action or order of the Bankruptcy Court.  No Liens, claims, or interests shall encumber the Fee Escrow Account in any way, other than customary liens in favor of the depository bank at which the Fee Escrow Account is maintained.

(d)    On the Effective Date, any requirement that professionals, including the Professional Persons, comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any professional, including the Professional Persons, in the ordinary course of business without any further notice to, or action, order, or approval of, the Bankruptcy Court.

## ARTICLE III.    CLASSIFICATION OF CLAIMS AND INTERESTS.

### 3.1    *Classification in General.*

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under this Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

### 3.2    *Summary of Classification of Claims and Interests.*

The following tables designate the Classes of Claims against and Interests in the Debtors and specify which Classes are (i) Impaired and Unimpaired under this Plan, (ii) entitled to vote to accept or reject this Plan in accordance with section 1126 of the Bankruptcy Code, and (iii) presumed to accept or deemed to reject this Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Priority Tax Claims, DIP Claims, and Fee Claims have not been classified.

(a)    Claims Against and Interests in SAS AB.

| Class | Type of Claim or Interest | Impairment | Entitled to Vote |
|-------|---------------------------|------------|------------------|
| Class 1 | Other Secured Claims | Unimpaired | No (Presumed to accept) |
| Class 2 | Other Priority Claims | Unimpaired | No (Presumed to accept) |
| Class 3 | Aircraft Lease Claims and Trade Claims | Impaired | Yes |
| Class 4 | Norwegian Term Loan Claims | Impaired | Yes |
| Class 5 | Commercial Hybrid Bond Claims, Other General Unsecured Claims, and Intercompany Claims | Impaired | Yes |
| Class 6 | [Reserved – No Class at this Debtor] | | |
| Class 7 | [Reserved – No Class at this Debtor] | | |
| Class 8 | Swiss Bond Claims | Impaired | No (Deemed to reject) |
| Class 9 | [Reserved – No Class at this Debtor] | | |

| Class | Type of Claim or Interest | Impairment | Entitled to Vote |
|---|---|---|---|
| Class 10 | State Hybrid Bond Claims and Danish State Hybrid Bond Claims | Impaired | No (Deemed to reject) |
| Class 11 | Existing Equity Interests | Impaired | No (Deemed to reject) |

(b)    Claims Against and Interests in the Consolidated Debtors.

| Class | Type of Claim or Interest | Impairment | Entitled to Vote |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | No (Presumed to accept) |
| Class 2 | Other Priority Claims | Unimpaired | No (Presumed to accept) |
| Class 3 | Aircraft Lease Claims, Trade Claims, and Union Claims | Impaired | Yes |
| Class 4 | Danish Term Loan Claims, Swedish Term Loan Claims, and Norwegian Term Loan Claims | Impaired | Yes |
| Class 5 | Other General Unsecured Claims | Impaired | Yes |
| Class 6 | Convenience Class Claims | Impaired | Yes |
| Class 7 | Intercompany Claims | Unimpaired / Impaired | No (Presumed to accept / deemed to reject) |
| Class 8 | Swiss Bond Claims | Impaired | No (Deemed to reject) |
| Class 9 | Intercompany Interests | Unimpaired | No (Presumed to accept) |
| Class 10 | [Reserved – No Class at this Debtor] | | |
| Class 11 | [Reserved – No Class at this Debtor] | | |

(c)    Claims Against and Interests in Gorm Dark Blue Limited.

| Class | Type of Claim or Interest | Impairment | Entitled to Vote |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | No (Presumed to accept) |
| Class 2 | Other Priority Claims | Unimpaired | No (Presumed to accept) |
| Class 3 | Aircraft Lease Claims | Impaired | Yes |
| Class 4 | [Reserved – No Class at this Debtor] | | |
| Class 5 | Other General Unsecured Claims | Impaired | Yes |
| Class 6 | [Reserved – No Class at this Debtor] | | |

| Class | Type of Claim or Interest | Impairment | Entitled to Vote |
|---|---|---|---|
| Class 7 | Intercompany Claims | Unimpaired / Impaired | No (Presumed to accept / deemed to reject) |
| Class 8 | [Reserved – No Class at this Debtor] | | |
| Class 9 | Intercompany Interests | Unimpaired | No (Presumed to accept) |
| Class 10 | [Reserved – No Class at this Debtor] | | |
| Class 11 | [Reserved – No Class at this Debtor] | | |

(d)    Claims Against and Interests in Gorm Deep Blue Limited.

| Class | Type of Claim or Interest | Impairment | Entitled to Vote |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | No (Presumed to accept) |
| Class 2 | Other Priority Claims | Unimpaired | No (Presumed to accept) |
| Class 3 | Aircraft Lease Claims | Impaired | Yes |
| Class 4 | [Reserved – No Class at this Debtor] | | |
| Class 5 | Other General Unsecured Claims | Impaired | Yes |
| Class 6 | [Reserved – No Class at this Debtor] | | |
| Class 7 | Intercompany Claims | Unimpaired / Impaired | No (Presumed to accept / deemed to reject) |
| Class 8 | [Reserved – No Class at this Debtor] | | |
| Class 9 | Intercompany Interests | Unimpaired | No (Presumed to accept) |
| Class 10 | [Reserved – No Class at this Debtor] | | |
| Class 11 | [Reserved – No Class at this Debtor] | | |

(e)    Claims Against and Interests in Gorm Light Blue Limited.

| Class | Type of Claim or Interest | Impairment | Entitled to Vote |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | No (Presumed to accept) |
| Class 2 | Other Priority Claims | Unimpaired | No (Presumed to accept) |
| Class 3 | Aircraft Lease Claims | Impaired | Yes |
| Class 4 | [Reserved – No Class at this Debtor] | | |
| Class 5 | Other General Unsecured Claims | Impaired | Yes |
| Class 6 | [Reserved – No Class at this Debtor] | | |

| Class | Type of Claim or Interest | Impairment | Entitled to Vote |
|-------|---------------------------|------------|------------------|
| Class 7 | Intercompany Claims | Unimpaired / Impaired | No (Presumed to accept / deemed to reject) |
| Class 8 | [Reserved – No Class at this Debtor] | | |
| Class 9 | Intercompany Interests | Unimpaired | No (Presumed to accept) |
| Class 10 | [Reserved – No Class at this Debtor] | | |
| Class 11 | [Reserved – No Class at this Debtor] | | |

(f)    <u>Claims Against and Interests in Gorm Ocean Blue Limited</u>.

| Class | Type of Claim or Interest | Impairment | Entitled to Vote |
|-------|---------------------------|------------|------------------|
| Class 1 | Other Secured Claims | Unimpaired | No (Presumed to accept) |
| Class 2 | Other Priority Claims | Unimpaired | No (Presumed to accept) |
| Class 3 | Aircraft Lease Claims | Impaired | Yes |
| Class 4 | [Reserved – No Class at this Debtor] | | |
| Class 5 | Other General Unsecured Claims | Impaired | Yes |
| Class 6 | [Reserved – No Class at this Debtor] | | |
| Class 7 | Intercompany Claims | Unimpaired / Impaired | No (Presumed to accept / deemed to reject) |
| Class 8 | [Reserved – No Class at this Debtor] | | |
| Class 9 | Intercompany Interests | Unimpaired | No (Presumed to accept) |
| Class 10 | [Reserved – No Class at this Debtor] | | |
| Class 11 | [Reserved – No Class at this Debtor] | | |

(g)    <u>Claims Against and Interests in Gorm Sky Blue Limited</u>.

| Class | Type of Claim or Interest | Impairment | Entitled to Vote |
|-------|---------------------------|------------|------------------|
| Class 1 | Other Secured Claims | Unimpaired | No (Presumed to accept) |
| Class 2 | Other Priority Claims | Unimpaired | No (Presumed to accept) |
| Class 3 | Aircraft Lease Claims | Impaired | Yes |
| Class 4 | [Reserved – No Class at this Debtor] | | |
| Class 5 | Other General Unsecured Claims | Impaired | Yes |
| Class 6 | [Reserved – No Class at this Debtor] | | |

| Class | Type of Claim or Interest | Impairment | Entitled to Vote |
|---|---|---|---|
| Class 7 | Intercompany Claims | Unimpaired / Impaired | No (Presumed to accept / deemed to reject) |
| Class 8 | [Reserved – No Class at this Debtor] | | |
| Class 9 | Intercompany Interests | Unimpaired | No (Presumed to accept) |
| Class 10 | [Reserved – No Class at this Debtor] | | |
| Class 11 | [Reserved – No Class at this Debtor] | | |

(h)    Claims Against and Interests in Gorm Asset Management Limited.

| Class | Type of Claim or Interest | Impairment | Entitled to Vote |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | No (Presumed to accept) |
| Class 2 | Other Priority Claims | Unimpaired | No (Presumed to accept) |
| Class 3 | [Reserved – No Class at this Debtor] | | |
| Class 4 | [Reserved – No Class at this Debtor] | | |
| Class 5 | [Reserved – No Class at this Debtor] | | |
| Class 6 | [Reserved – No Class at this Debtor] | | |
| Class 7 | Intercompany Claims | Unimpaired / Impaired | No (Presumed to accept / deemed to reject) |
| Class 8 | [Reserved – No Class at this Debtor] | | |
| Class 9 | Intercompany Interests | Unimpaired | No (Presumed to accept) |
| Class 10 | [Reserved – No Class at this Debtor] | | |
| Class 11 | [Reserved – No Class at this Debtor] | | |

(i)    Claims Against and Interests in Gorm Engine Management Limited.

| Class | Type of Claim or Interest | Impairment | Entitled to Vote |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | No (Presumed to accept) |
| Class 2 | Other Priority Claims | Unimpaired | No (Presumed to accept) |
| Class 3 | [Reserved – No Class at this Debtor] | | |
| Class 4 | [Reserved – No Class at this Debtor] | | |
| Class 5 | [Reserved – No Class at this Debtor] | | |
| Class 6 | [Reserved – No Class at this Debtor] | | |

| Class | Type of Claim or Interest | Impairment | Entitled to Vote |
|---|---|---|---|
| Class 7 | Intercompany Claims | Unimpaired / Impaired | No (Presumed to accept / deemed to reject) |
| Class 8 | [Reserved – No Class at this Debtor] | | |
| Class 9 | Intercompany Interests | Unimpaired | No (Presumed to accept) |
| Class 10 | [Reserved – No Class at this Debtor] | | |
| Class 11 | [Reserved – No Class at this Debtor] | | |

(j)      Claims Against and Interests in Gorm Warm Red Limited.

| Class | Type of Claim or Interest | Impairment | Entitled to Vote |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | No (Presumed to accept) |
| Class 2 | Other Priority Claims | Unimpaired | No (Presumed to accept) |
| Class 3 | [Reserved – No Class at this Debtor] | | |
| Class 4 | [Reserved – No Class at this Debtor] | | |
| Class 5 | [Reserved – No Class at this Debtor] | | |
| Class 6 | [Reserved – No Class at this Debtor] | | |
| Class 7 | Intercompany Claims | Unimpaired / Impaired | No (Presumed to accept / deemed to reject) |
| Class 8 | [Reserved – No Class at this Debtor] | | |
| Class 9 | Intercompany Interests | Unimpaired | No (Presumed to accept) |
| Class 10 | [Reserved – No Class at this Debtor] | | |
| Class 11 | [Reserved – No Class at this Debtor] | | |

(k)      Claims Against and Interests in SANA.

| Class | Type of Claim or Interest | Impairment | Entitled to Vote |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | No (Presumed to accept) |
| Class 2 | Other Priority Claims | Unimpaired | No (Presumed to accept) |
| Class 3 | [Reserved – No Class at this Debtor] | | |
| Class 4 | [Reserved – No Class at this Debtor] | | |
| Class 5 | Other General Unsecured Claims | Impaired | Yes |
| Class 6 | [Reserved – No Class at this Debtor] | | |

| Class | Type of Claim or Interest | Impairment | Entitled to Vote |
|---|---|---|---|
| Class 7 | Intercompany Claims | Unimpaired / Impaired | No (Presumed to accept / deemed to reject) |
| Class 8 | [Reserved – No Class at this Debtor] | | |
| Class 9 | Intercompany Interests | Unimpaired | No (Presumed to accept) |
| Class 10 | [Reserved – No Class at this Debtor] | | |
| Class 11 | [Reserved – No Class at this Debtor] | | |

### 3.3    *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in this Plan, nothing under this Plan shall affect the rights of the Debtors or the Reorganized Debtors, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

### 3.4    *Subordinated Claims.*

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective Plan Distributions and treatments under this Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors and the Reorganized Debtors reserve the right to reclassify or subordinate any Disputed or Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto, or on any other grounds.

### 3.5    *Elimination of Vacant Classes.*

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from this Plan for purposes of acceptance or rejection of this Plan, and disregarded for purposes of determining whether this Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

### 3.6    *Voting Classes; Presumed Acceptance by Non-Voting Classes.*

With respect to each Debtor, if a Class contained Claims or Interests eligible to vote and no holder of such Claims or Interests, as applicable, votes to accept or reject this Plan, this Plan shall be presumed accepted by the holders of such Claims or Interests, as applicable, in such Class.

3.7    *No Waiver*.

Nothing contained in this Plan shall be construed to waive a Debtor's or other Person's right to object on any basis to any Claim.

## ARTICLE IV.    TREATMENT OF CLAIMS AND INTERESTS.

4.1    ***Claims Against and Interests in SAS AB***.

(a)    Class 1:  Other Secured Claims.

(i)    **Treatment**:  Except to the extent that a holder of an Allowed Other Secured Claim against SAS AB agrees to a less favorable treatment, in full and final satisfaction of such Claim, each holder of an Allowed Other Secured Claim against SAS AB shall receive, at the option of the Debtors or the Reorganized Debtors:

1.    payment in full in Cash on or as soon as reasonably practicable after the later of the Effective Date and the date that is ten Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim;

2.    reinstatement of its Allowed Other Secured Claim; or

3.    other treatment to render such holder's Allowed Other Secured Claim Unimpaired.

(ii)    **Impairment**:  Allowed Other Secured Claims against SAS AB are Unimpaired.

(b)    Class 2:  Other Priority Claims.

(i)    **Treatment**:  Except to the extent that a holder of an Allowed Other Priority Claim against SAS AB agrees to a less favorable treatment, in full and final satisfaction of such Claim, each holder of an Allowed Other Priority Claim against SAS AB shall receive, at the option of the Debtors or the Reorganized Debtors, either:

1.    payment in full in Cash on or as soon as reasonably practicable after the later of the Effective Date and the date that is ten Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim; or

2.    other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

(ii)    **Impairment**:  Allowed Other Priority Claims against SAS AB are Unimpaired.

(c)      <u>Class 3:  Aircraft Lease Claims and Trade Claims</u>.

(i)      **Treatment**:  As soon as reasonably practicable after the later of the Effective Date and the date on which an Aircraft Lease Claim or Trade Claim against SAS AB becomes, as applicable, an Allowed Aircraft Lease Claim or Allowed Trade Claim against SAS AB, each holder of such Allowed Aircraft Lease Claim or Allowed Trade Claim, as the case may be, shall receive, in full and final satisfaction of such Claim, such holder's Pro Rata share of each of the SAS AB New Shares Distribution Pool, the SAS AB GUC Interests, and any Residual SAS AB Available Cash.

(ii)      **Impairment**:  Aircraft Lease Claims and Trade Claims against SAS AB are Impaired.

(d)      <u>Class 4:  Norwegian Term Loan Claims</u>.

(i)      **Treatment**:  On the Effective Date or as soon as reasonably practicable thereafter, each holder of an Allowed Norwegian Term Loan Claim against SAS AB shall receive, in full and final satisfaction of such Claim, such holder's Pro Rata share of each of the SAS AB New Shares Distribution Pool, the SAS AB GUC Interests, and any Residual SAS AB Available Cash.

(ii)      **Impairment**:  Norwegian Term Loan Claims against SAS AB are Impaired.

(e)      <u>Class 5:  Commercial Hybrid Bond Claims, Other General Unsecured Claims, and Intercompany Claims</u>.

(i)      **Treatment**:  As soon as reasonably practicable after the later of the Effective Date and the date on which a Commercial Hybrid Bond Claim, Other General Unsecured Claim, or Intercompany Claim against SAS AB becomes, as applicable, an Allowed Commercial Hybrid Bond Claim (to the extent allowed as a debt claim under Swedish Law), Allowed Other General Unsecured Claim, or Allowed Intercompany Claim against SAS AB, each holder of such Allowed Commercial Hybrid Bond Claim, Allowed Other General Unsecured Claim, or Allowed Intercompany Claim, as the case may be, shall receive, in full and final satisfaction of such Claim, such holder's Pro Rata share of each of the Remaining SAS AB Available Cash and the SAS AB GUC Interests.

(ii)      **Impairment**:  Commercial Hybrid Bond Claims, Other General Unsecured Claims, and Intercompany Claims against SAS AB are Impaired.

36

(f)    Class 8:  Swiss Bond Claims.

    (i)    **Treatment**:  On the Effective Date, all Swiss Bond Claims against SAS AB shall be discharged, cancelled, released, and extinguished, and the holders of such Claims shall not receive any distribution on account of such Claims.

    (ii)    **Impairment**:  Swiss Bond Claims against SAS AB are Impaired under this Plan.

(g)    Class 10:  State Hybrid Bond Claims and Danish State Hybrid Bond Claims.

    (i)    **Treatment**:  On the Effective Date, all State Hybrid Bond Claims and Danish State Hybrid Bond Claims against SAS AB shall be discharged, cancelled, released, and extinguished, and the holders of such Claims shall not receive any distribution on account of such Claims.

    (ii)    **Impairment**:  State Hybrid Bond Claims and Danish State Hybrid Bond Claims against SAS AB are Impaired under this Plan.

(h)    Class 11:  Existing Equity Interests.

    (i)    **Treatment**:  All Existing Equity Interests shall be discharged, cancelled, released, and extinguished on the Effective Date (and registered with the Swedish Companies Registration Office as soon as reasonably practicable thereafter), and the holders of such Interests shall not receive any distribution on account of such Interests.

    (ii)    **Impairment**:  Existing Equity Interests are Impaired under this Plan.

**4.2**    ***Claims Against and Interests in the Consolidated Debtors.***

(a)    Class 1:  Other Secured Claims.

    (i)    **Treatment**:  Except to the extent that a holder of an Allowed Other Secured Claim against the Consolidated Debtors agrees to a less favorable treatment, in full and final satisfaction of such Claim, each holder of an Allowed Other Secured Claim against the Consolidated Debtors shall receive, at the option of the Debtors or the Reorganized Debtors:

    1.    payment in full in Cash on or as soon as reasonably practicable after the later of the Effective Date and the date that is ten Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim;

37

          2.      reinstatement of its Allowed Other Secured Claim; or

          3.      other treatment to render such holder's Allowed Other Secured Claim Unimpaired.

(ii)    **Impairment**:   Allowed Other Secured Claims against the Consolidated Debtors are Unimpaired.

(b)    <u>Class 2:  Other Priority Claims</u>.

(i)    **Treatment**:  Except to the extent that a holder of an Allowed Other Priority Claim against the Consolidated Debtors agrees to a less favorable treatment, in full and final satisfaction of such Claim, each holder of an Allowed Other Priority Claim against the Consolidated Debtors shall receive, at the option of the Debtors or the Reorganized Debtors, either:

          1.      payment in full in Cash on or as soon as reasonably practicable after the later of the Effective Date and the date that is ten Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim; or

          2.      other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

(ii)    **Impairment**:   Allowed Other Priority Claims against the Consolidated Debtors are Unimpaired.

(c)    <u>Class 3:  Aircraft Lease Claims, Trade Claims, and Union Claims</u>.

(i)    **Treatment**:  As soon as reasonably practicable after the later of the Effective Date and the date on which an Aircraft Lease Claim, Trade Claim, or Union Claim against the Consolidated Debtors becomes, as applicable, an Allowed Aircraft Lease Claim, Allowed Trade Claim, or Allowed Union Claim against the Consolidated Debtors, each holder of such Allowed Aircraft Lease Claim, Allowed Trade Claim, or Allowed Union Claim, as the case may be, shall receive, in full and final satisfaction of such Claim, such holder's Pro Rata share of each of the Consolidated Debtors New Shares Distribution Pool and the Consolidated Debtors GUC Interests; *provided, however*, that the distribution on account of the Allowed Pilot Union Claim shall be capped at SEK 100,000,000, with any recovery that would have been distributed on account thereof (but for this proviso) being added to the Consolidated Debtors New Shares Distribution Pool and the Consolidated Debtors GUC Interests for distribution in accordance with the terms of this Plan.

       (ii)     **Impairment**:  Aircraft Lease Claims, Trade Claims, and Union Claims against the Consolidated Debtors are Impaired.

(d)     <u>Class 4:  Danish Term Loan Claims, Swedish Term Loan Claims, and Norwegian Term Loan Claims</u>.

       (i)     **Treatment**:  On the Effective Date or as soon as reasonably practicable thereafter, each holder of an Allowed Swedish Term Loan Claim, Allowed Danish Term Loan Claim, or Allowed Norwegian Term Loan Claim against the Consolidated Debtors, as the case may be, shall receive, in full and final satisfaction of such Claim, such holder's Pro Rata share of each of the Consolidated Debtors New Shares Distribution Pool and the Consolidated Debtors GUC Interests.

       (ii)     **Impairment:**  Swedish Term Loan Claims, Danish Term Loan Claims, and Norwegian Term Loan Claims against the Consolidated Debtors are Impaired.

(e)     <u>Class 5:  Other General Unsecured Claims</u>.

       (i)     **Treatment**:  As soon as reasonably practicable after the later of the Effective Date and the date on which an Other General Unsecured Claim against the Consolidated Debtors becomes an Allowed Other General Unsecured Claim against the Consolidated Debtors, each holder of such Allowed Other General Unsecured Claim shall receive, in full and final satisfaction of such Claim, subject to a proportionate distribution on account of the Intercompany Claim against the Consolidated Debtors held by SAS AB pursuant to <u>Section 4.2(g)(i)</u> of this Plan, such holder's Pro Rata share of each of the Consolidated Debtors Available Cash, the Consolidated Debtors New Shares Distribution Pool, and the Consolidated Debtors GUC Interests.

       (ii)     **Impairment**:  Other General Unsecured Claims against the Consolidated Debtors are Impaired.

(f)     <u>Class 6:  Convenience Class Claims</u>.

       (i)     **Treatment**:  As soon as reasonably practicable after the later of the Effective Date and the date on which an Other General Unsecured Claim against the Consolidated Debtors becomes an Allowed Other General Unsecured Claim against the Consolidated Debtors, each holder of an Allowed Convenience Class Claim shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to 10% of such Allowed Convenience Class Claim to be funded from the Convenience Class Funding Amount.

(ii)     **Impairment**:  Holders of Convenience Class Claims against the Consolidated Debtors are Impaired.

(g)     Class 7:  Intercompany Claims.

(i)     **Treatment**:    Intercompany Claims shall be paid, adjusted, continued, settled, reinstated, discharged, or eliminated in a manner to obtain the most efficient structure for the Debtors at the election of the Debtors or the Reorganized Debtors, with such election to be reasonably acceptable to the Required Investors and made in consultation with the Creditors' Committee; *provided, however*, that any payment, adjustment, continuation, settlement, or reinstatement on account of an Intercompany Claim shall not reduce the amount of the Consolidated Debtors Available Cash, Consolidated Debtors GUC Interests, or Consolidated Debtors New Shares Distribution Pool available to holders of Allowed Claims against the Consolidated Debtors as set forth in this Plan, other than as a result of making a Pro Rata distribution on account of an Intercompany Claim; *provided, further*, that the Intercompany Claim against the Consolidated Debtors held by SAS AB shall receive a distribution from the Consolidated Debtors Available Cash, the Consolidated Debtors GUC Interests, and the Consolidated Debtors New Shares Distribution Pool in amounts such that the Intercompany Claim receives a recovery proportionate to Other General Unsecured Claims against the Consolidated Debtors solely for purposes of distributions under this Plan.

(ii)     **Impairment**:    Holders of Intercompany Claims against the Consolidated Debtors are either Impaired or Unimpaired.

(h)     Class 8:  Swiss Bond Claims.

(i)     **Treatment**:  On the Effective Date, all Swiss Bond Claims against the Consolidated Debtors shall be discharged, cancelled, released, and extinguished, and the holders of such Claims shall not receive any distribution on account of such Claims.

(ii)     **Impairment**:  Swiss Bond Claims against the Consolidated Debtors are Impaired under this Plan.

(i)     Class 9:  Intercompany Interests.

(i)     **Treatment**:  Intercompany Interests in the Consolidated Debtors shall be reinstated.

(ii)     **Impairment**:    Holders of Intercompany Interests in the Consolidated Debtors are Unimpaired.

**4.3**    ***Claims Against and Interests in Gorm Dark Blue Limited.***

(a)    Class 1:  Other Secured Claims.

(i)    **Treatment**:  Except to the extent that a holder of an Allowed Other Secured Claim against Gorm Dark Blue Limited agrees to a less favorable treatment, in full and final satisfaction of such Claim, each holder of an Allowed Other Secured Claim against Gorm Dark Blue Limited shall receive, at the option of the Debtors or the Reorganized Debtors:

1.    payment in full in Cash on or as soon as reasonably practicable after the later of the Effective Date and the date that is ten Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim;

2.    reinstatement of its Allowed Other Secured Claim; or

3.    other treatment to render such holder's Allowed Other Secured Claim Unimpaired.

(ii)    **Impairment**:  Allowed Other Secured Claims against Gorm Dark Blue Limited are Unimpaired.

(b)    Class 2:  Other Priority Claims.

(i)    **Treatment**:  Except to the extent that a holder of an Allowed Other Priority Claim against Gorm Dark Blue Limited agrees to a less favorable treatment, in full and final satisfaction of such Claim, each holder of an Allowed Other Priority Claim against Gorm Dark Blue Limited shall receive, at the option of the Debtors or the Reorganized Debtors, either:

1.    payment in full in Cash on or as soon as reasonably practicable after the later of the Effective Date and the date that is ten Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim; or

2.    other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

(ii)    **Impairment**:  Allowed Other Priority Claims against Gorm Dark Blue Limited are Unimpaired.

(c)    Class 3:  Aircraft Lease Claims.

(i)    **Treatment**:  As soon as reasonably practicable after the later of the Effective Date and the date on which an Aircraft Lease Claim

41

against Gorm Dark Blue Limited becomes an Allowed Aircraft Lease Claim against Gorm Dark Blue Limited, each holder of such Allowed Aircraft Lease Claim shall receive, in full and final satisfaction of such Claim, such holder's Pro Rata share of each of the Gorm Dark Blue New Shares Distribution Pool and the Gorm Dark Blue GUC Interests.

(ii)    **Impairment**:  Aircraft Lease Claims against Gorm Dark Blue Limited are Impaired.

(d)    Class 5:  Other General Unsecured Claims.

(i)    **Treatment**:  As soon as reasonably practicable after the later of the Effective Date and the date on which an Other General Unsecured Claim against Gorm Dark Blue Limited becomes an Allowed Other General Unsecured Claim against Gorm Dark Blue Limited, each holder of such Allowed Other General Unsecured Claim shall receive, in full and final satisfaction of such Claim, such holder's Pro Rata share of each of the Gorm Dark Blue New Shares Distribution Pool and the Gorm Dark Blue GUC Interests.

(ii)    **Impairment**:  Other General Unsecured Claims against Gorm Dark Blue Limited are Impaired.

(e)    Class 7:  Intercompany Claims.

(i)    **Treatment**:    Intercompany Claims shall be paid, adjusted, continued, settled, reinstated, discharged, or eliminated in a manner to obtain the most efficient structure for the Debtors at the election of the Debtors or the Reorganized Debtors, with such election to be reasonably acceptable to the Required Investors and made in consultation with the Creditors' Committee; *provided, however*, that any payment, adjustment, continuation, settlement, or reinstatement on account of an Intercompany Claim shall not reduce the amount of the Gorm Dark Blue New Shares Distribution Pool or Gorm Dark Blue GUC Interests available to holders of Allowed Aircraft Lease Claims and Allowed Other General Unsecured Claims against Gorm Dark Blue Limited, as set forth in this Plan.

(ii)    **Impairment**:  Holders of Intercompany Claims against Gorm Dark Blue Limited are either Impaired or Unimpaired.

(f)    Class 9:  Intercompany Interests.

(i)    **Treatment**:  Intercompany Interests in Gorm Dark Blue Limited shall be reinstated.

42

(ii)    **Impairment**:  Holders of Intercompany Interests in Gorm Dark Blue Limited are Unimpaired.

**4.4**    ***Claims Against and Interests in Gorm Deep Blue Limited.***

(a)    Class 1:  Other Secured Claims.

(i)    **Treatment**:  Except to the extent that a holder of an Allowed Other Secured Claim against Gorm Deep Blue Limited agrees to a less favorable treatment, in full and final satisfaction of such Claim, each holder of an Allowed Other Secured Claim against Gorm Deep Blue Limited shall receive, at the option of the Debtors or the Reorganized Debtors:

1.    payment in full in Cash on or as soon as reasonably practicable after the later of the Effective Date and the date that is ten Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim;

2.    reinstatement of its Allowed Other Secured Claim; or

3.    other treatment to render such holder's Allowed Other Secured Claim Unimpaired.

(ii)    **Impairment**:  Allowed Other Secured Claims against Gorm Deep Blue Limited are Unimpaired.

(b)    Class 2:  Other Priority Claims.

(i)    **Treatment**:  Except to the extent that a holder of an Allowed Other Priority Claim against Gorm Deep Blue Limited agrees to a less favorable treatment, in full and final satisfaction of such Claim, each holder of an Allowed Other Priority Claim against Gorm Deep Blue Limited shall receive, at the option of the Debtors or the Reorganized Debtors, either:

1.    payment in full in Cash on or as soon as reasonably practicable after the later of the Effective Date and the date that is ten Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim; or

2.    other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

(ii)    **Impairment**:  Allowed Other Priority Claims against Gorm Deep Blue Limited are Unimpaired.

(c)    Class 3:  Aircraft Lease Claims.

(i)    **Treatment**:  As soon as reasonably practicable after the later of the Effective Date and the date on which an Aircraft Lease Claim against Gorm Deep Blue Limited becomes an Allowed Aircraft Lease Claim against Gorm Deep Blue Limited, each holder of such Allowed Aircraft Lease Claim shall receive, in full and final satisfaction of such Claim, such holder's Pro Rata share of each of the Gorm Deep Blue New Shares Distribution Pool and the Gorm Deep Blue GUC Interests.

(ii)    **Impairment**:  Aircraft Lease Claims against Gorm Deep Blue Limited are Impaired.

(d)    Class 5:  Other General Unsecured Claims.

(i)    **Treatment**:  As soon as reasonably practicable after the later of the Effective Date and the date on which an Other General Unsecured Claim against Gorm Deep Blue Limited becomes an Allowed Other General Unsecured Claim against Gorm Deep Blue Limited, each holder of such Allowed Other General Unsecured Claim shall receive, in full and final satisfaction of such Claim, such holder's Pro Rata share of each of the Gorm Deep Blue New Shares Distribution Pool and the Gorm Deep Blue GUC Interests.

(ii)    **Impairment**:  Other General Unsecured Claims against Gorm Deep Blue Limited are Impaired.

(e)    Class 7:  Intercompany Claims.

(i)    **Treatment**:    Intercompany Claims shall be paid, adjusted, continued, settled, reinstated, discharged, or eliminated in a manner to obtain the most efficient structure for the Debtors at the election of the Debtors or the Reorganized Debtors, with such election to be reasonably acceptable to the Required Investors and made in consultation with the Creditors' Committee; *provided, however*, that any payment, adjustment, continuation, settlement, or reinstatement on account of an Intercompany Claim shall not reduce the amount of the Gorm Deep Blue New Shares Distribution Pool or Gorm Deep Blue GUC Interests available to holders of Allowed Aircraft Lease Claims and Allowed Other General Unsecured Claims against Gorm Deep Blue Limited, as set forth in this Plan.

(ii)    **Impairment**:  Holders of Intercompany Claims against Gorm Deep Blue Limited are either Impaired or Unimpaired.

44

(f)     Class 9:  Intercompany Interests.

    (i)     **Treatment**:  Intercompany Interests in Gorm Deep Blue Limited shall be reinstated.

    (ii)    **Impairment**:  Holders of Intercompany Interests in Gorm Deep Blue Limited are Unimpaired.

**4.5    _Claims Against and Interests in Gorm Light Blue Limited._**

(a)     Class 1:  Other Secured Claims.

    (i)     **Treatment**:  Except to the extent that a holder of an Allowed Other Secured Claim against Gorm Light Blue Limited agrees to a less favorable treatment, in full and final satisfaction of such Claim, each holder of an Allowed Other Secured Claim against Gorm Light Blue Limited shall receive, at the option of the Debtors or the Reorganized Debtors:

        1.     payment in full in Cash on or as soon as reasonably practicable after the later of the Effective Date and the date that is ten Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim;

        2.     reinstatement of its Allowed Other Secured Claim; or

        3.     other treatment to render such holder's Allowed Other Secured Claim Unimpaired.

    (ii)    **Impairment**:  Allowed Other Secured Claims against Gorm Light Blue Limited are Unimpaired.

(b)     Class 2:  Other Priority Claims.

    (i)     **Treatment**:  Except to the extent that a holder of an Allowed Other Priority Claim against Gorm Light Blue Limited agrees to a less favorable treatment, in full and final satisfaction of such Claim, each holder of an Allowed Other Priority Claim against Gorm Light Blue Limited shall receive, at the option of the Debtors or the Reorganized Debtors, either:

        1.     payment in full in Cash on or as soon as reasonably practicable after the later of the Effective Date and the date that is ten Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim; or

        2.     other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

        (ii)    **Impairment**:  Allowed Other Priority Claims against Gorm Light Blue Limited are Unimpaired.

(c)    <u>Class 3:  Aircraft Lease Claims</u>.

        (i)    **Treatment**:  As soon as reasonably practicable after the later of the Effective Date and the date on which an Aircraft Lease Claim against Gorm Light Blue Limited becomes an Allowed Aircraft Lease Claim against Gorm Light Blue Limited, each holder of such Allowed Aircraft Lease Claim shall receive, in full and final satisfaction of such Claim, such holder's Pro Rata share of each of the Gorm Light Blue New Shares Distribution Pool and the Gorm Light Blue GUC Interests.

        (ii)    **Impairment**:  Aircraft Lease Claims against Gorm Light Blue Limited are Impaired.

(d)    <u>Class 5:  Other General Unsecured Claims</u>.

        (i)    **Treatment**:  As soon as reasonably practicable after the later of the Effective Date and the date on which an Other General Unsecured Claim against Gorm Light Blue Limited becomes an Allowed Other General Unsecured Claim against Gorm Light Blue Limited, each holder of such Allowed Other General Unsecured Claim shall receive, in full and final satisfaction of such Claim, such holder's Pro Rata share of each of the Gorm Light Blue New Shares Distribution Pool and the Gorm Light Blue GUC Interests.

        (ii)    **Impairment**:  Other General Unsecured Claims against Gorm Light Blue Limited are Impaired.

(e)    <u>Class 7:  Intercompany Claims</u>.

        (i)    **Treatment**:  Intercompany Claims shall be paid, adjusted, continued, settled, reinstated, discharged, or eliminated in a manner to obtain the most efficient structure for the Debtors at the election of the Debtors or the Reorganized Debtors, with such election to be reasonably acceptable to the Required Investors and made in consultation with the Creditors' Committee; *provided, however*, that any payment, adjustment, continuation, settlement, or reinstatement on account of an Intercompany Claim shall not reduce the amount of the Gorm Light Blue New Shares Distribution Pool or Gorm Light Blue GUC Interests available to holders of Allowed Aircraft Lease Claims and Allowed Other General Unsecured Claims against Gorm Light Blue Limited, as set forth in this Plan.

        (ii)    **Impairment**:  Holders of Intercompany Claims against Gorm Light Blue Limited are either Impaired or Unimpaired.

(f)    Class 9:  Intercompany Interests.

    (i)    **Treatment**:  Intercompany Interests in Gorm Light Blue Limited shall be reinstated.

    (ii)    **Impairment**:  Holders of Intercompany Interests in Gorm Light Blue Limited are Unimpaired.

**4.6    _Claims Against and Interests in Gorm Ocean Blue Limited._**

(a)    Class 1:  Other Secured Claims.

    (i)    **Treatment**:  Except to the extent that a holder of an Allowed Other Secured Claim against Gorm Ocean Blue Limited agrees to a less favorable treatment, in full and final satisfaction of such Claim, each holder of an Allowed Other Secured Claim against Gorm Ocean Blue Limited shall receive, at the option of the Debtors or the Reorganized Debtors:

        1.    payment in full in Cash on or as soon as reasonably practicable after the later of the Effective Date and the date that is ten Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim;

        2.    reinstatement of its Allowed Other Secured Claim; or

        3.    other treatment to render such holder's Allowed Other Secured Claim Unimpaired.

    (ii)    **Impairment**:  Allowed Other Secured Claims against Gorm Ocean Blue Limited are Unimpaired.

(b)    Class 2:  Other Priority Claims.

    (i)    **Treatment**:  Except to the extent that a holder of an Allowed Other Priority Claim against Gorm Ocean Blue Limited agrees to a less favorable treatment, in full and final satisfaction of such Claim, each holder of an Allowed Other Priority Claim against Gorm Ocean Blue Limited shall receive, at the option of the Debtors or the Reorganized Debtors, either:

        1.    payment in full in Cash on or as soon as reasonably practicable after the later of the Effective Date and the date that is ten Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim; or

        2.    other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

      (ii)     **Impairment**:  Allowed Other Priority Claims against Gorm Ocean Blue Limited are Unimpaired.

(c)    <u>Class 3:  Aircraft Lease Claims</u>.

      (i)     **Treatment**:  As soon as reasonably practicable after the later of the Effective Date and the date on which an Aircraft Lease Claim against Gorm Ocean Blue Limited becomes an Allowed Aircraft Lease Claim against Gorm Ocean Blue Limited, each holder of such Allowed Aircraft Lease Claim shall receive, in full and final satisfaction of such Claim, such holder's Pro Rata share of each of the Gorm Ocean Blue New Shares Distribution Pool and the Gorm Ocean Blue GUC Interests.

      (ii)     **Impairment**:  Aircraft Lease Claims against Gorm Ocean Blue Limited are Impaired.

(d)    <u>Class 5:  Other General Unsecured Claims</u>.

      (i)     **Treatment**:  As soon as reasonably practicable after the later of the Effective Date and the date on which an Other General Unsecured Claim against Gorm Ocean Blue Limited becomes an Allowed Other General Unsecured Claim against Gorm Ocean Blue Limited, each holder of such Allowed Other General Unsecured Claim shall receive, in full and final satisfaction of such Claim, such holder's Pro Rata share of each of the Gorm Ocean Blue New Shares Distribution Pool and the Gorm Ocean Blue GUC Interests.

      (ii)     **Impairment**:  Other General Unsecured Claims against Gorm Ocean Blue Limited are Impaired.

(e)    <u>Class 7:  Intercompany Claims</u>.

      (i)     **Treatment**:  Intercompany Claims shall be paid, adjusted, continued, settled, reinstated, discharged, or eliminated in a manner to obtain the most efficient structure for the Debtors at the election of the Debtors or the Reorganized Debtors, with such election to be reasonably acceptable to the Required Investors and made in consultation with the Creditors' Committee; *provided, however*, that any payment, adjustment, continuation, settlement, or reinstatement on account of an Intercompany Claim shall not reduce the amount of the Gorm Ocean Blue New Shares Distribution Pool or Gorm Ocean Blue GUC Interests available to holders of Allowed Aircraft Lease Claims and Allowed Other General Unsecured Claims against Gorm Ocean Blue Limited, as set forth in this Plan.

      (ii)     **Impairment**:  Holders of Intercompany Claims against Gorm Ocean Blue Limited are either Impaired or Unimpaired.

(f)     Class 9:  Intercompany Interests.

    (i)     **Treatment**:  Intercompany Interests in Gorm Ocean Blue Limited shall be reinstated.

    (ii)    **Impairment**:  Holders of Intercompany Interests in Gorm Ocean Blue Limited are Unimpaired.

**4.7     _Claims Against and Interests in Gorm Sky Blue Limited._**

(a)     Class 1:  Other Secured Claims.

    (i)     **Treatment**:  Except to the extent that a holder of an Allowed Other Secured Claim against Gorm Sky Blue Limited agrees to a less favorable treatment, in full and final satisfaction of such Claim, each holder of an Allowed Other Secured Claim against Gorm Sky Blue Limited shall receive, at the option of the Debtors or the Reorganized Debtors:

        1.     payment in full in Cash on or as soon as reasonably practicable after the later of the Effective Date and the date that is ten Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim;

        2.     reinstatement of its Allowed Other Secured Claim; or

        3.     other treatment to render such holder's Allowed Other Secured Claim Unimpaired.

    (ii)    **Impairment**:  Allowed Other Secured Claims against Gorm Sky Blue Limited are Unimpaired.

(b)     Class 2:  Other Priority Claims.

    (i)     **Treatment**:  Except to the extent that a holder of an Allowed Other Priority Claim against Gorm Sky Blue Limited agrees to a less favorable treatment, in full and final satisfaction of such Claim, each holder of an Allowed Other Priority Claim against Gorm Sky Blue Limited shall receive, at the option of the Debtors or the Reorganized Debtors, either:

        1.     payment in full in Cash on or as soon as reasonably practicable after the later of the Effective Date and the date that is ten Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim; or

        2.     other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

> (ii)    **Impairment**:  Allowed Other Priority Claims against Gorm Sky Blue Limited are Unimpaired.

(c)    Class 3:  Aircraft Lease Claims.

> (i)    **Treatment**:  As soon as reasonably practicable after the later of the Effective Date and the date that on which an Aircraft Lease Claim against Gorm Sky Blue Limited becomes an Allowed Aircraft Lease Claim against Gorm Sky Blue Limited, each holder of such Allowed Aircraft Lease Claim shall receive, in full and final satisfaction of such Claim, such holder's Pro Rata share of each of the Gorm Sky Blue New Shares Distribution Pool and the Gorm Sky Blue GUC Interests.

> (ii)    **Impairment**:  Aircraft Lease Claims against Gorm Sky Blue Limited are Impaired.

(d)    Class 5:  Other General Unsecured Claims.

> (i)    **Treatment**:  As soon as reasonably practicable after the later of the Effective Date and the date on which an Other General Unsecured Claim against Gorm Sky Blue Limited becomes an Allowed Other General Unsecured Claim against Gorm Sky Blue Limited, each holder of such Allowed Other General Unsecured Claim shall receive, in full and final satisfaction of such Claim, such holder's Pro Rata share of each of the Gorm Sky Blue New Shares Distribution Pool and the Gorm Sky Blue GUC Interests.

> (ii)    **Impairment**:  Other General Unsecured Claims against Gorm Sky Blue Limited are Impaired.

(e)    Class 7:  Intercompany Claims.

> (i)    **Treatment**:    Intercompany Claims shall be paid, adjusted, continued, settled, reinstated, discharged, or eliminated in a manner to obtain the most efficient structure for the Debtors at the election of the Debtors or the Reorganized Debtors, with such election to be reasonably acceptable to the Required Investors and made in consultation with the Creditors' Committee; *provided, however*, that any payment, adjustment, continuation, settlement, or reinstatement on account of an Intercompany Claim shall not reduce the amount of the Gorm Sky Blue New Shares Distribution Pool or Gorm Sky Blue GUC Interests available to holders of Allowed Aircraft Lease Claims and Allowed Other General Unsecured Claims against Gorm Sky Blue Limited, as set forth in this Plan.

> (ii)    **Impairment**:  Holders of Intercompany Claims against Gorm Sky Blue Limited are either Impaired or Unimpaired.

50

(f)    Class 9:  Intercompany Interests.

   (i)    **Treatment**:  Intercompany Interests in Gorm Sky Blue Limited shall be reinstated.

   (ii)    **Impairment**:  Holders of Intercompany Interests in Gorm Sky Blue Limited are Unimpaired.

**4.8**    ***Claims Against and Interests in Gorm Asset Management Limited.***

(a)    Class 1:  Other Secured Claims.

   (i)    **Treatment**:  Except to the extent that a holder of an Allowed Other Secured Claim against Gorm Asset Management Limited agrees to a less favorable treatment, in full and final satisfaction of such Claim, each holder of an Allowed Other Secured Claim against Gorm Asset Management Limited shall receive, at the option of the Debtors or the Reorganized Debtors:

   1.    payment in full in Cash on or as soon as reasonably practicable after the later of the Effective Date and the date that is ten Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim;

   2.    reinstatement of its Allowed Other Secured Claim; or

   3.    other treatment to render such holder's Allowed Other Secured Claim Unimpaired.

   (ii)    **Impairment**:  Allowed Other Secured Claims against Gorm Asset Management Limited are Unimpaired.

(b)    Class 2:  Other Priority Claims.

   (i)    **Treatment**:  Except to the extent that a holder of an Allowed Other Priority Claim against Gorm Asset Management Limited agrees to a less favorable treatment, in full and final satisfaction of such Claim, each holder of an Allowed Other Priority Claim against Gorm Asset Management Limited shall receive, at the option of the Debtors or the Reorganized Debtors, either:

   1.    payment in full in Cash on or as soon as reasonably practicable after the later of the Effective Date and the date that is ten Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim; or

   2.    other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

51

(ii)    **Impairment**:  Allowed Other Priority Claims against Gorm Asset Management Limited are Unimpaired.

(c)    Class 7:  Intercompany Claims.

(i)    **Treatment**:    Intercompany Claims shall be paid, adjusted, continued, settled, reinstated, discharged, or eliminated in a manner to obtain the most efficient structure for the Debtors at the election of the Debtors or the Reorganized Debtors, with such election to be reasonably acceptable to the Required Investors and made in consultation with the Creditors' Committee.

(ii)    **Impairment**:  Holders of Intercompany Claims against Gorm Asset Management Limited are either Impaired or Unimpaired.

(d)    Class 9:  Intercompany Interests.

(i)    **Treatment**:  Intercompany Interests in Gorm Asset Management Limited shall be reinstated.

(ii)    **Impairment**:  Holders of Intercompany Interests in Gorm Asset Management Limited are Unimpaired.

**4.9    _Claims Against and Interests in Gorm Engine Management Limited._**

(a)    Class 1:  Other Secured Claims.

(i)    **Treatment**:  Except to the extent that a holder of an Allowed Other Secured Claim against Gorm Engine Management Limited agrees to a less favorable treatment, in full and final satisfaction of such Claim, each holder of an Allowed Other Secured Claim against Gorm Engine Management Limited shall receive, at the option of the Debtors or the Reorganized Debtors:

1.    payment in full in Cash on or as soon as reasonably practicable after the later of the Effective Date and the date that is ten Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim;

2.    reinstatement of its Allowed Other Secured Claim; or

3.    other treatment to render such holder's Allowed Other Secured Claim Unimpaired.

(ii)    **Impairment**:  Allowed Other Secured Claims against Gorm Engine Management Limited are Unimpaired.

(b)    <u>Class 2:  Other Priority Claims</u>.

    (i)    **Treatment**:  Except to the extent that a holder of an Allowed Other Priority Claim against Gorm Engine Management Limited agrees to a less favorable treatment, in full and final satisfaction of such Claim, each holder of an Allowed Other Priority Claim against Gorm Engine Management Limited shall receive, at the option of the Debtors or the Reorganized Debtors, either:

        1.    payment in full in Cash on or as soon as reasonably practicable after the later of the Effective Date and the date that is ten Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim; or

        2.    other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

    (ii)    **Impairment**:  Allowed Other Priority Claims against Gorm Engine Management Limited are Unimpaired.

(c)    <u>Class 7:  Intercompany Claims</u>.

    (i)    **Treatment**:  Intercompany Claims shall be paid, adjusted, continued, settled, reinstated, discharged, or eliminated in a manner to obtain the most efficient structure for the Debtors at the election of the Debtors or the Reorganized Debtors, with such election to be reasonably acceptable to the Required Investors and made in consultation with the Creditors' Committee.

    (ii)    **Impairment**:  Holders of Intercompany Claims against Gorm Engine Management Limited are either Impaired or Unimpaired.

(d)    <u>Class 9:  Intercompany Interests</u>.

    (i)    **Treatment**:  Intercompany Interests in Gorm Engine Management Limited shall be reinstated.

    (ii)    **Impairment**:  Holders of Intercompany Interests in Gorm Engine Management Limited are Unimpaired.

**4.10    *Claims Against and Interests in Gorm Warm Red Limited*.**

(a)    <u>Class 1:  Other Secured Claims</u>.

    (i)    **Treatment**:  Except to the extent that a holder of an Allowed Other Secured Claim against Gorm Warm Red Limited agrees to a less favorable treatment, in full and final satisfaction of such Claim, each holder of an Allowed Other Secured Claim against Gorm Warm Red

Limited shall receive, at the option of the Debtors or the Reorganized Debtors:

1.    payment in full in Cash on or as soon as reasonably practicable after the later of the Effective Date and the date that is ten Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim;

2.    reinstatement of its Allowed Other Secured Claim; or

3.    other treatment to render such holder's Allowed Other Secured Claim Unimpaired.

(ii)    **Impairment**:  Allowed Other Secured Claims against Gorm Warm Red Limited are Unimpaired.

(b)    Class 2:  Other Priority Claims.

(i)    **Treatment**:  Except to the extent that a holder of an Allowed Other Priority Claim against Gorm Warm Red Limited agrees to a less favorable treatment, in full and final satisfaction of such Claim, each holder of an Allowed Other Priority Claim against Gorm Warm Red Limited shall receive, at the option of the Debtors or the Reorganized Debtors, either:

1.    payment in full in Cash on or as soon as reasonably practicable after the later of the Effective Date and the date that is ten Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim; or

2.    other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

(ii)    **Impairment**:  Allowed Other Priority Claims against Gorm Warm Red Limited are Unimpaired.

(c)    Class 7:  Intercompany Claims.

(i)    **Treatment**:  Intercompany Claims shall be paid, adjusted, continued, settled, reinstated, discharged, or eliminated in a manner to obtain the most efficient structure for the Debtors at the election of the Debtors or the Reorganized Debtors, with such election to be reasonably acceptable to the Required Investors and made in consultation with the Creditors' Committee.

(ii)    **Impairment**:  Holders of Intercompany Claims against Gorm Warm Red Limited are either Impaired or Unimpaired.

(d)    Class 9:  Intercompany Interests.

    (i)    **Treatment**:  Intercompany Interests in Gorm Warm Red Limited shall be reinstated.

    (ii)    **Impairment**:  Holders of Intercompany Interests in Gorm Warm Red Limited are Unimpaired.

**4.11    *Claims Against and Interests in SANA*.**

(a)    Class 1:  Other Secured Claims.

    (i)    **Treatment**:  Except to the extent that a holder of an Allowed Other Secured Claim against SANA agrees to a less favorable treatment, in full and final satisfaction of such Claim, each holder of an Allowed Other Secured Claim against SANA shall receive, at the option of the Debtors or the Reorganized Debtors:

        1.    payment in full in Cash on or as soon as reasonably practicable after the later of the Effective Date and the date that is ten Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim;

        2.    reinstatement of its Allowed Other Secured Claim; or

        3.    other treatment to render such holder's Allowed Other Secured Claim Unimpaired.

    (ii)    **Impairment**:  Allowed Other Secured Claims against SANA are Unimpaired.

(b)    Class 2:  Other Priority Claims.

    (i)    **Treatment**:  Except to the extent that a holder of an Allowed Other Priority Claim against SANA agrees to a less favorable treatment, in full and final satisfaction of such Claim, each holder of an Allowed Other Priority Claim against SANA shall receive, at the option of the Debtors or the Reorganized Debtors, either:

        1.    payment in full in Cash on or as soon as reasonably practicable after the later of the Effective Date and the date that is ten Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim; or

        2.    other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

        (ii)    **Impairment**:  Allowed Other Priority Claims against SANA are Unimpaired.

(c)    <u>Class 5:  Other General Unsecured Claims</u>.

        (i)    **Treatment**:  As soon as reasonably practicable after the later of the Effective Date and the date on which an Other General Unsecured Claim against SANA becomes an Allowed Other General Unsecured Claim against SANA, each holder of such Allowed Other General Unsecured Claim shall receive, in full and final satisfaction of such Claim, such holder's Pro Rata share of the SANA Available Cash.

        (ii)    **Impairment**:  Other General Unsecured Claims against SANA are Impaired.

(d)    <u>Class 7:  Intercompany Claims</u>.

        (i)    **Treatment**:  Intercompany Claims shall be paid, adjusted, continued, settled, reinstated, discharged, or eliminated in a manner to obtain the most efficient structure for the Debtors at the election of the Debtors or the Reorganized Debtors, with such election to be reasonably acceptable to the Required Investors and made in consultation with the Creditors' Committee; *provided, however*, that any payment, adjustment, continuation, settlement, or reinstatement on account of an Intercompany Claim shall not reduce the amount of the SANA Available Cash available to holders of Allowed Other General Unsecured Claims against SANA as set forth in this Plan.

        (ii)    **Impairment**:  Holders of Intercompany Claims against SANA are either Impaired or Unimpaired.

(e)    <u>Class 9:  Intercompany Interests</u>.

        (i)    **Treatment**:  Intercompany Interests in SANA shall be reinstated.

        (ii)    **Impairment**:  Holders of Intercompany Interests in SANA are Unimpaired.

## ARTICLE V.    MEANS FOR IMPLEMENTATION.

### 5.1    *<u>Substantive Consolidation</u>.*

This Plan provides for the substantive consolidation only of the Consolidated Debtors, exclusively for the purposes set forth herein, and otherwise shall be implemented without any substantive consolidation.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to sections 105(a) and 1123(a)(5)(C) of the Bankruptcy Code of the substantive consolidation of the Consolidated Debtors exclusively for voting and distribution purposes, on the basis that the substantive consolidation of the Consolidated Debtors to the extent set forth herein is (i) in exchange for good and valuable consideration provided by each of the Consolidated Debtors (including performance of the terms of this Plan), (ii) in the best interests of the Debtors, the Reorganized Debtors, the Estates, and all holders of Claims, and (iii) fair, equitable, and reasonable.  In furtherance of the foregoing, (a) all assets and liabilities of the Consolidated Debtors shall be treated as though they are pooled, (b) each Claim filed or to be filed against any Consolidated Debtor shall be deemed filed as a single Claim against, and a single obligation of, the Consolidated Debtors, (c) any joint or several liability of any Consolidated Debtor shall be one obligation of the Consolidated Debtors and any Claims based upon such joint or several liability shall be treated as one Claim against the Consolidated Debtors, and (d) any guarantee of a Consolidated Debtor of the payment, performance, or collection of an obligation of another Consolidated Debtor shall be eliminated and cancelled.

The deemed substantive consolidation of the Consolidated Debtors under this Plan shall not (other than for purposes related to voting and distribution) affect the legal and organizational structure of the Debtors or the Reorganized Debtors.

**5.2**    ***Implementation of Restructuring.***

(a)    Subject to the satisfaction of the conditions set forth in <u>Article VIII</u> of the Investment Agreement or the waiver thereof by the party entitled to waive that condition, on the Effective Date, Reorganized SAS AB shall issue New Shares and New Convertible Notes to the Investors for an aggregate purchase price equal to the Total Share Subscription Amount and the New Convertible Notes Amount, respectively, subject to and in accordance with the terms and conditions of this Plan, the Investment Agreement, the New Convertible Notes Indenture, the Governance Term Sheet, the Shareholders' Agreement, the Recipient Shareholders' Agreement, the Articles, and any consents or approvals required under each of the foregoing.  Accordingly, the Restructuring shall include:

(i)    a total investment in Reorganized SAS AB corresponding to $1,200,000,000, comprised of $475,000,000 in New Shares and $725,000,000 in New Convertible Notes; and

(ii)    the allocation of up to $325,000,000 in value to holders of Allowed General Unsecured Claims as set forth herein, subject to the establishment of one or more GUC Entities, through a combination of the Available Cash, the GUC Interests (including, for the avoidance of doubt, any value distributed on account thereof), and the New Shares Distribution Pool.

(b)    Following the Closing (as defined in the Investment Agreement), but prior to any conversion of the New Convertible Notes, the New Shares and the New Convertible Notes are expected to be held as follows:

| Party | New Shares (Approx.) | New Convertible Notes |
|---|---|---|
| Castlelake | 32.0% | 55.2% |
| Danish State Investor | 25.8% | 30.0% |
| Air France-KLM | 19.9% | 4.8% |
| Lind Invest | 8.6% | 10.0% |
| Holders of certain Allowed Claims | 13.6% | 0.0% |

(c)    Subject to the terms and conditions of this Plan (including, for the avoidance of doubt, receipt by Reorganized SAS AB of any deliverables required pursuant to Section 5.16 of this Plan) and the Investment Agreement, on the Effective Date, or as soon as practicable thereafter, Reorganized SAS AB shall issue New Shares to the holders of certain Allowed Claims that are entitled to receive a recovery from the New Shares Distribution Pool, subject to Section 6.11 and Section 6.12 of this Plan.  Each New Share shall be issued at the Share Subscription Price (as defined in the Investment Agreement).

(d)    Unless otherwise determined by the Investors and the Debtors (including, for the avoidance of doubt, the board of SAS AB), the Debtors intend in accordance with the conditions precedent provided for in the Investment Agreement, following the Confirmation Date, to implement the Restructuring in Sweden pursuant to the Swedish SAS AB Reorganization and, in connection therewith, cancel, and cause a delisting of, the Existing Equity Interests and other applicable Securities.  The Debtors, the Investors, and the Creditors' Committee shall cooperate in good faith regarding the actions to be taken in the Swedish SAS AB Reorganization.

(e)    Upon the Confirmation Date, the Debtors shall be authorized to take any and all actions necessary to consummate the Transaction, including the commencement of the Swedish SAS AB Reorganization, subject to any conditions provided for in the Swedish Reorganization Plan and any orders or resolutions of the Swedish Court, without the need for any further order of the Bankruptcy Court, and without any further action by holders of Claims or Interests.

### 5.3    *Contribution Fees.*

On the Effective Date, the States shall receive the Initial Contribution Fees from the Convertible Notes Purchasers, in each case in accordance with the Investment Agreement (subject to adjustments on the Effective Date for the Closing FX Rate and as provided in Section 6.3 of the Investment Agreement), and the Escrow Contribution Fees shall be deposited in the Contribution Fee Escrow Account.  Following the Effective Date, the Escrow Contribution Fees shall be paid from the Contribution Fee Escrow Account, after taking into account the payments and adjustments made pursuant to the Investment Agreement, in accordance with the Contribution Fee Escrow Agreement.

### 5.4    *Reserved Funds, GUC Entity, and Contribution Fee Escrow Account.*

(a)    On the Effective Date, (i) one or more GUC Entities shall be established and, as soon as practically possible thereafter in order to allow for the SCRO Registration, shall be funded by the Reorganized Debtors with a portion of the GUC Cash in accordance with this Plan and the GUC Documents and (ii) the Contribution Fee Escrow Account shall be established and shall be funded by the Convertible Notes Purchasers with the Escrow Contribution Fees, in each case in accordance with the Investment Agreement, this Plan, and the Swedish Reorganization Plan. The Reorganized Debtors shall pay all costs related to the establishment of the GUC Entities up to a maximum of $200,000 (including any mutually agreeable reserves, as shall be agreed in the Plan Supplement).

(b)    The GUC Entities and the Contribution Fee Escrow Account shall be funded with Cash in the aggregate amount of the Reserved Funds, with a portion of the GUC Cash and the Escrow Contribution Fees used to constitute the Reserved Funds to be allocated to the GUC Entities, on the one hand, and the Contribution Fee Escrow Account, on the other hand, in amounts relatively proportionate to the amount of the Total Distributable Value as compared to the amount of the Contribution Fees.

(c)    Subject to Section 5.4(h), the Reserved Funds shall be utilized and released as follows, as set forth in order of priority of payment:

(i)    First, for amounts required by the Debtors or the Reorganized Debtors (A) after the Effective Date to defend themselves against a State Non-Tax Claim; *provided, however*, that the Reorganized Debtors shall be solely responsible for and fund the first SEK 25,000,000 in amounts payable pursuant to this Section 5.4(c)(i)(A), and (B) to satisfy any costs or expenses related to a third party irrevocably agreeing to pay in full, without recourse to the Reorganized Debtors, any State Non-Tax Claim, as set forth in Section 5.4(d)(iii) of this Plan;

(ii)    Second, in the event of (A) a final and non-appealable decision from a competent court requiring any one or more of the Reorganized Debtors to pay any State Non-Tax Claim, or (B) a determination by the Reorganized Debtors to settle all or a portion of any State Non-Tax Claim, the Reserved Funds shall be released for the Reorganized Debtors to pay that State Non-Tax Claim or settlement amount, as applicable, when due and payable, to the extent a third party as contemplated in Section 5.4(d)(iii) of this Plan has not already paid, or irrevocably agreed to pay, such State Non-Tax Claim *provided, however*, that, in the event of a determination to settle any State Non-Tax Claim prior to entry of a final order requiring any Reorganized Debtor to pay any State Non-Tax Claim, any release of the Reserved Funds pursuant to this section shall require the consent of the Creditor Oversight Committee, which

consent shall not be unreasonably withheld, conditioned, or delayed; and

(iii)     Third, in the event the Reserved Funds exceed all amounts paid pursuant to clause (i) above and any and all payments by the Reorganized Debtors described in clause (ii) above, any residual amount of GUC Cash (and any earnings thereon) in the GUC Entities shall be released for distribution to holders of GUC Interests in accordance with this Plan and any residual amount in the Contribution Fee Escrow Account shall be released to the Kingdom of Sweden and the Danish State Investor for payment of any unpaid portion of the Contribution Fees in accordance with Section 5.4(f) of this Plan and the Swedish Reorganization Plan; *provided, however*, that if there is an interim distribution from the Reserved Funds in accordance with Section 5.4(h), the remainder of the Reserved Funds shall remain intact unless and until the occurrence of any event pursuant to Section 5.4(c)(i) or Section 5.4(c)(ii) that would trigger the use of such remaining Reserved Funds.

(d)     Notwithstanding the foregoing, any Cash remaining in any of the GUC Entities after the utilization of any amounts required pursuant to Section 5.4(c)(i) or Section 5.4(c)(ii) of this Plan, to the extent applicable, shall be released to the holders of GUC Interests on the earliest to occur of:

(i)     December 31, 2033, if the States have not in any way asserted any State Non-Tax Claim, within the meaning of Section 5 of the Swedish Statute of Limitations (Sw. *5 § Preskriptionslagen (1981:130)*), or Chapter 5 or Chapter 6 of the Danish Statute of Limitations (Da. *Forældelsesloven*);

(ii)     the final resolution of all State Non-Tax Claims as determined by Reorganized SAS AB, it being understood and agreed that the GUC Documents may contain provisions identifying the conditions under which a final resolution of all State Non-Tax Claims shall be deemed to have occurred, which provisions shall, notwithstanding anything to the contrary herein, be acceptable to the Required Investors in their sole and absolute discretion;

(iii)     a third party agreement, acceptable to the Debtors and the Investors, with such consent not to be unreasonably withheld, irrevocably providing for payment in full, without recourse to the Reorganized Debtors, of any and all State Non-Tax Claims; and

(iv)     an agreement between the Reorganized Debtors and the Investors to release the Reserved Funds.

(e)     Subject to the availability and release of GUC Cash in the GUC Entities as set forth above, the holders of GUC Interests shall be entitled to distributions of any GUC Cash in the applicable GUC Entity to which their GUC Interests relate in accordance with this Plan and the terms of the GUC Documents. The GUC Entities shall be governed by the applicable GUC Documents and administered by an independent manager or trustee or the appropriate governing body of such GUC Entity as set forth in the GUC Documents. The GUC Interests shall be passive and shall not have voting, consent, or other shareholder-like control rights with respect to the GUC Entities or the Reorganized Debtors.

(f)     Upon the occurrence of a distribution of the GUC Cash in the GUC Entities to the holders of the applicable GUC Interests, there shall be a corresponding distribution from the Contribution Fee Escrow Account to pay the applicable remaining amounts of the Contribution Fees pursuant to a joint release instruction delivered by the applicable Reorganized Debtor and the States based on the gross amount of the GUC Cash distributed from all GUC Entities, in the aggregate, to holders of GUC Interests *plus* the amount of GUC Cash used from the GUC Entities pursuant to Section 5.4(c)(i). For the avoidance of doubt, the amount distributed to the States on account of the Contribution Fees shall not include any portion of the Cash held by the Holding Period Trustee.

(g)     To the extent no or no further distributions can be made from the Contribution Fee Escrow Account, the remaining funds in the Contribution Fee Escrow Account shall be distributed to the Reorganized Debtors pursuant to a joint release instruction delivered by the applicable Reorganized Debtor and the States.

(h)     Notwithstanding anything to the contrary in this Section 5.4, any interest or investment income accrued or earned by any GUC Entity during the period beginning on the Effective Date and ending on the date of any final distribution of the GUC Cash pursuant to this Section 5.4, may be used and released by the GUC Entity in the following order: (1) to pay costs and expenses associated with establishing, operating, and administering the GUC Entities; (2) to establish a reserve for future costs and expenses associated with establishing, operating, and administering the GUC Entities; and (3) on an annual basis, as a distribution to holders of such GUC Entities' GUC Interests, in each case, as set forth in the applicable GUC Documents. Prior to any such payment or distribution, such interest and investment income shall be held by the applicable GUC Entity in accounts segregated from the principal amount of the Reserved Funds.

(i)     The GUC Cash in the GUC Entities shall be invested to earn interest or investment income pursuant to investment guidelines agreed to between Reorganized SAS, the Creditors' Committee, and the Required Investors and shall be set forth in the GUC Agreement.

(j)     As may be necessary or advisable to comply with applicable law, including applicable securities laws, as determined by the Debtors (but subject to the applicable consent or consultation rights of the Investors or the Creditors' Committee as set forth herein):

    (i)     unless waived by the Debtors, each holder of an Allowed General Unsecured Claim in (A) Classes 3, 4, and 5 with respect to SAS AB and the Consolidated Debtors and (B) Classes 3 and 5 with respect to the Gorm Blue Entities, in each case, shall be required to deliver

to the Debtors prior to the Effective Date, as conditions precedent to the receipt of any GUC Interests, such certifications regarding such Person's identity, residence, and level of sophistication (for example, a U.S. Person vs. non-U.S. Person, an "accredited investor" or a "qualified purchaser") and supporting documentation as reasonably requested by the Debtors to determine such Person's eligibility to receive GUC Interests;

(ii)    if any Person is a Disqualified Person, the Debtors may elect, and may direct any applicable GUC Entity, not to distribute any GUC Interests to such Disqualified Person unless and until the requirements of Section 5.4(j)(i) have been satisfied;

(iii)   to the extent set forth in or required by the GUC Documents, on or after the Effective Date, pursuant to the terms and conditions as will be set forth in the Plan Supplement, the Debtors or any GUC Entity, as applicable, may deliver GUC Interests to which a Disqualified Person or ineligible person (as will be defined in the Plan Supplement)[9] might otherwise be entitled under this Plan to the Holding Period Trustee to, among other things, hold such GUC Interests in trust for the benefit of any Disqualified Person or ineligible person (as will be defined in the Plan Supplement) and, if applicable, sell such GUC Interests and distribute the Cash proceeds of such GUC Interests to such Disqualified Person or ineligible person (as will be defined in the Plan Supplement), in accordance with the terms of the GUC Holding Period Trust Agreement;

(iv)    to the extent set forth in or required by the GUC Documents, to the extent any GUC Interests shall be transferrable, the Debtors may elect to, or direct the GUC Entities to, distribute to such ineligible person (as will be defined in the Plan Supplement) alternative GUC Interests (which interests, for the avoidance of doubt, shall be non-transferable); and

(v)     The distribution of the GUC Interests shall occur or be deemed to have occurred in accordance with the GUC Implementation Steps.

### 5.5    *Compromise and Settlement of Claims, Interests, and Controversies*.

Subject to approval by the Bankruptcy Court in connection with confirmation of this Plan, the provisions of this Plan and other documents entered into in connection with this Plan constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, and

---

[9] For informational purposes only, at the present time, it is currently anticipated that "Ineligible Person" shall be defined as any holder of Allowed General Unsecured Claims in (i) Classes 3, 4, and 5 with respect to SAS AB and the Consolidated Debtors and (ii) Classes 3 and 5 with respect to the Gorm Blue Entities that is a (a) a "U.S. Person" as such term is defined in Section 902(k)(1) of Regulation S of the Securities Act of 1933, as amended and (b) not a "qualified purchaser" (within the meaning of the Investment Company Act of 1940, as amended).

controversies resolved pursuant to this Plan. This Plan shall be deemed a motion to approve the compromises and settlements contained in this Plan and the good faith compromise and settlement of all of the Claims, Interests, Causes of Action, and controversies described in the foregoing sentence pursuant to sections 363 and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromises and settlements, as well as a finding by the Bankruptcy Court that the compromises and settlements are fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.

### 5.6    *Continued Corporate Existence; Effectuating Documents; Further Transactions*.

(a)    Except as otherwise provided in this Plan, the Debtors shall continue to exist after the Effective Date as Reorganized Debtors in accordance with the applicable laws of the respective jurisdictions in which they are incorporated or organized and pursuant to their respective organizational documents in effect prior to the Effective Date, except to the extent such documents are amended by this Plan or otherwise.

(b)    On or after the Effective Date, each Reorganized Debtor may, in its sole discretion, take such action as permitted by applicable Law and such Reorganized Debtor's Amended Organizational Documents, as such Reorganized Debtor may determine is reasonable and appropriate, including causing (i) a Reorganized Debtor to be dissolved, (ii) the legal name of a Reorganized Debtor to be changed, or (iii) the closure of a Reorganized Debtor's Chapter 11 Case on the Effective Date or any time thereafter, and such action and documents shall require (and are deemed to require) no further notice to or action, order, or approval of the Bankruptcy Court or any other court of competent jurisdiction (other than any requisite filings required under applicable Law).

(c)    On or after the Effective Date, the Reorganized Debtors are authorized to and may issue, execute, deliver, file or record such contracts, Securities, instruments, releases, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of this Plan in the name of and on behalf of the Reorganized Debtors without the need for any approvals, authorization, or consents, except for those expressly required pursuant to this Plan and applicable Swedish Law.

(d)    On the Effective Date or as soon as reasonably practicable thereafter, the Debtors or the Reorganized Debtors, as applicable, may take all actions consistent with this Plan as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring under and in connection with this Plan, including (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of this Plan and that satisfy the requirements of applicable Law and have other terms to which the applicable parties agree, (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of this Plan and having other terms to which the applicable parties agree, and (iii) all other actions that the Debtors

or Reorganized Debtors, as applicable, determine to be necessary, desirable, or appropriate to implement, effectuate, and consummate this Plan or the transactions contemplated hereby.

5.7     *Corporate Action*.

(a)     Upon the Effective Date, all actions contemplated by this Plan shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified, in each case without any requirement for further action by holders of Claims or Interests, the Debtors, or any other Entity or Person. All matters provided for in this Plan involving the corporate structure of the Debtors, and any corporate action required by the Debtors in connection therewith, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Debtors or the Estates.

(b)     On or (as applicable) before the Effective Date, the appropriate directors, officers, and managers of the Debtors shall be authorized and directed to issue, execute, and deliver the agreements, documents, and instruments contemplated by this Plan (or necessary or desirable to effect the transactions contemplated by this Plan, including the Transaction) in the name of and on behalf of the Reorganized Debtors. The authorizations and approvals contemplated by this Section 5.7 shall be effective notwithstanding any requirements under nonbankruptcy Law, unless otherwise determined by the Debtors or the Reorganized Debtors, as applicable, to comply with any applicable corporate authorizations or approvals that may be required in accordance with Danish, Irish, Norwegian, or Swedish Law.

5.8     *Cancellation of Existing Securities, Liens, and Agreements*.

(a)     Except (i) for the purpose of evidencing a right to a distribution under this Plan, (ii) as otherwise set forth in this Plan, including with respect to executory contracts or unexpired leases that shall be assumed by the Reorganized Debtors, (iii) as it relates to Existing Letters of Credit, surety bonds, insurance bonds, financial assurances, and other similar instruments (as amended, restated, renewed, modified, supplemented, extended, confirmed, or counter-guaranteed from time to time) issued to or on behalf of the Debtors, and (iv) as otherwise set forth in the Definitive Documents or the Confirmation Order, on the Effective Date, all agreements, instruments, notes, certificates evidencing debt of the Debtors, indentures, Securities, mortgages, and other documents evidencing any Claim or Interest (other than Intercompany Claims and Intercompany Interests, to the extent they are not modified by this Plan) and any rights of any holder in respect thereof shall be deemed cancelled and of no force or effect, and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged; *provided, however*, that, in the case of the applicable DIP Loan Documents, the foregoing shall apply upon satisfaction in full of all DIP Obligations in accordance with the applicable DIP Loan Documents. The holders of or parties to such cancelled instruments, debt, Interests, Securities, and other documentation shall have no rights arising from or related to such instruments, debt, Interests, Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to this Plan.

(b)     Upon the full payment or other satisfaction of an Allowed Other Secured Claim (or other treatment hereunder that results in the release of a Lien), or promptly thereafter, the holder of such Allowed Other Secured Claim shall deliver to the Debtors or Reorganized

Debtors, as applicable, any collateral or other property of a Debtor held by such holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Other Secured Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or lis pendens, or similar interests or documents.

(c)    Subject to <u>Section 3.02</u> of the DIP Credit Agreement and any security documents governed by Danish, English, Irish, Norwegian, or Swedish Law, upon the satisfaction of all DIP Claims in accordance with this Plan, (i) all DIP Claims shall be automatically and irrevocably released and discharged, (ii) all DIP Liens and all related instruments, agreements, and other documents executed by any of the Debtors shall be automatically, absolutely, unconditionally, irrevocably, and forever terminated, released, re-assigned, and discharged, and (iii) the DIP Agent shall deliver a customary payoff letter reasonably acceptable to the DIP Agent, DIP Lenders, and the Reorganized Debtors, pursuant to which the Reorganized Debtors shall be authorized, and the DIP Agent will be obligated, to take all steps and/or execute and/or deliver all instruments or documents, in each case, required to effect the release of the DIP Liens and/or reflect on the public record the consummation of the payoff, releases, and terminations contemplated thereby.

(d)    Notwithstanding the foregoing, any provision in any agreement, instrument, note, certificate evidencing debt of the Debtors, indenture, mortgage, Security, or other document that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtors of their interests as a result of the cancellations, terminations, satisfaction, releases, or discharges provided for in this <u>Section 5.8</u> shall be (and be deemed) null and void and shall be of no force and effect.

### 5.9    *Authorization and Issuance of New Shares*.

Upon the Closing Date, subject to applicable Swedish Law, Reorganized SAS AB is authorized to issue or cause to be issued and shall issue the New Shares (which, as soon as practicable thereafter, shall be registered with the SCRO) and the New Convertible Notes for distribution in accordance with the terms of this Plan and the Investment Agreement without the need for any further corporate or shareholder action. All of the New Shares and New Convertible Notes issuable under this Plan, when so issued, shall be duly authorized, validly issued, fully paid, and non-assessable.

### 5.10    *Exemption from Securities Laws*.

(a)    The offer, issuance, and distribution of the New Shares pursuant to this Plan, including pursuant to the Transaction, except for the Non-1145 Equity and the Non-1145 Convertible Notes, shall be exempt, pursuant to section 1145 of the Bankruptcy Code, without further act or actions by any Person, from registration under the Securities Act, and all rules and regulations promulgated thereunder, any state or local Law requiring registration for the offer, issuance, or distribution of such New Shares, and any other applicable securities laws, to the fullest extent permitted by section 1145 of the Bankruptcy Code. Such New Shares issued pursuant to section 1145(a) of the Bankruptcy Code may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(a)(1) of the

65

Securities Act, subject to (i) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an "underwriter" in section 2(a)(11) of the Securities Act; (ii) the holder (a) not being an "affiliate" of Reorganized SAS AB as defined in Rule 144(a)(1) under the Securities Act, (b) not having been such an "affiliate" within 90 days of such transfer and/or (c) not having acquired such securities from an "affiliate" within one year of such transfer (other than, with respect to clause (ii), such resales as may be permitted by and subject to the conditions of Rule 144 of the Securities Act); (iii) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments; (iv) compliance with Swedish securities laws and other applicable securities laws; (v) the transfer provisions, if any, and other applicable provisions contained in the Shareholders' Agreement and the Recipient Shareholders' Agreement; and (vi) any applicable regulatory approval.  In addition, such section 1145 exempt Securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.  Transfers of such securities will also be subject to the transfer restrictions, if any, and other applicable provisions set forth in the Shareholders' Agreement and the Recipient Shareholders' Agreement.

(b)    The offer, issuance, and distribution of the Non-1145 Equity and Non-1145 Convertible Notes pursuant to this Plan, including pursuant to the Transaction, is being made outside of the United States in accordance with Swedish securities laws and other applicable securities laws.  To the extent any Non-1145 Equity or Non-1145 Convertible Notes are issued to U.S. Persons on the Closing Date or any later date pursuant to this Plan, such issuance is being made in reliance on the exemption from registration set forth in section 4(a)(2) of the Securities Act.  Such securities will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act, such as, under certain conditions, the resale provisions of Rule 144 of the Securities Act.  Transfers of such securities will also be subject to the transfer restrictions, if any, and other applicable provisions set forth in the Shareholders' Agreement and the Recipient Shareholders' Agreement.

(c)    The Plan Supplement shall set forth the securities laws considerations, if any, applicable to any GUC Interests.

### 5.11    *Officers and Boards of Directors*.

(a)    The identities of the directors and officers shall, to the extent known, be disclosed in the Plan Supplement.  The composition of the New Boards shall be identified no later than the Confirmation Hearing.  Nothing herein shall alter any party's rights under the Governance Term Sheet.

(b)    Except as otherwise provided in the Plan Supplement, the officers of the respective Reorganized Debtors immediately before the Effective Date, as applicable, shall serve as the initial officers of each of the respective Reorganized Debtors on and after the Effective Date. After the Effective Date, the selection of officers of the Reorganized Debtors shall be as provided by their respective Amended Organizational Documents.

(c)    Except to the extent that a member of the board of directors or a manager, as applicable, of a Debtor continues to serve as a director or manager of such Debtor on and after the Effective Date, the members of the board of directors or managers, as applicable, of each Debtor prior to the Effective Date, in their capacities as such, shall have no continuing obligations or duties to the Reorganized Debtors on or after the Effective Date, and each such director or manager shall be deemed to have resigned or shall otherwise cease to be a director or manager of the applicable Debtor on the Effective Date.  Commencing on the Effective Date, each of the directors and managers, as applicable, of each of the Reorganized Debtors shall be deemed elected and serve pursuant to the terms of the applicable Amended Organizational Documents of such Reorganized Debtor and may be replaced or removed in accordance with such Amended Organizational Documents and applicable non-bankruptcy Law.

### 5.12    *Separate Plans*.

Notwithstanding the combination of separate plans of reorganization for the Debtors set forth in this Plan for purposes of economy and efficiency, this Plan constitutes a separate chapter 11 plan for each Debtor, other than with respect to the Consolidated Debtors. Accordingly, other than with respect to the Consolidated Debtors, if the Bankruptcy Court does not confirm this Plan with respect to one or more Debtors, it may still confirm this Plan with respect to any other Debtor that satisfies the confirmation requirements of section 1129 of the Bankruptcy Code.

### 5.13    *Tax Structure*.

To the extent reasonably practicable and as far as is legally possible, the Restructuring and the Transaction (including, for the avoidance of doubt, the structuring, formation and any other transactions in respect of the GUC Entities) shall be structured in a manner to obtain the most efficient structure for the Debtors and the Post-Closing Company Shareholders (as defined in the Investment Agreement), as determined by the Debtors and the Investors in consultation with the Creditors' Committee.

### 5.14    *Closing of Chapter 11 Cases*.

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.  As of the Effective Date, the Reorganized Debtors may submit separate orders to the Bankruptcy Court under certification of counsel closing certain individual Chapter 11 Cases and changing the caption of the Chapter 11 Cases accordingly.  Matters concerning Claims may be heard and adjudicated in a Debtor's Chapter 11 Case that remains open regardless of whether the applicable Claim is against a Debtor in a chapter 11 case that is closed.  Nothing in this Plan shall authorize the closing of any case *nunc pro tunc* to a date that precedes the date any such order is entered.  Any request for *nunc pro tunc* relief shall be made on motion served on the United States Trustee, and the Bankruptcy Court shall rule on such request after notice and a hearing.  Upon the filing of a motion to close the last Chapter 11 Case remaining open, the Reorganized Debtors shall file a final report with respect to all of the Chapter 11 Cases pursuant to Local Rule 3022-1(c).

### 5.15   *Amended Organizational Documents*.

The prohibition of the issuance of non-voting equity securities, to the extent required by section 1123(a)(6) of the Bankruptcy Code, shall be addressed in the Amended Organizational Documents, the Shareholders' Agreement, the Recipient Shareholders' Agreement, or pursuant to an undertaking by the shareholders of each Debtor, in each case, to the extent permitted pursuant to applicable non-U.S. Law governing each Debtor.  After the Effective Date, the Reorganized Debtors may amend and restate their respective Amended Organizational Documents and other related documents as permitted by the laws of their respective states or countries of incorporation or formation, and their respective Amended Organizational Documents, without further order of the Bankruptcy Court.

### 5.16   *New Shares*.

The Investors shall enter into the Shareholders' Agreement on or after the Effective Date.  Any Entity that will receive New Shares pursuant to this Plan shall be required to deliver to the Debtors, as conditions precedent to the receipt of the New Shares, (i) a signature page to the Recipient Shareholders' Agreement, *provided, however*, that such requirement may be removed if determined to be unnecessary by the Debtors and the Required Investors based on the terms of the Articles of Reorganized SAS AB; (ii) any documentation reasonably requested by the Debtors in order to effect the issuance and registration of the New Shares with the SCRO, including (A) a signed subscription list, provided by the Debtors by a reasonable deadline prior to the Effective Date and (B) any documentation required for the payment of the aggregate Share Subscription Price for the New Shares, including evidence that the relevant Allowed Claim has been contributed to SAS AB either through set-off (Sw. *kvittning*) or payment-in-kind (Sw. *apport*) and that any portion of such Allowed Claim in excess of the amount recovered in accordance with this Plan and the Swedish Reorganization Plan has been forgiven (in each case as applicable); and (iii) the account number of the securities account (being either a VPC account (Sw. *VP-konto*) kept in the Entity's own name or a custody account (Sw. *förvaltarkonto*) kept with a Swedish bank/broker affiliated with Euroclear Sweden, the Swedish Central Securities Depositary, to which the New Shares shall be distributed.  Any Entity receiving New Shares shall deliver to the Debtors such signature page, documentation, and account number (as applicable) prior to the Effective Date. However, to the extent such signature page, documentation, or account number is not received by the Effective Date, then such Entity shall not receive any New Shares under this Plan, unless waived by the Debtors and the Required Investors.  The Debtors and the Required Investors shall continue to negotiate the terms of the foregoing in good faith.

### 5.17   *Creation of Creditor Oversight Committee.*

(a)      The Creditor Oversight Committee shall be a committee of up to three members appointed on the Effective Date as selected by the Creditors' Committee.  The Creditor Oversight Committee, its members, and Representatives shall not have any liability to any creditor of the Debtors, or holder of a GUC Interest, on account of any action taken in good faith in accordance with this Plan or the GUC Documents.

(b)      In the event of a vacancy on the Creditor Oversight Committee, the remaining members of the Creditor Oversight Committee may select an acceptable successor member to the Creditor Oversight Committee.

(c)      On the Effective Date, the Creditor Oversight Committee shall have consultation rights with respect to any litigation regarding the State Non-Tax Claims as described in the GUC Documents, including any briefing submitted by the Reorganized Debtors in connection with such litigation.

(d)      The Reorganized Debtors shall support, and the Investors shall not object to, a request by the Creditor Oversight Committee or its designee (which designee may be the GUC Entity) to participate in any litigation regarding the State Non-Tax Claims; *provided, however*, that the governing body of any GUC Entity participating in such litigation shall take direction from the Creditor Oversight Committee.  The legal fees incurred by such participation in the litigation regarding the State Non-Tax Claims shall be paid solely with funds from interest or investment income accrued or earned by the applicable GUC Entity.

(e)      The Creditor Oversight Committee shall have a consent right over any settlement (not to be unreasonably withheld, conditioned or delayed) in the event the Reorganized Debtors voluntarily determine to pay a portion of the Reserved Funds to settle the State Non-Tax Claims prior to entry of a final order requiring any Reorganized Debtor to pay any State Non-Tax Claim.

(f)      The Creditor Oversight Committee shall have any other consent and consultation rights as set forth in the GUC Documents.

## ARTICLE VI.    DISTRIBUTIONS.

### 6.1    *Distributions Generally*.

Subject to any reserves or holdbacks for estimated or Disputed Claims established in accordance with this Plan, or any authority granted to the Debtors to make payments pursuant to applicable orders of the Bankruptcy Court, including the Critical Vendors Order, the Disbursing Agent shall make all Plan Distributions to the appropriate holders of Allowed Claims in accordance with this Plan.

### 6.2    *No Postpetition Interest on Claims*.

Unless otherwise provided in this Plan, the Definitive Documents, the Confirmation Order, or other order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on any Claim and no holder of a Claim shall be entitled to interest accruing on or after the Commencement Date on any such Claim; *provided, however*, that, in accordance with the Swedish Reorganization Act, solely for the purpose of calculating the Pro Rata share of Plan Distributions for holders of certain Allowed Claims against SAS AB, such Allowed Claims against SAS AB shall accrue interest on and after the Commencement Date to the extent such Allowed Claims are entitled to interest under applicable Swedish Law.

### 6.3 *Date of Distributions*.

Unless otherwise provided in this Plan, the initial distribution to be made to holders of Allowed Claims under this Plan shall be made on the Effective Date or as soon as reasonably practicable thereafter. Any subsequent distributions shall be made from time to time as reasonably determined by the Disbursing Agent or as set forth in the GUC Documents with respect to distributions on account of GUC Interests. As described in Section 12.4, in the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in ARTICLE VII hereof.

### 6.4 *Distribution Record Date*.

As of the close of business on the Distribution Record Date, the various lists of holders of Claims in each Class, as maintained by the Debtors or their agents, shall be deemed closed, and there shall be no further changes in the record holders of any Claims after the Distribution Record Date; *provided, however*, that such Distribution Record Date does not apply to the Debtors' public securities—the holders of which will receive their distributions pursuant to the standard and customary procedures of Euroclear Sweden and any other applicable securities depositories. Neither the Debtors nor the Disbursing Agent shall have any obligation to recognize any transfer of a Claim occurring after the close of business on the Distribution Record Date.

### 6.5 *Distributions after Effective Date*.

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date, but which later become Allowed Claims, shall be deemed to have been made on the Effective Date.

### 6.6 *Disbursing Agent*.

All Plan Distributions shall be made by the Disbursing Agent on and after the Effective Date as provided herein. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties. The Reorganized Debtors shall use commercially reasonable efforts to provide the Disbursing Agent (if other than the Reorganized Debtors) with a record of the amounts of Claims and the identities and addresses of holders of Claims, in each case, as set forth in the Debtors' or Reorganized Debtors' books and records. The Reorganized Debtors shall cooperate in good faith with the applicable Disbursing Agent (if other than the Reorganized Debtors) to comply with the reporting and withholding requirements outlined in Section 6.18 of this Plan.

### 6.7 *Delivery of Distributions*.

(a)      Subject to Bankruptcy Rule 9010, the Disbursing Agent shall make all distributions to any holder of an Allowed Claim as and when required by this Plan at (i) the address of such holder on the books and records of the Debtors or their agents or (ii) at the address in any written notice of address change delivered to the Debtors or the Disbursing Agent, including any

addresses included on any transfers of Claim filed pursuant to Bankruptcy Rule 3001. Subject to Section 6.8, in the event that any distribution to any holder is returned as undeliverable, no distribution or payment to such holder shall be made unless and until the Disbursing Agent has been notified of the then-current address of such holder, at which time or as soon thereafter as reasonably practicable, such distribution shall be made to such holder without interest.

(b)    As set forth in Section 5.2(a), the Investor Equity and the New Convertible Notes shall be distributed in accordance with the terms set forth in the Investment Agreement. The remaining New Shares, the aggregate value of which shall correspond to the New Shares Distribution Pool, shall be distributed to holders of certain Allowed Claims that are entitled to receive a recovery from the New Shares Distribution Pool in accordance with the terms set forth in this Plan.

### 6.8    *Unclaimed Property*.

(a)    One year from the later of: (i) the Effective Date and (ii) the date that is ten Business Days after the date a Claim is first Allowed, all distributions payable on account of such Claim that are not claimed or accepted by such date shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall revert to the Reorganized Debtors or their successors or assigns, and all claims of any other Person (including the holder of a Claim in the same Class) to such distribution shall be discharged and forever barred. The Reorganized Debtors and the Disbursing Agent shall have no obligation to attempt to locate any holder of an Allowed Claim other than by reviewing the Debtors' books and records and the Bankruptcy Court's filings.

(b)    A distribution shall be deemed unclaimed if a holder has not (i) accepted a particular distribution or, in the case of distribution made by check by 90 days after issuance, negotiated such check, (ii) given notice to the Reorganized Debtors of an intent to accept a particular distribution, (iii) responded to the Debtors' or Reorganized Debtors', as applicable, request for information necessary to facilitate a particular distribution, or (iv) taken any other action necessary to facilitate such distribution.

### 6.9    *Satisfaction of Claims*.

Unless otherwise provided in this Plan, any distributions and deliveries to be made on account of Allowed Claims under this Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims.

### 6.10    *Manner of Payment under Plan*.

Except as specifically provided herein, at the option of the Debtors or the Reorganized Debtors, as applicable, any Cash payment to be made under this Plan may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors or Reorganized Debtors, as applicable. Any wire transfer fees incurred by the Disbursing Agent in connection with the transmission of a wire transfer shall be deducted from the amount of the recipient holder's Allowed Claim.

### 6.11    _Fractional Shares_.

No fractional shares of New Shares shall be distributed.  When any distribution would otherwise result in the issuance of a number of shares of New Shares that is not a whole number, the New Shares subject to such distribution shall be rounded to the next lower whole number.  The total number of New Shares to be distributed on account of Allowed Claims or Interests shall be adjusted as necessary to account for the rounding provided for herein.  No consideration shall be provided in lieu of fractional shares that are rounded down.

### 6.12    _Minimum Distribution_.

The Reorganized Debtors and the Disbursing Agent, as applicable, shall have the right to determine, based on, among other things, efficiency and whether the distribution costs exceed the recovery amount, whether to make (i) a distribution pursuant to this Plan that is less than the value of one New Share or $50.00 in Cash; _provided, however_, that to the extent any distribution is not made pursuant to this Section 6.12, such distribution shall be added to any subsequent distribution to be made on account of the holder's Allowed Claim and (ii) any final distributions of less than the value of one New Share or Cash less than $10 to any holder of an Allowed Claim.  If either (a) all Plan Distributions on Allowed Claims (other than those whose Plan Distributions are deemed undeliverable hereunder) otherwise have been paid in full or (b) the amount of any final distributions to holders of Allowed Claims would be (1) less than the value of one New Share or (2) $10 or less and the aggregate amount of Cash available for distributions to holders of Allowed General Unsecured Claims is less than $25,000, then the Reorganized Debtors and the Disbursing Agent, as applicable, shall have the right to determine whether any further distribution shall be made by the Reorganized Debtors. Any surplus Cash shall revert to the Reorganized Debtors.

### 6.13    _No Distribution in Excess of Amount of Allowed Claim_.

Notwithstanding anything to the contrary in this Plan, no holder of an Allowed Claim shall receive, on account of such Allowed Claim, Plan Distributions in excess of the Allowed amount of such Claim (plus any postpetition interest on such Claim solely to the extent permitted by Section 6.2 of this Plan).

### 6.14    _Allocation of Distributions between Principal and Interest_.

Except as otherwise required by Law (as determined by the Debtors or Reorganized Debtors), distributions with respect to an Allowed Claim shall be allocated first to the principal portion of such Allowed Claim (as determined for United States federal income tax purposes) and, thereafter, to the remaining portion of such Allowed Claim, if any.

### 6.15    _Setoffs and Recoupments_.

Except as otherwise provided in Section 10.10, each Debtor or Reorganized Debtor, or such Entity's designee as instructed by such Debtor or Reorganized Debtor, may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy Law, set-off or recoup against any Allowed Claim, and the distributions to be made pursuant to this Plan on account of such Allowed Claim, any and all claims, rights, and Causes of Action of any nature whatsoever that a

Debtor or Reorganized Debtor or its successors may hold against the holder of such Allowed Claim after the Effective Date; *provided, however*, that neither the failure to effect a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Debtor or Reorganized Debtor or its successor of any claims, rights, or Causes of Action that a Debtor or Reorganized Debtor or its successor or assign may possess against the holder of such Claim.

### 6.16 *Rights and Powers of Disbursing Agent*.

The Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder, (ii) make all applicable distributions or payments provided for under this Plan, (iii) employ professionals to represent it with respect to its responsibilities, and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court (including any Final Order issued after the Effective Date) or pursuant to this Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

### 6.17 *Expenses of Disbursing Agent*.

To the extent the Disbursing Agent is a Person other than a Debtor or Reorganized Debtor or as otherwise ordered by the Bankruptcy Court, subject to the written agreement of the Reorganized Debtors, the amount of any reasonable fees and out-of-pocket expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and out-of-pocket expense reimbursement Claims (including for reasonable attorneys' fees and other professional fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors in the ordinary course of business. For the avoidance of doubt, any provisions in this <u>Section 6.17</u>, or elsewhere in this Plan, entitling a Person to a reimbursement of fees and expenses shall not include any recoverable value added tax (or similar tax).

### 6.18 *Withholding and Reporting Requirements*.

(a)    *Withholding Rights*. In connection with this Plan, any Person issuing any instrument or making any distribution or payment (including any payments or distributions made by or from any GUC Entities) in connection therewith, shall comply with all applicable withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority and, as applicable, any other federal, state, local or foreign Laws as necessary to implement the Restructuring set forth in this Plan and the Swedish Reorganization Plan. In the case of a non-Cash distribution that is subject to withholding, the distributing party may either (i) require the intended recipient of such distribution to provide the withholding agent with an amount of Cash sufficient to satisfy such withholding tax as a condition to receiving such distribution or (ii) withhold an appropriate portion of such distributed property and either (A) sell such withheld property to generate Cash necessary to pay over the withholding tax (or reimburse the distributing party for any advance payment of the withholding tax) or (B) pay the withholding tax using its own funds and retain such withheld property. Any amounts so withheld shall be remitted to the appropriate Governmental Unit. Any amounts withheld pursuant to the preceding sentence shall be deemed to have been distributed to and received by the applicable recipient for all purposes of this Plan. Notwithstanding the foregoing, each holder of an Allowed Claim or any other entity that

receives a distribution pursuant to this Plan shall have responsibility for any taxes imposed by any Governmental Unit, including income, withholding, and other taxes, on account of such distribution. Any party issuing any instrument or making any distribution pursuant to this Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

(b)     *Forms*.   Any party entitled to receive any property as an issuance or distribution under this Plan shall, upon request, deliver to the applicable Disbursing Agent or such other entity designated by the Reorganized Debtors (which entity shall subsequently deliver to the applicable Disbursing Agent any applicable IRS Form W-8 or Form W-9 received) or any GUC Entities, an appropriate IRS Form W-9 or (if the payee is a foreign entity) an appropriate IRS Form W-8 and any other forms or documents reasonably requested by any Reorganized Debtor, any GUC Entities or other designated entity, as applicable, to reduce or eliminate any withholding required by any taxing authority.   If such request is made by the Reorganized Debtors, the Disbursing Agent, the GUC Entities, or such other entity designated by the Reorganized Debtors, the GUC Entities, or a Disbursing Agent and such party fails to comply before the date that is 180 days after the request is made, the amount of such distribution shall irrevocably revert to the applicable Reorganized Debtor, the GUC Entities or other designated entity, as applicable, and any Claim in respect of such distribution shall be discharged and forever barred from assertion against such Reorganized Debtor, the GUC Entities or other designated entity, as applicable, or their respective property.

(c)     Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under this Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such holder by any Governmental Unit, including income, withholding, and other tax obligations, on account of such Plan Distribution.

### 6.19    *Indefeasible Distribution*.

Any and all distributions made under this Plan shall be indefeasible and not subject to clawback or turnover.

## ARTICLE VII.   PROCEDURES FOR DISPUTED CLAIMS.

### 7.1    *Objections to Claims*.

Except as provided in Section 7.3 of this Plan, the Debtors, the Reorganized Debtors, and the Creditors' Committee, as applicable, shall be entitled to object to Claims; *provided, however*, that the Creditors' Committee shall only be entitled to object to Claims prior to the Effective Date.  After the Effective Date, the Reorganized Debtors shall have and retain any and all rights and defenses that the Debtors had with respect to any Claim immediately before the Effective Date.  Except as expressly provided in this Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is Allowed or deemed Allowed pursuant to this Plan or a Final Order, including the Confirmation Order, allowing such Claim.  Any objection to Claims

shall be served and filed on or before the Claims Objection Deadline, as such deadline may be extended from time to time.

## 7.2    *Resolution of Disputed Claims*.

Except as provided in Section 7.3 of this Plan, or as otherwise provided in an order of the Bankruptcy Court and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, on and after the Effective Date, the Reorganized Debtors shall have the authority to (i) file, withdraw, or litigate to judgment objections to Claims, (ii) settle or compromise any Disputed Claims, without further notice to or action, order, or approval by the Bankruptcy Court, and (iii) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  For the avoidance of doubt, prior to the Effective Date, the Creditors' Committee shall have the authority to file, withdraw, or litigate to judgment objections to Claims.

## 7.3    *Estimation of Claims*.

The Debtors or the Reorganized Debtors, as applicable, in consultation with the Creditors' Committee, may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtors had previously objected to or otherwise disputed such Claim or whether the Bankruptcy Court has ruled on any such objection.  The Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on any potential Allowed amount of such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on any potential Allowed amount of such Claim, the Debtors or the Reorganized Debtors, as applicable, may pursue supplementary proceedings to object to the allowance of such Claim.

## 7.4    *Adjustment to Claims Register without Objection*.

Any duplicate Claim or any Claim that has been paid, satisfied, or settled, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Debtors or the Reorganized Debtors, as applicable, upon stipulation between the parties in interest without a Claims objection having to be filed and without any further notice or action, order, or approval of the Bankruptcy Court.

## 7.5    *Claim Resolution Procedures Cumulative*.

All of the objection, estimation, and resolution procedures in this Plan are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently settled, compromised, withdrawn, or resolved in accordance with this Plan without further notice or Bankruptcy Court approval.

### 7.6 *No Distributions Pending Allowance*.

Except with respect to Fee Claims, which are governed by the Interim Compensation Procedures Order, if an objection, motion to estimate, or other challenge to a Claim is filed, no payment or distribution provided under this Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

### 7.7 *Distributions after Allowance*.

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the holder of such Allowed Claim from the Disputed Claims Reserve in accordance with the provisions of this Plan. As soon as reasonably practicable after the date on which the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the holder of such Claim the distribution (if any) to which such holder is entitled under this Plan as of the Effective Date.

### 7.8 *Disputed Claims Reserve*.

(a) Amounts or property that would be distributable in respect of any Disputed Claim had such Disputed Claim been Allowed on the Effective Date, together with all earnings thereon (net of any taxes imposed thereon or otherwise payable by the Disputed Claims Reserve), shall be deposited in the Disputed Claims Reserve. The amount of, or the amount of property constituting, the Disputed Claims Reserve shall be determined prior to the Effective Date based on the Debtors' good faith estimates or an order of the Bankruptcy Court estimating such Disputed Claims, and shall be established on or about the Effective Date.

(b) Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, or the receipt of a determination by the IRS, the Disbursing Agent shall treat the Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 and, to the extent permitted by applicable Law, report consistently with the foregoing for state and local income tax purposes. All parties (including the Debtors, the Reorganized Debtors, the Disbursing Agent, and the holders of Disputed Claims) shall be required to report for tax purposes consistently with the foregoing.

(c) The Disbursing Agent shall hold in the Disputed Claims Reserve all distributions to be made on account of Disputed Claims for the benefit of holders of Disputed Claims whose Claims are subsequently Allowed. All taxes imposed on assets or income of the Disputed Claims Reserve shall be payable by the Disbursing Agent from the assets of the Disputed Claims Reserve.

(d) In the event the remaining assets in the Disputed Claims Reserve are insufficient to satisfy all the Disputed Claims that have become Allowed, such Allowed Claims shall be satisfied Pro Rata from such remaining assets. After all assets have been distributed from the Disputed Claims Reserve, no further distributions shall be made in respect of Disputed Claims. At such time as all Disputed Claims have been resolved, any remaining assets in the Disputed Claims Reserve shall be distributed to all holders of Allowed General Unsecured Claims Pro Rata and in proportion to the Class-specific allocations provided for in this Plan.

**ARTICLE VIII.  EXECUTORY CONTRACTS AND UNEXPIRED LEASES.**

    **8.1**    *General Treatment*.

    (a)    As of and subject to the occurrence of the Effective Date, all executory contracts and unexpired leases to which any of the Debtors are parties shall be rejected and deemed rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such contract or lease (i) was previously assumed or rejected by the Debtors, pursuant to a Final Order of the Bankruptcy Court, (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto, (iii) is the subject of a motion to assume filed by the Debtors on or before the Confirmation Date, or (iv) is specifically designated as a contract or lease to be assumed on the Schedule of Assumed Contracts.

    (b)    The Debtors shall identify the executory contracts and unexpired leases to be assumed; *provided, however*, that:

        (i)    the Investors (other than Air France-KLM) shall have a consent right with respect to assumption or rejection of any Material Non-Aircraft Executory Contract or Lease;

        (ii)    the Investors shall not have a consultation or consent right with respect to assumption or rejection of any executory contract or unexpired lease related to the Debtors' aircraft, engines, and related equipment and arrangements; and

        (iii)    the Debtors shall deliver to the Investors copies of all Material Contracts prior to closing the Transaction.

    (c)    Subject to (i) satisfaction of the conditions set forth in Section 8.1(a)-(c) of this Plan, (ii) resolution of any disputes in accordance with Section 8.2 of this Plan with respect to the contracts or leases subject to such dispute, and (iii) the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions or rejections provided for in this Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Each executory contract and unexpired lease assumed pursuant to this Plan shall vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as modified by the provisions of this Plan, any Final Order of the Bankruptcy Court authorizing and providing for its assumption, or applicable Law.

    (d)    The Debtors shall file, as part of the Plan Supplement, the Schedule of Assumed Contracts, which may be amended, supplemented, or otherwise modified through the Effective Date; *provided, however*, that the Debtors may file an amended Schedule of Assumed Contracts after the Effective Date with the consent of the lessors or contract counterparties affected by such amended Schedule of Assumed Contracts.

    (e)    With respect to Aircraft Leases that were not previously assumed, have not previously expired or terminated pursuant to their terms, or are not subject to a motion to assume filed on or before the Confirmation Date, the Debtors shall assume only those Aircraft Leases and related executory contracts that are designated on the Schedule of Assumed Contracts.  For the

avoidance of doubt, any executory contracts or unexpired leases that are ancillary to Aircraft Leases that have been previously assumed or are being assumed under this Plan shall be and shall be deemed assumed. Notwithstanding anything to the contrary herein, to the extent certain of the Aircraft Leases identified on the Schedule of Assumed Contracts include finance leases of the Debtors that were amended during the course of these Chapter 11 Cases, the obligations associated with such lease shall be provided the treatment agreed between the applicable Debtor(s) and the lease counterparties and lenders in the applicable governing amendment documents.

### 8.2 *Determination of Cure Disputes and Deemed Consent*.

(a)    Any Cure Amount shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Amount, as reflected on the applicable Cure Notice, in Cash on the Effective Date, or as soon as reasonably practicable thereafter, subject to the limitations described below, or on such other terms as the counterparties to such executory contracts or unexpired leases and the Debtors (subject to Section 8.1(b)(i) of this Plan) may otherwise agree.

(b)    The Debtors shall serve a Cure Notice on counterparties to executory contracts and unexpired leases no later than 21 days before the commencement of the Confirmation Hearing in accordance with the order approving the Disclosure Statement and Solicitation and Voting Procedures. If a counterparty to any executory contract or unexpired lease is not listed on the applicable Cure Notice, the proposed Cure Amount for such executory contract or unexpired lease shall be deemed to be zero dollars ($0).

(c)    Any counterparty to an executory contract or unexpired lease shall have the time prescribed by the order approving the Disclosure Statement and Solicitation and Voting Procedures to object to the proposed assumption or related Cure Amount listed on the Cure Notice.

(d)    Any counterparty to an executory contract or unexpired lease that fails to object timely to the proposed assumption or Cure Amount (i) shall be deemed to have assented to such assumption or Cure Amount, notwithstanding any provision thereof that purports to (1) prohibit, restrict, or condition the transfer or assignment of such contract or lease or (2) terminate or permit the termination of a contract or lease as a result of any direct or indirect transfer or assignment of the rights of the Debtors under such contract or lease or a change, if any, in the ownership or control to the extent contemplated by this Plan, and shall forever be barred and enjoined from asserting such objection against the Debtors or terminating or modifying such contract or lease on account of transactions contemplated by this Plan and (ii) shall be forever barred, estopped, and enjoined from challenging the validity of such assumption thereafter.

(e)    If there is a dispute presented in a timely objection regarding (i) any Cure Amount, (ii) the ability of the Debtors (or the Reorganized Debtors) to provide adequate assurance of future performance (within the meaning of section 365 of the Bankruptcy Code) under such contract or lease to be assumed, or (iii) any other matter pertaining to assumption, such dispute shall be heard by the Bankruptcy Court prior to such assumption being effective. Notwithstanding the foregoing, to the extent the dispute relates solely to any Cure Amounts, the applicable Debtor (subject to Section 8.1(b)(i) of this Plan) may assume the executory contract or unexpired lease prior to the resolution of any such dispute, as long as that Debtor reserves Cash in an amount

sufficient to pay the full amount reasonably asserted as the required Cure Amount by the contract counterparty. Following entry of a Final Order resolving any such dispute, the Debtors (subject to Section 8.1(b)(i) of this Plan) shall have the right to reject any executory contract or unexpired lease within thirty (30) days of such resolution.

(f)    Subject to resolution of any dispute regarding any Cure Amount, all Cure Amounts shall be satisfied by the Debtors or Reorganized Debtors, as the case may be, upon assumption of the underlying contracts and unexpired leases. Assumption of any executory contract or unexpired lease pursuant to this Plan, or otherwise, shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure Amount, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the effective date of the assumption. Any Claims arising from an executory contract or unexpired lease that has been assumed shall be deemed Disallowed and expunged from the Claims Register, without further notice to or action, order or approval of the Bankruptcy Court or any other Person, upon the deemed assumption of such contract or unexpired lease.

### 8.3    *Rejection Damages Claims*.

Any counterparty to an executory contract or unexpired lease that is rejected by the Debtors pursuant to this Plan must file and serve a Proof of Claim on the applicable Debtor that is party to the contract or lease to be rejected no later than 30 days after the later of (i) the Confirmation Date or (ii) the effective date of rejection of such executory contract or unexpired lease.

### 8.4    *Survival of the Debtors' Indemnification Obligations*.

Any and all obligations of the Debtors pursuant to corporate charters, bylaws, limited liability company agreements, or other organizational documents to indemnify current and former officers, members, managers, directors, agents, or employees with respect to all present and future actions, suits, and proceedings against the Debtors or such directors, officers, members, managers, agents, or employees based upon any act or omission for or on behalf of the Debtors shall not be discharged or impaired by confirmation of this Plan. All such obligations shall be deemed and treated as executory contracts to be assumed by the Debtors under this Plan and shall continue as obligations of the Reorganized Debtors, as applicable. Any Claim based on the Debtors' obligations with respect thereto shall be an Allowed Claim.

### 8.5    *Employment, Compensation and Benefit Plans*.

Unless otherwise modified prior to the Effective Date, all employment policies, local labor agreements, collective bargaining agreements, and all compensation and benefits plans, policies, and programs of the Debtors applicable to their respective employees, retirees, and nonemployee directors, including all savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, and life and accidental death and dismemberment insurance plans, are deemed to be, and shall be treated as, executory contracts under this Plan and, on the Effective Date, shall be assumed pursuant to sections 365 and 1123 of the Bankruptcy Code;

*provided*, *however*, that no employee equity or equity-based incentive plans, or any provisions set forth in any compensation and benefit plans that provide for rights to acquire equity interests in any of the Debtors, shall be assumed by the Debtors or Reorganized Debtors.

### 8.6     *Insurance Policies*.

(a)     All insurance policies to which any Debtor is a party as of the Effective Date, including any directors' and officers' insurance policies, shall be deemed to be and treated as executory contracts and shall be assumed by the applicable Debtor or Reorganized Debtor and shall continue in full force and effect thereafter in accordance with their respective terms.  All insurance policies shall vest in the Reorganized Debtors.

(b)     In addition, after the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including any "tail policy") in effect or purchased as of the Commencement Date.  Any individuals covered by such insurance policies, including all members, managers, directors, officers, agents, and employees of the Debtors who served in such capacity at any time prior to the Effective Date, shall be entitled to the full benefits of any such policy for the full term of the policy regardless of whether such members, managers, directors, officers, or other individuals remain in such positions after the Effective Date.

### 8.7     *Intercompany Agreements*.

Notwithstanding anything to the contrary herein or in the Plan Supplement, but subject to Section 8.1(b)(i) of this Plan, all Intercompany Agreements are deemed to be, and shall be treated as, executory contracts under this Plan and, on the Effective Date, shall be deemed assumed pursuant to sections 365 and 1123 of the Bankruptcy Code (in each case, as amended prior to or on the Effective Date) unless any such Intercompany Agreement is specifically rejected pursuant to a separate order of the Bankruptcy Court or is the subject of a separate rejection motion filed by the Debtors.

### 8.8     *Assumed Credit Card Processing Agreements*.

Notwithstanding anything herein to the contrary, Elavon may exercise its normal recoupment, setoff, reserve, and processing procedures in respect of claims and the netting of fees, chargebacks, and other amounts in accordance with the terms and conditions of the Assumed Credit Card Processing Agreements.  All obligations of the Debtors and all operations, rights, and remedies of Elavon, including the netting of prepetition and postpetition sales, refunds, fees, and chargebacks, arising under and pursuant to the Assumed Credit Card Processing Agreements shall remain fully enforceable against the Reorganized Debtors.

### 8.9     *Reservation of Rights*.

(a)     Neither the exclusion nor the inclusion by the Debtors of any contract or lease on any exhibit, schedule, or other annex to this Plan or in the Plan Supplement, nor anything contained in this Plan, shall constitute an admission by the Debtors that any such contract or lease is or is not an executory contract or unexpired lease or that the Debtors or the Reorganized Debtors or their respective Affiliates have any liability thereunder.

(b)      Except as explicitly provided in this Plan, nothing in this Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtors or the Reorganized Debtors under any executory or non-executory contract or unexpired or expired lease.

(c)      Nothing in this Plan shall increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Reorganized Debtors, as applicable, under any executory or non-executory contract or unexpired or expired lease.

(d)      If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of its assumption under this Plan, and subject to Section 8.1(b)(i) of this Plan, the Debtors or Reorganized Debtors, as applicable, shall have 30 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

## ARTICLE IX.    CONDITIONS PRECEDENT TO OCCURRENCE OF EFFECTIVE DATE.

### 9.1    *Conditions Precedent to Effective Date.*

The Effective Date shall not occur unless all of the following conditions precedent have been satisfied:

(a)      the Key Transaction Documents shall be consistent with this Plan in all material respects, and otherwise be acceptable to the Investors pursuant to Investor Consent;

(b)      the Bankruptcy Court shall have entered the Confirmation Order in relation to this Plan as to every Debtor, except as set forth herein with respect to a Gorm Entity, and such Confirmation Order shall have become a Final Order; *provided, however*, that if a Confirmation Order is not entered with respect to any Gorm Entities, the effectiveness of this Plan shall be conditioned upon a resolution of the assets and executory contracts attributable to such Gorm Entities, which resolution shall be subject to Investor Consent;

(c)      the Swedish Reorganization Plan Confirmation shall have occurred and the Existing Equity Interests shall be cancelled and, as a result, delisted as soon as practicable following the SCRO Registration;

(d)      the documents related to the New Convertible Notes, including the New Convertible Notes Indenture, shall have been duly executed, all conditions precedent to effectiveness of the New Convertible Notes shall have been satisfied or waived in accordance with the terms thereof, and the closing of the New Convertible Notes shall have occurred;

(e)      all conditions precedent to the Investment Agreement shall have been satisfied or waived in accordance with the terms thereof, and the Investment Agreement shall not have been terminated;

(f)      all conditions precedent to the GUC Documents, as applicable, shall have been satisfied or waived in accordance with the terms thereof, as applicable, and the GUC

Documents shall be reasonably acceptable to the Debtors, Required Investors, and Creditors' Committee;

(g)    the Debtors shall have received Bankruptcy Court approval and, if required, counterparty approval for the assumption or rejection of the Material Contracts identified by the Required Investors (other than Air France-KLM) upon closing in a manner reasonably acceptable to the Investors, and the cure amounts for any such contracts shall be reasonably acceptable to the Required Investors (other than Air France-KLM);

(h)    all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate this Plan shall have been obtained, including as set forth in the Investment Agreement;

(i)    one or more decisions by the European Commission declaring compatible with the internal market the recapitalization measures granted by the States during the 2020 COVID-19 recapitalization of SAS AB (cases SA.57543 and SA.58342), which decisions shall be deemed acceptable to the Investors; *provided, however*, that, to the extent that any such decision constitutes a Material State Aid Decision, it shall have been approved by each of the Investors;

(j)    one or more decisions by the European Commission declaring compatible with the internal market the restructuring aid granted by the States through their participation in the Restructuring, which decisions shall be deemed acceptable to the Investors; *provided, however*, that, to the extent that any such decision constitutes a Material State Aid Decision, it shall have been approved by each of the Investors;

(k)    one or more decisions by the EFTA Surveillance Authority declaring compatible with the functioning of the EEA Agreement the restructuring aid granted by the Norwegian State through its contribution to the Restructuring, which decisions shall be deemed acceptable to the Investors; *provided, however*, that, to the extent that any such decision constitutes a Material State Aid Decision, it shall have been approved by each of the Investors;

(l)    the current slot portfolio of the Debtors (including their affiliate carriers) shall be substantially the same (both in terms of number and location) on the Effective Date as on the date hereof;

(m)    regulatory approvals, including foreign direct investment approvals and approvals from the relevant civil aviation authorities (or any other relevant authorities) confirming that all operating licenses, air operator certificates, traffic rights, and any other authorizations, approvals, licenses, or rights required for the Debtors (including their affiliate carriers) to operate its existing network shall be preserved following the Restructuring and the Effective Date as set forth on Schedule 7.3(a)(i) of the Investment Agreement;

(n)    all other actions, documents, and agreements necessary to implement and effectuate this Plan shall have been effected or executed, including as set forth in the Investment Agreement;

(o)    all Allowed Fee Claims approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date shall have been placed in the Fee Escrow Account pending approval by the Bankruptcy Court;

(p)    subject to the Overall Cap, the Commitment Fee, the Contribution Fees, and the Expense Reimbursement shall have been paid;

(q)    the Debtors shall have paid all trade payables in the ordinary course of business arising from the provision of goods and services on or after the Commencement Date that are due and payable at or before the Effective Date, other than such amounts (A) which are disputed by the Debtors in good faith for which adequate reserves have been created and (B) which are not allowed to be paid in full pursuant to the Swedish Reorganization Act;

(r)    the Bankruptcy Court orders approving the Key Transaction Documents and the transactions contemplated thereby shall have provided for the release of any and all encumbrances on the Debtors' assets, other than those expressly permitted by the Key Transaction Documents, and the Investors shall have received such documents or instruments as may be required to demonstrate that, effective as of the Effective Date, the assets of the Debtors and their subsidiaries are released from any and all encumbrances other than those expressly permitted by the Key Transaction Documents;

(s)    the Debtors shall have implemented the Restructuring and all transactions contemplated in this Plan and the Investment Agreement, including through any supplemental proceedings, in a manner consistent with this Plan and the Investment Agreement and otherwise reasonably acceptable to the Investors;

(t)    all reasonable and documented fees and out-of-pocket expenses of (x) Skadden, Arps, Slate, Meagher & Flom LLP, White & Case LLP, Bech-Bruun Law Firm P/S and Latham & Watkins LLP, as respective counsel to the Investors (other than the Danish State Investor), (y) Rothschild & Co. as financial advisor to Castlelake, and (z) all other legal counsel, accountants, financial advisors, and other professionals, advisors, and consultants retained by any one or more Investors (other than the Danish State Investor) in connection with the Chapter 11 Cases, the Transaction, this Plan, or the Swedish Reorganization Plan (as permitted pursuant to the terms of the Investment Agreement), shall have been paid in full in accordance with the Investment Agreement; and

(u)    the DIP Orders shall remain Final Orders, the Swedish Reorganization Plan Confirmation shall be final and binding (Sw. *lagakraftvunnen*), and the EPCA Approval Order shall not have been stayed, modified, reversed, or be subject to appeal.

## 9.2    *Waiver of Conditions Precedent to Effective Date*.

(a)    Each of the conditions precedent to the occurrence of the Effective Date, other than the condition set forth in Section 9.1(b), may be waived in writing by the Debtors, with the consent of the Required Investors and in consultation with the Creditors' Committee, without leave of or order of the Bankruptcy Court. If any such condition precedent is waived pursuant to this Section 9.2 and the Effective Date occurs, each party agreeing to waive such condition precedent shall be estopped from withdrawing such waiver after the Effective Date or otherwise

challenging the occurrence of the Effective Date on the basis that such condition was not satisfied, the waiver of such condition precedent shall benefit from the "equitable mootness" doctrine, and the occurrence of the Effective Date shall foreclose any ability to challenge this Plan in any court. If this Plan is confirmed for fewer than all of the Debtors, only the conditions applicable to the Debtor or Debtors for which this Plan is confirmed must be satisfied or waived for the Effective Date to occur.

(b)     Except as otherwise provided herein, all actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action.

## ARTICLE X.     EFFECT OF CONFIRMATION.

### 10.1     _Binding Effect_.

Subject to Section 12.4 and Section 12.12 of the Investment Agreement and the occurrence of the Effective Date, except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, the provisions of this Plan and the Definitive Documents shall bind the Debtors, the Estates, the Reorganized Debtors, and every holder of a Claim or Interest, and inure to the benefit of and be binding on such holder's respective successors and assigns, regardless of whether the Claim or Interest of such holder is Impaired under this Plan and whether such holder has accepted this Plan.  Except as expressly provided in this Plan, all agreements, instruments and other documents filed in connection with this Plan shall be given full force and effect, and shall bind all parties referred to herein as of the Effective Date, whether or not such agreements are actually issued, delivered, or recorded on the Effective Date or thereafter and whether or not a party has actually executed such agreement.

### 10.2     _Vesting of Assets_.

Except as otherwise provided in this Plan, or any Definitive Document, on and after the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property dealt with by this Plan, including all claims, rights, and Causes of Action and any property acquired by the Debtors under or in connection with this Plan or the Plan Supplement, shall vest in the applicable Reorganized Debtor free and clear of all Claims, Liens, encumbrances, charges, and other interests, other than those provided for in this Plan.  Subject to the terms of this Plan, on and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property and prosecute, compromise, or settle any Claims (including any Administrative Expense Claims) and Causes of Action without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by this Plan or the Confirmation Order.  Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur on or after the Confirmation Date for Professional Persons' fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

### 10.3     _Discharge of Claims against and Interests in Debtors_.

Upon the Effective Date and in consideration of the distributions to be made under this Plan, except as otherwise expressly provided in this Plan or in the Confirmation Order, each

holder (as well as any trustee or agents on behalf of each holder) of a Claim or Interest and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interest, rights, and liabilities that arose prior to the Effective Date.  Except as otherwise provided in this Plan, upon the Effective Date, all such holders of Claims and Interests and their affiliates shall be forever precluded and enjoined, pursuant to sections 105, 524, and 1141 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Interest in any Debtor or Reorganized Debtor.

### 10.4    *Pre-Confirmation Injunctions and Stays*.

Unless otherwise provided in this Plan or a Final Order of the Bankruptcy Court, all injunctions and stays arising under or entered during the Chapter 11 Cases, whether under sections 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the date of entry of the Confirmation Order, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

### 10.5    *Injunction against Interference with Plan*.

Upon the entry of the Confirmation Order, all holders of Claims and Interests and all other parties in interest, along with their respective present and former affiliates, employees, agents, officers, directors, and principals, shall be enjoined from taking any action to interfere with the implementation or the occurrence of the Effective Date.

### 10.6    *Plan Injunction*.

(a)    **Except as otherwise provided in this Plan, in the Definitive Documents, or in the Confirmation Order, as of the entry of the Confirmation Order but subject to the occurrence of the Effective Date, (i) all Persons who have held, hold, or may hold Claims or Interests and their respective Related Persons, are permanently enjoined after the entry of the Confirmation Order from (A) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting, directly or indirectly, a Debtor, a Reorganized Debtor, or an Estate or the property of any of the foregoing, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this clause (A) or any property of any such transferee or successor, (B) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree, or order against a Debtor, a Reorganized Debtor, or an Estate or its property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this clause (B) or any property of any such transferee or successor, (C) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against a Debtor, a Reorganized Debtor, or an Estate or any of its property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons mentioned in this clause (C) or any property of any such transferee or successor, (D) acting or proceeding in any manner, in any**

place whatsoever, that does not conform to or comply with the provisions of this Plan and the Definitive Documents, to the fullest extent permitted by applicable Law, and (E) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of this Plan and the Definitive Documents, and (ii) all Persons are permanently enjoined from taking or continuing to take in any manner, directly or indirectly, any action to cause a Person described in the foregoing clause (i) to take or continue to take any act described in any of clauses (A) through (E) of the foregoing clause (i).

(b)     By accepting distributions pursuant to this Plan, each holder of an Allowed Claim or Interest shall be deemed to have affirmatively and specifically consented to be bound by this Plan, including the injunctions set forth in <u>Section 10.6</u> of this Plan.

10.7   <u>*Releases*</u>.

(a)     Releases by Debtors.  As of the Effective Date, except for the rights, remedies, and Causes of Action that are preserved and remain in effect from and after the Effective Date, including to enforce this Plan and the obligations contemplated by the Restructuring, for good and valuable consideration, on and after the Effective Date, the Released Parties shall be conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, to the maximum extent permitted by Law, by the Debtors, the Reorganized Debtors, and the Estates, in each case on behalf of themselves and their respective Related Entities and any and all other Entities that may purport to assert any Cause of Action derivatively, by or through the foregoing Entities, from any and all Causes of Action (including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or the Estates) that the Debtors, the Reorganized Debtors, the Estates, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on, relating to, or in any manner arising from, in whole or in part: the Debtors (including the management, direct or indirect ownership, or operation thereof) or their Estates; the Reorganized Debtors; the Chapter 11 Cases; this Plan; the Confirmation Order; the Restructuring; the Transaction; the equity solicitation process; any debt or Security of or in the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of or in the Debtors or the Reorganized Debtors, including the New Shares and the New Convertible Notes; the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan; the business or contractual arrangements or other interactions between any Debtor and any Released Party; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in- or out-of-court restructuring efforts of the Debtors; any intercompany transaction; the negotiation, formulation, preparation, dissemination, or consummation of this Plan and any related agreements, instruments, or other documents or any other contract, instrument, release, or document created or entered into in connection with this Plan or any related agreements, instruments, or other documents (including the Investment Agreement); the solicitation of votes with respect to, or confirmation of, this Plan; or any other act or omission, transaction, agreement, event, or other occurrence related to any of the forgoing and taking place on or before the Effective Date.  Notwithstanding anything herein to the contrary, the releases contained in this <u>Section 10.7(a)</u> shall not (i) affect the

86

liability of any Entity from Causes of Action based on willful misconduct, gross negligence or intentional fraud as determined by a Final Order, (ii) release post-Effective Date obligations of any Entity under this Plan, the Restructuring, the Definitive Documents or any other document, instrument, or agreement executed to implement this Plan (unless expressly cancelled by this Plan), or (iii) affect the Releasing Parties' rights that remain in effect from and after the Effective Date to enforce this Plan, the Definitive Documents, and the obligations contemplated by the Transaction or as otherwise provided in any order of the Bankruptcy Court.

(b)      **Releases by Holders of Claims or Interests. As of the Effective Date, except for the rights, remedies, and Causes of Action that are preserved and remain in effect from and after the Effective Date, including to enforce this Plan and the obligations contemplated by the Restructuring, for good and valuable consideration, on and after the Effective Date, the Released Parties shall be conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, to the maximum extent permitted by Law, by the Releasing Parties, in each case from any and all Causes of Action (including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or their Estates) that such Releasing Parties or their respective Related Entities, and any other Entities claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on, relating to, or in any manner arising from, in whole or in part: the Debtors (including the management, direct or indirect ownership, or operation thereof) or their Estates; the Reorganized Debtors; the Chapter 11 Cases; this Plan; the Confirmation Order; the Restructuring; the Transaction; the equity solicitation process; any debt or Security of or in the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of or in the Debtors or the Reorganized Debtors, including the New Shares and the New Convertible Notes; the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan; the business or contractual arrangements or other interactions between any Debtor and any Released Party; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in- or out-of-court restructuring efforts of the Debtors; any intercompany transaction; the negotiation, formulation, preparation, dissemination, or consummation of this Plan and any related agreements, instruments, or other documents or any other contract, instrument, release, or document created or entered into in connection with this Plan or any related agreements, instruments, or other documents (including the Investment Agreement); the solicitation of votes with respect to, or confirmation of, this Plan; or any other act or omission, transaction, agreement, event, or other occurrence related to any of the forgoing and taking place on or before the Effective Date. Notwithstanding anything herein to the contrary, the releases contained in this <u>Section 10.7(b)</u> shall not (i) affect the liability of any Entity from Causes of Action based on willful misconduct, gross negligence or intentional fraud as determined by a Final Order, (ii) release post-Effective Date obligations of any Entity under this Plan, the Restructuring, the Definitive Documents or any other document, instrument, or agreement executed to implement this Plan (unless expressly cancelled by this Plan), or (iii) affect the Releasing Parties' rights that remain in effect from and after the Effective Date to enforce this Plan, the Definitive Documents, and the obligations contemplated by the Transaction or as otherwise provided in any order of**

the Bankruptcy Court.  For the avoidance of doubt, the only parties that are bound by the releases contained in this Section 10.7(b) are the Releasing Parties.

10.8    *Exculpation*.

To the fullest extent permitted by applicable Law, from and after the Effective Date, no Exculpated Party shall have or incur, and each such Entity shall be released and exculpated from, any Cause of Action based on, in whole or in part: the negotiation, execution, and implementation of any transactions approved by the Bankruptcy Court in the Chapter 11 Cases on or after the Commencement Date through the Effective Date, including the DIP Credit Agreement and the incurrence of the DIP Obligations, the new collective labor agreements with the Debtors' pilot unions as contemplated in the CLA Order, stipulations relating to the Aircraft Lease Claims, the pre-delivery payment financing as contemplated by the PDP Facility Order, the Restructuring, the Disclosure Statement, this Plan and any Plan Supplement(s), the Confirmation Order, or other documents or any other contract, instrument, release, or document created or entered into in connection with the Disclosure Statement or this Plan or any related agreements, instruments, or other documents (including the Investment Agreement), the filing of the Chapter 11 Cases, the solicitation of votes with respect to, or confirmation of, this Plan, the administration and implementation of this Plan, including the issuance of any debt or securities, including the New Shares, the New Convertible Notes, or the distribution of property under this Plan or any other related agreement, and the implementation of the Restructuring contemplated by this Plan.  Notwithstanding anything herein to the contrary, the exculpation provided in this Section 10.8 shall not (i) affect the liability of any Entity from Causes of Action based on willful misconduct, gross negligence or intentional fraud as determined by a Final Order, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to this Plan, (ii) release or be an exculpation with respect to post-Effective Date obligations of any Entity under this Plan, the Restructuring, the Definitive Documents or any other document, instrument, or agreement executed to implement this Plan (unless expressly cancelled by this Plan), or (iii) affect the Releasing Parties' rights that remain in effect from and after the Effective Date to enforce this Plan, the Definitive Documents, and the obligations contemplated by the Transaction or as otherwise provided in any order of the Bankruptcy Court.  The exculpation provided in this Section 10.8 shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable Law or rules protecting the Exculpated Parties from liability.

10.9    *Injunction Related to Releases and Exculpation*.

The Confirmation Order shall permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively, or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, or liabilities released pursuant to this Plan, including, without limitation, the claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities released or exculpated in this Plan or the Confirmation Order.

10.10    *__Avoidance Actions__*

On the Effective Date, the Reorganized Debtors shall be deemed to waive and release all Avoidance Actions (other than those listed on the Schedule of Retained Causes of Action to be filed with the Plan Supplement) that the Reorganized Debtors may have in relation to any creditor affected by this Plan; *provided, however*, that the Reorganized Debtors shall retain the right to assert such Avoidance Actions (i) as defenses or counterclaims with respect to any proofs of claim or in any Cause of Action brought by any creditor or (ii) where stipulated by mandatory insolvency law in the jurisdiction of the relevant Reorganized Debtor's establishment.

10.11    *__Retention of Causes of Action and Reservation of Rights__*.

Except as otherwise provided in this Plan, including Sections 10.6, 10.7, 10.8, 10.9, and 10.10, nothing contained in this Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the Debtors had immediately prior to the Effective Date on behalf of the Estates or of themselves in accordance with any provision of the Bankruptcy Code or any applicable nonbankruptcy Law. The Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

10.12    *__Ipso Facto and Similar Provisions Ineffective__*.

Any term of any prepetition policy, prepetition contract, or other prepetition obligation applicable to a Debtor shall be void and of no further force or effect with respect to any Debtor or Reorganized Debtor to the extent that such policy, contract, or other obligation is conditioned on, creates an obligation of the Debtor or Reorganized Debtor as a result of, or gives rise to a right of any Entity based on (i) the insolvency or financial condition of a Debtor, (ii) the commencement of the Chapter 11 Cases, (iii) the confirmation or consummation of this Plan, including any change of control that shall occur as a result of such consummation, or (iv) the Restructuring.

## ARTICLE XI.    RETENTION OF JURISDICTION.

11.1    *__Retention of Jurisdiction__*.

(a)    Subject to Section 12.4 and Section 12.12 of the Investment Agreement, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction, pursuant to 28 U.S.C. §§ 1334 and 157, over all matters arising in, arising under, or related to the Chapter 11 Cases for, among other things, the following purposes:

(i)    to hear and determine motions or applications for the assumption or rejection of executory contracts or unexpired leases and the allowance, classification, priority, compromise, estimation, or

payment of Claims resulting therefrom (including any disputes over Cure Amounts);

(ii)    to determine any motion, adversary proceeding, application, contested matter, or other litigated matter pending on or commenced after the Confirmation Date;

(iii)    to ensure that distributions to holders of Allowed Claims and Interests are accomplished as provided herein and in the Confirmation Order and to adjudicate any and all disputes arising from or relating to distributions under this Plan and the Confirmation Order;

(iv)    to consider Claims or the allowance, subordination, classification, priority, compromise, estimation, or payment of any Claim, including any Administrative Expense Claim;

(v)    to enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(vi)    to issue and enforce injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of this Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(vii)    to hear and determine any application to modify this Plan in accordance with section 1127 of the Bankruptcy Code or approve any modification of the Confirmation Order or any contract, instrument, release, or other agreements or document created in connection with this Plan, the Disclosure Statement, or the Confirmation Order (in each case, to the extent Bankruptcy Court approval is necessary), or to remedy any defect or omission or reconcile any inconsistency in this Plan, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(viii)    to hear and determine all Fee Claims;

(ix)    to resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

(x)    to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan, the Confirmation Order, any transactions or payments in furtherance of

90

either, or any agreement, instrument, or other document governing or related to any of the foregoing;

(xi)    to take any action and issue such orders, including any such action or orders as may be necessary after entry of the Confirmation Order or the occurrence of the Effective Date, as may be necessary to construe, interpret, enforce, implement, execute, and consummate this Plan;

(xii)    to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(xiii)    to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code with respect to the Debtors for all taxable periods through the Effective Date);

(xiv)    to adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

(xv)    to hear and determine any other matters related to the Chapter 11 Cases and not inconsistent with the Bankruptcy Code or title 28 of the United States Code;

(xvi)    to resolve any disputes concerning whether a Person had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, the Bar Date, or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose of determining whether a Claim or Interest is discharged hereunder or for any other purposes;

(xvii)    to hear, adjudicate, decide, or resolve any and all matters related to ARTICLE X of this Plan, including, without limitation, the releases, discharges, exculpations, and injunctions issued thereunder;

(xviii)    to hear and determine any rights, Claims, or Causes of Action held by or accruing to the Reorganized Debtors pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory;

(xix)    to recover all assets of the Debtors and property of the Estates, wherever located; and

(xx)    to enter a final decree closing each of the Chapter 11 Cases;

*provided, however*, that the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement or any Definitive Documents, in each case, that have

a jurisdictional, forum selection or dispute resolution clause that refers disputes to or permits a Person to bring disputes to a different court and any disputes concerning documents contained in the Plan Supplement or any other Definitive Documents that contain such clauses shall be governed in accordance with the provisions of such documents.

(b)    If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, the provisions of this Section 11.1 shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

## 11.2    *Submission to Jurisdiction*.

Consistent with Section 12.4 and Section 12.12 of the Investment Agreement, while the Danish State Investor and the Danish State Noteholder support this Plan, the Danish State Investor and the Danish State Noteholder are not consenting to the jurisdiction of the Bankruptcy Court and, therefore, the Danish State Noteholder is not voting on this Plan. Further, neither the Danish State Investor nor the Danish State Noteholder is consenting to the jurisdiction of the Bankruptcy Court as a result of the (i) submission of any bid pursuant to the Equity Solicitation Procedures, (ii) Equity Solicitation Procedures Motion, (iii) Equity Solicitation Procedures, (iv) subscription for New Shares and receipt of New Convertible Notes, (v) status of the Danish State Noteholder as a Consultation Party (as defined in the Equity Solicitation Procedures Motion), (vi) negotiation of any of the foregoing, (vii) releases and exculpations granted or afforded pursuant to or in connection with this Plan and the Transaction, (viii) entry into the Investment Agreement or any other Key Transaction Documents, or (ix) otherwise. The Debtors and the Non-State Investors shall not take a position in the Chapter 11 Cases that is contrary or inconsistent with the foregoing.

# ARTICLE XII.    MISCELLANEOUS PROVISIONS.

## 12.1    *Statutory Fees*.

All Statutory Fees due and payable prior to the Effective Date shall be paid by the Debtors or the Reorganized Debtors. On and after the Effective Date, the Reorganized Debtors shall pay any and all Statutory Fees when due and payable, and shall file with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. Each Debtor or Reorganized Debtor, as applicable, shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's, or Reorganized Debtor's, as applicable, Chapter 11 Case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code, notwithstanding the substantive consolidation of the Consolidated Debtors for purposes of this Plan.

## 12.2    *Exemption from Certain Transfer Taxes*.

To the fullest extent permitted by section 1146 of the Bankruptcy Code, (i) the issuance, transfer or exchange of any Securities, instruments or documents, (ii) the creation of any Lien, mortgage, deed of trust or other security interest, (iii) all sale transactions consummated by the Debtors and approved by the Bankruptcy Court on and after the Confirmation Date through

and including the Effective Date, including any transfers effectuated under this Plan, (iv) any assumption, assignment, or sale by the Debtors of their interests in unexpired leases of nonresidential real property or executory contracts pursuant to section 365(a) of the Bankruptcy Code, and (v) the issuance, renewal, modification, or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax or other similar tax or governmental assessment, in each case, imposed under any U.S. federal, state, or local law. Consistent with the foregoing, each recorder of deeds or similar official (or any other Person with authority over any of the foregoing, other than in, each case, in respect of any tax, stamp or fee imposed under the Law of any jurisdiction other than the United States) for any county, city or Governmental Unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

### 12.3 *Request for Expedited Determination of Taxes*.

The Debtors shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Commencement Date through the Effective Date.

### 12.4 *Dates of Actions to Implement Plan*.

In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day but shall be deemed to have been completed as of the required date.

### 12.5 *Amendments*.

(a)   **Plan Modifications**.   This Plan may be amended, modified, or supplemented by the Debtors, in consultation with the Investors and the Creditors' Committee, in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by Law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Bankruptcy Court.  In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims pursuant to this Plan, the Debtors may remedy any defect or omission or reconcile any inconsistencies in this Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes and effects of this Plan, and any holder of a Claim or Interest that has accepted this Plan shall be deemed to have accepted this Plan as amended, modified, or supplemented.

(b)   **Certain Technical Amendments**.  Prior to the Effective Date, the Debtors may make appropriate technical adjustments and modifications to this Plan without further order or approval of the Bankruptcy Court, as long as such technical adjustments and modifications do

not adversely affect in a material way the treatment of holders of Claims or Interests under this Plan; *provided, however*, that the Creditors' Committee shall have a consultation right with respect to any technical adjustments and modifications to this Plan.

(c)    **Investor Consent**.  Investor Consent is required as to any modification of this Plan, including under this <u>Section 12.5</u>, whether material or immaterial, that impacts the terms of the Transaction or other rights or entitlements of the Investors.

## 12.6    *Revocation or Withdrawal of Plan*.

The Debtors reserve the right, subject to consultation with the Creditors' Committee, to revoke or withdraw this Plan prior to the Effective Date as to any or all of the Debtors.  If, with respect to a Debtor, this Plan has been revoked or withdrawn prior to the Effective Date, or if confirmation or the occurrence of the Effective Date as to such Debtor does not occur on the Effective Date, then, with respect to such Debtor (i) this Plan shall be null and void in all respects, (ii) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts or unexpired leases affected by this Plan, and any document or agreement executed pursuant to this Plan, shall be deemed null and void, and (iii) nothing contained in this Plan shall (a) constitute a waiver or release of any claim by,  Claim against, or any Interest in, such Debtor, or claim by or against, or interest in, any other Person, (b) prejudice in any manner the rights of such Debtor or any other Person, or (c) constitute an admission of any sort by any Debtor or any other Person.

## 12.7    *Severability*.

If, prior to the entry of the Confirmation Order, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation by the Bankruptcy Court, the remainder of the terms and provisions of this Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.    The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with this <u>Section 12.7</u>, is (i) valid and enforceable pursuant to its terms, (ii) integral to this Plan and may not be deleted or modified without the consent of the Debtors or the Reorganized Debtors (as the case may be); *provided, however*, that Investor Consent is required as to any modification of this Plan, whether material or immaterial, that impacts the terms of the Transaction or other rights or entitlements of the Investors, and (iii) nonseverable and mutually dependent.

## 12.8    *Governing Law*.

Except to the extent that the Bankruptcy Code or other federal law is applicable or to the extent that a Definitive Document provides otherwise, the rights, duties, and obligations

arising under this Plan and the Definitive Documents shall be governed by, and construed and enforced in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflicts of laws thereof (other than section 5-1401 and section 5-1402 of the New York General Obligations Law).

### 12.9    *Successors and Assigns*.

The rights, benefits, and obligations of any Person named or referred to in this Plan shall be binding on and shall inure to the benefit of any heir, executor, administrator, successor, or permitted assign, if any, of each such Person.

### 12.10    *Entire Agreement*.

On the Effective Date, this Plan, the Plan Supplement, the Definitive Documents, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

### 12.11    *Computing Time*.

In computing any period of time prescribed or allowed by this Plan, unless otherwise set forth in this Plan or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

### 12.12    *Exhibits to Plan*.

All exhibits, schedules, supplements, and appendices to this Plan (including the Plan Supplement and the Investment Agreement) are incorporated into and are a part of this Plan as if set forth in full in this Plan.

### 12.13    *Notices*.

All notices, requests, and demands hereunder shall be in writing (including by email transmission) and, unless otherwise provided herein, shall be deemed to have been duly given or made only when actually delivered or, in the case of notice by email transmission, when received and confirmed by email, addressed as follows:

(a)    if to the Debtors or the Reorganized Debtors:

SAS AB
AVD kod: STOUU-T, SE-195 87
Stockholm, Sweden
Attn:
    Anna Almén (anna.almen@sas.se)
    Ginger Hughes (ginger.hughes@sas.se)

– and –

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Attn:
     Gary T. Holtzer, Esq. (gary.holtzer@weil.com)
     Kelly DiBlasi, Esq. (kelly.diblasi@weil.com)
     David Griffiths, Esq. (david.griffiths@weil.com)
     Lauren Tauro, Esq. (lauren.tauro@weil.com)

*Attorneys for the Debtors*

(b)    if to Castlelake:

CASTLELAKE, L.P.
250 Nicollet Mall, Suite 900
Minneapolis, MN 55401
Attn:
     Legal (notices@castlelake.com)

– and –

SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
One Manhattan West
New York, New York 10001
Attn:
     James J. Mazza, Jr. (James.Mazza@skadden.com)
     Robert E. Fitzgerald (Robert.Fitzgerald@skadden.com)

*Attorneys for Castlelake*

(c)    if to Air France-KLM:

AIR FRANCE-KLM, S.A.
7 rue du Cirque
75008 Paris, France
Attn:
     Jos Veenstra (jos.veenstra@airfranceklm.com)

– and –

WHITE & CASE LLP
19, Place Vendôme
75001 Paris, France
Attn:
     Hugues Mathez (hmathez@whitecase.com)
     Michael Shepherd (mshepherd@whitecase.com)
     Luke Laumann (luke.laumann@whitecase.com)
     Jeff Gilson (jeff.gilson@whitecase.com)

*Attorneys for Air France-KLM*

(d)     if to Lind Invest:

LIND INVEST APS
Værkmestergade 25, 14.
DK-8000 Aarhus C
Denmark
Attn:
     Henrik Lind (lind@lind-invest.dk)
     Jonas Højhus Jeppesen (jhj@lind-invest.dk)

– and –

BECH-BRUUN LAW FIRM P/S
Langelinie Alle 35
DK-2100 Copenhagen
Denmark
Attn:
     Simon Milthers (smi@bechbruun.com)
     Theis Kristensen (tkr@bechbruun.com)
     Emil Dencker Steenberg (eds@bechbruun.com)

*Attorneys for Lind Invest*

– and –

LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
Attn:
     George Davis (George.Davis@lw.com)
     David Hammerman (David.Hammerman@lw.com)
     John Greer (John.Greer@lw.com)

*Attorneys for Lind Invest*

(e)      if to the Danish State Investor:

FINANSMINISTERIET
Christiansborg Slotsplads 1
DK-1218 Copenhagen
Denmark
Attn:
        Adrian Lübbert (adblb@fm.dk)
        Anders Rendebo Jepsen (anrje@fm.dk)

– and –

PLESNER ADVOKATPARTNERSELSKAB
Amerika Plads 37
DK-2100 Copenhagen
Attn:
        Thomas Holst Laursen (thl@plesner.com)
        Hans Hedegaard (hhe@plesner.com)

*Attorneys for the Danish State Investor*

– and –

FRESHFIELDS BRUCKHAUS DERINGER LLP
601 Lexington Avenue
New York, NY 10022
Attn:
        Madlyn Primoff (madlyn.primoff@freshfields.com)

*Attorneys for the Danish State Investor*

(f)      if to the Creditors' Committee:

WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
Telephone:  (212) 728-8000
Facsimile:  (212) 728-8111
Attn:
        Brett H. Miller, Esq. (bmiller@willkie.com)
        Todd M. Goren, Esq. (tgoren@willkie.com)
        Craig A. Damast, Esq. (cdamast@willkie.com)
        James H. Burbage, Esq. (jburbage@willkie.com)

*Attorneys for the Creditors' Committee*

After the occurrence of the Effective Date, the Reorganized Debtors have authority
to send a notice to Entities that, to continue to receive documents pursuant to Bankruptcy Rule

2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. Notwithstanding the foregoing, the U.S. Trustee need not file such a renewed request and shall continue to receive documents without any further action being necessary.  After the occurrence of the Effective Date, the Reorganized Debtors are authorized to limit the list of entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities that have filed such renewed requests.

### 12.14    *Dissolution of Creditors' Committee*.

On the Effective Date, the Creditors' Committee shall be deemed to have been dissolved, and the members thereof, and their respective counsel, advisors and agents, shall be released and discharged of and from all further authority, duties, responsibilities, and obligations related to and arising from and in connection with the Chapter 11 Cases, except with respect to (i) any continuing confidentiality obligations, (ii) prosecuting requests for allowances of compensation and reimbursement of expenses incurred prior to the Effective Date, (iii) in the event that the Bankruptcy Court's entry of the Confirmation Order is appealed, participating in such appeal, (iv) reviewing and responding to inquiries from holders of Claims regarding implementation of the Plan, and (v) all issues relating to the Swedish Reorganization Plan and any appeals of the Swedish Reorganization Plan Confirmation.  From and after the Effective Date, the Reorganized Debtors shall continue to pay, when due and payable in the ordinary course of business, the reasonable and documented fees and expenses of the Creditors' Committee's professionals solely to the extent arising out of or related to the foregoing without further order of the Bankruptcy Court.

### 12.15    *Reservation of Rights*.

Except as otherwise provided herein, this Plan shall be of no force or effect unless the Bankruptcy Court enters the Confirmation Order.  None of the filing of this Plan, any statement or provision of this Plan, or the taking of any action by the Debtors with respect to this Plan shall be or shall be deemed to be an admission or waiver of any rights of the Debtors with respect to any Claims or Interests prior to the Effective Date.

Dated: February 7, 2024

**SAS AB**

**SCANDINAVIAN AIRLINES SYSTEM
DENMARK-NORWAY-SWEDEN**

By:    /s/    *Erno Hildén*

Name:  Erno Hildén

Title:   EVP & CFO

By:    /s/

Name:  Ginger Hughes

Title:   Chief Transformation Officer

*[Signature Page for Second Amended Joint Chapter 11 Plan of Reorganization of SAS AB and Its Affiliated Debtors]*

**SAS DANMARK A/S**

**SAS NORGE AS**

**SAS SVERIGE AB**

**SCANDINAVIAN AIRLINES OF NORTH AMERICA INC.**

By:   /s/   *Anna Almén*
Name:  Anna Almén
Title:   Vice President & General Counsel

**GORM ASSET MANAGEMENT LIMITED**

By:    /s/
Name:  Ciaran Connolly
Title:  Director


**GORM DARK BLUE LIMITED**

By:    /s/
Name:  Ciaran Connolly
Title:  Director


**GORM SKY BLUE LIMITED**

By:    /s/
Name:  Ciaran Connolly
Title:  Director


**GORM LIGHT BLUE LIMITED**

By:    /s/
Name:  Ciaran Connolly
Title:  Director


**GORM DEEP BLUE LIMITED**

By:    /s/
Name:  Ciaran Connolly
Title:  Director


*[Signature Page for Second Amended Joint Chapter 11 Plan of Reorganization of SAS AB and Its Affiliated Debtors]*

**GORM WARM RED LIMITED**


By:    /s/

Name:  Ciaran Connolly
Title:  Director


**GORM OCEAN BLUE LIMITED**


By:    /s/

Name:  Ciaran Connolly
Title:  Director


**GORM ENGINE MANAGEMENT LIMITED**


By:    /s/

Name:  Ciaran Connolly
Title:  Director

## Exhibit A

**Investment Agreement**

EXECUTION VERSION

INVESTMENT AGREEMENT


BY AND BETWEEN


SAS AB (publ)


AND


CL-S HOLDINGS LUX S.À R.L., AIR FRANCE-KLM S.A., LIND INVEST APS AND THE
KINGDOM OF DENMARK


_____


Dated as of November 4, 2023

## Table of Contents

Page

ARTICLE I DEFINITIONS ............................................................................................... 3
   1.1    Certain Definitions............................................................................................ 3
   1.2    Other Definitional and Interpretive Matters ................................................... 26

ARTICLE II SUBSCRIPTION FOR NEW SECURITIES ............................................. 27
   2.1    Subscription for New Securities ..................................................................... 27
   2.2    Consideration .................................................................................................. 27
   2.3    Escrowed Funds. ............................................................................................. 28
   2.4    Payment of the Total Subscription Amount.................................................... 30
   2.5    Failure to Pay ................................................................................................. 30
   2.6    Withholding .................................................................................................... 31
   2.7    Value-added Taxes......................................................................................... 31

ARTICLE III CLOSING, EFFECTIVENESS AND TERMINATION ........................... 31
   3.1    Closing Date.................................................................................................... 31
   3.2    Deliveries by the Company on the Closing Date............................................ 32
   3.3    Deliveries by the Investors on the Closing Date ............................................ 32
   3.4    Deliveries by the Company Following Receipt of Payments ......................... 33
   3.5    Deliveries by the Company following SCRO Registration ............................ 33
   3.6    Effectiveness .................................................................................................. 33
   3.7    Termination of Agreement.............................................................................. 34
   3.8    Procedure Upon Termination.......................................................................... 36
   3.9    Effect of Termination ..................................................................................... 36

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE COMPANY.................. 37
   4.1    Organization and Authority ............................................................................ 37
   4.2    Due Execution................................................................................................. 38
   4.3    Capitalization. ................................................................................................. 38
   4.4    Financial Statements ....................................................................................... 39
   4.5    Undisclosed Liabilities.................................................................................... 40
   4.6    Absence of Certain Changes ........................................................................... 40
   4.7    Compliance with Laws; Permits ..................................................................... 40
   4.8    Litigation........................................................................................................ 41
   4.9    Brokers ........................................................................................................... 41
   4.10   Insurance ........................................................................................................ 41
   4.11   Material Contracts .......................................................................................... 41
   4.12   Sanctions and Trade Controls; Anti-Corruption; Anti-Money Laundering
           Laws ............................................................................................................... 42
   4.13   Payment of Taxes. .......................................................................................... 43
   4.14   Employee Matters; Employee Benefit Plan Matters....................................... 45
   4.15   Intellectual Property ....................................................................................... 48

i

4.16    Data Privacy.................................................................................................. 49
4.17    Appointment of Trustee or Examiner; Liquidation .................................... 49
4.18    Environmental Compliance .......................................................................... 50
4.19    Private Offering by the Company ................................................................ 51
4.20    Ranking ........................................................................................................ 51
4.21    Collateral Matters......................................................................................... 51
4.22    No Other Representations and Warranties ................................................... 52

ARTICLE V REPRESENTATIONS AND WARRANTIES OF THE INVESTORS AND
CONVERTIBLE NOTES PURCHASERS ................................................................... 53
5.1    Organization and Authority .......................................................................... 53
5.2    Due Execution............................................................................................... 53
5.3    Brokers ......................................................................................................... 54
5.4    Financial Capability ..................................................................................... 54
5.5    Investment Intent .......................................................................................... 54
5.6    Securities Act ............................................................................................... 55
5.7    Sophisticated Investor .................................................................................. 55
5.8    Sanctions and Trade Controls; Anti-Corruption; Anti-Money Laundering
       Laws.............................................................................................................. 56
5.9    Danish State Term Loan ............................................................................... 57
5.10   No Other Representations; Condition of the Business ................................. 57

ARTICLE VI BANKRUPTCY RELATED COVENANTS ........................................ 58
6.1    Approval Motions ......................................................................................... 58
6.2    Bankruptcy Milestones ................................................................................ 59
6.3    Contribution Fees.......................................................................................... 59
6.4    Full Form Documents ................................................................................... 60

ARTICLE VII COVENANTS ...................................................................................... 60
7.1    Access to Information ................................................................................... 60
7.2    Conduct of the Business Pending the Closing ............................................. 61
7.3    Regulatory Approvals ................................................................................... 64
7.4    Further Assurances........................................................................................ 69
7.5    Use of Proceeds............................................................................................ 69
7.6    Publicity ........................................................................................................ 69
7.7    Consultations................................................................................................. 70
7.8    Shareholders' Agreement ............................................................................. 70
7.9    Alternative Transactions. ............................................................................. 70
7.10   Expense Reimbursement............................................................................... 73
7.11   Tag Right Termination Fee........................................................................... 75
7.12   Delisting ....................................................................................................... 76
7.13   Post-Closing Covenants................................................................................ 76
7.14   Special Prorate Agreement ........................................................................... 76
7.15   Reserved Funds ............................................................................................ 76

ii

ARTICLE VIII CONDITIONS TO CLOSING ................................................................. 77
8.1    Conditions Precedent or Concurrent to Obligations of Investors ............................. 77
8.2    Conditions Precedent or Concurrent to Obligations of the Company ...................... 78
8.3    Conditions Precedent or Concurrent to Obligations of the Investors, the
       Convertible Notes Purchaser and the Company ...................................................... 79
8.4    Frustration of Closing Conditions ......................................................................... 79

ARTICLE IX TERMINATION FEE .......................................................................... 80
9.1    Termination Fee ................................................................................................... 80
9.2    Court Approval .................................................................................................... 80
9.3    Limitation on Liability ......................................................................................... 80

ARTICLE X .............................................................................................................. 81
NO SURVIVAL ........................................................................................................ 81
10.1   No Survival of Representations and Warranties ..................................................... 81

ARTICLE XI TAXES ................................................................................................. 82
11.1   Transfer Taxes ..................................................................................................... 82
11.2   Tax Cooperation .................................................................................................. 82

ARTICLE XII MISCELLANEOUS ............................................................................ 83
12.1   Expenses ............................................................................................................. 83
12.2   Injunctive Relief .................................................................................................. 83
12.3   Governing Law .................................................................................................... 83
12.4   Submission to Jurisdiction; Consent to Service of Process ..................................... 83
12.5   Entire Agreement; Amendments and Waivers ....................................................... 84
12.6   Notices ................................................................................................................ 84
12.7   Severability ......................................................................................................... 88
12.8   Assignment .......................................................................................................... 88
12.9   No Third-Party Beneficiaries ................................................................................ 88
12.10  Counterparts ........................................................................................................ 88
12.11  Non-Recourse ...................................................................................................... 88
12.12  Acknowledgement Regarding Danish State ........................................................... 89
12.13  Several and Not Joint .......................................................................................... 90

Exhibit A      Joint Plan of Reorganization Term Sheet
Exhibit B      Conditions Precedent for the Purchase of the Convertible Notes; Convertible Loan
               Note Term Sheet
Exhibit C      Release Form

iii

INVESTMENT AGREEMENT

THIS INVESTMENT AGREEMENT, dated as of November 4, 2023 (as amended, modified or supplemented from time to time in accordance with its terms, this "Agreement"), is by and between SAS AB (publ), a public limited liability company incorporated under the laws of Sweden, with Swedish Reg. No. 556606-8499 (the "Company"), CL-S Holdings Lux S.à r.l., a Luxembourg private limited liability company ("Castlelake"), Air France-KLM S.A., a *société anonyme* organized under the laws of The Republic of France ("AFKLM"), Lind Invest ApS, a private limited liability company incorporated under the laws of Denmark, with Danish business registration number (CVR) No. 26559243 ("Lind"), the Danish State (as defined below) (together with Castlelake, AFKLM, and Lind, the "Investors" and each an "Investor"). The Company and the Investors are sometimes herein referred to collectively as the "Parties" and individually as a "Party".

W I T N E S S E T H:

WHEREAS, on July 5, 2022 (the "Commencement Date"), the Company and certain of its subsidiaries (collectively, the "Debtors") commenced voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), which are being jointly administered under the caption *In re SAS AB, et al.*, Case No. 22-10925 (MEW) (collectively, the "Chapter 11 Cases"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

WHEREAS, the Debtors and the Investors have agreed to implement the Transactions at the Closing and (in relation to items (a) – (b) and, as applicable, (d) of this paragraph) by operation of the Swedish Reorganization Plan, including: (a) all of the Existing Common Shares being cancelled and redeemed for no consideration through a reduction of the Company's registered share capital (which shall, to the extent legally possible, be made for the purpose of allocation to non-restricted equity pursuant to Chapter 20, section 1, item 2 of the Swedish Companies Act, or otherwise for the purpose of covering losses pursuant to Chapter 20, section 1, item 1 of the Swedish Companies Act) (the "Share Redemption"), (b) the Company issuing to the Investors, and the Investors subscribing for, new subordinated shares in the Company in an aggregate amount equal to $475,000,000, the name and rights of which shall be amended by adoption of the Post-Closing Articles as soon as practically possible after Closing (the "Subscription Shares") and (c) the Company issuing to the Investors (the "Convertible Notes Purchasers"), and the Convertible Notes Purchasers purchasing, $725,000,000 aggregate principal amount of senior secured convertible exit notes (the "Convertible Notes") to be issued pursuant to terms of an indenture reflecting the terms and conditions substantially as set out in the term sheet appended as Exhibit B and otherwise in form and substance reasonably satisfactory to the Convertible Notes Purchasers (the "Convertible Note Indenture") and to be purchased pursuant to the terms of, and subject to the conditions set forth in, this Agreement and (d) subject to the Share Redemption being made for the purpose of allocation to non-restricted equity, the Company carrying out a bonus issue (without issuance of shares) in an amount corresponding to SEK 4,500,000,000 (or such lower or higher amount determined by the Company and the Required

Investors to be sufficient or required, respectively, in order to restore the expected difference between the current registered share capital in the Company and the share capital increase resulting from the issuance of the Subscription Shares (the "Share Capital Deficit")) (the "Bonus Issue"), or in the event that it is not legally possible to carry out the Bonus Issue in an amount equal to the Share Capital Deficit (or carry out the Share Redemption for the purpose of covering losses), the Company applying for approval from the SCRO or the relevant Swedish court for a permanent reduction of the Company's registered share capital in an amount equal to the Share Capital Deficit (the "Share Capital Reduction"), all as more specifically set forth herein;

WHEREAS, the Transactions shall be implemented in part by operation of (a) a chapter 11 plan of reorganization (as it may be amended, modified, or supplemented, the "Chapter 11 Plan"), which shall be consistent in all material respects with the term sheet attached hereto as Exhibit A and (b) the Swedish Reorganization Plan;

WHEREAS, subject to the terms and conditions herein (including Section 7.8), at the Closing, the Investors will enter into the Shareholders' Agreement or deem the Governance Term Sheet binding as set out in Section 7.8, which, together with the current articles of association of the Company (the "Pre-Closing Articles"), an amended version of which (which shall be in form and substance reasonably acceptable to the Required Investors), where only the limits for the total number of shares and share capital are changed to the extent required to effectuate issuance of the Subscription Shares, the Share Redemption and, as applicable, the Bonus Issue or the Share Capital Reduction, is to be adopted by operation of the Swedish Reorganization Plan (the "Closing Articles"), and a further amended version of which, in form and substance reasonably acceptable to the Investors, is to be adopted by a resolution of the general meeting of shareholders in the Company to be held as soon as practically possible after Closing (the "Post-Closing Articles"), shall govern the rights and obligations of the Investors as holders of securities of the Company;

WHEREAS, the board of directors of the Company (the "Board") has determined that this Agreement, including its Exhibits, and the Transactions are advisable and in the best interests of the Debtors and their estates, and superior to any other offer, proposal, or other indication of interest received by the Company to date through its Bankruptcy Court-approved equity solicitation procedures; and

WHEREAS, the Parties acknowledge that consummation of the Transactions is subject to the entry of the Confirmation Order and the Swedish Reconstructor's Consent, the occurrence of the Chapter 11 Plan Effective Date, and the other conditions set forth in this Agreement, the Chapter 11 Plan, and the Swedish Reorganization Plan.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter contained, the Parties hereby agree as follows:

AMERICAS 125333004
WEIL:\99329431\42\72316.0004

# ARTICLE I

# DEFINITIONS

1.1    <u>Certain Definitions</u>.

For purposes of this Agreement, the following terms shall have the meanings specified in this <u>Section 1.1</u>:

"<u>2020 State Investment</u>" means the participation by the States in the recapitalization of the Company through subscription for capital securities issued by the Company and common shares in the Company (approved by the European Commission as lawful and compatible State aid by its decision of 14 August 2020 in cases SA.57543 and SA.58342, annulled by the General Court of the European Union by its judgment of 10 May 2023 in case T-238/21, on the basis that the European Commission had erred in its initial approval decision by not requiring the States to include a "step-up mechanism", as required by the Temporary Framework, in relation to the investment in common shares).

"<u>Affiliate</u>" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to (a) vote securities having more than fifty percent (50%) of the ordinary voting power for the election of directors or Persons with similar powers and duties, or (b) direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise; <u>provided</u> that, for the avoidance of doubt, (i) for purposes of <u>Section 12.11</u>, any funds, accounts, portfolio companies or other investment vehicles directly or indirectly managed or advised by Castlelake or any of its direct or indirect Affiliates shall be deemed to be an "Affiliate" of Castlelake and (ii) for purposes of <u>Section 7.10</u> and <u>Section 12.11</u>, neither the Company nor any Company Subsidiary shall be deemed an "<u>Affiliate</u>" of any Investor or any of such Investor's Affiliates, and neither any Investor nor any of its Affiliates shall be deemed an "<u>Affiliate</u>" of the Company or any of its Subsidiaries.

"<u>Aircraft</u>" means any contrivance invented, used, or designed to navigate, or fly in, the air, which includes the Engines, Parts and manual and technical records related thereto.

"<u>Airframe</u>" means an Aircraft but excluding any Engines which are, from time to time, installed thereon.

"<u>Alternative Transaction</u>" means any transaction, or series of transactions, with respect to a plan of reorganization or dissolution, winding up, liquidation, reorganization, assignment for the benefit of creditors, merger, consolidation, business combination, joint venture, partnership, sale or disposition of or foreclosure on assets or equity interests (including any acceptance of collateral in lieu of disposition) financing (debt or equity), refinancing or restructuring involving the Company or any of its Subsidiaries (other than the Transactions), that (i) has not been specifically approved by all of the Investors in writing and (ii) competes with or

3

prevents the consummation of, or would reasonably be expected to compete with or prevent the consummation of, the Chapter 11 Plan, this Agreement or the Transactions or materially frustrates, hinders or delays, or could reasonably be expected to materially frustrate, hinder or delay, the purposes of the Chapter 11 Plan, this Agreement or the Transactions.

"<u>Anti-Corruption Laws</u>" means all applicable anti-corruption and anti-bribery laws, rules and regulations of any jurisdiction from time to time, including the U.S. Foreign Corrupt Practices Act of 1977, as amended.

"<u>Anti-Money Laundering Laws</u>" means any and all laws, rules and regulations of any jurisdiction applicable to the Company, the Company Subsidiaries or their Affiliates from time to time concerning or relating to terrorism financing or money laundering, including any applicable provision of the Patriot Act and The Currency and Foreign Transactions Reporting Act (also known as the "Bank Secrecy Act", 31 U.S.C. §§ 5311-5330 and 12 U.S.C. §§ 1818(s), 1820(b) and 1951-1959).

"<u>Antitrust Laws</u>" means any Laws applicable to the Company or any Company Subsidiary under any applicable jurisdiction that are designed to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade, including the HSR Act.

"<u>AOC</u>" means an air operator certificate issued jointly by the Danish Transport Authority, Civil Aviation Authority Norway and the Swedish Transport Agency to the Consortium in accordance with Article 6 of the EU Licensing Regulation and applicable derogations.

"<u>Articles</u>" means the Pre-Closing Articles, the Closing Articles and the Post-Closing Articles, whether collectively or individually as context may require.

"<u>Aviation Authority</u>" means:

(a)     any Governmental Body which, from time to time, has control or supervision of civil aviation in, as applicable, any of Denmark, Norway, Sweden or Ireland, including the Swedish Transport Agency (Sw: *Transportstyrelsen*);

(b)     the European Aviation Safety Agency (EASA), or any successor thereof; and/or

(c)     any other Governmental Body, including the U.S. Federal Aviation Administration of the United States of America (FAA), or any successor thereof, as applicable, which, from time to time, has control or supervision of civil aviation.

"<u>Business</u>" means the business of the Company and its Subsidiaries as conducted as of the date hereof.

"<u>Business Day</u>" means any day of the year that is not a Saturday, Sunday or other day on which (i) commercial banks in New York City are authorized or required by Law or other

4

governmental actions to remain closed, (ii) commercial banks in Stockholm, Sweden are not open for business (being public holidays, including Midsummer Eve (Sw. *midsommarafton*), Christmas Eve (Sw. *julafton*) and New Year's Eve (Sw. *nyårsafton*)) or (iii) commercial banks in Copenhagen, Denmark, Paris, France or Amsterdam, The Netherlands are not open for business.

"Business Plan" means the business plan entitled "v331 – Adjusted" provided by the Company to the Investors (other than the Danish State) on August 31, 2023.

"Cash" means legal tender of the United States of America or equivalents thereof (as well as any and all non-U.S. currencies), including payment in such tender by check, wire transfer or any other customary payment method.

"Chapter 11 Plan Effective Date" means the date upon which all conditions to the effectiveness of the Chapter 11 Plan have been satisfied or waived in accordance with the terms thereof and the Chapter 11 Plan becomes effective.

"Closing FX Rate" means the European Central Bank exchange reference rate of SEK per $ as of one (1) Business Day prior to the Closing.

"Code" means the U.S. Internal Revenue Code of 1986, as amended.

"Collateral" means all of the property and assets that are or are intended under the terms of the Collateral Documents to be subject to Liens in favor of the collateral agent for the Convertible Notes Purchasers, for the benefit of the Convertible Notes Purchasers.

"Collateral Documents" means any instrument or agreement which is designated as a "Collateral Document" or similar term under the Convertible Note Indenture, in each case as amended, supplemented or otherwise modified from time to time.

"Commitment Fee" means a fee to be paid to the Danish State in an amount equal to 3.0% of the Danish State's portion of the Total Share Subscription Amount, which is set forth opposite its name on Schedule 2.1.

"Company Subsidiary" means any Subsidiary of the Company.

"Confirmation Order" means the Order of the Bankruptcy Court confirming the Chapter 11 Plan.

"Consortium" means Scandinavian Airlines System Denmark-Norway-Sweden, a consortium organized and existing under a consortium agreement dated February 8, 1951 (as amended from time to time and most recently on May 27, 2019) between the Consortium Members.

"Consortium Members" means:

5

(a)      SAS Danmark A/S, a limited liability company incorporated under the laws of Denmark, with Danish Reg. No. 56994912;

(b)      SAS Norge AS, a limited liability company incorporated under the laws of Norway, with Norwegian Reg. No. 811 176 702; and

(c)      SAS Sverige AB, a limited liability company incorporated under the laws of Sweden, with Swedish Reg. No. 556042-5414,

and each a "Consortium Member".

"Contract" means any binding contract, indenture, note, bond, lease or other agreement or instrument, whether oral or written, and any amendments thereto.

"Contribution Fee Escrow Account" means a joint escrow account to be established pursuant to the Contribution Fee Escrow Agreement.

"Contribution Fee Escrow Agreement" means an escrow agreement to be entered into by and among the Company, the Convertible Notes Purchasers and an escrow agent to be reasonably acceptable to such parties, which agreement shall be in form and substance reasonably acceptable to the parties thereto.

"Convertible Notes Subscription Price" means the subscription price per Convertible Note of 100% of the principal amount thereof.

"Copyrights" means all copyrights (whether or not the underlying works of authorship have been published) and copyrightable works, including copyrights in Software and any copyrights in and to databases or other collections of information, whether registered or unregistered, and all registrations and applications therefor.

"COVID Measures" means any quarantine, "shelter in place," "stay at home," social distancing Order, or any other Order by any Governmental Body, including the Centers for Disease Control and Prevention and the World Health Organization, in each case, (x) in connection with or in response to COVID-19 or any other pandemic, epidemic or disease outbreak and (y) that is binding (as applicable) on the Company or any Company Subsidiary.

"Currency Agreement" means any foreign exchange contract, currency swap agreement or other similar agreement or arrangement.

"Damages" means any and all damages, losses, charges, claims, fines, fees, assessments, penalties, liabilities, obligations, deficiencies, demands, awards, judgments, and reasonable out of pocket costs and expenses (including reasonable out of pocket expenses of investigation and reasonable out of pocket attorneys' fees and expenses).

"Danish Contribution Fee" means a fee to be paid to the Danish State by the Convertible Notes Purchasers, on or after the Chapter 11 Plan Effective Date, in an amount equal

6

to 50% of the sum of (i) 10% of SEK 1,250,000,000 (converted to $ (truncated to two decimal places) using the Closing FX Rate) and (ii) 5% of the positive difference of the total distributable value to unsecured creditors of the Debtors pursuant to the Chapter 11 Plan and SEK 1,250,000,000 (converted to $ (truncated to two decimal places) using the Closing FX Rate), in each case, such amounts representing a percentage of the total distributable value provided to the holders of unsecured claims against the Debtors and in all circumstances at least SEK 25,000,000.  The Danish Contribution Fee shall be rounded to two decimal places.

"Danish State" means the Kingdom of Denmark, represented by the Ministry of Finance in its capacity as a subscriber and purchaser of New Securities under, and in accordance with, this Agreement and/or purchaser of Convertible Notes under, and in accordance with, this Agreement and the Convertible Notes Indenture (as applicable), in each case, to the extent provided in Section 12.12.

"Danish State Expense Reimbursement" means an expense reimbursement to be paid to the Danish State in an amount equal to the lesser of (A) 2.0% of the Danish State's portion of (i) the Total Share Subscription Amount and (ii) the principal amount of the Convertible Notes, both of which as set forth opposite its name in column II on Schedule 2.1, and (B) SEK 62,500,000 (as converted to U.S. Dollars using the Closing FX Rate).

"Determination" means (A) the European Commission notifies one or more of the Parties in writing or publicly announces or otherwise communicates to one or more of the Parties that the Transactions constitute a concentration within the meaning of Regulation 139/2004 or (B) any Investor, Convertible Notes Purchaser or the Company concludes in good faith that it is unlikely that the European Commission will determine that the Transactions do not constitute a concentration within the meaning of Regulation 139/2004.

"DIP Credit Agreement" means the super-priority replacement debtor-in-possession term loan agreement entered into on the date hereof among Scandinavian Airlines System Denmark-Norway-Sweden, as borrower, the Company and the other parties thereto as guarantors, the lenders party thereto and the administrative agent and collateral agent party thereto (as may be amended, supplemented or otherwise modified from time to time).

"DIP Loan Documents" means the DIP Credit Agreement, the DIP Order, any instrument or agreement which is designated as a "DIP Loan Document" under the DIP Credit Agreement, in each case as amended, supplemented or otherwise modified from time to time.

"DIP Order" means that certain order to be entered by the Bankruptcy Court approving the DIP Credit Agreement and the DIP Loan Documents and authorizing the Debtors to incur and perform their obligations thereunder and to execute such other documentation as may be required with respect to the transactions contemplated by such documents.

"Disclosure Statement" means the disclosure statement in respect of the Chapter 11 Plan, including all exhibits and schedules thereto, as approved or ratified by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

7

"Employee" means all individuals, as of the date hereof, whether or not actively at work as of the date hereof, who are employed by the Company or any Company Subsidiary, together with individuals who are hired after the date hereof and prior to the Closing.

"Employee Consultation Process" means any notification or provision of information to, or any consultation with, Employees who might be affected by the Transactions, their applicable Employee Representatives or any labor boards or other relevant Governmental Body, whether required by law or pursuant to any collective agreement or other labor-related agreement or arrangement, regarding or in connection with the Transactions and its impact on such Employees, whether arising prior to or following the date of this Agreement.

"Employee Representative" means any union, works council or other employee representative body.

"Engine" means an engine used, or intended to be used, to propel an Aircraft, including a Part, appurtenance, and accessory of such Engine and any records relating to such Engine.

"Environmental Claim" means any notice, claim, proceeding, notice of proceeding, investigation, demand, abatement order or other order or directive by any Person or Governmental Body alleging or asserting liability with respect to the Company or any Company Subsidiary or the property operated by the Company or any Company Subsidiary, as the case may be, arising out of, in connection with or resulting from (a) the actual or alleged presence, Use, Hazardous Release or threatened Hazardous Release, (b) violations of Environmental Law, or (c) any actual or alleged injury or threat of injury to health or safety (as it relates to exposures to Hazardous Materials), natural resources or the environment.

"Environmental Law" means all applicable laws (including common law), statutes, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions or legally binding agreements issued, promulgated or entered into by or with any Governmental Body relating to the environment, pollution, Hazardous Materials, noise pollution, waste management, health and safety (as it relates to exposures to Hazardous Materials) or natural resources.

"Environmental Liability" means any liability (including any liability for damages, natural resource damage, costs of environmental investigation, remediation or monitoring or costs, fines or penalties) resulting from or based upon (a) violations of Environmental Law, (b) the presence, Use or the arrangement for disposal of any Hazardous Materials, (c) exposure of any Person to any Hazardous Materials, or (d) the Hazardous Release or threatened Hazardous Release of any Hazardous Materials into the environment.

"Environmental Permit" means any permit, approval, identification number, license, registration, consent or other authorization required to be held by the Company or any Company Subsidiary under any Environmental Law.

"EPCA Approval Obligations" means the obligations of the Company and the other Debtors under the EPCA Approval Order.

8

"EPCA Approval Order" means an Order of the Bankruptcy Court that (a) authorizes the Company (on behalf of itself and the other Debtors) to enter into and perform its obligations under this Agreement and to execute such other documentation as may be required with respect to the Transactions and (b) provides that the Termination Fee and the Expense Reimbursement contained herein shall constitute allowed administrative expenses of the Debtors' estates under sections 503(b) and 507(a) of the Bankruptcy Code and shall be payable by the Debtors as provided in this Agreement without further Order of the Bankruptcy Court, which Order shall be acceptable to the Required Investors.

"Escrow Agreement" means that certain Escrow Agreement, dated as of September 25, 2023, by and among the Consortium, CL VI Ventures Offshore LP, CLA V Ventures Offshore LP, CLA IV Investment Holding Company (Offshore) LP, AFKLM, Lind and Citibank, N.A., as the escrow agent, as may be amended, restated, supplemented or otherwise modified from time to time in accordance with its terms.

"Euroclear Sweden" means Euroclear Sweden AB, with Swedish Reg. No. 556112 -8074.

"Euroclear Sweden Registrations" means instructions to Euroclear Sweden to (i) cancel the Existing Common Shares in the CSD system and (ii) cause the Subscription Shares to be created in the CSD system.

"EU Blocking Regulation" means EU Council Regulation (EC) 2271/96 of 22 November 1996.

"EU Market Abuse Regulation" means Regulation (EU) No 596/2014 of the European Parliament and of the Council of 16 April 2014 on market abuse.

"EU Slots Regulation" means Council Regulation (EEC) No 95/93 of 18 January 1993 on common rules for the allocation of slots at Community airports, as amended by Regulation (EC) No 894/2002 of 27 May 2002, Regulation (EC) No 1554/2003 of 22 July 2003, Regulation (EC) No 793/2004 of 21 April 2004 and Regulation (EC) No 545/2009 of 18 June 2009.

"Existing Common Shares" means the common shares with ISIN SE0003366871 in the Company existing as of the Commencement Date.

"Final Order" means a judgment or Order of any court of competent jurisdiction entered on the docket maintained by the clerk of such court, which has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for certiorari or move for a new trial, stay, reargument or rehearing has expired, and as to which no appeal, petition for certiorari or other proceeding for a new trial, shall then be pending or (b) if an appeal, writ for certiorari, new trial, stay, reargument or rehearing thereof has been sought, such judgment or Order shall have been affirmed in full by the highest court to which such judgment or Order was appealed, or certiorari shall have been denied, or a new trial, reargument or rehearing shall have been denied, and the time to make any further appeal, petition, writ for certiorari or move for a new trial, reargument or rehearing shall have expired.  Notwithstanding anything herein to the contrary, no Order or

9

judgment will fail to be a "Final Order" solely because of the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedures, or any analogous rule under the Federal Rules of Bankruptcy Procedure, or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed relating to such judgment or Order.

"GAAP" means U.S. generally accepted accounting principles.

"Governance Term Sheet" means that certain Equity and Governance Term Sheet, dated November 4, 2023, a copy of which was provided to the advisors to the Debtors on November 4, 2023, as may be amended, restated, supplemented or otherwise modified from time to time by the mutual agreement of the Investors.

"Governmental Body" means any government, parliament or governmental authority or regulatory or administrative body thereof, or political subdivision thereof, whether foreign, federal, state, or local, or any agency or commission, instrumentality or authority thereof, including the European Commission, or any court, tribunal, judicial body or arbitrator (public or private) or applicable stock exchange.

"Hazardous Materials" means (a) all explosive or radioactive substances or wastes, (b) all hazardous or toxic substances or wastes, (c) all other pollutants, including petroleum, petroleum products, petroleum by-products, petroleum breakdown products, petroleum distillates, asbestos, asbestos containing materials, polychlorinated biphenyls, per- and polyfluoroalkyl substances, radon gas, and infectious or medical wastes and (d) all other substances or wastes of any nature that are regulated pursuant to, or could reasonably be expected to give rise to liability under any Environmental Law.

"Hazardous Release" means spilling, leaking, pumping, pouring, emitting, emptying, discharging, migrating, injecting, escaping, leaching, dumping, or disposing of any Hazardous Material into the environment.

"Hedging Agreement" means any Interest Rate Agreement, any Currency Agreement and any other derivative or hedging contract, agreement, confirmation or other similar transaction or arrangement that is entered into by the Company or any Company Subsidiary, including any commodity or equity exchange, swap, collar, cap, floor, adjustable strike cap, adjustable strike corridor, cross-currency swap or forward rate agreement, spot or forward foreign currency or commodity purchase or sale, listed or over-the-counter option or similar derivative right related to any of the foregoing, non-deliverable forward or option, foreign currency swap agreement, currency exchange rate price hedging arrangement or other arrangement designed to protect against fluctuations in interest rates or currency exchange rates, emission rights allowances, commodity, currency or securities values, or any combination of the foregoing agreements or arrangements, in all cases in the Ordinary Course of Business.

"Hedging Obligations" means obligations under or with respect to Hedging Agreements.

AMERICAS 125333004
WEIL:\99329431\42\72316.0004

"<u>Hedging Order</u>" shall mean that *Final Order (I) Authorizing Debtors To (A) Continue Performing Under Foreign Currency Hedging Agreements And Emission Rights Allowance Transactions And (B) Enter Into And Perform Under New Postpetition Foreign Currency Hedging Agreements And Emission Rights Allowance Transactions And (II) Granting Related Relief* [ECF No. 171].

"<u>HSR Act</u>" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"<u>IFRS</u>" means the International Financial Reporting Standards.

"<u>Indebtedness</u>" of any Person means, on any date, all indebtedness of such Person as of such date, and shall include the following: (i) all indebtedness of such Person for borrowed money, (ii) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (iii) all obligations of such Person to pay the deferred purchase price of property or services other than in the Ordinary Course of Business, (iv) all obligations of such Person under finance or capital leases which would be shown as an obligation in a balance sheet prepared in accordance with IFRS, (v) all Hedging Obligations under Hedging Agreements, (vi) all indebtedness of others with respect to obligations referred to in <u>clauses (i)</u> to <u>(v)</u> above, guaranteed in any manner, directly or indirectly, by such Person and (vii) all net reimbursement obligations of such Person with respect to letters of credit, foreign currency sale agreements and bankers' acceptances, except such as are obtained by such Person to secure performance of obligations (other than for borrowed money or similar obligations). Notwithstanding the foregoing, trade payables and accounts receivable (including intercompany payables and receivables but excluding trade payables that are overdue by more than ninety (90) days) incurred in the Ordinary Course of Business shall not constitute "Indebtedness."

"<u>Intellectual Property</u>" means all intellectual property worldwide, whether registered or unregistered, including such rights in and to the following: (a) Trademarks, (b) Patents, (c) Copyrights, (d) Software, (e) Trade Secrets, (f) domain name registrations, and (g) any applications, registrations or issuances for any of the foregoing.

"<u>Intercompany Loans</u>" means all intercompany loans or advances among the Company and/or the Company Subsidiaries from time to time.

"<u>Interest Rate Agreement</u>" means any interest rate protection agreement, interest rate future agreement, interest rate option agreement, interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, interest rate hedge agreement, option or future contract or other similar agreement or arrangement.

"<u>Investor Consent</u>" means the prior written consent of (i) for all purposes hereunder other than <u>Section 7.2(b)(iii)</u>, each of the Required Investors acting in its sole and absolute discretion (unless otherwise provided in the applicable provision) or (ii) for purposes of <u>Section 7.2(b)(iii)</u>, each of the Required Investors (other than AFKLM) acting in its sole and absolute discretion (unless otherwise provided in the applicable provision) (in each case, which may include the prior written consent of Lind to the extent so required by the definition of Required Investors).

11

"Key Transaction Documents" means this Agreement, the Convertible Notes, the Convertible Notes Indenture, the EPCA Approval Order, the Chapter 11 Plan, the Swedish Reorganization Plan, the Confirmation Order, the DIP Credit Agreement and the DIP Order.

"Knowledge of the Company" means the actual knowledge of those officers of the Company identified on Schedule 1.1(a) after reasonable inquiry, which shall include such inquiry as such individuals would normally conduct in the ordinary course of their duties to the Company or the Company Subsidiaries.

"Law" means any federal, state, local, municipal, provincial, territorial or foreign law, statute, code, ordinance, rule, treaty, constitution, Order, regulation or other similar restriction or requirement (having the force of law) enacted or imposed by any Governmental Body.

"Legal Proceeding" means any actions, suits, complaints, investigations, arbitration, audits, hearings, litigation, proceedings (whether public, private, civil, criminal, administrative, investigative, or informal) or claims by or before a Governmental Body or any mediator.

"Letters of Credit" means those letters of credit, surety bonds, insurance bonds and other similar instruments, issued for the account of the Company or a Company Subsidiary as set forth on Schedule 1.1 and any amendments, renewals or extensions thereof.

"Liability" means all debts, liabilities, guarantees, assurances, commitments and obligations, whether fixed, contingent or absolute, asserted or unasserted, matured or unmatured, liquidated or unliquidated, accrued or not accrued, known or unknown, due or to become due, whenever or however arising.

"Lien" means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, title retention agreement, title defect, charge, option, right of first refusal or first offer, preemptive right, claim, easement, transfer restrictions, rights-of-way, hypothecation or similar restriction of any kind whatsoever.

"made available to the Investors" means provided to each Investor at least two (2) Business Days prior to the date hereof via an electronic dataroom operated by the Company and/or its advisors (the "Dataroom").

"Material Adverse Effect" means any event, occurrence, fact, condition, circumstance, development, effect or change (collectively, a "Change") that, individually or in the aggregate, (a) has, has had or would reasonably be expected to have a material and adverse effect on the assets, properties, business, condition (financial or otherwise), Liabilities or results of operations of the Company and its Subsidiaries, taken as a whole or (b) would, or would reasonably be expected to, have a material and adverse effect on the ability of the Company to consummate the Transactions under this Agreement; provided, that, solely with respect to the foregoing clause (a), none of the following shall be taken into account in determining whether a Material Adverse Effect exists or has occurred or would reasonably be expected to exist or occur: (i) Changes generally affecting the economy or affecting financial, credit, banking or securities markets

12

(including any disruption thereof and any decline in the price of any security or any market index or changes in interest rates or exchange rates) in any country or region of the world in which the Company or any Company Subsidiaries operate, (ii) Changes generally affecting the industries or markets in which the Company or any of its Subsidiaries operates, (iii) any Changes to national, regional, international foreign or domestic, social or political conditions (including changes therein), including the results of any primary or general elections, (iv) Changes caused by or resulting from the engagement or escalation by any country in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or escalation of any hostilities, acts of terrorism, cyber terrorism or military attack upon any country, or any of their respective territories, possessions, or diplomatic or consular offices or upon any military installation, equipment or personnel of any country, or other national or international calamity, crisis or emergency, flood, hurricane, earthquake, volcanic eruption or other natural disaster or any governmental or other response to any of the foregoing, (v) Changes in IFRS or applicable Laws or the interpretation or enforcement thereof after the date hereof, (vi) any failure by the Company or its Subsidiaries to meet any internal or published projections, plans, estimates, budgets, forecasts, predictions or guidance of revenues, income, cash position, cash-flow or other financial measure (except that the exception in this clause (vi) shall not prevent or otherwise affect a determination that any Change underlying such failure not otherwise excluded from the definition of "Material Adverse Effect" has resulted in or contributed to a Material Adverse Effect, and any such Change may be taken into account in determining whether a Material Adverse Effect exists or has occurred or would reasonably be expected to exist or occur), (vii) Changes related to any State aid decisions of the European Commission and/or EFTA Surveillance Authority concerning State aid decisions, (viii) Changes relating to or arising from the commencement of the filing of the Chapter 11 Cases or the Swedish Reorganization Plan, (ix) Changes relating to the execution of this Agreement or the Transactions or the announcement thereof (except that the exception in this clause (ix) shall not apply to the use of "Material Adverse Effect" in clause (b) of Section 4.2 or in connection with any other representation or warranty in Article IV addressing the effects of the execution, delivery or performance of this Agreement or the consummation of the Transactions), (x) Changes resulting from the taking of any action expressly required by this Agreement (other than Section 7.2(a)), or the omission from taking any action expressly prohibited to be taken by this Agreement; provided, that Changes arising from or related to the matters described in clauses (i), (ii), (iii), (iv) or (v) that disproportionately affect the Company and its Subsidiaries taken as a whole, as compared to other companies operating in the industries in which the Company and its Subsidiaries operate shall be taken into account in determining whether there has been, or is reasonably expected to be, a Material Adverse Effect (but only to the extent of the incremental disproportionate effect on the Company and its Subsidiaries, taken as a whole, compared to other companies operating in the industries and markets in which the Company and its Subsidiaries operate).

"Material Contracts" means any Contract with an annual value (either on an asset, income, liability and/or expense basis) during any twelve (12)-month period in excess of $10,000,000, including any executory contract or unexpired lease with an annual value (either on an asset, income, liability and/or expense basis) during any twelve (12)-month period in excess of $10,000,000, other than (a) executory contracts and unexpired leases related to the Debtors'

13

Aircraft, Engines, and related equipment and arrangements and (b) licenses to off-the-shelf or commercially available Software.

"Material State Aid Decision" means, with respect to all State aid decisions, a decision that is reasonably likely to (i) create a potential total negative impact of $100,000,000 or greater (when combined with all other State aid decisions) on the Company's projected EBITDA, as set forth in the Business Plan, over a total period of five (5) years, (ii) place material limitations on the ability of the Company to undertake expansion or growth activities after the Closing, (iii) limit the ability of the Company to freely operate a worldwide network from a hub in Copenhagen (including to AFKLM's and its partners' gateways), or limit the Company's ability to enter into commercial arrangements with AFKLM and its joint venture partners providing for any form of code sharing, network coordination, pricing coordination, joint marketing, frequent flyer / loyalty program cooperation, or revenue sharing, and (iv) otherwise impact the material terms of any Key Transaction Document.

"New Securities" means, together, the Subscription Shares and the Convertible Notes.

"Norwegian Tax Authority" means the Norwegian Tax Administration, as the same may be amended, replaced, revised, supplemented, re-enacted or substituted from time to time.

"Old Warrants" means the warrants of series 2021/2041 entitling to subscription for subordinated shares in the Company held by SAS Scandinavia AB, being all of the Company's issued warrants as of immediately prior to the Closing Date.

"Operating License" means an air transport license issued by the Relevant Licensing Authority to operators of aircraft for the purpose of commercial air transport of either cargo or passengers.

"Order" means any order, decision, directive, injunction, judgment, decree, ruling, writ, subpoena, indictment, stipulation, determination, assessment or arbitration award entered into by or with any Governmental Body.

"Ordinary Course of Business" means the ordinary course of normal day-to-day operations of the Business through the date hereof consistent with past practice.

"Original DIP Agreement" means that certain Super-Priority Debtor-In-Possession Term Loan Agreement entered into between, among others, the Company, an Affiliate of Apollo Global Management (the "Original DIP Lender") and certain other parties thereto.

"Other Governmental Body" means each Governmental Body identified by the Investors pursuant to Section 7.3(a) with respect to applicable Antitrust Law, other than a Governmental Body to whom a notice or filing set forth in Schedule 7.3(a)(i) (Part 1, Antitrust approvals) as in effect as of the date hereof, and is agreed by the Parties pursuant to Section 7.3(a) to be governed by Section 7.3(g).

14

"Overall Cap" means a cap in the aggregate amount of SEK 500,000,000 on the fees and expenses the States may receive pursuant to the Danish Contribution Fee, the Commitment Fee, the Danish State Expense Reimbursement, and the Swedish Contribution Fee.

"Participating Member State" means any member state of the European Union that has the € as its lawful currency in accordance with legislation of the European Union relating to Economic and Monetary Union.

"Parts" means all avionics, appliances, parts, modules, accessories, furnishings and instruments, appurtenances and other equipment (including all inflight equipment, buyer-furnished and buyer-designated equipment) of whatever nature which may from time to time be incorporated or installed in or attached to any Aircraft or any Engine.

"Patents" mean all patents and patent applications, together with all reissuances, divisionals, provisionals, continuations, continuations-in-part, revisions, renewals, extensions, and reexaminations thereof.

"PDP Facility" means that certain facility established pursuant to the PDP Facility Agreement, dated as of August 31, 2021, among Rofford Limited, as borrower, Carlyle Aviation Management Limited, as agent, and Runway Three Lender LLC, as security trustee and as lender, as may be amended, amended and restated, supplemented or otherwise modified from time to time in accordance with the PDP Facility Order.

"PDP Facility Order" means the *Order (I) Authorizing Debtors to Honor and Perform Their Obligations Under PDP Facility, (II) Granting Superpriority Administrative Expense Status to Obligations Under PDP Facility, (III) Modifying Automatic Stay, and (IV) Granting Related Relief* (ECF No. 333) entered by the Bankruptcy Court on September 12, 2022.

"Permitted Hedging Agreements" shall mean any Hedging Agreements to the extent constituting a swap, cap, collar, forward purchase or similar agreements or arrangements dealing with interest rates, currency exchange rates, emissions allowances or fuel, either generally or under specific contingencies, in each case, entered into in the Ordinary Course of Business and not for speculative purposes, in a manner consistent with the hedging policies of the Company and the Company Subsidiaries party to the DIP Loan Documents as in effect as of the Commencement Date, and, in each case, in accordance with the Hedging Order and/or the DIP Budget referenced under the DIP Credit Agreement. The use of any Hedging Agreement by the Company or any Company Subsidiary to hedge the Total Subscription Amount or any other amounts payable by the Investors under this Agreement shall not constitute a "Permitted Hedging Agreement".

"Permitted Indebtedness" means:

(a)    Indebtedness under the DIP Loan Documents;

(b)    unsecured guaranties of any Indebtedness otherwise permitted to be incurred under this Agreement (including, for greater certainty, guaranties in respect of Intercompany Loans);

15

(c)     Intercompany Loans; provided, that such Indebtedness is incurred in compliance with terms and conditions set forth under the DIP Loan Documents;

(d)     Indebtedness consisting of the financing of insurance premiums incurred in the Ordinary Course of Business;

(e)     Indebtedness related to any Permitted Sale and Leaseback;

(f)     Indebtedness in respect of any bankers' acceptances, bank guarantees, letter of credit, warehouse receipt or similar facilities entered into in the Ordinary Course of Business and not to exceed $40,000,000 in the aggregate;

(g)     unsecured guarantees incurred in the Ordinary Course of Business in respect of obligations of suppliers, customers, franchisees, lessors and licensees;

(h)     Indebtedness existing as of the Commencement Date;

(i)     (A) the Letters of Credit and (B) Indebtedness in respect of any bank guarantee or letter of credit entered into in connection with the PDP Facility in an aggregate amount not to exceed the amount required under the PDP Facility;

(j)     Indebtedness of the Company or a Company Subsidiary party to the DIP Loan Documents not otherwise permitted under the DIP Loan Documents in an aggregate principal amount which, when aggregated with the principal amount or liquidation preference of all other Indebtedness then outstanding and incurred pursuant to this clause (j), does not exceed $10,000,000 at any one time outstanding;

(k)     obligations of the Company or any Company Subsidiary party to the DIP Loan Documents consisting of obligations contained in supply arrangements entered into in the Ordinary Course of Business and to the extent constituting Indebtedness;

(l)     Indebtedness of any of the Company or any Company Subsidiary that is a party to the DIP Loan Documents to credit card processors in connection with credit card processing services incurred in the Ordinary Course of Business of the Company or any Company Subsidiary that is a party to the DIP Loan Documents;

(m)     Indebtedness under Hedging Obligations under Permitted Hedging Agreements;

(n)     Indebtedness incurred under or in connection with any Pre-Petition Financing Lease Arrangements;

(o)     Indebtedness incurred under leases relating to leased Aircraft pursuant to the terms of which the Company, a Company Subsidiary or an Affiliate has the option to acquire such Aircraft at the end of the term of such lease upon payment and satisfaction in full of all amounts and obligations outstanding thereunder;

16

(p)    Indebtedness incurred under or in connection with the purchase or repurchase of any Aircraft or Airframe as contemplated by, or consistent with the objectives under, the SAS Forward Plan;

(q)    Indebtedness incurred under or in connection with the purchase of, or expenses relating to, emission right allowances or related rights;

(r)    obligations of the Company or any Company Subsidiary pursuant to any stipulations entered into after the Commencement Date in connection with the Pre-Petition Financing Lease Arrangements in furtherance of cost savings objectives under the SAS Forward Plan; provided, that such obligations are consistent with the SAS Forward Plan;

(s)    (i) Indebtedness incurred under or in connection with the PDP Facility, to the extent permitted by the requirements set forth in the definition of "PDP Facility" and (ii) any administrative expense incurred in connection with the PDP Facility, in each case of this clause (s), to the extent junior to the obligations under the DIP Loan Documents;

(t)    any Indebtedness incurred under any Permitted Lease;

(u)    Indebtedness incurred under or in connection with any tax respite program administered by the Swedish Tax Agency (Sw. *Skatteverket*) in an amount not to exceed SEK300,000,000;

(v)    Indebtedness in respect of any bank guarantee or letter of credit in connection with and/or required by commercial agreements entered into in the Ordinary Course of Business (including those issued in favor of vendors and aircraft lessors); and

(w)    Indebtedness incurred (including any commitment to incur Indebtedness in the future) as a consequence of the implementation of a requirement by the EU Commission to put in place a "step-up mechanism" as a condition for approving the 2020 State Investment as lawful and compatible State aid, in the form of either (i) an amendment of the principal amount of the existing SEK 5,000,000,000 capital securities issued by the Company under ISIN SE0014958005, in each case as issued or to be issued to the States (the "2020 State Capital Securities") or (ii) new capital securities issued by the Company to the Danish State and the Swedish State on substantially the same terms as the 2020 State Capital Securities, respectively, in each case, provided that such Indebtedness is not secured and constitutes Subordinated Indebtedness.

"Permitted Lease" shall mean any lease in respect of Aircraft or Engines to the extent permitted under the DIP Loan Documents.

"Permitted Sale and Leaseback" means any Sale and Leaseback (including, for the avoidance of doubt, by acting as a guarantor thereunder), in each case with respect to any property or asset that is not or is not intended under the terms of the DIP Loan Documents to be subject to Liens in favor of the collateral agent under the DIP Loan Documents, that (x) is consummated for fair value as determined at the time of consummation in good faith by the Company or any Company Subsidiary and (y) is in the Ordinary Course of Business.

17

"Person" means any individual, corporation, limited liability company, general or limited partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization or Governmental Body.

"Personal Information" means all information that identifies, could be used to identify or is otherwise related to an individual person, in addition to any definition for "personal information," "personal data" or any similar term provided by applicable Law, including Privacy Laws.

"Pre-Petition Financing Lease Arrangements" means Pre-Petition Financing Leases and related agreements of the Company or a Company Subsidiary existing on the Commencement Date as set forth in Schedule 1.1(b) hereto, as amended, restated, modified, supplemented or extended after the Commencement Date, subject to the approval of the Bankruptcy Court.

"Pre-Petition Financing Leases" means any finance or other lease in existence on the Commencement Date relating to leased Aircraft pursuant to the terms of which the Company or a Company Subsidiary has the option to acquire such Aircraft at the end of the term of such lease upon payment and satisfaction in full of all amounts and obligations outstanding thereunder; provided that any lease which includes such option to acquire an Aircraft at generally above market rates or for an amount which does not constitute a repayment of debt shall not be deemed to be a Pre-Petition Financing Lease.

"Privacy Laws" means all applicable Laws, legal requirements and self-regulatory guidelines relating to data privacy or data security or the Processing of any Personal Information, including: (i) the General Data Protection Regulation (Regulation (EU) 2016/679); and (ii) the Privacy and Electronic Communications Directive 2002/58/EC.

"Processing" means the receipt, collection, compilation, use, storage, processing, sharing, safeguarding, security (technical, physical or administrative), disposal, destruction, disclosure or transfer (including cross-border) of any data, including Personal Information.

"Prospectus Regulation" means Regulation (EU) 2017/1129 of the European Parliament and of the Council of June 14, 2017.

"Relevant Licensing Authority" means, in respect of an AOC, Operating License or Temporary Operating License, the Aviation Authority that originally issued such AOC, Operating License or Temporary Operating License or, where more than one Aviation Authority issued such AOC, Operating License or Temporary Operating License, any of them.

"Representatives" means, with respect to any Person, its officers, directors, principals, partners, managers, members, employees, consultants, agents, financial advisors, investment bankers, attorneys, accountants, other advisors and other representatives.

"Required Investors" means AFKLM, Castlelake and the Danish State; provided that any consent by the Required Investors that adversely affects Lind's rights or obligations as

18

compared to one or several of the other Investors shall also require Lind's prior written consent (not to be unreasonably withheld, conditioned or delayed).

"Reserved Funds" means cash proceeds from the Investors' subscription for, and purchase of, the Subscription Shares and the Convertible Notes Purchasers' purchase of the Convertible Notes, in an aggregate amount of SEK 2.4 billion, following the deduction of amounts required by the Company to defend itself against a claim raised in national courts requiring the Company to pay any State Non-Tax Claim.

"Sale and Leaseback" means any lease of any property (whether real, personal or mixed), whether now owned or hereafter acquired, that the Company or any Company Subsidiary (a) has sold or transferred or is to sell or transfer to any other Person, or (b) intends to use for substantially the same purpose as any other property that has been or is to be sold or transferred by the Company or such Company Subsidiary to any Person in connection with such lease.

"SAS Forward Plan" means the comprehensive business plan of Company and the Company Subsidiaries through the end of the fiscal year ended October 31, 2028.

"SCRO" means the Swedish Companies Registration Office (Sw. *Bolagsverket*).

"SCRO Registration" means registration with the SCRO of: (i) the Share Redemption, (b) the issuance of the Subscription Shares, (c) the Bonus Issue or the Share Capital Reduction (as applicable); and (d) the Closing Articles.

"Securities Act" means the United States Securities Act of 1933, as amended.

"Share Subscription Price" means the subscription price of SEK 1.19040499526657 per Subscription Share, corresponding to the quota value (Sw. *kvotvärde*) of the Subscription Shares.

"Software" means all computer programs, data, databases and applications (whether in object code or source code) and supporting documentation, including "software" as such term is defined in the Uniform Commercial Code as in effect on the Closing Date in the State of New York and computer programs that may be construed as included in the definition of "goods" in the Uniform Commercial Code as in effect on the Closing Date in the State of New York, including any licensed rights to Software, and all media that may contain Software or recorded data of any kind.

"Specified Norwegian Tax Action" means any action taken in respect of or in connection with the inquiry commenced by the Norwegian Tax Authority during fiscal year 2019 relating to certain deductions claimed by SAS Norge AS in respect of aircraft and engine maintenance reserves in its Norwegian tax returns for fiscal years 2017 onwards as further set forth on Schedule 4.13(b) and, for the avoidance of doubt, such action shall include any action to appeal, dispute or contest any decision by the Norwegian Tax Authority.

"States" means, together, the Danish State and Swedish State.

19

"Stock Exchanges" means Nasdaq Copenhagen, Nasdaq Stockholm and Oslo Børs.

"Stock Exchange Rules" means any rules and regulations for issuers adopted by the Stock Exchanges, as the same may be amended, replaced, revised, supplemented, re-enacted or substituted from time to time.

"Subordinated Indebtedness" means any Indebtedness of the Company or any of its Subsidiaries which (i) is subordinated in right of payment to the obligations under the DIP Credit Agreement (including in case of an insolvency proceeding of the Company or any of its Subsidiaries) and (ii) does not (including upon the happening of any insolvency proceeding of the Company or any of its Subsidiaries) restrict the payment of amounts due thereunder or compliance by the obligors under the DIP Credit Agreement with their obligations thereunder.

"Subsidiary" means, when used with respect to any Person, any corporation, limited liability company, partnership, association, trust or other entity of which (i) securities or other ownership interests representing more than 50% of the ordinary voting power (or, in the case of a partnership, more than 50% of the general partnership interests) or (ii) sufficient voting rights to elect at least a majority of the board of directors or other governing body are, as of such date, owned by such Person or one or more Subsidiaries of such Person or by such Person and one or more Subsidiaries of such Person.

"Superior Transaction" means a bona fide Alternative Transaction that the Board determines in good faith, after consultation with outside financial advisors and outside legal counsel, (i) would be in the best interests of the Company and its creditors and equity holders, and other stakeholders as a whole, (ii) is reasonably capable of being completed, taking into account all financial, regulatory and legal aspects (including whether an agreement on governance terms has been reached with the Danish State) of such Alternative Transaction as set forth in the Alternative Transaction Proposal with respect thereto and (iii) to be more favorable from a financial point of view to the Company and its creditors, equity holders and other stakeholders, as a whole (taking into account the terms, conditions and impact of, and all legal, financial (including the financing terms of any such proposal), conditionality, regulatory and other aspects of such Alternative Transaction as set forth in the Alternative Transaction Proposal with respect thereto) than would be obtained through the consummation of the Transactions (including any binding proposal by the Investors to amend the terms and conditions of this Agreement, the Chapter 11 Plan or the Transactions in effect as of the date of such determination).

"Swedish Companies Act" means the Swedish Companies Act (Sw. *aktiebolagslag (2005:551)*).

"Swedish Contribution Fee" means a fee to be paid to the Swedish State by the Convertible Notes Purchasers, on or after the Chapter 11 Plan Effective Date, in an amount equal to 50% of the sum of (i) 10% of SEK 1,250,000,000 (converted to $ (truncated to two decimal places) using the Closing FX Rate) and (ii) 5% of the positive difference of the total distributable value to unsecured creditors of the Debtors pursuant to the Chapter 11 Plan and SEK 1,250,000,000 (converted to $ (truncated to two decimal places) using the Closing FX Rate), in each case, such

20

amounts representing a percentage of the total distributable value provided to the holders of unsecured claims against the Debtors and in all circumstances at least SEK 25,000,000. The Swedish Contribution Fee shall be rounded to two decimal places.

"Swedish Court" means the District Court of Stockholm (Sw. *Stockholms tingsrätt*) (or any relevant court of appeal), contemplated to approve and confirm the Swedish Reorganization Plan.

"Swedish Reconstructor" means the person appointed by the Swedish Court to be the Company's reconstructor (Sw. *rekonstruktör*) in its Swedish Reorganization.

"Swedish Reconstructor's Consent" means, to the extent required by the Swedish Reorganization Act (Sw. *lag (2022:964) om företagsrekonstruktion*) or determined jointly by the Company and the Required Investors to be desirable, the Swedish Reconstructor's consent to any act, including the Transactions, by the Company after its filing for Swedish Reorganization which is outside the Ordinary Course of Business.

"Swedish Reorganization" means a company reorganization proceeding under the Swedish Reorganization Act (Sw. *lag (2022:964) om företagsrekonstruktion*) under which the Company is the sole debtor, as contemplated in the Chapter 11 Plan.

"Swedish Reorganization Plan" means the reorganization plan to be filed with the Swedish Court, approved by the affected parties (or a sufficient majority of classes) and ultimately approved and confirmed by the Swedish Court as part of the Swedish Reorganization, as contemplated in the Chapter 11 Plan.

"Swedish Reorganization Plan Confirmation" means the decision by the Swedish Court approving and confirming the Swedish Reorganization Plan for the Company, which approval and confirmation shall be final and binding (Sw. *lagakraftvunnen*) and reasonably acceptable to the Required Investors.

"Swedish State" means the Kingdom of Sweden, including its government and the instrumentalities thereof.

"Swedish Tax Agency" means the Swedish Tax Agency (*Sw. Skatteverket*), as the same may be amended, replaced, revised, supplemented, re-enacted or substituted from time to time.

"Taxes" means any and all present or future taxes (including all net income, gross income, gross receipts, license, lease, service, service use, payroll, employment, fringe, fringe benefits, excise, severance, stamp, occupation, premium, environmental, customs duties, capital stock, ad valorem, value added, inventory, franchise, profits, branch profits, profit share, withholding (including backup withholding), social security, unemployment, pension plan, health, disability, real property, personal property, windfall profits, wealth, net wealth, net worth, export fees and charges, registration fees, deposits, sales, use, transfer, registration, alternative or add-on minimum or estimated taxes), levies, imposts, duties, assessments, fees or deductions of any kind,

21

and any similar charges, imposed by any Governmental Body including any interest, additions to tax or penalties applicable thereto or in respect thereof.

"Tax Return" means any return, report, form, claim for refund, information return, declaration, statement, schedule or other similar document (including but not limited to any related or supporting information, schedule or attachment thereto and estimated or amended returns, reports, forms, information returns, declarations, statements or schedules) relating to Taxes.

"Temporary Operating License" means a temporary license issued by an Aviation Authority, pursuant to Article 9(1) of the EU Licensing Regulation to a "Community air carrier" as defined in Article 2(e) of the EU Slots Regulation (or any equivalent issued by any Aviation Authority in a non-EU state to an air carrier that is not a "Community air carrier").

"Total Cash Convertible Notes Purchase Price" means the Total Convertible Notes Purchase Price less the Total Set-Off Convertible Notes Purchase Price.

"Total Cash Share Subscription Amount" means the Total Share Subscription Amount less the Total Set-Off Share Subscription Amount.

"Total Convertible Notes Purchase Price" means an aggregate purchase price amount for the Convertible Notes equal to $725,000,000 payable by the Convertible Notes Purchasers in cash and/or by set-off pursuant to this Agreement, the Chapter 11 Plan and the Swedish Reorganization Plan.

"Total Set-Off Amounts" means, together, the Total Set-Off Share Subscription Amount and the Total Set-Off Convertible Notes Purchase Price.

"Total Set-Off Convertible Notes Purchase Price" means the aggregate amount owed by the Company and other Debtors to the Convertible Notes Purchasers or any of their respective Affiliates which, at the Closing, shall be set-off against the purchase price payable by the Convertible Notes Purchasers for the Convertible Notes pursuant to this Agreement, the Chapter 11 Plan and the Swedish Reorganization Plan (in each case, to the extent legally possible). For the purposes of this Agreement, any references to "set-off" shall, insofar as it relates to set-off against the purchase price payable for the Convertible Notes, also include payment in kind (Sw. *apport*), as required.

"Total Set-Off Share Subscription Amount" means the aggregate amount owed by the Company and other Debtors to the Investors or any of their respective Affiliates which, at the Closing, at the direction of such Investor shall be set-off against the subscription amounts payable by the Investors for the Subscription Shares pursuant to this Agreement, the Chapter 11 Plan and the Swedish Reorganization Plan (in each case, to the extent legally possible). For the purposes of this Agreement, any references to "set-off" shall, insofar as it relates to set-off against the subscription amounts payable for the Subscription Shares, also include payment in kind (Sw. *apport*), as required.

22

"Total Share Subscription Amount" means an aggregate subscription amount for the Subscription Shares equal to $475,000,000 payable by the Investors in cash and/or by set-off pursuant to this Agreement, the Chapter 11 Plan and the Swedish Reorganization Plan.

"Total Subscription Amount" means together, the Total Share Subscription Amount and the Total Convertible Notes Purchase Price.

"Trademarks" means all trademarks, trade names, trade dress, slogans, domain names, corporate names, company names, business names, fictitious business names, service marks, certification marks, collective marks, brand names, logos and all other source identifiers, whether or not registered, and with respect to any and all of the foregoing: (i) all registrations and applications therefor and (ii) all of the goodwill associated therewith or symbolized thereby.

"Trade Secrets" means all trade secrets, know-how, processes and all other confidential, non-public or proprietary information, in each case, that derives economic value from their confidential nature, whether or not reduced to a writing or other tangible form, and including all documents and any materials embodying, incorporating, or referring in any way to any of the foregoing, including technical, engineering and manufacturing information, specifications, blue prints, supplier lists, customer lists, business, production or marketing plans, formulae, methods (whether or not patentable), ideas, algorithms, techniques, analyses, source code and data collections.

"Transactions" means the transactions contemplated by this Agreement, the Confirmation Order, the Chapter 11 Plan and the Swedish Reorganization Plan.

"Treasury Regulations" means the regulations promulgated under the Code.

"Uninsured Liabilities" means any losses, damages, costs, expenses and/or, liabilities (including any losses, damages, costs, expenses or liabilities resulting from property damage or casualty, general liability, workers' compensation claims and business interruption) incurred by the Company or any Company Subsidiary which are not covered by insurance, but with respect to which insurance coverage is commercially available to Persons engaged in the same or similar business as the Company and the Company Subsidiaries.

"Unsecured Creditors" means the holders of General Unsecured Claims (as such term is defined in the term sheet appended as Exhibit A) and the corresponding classes of creditors pursuant to the Swedish Reorganization Plan, that are entitled to receive distributions from Available Cash (as such term is defined in the term sheet appended as Exhibit A) pursuant to the Chapter 11 Plan and the Swedish Reorganization Plan.

"Use" means, with respect to any Hazardous Materials, generation, manufacture, processing, distribution, handling, use, discharge, treatment, disposal, transportation, removal or storage.

Terms Defined Elsewhere in this Agreement. For purposes of this Agreement, the following terms have meanings set forth in the Sections indicated:

23

| **Term** | **Section** |
|---|---|

| Term | Section |
|---|---|
| 2020 State Capital Securities | 1.1 |
| Affiliated Persons | 12.11 |
| AFKLM | Preamble |
| Agreement | Preamble |
| Agreement Date | 3.6(a) |
| Alternative Transaction Proposal | 7.9 |
| Balance Sheet Date | 4.4 |
| Bankruptcy Court | Recitals |
| Board | Recitals |
| Bonus Issue | Recitals |
| Briefing Paper | 7.3(e) |
| Burdensome Condition | 7.3(c) |
| Castlelake | Preamble |
| Change | 1.1 |
| Chapter 11 Cases | Recitals |
| Chapter 11 Plan | Recitals |
| Closing | 3.1 |
| Closing Articles | Recitals |
| Closing Date | 3.1 |
| Commencement Date | Recitals |
| Company | Preamble |
| Company Documents | 4.1(b) |
| Company Notice of Superior Proposal | 7.9(b) |
| Company Representatives | 7.9 |
| Convertible Note Indenture | Recitals |
| Convertible Notes | Recitals |
| Convertible Notes Purchasers | Recitals |
| Dataroom | Article I |
| Default Date | 2.5 |
| Defaulting Investor | 2.5 |
| Disclosure Schedules | Article IV |
| Employee Benefit Plan | 4.14(f) |
| Equitable Exceptions | 4.1(b) |
| ERISA | 4.14(f) |
| Escrow Agent | 2.3(a) |
| Escrowed Funds | 2.3(b), 2.3(a) |
| EU AT Milestone Date | 7.3(f) |
| EUWA | 5.7 |
| Expense Reimbursement | 7.10(a) |
| Expense Reimbursement Milestones | 7.10(c) |
| Failure to Fund | 2.5 |
| Final Escrowed Funds | 2.3(b) |
| Financial Promotion Order | 5.7 |

24

Financial Statements ........................................................................................... 4.4
FSMA .................................................................................................................. 5.7
Insurance Distribution Directive ........................................................................ 5.7
Interim Period .................................................................................................... 7.2
International Company Employee Plan ...........................................................4.14(h)
Investor Documents ........................................................................................5.1(a)
Investor-Linked Transfer Tax .......................................................................... 11.1
Investors ................................................................................................... Preamble
Joint Release Instruction .............................................................................2.3(c)(i)
Lind .......................................................................................................... Preamble
MiFID II ............................................................................................................ 5.7
New Closing Date ............................................................................................. 2.5
Non-Defaulting Investor ................................................................................... 2.5
Non-Parties ..................................................................................................... 12.11
Original DIP Default............................................................... Disclosure Schedules
Outside Date.....................................................................................................3.7(b)
Parties...................................................................................................... Preamble
Party ........................................................................................................ Preamble
Payor-Linked Deduction .................................................................................. 2.6
Permits .............................................................................................................4.7(b)
Post-Closing Articles .................................................................................. Recitals
Post-Closing Company Shareholders ............................................................... 7.8
Pre-Closing Articles.................................................................................... Recitals
Publicly Available Documents .................................................................. Article IV
Regulatory Action .........................................................................................7.3(c)
Regulatory Meeting ...................................................................................... 7.3(f)
Related Persons ......................................................................... 5.10, 4.22(a)
Released Group ................................................................................................ 10.1
Replacement Financing Period ........................................................................ 2.5
Replacement Financing Right............................................................................ 2.5
Required Approvals .......................................................................................7.3(a)
Sanctioned Country........................................................................................4.12(b)
Sanctioned Person ........................................................................................4.12(b)
Sanctions and Trade Controls Laws ..............................................................4.12(b)
Share Capital Deficit........................................................................................ Recitals
Share Redemption ....................................................................................... Recitals
Shareholders' Agreement ................................................................................. 7.8
Submission Date .............................................................................................7.3(e)
Subscription Shares......................................................................................... Recitals
Superior Proposal ...........................................................................................7.9(b)
Surviving Covenants ........................................................................................ 10.1
Tag Right Termination Fee Advance ................................................................ 7.11
Tag Right Termination Order ........................................................................... 7.11
Termination Fee ..............................................................................................9.1(a)
Transfer Taxes ................................................................................................ 11.1

25

1.2    <u>Other Definitional and Interpretive Matters</u>.

(a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)    <u>Calculation of Time Period</u>.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.  References to "days" means calendar days unless Business Days are expressly specified.

(ii)    <u>Dollars</u>.  Any reference in this Agreement to $ means U.S. dollars.

(iii)    <u>Euros</u>.  Any reference in this Agreement to € means Euros.

(iv)    <u>Swedish kronor</u>:  Any reference in this Agreement to SEK means Swedish kronor.

(v)    <u>Exhibits/Schedules</u>.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(vi)    <u>Gender and Number</u>.  Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(vii)    <u>Headings</u>.  The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement.  All references in this Agreement to any "Article" or "Section" are to the corresponding Article or Section of this Agreement unless otherwise specified.

(viii)    <u>Herein</u>.  The words such as "<u>herein</u>," "<u>hereinafter</u>," "<u>hereof</u>," and "<u>hereunder</u>" refer to this Agreement as a whole (including the Exhibits and Schedules annexed hereto) and not merely to a subdivision in which such words appear unless the context otherwise requires.

(ix)    <u>Including</u>.  The word "<u>including</u>" or any variation thereof means "<u>including, without limitation</u>" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(x)    <u>Law</u>.  Reference to any Law means such Law as amended, modified, codified, replaced or re-enacted, in whole or in part, and in effect from time to time, including any successor legislation thereto and any rules and regulations promulgated thereunder, and references to any Section or other provision of a Law means that Section or provision of such Law in effect from time to time and constituting the substantive amendment, modification, codification, replacement or re-enactment of such Section or other provision.

(xi)    <u>Subsidiaries</u>.  All references herein to the Subsidiaries of a Person shall be deemed to include all direct and indirect Subsidiaries of such Person unless otherwise indicated or the context otherwise requires.

(b)    The Parties have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

## ARTICLE II

## SUBSCRIPTION FOR NEW SECURITIES

2.1    <u>Subscription for New Securities</u>.  On the terms and subject to the satisfaction (or, to the extent permitted by applicable Law, waiver by the Party entitled to waive that condition) of the conditions set forth in <u>Article VIII</u>, following the satisfaction or waiver of such conditions at the Closing, (a) the Company undertakes to take all actions required to give effect to the issuance of the Subscription Shares in accordance with the Swedish Reorganization Plan, and each Investor agrees, severally and not jointly, to subscribe for a number of Subscription Shares corresponding to such Investor's portion of the Total Share Subscription Amount as set forth on <u>Schedule 2.1</u> converted to SEK (rounded to two decimal places) using the Closing FX Rate divided by the Share Subscription Price (whereby the number of Subscription Shares shall be truncated down to the nearest integer), and (b) the Company undertakes to take all actions required to give effect to the issuance of the Convertible Notes in accordance with the Swedish Reorganization Plan, and each Convertible Notes Purchaser agrees, severally and not jointly, to purchase, the aggregate principal amount of Convertible Notes as set forth opposite its name in column II on <u>Schedule 2.1</u>, in each case free and clear of all Liens other than transfer restrictions imposed by securities and corporate Laws, the applicable Articles, the Shareholders' Agreement and the Convertible Note Indenture.

2.2    <u>Consideration</u>.

(a)    Each Subscription Share shall be subscribed for by the relevant Investor at the Share Subscription Price, payable either through (i) cash in an aggregate amount equal to such Investor's applicable portion of the Total Cash Share Subscription Amount set forth opposite such Investor's name in column I on <u>Schedule 2.1</u> (converted to SEK (rounded to two decimal places)

27

using the Closing FX Rate) or (ii) set-off in an aggregate amount equal to such Investor's applicable portion of the Total Set-Off Share Subscription Amount.

(b)    Each Convertible Notes Purchaser agrees, severally and not jointly, to purchase at the Closing the aggregate principal amount of Convertible Notes as set forth opposite its name in column II on Schedule 2.1 at the Convertible Notes Subscription Price, payable either through (i) cash at the Closing in an aggregate amount equal to such Convertible Notes Purchaser's applicable portion of the Total Cash Convertible Notes Purchase Price (as set forth opposite such Convertible Notes Purchaser's name in column II on Schedule 2.1) or (ii) set-off in an aggregate amount equal to such Convertible Notes Purchaser's applicable portion of the Total Set-Off Convertible Notes Purchase Price.

2.3    Escrowed Funds.

(a)    Subscription Price Initial Deposit.  It is hereby acknowledged by the Company and the Investors that, on September 25, 2023, pursuant to the terms of the Escrow Agreement, CL VI Ventures Offshore LP, CLA V Ventures Offshore LP, CLA IV Investment Holding Company (Offshore) LP, AFKLM and Lind deposited with Citibank, N.A., in its capacity as escrow agent (the "Escrow Agent"), the sum as set forth opposite Castlelake's (in respect of the amounts deposited by CL VI Ventures Offshore LP, CLA V Ventures Offshore LP and CLA IV Investment Holding Company (Offshore) LP), AFKLM's and Lind's respective names in column III on Schedule 2.1, by wire transfer of immediately available funds (the "Initial Escrowed Funds"), to be released by the Escrow Agent and delivered to either the relevant Investor or the Company, as the case may be, in accordance with the provisions of the Escrow Agreement and Section 2.3(c).  For the avoidance of doubt, the Initial Escrowed Funds deposited by CL VI Ventures Offshore LP, CLA V Ventures Offshore LP and CLA IV Investment Holding Company (Offshore) LP shall be deemed deposited by Castlelake for purposes of this Agreement.

(b)    Subscription Price Final Deposit.  No later than one (1) Business Day prior to the expected Swedish Reorganization Plan Confirmation by the Swedish Court, such date to be notified by the Company in writing and in good faith based on the Swedish Reconstructor's indications, pursuant to the terms of the Escrow Agreement, each Investor and Convertible Notes Purchaser (as applicable) shall procure that it has deposited with the Escrow Agent the sum as set forth opposite its name in column IV on Schedule 2.1 (less such Investor or Convertible Notes Purchaser's (as applicable) portion of the Total Set-Off Amounts) by wire transfer of immediately available funds (the "Final Escrowed Funds", and together with the Initial Escrowed Funds, the "Escrowed Funds"), to be released by the Escrow Agent and delivered to the Company or the relevant Investor, as the case may be, in accordance with the provisions of the Escrow Agreement and Section 2.3(c).

(c)    Release of Escrowed Funds.  The Escrowed Funds (together with all accrued investment income thereon, if any) shall be released and distributed by the Escrow Agent as follows:

28

(i)    if the Closing shall occur, the Company and the Investors or Convertible Notes Purchasers (as applicable) shall (or shall cause their Affiliate party to the Escrow Agreement to) promptly execute and deliver to the Escrow Agent a joint release instruction (the "Joint Release Instruction") directing the Escrow Agent to release and distribute at the Closing (x) to the Company the portion of the Escrowed Funds deposited by each Investor or Convertible Notes Purchaser (as applicable) (less any portion of the Initial Escrowed Funds distributed to the Debtors to pay the Tag Right Termination Fee in accordance with Section 7.11), which Escrowed Funds shall be applied towards their respective portions of the Total Cash Share Subscription Amount and the Total Cash Convertible Notes Purchase Price payable by such Investor or Convertible Notes Purchaser (as applicable) to the Company under Section 2.1, and (y) to the relevant Investor or Convertible Notes Purchaser (as applicable), all remaining Escrowed Funds, including accrued investment income on the Escrowed Funds (if any);

(ii)    if this Agreement is terminated pursuant to Section 3.7(g), the Company, the Convertible Notes Purchaser and the Investors shall (or shall cause their affiliate party to the Escrow Agreement to) promptly execute and deliver to the Escrow Agent a Joint Release Instruction directing the Escrow Agent to release and distribute: (1) an aggregate amount equal to (x) the Initial Escrowed Funds deposited by the applicable Investors and Convertible Notes Purchasers, together with all accrued investment income thereon (if any), less (y) any portion of such Initial Escrowed Funds distributed to the Company prior to the date of such termination in accordance with Section 7.11, to the Company, and (2) the Final Escrowed Funds, together with all accrued investment income thereon (if any), to the relevant Investor or Convertible Notes Purchaser (as applicable); or

(iii)    if this Agreement is terminated for any reason other than pursuant to Section 3.7(g), (A) the Company, the Convertible Notes Purchasers and the Investors shall (or shall cause their Affiliate party to the Escrow Agreement to) promptly execute and deliver to the Escrow Agent a Joint Release Instruction directing the Escrow Agent to release and distribute the Escrowed Funds, together with all accrued investment income thereon (if any), to the relevant Investor or Convertible Notes Purchaser (as applicable), and (B) the Company shall promptly make the applicable payments to the relevant Convertible Notes Purchasers in accordance with Section 7.11.

(iv)    If the Initial Escrowed Funds (or the remaining portion thereof) are distributed to the Company pursuant to Section 2.3(c)(ii): (A) such distributed funds shall not be a penalty, but rather liquidated damages in a reasonable amount that will compensate the Company in the circumstance of any breach of this Agreement by any of the Investors or Convertible Notes Purchasers; and (B) (x) the Company's receipt of such distributed funds in accordance with Section 2.3(c)(ii) shall be the sole and exclusive remedy of the Company for any breach of this Agreement by any Investor; and (y) none of the Company, any Company Subsidiary, any of their Affiliates or any other Person shall be entitled to bring or maintain any other claim, action or proceeding against any Investor or any of their respective Affiliates for any losses arising out, or damages suffered or incurred under, this

29

Agreement, any of the Transactions or any matters forming the basis for such termination (other than in the case of actual and intentional fraud).

2.4     Payment of the Total Subscription Amount.

(a)     On the Closing Date, the Company and the Investors or Convertible Notes Purchasers (as applicable) shall (or shall cause their Affiliate party to the Escrow Agreement to) execute and deliver to the Escrow Agent the Joint Release Instruction described in Section 2.3(c)(i), thereby instructing the Escrow Agent to pay to the Company the Escrowed Funds in accordance with Section 2.3(c), in immediately available cash funds by wire transfer into one or more accounts designated by the Company in writing to the Investors and the Escrow Agent at least three (3) Business Days prior to the Closing Date, for application in satisfaction of the Total Cash Share Subscription Amount and the Total Convertible Notes Purchase Price payable by such Investor to the Company.  Notwithstanding anything to the contrary in this Agreement, the Parties acknowledge that the Total Share Subscription Amount in SEK (rounded to two decimals) must be paid to the Company in full (in cash and/or through set-off), in each case without any reductions or withholdings, and that any reductions thus will need to be made from the Total Convertible Notes Purchase Price.

(b)     The Company, the Convertible Notes Purchasers and the Investors shall procure that all actions within their respective control, reasonably requested or required by the Swedish Reconstructor, the Swedish Court, the SCRO and/or the auditor of the Company in order to effect the payment of the Total Set-Off Amounts, are executed on or prior to the Closing Date, including delivering any instruments or documents evidencing their claim (as applicable).

(c)     The Company and the Danish State will cooperate in good faith and the Company will use commercially reasonable efforts to ensure that the Danish State can set-off any cash payments to be made by the Danish State to the Company pursuant to this Agreement against any cash payment obligations of the Company to the Danish State pursuant to this Agreement or any Key Transaction Document, in each case, on the Closing Date.

2.5     Failure to Pay.  Notwithstanding anything to the contrary herein, if any Investor or Convertible Note Purchaser fails to fund such Investor's or Convertible Note Purchaser's portion of the Total Subscription Amount on the date that the Closing is required to occur in accordance with Section 3.1 (such defaulting Investor or Convertible Note Purchaser, a "Defaulting Investor", such failure, a "Failure to Fund" and such date the "Default Date"), the non-defaulting Investors and Convertible Note Purchasers (each a "Non-Defaulting Investor") shall have the right and opportunity (but not the obligation) (such right and opportunity, the "Replacement Financing Right"), to defer Closing to a date that is not more than fifteen (15) calendar days after the Default Date (such date, the "New Closing Date" and such period, the "Replacement Financing Period") and to make arrangements for one or more of the Non-Defaulting Investors or one or more of their Affiliates reasonably acceptable to the Company and such Non-Defaulting Investors and/or any third party acceptable to the Company and such Non-Defaulting Investors to fund such Defaulting Investor's portion of the Total Subscription Amount and subscribe for and/or purchase (as applicable) the corresponding Subscription Shares and Convertible Notes, on the terms and subject

30

to the satisfaction or waiver of the applicable conditions set forth in this Agreement, including those conditions set forth in <u>Article VIII</u>; <u>provided</u> that, notwithstanding anything to the contrary herein, (x) all of the conditions precedent set forth in <u>Section 8.1</u> shall automatically be deemed satisfied as of the New Closing Date if such conditions precedent were satisfied as of the Default Date (other than <u>Section 8.1(f)</u>), and (y) the Company shall not have the right to terminate this Agreement in accordance with <u>Section 3.7(b)</u> or <u>Section 3.7(g)</u> prior to the earlier of (i) the expiration of the Replacement Financing Period and (ii) the date that all Non-Defaulting Investors provide written notice to the Company of their election to not exercise the Replacement Financing Right.

2.6    <u>Withholding</u>.  Notwithstanding anything in this Agreement to the contrary, each Party (and any agent of any Party) shall be entitled to deduct and withhold from any amount payable under this Agreement such Taxes as may be required to be deducted and withheld from such amount under the Code or any applicable provision of U.S. or non-U.S. Tax Law, <u>provided</u>, <u>however</u>, that the applicable withholding party shall take commercially reasonable efforts to provide the recipient with a written notice of such withholding party's intention to withhold and basis for such withholding as soon as reasonably practicable and the applicable withholding party and the recipient shall use commercially reasonable efforts to minimize or eliminate any such withholding.  Any amounts deducted and withheld in accordance with this <u>Section 2.6</u>, and which are not treated as a Payor-Linked Deduction, shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding was made.  To the extent that any amounts are so deducted or withheld, the Party making the payment (the "<u>payor</u>") shall pay (or procure the payment of) such additional amount as shall be required by the recipient of such payment (the "payee") to ensure that the total amount received by the payee is equal to the amount that would have been received by the payee if no such withholding or deduction been required, provided that payment of an additional amount under this clause shall only be made if the deduction or withholding is a Payor-Linked Deduction.  For the purposes of this <u>Section 2.6</u>, a "<u>Payor-Linked Deduction</u>" means any deduction or withholding which arises solely as result of a connection of the payer with the jurisdiction imposing it.

2.7    <u>Value-added Taxes</u>.  Except where stated otherwise, all amounts payable under this Agreement by any Party in respect of supplies under this Agreement shall be inclusive of value added tax (or similar Tax) and no additional amount shall be added in respect of such Taxes (including, for the avoidance of doubt, in respect of the Termination Fee).

ARTICLE III

CLOSING, EFFECTIVENESS AND TERMINATION

3.1    <u>Closing Date</u>.  Subject to the satisfaction of the conditions set forth in <u>Article VIII</u> or the waiver thereof by the Party entitled to waive that condition, the subscription for and/or purchase of the New Securities provided for in <u>Article II</u> (the "<u>Closing</u>") shall, as soon as practically possible after the later to occur of the date of the Swedish Reorganization Plan Confirmation and the Chapter 11 Plan Effective Date, unless another time or date, or both, are agreed to in writing by the Company and the Investors, take place by way of payment of the Total

31

Subscription Amount to the Company in accordance with <u>Article II</u>.  The date on which the Closing shall be held is referred to in this Agreement as the "<u>Closing Date</u>".

3.2     <u>Deliveries by the Company on the Closing Date</u>.  At the Closing, the Company shall deliver, or cause to be delivered, to each Investor and each Convertible Notes Purchaser:

(a)     a certificate duly executed by the chief executive officer or chief financial officer of the Company certifying that the conditions set forth in <u>Section 8.1(a)</u>, <u>Section 8.1(b)</u> and <u>Section 8.1(c)</u> have been satisfied;

(b)     a signed copy of the minutes of the Board (i) approving this Agreement, the other Key Transaction Documents and the transactions contemplated hereby or thereby (including the approval of the allotment of the Subscription Shares to the Investors and issuance of the Convertible Notes to the Convertible Notes Purchasers) and (ii) resolving to cancel (Sw. *makulera*) the Old Warrants and to report such cancellation of the Old Warrants to the SCRO following SCRO Registration;

(c)     a counterpart of the Joint Release Instruction, duly executed by the Company, directing the Escrow Agent to release the Escrowed Funds in accordance with <u>Section 2.3(c)</u>;

(d)     payment of the "Tag Right Termination Fee" (as defined in the Original DIP Agreement) to the "DIP Lender" (as defined in the Original DIP Agreement) in full satisfaction of the Company's obligations under Section 2.10(i) of the Original DIP Agreement;

(e)     executed copies of the Convertible Note Indenture and the Convertible Notes; and each other instrument or agreement associated with the Convertible Notes required to be delivered as a condition for the obligation of the Convertible Notes Purchasers to purchase the Convertible Notes, as specified in the term sheet appended as <u>Exhibit B</u>; and

(f)     an electronic copy of the Dataroom as of two (2) Business Days prior to the date hereof.

3.3     <u>Deliveries by the Investors on the Closing Date</u>.  At the Closing, each Investor and with respect to Section 3.3(c) and Section 3.3(d), each Convertible Notes Purchaser shall deliver, or cause to be delivered to the Company:

(a)     a counterpart of the Joint Release Instruction, duly executed by such Investor, directing the Escrow Agent to release the Escrowed Funds in accordance with <u>Section 2.3(c)</u>;

(b)     upon written request by the Company, duly executed subscription lists with respect to the Subscription Shares;

(c)     each Investor and each Convertible Note Purchaser shall deliver to the Company a certificate duly executed by an officer of such Investor or Convertible Note Purchaser

32

(as applicable), certifying that the conditions set forth in <u>Section 8.2(a)</u> and <u>Section 8.2(b)</u> have been satisfied;

(d)    unless covered by the Swedish Reorganization Plan Confirmation dealing with the DIP Credit Agreement and the DIP Loans and/or to the extent necessary from a New York law perspective, a customary payoff letter, or similar document, in form and substance reasonably satisfactory to the Company, which shall, *inter alia*, (i) confirm the Payment in Full (as defined in the DIP Credit Agreement) of all DIP Obligations (as defined in the DIP Credit Agreement) in accordance with the DIP Credit Agreement and (ii) provide for the automatic termination and release of all DIP Liens;

(e)    to the extent requested by the Swedish Reconstructor, the auditor of the Company and/or the SCRO in order to consummate the Transaction, any instruments or documents evidencing payment of the Total Set-Off Share Subscription Amount; and

(f)    solely with respect to the Danish State, a counterpart to the Release, in the form attached hereto as <u>Exhibit C</u>, duly executed by the Danish State.

3.4    <u>Deliveries by the Company Following Receipt of Payments</u>.  On the date of receipt by the Company of the Total Cash Share Subscription Amount (or, if such receipt is received later than 2:00 p.m. CET, the Business Day immediately following such date), the Company shall deliver, or cause to be delivered, to the Investors proof that all relevant application forms and supporting documentation required for the SCRO Registration has been submitted to the SCRO, and that all actions required for the SCRO Registration have been (or will be) taken by the Company.

3.5    <u>Deliveries by the Company following SCRO Registration</u>.  As soon as practically possible following the SCRO Registration (and not in any event later than the Business Day after the SCRO Registration or, in respect of <u>item (c)</u> below, if not registered on the same date, as soon as practically possible following registration with the SCRO of the cancellation of all Old Warrants), the Company shall deliver, or cause to be delivered, to each Investor:

(a)    a certificate of registration of the Company, confirming that the SCRO Registration has been effected;

(b)    proof that the Company has submitted the Euroclear Sweden Registrations; and

(c)    proof that the Company has cancelled all Old Warrants.

3.6    <u>Effectiveness</u>.

(a)    This Agreement shall be effective and legally binding on each Investor and each Convertible Notes Purchaser upon the date set forth in the Preamble (the "<u>Agreement Date</u>") following its execution and delivery of each of the Investor signature pages to the Company.

33

(b)    This Agreement shall be effective and legally binding on the Company immediately upon the occurrence of both (i) the Company's execution and delivery of its signature page to the Investors and (ii) entry of the EPCA Approval Order.

(c)    The Closing shall not be deemed to have been completed until the SCRO Registration (noting, for the avoidance of doubt, that the obligations set out in Section 3.2 and Section 3.3 shall be carried out on the Closing Date, regardless of whether or not the SCRO Registration has occurred).

3.7    Termination of Agreement.    This Agreement may be terminated and the Transactions abandoned prior to the Closing as follows:

(a)    by mutual written consent of the Company and the Required Investors;

(b)    by the Company or Investor Consent, if the Closing (including for the avoidance of doubt, the SCRO Registration) shall not have occurred by the close of business on the date that is nine (9) months following the Agreement Date (as may be extended pursuant to this Section 3.7(b), the "Outside Date"); provided, however, that (i) if the Closing shall not have occurred due to the failure of the Bankruptcy Court to enter the Confirmation Order, absence of the Swedish Reorganization Plan Confirmation or the conditions to Closing set forth in Section 8.3(a), Section 8.3(b), or Section 8.3(d) remain unsatisfied and not waived and if all other conditions to the respective obligations of the Parties to close hereunder that are capable of being fulfilled by the Outside Date shall have been so fulfilled or waived, then no Party may terminate this Agreement prior to the date that is twelve (12) months following the Agreement Date, and (ii) if the Closing shall not have occurred due to a Failure to Fund, the Company shall not have the right to terminate this Agreement in accordance with this Section 3.7(b) until the later of (x) the Outside Date and (y) the date that is the earlier of (A) the date of the expiration of the Replacement Financing Period and (B) the date that all Non-Defaulting Investors provide written notice to the Company of their election to not exercise the Replacement Financing Right; provided, further, that if the failure of the Closing to occur on or before the Outside Date arose primarily out of the Company's or any Investor's or any Convertible Note Purchaser's material breach of this Agreement, then the breaching Party may not terminate this Agreement pursuant to this Section 3.7(b);

(c)    by the Company or Investor Consent, (A) if any Chapter 11 Case shall have been dismissed or converted to a case under Chapter 7 of the Bankruptcy Code, (B) if a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or examiner with expanded powers (beyond those set forth in section 1104(c) and 1106(a)(3) and (4) of the Bankruptcy Code) shall have been appointed in any of the Chapter 11 Cases, or (C) upon the granting of relief from the automatic stay to permit foreclosure with respect to any material assets of the Debtors to the extent such foreclosure constitutes an Alternative Transaction;

(d)    by the Company or Investor Consent, if the Bankruptcy Court enters an Order denying confirmation of the Chapter 11 Plan, the effect of which would render the Chapter 11 Plan incapable of being consummated on the terms consistent with the terms herein; provided

34

that, for the avoidance of doubt, none of the Company, the Convertible Notes Purchasers or the Investors shall have the right to terminate this Agreement pursuant to this Section 3.7(d) if the Bankruptcy Court denies confirmation of the Chapter 11 Plan subject only to the making of ministerial, administrative or immaterial modifications to the Chapter 11 Plan;

(e)     by the Company or Investor Consent, if any Final Order or applicable Law has been issued or enacted by a Governmental Body of competent jurisdiction (or is otherwise in effect) after the date of this Agreement that prevents, enjoins, makes illegal or otherwise prohibits the Transactions, in a way that cannot be remedied by the Company in a manner acceptable to the Required Investors;

(f)     by Investor Consent, if there shall have been a breach by the Company of any of its representations, warranties, covenants or obligations set forth in this Agreement, which breach would result in the failure to satisfy any condition set forth in Section 8.1(a) or Section 8.1(b) and, in any such case, such breach: (A) shall by its nature be incapable of being cured by the Outside Date; or (B) if capable of being cured, shall not have been cured by the earlier of: (I) twenty (20) calendar days after written notice thereof shall have been delivered to the Company; and (II) the Outside Date;

(g)     by the Company, if there shall have been a breach by an Investor or a Convertible Note Purchaser of any of its representations, warranties, covenants or obligations set forth in this Agreement, which breach would result in the failure to satisfy any condition set forth in Section 8.2(a) and Section 8.2(b) and, in any such case, such breach: (A) shall by its nature be incapable of being cured by the Outside Date; or (B) if capable of being cured, shall not have been cured by the earlier of: (I) twenty (20) calendar days after written notice thereof shall have been delivered to the Investors; and (II) the Outside Date;

(h)     by the Company, if the Company or any of its Subsidiaries enters into a binding agreement in respect of an Alternative Transaction (regardless of whether the effectiveness of such agreement, or the binding nature of such agreement with respect to the Company or such Subsidiary, is conditioned on or subject to approval by the Bankruptcy Court), that is determined by the Board to be a Superior Proposal in accordance with and subject to Section 7.9(b) and Section 7.9(c);

(i)     by Investor Consent, if (A) the Company or any of its Subsidiaries materially breach Section 7.9; or (B) the Company or any of its Subsidiaries enters into a binding agreement in respect of any Alternative Transaction (regardless of whether the effectiveness of such agreement, or the binding nature of such agreement with respect to the Company or such Subsidiary, is conditioned on or subject to approval by the Bankruptcy Court);

(j)     by Investor Consent, if the DIP Order or Confirmation Order is terminated, reversed, stayed, dismissed, vacated, or reconsidered, or any such Order is modified or amended after entry without Investor Consent in a manner that prevents or prohibits the consummation of the transactions contemplated by this Agreement or any of the other Key Transaction Documents

35

in a way that cannot be remedied by the Company, in each case, in a manner reasonably acceptable to the Investors;

(k)     by the Company or Investor Consent, if the Swedish Reconstructor objects to or rejects this Agreement in a manner that restrains, enjoins or otherwise prohibits the consummation of the Transactions;

(l)     by Investor Consent, if, as of 11:59pm prevailing Eastern Time on the date that is three (3) Business Days following the date upon which the hearing for approval of the DIP Order is held by the Bankruptcy Court, (A) all obligations under the Original DIP Agreement have not been Paid In Full (as defined in the Original DIP Agreement) and all commitments of each Original DIP Lender terminated on the terms in effect as of the date hereof, by way of a refinancing of such obligations pursuant to the DIP Credit Agreement, which has been approved by the Bankruptcy Court pursuant to the DIP Order or (B) any Event of Default (as defined in the Original DIP Agreement) has not been waived by the Original DIP Lenders or otherwise remedied in a manner acceptable to the Investors, acting by Investor Consent; or

(m)     by the Company or the Investors, in accordance with Section 7.3(f) or Section 7.3(g).

3.8     Procedure Upon Termination.  In the event of termination by an Investor or the Company, or both, pursuant to Section 3.7, written notice thereof shall be given to the other Parties specifying the provision hereof pursuant to which the termination of the Transactions is made, and this Agreement shall terminate, and the subscription for the New Securities hereunder shall be abandoned, without further action by the Investors or the Company.

3.9     Effect of Termination.  In the event that this Agreement is validly terminated as provided herein, then each of the Parties shall be relieved of its duties and obligations arising under this Agreement after the date of such termination and such termination shall be without Liability to the Investors, the Convertible Notes Purchasers or the Company; provided that nothing herein shall relieve any Party from Liability for its actual and intentional fraud or, except as provided in Section 2.3(c)(iv), any material breach of this Agreement; and provided, further, that notwithstanding the foregoing or anything in Section 3.8 to the contrary:

(a)     the obligations of the Company and the other Debtors to pay the Expense Reimbursement pursuant to (and to the extent required by) Section 7.10 shall survive the termination of this Agreement and shall remain in full force and effect, in each case, until such obligations have been satisfied;

(b)     if this Agreement is terminated prior to the SCRO Registration but after any amount has been paid to the Company (or any other Debtor), or any claim has been set-off, for subscription and payment for New Securities pursuant to this Agreement, (x) the Company and the other Debtors shall promptly take all actions necessary or appropriate to (i) repay to the relevant Investor or Convertible Notes Purchaser (as applicable) any amount paid for the New Securities to the Company (or any other Debtor) by the Escrow Agent on behalf of the relevant Investor or Convertible Notes Purchaser (as applicable), or directly by the Investor or Convertible Notes

36

Purchaser (as applicable), and (ii) ensure that any set-off of any claim made by any Investor or Convertible Notes Purchaser (as applicable) for subscription and payment for New Securities is reversed, so that the underlying claim remains as before the set-off; and (y) the Release provided by the Danish State pursuant to <u>Section 3.3(f)</u> shall automatically be deemed null and void and of no further force or effect; and

(c)     the provisions of <u>Section 2.3(c)(ii)</u>, <u>Section 2.3(c)(iii)</u>, <u>Section 2.3(c)(iv)</u>, <u>Section 2.6</u>, <u>Section 2.7</u>, this <u>Section 3.9</u>, <u>Section 7.6</u>, <u>Section 7.10</u>, <u>Section 7.11</u>, <u>Article IX</u>, <u>Article XI</u> and <u>Article XII</u> and, to the extent necessary to effectuate the foregoing enumerated provisions, <u>Section 1.1</u>, shall survive any such termination.

ARTICLE IV

REPRESENTATIONS AND WARRANTIES OF THE COMPANY

The Company hereby represents and warrants to each Investor that, except as (i) set forth in the applicable Section of the schedules to this Agreement (the "<u>Disclosure Schedules</u>") delivered by the Company concurrently herewith (it being understood that any information set forth in one section or subsection of such Disclosure Schedules shall be deemed to apply to and qualify the representation and warranty set forth in the Section of this Agreement to which it corresponds in number and, whether or not an explicit reference or cross reference is made, each other representation and warranty set forth in each other Section of this <u>Article IV</u> for which it is reasonably apparent on the face of such information that such information is relevant to such other Section), (ii) information disclosed in the Company's annual and sustainability reports, the Company's interim reports, published prospectuses, any press releases issued under the EU Market Abuse Regulation and any other information about the Company published pursuant to the Stock Exchange Rules that has been made available to the Investors or made widely available to the public after January 1, 2022, and at least two (2) Business Days prior to the date hereof ("<u>Publicly Available Documents</u>") (provided that the disclosures in the Publicly Available Documents shall not be deemed to qualify any representations or warranties made in <u>Section 4.1</u> (Organization and Authority), <u>Section 4.2</u> (Due Execution), <u>Section 4.3</u> (Capitalization) and <u>Section 4.9</u> (Brokers)) or (iii) information which has otherwise been made available to the Investors:

4.1     <u>Organization and Authority</u>.

(a)     The Company and each of the Company Subsidiaries (i) is duly organized, validly existing and in good standing (to the extent such concept is applicable in the applicable jurisdiction) under the Laws of the jurisdiction of its organization or incorporation, (ii) is duly qualified and in good standing (to the extent such concept is applicable in the applicable jurisdiction) in each other jurisdiction in which the failure to so qualify would not reasonably be expected to have a Material Adverse Effect and (iii) subject to entry of the EPCA Approval Order, has the requisite corporate or limited liability company power and authority to effect the Transactions and the EPCA Approval Obligations, to own or lease and operate its properties and to conduct its business as now or currently proposed to be conducted.

37

(b)     This Agreement has been, and each other agreement, document, instrument or certificate contemplated by this Agreement, the Confirmation Order, the Chapter 11 Plan or Swedish Reorganization Plan to be executed by the Company in connection with the consummation of the Transactions (together with the Confirmation Order, the Chapter 11 Plan, the EPCA Approval Order and Swedish Reorganization Plan, the "Company Documents"), will be at or prior to the Closing (other than any agreement, document, instrument or certificate that by its terms is to be executed after the Closing), duly executed and delivered by the Company, and assuming the due authorization, execution and delivery of this Agreement by each Investor and the entry of the EPCA Approval Order and the Swedish Reconstructor's Consent (to the extent required), this Agreement constitutes, and each Company Document when so executed and delivered will constitute, a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with their respective terms, except as enforcement may be limited by legal and equitable limitations on the availability of specific remedies (collectively, the "Equitable Exceptions").

4.2     Due Execution.  Subject to entry of the EPCA Approval Order, the Swedish Reconstructor's Consent and the Confirmation Order, in each case, as applicable, the execution, delivery and performance of this Agreement and the Company Documents by the Company and the consummation of the transactions contemplated hereby and thereby (a) are within its corporate or limited liability company powers, have been duly authorized by all necessary corporate or limited liability company action, including the consent of shareholders or members where required, and do not (i) contravene its charter, constitution, by-laws or limited liability company agreement (or equivalent documentation), (ii) violate any applicable Law or any material Order of any Governmental Body applicable to it, (iii) conflict with or result in a breach of, or constitute a default under, any material indenture, mortgage or deed of trust or any material lease, agreement, Contract or other instrument binding on its members or any of their properties, other than with respect to the rejection of an executory contract or unexpired lease pursuant to and in accordance with section 365 of the Bankruptcy Code and the Chapter 11 Plan, or (iv) result in or require the creation or imposition of any Lien upon any of its property other than Liens granted pursuant to this Agreement or any other Company Document; and (b) does not require the consent, authorization by or approval of or notice to or filing or registration with any Governmental Body or any other Person, other than: (1) the Bankruptcy Court's confirmation of the Chapter 11 Plan, (2) the filings and consents contemplated by the Confirmation Order (if any), (3) the Swedish Reorganization Plan Confirmation, (4) the SCRO Registration, (5) the Euroclear Sweden Registrations, (6) approvals, consents and exemptions that have been obtained on or prior to the Closing Date and remain in full force and effect, (7) consents, approvals and exemptions that the failure to obtain in the aggregate would not be reasonably expected to result in a Material Adverse Effect, (8) routine reporting obligations, and (9) as required under the HSR Act or other Antitrust Laws.

4.3     Capitalization.

(a)     As of immediately following the SCRO Registration, the issued and outstanding equity securities of the Company will consist solely of new subordinated shares in the capital of the Company (the "New Ordinary Shares") which will rank *pari passu* in all respects

38

and have such rights set out in the Articles, the Shareholders' Agreement and under applicable Laws. As of immediately following the SCRO Registration, (i) the Subscription Shares, together with any New Ordinary Shares issued to holders of Allowed Claims (as that term is defined in the term sheet appended as Exhibit A) in accordance with and pursuant to the Chapter 11 Plan and the Swedish Reorganization Plan, will represent 100% of the issued and outstanding shares of the Company and will be owned beneficially and of record as set forth on Schedule 4.3(a), and (ii) the only other issued and outstanding shares or other equity or voting securities or interests in the Company will be the New Ordinary Shares issued to the general unsecured creditors of the Debtors pursuant to the Chapter 11 Plan and the Swedish Reorganization Plan.

(b)    All the New Securities will be, immediately following allotment of the Subscription Shares and issue of the Convertible Notes, (i) duly authorized, validly issued, fully paid and nonassessable and issued in compliance in all material respects with all applicable securities and corporate Laws, and (ii) free and clear of any Liens other than transfer restrictions imposed by securities or corporate Laws or applicable Articles and the Shareholders' Agreement. There are no, and immediately following the Closing, there will not be any, outstanding or authorized options, warrants (save for the Old Warrants, which shall be cancelled as soon as practically possible following the Closing), convertible or exchangeable securities (save for the Convertible Notes), subscriptions, rights (including any preemptive, first refusal, profit participation, equity appreciation or phantom equity rights), calls, agreements or commitments of any character whatsoever, relating to the equity or voting interest in, the Company or any Company Subsidiary granted by the Company or any Company Subsidiary, to which the Company or any Company Subsidiary is legally bound, or (to the Knowledge of the Company) otherwise. Except as a consequence of the filing of the Chapter 11 Cases and the Swedish Reorganization, neither the Company nor any Company Subsidiary has authorized or outstanding bonds, debentures, notes or other Indebtedness the holders of which have the right to vote (or which are convertible into, exchangeable for, or evidence the right to subscribe for or acquire securities having the right to vote) with respect to the Company or any Company Subsidiary on any matter. There are no Contracts to which the Company or any Company Subsidiary is a party or by which it is bound to (i) repurchase, redeem or otherwise acquire, or issue, sell or otherwise cause to become outstanding, any equity or voting interests in, the Company or any Company Subsidiary, or (ii) vote or dispose of any equity or voting interests in, the Company or any Company Subsidiary. All of Company Subsidiaries are wholly owned by the Company or other Company Subsidiaries. Neither the Company nor any Company Subsidiary owns, directly or indirectly, any shares or other equity or voting securities or interests in any Person other than the Company Subsidiaries.

4.4    Financial Statements. As of the date hereof, the Company has made available to the Investors (a) the audited consolidated financial statements of the Company and the Company Subsidiaries for the fiscal year ended October 31, 2022 (the "Balance Sheet Date"), filed with the SCRO, and (b) the unaudited condensed consolidated financial statements of the Company and the Company Subsidiaries for the fiscal quarter ended July 31, 2023, in each case, as amended prior to being made available to the Investors. The financial statements referred to above, including the footnotes thereto (collectively, the "Financial Statements"), present fairly, in all material respects, in accordance with IFRS, the financial condition, results of operations and cash flows of the

39

Company and the Company Subsidiaries on a consolidated basis as of such dates and for such periods.

4.5    <u>Undisclosed Liabilities</u>.  Neither the Company nor any of Company Subsidiaries has any Liabilities that would be required to be reflected on a balance sheet prepared in accordance with IFRS, except as (a) adequately reflected or reserved against the balance sheet included in the Financial Statements, (b) incurred since the Balance Sheet Date in the Ordinary Course of Business, (c) as contemplated by this Agreement, the Chapter 11 Plan, the Swedish Reorganization Plan or the other Key Transaction Documents or as incurred in connection with the Transactions, (d) as a result of any State aid decisions, or (e) as would not reasonably be expected to have a Material Adverse Effect.

4.6    <u>Absence of Certain Changes</u>.  Since the Balance Sheet Date, (a) the Company and each Company Subsidiary has operated in the Ordinary Course of Business in all material respects and in a manner consistent with Bankruptcy Code and the Orders entered into from time-to-time by the Bankruptcy Court in the Chapter 11 Cases and, following filing for the Swedish Reorganization in a manner consistent with the Swedish Reorganization Act and (b) there has not been any Change which has had, or would reasonably be expected to have a Material Adverse Effect.

4.7    <u>Compliance with Laws; Permits</u>.

(a)    Except with respect to any matters that would not reasonably be expected to result in a Material Adverse Effect, each of the Company and the Company Subsidiaries is currently, and has been since January 1, 2022, in compliance with all Laws and Orders imposed by all Governmental Bodies, in respect of the conduct of its business and ownership of its property, including regulations issued by any applicable Aviation Authority.  Since January 1, 2022, neither the Company nor any Company Subsidiary has (i) received any warning letters, written notice of adverse finding or similar written document or notice that asserts a lack of substantial compliance with any applicable Laws, Orders or regulatory requirements that have not been fully resolved to the satisfaction of the requesting Governmental Bodies or (ii) to the Knowledge of the Company, engaged in any fraud or fraudulent conduct, including conspiracy in connection with any such fraud or fraudulent conduct, except, in each case, as would not reasonably be expected to have a Material Adverse Effect.

(b)    Except as would not reasonably be expected to have a Material Adverse Effect, the Company and each Company Subsidiary possesses all material permits, approvals, licenses, authorizations, certificates, rights, identification numbers, exemptions, franchisees and other governmental authorizations and orders from Governmental Bodies (collectively, the "<u>Permits</u>") that are necessary for the operation of the Business, or that are necessary for the lawful ownership of their respective properties and assets.  The Company and each Company Subsidiary is in compliance with all such Permits, except as would not reasonably be expected to have a Material Adverse Effect.

AMERICAS 125333004
WEIL:\99329431\42\72316.0004

(c)    The Consortium holds a valid AOC which remains in full force and effect, has not been suspended, revoked or cancelled and there are no threatened or pending proceedings for its suspension, revocation or cancellation.  Each Consortium Member holds a valid Operating License which remains in full force and effect, has not been suspended, revoked or cancelled and, to the Knowledge of the Company, there are no threatened or pending proceedings for its suspension, revocation or cancellation.

4.8    <u>Litigation</u>.  Other than the Chapter 11 Cases and any adversary proceedings or contested motions commenced in connection therewith or in connection with the Swedish Reorganization, there are no Legal Proceedings pending or, to the Knowledge of the Company, threatened in writing, to which the Company or any Company Subsidiary is a party or to which any property of the Company or any Company Subsidiary is the subject, except as would not reasonably be expected to have a Material Adverse Effect.

4.9    <u>Brokers</u>.  No broker, finder, investment banker or similar agent is entitled to any brokerage, finder's or other fee or commission in connection with the Transactions for which the Company or any of its Subsidiaries would have any Liability or obligation.

4.10    <u>Insurance</u>.  The properties of the Company and the Company Subsidiaries are insured with financially sound and reputable insurance companies which are not Affiliates of the Company, in such amounts, with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties and assets in localities where the Company or the applicable Company Subsidiary operates, as are necessary to ensure that Uninsured Liabilities of the Company or any Company Subsidiary are not reasonably expected to result in a Material Adverse Effect.

4.11    <u>Material Contracts</u>.  Other than as a result of a rejection motion filed by the Company or any other Debtor in the Chapter 11 Cases or the rejection of a Material Contract in accordance with the Chapter 11 Plan (or the term sheet appended as <u>Exhibit A</u>) or the Swedish Reorganization Plan, all Material Contracts are valid, binding and (subject to the Equitable Exceptions) enforceable by and against the Company and/or the applicable Company Subsidiary and, to the Knowledge of the Company, each other party thereto (except where the failure to be so valid, binding or enforceable has not had and would not reasonably be expected to have a Material Adverse Effect), and since the Balance Sheet Date no written notice to terminate, in whole or part, any Material Contract has been delivered to the Company and/or the applicable Company Subsidiary (except where such termination has not had and would not reasonably be expected to have a Material Adverse Effect).  Other than as a result of the filing of the Chapter 11 Cases or any rejection motion filed by any of the Company or any other Debtor in the Chapter 11 Cases or as a result of a subsequent filing for the Swedish Reorganization, none of the Company or any Company Subsidiaries nor, to the Knowledge of the Company, any other party to any Material Contract, is in material default or breach under the terms thereof, in each case, except for such

41

instances of material default or breach that has not had and would not reasonably be expected to have a Material Adverse Effect.

4.12    <u>Sanctions and Trade Controls; Anti-Corruption; Anti-Money Laundering Laws</u>.

(a)    Neither the Company nor any Company Subsidiary, or their respective directors, officers, or employees acting in their capacities as such, nor to the Knowledge of the Company, their Affiliates or agents, has engaged in any activity or conduct which would comprise a violation of any applicable Anti-Corruption Laws, Sanctions and Trade Controls Laws, or Anti-Money Laundering Laws, in any applicable jurisdiction, and Company and the Company Subsidiaries are presently in compliance in all respects with applicable Anti-Corruption Laws, Sanctions and Trade Controls Laws, and Anti-Money Laundering Laws and have instituted and maintain in place policies and procedures designed to promote compliance with such laws.

(b)    Neither the Company nor any Company Subsidiary, or their respective directors, officers, nor to the Knowledge of the Company, employees, agents, or Affiliates, is an individual or entity (for the purposes of this <u>Section 4.12</u>, a "<u>Person</u>"), that is: (i) the target of any Sanctions and Trade Controls Laws, including as a result of appearing on any sanctions or export control-related list of restricted Persons (ii) located, organized or resident in a country or territory that is the subject of sanctions broadly prohibiting dealings with such country or territory (on the Closing Date, Cuba, Iran, North Korea, Syria, the Crimea Region of Ukraine, the so-called Donetsk People's Republic, and the so-called Luhansk People's Republic, and the non-government controlled areas of Ukraine in the oblasts of Kherson and Zaporizhzhia, each, a "<u>Sanctioned Country</u>"), or (iii) a person that is 50% or more owned by, controlled by, or acting on behalf of, any Person described in (i) or (ii) (any of the foregoing, a "<u>Sanctioned Person</u>"). "<u>Sanctions and Trade Controls Laws</u>" means any economic or trade sanctions, export controls, and customs and trade laws, enacted, imposed, administered or enforced by the United States (including by the U.S. Department of the Treasury's Office of Foreign Assets Control, the U.S. Department of State, and the U.S. Department of Commerce), the United Nations Security Council, the European Union, any European Union member state or the United Kingdom.

(c)    None of the proceeds in connection with this Agreement will be used, lent, contributed, or otherwise made available, directly or indirectly, to fund or finance any activities or business of or with any Person that is a Sanctioned Person or in any Sanctioned Country.

(d)    There are no pending or, to the Knowledge of the Company, threatened claims, controversies, charges, causes of action, complaints, demands, subpoenas, prosecutions, audits, examinations, mediations, notices, actions, suits, litigations, arbitrations, inquiries, investigations or other legal administrative, arbitral or similar proceedings against the Company, any Company Subsidiary, their respective directors, officers or employees in their capacities as such, or to the Knowledge of the Company, their respective employees, their Affiliates or their Affiliates' employees with respect to Anti-Corruption Laws, Sanctions and Trade Control Laws, or Anti-Money Laundering Laws.

42

(e)    Neither the Company nor any Company Subsidiary is, owns, or operates any TID U.S. business, as defined in 31 C.F.R. Part 800.

Notwithstanding anything herein to the contrary, this Section 4.12 shall be subject in all respects to the EU Blocking Regulation.  To the extent the Company or any Company Subsidiary is unable to make any representation provided in this Section 4.12 due to the EU Blocking Regulation, a description of any such business or activity is included in Schedule 4.12.

4.13    Payment of Taxes.

(a)    The Company and the Company Subsidiaries have: (i) timely filed or caused to be filed all income and other material Tax Returns and reports required to have been filed by them and (ii) paid or caused to be paid when due all income and other material Taxes required to have been paid by them (whether or not shown on any Tax Return), taking into account any applicable extensions, postponements or respites afforded under applicable Law or administered by any applicable Governmental Body, other than such Taxes, if any, that are being contested in good faith by appropriate proceedings and for which adequate reserves have been maintained in accordance with IFRS and if not on a consolidated basis, local GAAP, and subject to any terms or conditions set forth in any order entered by the Bankruptcy Court with respect to the Company or the Company Subsidiaries, including the *Final Order (I) Authorizing Debtors to Pay Certain Prepetition Taxes and Fees and (II) Granting Related Relief* [ECF No. 176] and the *Order Authorizing Debtors to Pay Certain Deferred Tax Obligations* [ECF No. 615], or under the Swedish Reorganization Plan.  All such Tax Returns are true, complete and correct in all material respects.

(b)    To the Knowledge of the Company, there are no disputes, audits, examinations, investigations or proceedings pending or threatened in writing relating to the assessment or collection of any material Taxes with respect to the Company or the Company Subsidiaries.

(c)    There are no Liens of record for any material Taxes (other than Taxes not yet due and payable or the amount or validity of which is being contested in good faith and for which adequate reserves have been maintained in accordance with IFRS and if not on a consolidated basis, local GAAP) against the assets of the Company or the Company Subsidiaries.

(d)    The Company and the Company Subsidiaries have deducted or withheld and timely paid over to the proper Governmental Bodies all material Taxes required to have been deducted or withheld and paid over, including any Taxes required to be withheld from amounts owing to, or collected from, any employee, creditor, or other third party, and have complied with all information reporting, withholding and backup withholding requirements (in each case, taking into account any applicable extensions, postponements or respites afforded under applicable Law or administrated by any applicable Governmental Body).

(e)    The Company and the Company Subsidiaries (i) are not nor have been a member of any "affiliated group" as defined in Section 1504(a) of the Code or any affiliated, combined, unitary, consolidated or similar group under state, local or non-U.S. Law (other than a

43

group for which the Company or one of its Subsidiaries is the common parent) and (ii) do not have Liability for material Taxes of any other Person (other than the Company or the Company Subsidiaries) as a transferee, successor, by Contract, or pursuant to applicable Law.

(f)    Neither the Company nor any of the Company Subsidiaries will be required to include any material item of income in, or exclude any items of deduction from, taxable income for any taxable period (or portion thereof) beginning after the Closing Date as a result of (i) a change in accounting occurring prior to the Closing, or for U.S. federal income tax purposes (ii) an installment sale or open transaction arising prior to the Closing, (iii) a prepaid amount received or deferred revenue realized on or prior to the Closing Date outside the Ordinary Course of Business, or (iv) a "closing agreement" as described in Section 7121 of the Code executed prior to the Closing.

(g)    No material claim has been made in writing by any Governmental Body in a jurisdiction where Tax Returns are not filed or material Taxes are not paid by or with respect to the Company or any of the Company Subsidiaries that such a Tax Return is or may be required to be filed or such material Taxes are or may be required to be paid.

(h)    Neither the Company nor any of the Company Subsidiaries currently is subject to any waiver of any statute of limitations in respect of material Taxes or any agreement to any extension of time with respect to a material Tax assessment or deficiency for any period.

(i)    To the Knowledge of the Company, neither the Company nor any of the Company Subsidiaries has participated or engaged in, or is otherwise required to make any disclosure with the U.S. Internal Revenue Service with respect to, any transaction that constitutes a "listed transaction" pursuant to Treasury Regulations Section 1.6011-4(b)(2).

(j)    The Company and each of the Company Subsidiaries are resident in their respective countries of incorporation for Tax purposes and, to the Knowledge of the Company, have not been at any time resident in any jurisdiction other than (or in addition to) their respective countries of incorporation for Tax purposes.

(k)    The Company and each of the Company Subsidiaries have not previously made:  (i) a disclosure in respect of a reportable cross-border arrangement for the purposes of Council Directive 2018/822/EU (also known as "DAC6"); or (ii) any other form of a mandatory disclosure to a Governmental Body under a similar mandatory disclosure tax regime in respect of a transaction or a proposed transaction which enables any person to obtain a Tax advantage.

(l)    The Company and each of the Company Subsidiaries is in material compliance with transfer pricing requirements in all jurisdictions in which they are required to comply with applicable transfer pricing regulations, and all material transactions between the Company and its Subsidiaries, on the one hand, and other related Persons (including any of the Company Subsidiaries), on the other hand, have been effected on an arm's length basis.

44

(m)     Notwithstanding any other provision of this Agreement, the representations and warranties in this <u>Section 4.13</u> and in <u>Section 4.14</u> are the only representations and warranties being made with respect to Tax matters.

4.14    <u>Employee Matters; Employee Benefit Plan Matters</u>

(a)     Except as would not reasonably be expected to have a Material Adverse Effect, the Company and the Company Subsidiaries are not engaged in any unfair labor practice, and there is no (i) unfair labor practice charge or complaint pending against the Company or any Company Subsidiary or, to the Knowledge of the Company, threatened by or on behalf of any employees of the Company or any Company Subsidiary, or (ii) material grievance or arbitration proceeding arising out of or under any collective bargaining agreement that is so pending against the Company or any Company Subsidiary or, to the Knowledge of the Company, threatened against the Company or any Company Subsidiary.  There is no strike, work stoppage or other material labor dispute against the Company or any Company Subsidiary or, to the Knowledge of the Company, threatened against the Company or any Company Subsidiary.  To the Knowledge of the Company, there is no organizing activity by any Employee, group of Employees or Employee Representative.

(b)     Except as would not reasonably be expected to have a Material Adverse Effect, the Company and the Company Subsidiaries are in compliance with all applicable Laws respecting employment and employment practices, including discrimination in employment, terms and conditions of employment, worker classification, wages, hours and occupational safety and health, collective consultation, child labor and any other employment-related practices arising under applicable Laws.

(c)     Except as would not reasonably be expected to have a Material Adverse Effect, there are no pending or, to the Knowledge of the Company, threatened actions, suits or proceedings against the Company or the Company Subsidiaries brought or filed by or with any Governmental Body or arbitral tribunal in connection with the employment or termination of employment of any Employee or applicant to become an Employee, including any such claims relating to discrimination in employment, terms and conditions of employment, worker classification, wages, hours and occupational safety and health, collective consultation, child labor and any other employment-related practices arising under applicable Laws.

(d)     In the last three (3) years, neither the Company nor the Company Subsidiaries has become a party to a settlement agreement with any Employee or current or former director, officer, employee or independent contractor of the Company or any Company Subsidiary that involves allegations relating to sexual harassment or sexual misconduct by a current officer or director of the Company or any Company Subsidiary.  To the Knowledge of the Company, in the last three (3) years, no allegations of unlawful discrimination, sexual harassment or sexual misconduct have been made against any officer or director of the Company or any Company Subsidiary.

45

(e)    The Company and the Company Subsidiaries have complied in all material respects with any Employee Consultation Process, in connection with the execution of this Agreement.

(f)    For the purposes of this Agreement, "Employee Benefit Plans" shall mean each employee benefit plan, within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations thereunder ("ERISA"), whether or not subject to ERISA, and each other material stock option, stock appreciation right, restricted stock, stock purchase, stock unit, performance share, incentive, bonus, profit-sharing, savings, deferred compensation, health, medical, dental, life insurance, disability, accident, supplemental unemployment or retirement, employment, severance or salary or benefits continuation or fringe benefit plan, program, arrangement, agreement or commitment maintained by the Company or any Company Subsidiary or Affiliate thereof (including, for this purpose and for the purpose of all of the representations in this Section 4.14, any predecessors to the Company or the Company Subsidiaries or Affiliates and all employers (whether or not incorporated) that would be treated together with the Company, any such Company Subsidiary or Affiliate as a single employer within the meaning of Section 414 of the Code) or to which the Company or any Company Subsidiary or Affiliate thereof contributes (or has any obligation to contribute), has or may have any liability or is a party, excluding, in each case, any plan, program or arrangement that is sponsored by a Governmental Body to which the Company or any Company Subsidiary or Affiliate contributes pursuant to applicable Law.

(g)    With respect to each Employee Benefit Plan, except as would not reasonably be expected to have a Material Adverse Effect:

(i)    each Employee Benefit Plan is in compliance with applicable Law and has been administered and operated in all respects in accordance with its terms;

(ii)    all employer and employee contributions, and all insurance premium payments (if applicable), required by Law or by the terms of any Employee Benefit Plan, have been timely made, funded, reserved, secured by way of an insurance policy or, accrued, in accordance with normal accounting practices (as applicable);

(iii)    the fair market value of the assets of each funded Employee Benefit Plan, the liability of each insurer for each Employee Benefit Plan funded through insurance or the book reserve established for each Employee Benefit Plan, together with any accrued contributions, is sufficient to procure or provide for the accumulated benefit obligations (whether or not vested) as of the Closing Date, with respect to all current and former participants in such Employee Benefit Plan, determined on a plan termination basis in accordance with the actuarial assumptions and valuations most recently used to account for such obligations in accordance with applicable generally accepted accounting principles;

(iv)    each Employee Benefit Plan required to be registered has been registered and has been maintained in good standing with applicable regulatory authorities

46

and if any such Employee Benefit Plan is intended to qualify for special tax treatment, it meets all applicable requirements to qualify for such tax treatment;

(v)    no proceeding, audit, assessment, complaint or examination has been made, commenced or, to the Knowledge of the Company, threatened with respect to any Employee Benefit Plan (other than routine claims for benefits payable in the Ordinary Course of Business);

(vi)    no Employee Benefit Plan provides for post-employment or retiree welfare benefits, except as required by applicable Law and in the six years prior to the date of this Agreement neither the Company nor any Company Subsidiary has been the employer, participated in or been an "associate" of or "connected" with an "employer" (within the meaning of the UK Pensions Act 2004) of an "occupational pension scheme" which is not a "money purchase scheme" (as such terms are defined in the UK Pension Schemes Act 1993);

(vii)    no Employee Benefit Plan is covered by Title IV of ERISA or subject to Section 412 of the Code or Section 302 of ERISA, and none of the assets of the Company or any of the Company Subsidiaries is, or may reasonably be expected to become, the subject of any lien arising under Section 303 of ERISA or Sections 430 or 436 of the Code;

(viii)    the execution of this Agreement, shareholder approval of this Agreement, nor any of the transactions contemplated by this Agreement will (either alone or upon the occurrence of any additional or subsequent events): (i) entitle any current or former director, officer, employee, independent contractor, or consultant of the Company or any of the Company Subsidiaries to severance pay, any increase in severance pay, or any other payment; (ii) accelerate the time of payment, funding, or vesting, or increase the amount of compensation (including stock or stock-based compensation) due to any such individual; (iii) limit or restrict the right of the Company and the Company Subsidiaries to merge, amend, or terminate any Employee Benefit Plan; (iv) increase the amount payable under or result in any other material obligation pursuant to any Employee Benefit Plan; (v) result in "excess parachute payments" within the meaning of Section 280G(b) of the Code; or (vi) require a "gross-up" or other payment to any "disqualified individual" within the meaning of Section 280G(c) of the Code; and

(ix)    no Employee has had their contract of employment transferred to the Company or any of the Company Subsidiaries from another employer pursuant to the United Kingdom Transfer of Undertakings (Protection of Employment) Regulations 1981 or 2006 ("TUPE") or equivalent in circumstances where the Employee was entitled to rights under an occupational pension scheme which do not relate to benefits for old age, invalidity or survivors (within the meaning of regulation 10(2) of TUPE) in respect of the former employment.

AMERICAS 125333004
WEIL:\99329431\42\72316.0004

(h)    International Company Employee Plans.  Except as would not reasonably be expected to have a Material Adverse Effect, with respect to each Employee Benefit Plan that is not subject exclusively to the Laws of the United States (each, a "International Company Employee Plan"): (i) the fair market value of the assets of each International Company Employee Plan, the liability of each insurer for any International Company Employee Plan funded through insurance or the book reserve established for any such plan, together with any accrued contributions, is sufficient to procure or provide for the accrued benefit obligations, as of the date of this Agreement, with respect to all current and former participants in such plan according to the actuarial assumptions and valuations most recently used to determine employer contributions to such International Company Employee Plan, and no transaction contemplated by this Agreement shall cause such assets or insurance obligations to be less than such benefit obligations; (ii) there has been no amendment to, written interpretation of or announcement (whether or not written) by the Company or any of the Company Subsidiaries relating to, or change in participation or coverage under, any International Company Employee Plan that would increase the expense of maintaining such International Company Employee Plan above the level of expense incurred in respect thereof for the most recent fiscal year ended prior to the date hereof; and (iii) each International Company Employee Plan required or intended to be registered, qualified or approved under applicable Law has in fact been registered, qualified or approved, as the case may be, under applicable Law and has been maintained in good standing with applicable regulatory authorities.

4.15    Intellectual Property.

(a)    Except as would not reasonably be expected to have a Material Adverse Effect, (i) the Company or the Company Subsidiaries own, or have a valid and enforceable right to use, all Intellectual Property that is used in the conduct of their respective businesses as currently conducted, (ii) no Legal Proceeding is pending or threatened in writing against the Company or any Company Subsidiary (or, to the Knowledge of the Company, otherwise threatened) by any Person (1) challenging the right of the Company or any Company Subsidiary to use any Intellectual Property owned or purported to be owned or used or held for use by or licensed to such company, (2) challenging the validity of any Intellectual Property owned or purported to be owned by the Company or any Company Subsidiary or (3) claiming infringement, misappropriation or any other violation by the Company or any Company Subsidiary of any right in Intellectual Property of any Person, (iii) the operation of the business of the Company or any Company Subsidiary as currently conducted does not infringe, misappropriate or otherwise violate any rights in Intellectual Property of any Person and (iv) to the Knowledge of the Company, no Person is infringing, misappropriating or otherwise violating any rights in any Intellectual Property owned or purported to be owned by the Company or any Company Subsidiary.

(a)    Except as would not reasonably be expected to have a Material Adverse Effect, the Company and the Company Subsidiaries take commercially reasonable measures to maintain in confidence all Trade Secrets in their control and, to the Knowledge of the Company, there has been no disclosure (other than pursuant to a Contract restricting the disclosure by such Person of such Trade Secrets) or unauthorized access or use of any such Trade Secrets.

48

(b)    Except as would not reasonably be expected to have a Material Adverse Effect, with respect to the use of Software in the Business, (i) none of the Company or any of the Company Subsidiaries has experienced any material defects or technical concerns in such Software other than defects or concerns that have been corrected, (ii) to the Knowledge of the Company, no such Software contains any device or feature designed to disrupt, disable, or otherwise impair the functioning of any Software, including any "back door," "time bomb," "Trojan horse," "worm," "drop dead device," or other code or routines that permit unauthorized access to such Software and (iii) no Software owned or purported to be owned by the Company or the Company Subsidiaries incorporates Software that is subject to the terms of any "open source" or other similar license in a manner that requires any source code of Software that is owned or purported to be owned by the Company or the Company Subsidiaries to be disclosed or licensed for no charge, publicly distributed, or dedicated to the public.

4.16    Data Privacy.

(a)    The Company and the Company Subsidiaries, taken as a whole, have for the three (3) years preceding the date hereof: (i) complied, in all material respects, with all Privacy Laws as well as their own policies regarding the Processing of Personal Information, (ii) implemented and maintained appropriate safeguards, at least consistent with the industry in which the Company operates, designed to protect all Personal Information in the possession or control of or otherwise Processed by the Company and any Company Subsidiary against loss, theft, or unauthorized access or disclosure, (iii) experienced no material breaches of security involving, or accidental or unlawful destruction, loss, alteration, unauthorized disclosure of, access to, or use of, any Personal Information of the Business, its customers, its employees or other Persons that is in the possession or control of or otherwise Processed by or on behalf of the Company or any Company Subsidiaries; and (iv) received no written notice of any claims, or been charged with the violation of any Privacy Laws, and, to the Knowledge of the Company, not been subject to any investigations, notices or requests from any Governmental Body in relation to any Privacy Laws.

(b)    During the three (3) years preceding the date hereof, there have been no material disruptions in any information technology systems that materially adversely affected the operation of the Business other than disruptions that have been corrected.  The Company and the Company Subsidiaries have evaluated their disaster recovery and backup needs and have implemented plans and systems that reasonably address their assessment of risk.

(c)    None of the Company or any of the Company Subsidiaries are subject to any contractual requirement or other legal obligation that, following the Closing, would prohibit any Investor, the Company, or any Company Subsidiaries from Processing any Personal Information in materially the same manner in which the Company or any Company Subsidiaries Processed such Personal Information prior to the Closing.

4.17    Appointment of Trustee or Examiner; Liquidation.  No order has been entered in the Chapter 11 Cases (a) for the appointment of a chapter 11 trustee, (b) for the appointment of a responsible officer or examiner having enlarged powers (beyond those set forth under sections 1106(a)(3) and (4) of the Bankruptcy Code) under section 1104 of the Bankruptcy Code or (c) to

49

convert any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or to dismiss any of the Chapter 11 Cases. For the avoidance of doubt, following filing for the Swedish Reorganization, the Swedish Reconstructor will be appointed.

4.18    <u>Environmental Compliance</u>.

(a)    Except with respect to any matters that would not reasonably be expected to result in a Material Adverse Effect, the Company and each Company Subsidiary is in compliance with all Environmental Laws and Environmental Permits applicable to such Person, including in respect of the conduct of its business and ownership of its property.

(b)    Except with respect to any matters that would not reasonably be expected to result in a Material Adverse Effect, each of the Company and the Company Subsidiaries is in compliance with all Environmental Laws and Environmental Permits, all Environmental Permits are in full force and effect, and, to the Knowledge of the Company, no actions to revoke or materially change the Environmental Permits are anticipated.

(c)    Except with respect to any matters that would not reasonably be expected to result in a Material Adverse Effect there are no pending or, to the Knowledge of the Company, Legal Proceedings to revoke, attach, invalidate, rescind or modify any of the Environmental Permits.

(d)    All Hazardous Materials generated, Used, treated, handled or stored at, or transported to or from, any real property currently or formerly Used, owned, leased or operated by the Company or any Company Subsidiary have been disposed of in a manner not reasonably expected to result in a Material Adverse Effect.

(e)    There are no Environmental Claims pending or, to the Knowledge of the Company, threatened against the Company, any Company Subsidiary or any of their respective properties, that are reasonably expected to have a Material Adverse Effect, and all past material non-compliance with Environmental Laws and Environmental Permits and any past Environmental Claims have been resolved without ongoing material obligations or costs.

(f)    Except with respect to any matters that would not reasonably be expected to result in a Material Adverse Effect, there are no conditions or circumstances existing at, on, or under any real property owned, leased or operated by the Company or any Company Subsidiary that are likely to result in any Environmental Liability or requirement for investigation or assessment or remedial or response or other corrective action relating to any presence, actual or threatened Hazardous Release or Use of Hazardous Materials to be imposed on, or asserted against, the Company or any Company Subsidiary.

(g)    Except with respect to any matters that would not reasonably be expected to result in a Material Adverse Effect, neither the Company nor any of the Company Subsidiaries is undertaking, or is required to complete, any investigation or assessment or remedial or response action relating to any presence, actual or threatened Hazardous Release or Use of Hazardous Materials at any site, location or operation.

50

4.19    <u>Private Offering by the Company</u>.

(a)    Assuming the accuracy of the warranties of the Investors and Convertible Notes Purchasers contained in <u>Article V</u> and their compliance with the agreements set forth therein, it is not necessary, in connection with the placement of the New Securities, in the manner contemplated by this Agreement and the applicable Company Documents, to register the New Securities under the Securities Act or to register, file or qualify the New Securities under any securities or blue sky laws of any applicable jurisdiction.

(b)    Neither the Company nor anyone acting on its behalf has taken, or will take, any action that would require the Company to publish a prospectus in any Participating Member State pursuant to the Prospectus Regulation or publish a prospectus in the United Kingdom pursuant to the Prospectus Regulation as it forms part of domestic law by virtue of the European Union (Withdrawal) Act 2018, in respect of the issuance or sale of the New Securities.

(c)    Neither the Company nor anyone acting on its behalf has offered the New Securities or any similar securities for sale to, or solicited any offer to buy any of the same from, or otherwise approached or negotiated in respect thereof with, any person other than the Investors or Convertible Notes Purchasers (as applicable), each of which has been offered the New Securities at a private sale for investment.

(d)    Neither the Company nor any person acting on its behalf has offered or sold the New Securities by any form of general solicitation or general advertising, including, but not limited to, the following: (1) any advertisement, article, notice or other communication published in any newspaper, magazine, or similar media or broadcast over television or radio; (2) any website posting or widely distributed e-mail; or (3) any seminar or meeting whose attendees have been invited by any general solicitation or general advertising.

4.20    <u>Ranking</u>.  The obligations evidenced by the Company's Convertible Notes are and will at all times be direct and unconditional secured obligations of the Company, and be at all times effectively senior in right of payment to all existing and future unsecured Indebtedness of the Company, to the extent of the value of the Collateral (taking into account any other secured or priority claims thereon to the extent not prohibited by the terms of the Convertible Notes) and rank at least *pari passu* with all other senior unsecured Indebtedness of the Company, if any, whether now existing or hereafter outstanding.

4.21    <u>Collateral Matters</u>.  Subject to the exceptions and limitations set forth in the Collateral Documents, the Collateral Documents, once executed and delivered in accordance with their terms, shall create Liens in favor of the Convertible Notes Purchasers (or a trustee, collateral agent or similar entity for the benefit of such Convertible Notes Purchasers) over all Collateral intended to be encumbered thereby, and upon perfection thereof all such Liens will constitute Liens

51

(with the priority that such Liens are expressed to have under the Convertible Notes) on the Collateral.

4.22    No Other Representations and Warranties.

(a)    Except for the representations and warranties contained in this Article IV (as modified by the Disclosure Schedules) and any other Key Transaction Documents or other Company Documents, neither the Company nor any other Person makes or has made any other representation or warranty, express or implied, at law or in equity, with respect to the Company, any Company Subsidiary, the Transactions, or any of the Company's or the Company Subsidiaries' respective businesses, assets, Liabilities, operations, prospects, or condition (financial or otherwise), and the Company disclaims any other representations or warranties, whether made by the Company, any Company Subsidiary or any of its or the Company Subsidiaries' Affiliates, stockholders, officers, directors, agents or Representatives (in each case, other than any Investor or any of their respective Affiliates) (collectively, "Company Related Persons"), and no Company Related Person has any authority, express or implied, to make any representations, warranties or agreements not specifically set forth in Article IV or any other Key Transaction Documents or other Company Documents and subject to the limited remedies herein provided.  Except for the representations and warranties contained in Article IV (as modified by the Disclosure Schedules or other modification specified in the lead-in to this Article IV) and any other Key Transaction Documents or other Company Documents, and as acknowledged and agreed by the Investors and the Convertible Notes Purchasers in Section 5.10(b), except in the case of actual and intentional fraud, the Company (directly and on behalf of all Company Related Persons) hereby disclaims all Liability and responsibility for any representations or warranties that are not expressly set forth in Article IV (as modified by the Disclosure Schedules or other modification specified in the lead-in to this Article IV) or in any Key Transaction Documents or other Company Documents.

(b)    The Company acknowledges and agrees that, with respect to each Investor, neither such Investor nor any other Person is making any representations or warranties whatsoever, express or implied, at law or in equity, beyond those expressly given by such Investor in Article V and in any other Key Transaction Documents or other Investor Documents, and any representations or warranties other than those set forth in Article V and in any Key Transaction Documents or other Company Documents are hereby disclaimed.  The Company further acknowledges that, with respect to each Investor, neither such Investor nor any of its Affiliates, nor any other Person has made or is making any representation or warranty, express or implied, as to the accuracy or completeness of any information, data, or statement regarding such Investor or any of Investor Related Person or the Transactions, including in respect of the business, the operations, prospects, or condition (financial or otherwise), or the accuracy or completeness of any document, projection, material, statement, or other information, in each case, not expressly set forth in Article V and in any Key Transaction Documents or other Investor Documents, and, except in the case of actual and intentional fraud, the Company hereby acknowledges and agrees that, in accordance with Section 5.10(a), such Investor (directly and on behalf of all Investor Related Persons) has disclaimed all Liability and responsibility for any representations or warranties that are not expressly set forth in Article V or in any Key Transaction Documents or other Investor Documents.  The Company further acknowledges that, each Investor makes the representations

52

and warranties contained in <u>Article V</u> and any other Key Transaction Documents or other Investor Documents on behalf of itself only, and not on behalf of any other Investor or any Investor Related Person.

ARTICLE V

REPRESENTATIONS AND WARRANTIES OF THE INVESTORS AND CONVERTIBLE NOTES PURCHASERS

Each Investor and each Convertible Notes Purchaser (in respect of themselves only) hereby severally (and not jointly or jointly and severally) represents and warrants to the Company, on behalf of itself only and not on behalf of any other Investor or its or their respective Affiliates, stockholders, officers, directors, agents or Representatives, that:

5.1    <u>Organization and Authority</u>.

(a)    The Investor (other than the Danish State) and Convertible Notes Purchaser (other than the Danish State) is (i) duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization or incorporation and (ii) has the requisite corporate or limited liability company power and authority to perform its duties in respect to the Transactions, to own or lease and operate its properties and to conduct its business as now or currently proposed to be conducted.

(b)    This Agreement has been, and each other agreement, document, instrument or certificate contemplated by this Agreement to be executed by the Investor and Convertible Notes Purchaser in connection with the consummation of the Transactions (the "<u>Investor Documents</u>"), will be at or prior to the Closing (other than any agreement, document, instrument or certificate that is by its terms to be executed after Closing), duly executed and delivered by the Investor and Convertible Notes Purchaser, and assuming the due authorization, execution and delivery of this Agreement by the Company and subject to entry of the Confirmation Order and the EPCA Approval Order, this Agreement constitutes, and each Investor Document when so executed and delivered will constitute, a legal, valid and binding obligation of the Investor and Convertible Notes Purchaser, enforceable against the Investor and Convertible Notes Purchaser in accordance with their respective terms, subject to the Equitable Exceptions.

5.2    <u>Due Execution</u>.  The execution, delivery and performance of this Agreement and the Investor Documents by the Investor and Convertible Notes Purchaser and the consummation of the transactions contemplated hereby and thereby (a) are within (x) with respect to an Investor (other than the Danish State) and a Convertible Notes Purchaser, its corporate or limited liability company powers, have been duly authorized by all necessary corporate or limited liability company action, including the consent of shareholders or members where required and (y) with respect to the Danish State, its power and capacity and have been duly authorized by all necessary actions on the part of the Danish State, and do not (i) solely with respect to an Investor other than the Danish State, contravene its charter, constitution, by-laws or limited liability company agreement (or equivalent documentation), (ii) violate any applicable Law or any material Order of

53

any Governmental Body applicable to it, or (iii) conflict with or result in a breach of, or constitute a default under, any material indenture, mortgage or deed of trust or any material lease, agreement or other instrument binding on its members or any of their properties and (b) does not require the consent, authorization by or approval of or notice to or filing or registration with any Governmental Body or any other Person, other than (i) the filings and consents contemplated by the Confirmation Order (if any), (ii) the SCRO Registration, (iii) the Euroclear Sweden Registrations, (iv) approvals, consents and exemptions that have been obtained on or prior to the Closing Date and remain in full force and effect, (v) consents, approvals and exemptions that the failure to obtain in the aggregate would not be reasonably expected to result in a material adverse effect on the ability of the Investor to consummate the Transactions, (vi) routine reporting obligations and (vii) as required under the HSR Act or other Antitrust Laws, and (viii) all decisions, Orders, consents, authorizations, clearances, waivers and/or approvals set forth on Schedule 7.3(a).

5.3    Brokers.  Other than the Persons set forth on Schedule 5.3, no Person has acted, directly or indirectly, as a broker, finder, investment banker or similar intermediary for the Investor or Convertible Notes Purchaser in connection with the Transactions and no such Person is entitled to any fee or commission or like payment in respect thereof based on any agreements with the Investor, the Convertible Notes Purchaser or their respective Affiliates or other arrangements made by them.

5.4    Financial Capability.  The Investor or Convertible Notes Purchaser (i) will, one (1) Business Day prior to the expected Swedish Reorganization Plan Confirmation by the Swedish Court, have, sufficient internal funds (without giving effect to any unfunded financing regardless of whether any such financing is committed) available to pay the amount equal to the sum as set forth opposite the Investor or Convertible Notes Purchaser's name in columns I or II on Schedule 2.1 (respectively) less the Total Set-Off Amount and the Initial Escrowed Funds as set forth opposite the Investor or Convertible Notes Purchaser's name in column III on Schedule 2.1, (ii) will, at the Closing, have, sufficient internal funds (taking escrowed funds into account but without giving effect to any unfunded financing regardless of whether any such financing is committed) available to pay the amount equal to the sum as set forth opposite the Investor or Convertible Notes Purchaser's name in columns I or II on Schedule 2.1 (respectively) and the Initial Escrowed Funds as set forth opposite the Investor or Convertible Notes Purchaser's name in column III on Schedule 2.1, (iii) has, and at the Closing will have, the resources and capabilities (financial or otherwise) to perform its obligations hereunder, and (iv) has not incurred any obligation, commitment, restriction or Liability of any kind, which would impair or adversely affect such resources and capabilities.

5.5    Investment Intent.  Each Investor and Convertible Notes Purchaser acknowledges and understands that neither any disclosure or offering document, nor any prospectus has been prepared in connection with the subscription of the New Securities within the contemplated Transaction.    Each Investor and Convertible Notes Purchaser further understands that an investment in the New Securities involves a considerable degree of risk and that the New Securities have not been approved or disapproved by the U.S. Securities and Exchange Commission, any state securities commission in the United States or any other U.S. regulatory authority, nor have any of the foregoing authorities passed upon or endorsed the merits of the contemplated

54

Transaction and the subscription for the New Securities pursuant to this Agreement. Each Investor and Convertible Notes Purchaser hereby acknowledges that the subscription of the equity securities of the Company is not registered under the Securities Act or registered or qualified for sale under any applicable securities Law, including in Sweden, the United States or any other country or any state or province, and cannot be resold without registration thereunder or exemption therefrom. Each Investor and Convertible Notes Purchaser is acquiring the equity securities of the Company solely for its own account as principal, for investment purposes and is not acquiring such securities with a view to or for the public distribution thereof, in whole or in part, or as an underwriter or conduit to subsequent purchasers in violation of any securities Laws.

5.6     Securities Act. Each Investor and Convertible Notes Purchaser (a) understands that the Convertible Notes have not been registered under the Securities Act and may be resold only if registered pursuant to the provisions of the Securities Act or if an exemption from registration is available, except under circumstances where neither such registration nor such an exemption is required by law, and that the Company is not required to register the Convertible Notes, (b) represents that it is, and each account for which it is acting (if any) is either (i) a qualified institutional buyer within the meaning of Rule 144A under the Securities Act, (ii) an institutional accredited investor as defined in Rule 501(a) under the Securities Act; or (iii) a non-U.S. Person (as defined in Regulation S under the Securities Act) outside of the United States purchasing the Convertible Notes in an offshore transaction pursuant to Regulation S under the Securities Act; and (c) represents that it has not taken and will not take any action that would subject the placement of the Convertible Notes to the registration requirements of the Securities Act or to the registration, filing or qualification requirements of any securities or blue sky laws of any applicable jurisdiction, including Sweden.

5.7     Sophisticated Investor.

(a)     The Investor (i) has professional experience in matters relating to investments falling within Article 19(5) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005 (the "Financial Promotion Order"), or (ii) is a person falling within Article 49(2)(a) to (d) (high net worth companies, unincorporated associations, etc.) of the Financial Promotion Order or (iii) is a person to whom an invitation or inducement to engage in investment activity (within the meaning of section 21 of the Financial Services and Markets Act 2000 (the "FSMA")) in connection with the issue or sale of any securities may otherwise lawfully be communicated or caused to be communicated, and further that, it, and each account for which it is acting, is (i) a "qualified investor" within the meaning of the Prospectus Regulation, (ii) not a "retail investor" in the European Economic Area (a "retail investor" being a person who is one (or more) of the following: (i) a retail client as defined in point (11) of Article 4(1) of Directive 2014/65/EU, as amended ("MiFID II"); or (ii) a customer within the meaning of Directive 2016/97/EU, as amended (the "Insurance Distribution Directive"), where that customer would not qualify as a professional client as defined in point (10) of Article 4(1) of MiFID II), and (iii) not a "retail investor" in the United Kingdom (a "retail investor" being a person who is one (or more) of the following: (i) a retail client, as defined in point (8) of Article 2 of Regulation 2017/565/EU as it forms part of UK domestic law by virtue of the European Union (Withdrawal) Act 2018 ("EUWA"), (ii) a customer within the meaning of the provisions of the FSMA and any rules or

55

regulations made under the FSMA to implement the Insurance Distribution Directive, where that customer would not qualify as a professional client, as defined in point (8) of Article 2(1) of Regulation 600/2014/EU as it forms part of UK domestic law by virtue of the EUWA; or (iii) not a "qualified investor" as defined in Article 2 of the Prospectus Regulation as it forms part of domestic law by virtue of EUWA).

(b)    The Investor and Convertible Notes Purchaser (i) is a sophisticated institutional investor acting for its own account and has such knowledge and experience in financial and business matters and expertise in assessing credit risk that it is capable of evaluating the merit, risks and suitability of investing in the New Securities and is relying exclusively on its own sources of information and credit analysis with respect to its subscription for and/or purchase of the New Securities, and is aware that there are substantial risks incident to the subscription for and/or purchase of the New Securities and is able to bear the concomitant economic and financial risks, and sustain a complete loss, of such an investment, (ii) acknowledges that, as the offering of the New Securities is a private placement of securities, it is responsible for conducting its own due diligence in connection with the offering of the New Securities and any subscription for and/or purchase of the New Securities, (iii) has had the opportunity review the information contained in the Dataroom, to ask any queries regarding an acquisition of the New Securities, the Company and its affairs, and the terms of the New Securities, and has otherwise had access to all the information that it believes is necessary or appropriate in connection with the Transactions and acknowledges and agrees that any information provided by or on behalf of the Company to it or anyone on its behalf does not constitute a representation by the Company or its subsidiaries as to the merits or otherwise of an investment in the New Securities, and (iv) has made its own independent investigation and appraisal of the business, results, financial condition, prospects, creditworthiness, status and affairs of the Company and its subsidiaries and, following such investigation and appraisal and other due diligence that it has deemed necessary and subsequently conducted in connection with the offering of the New Securities, has made its own investment decision to acquire the New Securities.

5.8    Sanctions and Trade Controls; Anti-Corruption; Anti-Money Laundering Laws.

(a)    Other than the Danish State, the Investor's entry into and performance of this Agreement will not constitute a material violation of any applicable Anti-Corruption Laws, Sanctions and Trade Controls Laws, or Anti-Money Laundering Laws, in any applicable jurisdiction, and the Investor is presently in compliance in all material respects with applicable Anti-Corruption Laws, Sanctions and Trade Controls Laws, and Anti-Money Laundering Laws and has instituted and maintain in place policies and procedures designed to promote compliance with such laws. The Danish State has not engaged in any activity or conduct which would comprise a material violation of any applicable Danish Anti-Corruption Laws, Sanctions and Trade Controls Laws, or Anti-Money Laundering Laws and the Danish State is presently in compliance in all respects with Danish Anti-Corruption Laws, Sanctions and Trade Controls Laws, and Anti-Money Laundering Laws.

(b)    Other than the Danish State, neither the Investor nor Convertible Notes Purchaser is: (i) the target of any Sanctions and Trade Controls Laws, including as a result of

56

appearing on any sanctions or export control-related list of restricted Persons (ii) located, organized or resident in a Sanctioned Country, or (iii) a Sanctioned Person.

Notwithstanding anything herein to the contrary, this <u>Section 5.8</u> shall be subject in all respects to the EU Blocking Regulation. To the extent the Investor or Convertible Notes Purchaser is unable to make any representation provided in this <u>Section 5.8</u> due to the EU Blocking Regulation, a description of any such business or activity is included in <u>Schedule 5.8</u>.

5.9    <u>Danish State Term Loan</u>. Solely with respect to the Danish State, the Danish State has obtained the authority to deliver the release set forth in <u>Exhibit C</u> (the "<u>Release</u>"), and is the sole governmental agency or body within the Kingdom of Denmark required to deliver a release of the Company or its applicable Subsidiaries from the Indebtedness that is to be released pursuant to <u>Exhibit C</u>.

5.10    <u>No Other Representations; Condition of the Business</u>.

(a)    Except for the representations and warranties contained in this <u>Article V</u> and any other Key Transaction Documents or other Investor Documents, neither the Investor, Convertible Notes Purchaser nor any other Person makes or has made any other representation or warranty, express or implied, at law or in equity, with respect to the Investor, Convertible Notes Purchaser, the Transactions, or the Investor's, Convertible Notes Purchaser's or their respective Affiliates' respective businesses, assets, Liabilities, operations, prospects, or condition (financial or otherwise), and the Investor and Convertible Notes Purchaser each disclaims any other representations or warranties, whether made by the Investor, the Convertible Notes Purchaser, any of their respective Affiliates or any of its or the Investor's or Convertible Notes Purchaser's Affiliates' Affiliates, stockholders, officers, directors, agents or Representatives (in each case, other than the Company or any Company Subsidiary) (collectively, "<u>Investor Related Persons</u>"), and no Related Person has any authority, express or implied, to make any representations, warranties or agreements not specifically set forth in <u>Article V</u> or any other Key Transaction Documents or other Investor Documents and subject to the limited remedies herein provided. Except for the representations and warranties contained in <u>Article V</u> and any other Key Transaction Documents or other Investor Documents, and as acknowledged and agreed by the Company in <u>Section 4.22(b)</u>, except in the case of actual and intentional fraud, the Investor and the Convertible Notes Purchaser each (directly and on behalf of all Investor Related Persons) hereby disclaims all Liability and responsibility for any representations or warranties that are not expressly set forth in <u>Article V</u> or in any Key Transaction Documents or other Investor Documents. The Investor and the Convertible Notes Purchaser each makes the representations and warranties contained in this <u>Article V</u> and any other Key Transaction Documents or other Investor Documents on behalf of itself only, and not on behalf of any other Investor, Convertible Notes Purchaser or any Investor Related Person.

(b)    The Investor or Convertible Notes Purchaser (as applicable) acknowledges and agrees that neither the Company nor any other Person is making any representations or warranties whatsoever, express or implied, at law or in equity, beyond those expressly given by the Company in <u>Article IV</u> (as modified by the Disclosure Schedules or other modification

57

specified in the lead-in to <u>Article IV</u>) and in any other Key Transaction Documents or other Company Documents, and any representations or warranties other than those set forth in <u>Article IV</u> (as modified by the Disclosure Schedules or other modification specified in the lead-in to <u>Article IV</u>) and in any Key Transaction Documents or other Company Documents are hereby disclaimed.  The Investor or Convertible Notes Purchaser (as applicable) further acknowledges that none of the Company or any of its Affiliates (including the Company Subsidiaries), nor any other Person has made or is making any representation or warranty, express or implied, as to the accuracy or completeness of any information, data, or statement regarding the Company or any of its Subsidiaries or the Transactions, including in respect of the business, the operations, prospects, or condition (financial or otherwise), or the accuracy or completeness of any document, projection, material, statement, or other information, in each case, not expressly set forth in <u>Article IV</u> (as modified by the Disclosure Schedules or other modification specified in the lead-in to <u>Article IV</u>) and in any Key Transaction Documents or other Company Documents, and, except in the case of actual and intentional fraud, the Investor or Convertible Notes Purchaser (as applicable) hereby acknowledges and agrees that, in accordance with <u>Section 4.22(a)</u>, the Company (directly and on behalf of all Company Related Persons) has disclaimed all Liability and responsibility for any representations or warranties that are not expressly set forth in <u>Article IV</u> (as modified by the Disclosure Schedules or other modification specified in the lead-in to <u>Article IV</u>) or in any Key Transaction Documents or other Company Documents.

## ARTICLE VI

## BANKRUPTCY RELATED COVENANTS

6.1    <u>Approval Motions</u>.

(a)    As soon as practicable, and in no event more than three (3) days after the Agreement Date, the Company shall file with the Bankruptcy Court motions, which shall be reasonably acceptable to the Required Investors, seeking entry of (i) the DIP Order and (ii) the EPCA Approval Order, it being understood and agreed, that notwithstanding anything to the contrary herein or in EPCA Approval Order, the obligations of the Debtors which arise at Closing are subject to the terms and conditions set forth herein, including entry of the Confirmation Order and the Swedish Reorganization Plan Confirmation.

(b)    The Parties acknowledge and agree that this Agreement and the Transactions are subject to the entry of the Confirmation Order and the Swedish Reorganization Plan Confirmation, except as otherwise provided in the EPCA Approval Order.

(c)    Each Investor agrees that it will use commercially reasonable efforts to take such actions as are reasonably requested by the Company as promptly as reasonably practicable to assist in obtaining entry of the DIP Order and Confirmation Order, including furnishing documents or information for filing with the Bankruptcy Court.

(d)    The Parties shall consult with one another regarding substantive pleadings that any of them intends to file with the Bankruptcy Court that might reasonably affect the

58

Bankruptcy Court's approval or modification of, as applicable, the DIP Order or the Confirmation Order.

(e)    The Company agrees that it will use commercially reasonable efforts to seek and obtain entry of the Confirmation Order and the Swedish Reorganization Plan Confirmation. The Company shall ensure that (i) the Key Transaction Documents filed by the Debtors with the Bankruptcy Court or the Swedish Court, as applicable, from and after the date hereof, shall be consistent with the terms hereof, shall be provided to the Investors at least five (5) days in advance of filing to the extent reasonably practicable, and shall otherwise be acceptable to the Investors and shall not be modified, suspended, abandoned or revoked without Investor Consent; (ii) all other material documents related to the Transactions shall be consistent with the Key Transaction Documents and shall be provided to the Investors at least three (3) days in advance of filing to the extent reasonably practicable, and shall otherwise be reasonably acceptable to the Investors; and (iii) all other material documents in the Chapter 11 Cases shall be consistent with the Key Transaction Documents to the extent such documents are capable of being consistent with the Key Transaction Documents, and shall be provided to the Investors in advance of filing to the extent reasonably practicable and the Debtors shall consult with the Investors in good faith with respect to the contents of such material documents to the extent reasonably practicable.  The Company shall not, and shall cause the other Debtors not to, file any motion or pleading or make any statement on the record before the Bankruptcy Court or the Swedish Court or publish any press release that is inconsistent with this Agreement or that would reasonably be expected to prevent, delay or impede the successful implementation of the Transactions, without Investor Consent (in each case subject to applicable Laws, which shall, for the avoidance of doubt, include the EU Market Abuse Regulation and the Stock Exchange Rules).

6.2    Bankruptcy Milestones.  Unless extended upon mutual agreement between the Parties or modified by the Company with Investor Consent, the Debtors shall comply with the following milestones:

(a)    by the date that is thirty (30) days after the date of this Agreement, the DIP Order and the EPCA Approval Order shall have been entered by the Bankruptcy Court;

(b)    by the date that is forty-five (45) days after the date of this Agreement, the Debtors shall file in the Chapter 11 Cases the Chapter 11 Plan and the Disclosure Statement with the Bankruptcy Court, each of which shall be consistent with the terms of this Agreement;

(c)    by the date that is eighty-five (85) days after the date of this Agreement, the Bankruptcy Court shall have entered an order in the Chapter 11 Cases approving the Disclosure Statement; and

(d)    by the date that is one hundred and forty (140) days after the date of this Agreement, the Bankruptcy Court shall have entered the Confirmation Order in the Chapter 11 Cases in accordance with this Agreement.

6.3    Contribution Fees.  At the Closing, the Convertible Notes Purchasers shall make initial payments for the Danish Contribution Fee to the Danish State and the Swedish Contribution

59

Fee to the Swedish State, in either $ or SEK, in the amounts set forth opposite their respective names on Schedule 6.3 (subject to adjustments at Closing for the Closing FX Rate); provided, however, that, for administrative efficiency, the Upfront Fee (as that term is defined in the term sheet appended as Exhibit B) payable to each Convertible Notes Purchaser may be credited against the Danish Contribution Fees and Swedish Contribution Fees payable by such Convertible Notes Purchaser pursuant to this Section 6.3 as directed by the Convertible Notes Purchasers, and the amount of the Danish Contribution Fee shall be reduced by the amount of such Upfront Fee (as that term is defined in the term sheet appended as Exhibit B). Following the Chapter 11 Plan Effective Date, any remaining portion of the Danish Contribution Fee and the Swedish Contribution Fee, after taking into account the payments made pursuant to Schedule 6.3, shall be paid from the Contribution Fee Escrow Account.

6.4     Full Form Documents.  The Investors, the Convertible Notes Purchasers and (other than with respect to (ii)) the Company shall use commercially reasonable efforts and shall cooperate in good faith to agree on and finalize forms of (i) the Chapter 11 Plan on terms and conditions which shall be consistent in all material respects with the term sheet appended as Exhibit A, (ii) the Shareholders' Agreement in accordance with Section 7.8, (iii) the Closing Articles and the Post-Closing Articles, (iv) the Swedish Reorganization Plan, and (v) the Convertible Notes Indenture on terms and conditions substantially as set out in the term sheet appended as Exhibit B.

ARTICLE VII

COVENANTS

7.1     Access to Information.  The Company agrees that, prior to the Closing Date or the valid earlier termination of this Agreement pursuant to Section 3.7, it shall, and shall cause the Company Subsidiaries to (a) afford each Investor, its Affiliates and its and their respective Representatives reasonable access to the personnel and properties, book, records, Contracts and operations of the Business and Tax Returns and documents pertaining to the Business, the Company and the Company Subsidiaries, and promptly furnish to such parties all reasonable information concerning the Company, the Company Subsidiaries or their respective personnel and properties, book, records, Contracts and operations of the Business, as may reasonably be requested by such Investor or a reasonable number of Affiliates or Representatives thereof, (b) make its management reasonably available for meetings with the Investors or their respective Affiliates or Representatives and (c) subject to applicable Laws (including, for the avoidance of doubt the EU Market Abuse Regulation and Antitrust Laws), provide the Investors (other than AFKLM), as soon as available and in any event on or before the date that is seventy-five (75) days after the end of each of the first three (3) quarterly accounting periods in each fiscal year of the Company and its Subsidiaries, English language versions of the consolidated financial statements of the Company and its Subsidiaries, in each case as at the end of such quarterly period, that includes a statement of financial position.  Any such investigation, examination or meetings shall be conducted during regular business hours upon reasonable advance prior written notice and under reasonable circumstances, shall be subject to restrictions under applicable Law (which shall, for the avoidance of doubt, include the EU Market Abuse Regulation and applicable Antitrust

60

Laws) and shall not unreasonably interfere with the operation of the Business. Notwithstanding anything herein to the contrary, no such investigation or examination shall be permitted to the extent that it would require the Company or any of its Subsidiaries to disclose information subject to attorney-client privilege in a manner that would reasonably be expected to jeopardize such privilege or violate any Contracts to which the Company or any of its Subsidiaries is bound; provided that, in any such case, the Company shall provide such Investor with a general description of the nature of the information not provided (in each case, to the extent permissible by Law, which shall, for the avoidance of doubt, include the EU Market Abuse Regulation and applicable Antitrust Laws) and the Parties shall work in good faith and use their commercially reasonable efforts to attempt to mitigate such restrictions to allow disclosure of such information without causing any such jeopardy or violation. The Company makes no representation or warranty as to the accuracy of or otherwise with respect to any information provided under this Section 7.1, except as otherwise expressly provided herein. Notwithstanding anything to the contrary contained herein, without the prior written consent of the Company (which may be withheld in its sole discretion) neither the Investors nor the Convertible Notes Purchasers shall have any right to perform invasive or subsurface investigations of the properties or facilities of the Company or any of its Subsidiaries.

7.2    Conduct of the Business Pending the Closing.

(a)    During the period starting on the date of this Agreement and ending on the earlier of the Closing or the valid termination of this Agreement pursuant to Section 3.7 (the "Interim Period"), except (i) as set forth on Schedule 7.2(a), (ii) as required by applicable Law, or required by Order of the Bankruptcy Court, the Swedish Court, the Chapter 11 Plan or the Swedish Reorganization Plan, or as a consequence of the commencement of the Chapter 11 Cases or the Swedish Reorganization, (iii) as otherwise expressly required by this Agreement, or (iv) with Investor Consent, the Company shall, and shall cause the Company Subsidiaries to: (A) conduct the Business only in the Ordinary Course of Business and in a manner consistent with the Bankruptcy Code and all Orders entered into from time-to-time by the Bankruptcy Court in the Chapter 11 Cases and, following filing for the Swedish Reorganization, consistent with the Swedish Reorganization process; and (B) use commercially reasonable efforts to (x) preserve the present business operations, organization, properties and goodwill of the Business, (y) preserve the present relationships with material employees, customers, suppliers, licensors, licensees, unions, works councils, distributors, Governmental Bodies, and others having material business relationships with the Company or any Company Subsidiary, and (z) keep available the services of its material officers and material employees, in each case in accordance with the Ordinary Course of Business.

(b)    During the Interim Period, except: (i) as set forth on Schedule 7.2(b), (ii) to the extent required by applicable Law (including applicable COVID Measures), or required by Order of the Bankruptcy Court, the Swedish Court, the Chapter 11 Plan or the Swedish Reorganization Plan, or as a consequence of the commencement of the Chapter 11 Cases or the Swedish Reorganization, (iii) as otherwise expressly required by this Agreement, or (iv) with Investor Consent, the Company shall not, and shall cause the Company Subsidiaries not to:

61

(i)     issue any equity interests in the Company or any Company Subsidiary, other than issuances of equity interests of a Company Subsidiary to the Company or another wholly-owned Company Subsidiary;

(ii)     redeem, purchase or otherwise acquire any outstanding equity interests of the Company or any Company Subsidiary, or pay any dividend or make any distribution with respect to any equity interests of the Company or any Company Subsidiary;

(iii)     enter into, materially amend in a manner adverse to the Company or a Company Subsidiary, terminate (other than an expiration at the end of its term), or waive any material rights under, any Material Contract or assume or reject any Material Contract in connection with the Chapter 11 Cases;

(iv)     incur any additional Indebtedness or assume, endorse or guarantee any Indebtedness of another Person other than Permitted Indebtedness;

(v)     adopt any material amendment to the organizational documents of the Company or any Company Subsidiary;

(vi)     other than in the Ordinary Course of Business or as part of collective bargaining cycles conducted no more frequently than on an annual basis (1) enter into, adopt, amend, renew or terminate any collective bargaining agreement, or other arrangement, agreement or Contract with any Employee Representative or (2) recognize or certify any Employee Representative or group of Employees as the bargaining representative of any Employee;

(vii)     other than as required by any Contract (1) increase the annual level of compensation of any Employee with annual base pay in excess of $150,000 by more than 10%, (2) grant any unusual or extraordinary additional compensation to any Employee, (3) enter into any employment, deferred compensation, severance or similar agreement (or amend any such agreement) to which the Company or any Company Subsidiary is a party with an Employee of the Company or any Company Subsidiary in excess of $250,000; (4) adopt, enter into, terminate, or amend any Employee Benefit Plan except as required by applicable Law or collective bargaining agreement; (5) grant any new equity awards to any Employee or director; (6) accelerate the vesting or payment of compensation or benefits under any Employee Benefit Plan;

(viii)     (1) hire or engage any Person to be an Employee or officer of, or a service provider to, the Company or any Company Subsidiary, other than the hiring or engagement of Employees or service providers with annual base pay or fees not in excess of $250,000 in the Ordinary Course of Business, or (2) terminate the employment of any current officer or Employee of the Company or any Company Subsidiary with annual base pay in excess of $250,000 other than for cause (as determined in accordance with past practice);

62

(ix)    adopt or change any material accounting, financial reporting or tax principles, practices, periods, or methods used by the Company or any Company Subsidiary, except as may be required in order to comply with changes in IFRS, GAAP or applicable Law;

(x)    fail to use commercially reasonable efforts to maintain insurance policies in such amounts and against such risks and losses as is maintained by the Company and the Company Subsidiaries as of the date hereof;

(xi)    commence any Legal Proceeding (other than with respect to the Specified Norwegian Tax Action) seeking damages in an amount in excess of $2,500,000;

(xii)    make any payment, discharge, settlement or compromise (or the offer to settle or compromise) any pending Legal Proceeding (other than with respect to State aid decisions or the Specified Norwegian Tax Action) which (1) requires payment by the Company or any of its Subsidiaries (exclusive of attorney's fees) in excess of $2,500,000 in the aggregate or (2) which imposes material restrictions on the operations of the Company or any of its Subsidiaries;

(xiii)    make, change or revoke any material Tax election, file any material amended Tax Return, settle or compromise any material Tax liability, surrender or compromise any right to claim a material Tax refund or credit, extend or waive the statute of limitations period applicable to any material Tax or Tax Return, initiate any voluntary disclosure or similar program with any Governmental Body with respect to any material Taxes or enter into any agreement affecting any material Tax liability or refund or file any request for rulings or special Tax incentives, except, in each case, as related to the Specified Norwegian Tax Action;

(xiv)    acquire any business or Person, by merger or consolidation, purchase of substantial assets or equity interests, or by any other manner;

(xv)    sell, transfer, lease, sublease, distribute or otherwise dispose of any assets having a value in excess of $2,500,000 individually or $5,000,000 in the aggregate, other than (1) in the Ordinary Course of Business (including, for the avoidance of doubt, the leasing out or sale of Aircraft, Engines or Parts by Gorm Engine Management Limited or Gorm Asset Management Limited) or as requested by a Governmental Body and (2) to the extent such actions are required to comply with conditions imposed by the European Commission and/or the EFTA Surveillance Authority in conjunction with the clearance under State aid law of the participation by one or several of the states of Denmark, Norway and Sweden in the restructuring of the Company; or

(xvi)    agree or commit to take any of the foregoing actions.

63

7.3     Regulatory Approvals.

(a)     Each Investor, Convertible Notes Purchaser and the Company shall: (i) make or cause to be made all notices and filings set forth in Schedule 7.3(a)(i) (Part 1, Antitrust approvals, Part 2, FDI, Part 3, Aviation and transportation approvals, and Part 4, State aid (subject to Section 12.12)) required of each of them or any of their respective Affiliates under applicable Law (including voluntary notices and filings which each Investor, Convertible Notes Purchaser and the Company concludes in good faith is advisable) with respect to the Transactions (the "Required Approvals") (provided that, for purposes of this Section 7.3(a), "Required Approvals" shall not include State aid) as promptly as practicable; provided, that the Investors, Convertible Notes Purchasers and the Company may jointly elect to delay such filings if the Parties determine, acting reasonably, that such delay would be beneficial in facilitating or accelerating the obtaining of approvals required by any Governmental Body, and (ii) subject to Section 7.3(b), Section 7.3(c), Section 7.3(f) and Section 7.3(g), shall use commercially reasonable efforts to obtain the Required Approvals.  After the date of this Agreement, each Investor, Convertible Notes Purchaser and the Company shall cooperate in good faith to determine and agree upon (with each Party acting reasonably), as promptly as practicable, whether any of the consents, waivers or regulatory approvals set forth in Schedule 7.3(a)(ii), or any other consents, waivers or regulatory approvals, are required to consummate the Transactions and, to the extent so determined and agreed upon by the Parties (acting reasonably) in writing, any such required consents, waivers or regulatory approvals shall be deemed to be automatically added to Schedule 7.3(a)(i) without further action by any Party; provided that, notwithstanding the foregoing, the Danish State shall have the right to determine, without the consent or approval of any other Party, whether any of the consents, waivers or regulatory approvals set forth in Schedule 7.3(a)(ii) are required to consummate the Transactions and, to the extent so determined in writing, any such required consents, waivers or regulatory approvals shall be deemed to be automatically added to Schedule 7.3(a)(i) without further action by any Party; provided, further, that if any approval from any Governmental Body under applicable Antitrust Law is added to Schedule 7.3(a)(i) after the date hereof, the Parties shall expressly agree whether such approval shall be (x) governed by Section 7.3(g), or (y) governed by Section 7.3(c).  For the avoidance of doubt, (x) nothing in this Agreement prohibits any Investor, Convertible Notes Purchaser or the Company from making, or causing to be made, and each such Party shall be entitled to make, or cause to be made, the notices and filings set forth in Schedule 7.3(a)(ii) to the extent required by applicable Law and (y) any consent, waiver or regulatory approval added to Schedule 7.3(a)(i) in accordance with this Section 7.3(a) shall constitute a Required Approval unless and until such consent, waiver or regulatory approval is removed from Schedule 7.3(a)(i) in accordance with Section 7.3(g).

(b)     Each Investor, Convertible Notes Purchaser and the Company shall furnish to each other such necessary information and assistance as such other Party and its Affiliates may reasonably request in connection with their preparation of any application or other filing to be made pursuant to any applicable Law in connection with the Transactions, it being understood that each of such obliged Parties shall, acting reasonably, be entitled to decline to furnish such information other than in a redacted form or in the form of information strictly required by the other Parties (and, to the extent requested, only as "outside-counsel only").  Subject to Section 12.12, applicable Law and the limitations set out herein, each such Party shall: (A) use

64

commercially reasonable efforts to comply at the earliest practicable and advisable date with any request under applicable Law for additional information, documents, or other materials received by each of them or any of their respective Affiliates from any Governmental Body in respect of such filings or the Transactions, (B) in each case, cooperate with each other in connection with any such filing and in connection with resolving any investigation or other inquiry in respect of the Transactions of any Governmental Body under any applicable Law with respect to any such filing or the Transactions and (C) promptly inform the other Parties of any material communication with, and (subject to confidentiality, where necessary to comply with applicable Law or Section 12.12) provide copies of written communications with, any Governmental Body regarding any such filings or the Transactions. Subject to Section 12.12 and other than to the extent related to State aid, to the extent permitted by Law and reasonably practicable, no Party shall independently participate in any substantive meeting or call with any Governmental Body in respect of any such filings, investigation, or other inquiry in respect of the Transactions without giving the other Parties prior notice and, to the extent permitted by such Governmental Body, the opportunity to attend, participate or be represented by outside counsel. Subject to applicable Law and Section 12.12, and to the extent reasonably practicable, the Parties will consult and cooperate with one another in connection with any analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any Party relating to proceedings in respect of any such filings, investigation, or other inquiry in respect of the Transactions and shall consider in good faith the views of the other Party in connection with any proposed written communication to any Governmental Body relating to such matters. Each Investor, Convertible Notes Purchaser and the Company may, as they deem necessary, designate any sensitive materials to be exchanged in connection with this Section 7.3(b) as "outside-counsel only". Any such materials, as well as the information contained therein, shall be provided only to a receiving Party's outside counsel (and mutually acknowledged outside consultants) and not disclosed by such counsel (or consultants) to any employees, officers, managers or directors of the receiving party without the advance written consent of the Party supplying such material or information. The above provisions of this Section 7.3(b) shall not apply with respect to any requests from a Governmental Body or filings, investigations or other inquiries relating to Taxes.

(c)    Further, and without limiting the generality of the rest of this Section 7.3, and in all respects subject to Section 12.12, each Investor, Convertible Notes Purchaser and the Company shall use their commercially reasonable efforts to take any and all steps necessary to avoid or eliminate each and every impediment under any Antitrust Laws or other Laws that may be asserted by any Governmental Body with respect to this Agreement, in each case in respect of the Required Approvals, so as to enable as promptly as reasonably practicable (and in any event before the Outside Date) the consummation of the Transactions and to avoid any suit or proceeding which would otherwise have the effect of preventing or materially delaying the Closing (and, for the avoidance of doubt, so as to avoid an in-depth or second phase review by the relevant Governmental Body) (any such action, a "Regulatory Action"). The Regulatory Actions shall include using commercially reasonable efforts to: (i) contest, defend and appeal any threatened or pending litigation or preliminary or permanent injunction or other Order that would adversely affect the ability of any Party to consummate the Transactions; and (ii) agree to take any other action as may be required by a Governmental Body in order to, (A) obtain the Required Approvals as soon as reasonably possible, and in any event before the Outside Date, (B) avoid the entry of,

65

or have vacated, lifted, dissolved, reversed or overturned, any decree, judgment, injunction or other Order, whether temporary, preliminary or permanent, that is in effect in any Legal Proceeding in respect of the Required Approvals and that prohibits, prevents or restricts consummation of the Transactions, and (C) effect the expiration or termination of any waiting period in respect of the Required Approvals, which would otherwise have the effect of preventing or materially delaying the Closing. Notwithstanding anything to the contrary set forth herein, nothing in this Agreement shall require any Party to (x) agree to any condition, take any measure or action, or enter into any agreement that is not contingent on the Closing, or (y) agree to any action (and the Company shall not agree to take any Regulatory Action without Investor Consent), if such action would, or would reasonably be expected to, individually or in the aggregate with all other such terms, conditions, obligations, requirements, limitations, prohibitions, remedies, sanctions or other actions, (A) be material to the business, operations, financial condition or results of operations of the Company and its Subsidiaries, taken as a whole (for the avoidance of doubt, this shall include that no such actions would reasonably be expected to result in a deviation of, or impede the ability of the Company and its Subsidiaries taken as a whole to fulfill, the stated objectives in Schedule 7.13(a)), (B) be material to the business, operations, financial condition or results of operations of any Investor and its Subsidiaries, taken as a whole (assuming for purposes of this clause (B) that any Investor and its Subsidiaries (taken as a whole) shall be deemed to be the same size as the Company and its Subsidiaries (taken as a whole)), (C) would require or result in any amendment to the Governance Term Sheet (or, as applicable, clauses within the Shareholders Agreement that specifically pertain to the Governance Term Sheet) without the prior written consent of the Danish State (in its sole discretion), or (D) would require the Danish State to take any action contrary to Section 12.12, including any Governmental Task (any such requirement set forth in this subsection (y), a "Burdensome Condition").

(d)      Each Investor, Convertible Notes Purchaser and the Company shall not, and shall cause their respective Affiliates not to, acquire or enter into any agreement to acquire (by merger, consolidation, acquisition of equity interests or assets, joint venture or otherwise) any Person or a portion thereof or otherwise acquire or agree to acquire any assets, if such acquisition, or the entering into such agreement, would reasonably be expected to: (i) impose any material delay in the obtaining, or materially increase the risk of not obtaining, from any Governmental Body, any permit or Order necessary to consummate the Transactions or the expiration or termination of any waiting period under applicable Law, (ii) materially increase the risk of any Governmental Body entering an Order or adopting a decision prohibiting the consummation of the Transactions or materially increase the risk of not being able to remove any such Order or decision on appeal or otherwise; or (iii) otherwise materially delay or prevent the consummation of the Transactions. For clarity, this Section 7.3(d) shall not refer to any Alternative Transaction permitted pursuant to the terms of this Agreement.

(e)      Notwithstanding anything in this Agreement to the contrary, the Investors and Convertible Notes Purchasers shall, as soon as reasonably practicable following the entry by the Bankruptcy Court of the EPCA Approval Order, submit to the European Commission a briefing paper (the "Briefing Paper") for the purposes of obtaining the European Commission's informal view as to whether the Transactions constitute a concentration within the meaning of Regulation 139/2004 (such date, the "Submission Date"). The Investors and Convertible Notes Purchasers

66

shall deliver a draft of such Briefing Paper to the Company not less than three (3) Business Days prior to the submission thereof and shall consider, in good faith, any comments that the Company or its advisors submit to the Investors and Convertible Notes Purchasers (or their respective outside legal advisors) prior to filing.  The Parties shall use commercially reasonable efforts to: (A) contest any assertion by the European Commission, to the extent it becomes known after the submission of the Briefing Paper, that the Transactions constitute a concentration within the meaning of Regulation 139/2004; provided, that no Party shall be required hereunder to seek, or engage substantively with respect to any, approval of the European Commission under Antitrust Laws in connection with the Transactions; and (B) make necessary amendments to the Key Transaction Documents, the Governance Term Sheet, the Shareholders Agreement, any arrangements between the Investors or Convertible Note Purchasers or any other agreement contemplated by any such documents and/or adjustments to the structure of the Transactions that would enable the European Commission to determine that the Transactions do not constitute a concentration within the meaning of Regulation 139/2004 (provided, that (1) any imposition of a Burdensome Condition (excluding Burdensome Condition (B)) and/or (2) material adjustments to the structure of the Transactions, including (x) any changes to the Danish State's ownership stake of the Company (on a non-diluted as well as fully-diluted basis) and/or (y) any amendments to the closing condition relating to State aid, shall require the consent of the Danish State (in its sole discretion)).

(f)      Notwithstanding anything in this Agreement to the contrary, if at any time after the date that is four (4) months following the Submission Date (the "EU AT Milestone Date"), any Investor, Convertible Notes Purchaser or the Company, in good faith, concludes a Determination has occurred or is likely to occur, that Investor, Convertible Notes Purchaser or the Company, may promptly convene, by written notice to the other Parties, a meeting ("Regulatory Meeting") at which the Parties shall discuss whether final modifications, if any, might be made to the Key Transaction Documents and/or adjustments to the structure of the Transactions to avoid a Determination (provided, that (1) any imposition of a Burdensome Condition (excluding Burdensome Condition (B)) and/or (2) material adjustments to the structure of the Transactions, including (x) any changes to the Danish State's ownership stake of the Company (on a non-diluted as well as fully-diluted basis) and/or (y) any amendments to the closing condition relating to State aid, shall require the consent of the Danish State (in its sole discretion)).  The Parties shall, following the Regulatory Meeting and for a period of thirty (30) days following the EU AT Milestone Date, cooperate in good faith to negotiate and implement any such modifications to the Key Transaction Documents and/or adjustments to the structure of the Transactions (provided, that (1) any imposition of a Burdensome Condition (excluding Burdensome Condition (B)) and/or (2) material adjustments to the structure of the Transactions, including (x) any changes to the Danish State's ownership stake of the Company (on a non-diluted as well as fully-diluted basis) and/or (y) any amendments to the closing condition relating to State aid, shall require the consent of the Danish State (in its sole discretion)).  If, by the date that is sixty (60) days after the EU AT Milestone Date, the European Commission does not determine, or any of the Parties concludes in good faith that it is improbable that such final modifications would satisfy the European Commission, that the Transactions do not, constitute a concentration within the meaning of Regulation 139/2004 then this Agreement may be terminated by the Company or collectively by the Investors or the Convertible Notes Purchasers acting by Investor Consent by written notice to

67

the other Parties and neither the Company nor the Investors shall be deemed to be in breach of this Section 7.3.

(g)    If any Other Governmental Body shall initiate or threaten to initiate an investigation under any Antitrust Law into the Transactions, (A) the Parties shall use their commercially reasonable efforts, for a period of six (6) months from the entry of the EPCA Approval Order (the date at the end of such six (6) month period being the "Other Regulatory Approval Milestone Date"), to contest the jurisdiction of that Other Governmental Body over the Transaction; provided that such efforts shall not require any Party to seek, or engage substantively with respect to any, approval of such Other Governmental Body under Antitrust Laws in connection with the Transactions; and (B) in the event that such Other Governmental Body asserts jurisdiction, the Parties shall use commercially reasonable efforts (including by making necessary amendments to the Key Transaction Documents, the Governance Term Sheet, the Shareholders Agreement, any arrangements between the Investors or Convertible Note Purchasers or any other agreement contemplated by any such documents and/or adjustments to the structure of the Transactions) to enable the Governmental Body to close its investigation without causing a Burdensome Condition (provided, it is understood that any such necessary amendments or adjustments shall not be, or be deemed to be, a Burdensome Condition for purposes of clause (B) of such definition)) (provided, that (1) any imposition of a Burdensome Condition (excluding Burdensome Condition (B)) and/or (2) material adjustments to the structure of the Transactions, including (x) any changes to the Danish State's ownership stake of the Company (on a non-diluted as well as fully-diluted basis) and/or (y) any amendments to the closing condition relating to State aid, shall require the consent of the Danish State (in its sole discretion)).  If such Other Governmental Body has not closed its investigation without causing a Burdensome Condition (as modified by the proviso in the foregoing sentence) prior to the Other Regulatory Approval Milestone Date and any Party determines in good faith, in consultation with its outside legal counsel, that it is probable that such Other Governmental Body would close its investigation without causing a Burdensome Condition (as modified by the proviso in the foregoing sentence) within fourteen (14) days of the Other Regulatory Approval Milestone Date, such Party may, upon notice to the other Parties, extend the Other Regulatory Approval Milestone Date by fourteen (14) days. If such Other Governmental Body closes its investigation without causing a Burdensome Condition (as modified herein), any approval by such Other Governmental Body previously added to Schedule 7.3(a)(i) in accordance with Section 7.3(a), shall be deemed to be automatically removed from Schedule 7.3(a)(i) without further action by any Party. If, notwithstanding the use of the Parties' commercially reasonable efforts set forth in this Section 7.3(g), upon the earlier of (x) the Other Regulatory Approval Milestone Date (as may be extended pursuant to this Section 7.3(g)) or (y) the Parties, having discussed and agreed in good faith, conclude that such Other Governmental Body will not close its investigation without causing a Burdensome Condition (as modified herein), this Agreement may be terminated by the Company or any Investor in accordance with Section 7.3(b) and none of the Company nor any of the Investors shall not be deemed to be in breach of this Section 7.3.  In the circumstances described in this Section 7.3(g), the provisions of Section 7.3(b) shall apply to each Investor, Convertible Notes Purchaser, and the Company.

68

(h)    The Danish State shall notify the State aid measures related to the Danish State and the Transactions to the European Commission (the "State Aid Notification") and shall in good faith seek to obtain the European Commission's approval of those measures on conditions which are commercially reasonable to the Company (provided, such measures shall not constitute a Material State Aid Decision (which, for purposes of this Section 7.3(h), shall include that no such actions would reasonably be expected to result in a deviation of, or impede the ability of the Company and its Subsidiaries taken as a whole to fulfill, the stated objectives in Schedule 7.13(a)) or a Burdensome Condition set forth in clause (C) or (D) of such definition).

7.4    Further Assurances. Subject to Section 7.3, and other than in relation to obtaining regulatory approvals, which is regulated by Section 7.3, the Company, each Investor and each Convertible Notes Purchaser shall use their commercially reasonable efforts to (a) take all actions necessary or appropriate to consummate the Transactions on the terms set forth herein, the Confirmation Order, EPCA Approval Order, the Chapter 11 Plan and the Swedish Reorganization Plan, (b) facilitate the fulfillment at the earliest practicable date of all of the conditions to the other Party's obligations to consummate the Transactions, (c) defend any lawsuits or other legal proceedings, whether judicial or administrative, against it challenging this Agreement or the consummation of the Transactions, and (d) execute and deliver any additional agreement, document, instrument or certificate reasonably requested by the other Party for the purpose of consummating the Transactions (excluding for the purpose of the Danish State any release (any such required releases are exclusively set forth in Exhibit C)). Notwithstanding anything to the contrary in this Section 7.4, the Danish State shall not have any obligations under Section 7.4(a) and Section 7.4(d) until the entry of the Confirmation Order.

7.5    Use of Proceeds. The Debtors will apply the proceeds from the subscription of the New Securities for the purposes identified in the Chapter 11 Plan and Swedish Reorganization Plan.

7.6    Publicity. None of the Company, any Investor or a Convertible Notes Purchaser shall issue any press release or public announcement concerning this Agreement or the Transactions without obtaining the prior written approval of the other Parties (which approval will not be unreasonably withheld, delayed or conditioned) unless disclosure is required by applicable Law (which shall, for the avoidance of doubt, include the EU Market Abuse Regulation and the Stock Exchange Rules) or by order of the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court or the Swedish Court with respect to filing to be made with the Swedish Court in connection with this Agreement or otherwise consistent with prior disclosures in compliance with this Section 7.6; provided (a) that the Party intending to make such release shall use its commercially reasonable efforts consistent with such applicable Law or order of the Bankruptcy Court or Swedish Court to consult with the other Party with respect to the text thereof and to provide reasonable prior notice thereof and (b) that the Company shall be permitted to issue any press release and announcement relating to (i) traffic figures and (ii) the monthly operating reports submitted to the Bankruptcy Court without written approval from the other Parties. Notwithstanding anything to the contrary in this Section 7.6, the Danish State (including, for the avoidance of doubt, the Danish State as a Governmental Body) shall not have any obligations from, and shall not be subject to any other restrictions on Investors in, this Section 7.6.

69

7.7    Consultations. The Company shall, and shall procure that the Company Subsidiaries shall, take all necessary steps to complete the Employee Consultation Process in sufficient time before the Closing, in connection with the Transactions. In connection with the Employee Consultation Processes, except as prohibited by applicable Law, the Company shall, and shall cause any Company Subsidiary to: (i) keep the Investors reasonably informed of the status of the Employee Consultation Process and reasonably promptly provide the Investors with copies of any material statements relevant to the Investors delivered by any applicable Employee Representative; (ii) provide Investors with a reasonable opportunity to review, where possible prior to distribution, any material written communications delivered to any Employee Representative, and consider in good faith the Investors' reasonable comments thereto; and (iii) refrain from doing anything that is likely to prejudice the expeditious completion of any of the Employee Consultation Processes.

7.8    Shareholders' Agreement. During the Interim Period, the Investors will negotiate in good faith to prepare and execute a shareholders' agreement, in a form that incorporates the terms and conditions set forth in the Governance Term Sheet in all material respects, to govern the relationship among the Investors following the Closing (the "Post-Closing Company Shareholders"), in each case, in their respective capacity as Post-Closing Company Shareholders (the "Shareholders' Agreement"); provided that, solely in the event the Investors do not execute the Shareholders' Agreement by or on the Closing Date, (i) the Investors shall continue to negotiate in good faith to prepare and execute the Shareholders' Agreement in a form that incorporates the terms and conditions set forth in the Governance Term Sheet in all material respects and (ii) the Investors agree that the Governance Term Sheet shall be deemed to be binding on the Investors and the terms and conditions set forth therein shall govern the relationship among the Investors, in their capacity as Post-Closing Company Shareholders, in each case, until such time as the Shareholders' Agreement is so executed by the Investors and the term 'Shareholders' Agreement' as used in this Agreement shall be deemed to refer to the Governance Term Sheet. This Section 7.8 shall be governed by and any disputes settled according to the governing law and dispute resolution mechanisms in the Governance Term Sheet.

7.9    Alternative Transactions.

(a)    Except as expressly permitted in Section 7.9(b), during the Interim Period, (i) the Company shall, and shall cause its Subsidiaries, its Affiliates and the Company's and its Subsidiaries' respective Representatives ("Company Representatives") to, immediately (A) cease and terminate any ongoing solicitations, discussions, negotiations and communications with respect to any Alternative Transaction and (B) terminate all physical and electronic dataroom access previously granted to any Person or its Representatives (other than, for the avoidance of doubt, the Investors, their respective Representatives and, prior to the funding of the "DIP Loans" (as defined in the DIP Credit Agreement) in accordance with Section 2.1(a) of the DIP Credit Agreement, the Original DIP Lender(s) in connection with their role as lenders under the Original DIP Agreement and to the extent required to comply with the information and similar rights of the Original DIP Lender(s) under the Original DIP Agreement) by or on behalf of the Company or its Subsidiaries in connection with an Alternative Transaction or any inquiry or proposal, expression of interest or offer for (whether written or oral), or that is reasonably expected to lead to, an Alternative Transaction (an

70

"Alternative Transaction Proposal"), and request the return or destruction of all confidential, non-public information and materials provided to any such Person or its Representatives in accordance with the applicable confidentiality requirements (other than, for the avoidance of doubt, the Investors, their respective Representatives, the advisors to the Unsecured Creditors Committee in the Chapter 11 Cases and, prior to the funding of the "DIP Loans" (as defined in the DIP Credit Agreement) in accordance with Section 2.1(a) of the DIP Credit Agreement, the Original DIP Lender(s) in connection with their role as lenders under the Original DIP Agreement and to the extent required to comply with the information and similar rights of the Original DIP Lender(s) under the Original DIP Agreement), and (ii) each of the Company and its Subsidiaries shall not, and shall instruct and direct their respective Representatives not to, directly or indirectly, (A) initiate, seek, solicit, knowingly engage in or knowingly participate in any discussions, inquiries or negotiations in connection with any proposal, expression of interest or offer relating to, or that could reasonably be expected to lead to, an Alternative Transaction or Alternative Transaction Proposal, (B) provide any non-public information relating to the Company or any of its Subsidiaries to any Person (other than, for the avoidance of doubt, the Investors, their respective Representatives and, prior to the funding of the "DIP Loans" (as defined in the DIP Credit Agreement) in accordance with Section 2.1(a) of the DIP Credit Agreement, the Original DIP Lender(s) in connection with their role as lenders under the Original DIP Agreement and to the extent required to comply with the information and similar rights of the Original DIP Lender(s) under the Original DIP Agreement) that, to the Company's knowledge, has made, is seeking to make, or could reasonably be expected to make, an Alternative Transaction Proposal or otherwise in connection with or in response to any Alternative Transaction Proposal or any proposal, expression of interest or offer reasonably expected to lead to any Alternative Transaction Proposal, (C) initiate, seek, solicit, participate in, knowingly assist, knowingly facilitate or knowingly encourage (in each case, including by way of furnishing any non-public information relating to the Company or any of its Subsidiaries), the making, submission or announcement of any proposal, expression of interest or offer that constitutes, or could reasonably be expected to lead to, an Alternative Transaction Proposal, (D) enter into any binding or non-binding letter of intent, agreement in principle, memorandum of understanding, merger agreement, acquisition agreement, investment agreement, option agreement, joint venture agreement, partnership agreement or other agreement, commitment, arrangement or understanding contemplating or otherwise in connection with, or that is intended or would reasonably be expected to lead to any Alternative Transaction or Alternative Transaction Proposal or (E) resolve to do any of the foregoing.

(b)    Notwithstanding anything in the foregoing Section 7.9(a) to the contrary, (i) if, during the period starting on the date of this Agreement and ending on the entry of the Confirmation Order, the Company receives in writing a bona fide Alternative Transaction Proposal from any Person not solicited, knowingly assisted, knowingly facilitated or knowingly encouraged in violation of Section 7.9(a) and such bona fide Alternative Transaction Proposal was not solicited, knowingly assisted, knowingly facilitated, knowingly encouraged or knowingly induced in violation of Section 7.9(a), the Board (or any subcommittee of the Board to which authority has been delegated) may, directly or indirectly through the Company Representatives, contact such Person that has made such Alternative Transaction Proposal (or its Representatives) for the purpose of seeking clarification of such Alternative Transaction Proposal or any terms thereof, solely for purposes of determining, and only to the extent necessary to determine, whether such

71

proposal constitutes, or could reasonably be expected to constitute, a Superior Transaction and (ii) if the Board has determined in good faith, in consultation with its outside financial advisors and outside legal counsel, that such Alternative Transaction Proposal constitutes, or is reasonably likely to constitute, a Superior Transaction and that the failure of the Board to pursue such Alternative Transaction Proposal would be inconsistent with the Board's fiduciary duties under applicable Law (a "Superior Proposal"), the Company may: (A) furnish non-public information (if such Person has executed and delivered to the Company a confidentiality agreement on terms not materially less favorable to the Company than any confidentiality agreements entered into with any Investor); provided that the Company shall also promptly (and in any event within twenty-four (24) hours after the time such information is provided to such Person that has submitted such Superior Proposal) make such information available to the Investors, to the extent not previously provided to the Investors; and (B) engage or participate in discussions or negotiations with such Person regarding such Superior Proposal.  The Company may enter into an agreement with respect to an Alternative Transaction Proposal and terminate this Agreement pursuant to Section 3.7(h), in either case, only if: (1) the Alternative Transaction Proposal was not solicited, knowingly assisted, knowingly facilitated, knowingly encouraged or knowingly induced in violation of Section 7.9(a), (2) the Board has determined in good faith, in consultation with its outside financial advisors and outside legal counsel, that such Alternative Transaction Proposal constitutes a Superior Proposal and the failure to terminate the Agreement and enter into an agreement with respect to such Alternative Transaction Proposal would be inconsistent with the Board's fiduciary duties under applicable Law, (3) the Company has given the Investors at least five (5) Business Days' prior written notice of its decision to terminate (a "Company Notice of Superior Proposal") (it being understood and agreed that any amendment to any material term of any Superior Proposal shall require a new Company Notice of Superior Proposal and a new three (3)-day notice period) advising the Investors that the Company (whether on its behalf, on behalf of one or more of its Subsidiaries or on the Company's and its Subsidiaries' collective behalf) intends to take such action (which notice shall specify the identity of the Person making such Superior Proposal and the material terms thereof), (4) the Company has provided a copy of such Superior Proposal to the Investors, (5) the Company has negotiated, and has caused its Subsidiaries and the Company Representatives to negotiate, in good faith with the Investors or their respective Representatives during such notice period, to the extent any Investors wish to negotiate, to enable the Investors to propose in writing a binding offer to effect revisions to the terms of this Agreement such that such Superior Proposal would no longer constitute a Superior Proposal and (6) following the end of such notice period, the Board shall have considered in good faith any such binding offer, and shall have determined, in consultation with its outside financial advisors and outside legal counsel, that the Superior Proposal continues to constitute a Superior Proposal if the revisions proposed in such binding offer were to be given effect.  In addition, notwithstanding anything contained in Section 7.9(a) or any other provision of this Agreement to the contrary, the Company shall not waive or release any standstill provisions or similar agreements with any Person or group of Persons and shall enforce, to the fullest extent permitted under applicable Law, the provisions of any such agreements; provided, that the Company shall be permitted to waive any standstill agreement (or similar agreement) in order to permit a Person to make an Alternative Transaction Proposal to the Company in a confidential manner, if and only if the Company shall have determined in good faith, in consultation with its outside legal counsel, that the failure to so waive would be

72

inconsistent with the Board's fiduciary duties under applicable Law, to the extent not waived or otherwise modified or eliminated.

(c)     In addition to, and without limiting, the obligations of the Company (including the obligations of the Company to cause the Company's Subsidiaries and Affiliates and Company Representatives to take or omit from taking certain actions) set forth in the foregoing Section 7.9(a) and Section 7.9(b), the Company shall promptly (and in any event within twenty-four (24) hours following receipt thereof by the Company, any of the Company Subsidiaries or Affiliates or any Representative of the foregoing) provide (x) written notice to the Investors of each Alternative Transaction Proposal received by the Company, any of its Subsidiaries or Affiliates or any Representative of the foregoing and (y) a copy of each such written Alternative Transaction Proposal (including complete, unredacted copies of all material written proposals, written indications of interest and draft agreements relating to, and other material written materials that describe the terms and conditions of, such Alternative Transaction Proposal (to the extent available)) or a detailed summary of each such oral Alternative Transaction Proposal.  In addition to the foregoing, the Company shall (i) promptly (and in any event within twenty-four (24) hours following receipt thereof by the Company, any of its Subsidiaries or any Representatives of the foregoing) advise the Investors in writing of any proposal that may reasonably be expected to lead to an Alternative Transaction Proposal, (ii) keep the Investors reasonably informed in all material respects on a reasonably current basis of the status and details (including any change to the terms thereof) of any Alternative Transaction Proposal, and (ii) provide to the Investors as soon as practicable (and in any event with twenty-four (24) hours) after receipt or delivery thereof copies of all material documentation exchanged between the Company (or any of its Subsidiaries or Affiliates or any Company Representatives) and any Person that describes any of the material terms or conditions of any Alternative Transaction Proposal.  The Company shall also notify the Investors promptly if the Board determines, in accordance with Section 7.9(b), that an Alternative Transaction Proposal constitutes a Superior Proposal, and in any event no later than twenty-four (24) hours following such determination.  For the avoidance of doubt, any determination by the Company to enter into any Superior Transaction in accordance with this Agreement shall be subject to approval by the Bankruptcy Court, on at least seven (7) days' notice to parties in interest.

(d)     Nothing in this Agreement shall prevent the directors of the Company from resolving that the Company shall file for bankruptcy (Sw. *konkurs*) if deemed required in order to discharge the directors' fiduciary duties. To the extent possible without increasing the risk of personal liability for the directors of the Company, the Company shall consult with the Investors in good faith prior to any such filing.

7.10    Expense Reimbursement.

(a)     In accordance with and subject to the EPCA Approval Order, the Company shall, and shall cause the other Debtors to, pay or reimburse, in accordance with this Section 7.10, all reasonable and documented fees and out-of-pocket expenses (including travel costs and expenses) of (x) Skadden, Arps, Slate, Meagher & Flom LLP, White & Case LLP, Bech-Bruun Law Firm P/S and Latham & Watkins LLP, as respective counsel to the Investors (other than the Danish State), (y) Rothschild & Co. as financial advisor to Castlelake and (z) all other legal

73

counsels, accountants, financial advisors and other professionals, advisors and consultants retained by any one or more Investors (other than the Danish State) in connection with the Chapter 11 Cases and/or the Transactions or the Chapter 11 Plan or Swedish Reorganization Plan set forth on Schedule 7.10 (with such additions after the date of this Agreement as may be reasonably required by the Investors with the prior consent of the Debtors (not to be unreasonably withheld)), in each case incurred on behalf of such Person in connection with the due diligence investigation, negotiation, execution and performance of any Transaction (including any applicable filing or similar fees required to be paid in any applicable jurisdiction), regardless of when such fees are or were incurred (but in no event following termination of this Agreement) (the "Expense Reimbursement").  For the avoidance of doubt, any provisions in this Section 7.10(a), or elsewhere in this Agreement, entitling a Party to a reimbursement of fees and expenses shall not include any recoverable value added tax (or similar Tax).

(b)    In accordance with and subject to the EPCA Approval Order and the Overall Cap, the Company shall, and shall cause the other Debtors, to pay or reimburse the Danish State Expense Reimbursement and Commitment Fee.

(c)    Accrued, unpaid and invoiced amounts of the Expense Reimbursement (summary invoices which are actually delivered to the Company) shall be paid by the Debtors on the later of (x) the first (1st) Business Day following the Expense Reimbursement Milestone (as defined below) that next occurs and (y) the tenth (10th) Business Day following the date on which the applicable summary invoice setting forth such accrued and unpaid fees and out of pocket expenses to be paid pursuant to the Expense Reimbursement is received by the Company.  Without limiting the validity or enforceability of Section 7.10(d) or limiting the liability of the Company with respect to the Expense Reimbursement, payments of the Expense Reimbursement amounts shall become payable on the dates on which each of the following events occurs (the "Expense Reimbursement Milestones"):

(i)    the entry by the Bankruptcy Court of the EPCA Approval Order;

(ii)    the filing of the Chapter 11 Plan and the Disclosure Statement;

(iii)    the Bankruptcy Court's approval of the Disclosure Statement;

(iv)    the entry by the Bankruptcy Court of the Confirmation Order; and

(v)    the Chapter 11 Plan Effective Date.

(d)    Without duplication of the Expense Reimbursement Milestones, the Debtors' final payment of the Expense Reimbursement shall be made either (i) contemporaneously with the Closing for any invoices received by the Company at least three (3) Business Days prior to Closing (or, with respect to any invoice that is not received by the Company at least three (3) Business Days prior to Closing, within ten (10) Business Days following the Company's receipt of such invoice) or (ii) following the valid termination of this Agreement pursuant to Section 3.7 (other than pursuant to Section 3.7(g)) in each case in accordance with this Section 7.10; provided, that if the Expense Reimbursement becomes payable following

74

termination of this Agreement as set forth in the foregoing Section 7.10(d)(ii), the Expense Reimbursement through the date of termination, and not for any fees and expenses incurred following the date of termination of this Agreement, shall be payable in Cash to the Investors by the later of ten (10) Business Days following such valid termination and ten (10) Business Days after the date the Investors deliver to the Company in writing, reasonable documentation evidencing the costs and expenses included in any invoice for such Expense Reimbursement. For the avoidance of doubt, the Debtors may pay the Expense Reimbursement without any requirement of any professionals to file a fee application with the Bankruptcy Court pursuant to the EPCA Approval Order. The Expense Reimbursement shall constitute allowed administrative expenses against the Debtors' estates under sections 503(b) and 507(a) of the Bankruptcy Code. In no event shall any Investor be entitled to the payment of Expense Reimbursement more than once.

(e)     Nothing in this Section 7.10 shall amend, modify, alter, limit or impair the rights of Castlelake or any of its Affiliates to receive reimbursement of expenses under section 11.04 of the DIP Credit Agreement; provided that neither Castlelake nor any of its Affiliates shall be entitled to receive, and no Debtor shall be required to make, duplicate payments for the same expenses under this Agreement and the DIP Credit Agreement.

7.11    Tag Right Termination Fee. The Company shall promptly following the date hereof (a) take all actions reasonably necessary to seek authorization from the Bankruptcy Court to terminate the "Tag Right" (as defined in the Original DIP Agreement) in accordance with the "Call Option and Tag Right Procedures" attached to the order of the Bankruptcy Court approving the Original DIP Agreement (ECF No. 331) (the "Tag Right Termination Order") and (b) pay, or procure the payment of, the Tag Right Termination Fee (as defined in the Original DIP Agreement) in an amount equal to $21,000,000 as required in accordance with Section 2.10(i) of the Original DIP Agreement. The Company may elect, by providing written notice to the Investors following the entry by the Bankruptcy Court of the Tag Right Termination Order, to use a portion of the Initial Escrowed Funds to pay the Tag Right Termination Fee. Promptly following receipt of such written notice from the Company, the Investors or Convertible Notes Purchasers (as applicable) and the Company shall execute and deliver to the Escrow Agent a Joint Release Instruction directing the Escrow Agent to release and distribute such amount as requested in such written notice (up to a maximum of $21,000,000) of the Initial Escrowed Funds to the Company (such amounts distributed to the Company in accordance with this Section 7.11, the "Tag Right Termination Fee Advance"), which funds shall solely be used by the Debtors to pay the Tag Right Termination Fee. The Company hereby acknowledges and agrees that any portion of the Initial Escrowed Funds deposited by any Investor or a Convertible Notes Purchaser and used by the Debtors to pay the Tag Right Termination Fee shall, (i) if the Closing shall occur, to the extent legally possible, be credited to the Total Convertible Notes Purchase Price paid by the applicable Convertible Notes Purchaser on Closing for such portion of the Convertibles Notes to which such Convertible Notes Purchaser is entitled pursuant to this Agreement, the Chapter 11 Plan and the Swedish Reorganization Plan in accordance with Section 2.1, Section 2.2 and Section 2.4 and in the amount as set forth opposite such Convertible Notes Purchaser's name on Schedule 7.11 or (ii) unless distributed to the Company in accordance with Section 2.3(c)(ii), be repaid by the Company to such Convertible Notes Purchaser or Investors (as applicable) no later than one (1) Business Day following the release of the Escrowed Funds to the relevant Investors and Convertible Notes

75

Purchasers (as applicable) pursuant to <u>Section 2.3(c)(ii)</u>, in the amount as set forth opposite such Convertible Notes Purchaser's or Investors' name on <u>Schedule 7.11</u>. The Company shall ensure that the Tag Right Termination Order provides that the claims against the Company arising from the Tag Right Termination Fee Advance pursuant to the immediately preceding <u>clause (ii)</u> shall constitute allowed administrative expenses against the Debtors' estates under sections 503(b) and 507(a) of the Bankruptcy Code.

7.12    <u>Delisting</u>.  Prior to the Closing, the Company shall, and shall cause the Company Subsidiaries to, take, and do or cause to be done all things, reasonably necessary, proper or advisable on their parts under applicable Laws, Stock Exchange Rules and policies of the Stock Exchanges to cause the delisting in connection with the Closing by the Company and each such Company Subsidiary (as applicable) of the securities of the Company and each such Company Subsidiary (as applicable) from the Stock Exchanges.

7.13    <u>Post-Closing Covenants</u>.  The Company agrees with the Danish State (and the other Investors hereby agree) that, following the Closing Date, it shall, and shall cause the Company Subsidiaries to:

(a)    unless waived by the Danish State, conduct its business in compliance with the objectives set out in <u>Schedule 7.13(a)</u>;

(b)    comply with high standards in the areas of treatment of employees, tax, transparency, health and safety; and

(c)    continuously monitor the Company's and the Company Subsidiaries' contribution to the connectivity from Denmark and shall immediately inform the Danish State in writing if it becomes aware of a sustained reduction of the Company's and the Company Subsidiaries' contribution to the connectivity from Denmark as illustrated by a decrease of more than a predetermined percentage relative to the status of recognized connectivity indexes measuring the degree of integration of Denmark into the global air transport network, such as that of, for example, Copenhagen Economics and IATA air connectivity index (any notification related hereto shall include an explanation for the background for such reduction and a plan for reestablishment hereof).

7.14    <u>Special Prorate Agreement</u>.  The Company shall use commercially reasonable efforts to (a) agree (in final form) to (i) a Special Prorate Agreement between the respective Affiliates of the Company and those of AFKLM, and (ii) any potential other commercial agreements contemplated by them within the limits of the boundaries applicable to them (which agreements contemplated by <u>clauses (i)</u> and <u>(ii)</u> above shall become effective on Closing, at the earliest), and (b) reject or otherwise terminate (consensually or by Final Order) or otherwise obtain a waiver (to the benefit of all carriers, including AFKLM's Affiliates) of the Company's obligations in respect of its inability to implement reciprocal codesharing (within the limits of applicable air political frameworks), reciprocal earn and burn on frequent flyer programs and lounge access.

7.15    <u>Reserved Funds</u>.

(a)    In the event of (i) a final decision from a competent national court requiring the Company to pay or (ii) a State under Applicable Law being required to ex officio demand payment (including any election to do so as a result of or with reference to Applicable Law or similar) of any State non-tax claim against the Company which would have arisen in the period 2020–2023 (each such claim, a "State Non-Tax Claim"), the Reserved Funds shall be released for the Company to pay that State Non-Tax Claim to the extent a third party has not already paid, or agreed to pay, such State Non-Tax Claim. In the event that the Reserved Funds exceed the State Non-Tax Claim(s), the residual amount of the Reserved Funds will be released for distribution to the Unsecured Creditors on the Reserve Fund Release Date in accordance with the Chapter 11 Plan and the Swedish Reorganization Plan.

(b)    Subject to Section 7.15(a), the Reserved Funds shall be released to the Unsecured Creditors in accordance with the Chapter 11 Plan and the Swedish Reorganization Plan: (i) on the later of (x) 31 December 2033, if the States have not in any way asserted within the meaning of Section 5 of the Swedish Statute of Limitations (Sw. 5 § *Preskriptionslagen* (1981:130)), or any corresponding Danish law, any State Non-Tax Claim and (y) the final resolution of all State Non-Tax Claims; or (ii) any earlier date otherwise agreed between the Company and the Investors (such date, the "Reserve Fund Release Date").

(c)    Immediately following the Closing, pursuant to the terms of the Contribution Fee Escrow Agreement, each Convertible Notes Purchaser shall deposit (or shall cause to be deposited), into the Contribution Fee Escrow Account, by wire transfer of immediately available funds, an amount equal to the result of (x) the SEK 114,285,714.18 (converted to $ (truncated to two decimal places) using the Closing FX Rate) *multiplied by* (y) the percentage set forth opposite such Convertible Notes Purchasers' name on Schedule 7.15(c), in each case, to be released in accordance with the Chapter 11 Plan.

## ARTICLE VIII

## CONDITIONS TO CLOSING

8.1    Conditions Precedent or Concurrent to Obligations of Investors.  The obligation of the Investors and the Convertible Notes Purchasers to consummate the Transactions is subject to the fulfillment, as of the Closing, of each of the following conditions (any or all of which may be waived by Investor Consent in whole or in part to the extent permitted by applicable Law):

(a)    (i) the representations and warranties of the Company set forth in Section 4.1 (Organization and Authority), Section 4.2 (Due Execution), Section 4.3(b) (Capitalization) and 4.9 (Brokers) shall be true and correct in all material respects on and as of the date hereof and the Closing Date as if made on and as of the Closing Date (or, to the extent given as of a specific date, as of such date), (ii) the representations and warranties of the Company set forth in Section 4.3(a) (Capitalization) shall be true and correct in all but de minimis respects on and as of the date hereof and the Closing Date as if made on and as of the Closing Date (or, to the extent given as of a specific date, as of such date) and (iii) all of the other representations and warranties of the Company set forth in Article IV shall be true and correct in all respects (without giving effect to

77

any limitation or qualification as to "materiality" (including the word "material") or "Material Adverse Effect" set forth therein) on and as of the date hereof and the Closing Date as if made on and as of the Closing Date (or, to the extent given as of a specific date, as of such date), except for such failures to be true and correct that, individually and in the aggregate, have not had, or would not reasonably be expected to result in, a Material Adverse Effect;

(b)    the Company shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by it on or prior to the Closing Date;

(c)    since the date hereof, there shall not have been a Material Adverse Effect;

(d)    the Company shall have delivered, or caused to be delivered, to the Investors all of the items set forth in Section 3.2;

(e)    the Company shall have paid (or caused another Debtor to pay) all Expense Reimbursements accrued through the Closing Date in accordance with Section 7.10;

(f)    there shall not have occurred a dismissal or conversion of any Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code or the appointment of a Chapter 11 trustee or an examiner with expanded powers (beyond those set forth in section 1104(c) and 1106(a)(3) and (4) of the Bankruptcy Code) to operate the businesses of the Debtors in any Chapter 11 Cases; and

(g)    satisfaction of each of the conditions precedent set forth in the term sheet attached hereto as Exhibit B (unless waived by consent of the Required Investors); provided that, notwithstanding anything to the contrary in this Section 8.1, none of the conditions in this Section 8.1 can be waived without the prior written consent of the Danish State (email being sufficient).

8.2    Conditions Precedent or Concurrent to Obligations of the Company. The obligation of the Company to consummate the Transactions is subject to the fulfillment, as of the Closing Date, of each of the following conditions (any or all of which may be waived by the Company in whole or in part to the extent permitted by applicable Law):

(a)    all of the representations and warranties of each Investor and Convertible Notes Purchaser set forth in Article V shall be true and correct in all respects (without giving effect to any limitation or qualification as to "materiality" (including the word "material") set forth therein) on and as of the date hereof and the Closing Date as if made on and as of the Closing Date (or, to the extent given as of a specific date, as of such date), except for such failures to be true and correct that, individually and in the aggregate, have not had, or would not reasonably be expected to result in, a material adverse effect on the ability of such Investor to consummate the transactions contemplated hereby or perform its obligations hereunder;

(b)    each Investor and Convertible Notes Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement

78

to be performed or complied with by the Investors and Convertible Notes Purchasers on or prior to the Closing Date; and

(c)     each Investor and Convertible Notes Purchaser shall have delivered, or caused to be delivered, to the Company all of the items set forth in Section 3.3.

8.3     Conditions Precedent or Concurrent to Obligations of the Investors, the Convertible Notes Purchaser and the Company.  The respective obligations of the Investors, the Convertible Notes Purchasers and the Company to consummate the Transactions are subject to the fulfillment, as of the Closing Date, of each of the following conditions (any or all of which may be waived in whole or in part by Investor Consent and the Company to the extent permitted by applicable Law) (provided that, notwithstanding anything to the contrary in this Section 8.3, none of the conditions in this Section 8.3 can be waived without the prior written consent of the Danish State (email being sufficient)):

(a)     there shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Transactions;

(b)     all Required Approvals set forth on Schedule 7.3(a)(i) (as such Schedule may be adjusted pursuant to Section 7.3(a) or Section 7.3(g)) shall have been received, or all waiting periods and review periods under applicable Antitrust Laws in connection with the Transactions as set forth on Schedule 7.3(a)(i) (as such Schedule may be adjusted pursuant to Section 7.3(a) or Section 7.3(g)) shall have expired, and all such Required Approvals are in full force and effect without the imposition of a Burdensome Condition or a Material State Aid Decision, and shall have not been vacated, reversed or stayed (including stayed pending appeal), or modified or amended in a manner adverse to the Transactions or otherwise constituting (x) with respect to any Required Approval (other than State aid), a Burdensome Condition or (y) with respect to any State aid decision, a Material State Aid Decision;

(c)     the Bankruptcy Court shall have entered into the EPCA Approval Order and such Order is in full force and effect and has not been vacated, reversed or stayed (including stayed pending appeal); and

(d)     all conditions to the effectiveness of the Chapter 11 Plan (including, for the avoidance of doubt, the Swedish Reorganization Plan Confirmation) shall have been satisfied or waived in accordance with the terms thereof.

8.4     Frustration of Closing Conditions.  None of the Investors, Convertible Notes Purchasers or the Company may rely on the failure of any condition set forth in Section 8.1, Section 8.2 or Section 8.3, as the case may be, if such failure was primarily caused by such Party's failure to comply with any provision of this Agreement.

AMERICAS 125333004
WEIL:\99329431\42\72316.0004

## ARTICLE IX

## TERMINATION FEE

9.1    <u>Termination Fee</u>.

(a)    If (i) this Agreement is validly terminated (x) by the Company pursuant to <u>Section 3.7(h)</u> or (y) by Investor Consent pursuant to <u>Section 3.7(i)</u> or (ii) the Company or any of its Subsidiaries enters into a binding agreement in respect of an Alternative Transaction (or a series of related Alternative Transactions) involving, in the aggregate, not less than 50% of the assets of the Business based on the value of the total consolidated assets set forth in the Company's most recent balance sheet prepared in the Ordinary Course of Business (regardless of whether the effectiveness of such agreement, or the binding nature of such agreement with respect to the Company or such Subsidiary, is conditioned on or subject to approval by the Bankruptcy Court) within eighteen (18) months following the valid termination of this Agreement by Investor Consent or the Company pursuant to <u>Section 3.7(b)</u> (solely in the event the failure of the Closing to have occurred by or before the Outside Date arose primarily out of the Company's material breach of this Agreement) or pursuant to <u>Section 3.7(f)</u>, then, subject to <u>Section 9.3</u>, the Company shall pay (or procure that any Debtor(s) pays) to the Investors an aggregate fee of $24.71 million in Cash (the "<u>Termination Fee</u>") in accordance with <u>Section 9.1(b)</u>.  For the avoidance of doubt, the Termination Fee payable pursuant to <u>clause (ii)</u> of this <u>Section 9.1(a)</u> shall be reduced by the amount of any Damages actually received by the Investors on account of a material breach by the Company of this Agreement.

(b)    In the event the Termination Fee is payable pursuant to clause (i) of <u>Section 9.1(a)</u>, the Company shall pay (or procure that any Debtor(s) pays) to the Investors the Termination Fee within two (2) Business Days following the applicable termination of this Agreement.  In the event the Termination Fee is payable pursuant to clause (ii) of <u>Section 9.1(a)</u>, the Company shall pay (or procure that any Debtor(s) pays) to the Investors the Termination Fee concurrently with (and as a condition to) the consummation of such Alternative Transaction (regardless of whether such Alternative Transaction is consummated within eighteen (18) months following the valid termination of this Agreement).  The payment of the Termination Fee to the Investors in accordance with this <u>Section 9.1(b)</u> shall be made by wire transfer of immediately available funds to an account designated in writing by the Investors to the Company, which Termination Fee shall be split among the Investors in the proportions set forth opposite their respective names in column VI on <u>Schedule 2.1</u>.

9.2    <u>Court Approval</u>.  The Termination Fee shall be fully earned, nonrefundable and non-avoidable upon entry of the EPCA Approval Order and shall be paid by the Debtors if and when required pursuant to <u>Section 9.1</u>. The Termination Fee shall, pursuant to the EPCA Approval Order, constitute allowed administrative expenses against each of the Debtors' estates under sections 503(b) and 507(a) of the Bankruptcy Code.

9.3    <u>Limitation on Liability</u>.  Notwithstanding anything in this Agreement or in any other Key Transaction Document to the contrary, (a) except in the event of actual and intentional

80

fraud and for Expense Reimbursement pursuant to <u>Section 7.10</u>, the maximum aggregate Liability of the Company or any of the Company Subsidiaries under this Agreement shall not exceed the amount of the Termination Fee; and (b) in no event shall the Company, any of the Company Subsidiaries, any Investor, any Convertible Notes Purchaser or any Affiliate of any Investor or Convertible Notes Purchaser have any Liability under this Agreement for any consequential, special, incidental, indirect or punitive Damages, lost profits or similar items (including loss of revenue, income or profits, diminution of value or loss of business reputation or opportunity relating to a breach or alleged breach of this Agreement).

## ARTICLE X

## NO SURVIVAL

10.1    <u>No Survival of Representations and Warranties</u>.    None of the representations, warranties, covenants or agreements in this Agreement shall survive the Closing (other than any covenants and agreements that by their terms are to be satisfied, in whole or in part, on or after the Closing (including <u>Section 7.13</u>), which covenants and agreements shall survive until satisfied in accordance with their terms, and <u>Section 2.6</u>, <u>Section 2.7</u>, <u>Section 4.22</u>, <u>Section 5.10</u>, <u>Section 7.6</u>, <u>Section 7.8</u>, <u>Section 7.10</u>, <u>Section 9.3</u>, this <u>Article X</u>, <u>Article XI</u> and <u>Article XII</u>, which covenants and agreements shall survive the Closing (collectively with such covenants and agreements that by their terms are to be satisfied, in whole or in part, on or after the Closing, the "<u>Surviving Covenants</u>")).    All rights, claims and causes of action (whether in contract or in tort or otherwise, or whether at Law or in equity) with respect to the representations, warranties, covenants or agreements in this Agreement (other than, for the avoidance of doubt, with respect to the Surviving Covenants) shall terminate at Closing, and thereafter none of the Parties or any of their Affiliates or any of their respective current or former officers, directors, employees, partners, managers, members, advisors, consultants, agents or Representatives, or their respective successors and assigns shall have any liability whatsoever from and after the Closing with respect to any such representation, warranty, covenant or agreement (other than, for the avoidance of doubt, with respect to the Surviving Covenants), and no claim for breach of any such representation or warranty, detrimental reliance or other right or remedy (whether in contract, in tort or at Law or in equity) may be brought after the Closing with respect thereto (other than, for the avoidance of doubt, with respect to the Surviving Covenants) against the Company, the Investors, their respective Affiliates and each of their respective current and former officers, directors, employees, partners, managers, members, advisors, consultants, agents or Representatives, or their respective successors and assigns (the "<u>Released Group</u>"), and there will be no liability in respect thereof (other than, for the avoidance of doubt, in respect of the Surviving Covenants), whether such liability has accrued prior to, on or after the Closing, on the part of Investors, the Company, its Subsidiaries or any other member of the Released Group.    Notwithstanding anything herein to the contrary, no Party shall be relieved or released from any claims against such Party and Damages resulting from any such valid claim against such Party for actual and intentional fraud by a Party consciously participating in such actual and intentional fraud.

81

## ARTICLE XI

## TAXES

11.1    <u>Transfer Taxes</u>.  The Company shall be responsible for any stamp, documentary, filing, recording or similar fees or Taxes or governmental charges payable in connection with the Closing or the Transactions, including any interest, additions to tax or penalties applicable thereto ("<u>Transfer Taxes</u>"), but only to the extent such Transfer Taxes are not (i) subject to an exemption under Section 1146(a) of the Bankruptcy Code or (ii) an Investor-Linked Transfer Tax.  For purposes of this <u>Section 11.1</u>, an "<u>Investor-Linked Transfer Tax</u>" means any Transfer Tax which arises (i) solely as a result of a connection of the Investor with the jurisdiction imposing such Transfer Tax (other than a connection created by the Investor's entry into this Agreement) or (ii) to the extent such Transfer Tax arises as a result of the Investor's action, inaction, delay or negligence.  The Company and the Investors shall cooperate and consult with each other prior to filing any Tax Returns in respect of Transfer Taxes, including by availing themselves of any permitted exemptions from payment of Transfer Taxes, such as that provided under Section 1146(a) of the Bankruptcy Code. The Company shall prepare and file all necessary Tax Returns or other documents with respect to all such Transfer Taxes and the Investors shall cooperate with the Company in respect of the filing of any such Tax Returns or other documents.  The Company and the Investors shall cooperate and otherwise take reasonable efforts to reduce, mitigate and exempt the Closing and the Transactions from any such Transfer Taxes and to obtain any available refunds for Transfer Taxes.

11.2    <u>Tax Cooperation</u>.    The Parties shall reasonably cooperate (and cause their respective Affiliates to reasonably cooperate), as and to the extent reasonably requested by the other Parties, in connection with the preparation and filing of Tax Returns, or the conduct of any Tax audit, litigation or other proceeding, or in connection with determining any liability for Taxes of or with respect to the Company or the Company Subsidiaries.  Such cooperation shall include (i) the retention and (upon another Party's reasonable written request) the provision of records and information that are reasonably relevant to any such Tax Return or such audit, litigation or other proceeding and (ii) making employees reasonably available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder; provided that the Party requesting assistance shall pay the reasonable out-of-pocket expenses incurred by the Party providing such assistance; <u>provided</u>, <u>further</u>, that no Party shall be required to provide assistance at times or in amounts that would interfere unreasonably with the business and operations of such Party; <u>provided</u>, <u>further</u>, that if a Party reasonably determines that any records, information or material are protected by attorney-client privilege and that the disclosure of such records, information or material would reasonably be expected to jeopardize such privilege, such records, information or material are not required to be provided pursuant to this <u>Section 11.2</u>.

82

ARTICLE XII

MISCELLANEOUS

12.1    Expenses.  Except as otherwise expressly provided herein (including Section 7.10) or in the other Key Transaction Documents (including Section 11.04 of the DIP Credit Agreement), the Parties shall each bear their own expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby.

12.2    Injunctive Relief.  Damages at law are an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement, and, accordingly, any Party shall be entitled to injunctive relief with respect to any such breach, including specific performance of such covenants, promises or agreements or an Order enjoining a Party from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement (and each Party hereby waives any requirement for the securing or posting of any bond or other security in connection therewith).  Notwithstanding anything to the contrary herein, no Investor shall seek injunctive or other similar relief with respect to the performance by the Company of the covenants, promises or agreements in Section 7.2 hereof prior to the entry of the Confirmation Order.  The rights set forth in this Section 12.2 shall be in addition to any other rights which a Party may have at law or in equity pursuant to this Agreement.

12.3    Governing Law.   To the extent not governed by the Bankruptcy Code or as otherwise set out herein, this Agreement shall be governed by and construed in accordance with the Laws of the State of New York applicable to Contracts made and performed in such State, without regard to any conflict of laws principles thereof.  Notwithstanding anything in this Section 12.3 to the contrary, the forum for issues involving the Danish State shall be determined solely in accordance with Section 12.4.

12.4    Submission to Jurisdiction; Consent to Service of Process.  If not otherwise set out herein, the Company and the Investors submit to the exclusive jurisdiction of the Bankruptcy Court to settle any dispute arising out of or in connection with this Agreement (including a dispute regarding the existence, validity or termination of this Agreement).  Notwithstanding anything herein to the contrary, the Parties acknowledge and agree that the Danish State, by entering into this Agreement, is not submitting to the jurisdiction of the Bankruptcy Court and that the Company agrees that neither it nor any of the Debtors or their Affiliates will, and each other Party agrees that it will not, take the position that by entering into this Agreement the Danish State has submitted to the jurisdiction of the Bankruptcy Court.  Any dispute, controversy or claim with the Danish State under or in connection with this Agreement, including but not limited to any such disputes with respect to the formation, applicability, breach, termination, validity or enforceability hereof, shall be resolved by arbitration under the Rules of Arbitration of the International Chamber of Commerce (the "ICC Rules") by three arbitrators appointed in accordance with the ICC Rules. The seat of the arbitration shall be Stockholm, Sweden, and the language of the arbitration shall be English.  The award of the arbitral tribunal shall be final and binding on the Parties, and

83

judgment thereupon the award may be entered by any court of competent jurisdiction.  For the avoidance of doubt, it is stipulated and agreed among all Parties that an arbitration covered by this Section 12.4, and any resultant award or decision of the arbitral tribunal, is commercial in nature, and that the enforcement of such agreement and award is governed, inter alia, by the 1958 New York Convention on Recognition of Foreign Arbitral awards.  The Parties hereby agree that mailing of process or other papers in connection with any such action or proceeding in the manner provided in Section 12.6, or in such other manner as may be permitted by Law, shall be valid and sufficient service thereof and hereby waive any objections to service accomplished in the manner herein provided.

12.5    Entire Agreement; Amendments and Waivers.    This Agreement (including the Schedules, Exhibits, Company Documents, Investor Documents and the Key Transaction Documents) represents the entire understanding and agreement among the Parties with respect to the subject matter hereof.  This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by: (i) the Company and the Required Investors (including for all purposes the Danish State, which consent by the Danish State may be given or withheld in its sole and absolute discretion); and (ii) if the amendment, supplement change or waiver would either (A) adversely and disproportionately adversely affect a Party's rights in any material respect as compared to the other Parties or (B) create any material new obligation on a Party, such affected or waiving Party. No action taken pursuant to this Agreement, including any investigation by or on behalf of any Party, shall be deemed to constitute a waiver by the Party taking such action of compliance with any representation, warranty, covenant or agreement contained herein.  The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.  All remedies hereunder are cumulative and are not exclusive of any other remedies provided by Law.

12.6    Notices.    All notices and other communications under this Agreement shall be in writing and shall be deemed given (a) when received, if delivered personally by hand, (b) when received, if sent by courier, certified mail, registered mail, or (c) if sent by e-mail, when sent (except that if notice is sent after 5:00 p.m. local time where the receiving Party is incorporated on a Business Day at the place of receipt, it shall be effective the following Business Day) (provided that the sending party does not contemporaneously receive an automatically generated message from the recipient's e-mail server that such e-mail could not be delivered to such recipient), in each case, at the following addresses (or to such other address as a Party may have specified by notice given to the other Party pursuant to this provision):

If to the Company, to:

SAS AB
S-191 87 Stockholm

84

Sweden
Visiting/courier address Frösundaviks Allé 1, Solna
Attention.:   Anna Almén
              Erik Andren
Email:        Anna.almen@sas.se
              Erik.andren@sas.se

With a copy (which shall not constitute notice) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attention:   Gary Holtzer
             Kelly DiBlasi
             Lauren Tauro
             Gavin Westerman
             Mariel E. Cruz
Email:       Gary.Holtzer@weil.com
             Kelly.DiBlasi@weil.com
             Lauren.Tauro@weil.com
             Gavin.Westerman@weil.com
             Mariel.Cruz@weil.com

If to Castlelake, to:

Castlelake, L.P.
250 Nicollet Mall, Suite 900
Minneapolis, MN 55401
Attention:   Legal
Email:       notices@castlelake.com

With a copy (which shall not constitute notice) to:

Skadden, Arps, Slate, Meagher & Flom, LLP
One Manhattan West
New York, New York 10001

Attention:   Alejandro Gonzalez Lazzeri
             James J. Mazza, Jr.
             Richard Oliver
Email:       Alejandro.Gonzalez.Lazzeri@skadden.com
             James.Mazza@skadden.com
             Richard.Oliver@skadden.com

85

If to AFKLM, to:

    Air France-KLM, S.A.
    7 rue du Cirque
    75008 Paris (France)
    Attention:   Pieter Bootsma and Jos Veenstra
    Email:      pieter.bootsma@airfranceklm.com;
               jos.veenstra@airfranceklm.com

With a copy (which shall not constitute notice) to:

    White & Case LLP
    19, Place Vendôme
    75001 Paris France
    Attention:   Hugues Mathez
               Michael Shepherd
               Luke Laumann
               Jeff Gilson

    Email:      hmathez@whitecase.com
               mshepherd@whitecase.com
               luke.laumann@whitecase.com
               jeff.gilson@whitecase.com

If to Lind, to:

    Lind Invest ApS
    Værkmestergade 25, 14.
    DK-8000 Aarhus C
    Denmark
    Attention:   Henrik Lind
               Jonas Højhus Jeppesen
    Email:      lind@lind-invest.dk
               jhj@lind-invest.dk

With a copy (which shall not constitute notice) to:

    Bech-Bruun Law Firm P/S
    Langelinie Alle 35
    DK-2100 Copenhagen
    Denmark
    Attention:   Simon Milthers
               Theis Kristensen
               Emil Dencker Steenberg

86

Email:        smi@bechbruun.com
              tkr@bechbruun.com
              eds@bechbruun.com

and

Latham & Watkins LLP
1271 Avenue of the Americas

New York, NY 10020
Attention:    George Davis
              David Hammerman
              John Greer
Email:        George.Davis@lw.com
              David.Hammerman@lw.com
              John.Greer@lw.com

If to the Danish State, to:

Finansministeriet
Christiansborg Slotsplads 1
DK-1218 Copenhagen
Denmark
Attention:    Adrian Lübbert
              Anders Rendebo Jepsen
Email:        adblb@fm.dk
              anrje@fm.dk

With a copy (which shall not constitute notice) to:

Plesner Advokatpartnerselskab
Amerika Plads 37
DK-2100 Copenhagen
Attention:    Thomas Holst Laursen
              Hans Hedegaard
              Mikkel Rostock Jensen
Email:        thl@plesner.com
              hhe@plesner.com
              mrj@plesner.com
and

Freshfields Bruckhaus Deringer LLP
601 Lexington Avenue
New York, NY 10022
United States

87

Attention:    Madlyn Primoff
Email:        madlyn.primoff@freshfields.com

12.7    Severability.  If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any Law or public policy, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the Transactions is not affected in any manner materially adverse to any Party.  Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the Transactions are consummated as originally contemplated to the greatest extent possible.

12.8    Assignment.  This Agreement and the rights and obligations hereunder will not be assignable or transferable by any Party without the prior written consent of the other Parties; provided that, notwithstanding anything herein to the contrary, (i) without the consent of any other Parties, but upon prior written notice to the other Parties, each of Castlelake and Lind may assign all of its rights and obligations under this Agreement to an Affiliate of such Investor and (ii) in the event of any such assignment, such Affiliate shall be deemed "Castlelake" or "Lind" (as applicable) for all purposes of this Agreement and the other applicable Key Transaction Documents; provided that, in each case, no such assignment shall relieve such Investor of its obligations hereunder if any such assignee fails to perform such obligations.  Any attempted assignment in violation of this Section 12.8 will be void.  Subject to the preceding sentences, this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.

12.9    No Third-Party Beneficiaries.  Subject to Section 12.8, this Agreement shall be binding upon and inure solely to the benefit of the Parties and their respective successors and permitted assigns, and, except for the express rights, benefits and remedies afforded to (i) Company Related Persons or Investor Related Persons pursuant to Section 4.22 and Section 5.10, respectively, (ii) the Released Group pursuant to Section 10.1 and (iii) Non-Parties pursuant to Section 12.11, nothing herein, express or implied, is intended to or shall confer upon any Person (including any creditor of the Company) other than the Company, the Investors and their respective successors and permitted assigns, any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

12.10    Counterparts.  This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.  Facsimiles, e-mail transmission of .pdf signatures or other electronic copies of signatures shall be deemed to be originals.

12.11    Non-Recourse.  This Agreement may only be enforced against, and any Legal Proceeding based upon, arising out of or related to this Agreement may only be made or asserted against (and is expressly limited to) the Persons that are expressly named as Parties to this Agreement (or such Person's permitted assigns who becomes a Party hereto) and then only with

88

respect to the specific obligations set forth herein with respect to such Party.  Except to the extent named as a Party to this Agreement, and then only to the extent of the specific obligations of such Parties set forth in this Agreement, no Person who is not a Party  (or such Person's permitted assigns who becomes a Party hereto) and signatory hereto (including, (a) any former, current or future direct or indirect equity holder, controlling Person, management company, incorporator, member, partner, manager, director, officer, agent, Affiliate, assignee or other Representative of, and lender to (all above-described Persons in this sub-clause (a), collectively, "Affiliated Persons") a Party or any Affiliate of such Party, and (b) any Affiliated Persons of such Affiliated Persons (the Persons in sub-clauses (a) and (b), together with their respective successors, assigns, heirs, executors or administrators, collectively, but specifically excluding the Parties, "Non-Parties")) shall have any liability (whether in contract, tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or liabilities of any of the Parties to this Agreement or for any Legal Proceeding based upon, arising out of or related to this Agreement.  Without limiting the foregoing, no claim or cause of action will be brought or maintained by any Party against any of the Non-Parties, and no recourse of any kind will be sought or granted against any of them, by virtue of or based upon any alleged misrepresentation or inaccuracy in or breach of any of the representations, warranties, covenants or agreements of another Party or any other Person set forth in this Agreement.

      12.12    Acknowledgement Regarding Danish State.   Notwithstanding anything to the contrary or otherwise in this Agreement (other than Section 7.3(h)), including the covenants set forth in Section 6.1(c), Section 7.3 (other than Section 7.3(h)) and Section 7.4, it is acknowledged and agreed by the Parties that (i) only the Danish Ministry of Finance, in its sole capacity as a subscriber and purchaser of New Securities under, and in accordance with, this Agreement and/or purchaser of Convertible Notes under, and in accordance with, this Agreement, in each case, under this Agreement (and solely to the extent of any rights or obligations applicable to the Danish State in such capacities), and not in its capacity as a Governmental Body, is a Party to this Agreement, (for clarity, this Agreement does not impose any restrictions or obligations on the Kingdom of Denmark, including for the purpose of the remit area of the Ministry of Finance, acting as a Governmental Body), or (ii) the Kingdom of Denmark is not restricted in its capacity as creditor of the Company or any of its Subsidiaries (other than specifically set out in Exhibit C), and (iii) neither the Danish State nor the Kingdom of Denmark shall have, and shall not be deemed to have, any obligation of any kind or nature pursuant to this Agreement to take any step or action incremental to the express obligations of the Danish State under this Agreement that will cause (whether directly or indirectly) the Danish State and/or the Kingdom of Denmark to submit to the jurisdiction of the Bankruptcy Court.  Notwithstanding anything to the contrary in this Agreement (other than Section 7.3(h)), each of the Parties acknowledges and agrees that any matter relating directly or indirectly to obtaining the European Commission's approval of State aid measures and the assessment of any foreign direct investment notices and/or filings filed in the Kingdom of Denmark with the Danish Business Authority (the "Governmental Tasks") relate to the Danish State and/or the Kingdom of Denmark solely in their capacity as a Governmental Body and, therefore, neither the Danish State nor the Kingdom of Denmark shall have any obligation pursuant to this Agreement relating directly or indirectly to the Governmental Tasks, except as expressly contemplated by Section 7.3(h).

AMERICAS 125333004
WEIL:\99329431\42\72316.0004

12.13  <u>Several and Not Joint</u>.  The obligations of each Party under this Agreement are several and not joint with the obligations of any other Party, and no Party shall be responsible in any way for the performance of the obligations of any other Party under this Agreement.  Nothing in this Agreement and no actions taken by the Parties under this Agreement shall be deemed to constitute the Parties as, and the Company acknowledges that the Parties do not so constitute, a partnership, association, a joint venture or other kind of group or co-operative entity between any of the Parties, constitute any Party the agent of any other Party for any purpose, or create a presumption that the Parties are in any way acting in concert or as a group or entity with respect to such obligations or the Transactions.

[Signature Page Follows]

AMERICAS 125333004
WEIL:\99329431\42\72316.0004

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**COMPANY**

**SAS AB (publ)**

By: _____

Name: Carsten Dilling


By: _____

Name: Anko van der Werff

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**CASTLELAKE**

**CL-S HOLDINGS LUX S.À R.L.**

By: _____

Name: _Pietr Andrzejewski_____

Title: _Manager_____

[SIGNATURE PAGE TO INVESTMENT AGREEMENT]

**AFKLM:**

**AIR FRANCE-KLM S.A.**

By: _____
Name: Benjamin Smith
Title:   Chief Executive Officer

[SIGNATURE PAGE TO INVESTMENT AGREEMENT]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**the Danish State**

By: _____

Name: Adrian Lübbert
Title: Deputy Permanent Secretary

[*Signature Page to Investment Agreement*]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**LIND:**

**LIND INVEST ApS**

By: _____

Name: Henrik Lind
Title: Chief Executive Officer

[SIGNATURE PAGE TO INVESTMENT AGREEMENT]

# **EXHIBIT A**

## Joint Plan of Reorganization Term Sheet

See attached

**SAS AB, *et al.***

### CHAPTER 11 PLAN TERM SHEET

**November 4, 2023**

This term sheet (this "***Chapter 11 Plan Term Sheet***") sets forth the principal terms of a restructuring (the "***Restructuring***") of SAS AB (publ) ("***SAS AB***") and its subsidiaries identified below (collectively, the "***Company***" or the "***Debtors***"). The Debtors will consummate the Restructuring pursuant to a chapter 11 plan of reorganization (the "***Plan***") that the Debtors will file in their pending cases under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***") before the U.S. Bankruptcy Court for the Southern District of New York (the "***Bankruptcy Court***"), jointly administered under the caption *In re SAS AB, et al.*, Ch. 11 Case No. 22-10925 (MEW) (the "***Chapter 11 Cases***"). Capitalized terms used but not otherwise defined herein will have the meanings ascribed to such terms in __Annex 1__.

**THIS CHAPTER 11 PLAN TERM SHEET DOES NOT CONSTITUTE (NOR WILL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN OF REORGANIZATION. IT IS UNDERSTOOD THAT SUCH AN OFFER, IF ANY, WILL BE MADE ONLY IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY, AND/OR OTHER APPLICABLE LAWS.**

**THIS CHAPTER 11 PLAN TERM SHEET IS A SETTLEMENT PROPOSAL IN FURTHERANCE OF SETTLEMENT DISCUSSIONS. ACCORDINGLY, THIS CHAPTER 11 PLAN TERM SHEET IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER SIMILAR APPLICABLE STATUTES OR DOCTRINES PROTECTING AGAINST THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS. NOTHING IN THIS CHAPTER 11 PLAN TERM SHEET WILL CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, A STIPULATION, OR A WAIVER. EACH STATEMENT CONTAINED HEREIN IS MADE WITHOUT PREJUDICE, SOLELY FOR SETTLEMENT PURPOSES, AND WITH A FULL RESERVATION AS TO ANY RIGHTS, REMEDIES, OR DEFENSES OF ALL PARTIES.**

**THIS CHAPTER 11 PLAN TERM SHEET DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE TRANSACTIONS DESCRIBED HEREIN. SUCH TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN. THE CLOSING OF ANY TRANSACTION WILL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS. NO BINDING OBLIGATIONS WILL BE CREATED BY THIS CHAPTER 11 PLAN TERM SHEET UNLESS AND UNTIL BINDING DEFINITIVE DOCUMENTS ARE EXECUTED AND DELIVERED BY ALL APPLICABLE PARTIES.**

| **OVERVIEW** | |
|---|---|
| **Debtors** | SAS AB; Scandinavian Airlines System Denmark-Norway-Sweden (the "***Consortium***"); SAS Danmark A/S, SAS Norge AS, and SAS Sverige AB (collectively, the "***Consortium Constituents***" and, together with the Consortium, the "***Consolidated Debtors***"); Gorm Asset Management Limited; Gorm Dark Blue Limited; Gorm Sky Blue Limited; Gorm Light Blue Limited; Gorm Deep Blue Limited; Gorm Warm Red Limited; Gorm Ocean Blue Limited; Gorm Engine Management Limited; and Scandinavian Airlines of North America Inc. ("***SANA***"). |
| **Summary of Prepetition Claims and Interests to be Restructured**[1] | <u>Aircraft Lease Claims</u>: an unsecured Claim of an Aircraft Lessor that has entered into a Modified Aircraft Lease against (x) the Debtor party to such Aircraft Lease or (y) SAS AB on account of any guarantee of the obligations arising under such Aircraft Lease (an "***Aircraft Lease Claim***"). For the avoidance of doubt, any and all Claims of an Aircraft Lessor arising from the rejection of an Aircraft Lease will be treated as Other General Unsecured Claims (as defined below) under the Plan ("***Aircraft Rejection Claims***"). <br><br> <u>Trade Claims</u>: an unsecured, prepetition Claim that is held by a third-party provider of goods and services to a Debtor that facilitates such Debtor's operations in the ordinary course of business and will continue to do so after the Effective Date (a "***Trade Claim***"); *provided*, *however*, that any Claim of a Vendor arising from the rejection of an executory contract or unexpired lease between such Vendor and a Debtor will be treated as an Other General Unsecured Claim under the Plan (a "***Trade Rejection Claim***"). An initial list of Trade Claims will be designated on an exhibit attached to the Disclosure Statement, which will be developed in consultation with the Official Committee of Unsecured Creditors (the "***Creditors' Committee***") and updated in connection with the Plan Supplement. To the extent that any executory contract or unexpired lease giving rise to a Trade Claim is rejected in accordance with the terms hereof and the Plan after a vote has been cast with respect to such Claim, such Claim will be reclassified as an Other General Unsecured Claim and the applicable creditor will either (i) be provided with a new ballot to cast a vote on the Plan or (ii) if the voting deadline has passed, be deemed to reject the Plan. <br><br> <u>Norwegian Term Loan Claims</u>: Claims in the principal amount of $149,906,563.11 arising and payable under that certain Facility Agreement, dated as of December 18, 2020, by and among SAS AB, as Borrower, the Consortium, as Guarantor, and Export Finance Norway (Eksfin) as lender and administrative agent (the "***Norwegian Term Loan Claims***"). <br><br> <u>Commercial Hybrid Bond Claims</u>: Claims in the principal amount of $163,101,765.81 arising and payable under the Terms and Conditions for SEK 1,615,000,000 Unsubordinated Perpetual Floating Rate Callable Capital Securities, dated as of October 23, 2020, by and between SAS AB, as Issuer, and Intertrust (Sweden) AB, as Agent, ISIN SE0014957999 (the "***Commercial Hybrid Bond Claims***"). <br><br> <u>Swedish Term Loan Claims</u>: Claims in the principal amount of $146,840,894.12 arising |

---

[1] Unless stated otherwise, all amounts included herein are provided in U.S. Dollars ("***USD***") and reflect, to the extent applicable, the applicable conversion rate for each currency as of the Commencement Date.

and payable under that certain Term Facility Agreement, dated as of July 16, 2021, by and between the Consortium, as Borrower, and the Swedish National Debt Office, as Lender (the "**Swedish Term Loan Claims**").

Danish Term Loan Claims: Claims in the principal amount of $154,868,955.13 arising and payable under that certain On-Lending Facility Agreement, dated as of July 8, 2021, by and among the Consortium, as Borrower, Danmarks Nationalbank, as National Bank, and the Danish State Noteholder, as Lender (the "**Danish Term Loan Claims**").

Swiss Bond Claims: Claims in the principal amount of $131,716,439.97 arising and payable under those certain Subordinated Bonds, dated as of January 14, 1986, issued by the Consortium to Citicorp Bank (Switzerland), Geneva, Kreditbank (Suisse) S.A. Geneva, and a consortium of banks, as initial bondholders, and Citigroup Bank (Switzerland), Geneva, as principal paying agent against (x) the Consortium or (y) SAS AB in respect of the Irrevocable Undertaking (the "**Swiss Bond Claims**").

State Hybrid Bond Claims: Claims in the principal amount of $504,744,669.97 arising and payable under that certain Terms and Conditions for SEK 5,000,000,000 subordinated Perpetual Floating Rate Callable Capital Securities, dated as of October 26, 2020, issued by SAS AB, as Issuer, with Intertrust (Sweden) AB, as Agent, to the States, ISIN SE0014958005 (the "**State Hybrid Bond Claims**").

Danish State Hybrid Bond Claims: Claims in the principal amount of $101,640,888.39 arising and payable under that certain Terms and Conditions for SEK 1,000,000,000 subordinated Perpetual Floating Rate Callable Capital Securities, dated as of October 26, 2020, issued by SAS AB, as Issuer, with Intertrust (Sweden) AB, as Agent, to the Danish State Noteholder, ISIN SE0014958013 (the "**Danish State Hybrid Bond Claims**").

Union Claims: an unsecured Claim held by a labor union of the Debtors (the "**Union Claims**"), including the Claim Allowed by the Bankruptcy Court pursuant to that certain Amended and Restated Agreement, dated as of November 10, 2022, by and among the Consortium, Svensk Pilotförening, Norsk SAS-flygeres Forening, SAS Norge Pilotforenging, and Dansk Pilotforening (the "**Allowed Pilot Union Claim**").

Intercompany Claims: a Claim against a Debtor held by another Debtor or an Affiliate of a Debtor (the "**Intercompany Claims**").

Other General Unsecured Claims: unsecured Claims against the Debtors that are not entitled to priority of payment under section 507(a) of the Bankruptcy Code, other than Aircraft Lease Claims, Trade Claims, Norwegian Term Loan Claims, Commercial Hybrid Bond Claims, Swedish Term Loan Claims, Danish Term Loan Claims, Union Claims, Swiss Bond Claims, State Hybrid Bond Claims, Danish State Hybrid Bond Claims, and Intercompany Claims (the "**Other General Unsecured Claims**"). The Other General Unsecured Claims include the Aircraft Rejection Claims and the Trade Rejection Claims.

Intercompany Interests: Interests in a Debtor held by another Debtor or an Affiliate of a Debtor other than an Existing Equity Interest (as defined below) (the "**Intercompany Interests**").

Existing Equity Interests: common shares in SAS AB existing as of the Commencement Date (the "**Existing Equity Interests**").

| **CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS[2]** | |
|---|---|
| **Summary of Classification** | Except as set forth herein, the Plan will contain separate classes for Claims and Interests against each Debtor.  All of the potential Classes for the Debtors are set forth herein. |
| **Substantive Consolidation** | The Plan will provide for the substantive consolidation of the Consolidated Debtors exclusively for the purposes of voting on and receiving treatment under the Plan, and otherwise will be implemented without any substantive consolidation. |
| **DIP Claims** | Each holder of an Allowed DIP Claim will receive, in full and final satisfaction of such DIP Claim, (i) Cash in an amount equal to such Claim on the Effective Date, or as soon as practicable thereafter, or (ii) such other treatment as agreed to by the DIP Lenders and the Debtors and as reasonably acceptable to the Investors.  The existing debtor-in-possession financing facility with Apollo Management X, L.P. and its affiliated lenders will be refinanced with a new $500 million debtor-in-possession term loan provided in accordance with the DIP Credit Agreement. *Not Classified – Non-Voting* |
| **Administrative Expense Claims and Priority Tax Claims** | Except to the extent that a holder of an Allowed Administrative Expense Claim or Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction of such Claim, each holder of an Allowed Administrative Expense Claim and Allowed Priority Tax Claim will receive, at the option of the Debtors or the Reorganized Debtors, either: (i) Cash in an amount equal to such Allowed Claim on or as soon as reasonably practicable after the later of (a)(x) the Effective Date and (y) the date that is ten Business Days after the date on which such Administrative Expense Claim or Priority Tax Claim becomes an Allowed Administrative Expense Claim or Allowed Priority Tax Claim and (b) the date on which such Administrative Expense Claim or Priority Tax Claim would be paid by the Debtors in the ordinary course of business; or (ii) other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. *Not Classified – Non-Voting* |
| **Other Secured Claims** | Except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction of such Claim, each holder of an Allowed Other Secured Claim will receive, at the option of the Debtors or the Reorganized Debtors, either: (i) payment in full in Cash on or as soon as reasonably practicable after the later of the Effective Date and the date that is ten Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim; (ii) reinstatement of its Allowed Other Secured Claim; or |

---

[2]    To the extent the Debtors fail to confirm a Plan for a Gorm Entity, such Entity may be liquidated and any and all assumed leases or other assets held by such Entity may be assigned or otherwise transferred to an Affiliate of such Entity as determined by the Debtors or the Reorganized Debtors in accordance with applicable law.

|  | (iii) other treatment to render such holder's Allowed Other Secured Claim unimpaired pursuant to section 1124 of the Bankruptcy Code. |
|  | *Unimpaired – Presumed to Accept* |
| **Other Priority Claims** | Except to the extent that a holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction of such Claim, each holder of an Allowed Other Priority Claim will receive, at the option of the Debtors or the Reorganized Debtors, either: |
|  | (i) payment in full in Cash on or as soon as reasonably practicable after the later of the Effective Date and the date that is ten Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim; or |
|  | (ii) other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. |
|  | *Unimpaired – Presumed to Accept* |
| **Treatment of Claims and Allocation of Consideration** | The Debtors, the Creditors' Committee, and the Investors will work in good faith to negotiate the amount and nature of consideration to be allocated to each Class of Claims set out below. For the avoidance of doubt, any consideration to be provided on account of Allowed Claims will reflect (a) an acceptable capital structure for the Reorganized Debtors, (b) acceptable terms of any post-emergence debt, and (c) reasonably acceptable ownership of the New Shares, in each case as determined by the Required Investors (in the case of clauses (a) and (b), by Investor Consent) and the Debtors, in consultation with the Creditors' Committee. Further, any holders of General Unsecured Claims entitled to receive New Shares under the Plan must not (i) be adverse to the Investors' proposed Transaction structure or the Key Transaction Documents or (ii) impede the Investors' ability to satisfy regulatory, competition, or licensing requirements or Reorganized Parent's status as a private and de-listed company. |
| **SAS AB[3]** | |
| **Aircraft Lease Claims and Trade Claims** | As soon as practicable after the later of the Effective Date and the date that is ten Business Days after the date on which an Aircraft Lease Claim or Trade Claim becomes, as applicable, an Allowed Aircraft Lease Claim or Allowed Trade Claim, each holder of such Allowed Aircraft Lease Claim or Allowed Trade Claim, as the case may be, will receive, in full and final satisfaction of such Claim, at the election of the holder of such Claim, such holder's Pro Rata share of (A) (i) the SAS AB Available Cash or (ii) the SAS AB New Shares Distribution Pool and (B) the GUC Trust Interests.[4] |
|  | *Impaired – Entitled to Vote* |
| **Norwegian Term Loan Claims** | On the Effective Date or as soon as practicable thereafter, each holder of an Allowed Norwegian Term Loan Claim will receive, in full and final satisfaction of such Claim, such holder's Pro Rata share of the SAS AB Available Cash and the GUC Trust |

---

[3] Nature and allocation of consideration among Debtors and Classes of Claims are subject to change in accordance with the terms hereof.

[4] Plan will provide for timing of election and related mechanics.

| | |
|---|---|
| | Interests.<br><br>*Impaired – Entitled to Vote* |
| **Commercial Hybrid Bond Claims, Other General Unsecured Claims, and Intercompany Claims** | As soon as practicable after the later of the Effective Date and the date that is ten Business Days after the date on which a Commercial Hybrid Bond Claim, Other General Unsecured Claim, or Intercompany Claim becomes, as applicable, an Allowed Commercial Hybrid Bond Claim, Allowed Other General Unsecured Claim, or Allowed Intercompany Claim, each holder of such Allowed Commercial Hybrid Bond Claim, Allowed Other General Unsecured Claim, or Allowed Intercompany Claim, as the case may be, will receive, in full and final satisfaction of such Claim, such holder's Pro Rata share of the SAS AB Available Cash and the GUC Trust Interests.<br><br>*Impaired – Entitled to Vote* |
| **Swiss Bond Claims** | On the Effective Date, all Swiss Bond Claims will be discharged, cancelled, released, and extinguished, and the holders of such Claims will not receive any distribution on account of such Claims.<br><br>*Impaired – Deemed to Reject* |
| **State Hybrid Bond Claims and Danish State Hybrid Bond Claims** | On the Effective Date, all State Hybrid Bond Claims and Danish State Hybrid Bond Claims will be discharged, cancelled, released, and extinguished, and the holders of such Claims will not receive any distribution on account of such Claims.<br><br>*Impaired – Deemed to Reject* |
| **Existing Equity Interests** | All Existing Equity Interests will be discharged, cancelled, released, and extinguished on the Effective Date (to be registered with the Swedish Companies Registration Office as soon as practicable thereafter), and the holders of such Interests will not receive any distribution on account of such Interests.<br><br>*Impaired – Deemed to Reject* |
| **Consolidated Debtors** | |
| **Aircraft Lease Claims, Trade Claims, and Union Claims** | As soon as practicable after the later of the Effective Date and the date that is ten Business Days after the date on which an Aircraft Lease Claim, Trade Claim, or Union Claim becomes, as applicable, an Allowed Aircraft Lease Claim, Allowed Trade Claim, or Allowed Union Claim, each holder of such Allowed Aircraft Lease Claim, Allowed Trade Claim, or Allowed Union Claim, as the case may be, will receive, in full and final satisfaction of such Claim, at the election of the holder of such Claim, such holder's Pro Rata share of (A) (i) the Consolidated Debtors Available Cash or (ii) the Consolidated Debtors New Shares Distribution Pool and (B) the GUC Trust Interests; *provided, however*, that the distribution on account of the Allowed Pilot Union Claim will be capped at 100,000,000 SEK.<br><br>*Impaired – Entitled to Vote* |
| **Danish Term Loan Claims, Swedish Term Loan Claims, and Norwegian** | On the Effective Date or as soon as practicable thereafter, each holder of an Allowed Swedish Term Loan Claim, Allowed Danish Term Loan Claim, or Allowed Norwegian Term Loan Claim, as the case may be, will receive, in full and final satisfaction of such Claim, such holder's Pro Rata share of the Consolidated Debtors Available Cash and the GUC Trust Interests.  For the avoidance of doubt, each holder of an Allowed |

| Term Loan Claims | Swedish Term Loan Claim, Allowed Danish Term Loan Claim, and Allowed Norwegian Term Loan Claim will receive its Pro Rata share of the applicable consideration provided for herein and such form of consideration will be of equivalent value. |
| --- | --- |
| | *Impaired – Entitled to Vote* |
| **Other General Unsecured Claims** | As soon as practicable after the later of the Effective Date and the date that is ten Business Days after the date on which an Other General Unsecured Claim becomes an Allowed Other General Unsecured Claim, each holder of such Allowed Other General Unsecured Claim will receive, in full and final satisfaction of such Claim, such holder's Pro Rata share of the Consolidated Debtors Available Cash and the GUC Trust Interests. |
| | *Impaired – Entitled to Vote* |
| **Intercompany Claims** | Intercompany Claims will be paid, adjusted, continued, settled, reinstated, discharged, or eliminated in a manner to obtain the most efficient structure for the Company at the election of the Debtors or the Reorganized Debtors, with such election to be reasonably acceptable to the Required Investors and made in consultation with the Creditors' Committee; *provided, however*, that any payment, adjustment, continuation, settlement, or reinstatement on account of an Intercompany Claim will not reduce the amount of the Consolidated Debtors Available Cash or Consolidated Debtors New Shares Distribution Pool available to holders of Allowed Claims against the Consolidated Debtors as set forth in the Plan, other than as a result of making a Pro Rata distribution from the Consolidated Debtors Available Cash on account of an Intercompany Claim. |
| | *Unimpaired / Impaired – Presumed to Accept / Reject* |
| **Convenience Class Claims** | As soon as reasonably practicable after the later of the Effective Date and the date on which an Other General Unsecured Claim becomes an Allowed Other General Unsecured Claim, each holder of an Allowed Other General Unsecured Claim in an amount (i) less than $[●] and (ii) greater than such amount that elects to "voluntarily and irrevocably" reduce its Claim to such amount (such Claims described in clauses (i) and (ii), collectively, the "***Convenience Class Claims***") will receive, in full and final satisfaction of such Claim, Cash in an amount equal to [●]% of such Allowed Convenience Class Claim. |
| | *Impaired – Entitled to Vote* |
| **Swiss Bond Claims** | On the Effective Date, all Swiss Bond Claims will be discharged, cancelled, released, and extinguished, and the holders of such Claims will not receive any distribution on account of such Claims. |
| | *Impaired – Deemed to Reject* |
| **Intercompany Interests** | Intercompany Interests in the Consolidated Debtors will be cancelled or reinstated at the election of the Debtors or the Reorganized Debtors, in consultation with the Investors and the Creditors' Committee. |
| | *Unimpaired / Impaired – Presumed to Accept / Reject* |

| Gorm Asset Management Ltd. & Gorm Engine Management Ltd.[5] | |
|---|---|
| **Other General Unsecured Claims** | As soon as practicable after the later of the Effective Date and the date that is ten Business Days after the date on which an Other General Unsecured Claim becomes an Allowed Other General Unsecured Claim, each holder of such Allowed Other General Unsecured Claim will receive, in full and final satisfaction of such Claim, such holder's Pro Rata share of the Gorm Available Cash and the GUC Trust Interests. *Impaired – Entitled to Vote* |
| **Intercompany Claims** | Intercompany Claims will be paid, adjusted, continued, settled, reinstated, discharged, or eliminated in a manner to obtain the most efficient structure for the Company at the election of the Debtors or the Reorganized Debtors, with such election to be reasonably acceptable to the Required Investors and made in consultation with the Creditors' Committee; *provided, however*, that any payment, adjustment, continuation, settlement, or reinstatement on account of an Intercompany Claim will not reduce the amount of the Gorm Available Cash available to holders of Allowed Other General Unsecured Claims against Gorm Asset Management Ltd. and Gorm Engine Management Ltd., as applicable, as set forth in the Plan, other than as a result of making a Pro Rata distribution from the Gorm Available Cash on account of an Intercompany Claim. *Unimpaired / Impaired – Presumed to Accept / Reject* |
| **Intercompany Interests** | Intercompany Interests in Gorm Asset Management Ltd. and Gorm Engine Management Ltd. will be cancelled or reinstated at the election of the Debtors or the Reorganized Debtors, in consultation with the Investors and the Creditors' Committee. *Unimpaired / Impaired – Presumed to Accept / Reject* |
| Gorm Dark Blue Ltd., Gorm Deep Blue Ltd., Gorm Light Blue Ltd., Gorm Ocean Blue Ltd., Gorm Sky Blue Ltd. | |
| **Aircraft Lease Claims** | As soon as practicable after the later of the Effective Date and the date that is ten Business Days after the date on which an Aircraft Lease Claim becomes an Allowed Aircraft Lease Claim, each holder of such Aircraft Lease Claim will receive, in full and final satisfaction of such Claim, at the election of the holder of such Claim, such holder's Pro Rata share of (A) (i) the Gorm Available Cash or (ii) the Gorm New Shares Distribution Pool and (B) the GUC Trust Interests. *Impaired – Entitled to Vote* |
| **Other General Unsecured Claims** | As soon as practicable after the later of the Effective Date and the date that is ten Business Days after the date on which an Other General Unsecured Claim becomes an Allowed Other General Unsecured Claim, each holder of such Allowed Other General Unsecured Claim will receive, in full and final satisfaction of such Claim, such holder's Pro Rata share of the Gorm Available Cash and the GUC Trust Interests. *Impaired – Entitled to Vote* |
| **Intercompany** | Intercompany Claims will be paid, adjusted, continued, settled, reinstated, discharged, |

---

[5]    These Debtors are not being substantively consolidated and are grouped together for purposes of this Chapter 11 Plan Term Sheet only.

| Claims | or eliminated in a manner to obtain the most efficient structure for the Company at the election of the Debtors or the Reorganized Debtors, with such election to be reasonably acceptable to the Required Investors and made in consultation with the Creditors' Committee; *provided, however*, that any payment, adjustment, continuation, settlement, or reinstatement on account of an Intercompany Claim will not reduce the amount of the Gorm Available Cash or Gorm New Shares Distribution Pool available to holders of Allowed Aircraft Lease Claims and Allowed Other General Unsecured Claims against Gorm Dark Blue Ltd., Gorm Deep Blue Ltd., Gorm Light Blue Ltd., Gorm Ocean Blue Ltd., and Gorm Sky Blue Ltd., as applicable, as set forth in the Plan, other than as a result of making a Pro Rata distribution from the Gorm Available Cash on account of an Intercompany Claim. <br><br> *Unimpaired / Impaired – Presumed to Accept / Reject* |
|---|---|
| **Intercompany Interests** | Intercompany Interests in Gorm Dark Blue Ltd., Gorm Deep Blue Ltd., Gorm Light Blue Ltd., Gorm Ocean Blue Ltd., and Gorm Sky Blue Ltd. will be cancelled or reinstated at the election of the Debtors or the Reorganized Debtors, in consultation with the Investors and the Creditors' Committee. <br><br> *Unimpaired / Impaired – Presumed to Accept / Reject* |
| **Gorm Warm Red Ltd.** ||
| **Other General Unsecured Claims** | As soon as practicable after the later of the Effective Date and the date that is ten Business Days after the date on which an Other General Unsecured Claim becomes an Allowed Other General Unsecured Claim, each holder of such Allowed Other General Unsecured Claim will receive, in full and final satisfaction of such Claim, such holder's Pro Rata share of the Gorm Available Cash and the GUC Trust Interests. <br><br> *Impaired – Entitled to Vote* |
| **Intercompany Claims** | Intercompany Claims will be paid, adjusted, continued, settled, reinstated, discharged, or eliminated in a manner to obtain the most efficient structure for the Company at the election of the Debtors or the Reorganized Debtors, with such election to be reasonably acceptable to the Required Investors and made in consultation with the Creditors' Committee; *provided, however*, that any payment, adjustment, continuation, settlement, or reinstatement on account of an Intercompany Claim will not reduce the amount of the Gorm Available Cash available to holders of Allowed Other General Unsecured Claims against Gorm Warm Red Ltd. as set forth in the Plan, other than as a result of making a Pro Rata distribution from the Gorm Available Cash on account of an Intercompany Claim. <br><br> *Unimpaired / Impaired – Presumed to Accept / Reject* |
| **Intercompany Interests** | Intercompany Interests in Gorm Warm Red Ltd. will be cancelled or reinstated at the election of the Debtors or the Reorganized Debtors, in consultation with the Investors and the Creditors' Committee. <br><br> *Unimpaired / Impaired – Presumed to Accept / Reject* |
| **Scandinavian Airlines of North America Inc.** ||
| **Other General** | As soon as practicable after the later of the Effective Date and the date that is ten |

9

| | |
|---|---|
| **Unsecured Claims** | Business Days after the date on which an Other General Unsecured Claim becomes an Allowed Other General Unsecured Claim, each holder of such Allowed Other General Unsecured Claim will receive, in full and final satisfaction of such Claim, such holder's Pro Rata share of the SANA Available Cash and the GUC Trust Interests.<br><br>*Impaired – Entitled to Vote* |
| **Intercompany Claims** | Intercompany Claims will be paid, adjusted, continued, settled, reinstated, discharged, or eliminated in a manner to obtain the most efficient structure for the Company at the election of the Debtors or the Reorganized Debtors, with such election to be reasonably acceptable to the Required Investors and made in consultation with the Creditors' Committee; *provided, however*, that any payment, adjustment, continuation, settlement, or reinstatement on account of an Intercompany Claim will not reduce the amount of the SANA Available Cash available to holders of Allowed Other General Unsecured Claims against SANA as set forth in the Plan, other than as a result of making a Pro Rata distribution from the SANA Available Cash on account of an Intercompany Claim.<br><br>*Unimpaired / Impaired – Presumed to Accept / Reject* |
| **Intercompany Interests** | Intercompany Interests in SANA will be cancelled or reinstated at the election of the Debtors or the Reorganized Debtors, in consultation with the Investors and the Creditors' Committee.<br><br>*Unimpaired / Impaired – Presumed to Accept / Reject* |
| **RESTRUCTURING TRANSACTION** | |
| **New Shares and New Convertible Notes** | The Restructuring will involve a subscription for the Investor Equity by the Investors in accordance with and subject to the Investment Agreement.  Specifically, the Restructuring will include:<br><br>• a total investment in Reorganized Parent corresponding to $1.2 billion, comprised of $475 million in New Shares and $725 million in New Convertible Notes;<br><br>• the allocation of up to $325 million to holders of Allowed Claims as set forth herein and in the Plan through a combination of Cash and New Shares; and<br><br>• a shareholder structure post-Effective Date but prior to the conversion of the New Convertible Notes where:<br><br>   (i) Castlelake holds approximately 32.0% of the New Shares and 55.2% of the New Convertible Notes;<br><br>   (ii) the Danish State Investor holds approximately 25.8% of the New Shares and 30.0% of the New Convertible Notes;<br><br>   (iii) Air France-KLM holds approximately 19.9% of the New Shares and 4.8% of the New Convertible Notes;<br><br>   (iv) Lind Invest holds approximately 8.6% of the New Shares and 10.0% of the New Convertible Notes; and<br><br>   (v) the remaining approximately 13.6% of the New Shares will be distributed among, and held by, holders of certain Allowed Claims who elect to receive a recovery from the New Shares Distribution Pool, as |

| | |
|---|---|
| | provided herein.[6] |
| | Cash proceeds from the Investors' subscription for the New Shares and New Convertible Notes in connection with the Transaction in an aggregate amount of $42,207,792.20 (the "**Available Cash**"), the New Shares Distribution Pool, and the GUC Trust Interests will be allocated among the Debtors as determined by the Debtors in consultation with the Investors and the Creditors' Committee and made available for distributions to holders of Allowed General Unsecured Claims as set forth herein. |
| | For the avoidance of doubt, the Debtors, the Creditors' Committee, and the Investors will work in good faith to agree upon an allocation of value between the Debtors included in the Plan. |
| **Implementation of Restructuring** | Unless otherwise determined by the Investors and the Debtors (including, for the avoidance of doubt, the board of SAS AB), the Debtors intend, following confirmation of the Plan, to implement the Restructuring pursuant to a Swedish reorganization under the Swedish Reorganization Act (Sw. *lag (2022:964) om företagsrekonstruktion*) (the "**Swedish Reorganization Act**") of SAS AB and, as a part and parcel thereof, to cancel the Existing Equity Interests (the "**Swedish SAS AB Reorganization**") and cause a delisting of the Existing Equity Interests. |
| | The outcome of the Swedish SAS AB Reorganization will be consistent with the Key Transaction Documents, their contents, and otherwise be reasonably acceptable to the Investors. The Company and the Investors will cooperate in good faith regarding the actions to be taken in the Swedish SAS AB Reorganization. |
| | On the Effective Date, the Convertible Notes Purchasers will make initial payments for the Danish Contribution Fee and the Swedish Contribution Fee, in either USD or SEK, in the amounts set forth opposite their respective names on <u>Schedule 6.3</u> of the Investment Agreement (subject to adjustments on the Effective Date for the Closing FX Rate). Following the Effective Date, any remaining portion of the Danish Contribution Fee and the Swedish Contribution Fee, after taking into account the payments made pursuant to <u>Schedule 6.3</u> of the Investment Agreement, will be paid from the Contribution Fee Escrow Account. |
| | Subject to the approval of the Bankruptcy Court and the Overall Cap, the Debtors will pay or reimburse, in accordance with <u>Section 7.10</u> of the Investment Agreement, the Expense Reimbursement and Commitment Fee. |
| **Reserved Funds and Establishment of GUC Trust** | On the Effective Date, (i) the GUC Trust will be established and, as soon as practically possible in order to allow for the SCRO Registration (as defined in the Investment Agreement), funded with the Reserved Funds and the (ii) Contribution Fee Escrow Account will be established and funded by the Convertible Notes Purchasers with SEK 114,285,714.18 (converted to USD (truncated to two decimal places) using the Closing FX Rate), in each case in accordance with the Investment Agreement. |
| | The Reserved Funds will be utilized as follows, as set forth in order of priority of payment: |
| | i.    for amounts required by the Company to (a) defend itself against a claim raised in national courts requiring the Company to pay any State non-tax claim against |

---

[6]     The percentage of New Shares to be distributed to such creditors is subject to change, which may lead to minor adjustments to the New Shares' holdings for the Investors.

the Company, which would have arisen in the period from 2020–2023 (each such claim, a "**State Non-Tax Claim**") and (b) satisfy any costs or expenses related to a third party agreeing to pay in full without recourse to the Company any State Non-Tax Claim, as set forth below;

ii.    in the event of (a) a final decision from a competent court requiring the Company to pay or (b) a State under Applicable Law (as defined in the Investment Agreement) being required to ex officio demand payment (including any election to do so as a result of or with reference to Applicable Law or similar) of any State Non-Tax Claim, the Reserved Funds will be released for the Company to pay that State Non-Tax Claim, to the extent a third party has not already paid, or agreed to pay, such State Non-Tax Claim; and

iii.    in the event that the Reserved Funds exceed any amounts paid pursuant to clause (i) above and any payment by the Company described in clause (ii) above, the residual amount of the Reserved Funds will be released for distribution to holders of GUC Trust Interests in accordance with the Plan and the Swedish Reorganization Plan.

Notwithstanding the foregoing, any Reserved Funds remaining after the funding of any amounts required pursuant to clauses (i) or (ii) above, to the extent applicable, will be released to the holders of GUC Trust Interests on the earliest to occur of (a) the later of (x) December 31, 2033, if the States have not in any way asserted within the meaning of Section 5 of the Swedish Statute of Limitations (Sw. *5 § Preskriptionslagen (1981:130)*), or any corresponding Danish law, any State Non-Tax Claim and (y) the final resolution of all State Non-Tax Claims, (b) a third party agreement, acceptable to the Company and the Investors, with such consent not to be unreasonably withheld, providing for payment in full without recourse to the Company any State Non-Tax Claim, or (c) an agreement between the Company and the Investors to release the Reserved Funds.

Subject to the availability and release of the Reserved Funds as set forth above, the holders of GUC Trust Interests will be entitled to Pro Rata distributions of the Reserved Funds in accordance with the Plan and the terms of the GUC Trust Agreement.

Upon the occurrence of a distribution of Reserved Funds from the GUC Trust to the holders of the GUC Trust Interests, there will be a corresponding distribution from the Contribution Fee Escrow Account to pay the applicable amounts of the Danish Contribution Fee and the Swedish Contribution Fee pursuant to a joint release instruction; *provided, however*, that the payments of the Danish Contribution Fee and the Swedish Contribution Fee will not take into account any payments made by the GUC Trust from the Reserved Funds pursuant to clauses (i) and (ii) above and will be made based on the gross amount of the Reserved Funds.

To the extent no or no further distributions can be made from the Contribution Fee Escrow Account, the remaining funds in the Contribution Fee Escrow Account will be distributed to the Company pursuant to a joint release instruction.

| | |
|---|---|
| **OTHER TERMS OF RESTRUCTURING** | |
| **Governance** | Described in the Governance Term Sheet. |
| **Tax Structure** | To the extent reasonably practicable and as far as is legally possible, the Restructuring and the Transaction will be structured in a manner to obtain the most efficient structure |

| | |
|---|---|
| | for the Company and the Post-Closing Company Shareholders (as defined in the Investment Agreement), as determined by the Company and the Investors in consultation with the Creditors' Committee. |
| **Releases by Debtors** | As of the Effective Date, except for the rights, remedies, and Causes of Action that are preserved and remain in effect from and after the Effective Date, including to enforce the Plan and the obligations contemplated by the Restructuring, for good and valuable consideration, on and after the Effective Date, the Released Parties will be conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, to the maximum extent permitted by law, by the Debtors, the Reorganized Debtors, and the Estates, in each case on behalf of themselves and their respective Related Entities and any and all other Entities that may purport to assert any Cause of Action derivatively, by or through the foregoing Entities, from any and all Causes of Action (including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or the Estates) that the Debtors, the Reorganized Debtors, the Estates, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on, relating to, or in any manner arising from, in whole or in part: the Debtors (including the management, direct or indirect ownership, or operation thereof) or their Estates; the Reorganized Debtors; the Chapter 11 Cases; the Plan; the Confirmation Order; the Restructuring; the Transaction; the equity solicitation process; any debt or security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or security of the Debtors or the Reorganized Debtors, including the New Shares and the New Convertible Notes; the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan; the business or contractual arrangements or other interactions between any Debtor and any Released Party; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in- or out-of-court restructuring efforts of the Debtors; any intercompany transaction; the negotiation, formulation, preparation, dissemination, or consummation of the Plan and any related agreements, instruments, or other documents or any other contract, instrument, release, or document created or entered into in connection with the Plan or any related agreements, instruments, or other documents (including the Investment Agreement); the solicitation of votes with respect to, or confirmation of, the Plan; or any other act or omission, transaction, agreement, event, or other occurrence related to any of the forgoing and taking place on or before the Effective Date (collectively, the "***Debtor Releases***").  Notwithstanding anything herein to the contrary, the Debtor Releases will not (i) affect the liability of any Entity from Causes of Action based on willful misconduct, gross negligence or intentional fraud as determined by a Final Order, (ii) release post-Effective Date obligations of any Entity under the Plan, the Restructuring, the Definitive Documents or any other document, instrument, or agreement executed to implement the Plan (unless expressly cancelled by the Plan), or (iii) affect the Releasing Parties' rights that remain in effect from and after the Effective Date to enforce the Plan, the Definitive Documents, and the obligations contemplated by the Transaction or as otherwise provided in any order of the Bankruptcy Court. |
| **Third-Party Releases** | As of the Effective Date, except for the rights, remedies, and Causes of Action that are preserved and remain in effect from and after the Effective Date, including to enforce the Plan and the obligations contemplated by the Restructuring, for good and valuable consideration, on and after the Effective Date, the Released Parties will be conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, to the |

|  | maximum extent permitted by law, by the Releasing Parties, in each case from any and all Causes of Action (including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or their Estates) that such Releasing Parties or their respective Related Entities, and any other Entities claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on, relating to, or in any manner arising from, in whole or in part: the Debtors (including the management, direct or indirect ownership, or operation thereof) or their Estates; the Reorganized Debtors; the Chapter 11 Cases; the Plan; the Confirmation Order; the Restructuring; the Transaction; the equity solicitation process; any debt or security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or security of the Debtors or the Reorganized Debtors, including the New Shares and the New Convertible Notes; the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan; the business or contractual arrangements or other interactions between any Debtor and any Released Party; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in- or out-of-court restructuring efforts of the Debtors; any intercompany transaction; the negotiation, formulation, preparation, dissemination, or consummation of the Plan and any related agreements, instruments, or other documents or any other contract, instrument, release, or document created or entered into in connection with the Plan or any related agreements, instruments, or other documents (including the Investment Agreement); the solicitation of votes with respect to, or confirmation of, the Plan; or any other act or omission, transaction, agreement, event, or other occurrence related to any of the forgoing and taking place on or before the Effective Date (collectively, the "***Third-Party Releases***").  Notwithstanding anything herein to the contrary, the Third-Party Releases will not (i) affect the liability of any Entity from Causes of Action based on willful misconduct, gross negligence or intentional fraud as determined by a Final Order, (ii) release post-Effective Date obligations of any Entity under the Plan, the Restructuring, the Definitive Documents or any other document, instrument, or agreement executed to implement the Plan (unless expressly cancelled by the Plan), or (iii) affect the Releasing Parties' rights that remain in effect from and after the Effective Date to enforce the Plan, the Definitive Documents, and the obligations contemplated by the Transaction or as otherwise provided in any order of the Bankruptcy Court.<br><br>For the avoidance of doubt, the only parties that are bound by the Third-Party Releases are the Releasing Parties. |
| **Exculpation** | To the fullest extent permitted by applicable law, from and after the Effective Date, no Exculpated Party will have or incur, and each such Entity will be released and exculpated from, any Cause of Action based on, in whole or in part: the negotiation, execution, and implementation of any transactions approved by the Bankruptcy Court in the Chapter 11 Cases, including the DIP Credit Agreement and the incurrence of the DIP Obligations, the new collective labor agreements with the Debtors' pilot unions as contemplated in the CLA Order, stipulations relating to the Aircraft Lease Claims, the pre-delivery payment financing as contemplated by the PDP Facility Order, the Restructuring, the Disclosure Statement, the Plan and any Plan Supplement(s), the Confirmation Order, or other documents or any other contract, instrument, release, or document created or entered into in connection with the Disclosure Statement or the Plan or any related agreements, instruments, or other documents (including the Investment Agreement), the filing of the Chapter 11 Cases, the solicitation of votes with |

|  | respect to, or confirmation of, the Plan, the administration and implementation of the Plan, including the issuance of any debt or securities, including the New Shares, the New Convertible Notes, or the distribution of property under the Plan or any other related agreement, and the implementation of the Restructuring contemplated by the Plan (the "***Exculpation***").    Notwithstanding anything herein to the contrary, the Exculpation will not (i) affect the liability of any Entity from Causes of Action based on willful misconduct, gross negligence or intentional fraud as determined by a Final Order, but in all respects such Entities will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan, (ii) release or be an exculpation with respect to post-Effective Date obligations of any Entity under the Plan, the Restructuring, the Definitive Documents or any other document, instrument, or agreement executed to implement the Plan (unless expressly cancelled by the Plan), or (iii) affect the Releasing Parties' rights that remain in effect from and after the Effective Date to enforce the Plan, the Definitive Documents, and the obligations contemplated by the Transaction or as otherwise provided in any order of the Bankruptcy Court.<br><br>The Exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting the Exculpated Parties from liability. |
|---|---|
| **Discharge and Injunction** | The Plan will contain customary discharge and injunction provisions. |
| **Executory Contracts and Unexpired Leases** | Any executory contracts or unexpired leases not assumed by the Debtors under the Plan or pursuant to an order of the Bankruptcy Court will be rejected.  The Debtors will identify the executory contracts and unexpired leases to be assumed; *provided, however*, that (i) the Investors (other than Air France-KLM) will have a consent right with respect to assumption or rejection of any Material Non-Aircraft Executory Contract or Lease, (ii) the Investors will not have a consultation or consent right with respect to assumption or rejection of any executory contract or unexpired lease related to the Debtors' aircraft, engines, and related equipment and arrangements, and (iii) the Company will deliver copies of all Material Contracts prior to closing the Transaction. |
| **Release of Avoidance Actions** | On the Effective Date, the Reorganized Debtors will be deemed to waive and release all Avoidance Actions (other than those listed on a schedule of retained Causes of Action to be filed with the Plan Supplement) that the Reorganized Debtors may have in relation to any creditor affected by the Plan; *provided, however*, that the Reorganized Debtors will retain the right to assert such Avoidance Actions (i) as defenses or counterclaims with respect to any proofs of claim or in any Cause of Action brought by any creditor or (ii) where stipulated by mandatory insolvency law in the jurisdiction of the relevant Reorganized Debtor's establishment. |
| **New Shares Distribution Pools** | The Creditors' Committee will have consultation rights with respect to (i) which General Unsecured Claims receive distributions from the SAS AB New Shares Distribution Pool, Consolidated Debtors New Shares Distribution Pool, and Gorm New Shares Distribution Pool and (ii) Plan mechanics in the event creditors do not elect to receive all the New Shares in the SAS AB New Shares Distribution Pool, Consolidated Debtors New Shares Distribution Pool, and Gorm New Shares Distribution Pool. |

| **GENERAL PROVISIONS** | |
|---|---|
| **Cancellation of Notes, Instruments, Certificates, and Other Documents** | Except as otherwise provided for under the Plan, on the Effective Date, all notes, instruments, certificates evidencing debt of the Company, and Existing Equity Interests will be cancelled.  Any and all obligations of the Company with respect to such debt or Interests will be discharged. |
| **Vesting of Assets** | On the Effective Date, pursuant to section 1141(b)-(c) of the Bankruptcy Code, all property dealt with by the Plan will vest in the applicable Reorganized Debtor free and clear of all Claims and interests, other than those provided for in the Plan. |
| **Survival of Indemnification Obligations and D&O Insurance** | Any and all obligations of the Company pursuant to corporate charters, bylaws, limited liability company agreements, or other organizational documents to indemnify current and former officers, members, managers, directors, agents, or employees with respect to all present and future actions, suits, and proceedings against the Company or such directors, officers, members, managers, agents, or employees based upon any act or omission for or on behalf of the Company will not be discharged or impaired by confirmation of the Plan.  All such obligations will be deemed and treated as executory contracts to be assumed by the Company under the Plan and will continue as obligations of the Reorganized Debtors, as applicable.   Any Claim based on the Company's obligations with respect thereto will be an Allowed Claim.<br><br>In addition, after the Effective Date, the Reorganized Debtors will not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including any "tail policy") in effect or purchased as of the Commencement Date.  Any individuals covered by such insurance policies, including all members, managers, directors, officers, agents, and employees of the Company who served in such capacity at any time prior to the Effective Date, will be entitled to the full benefits of any such policy for the full term of the policy regardless of whether such members, managers, directors, officers, or other individuals remain in such positions after the Effective Date. |
| **Disputed Claims Reserve** | The Plan will include customary claims reconciliation, distribution, and disputed claims reserve procedures. |
| **Conditions to Confirmation / Shareholders' Agreement** | Confirmation of the Plan will be subject to the satisfaction of customary confirmation conditions.<br><br>In addition, the Investors will have agreed on the terms of a Shareholders' Agreement in form and substance satisfactory to such parties in their sole and absolute discretion; *provided, however*, that, solely in the event the Investors do not execute the Shareholders' Agreement by or on the Effective Date, (i) the Investors will continue to negotiate in good faith to prepare and execute the Shareholders' Agreement in a form that incorporates the terms and conditions set forth in the Governance Term Sheet in all material respects and (ii) the Investors agree that the Governance Term Sheet will be deemed to be binding on the Investors and the terms and conditions set forth therein will govern the relationship among the Investors, in their capacity as Post-Closing Company Shareholders, in each case, until such time as the Shareholders' Agreement is so executed by the Investors.<br><br>Any Entity that will receive New Shares pursuant to the Plan will be required to deliver to the Debtors or Reorganized Debtors, as applicable, a signature page to the |

|  | Shareholders' Agreement as a condition precedent to the receipt of the New Shares; *provided, however*, that such requirement may be removed if determined to be unnecessary by the Debtors and the Required Investors based on the terms of the articles of association of Reorganized SAS.  To the extent such signature page is not received by a reasonable deadline post-Effective Date to be determined, then such Entity will not receive any New Shares under the Plan.  The Debtors and the Required Investors will continue to negotiate the terms of the foregoing in good faith. |
|---|---|
| **Conditions to Effectiveness** | The effectiveness of the Plan will be subject to the satisfaction of the following conditions:<br><br>(i)   the Key Transaction Documents will be consistent with this Chapter 11 Plan Term Sheet in all material respects, and otherwise be acceptable to the Investors pursuant to Investor Consent;<br><br>(ii)   the Bankruptcy Court will have entered the DIP Order and the Company's existing DIP facility will have been refinanced pursuant to the terms of the DIP Order;<br><br>(iii)   the Bankruptcy Court will have entered the Confirmation Order in relation to the Plan, except as set forth herein with respect to a Gorm Entity, and such Confirmation Order will have become a Final Order; *provided*, *however*, that if a Confirmation Order is not entered with respect to any Gorm Entities, the effectiveness of the Plan will be conditioned upon a resolution of the assets and executory contracts attributable to such Gorm Entities, which resolution will be subject to Investor Consent;<br><br>(iv)   the Swedish Reorganization Plan in the Swedish SAS AB Reorganization will have been confirmed by the Swedish restructuring court and, as a part and parcel thereof, the Existing Equity Interests will have been cancelled and, as a result, delisted;<br><br>(v)   the documents related to the New Convertible Notes, including the New Convertible Notes Indenture, will have been duly executed, all conditions precedent to effectiveness of the New Convertible Notes will have been satisfied or waived in accordance with the terms thereof, and the closing of the New Convertible Notes will have occurred;<br><br>(vi)   the Investment Agreement will have been duly executed, all conditions precedent to the Investment Agreement will have been satisfied or waived in accordance with the terms thereof, and the Investment Agreement will not have been terminated;<br><br>(vii)   the Company will have received Bankruptcy Court approval and, if required, counterparty approval for the assumption or rejection of the Material Contracts identified by the Required Investors (other than Air France-KLM) upon closing in a manner reasonably acceptable to the Investors, and the cure amounts for any such contracts will be reasonably acceptable to the Required Investors (other than Air France-KLM);<br><br>(viii)   all authorizations (including any internal authorizations), consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan will have been obtained;<br><br>(ix)   decisions by the European Commission declaring compatible with the internal |

market the recapitalization measures granted by the States during the 2020 Covid-19 recapitalization of the Company (cases SA.57543 and SA.58342), which decisions will be deemed acceptable to the Investors provided that they do not constitute Material State Aid Decisions (to the extent that the decisions constitute Material State Aid Decisions, then they will need to be approved by each of the Investors);

(x)    decisions by the European Commission declaring compatible with the internal market the restructuring aid granted by the States through their participation in the Restructuring, which decisions will be deemed acceptable to the Investors provided that they do not constitute Material State Aid Decisions (to the extent that the decisions constitute Material State Aid Decisions, then they will need to be approved by each of the Investors);

(xi)   decision by the EFTA Surveillance Authority declaring compatible with the functioning of the EEA Agreement the restructuring aid granted by the Norwegian State through its contribution to the Restructuring, which decision will be deemed acceptable to the Investors provided that it does not constitute a Material State Aid Decision (to the extent that the decision constitutes a Material State Aid Decision, then it will need to be approved by each of the Investors);

(xii)  the current slot portfolio of the Debtors (including its affiliate carriers) will be substantially the same (both in terms of number and location) on the closing date as on the date hereof;

(xiii) regulatory approvals, including foreign direct investment approvals and approvals from the relevant civil aviation authorities (or any other relevant authorities) confirming that all operating licenses, air operator certificate, traffic rights, and any other authorizations, approvals, licenses, or rights required for the Company (including its affiliate carriers) to operate its existing network will be preserved following the Restructuring and the Company's emergence from chapter 11 as set forth on Schedule 7.3(a)(i) of the Investment Agreement;

(xiv)  all other actions, documents, and agreements necessary to implement and effectuate the Plan will have been effected or executed;

(xv)   all professional fees and expenses approved by the Bankruptcy Court will have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date will have been placed in a professional fee escrow account pending approval by the Bankruptcy Court;

(xvi)  subject to the Overall Cap, the Commitment Fee, the Danish Contribution Fee, the Swedish Contribution Fee, and the Expense Reimbursement will have been paid;

(xvii) the Debtors will have paid all trade payables in the ordinary course of business arising from the provision of goods and services on or after the Petition Date that are due and payable at or before the Effective Date, other than such amounts (A) which are disputed by the Debtors in good faith for which adequate reserves have been created and (B) which are not allowed to be paid in full pursuant to the Swedish Reorganization Act;

(xviii) the Bankruptcy Court orders approving the Key Transaction Documents and the transactions contemplated thereby will provide for the release of any and all

18

|  | encumbrances on the Debtors' assets, other than those expressly permitted by the Key Transaction Documents, and the Investors will have received such documents or instruments as may be required to demonstrate that, effective as of the Effective Date, the assets of the Debtors and their subsidiaries are released from any and all encumbrances other than those expressly permitted by the Key Transaction Documents; |
|  | (xix)  the Debtors will have implemented the Restructuring and all transactions contemplated in this Chapter 11 Plan Term Sheet, including through any supplemental proceedings, in a manner consistent with this Chapter 11 Plan Term Sheet and the Plan and otherwise reasonably acceptable to the Investors; |
|  | (xx)  all reasonable and documented fees and out-of-pocket expenses of Skadden, Arps, Slate, Meagher & Flom LLP, White & Case LLP, Sheppard, Mullin, Richter & Hampton LLP, Paul McGeown, Latham & Watkins LLP, Bech-Bruun Law Firm P/S, Rothschild & Co., and SkyWorks Holdings, LLC and the other professionals (as permitted pursuant to the terms of the Investment Agreement) will have been paid in full in accordance with the Investment Agreement; and |
|  | (xxi)  the DIP Order will have become and will remain a Final Order, the order approving the Swedish Reorganization Plan will be final and binding (Sw. *lagakraftvunnen*), and the EPCA Approval Order will not have been stayed, modified, reversed, or be subject to appeal. |
| **Amendments to Plan** | This Chapter 11 Plan Term Sheet and the Plan may be amended, modified, or supplemented by the Debtors, in consultation with the Investors and the Creditors' Committee, in accordance with the Bankruptcy Code or applicable law; *provided, however*, that Investor Consent is required as to any modification of this Chapter 11 Plan Term Sheet and the Plan, whether material or immaterial, that impacts the terms of the Transaction or other rights or entitlements of the Investors. |
| **Retention of Jurisdiction and Submission to Jurisdiction** | The Plan will provide for a broad retention of jurisdiction by the Bankruptcy Court, including (i) resolution of Claims, (ii) allowance of compensation and expenses for pre-Effective Date services, (iii) resolution of motions, adversary proceedings, or other contested matters, and (iv) entry of such orders as necessary to implement or consummate the Plan and any related documents or agreements. |
|  | While the Danish State Investor and the Danish State Noteholder support the Plan, the Danish State Investor and the Danish State Noteholder are not consenting to the jurisdiction of the Bankruptcy Court and, therefore, the Danish State Noteholder is not voting on the Plan.  Further, neither the Danish State Investor nor the Danish State Noteholder is consenting to the jurisdiction of the Bankruptcy Court as a result of the (i) submission of any bid pursuant to the Equity Solicitation Procedures, (ii) Equity Solicitation Procedures Motion, (iii) Equity Solicitation Procedures, (iv) subscription for New Shares and receipt of New Convertible Notes, (v) status of the Danish State Noteholder as a Consultation Party (as defined in the Equity Solicitation Procedures Motion), (vi) negotiation of any of the foregoing, (vii) releases and exculpations granted or afforded pursuant to or in connection with the Plan and the Transaction, (viii) entry into the Investment Agreement or any other Key Transaction Documents, or (ix) otherwise. |
|  | The Debtors and the Non-State Investors will not take a position in the Chapter 11 |

| | Cases that is contrary or inconsistent with the foregoing. |
|---|---|

## ANNEX 1

**Defined Terms**

| **Defined Terms** |  |
|---|---|
| "**Administrative Expense Claim**" | Any right to payment constituting a cost or expense of administration incurred during the Chapter 11 Cases of a kind specified under section 503(b) of the Bankruptcy Code and entitled to priority under sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including (i) the actual and necessary costs and expenses incurred after the Commencement Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors and (ii) Fee Claims. |
| "**Affiliate**" | Any "affiliate" as defined in section 101(2) of the Bankruptcy Code (except as provided otherwise herein). |
| "**Aircraft Lease**" | Any unexpired lease for the use or operation of an aircraft, engine, or other aircraft parts to which any Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code. |
| "**Aircraft Lessor**" | A lessor under an Aircraft Lease. |
| "**Air France-KLM**" | Air France-KLM S.A. |
| "**Allowed**" | With reference to any Claim or Interest, (i) any Claim or Interest arising on or before the Effective Date (a) as to which no objection to allowance has been interposed within the time period set forth in the Plan or is expected; (b) as to which any objection has been resolved by a Final Order of the Bankruptcy Court to the extent such objection is determined in favor of the respective holder; (c) as to which the liability of the Debtors and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court; or (d) that has been compromised, settled or otherwise resolved by the Debtors; (ii) any Claim or Interest expressly allowed under the Plan, or (iii) any Claim that is listed in the Debtors' schedules of assets and liabilities as liquidated, non-contingent, and undisputed for which no Proof of Claim has been filed. |
| "**Avoidance Action**" | Any and all avoidance, recovery, subordination or other Claims, actions or remedies that any Debtor or its Estate has asserted or may assert under sections 502, 510, 542, 544, 545, 547 through 553, or section 724(a) of the Bankruptcy Code or under similar or related state or federal statutes and common law. |
| "**Bankruptcy Court**" | The United States Bankruptcy Court for the Southern District of New York. |
| "**Business Day**" | Any day that is not a Saturday, Sunday, or other day on which commercial banks in New York City and Stockholm, Sweden are authorized or required by law or other governmental actions to remain closed. |

| **Defined Terms** |
|---|

| | |
|---|---|
| "***Business Plan***" | The business plan entitled "v331 – Adjusted" provided by the Company to the Non-State Investors on August 31, 2023. |
| "***Cash***" | Legal tender of the United States of America or equivalents thereof (as well as any and all foreign currencies), including, without limitation, payment in such tender by check, wire transfer or any other customary payment method. |
| "***Castlelake***" | Castlelake, L.P., on behalf of certain of its funds or affiliates. |
| "***Cause of Action***" | Any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, demand, right, lien, indemnity, contribution, guaranty, suit, obligation, liability, loss, debt, fee or expense, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, license, and franchise of any kind or character whatsoever, whether liquidated or unliquidated, contingent or non-contingent, matured or unmatured, known or unknown, foreseen or unforeseen, suspected or unsuspected, asserted or unasserted, assertable directly or derivatively (including any alter ego theories), accrued or unaccrued, disputed or undisputed, secured or unsecured, existing or hereinafter arising, arising before, on, or after the Commencement Date, in contract or tort, in law, equity, or pursuant to any other theory of law (including under any securities laws), and whether arising under federal law, state statutory law, common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise.  For the avoidance of doubt, "Cause of Action" includes (i) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (ii) the right to object to Claims or Interests, (iii) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code, (iv) any claim or defense including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code, and (v) any state law fraudulent transfer claim. |
| "***Claim***" | A "claim," as defined in section 101(5) of the Bankruptcy Code, as against any Debtor. |
| "***Class***" | Any group of Claims or Interests classified under the Plan pursuant to section 1122(a) of the Bankruptcy Code. |
| "***CLA Order***" | The *Order Authorizing Debtors to (I) Enter Into and Perform Under (A) New Collective Labor Agreements and (B) Amended and Restated Agreement with Pilot Unions and (II) Compromise and Settle Certain Claims Related Thereto* [ECF No. 686]. |
| "***Closing FX Rate***" | The European Central Bank exchange reference rate of SEK per USD as of |

| **Defined Terms** |  |
|---|---|
|  | one Business Day prior to the Closing (as defined in the Investment Agreement). |
| "***Commencement Date***" | July 5, 2022. |
| "***Commitment Fee***" | A fee to be paid to the Danish State Investor in an amount equal to 3.0% of the Danish State Investor's portion of the Total Share Subscription Amount, which is set forth opposite its name on <u>Schedule 2.1</u> of the Investment Agreement. |
| "***Confirmation Date***" | The date on which the Bankruptcy Court enters the Confirmation Order. |
| "***Confirmation Order***" | The order of the Bankruptcy Court confirming the Plan. |
| "***Consolidated Debtors Available Cash***" | Available Cash in an amount equal to $[●], including any distributions the Consolidated Debtors receive on account of Intercompany Claims, to fund distributions to holders of Claims against the Consolidated Debtors under the Plan. |
| "***Consolidated Debtors New Shares Distribution Pool***" | New Shares from the New Shares Distribution Pool in an amount equal to $[●] to fund distributions to holders of Claims against the Consolidated Debtors under the Plan. |
| "***Contribution Fee Escrow Account***" | A joint escrow account to be established pursuant to the Contribution Fee Escrow Agreement. |
| "***Contribution Fee Escrow Agreement***" | An escrow agreement to be entered into by and among the Company, the Convertible Notes Purchasers and an escrow agent to be reasonably acceptable to such parties, which agreement will be in form and substance reasonably acceptable to the parties thereto. |
| "***Convertible Notes Purchasers***" | The Investors purchasing the New Convertible Notes. |
| "***Danish Contribution Fee***" | A fee to be paid to the Danish State Investor by the Convertible Notes Purchasers, on or after the Effective Date, in an amount equal to 50% of the sum of (i) 10% of SEK 1,250,000,000 (converted to USD (truncated to two decimal places) using the Closing FX Rate) and (ii) 5% of the positive difference of the total distributable value to unsecured creditors of the Debtors pursuant to the Plan and SEK 1,250,000,000 (converted to USD (truncated to two decimal places) using the Closing FX Rate), in each case, such amounts representing a percentage of the total distributable value provided to the holders of Allowed General Unsecured Claims and in all circumstances at |

3

| **Defined Terms** |
| --- |

|  | least SEK 25,000,000. The Danish Contribution Fee will be rounded to two decimal places. |
| --- | --- |
| "*Danish State Investor*" | The Kingdom of Denmark, as represented by the Danish Ministry of Finance in its capacity as a subscriber of New Shares under the Investment Agreement or purchaser of New Convertible Notes under the Investment Agreement and the New Convertible Notes Indenture (as applicable), in each case, to the extent provided in <u>Section 12.12</u> of the Investment Agreement. |
| "*Danish State Noteholder*" | The Kingdom of Denmark, as represented by the Danish Ministry of Finance and not any other governmental agency or instrumentality thereof, in its capacity solely as a holder of Danish Term Loan Claims, State Hybrid Bond Claims, and Danish State Hybrid Bond Claims. |
| "*Definitive Documents*" | Collectively, all agreements, instruments, pleadings, orders, and other documents (including all exhibits, schedules, supplements, appendices, annexes, instructions, and attachments thereto) that are utilized to implement or effectuate the Restructuring, including the Investment Agreement. |
| "*DIP Agent*" | Wilmington Savings Fund Society, FSB, as administrative agent and collateral agent under the DIP Credit Agreement. |
| "*DIP Claim*" | Any Claim held by the DIP Lenders or the DIP Agent on account of, arising under, or relating to the DIP Credit Agreement, the DIP Facility, or the DIP Order, including Claims for all principal amounts outstanding, and any and all fees, interest, expenses, indemnification obligations, reimbursement obligations, and other amounts due under the DIP Loan Documents, which, for the avoidance of doubt, will include all "DIP Obligations" as such term is defined in the DIP Order. |
| "*DIP Credit Agreement*" | The Super-Priority Replacement Debtor-In-Possession Term Loan Agreement, dated as of November 4, 2023 (as may be amended, restated, amended and restated, extended, supplemented, waived or otherwise modified from time to time), by and among the Consortium, as borrower, the Company and the other parties thereto as guarantors, the DIP Lenders from time to time party thereto, and the DIP Agent. |
| "*DIP Facility*" | The debtor-in-possession financing facility provided by the DIP Lenders in an aggregate principal amount of up to $500,000,000, made available pursuant to the terms and conditions of the DIP Credit Agreement. |
| "*DIP Lenders*" | The lenders from time to time party to the DIP Credit Agreement. |
| "*DIP Loan Documents*" | The DIP Credit Agreement, the DIP Order, any instrument or agreement which is designated as a "DIP Loan Document" under the DIP Credit Agreement, in each case as amended, supplemented or otherwise modified |

4

| Defined Terms | |
|---|---|
| | from time to time in accordance with the terms thereof. |
| "*DIP Order*" | The order to be entered by the Bankruptcy Court approving the DIP Credit Agreement and the DIP Loan Documents and authorizing the Debtors to incur and perform their obligations thereunder and to execute such other documentation as may be required with respect to the transactions contemplated by such documents. |
| "*Disclosure Statement*" | The disclosure statement in respect of the Plan, including all exhibits and schedules thereto, as approved or ratified by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code, which will be reasonably acceptable to the Investors. |
| "*EBITDA*" | Earnings before interest, taxes, depreciation, and amortization. |
| "*Effective Date*" | The date upon which all conditions to the effectiveness of the Plan have been satisfied or waived in accordance with the terms thereof and the Plan becomes effective. |
| "*Entity*" | An "entity," as defined in section 101(15) of the Bankruptcy Code. |
| "*Equity Solicitation Procedures*" | The *Equity Solicitation Procedures* attached to the Equity Solicitation Procedures Order as <u>Exhibit 1</u>. |
| "*Equity Solicitation Procedures Motion*" | The *Motion of Debtors for Approval of (I) Equity Solicitation Procedures and (II) Form and Manner of Notice Related Thereto* [ECF No. 1061]. |
| "*Equity Solicitation Procedures Order*" | The *Order Approving (I) Equity Solicitation Procedures and (II) Form and Manner of Notice Related Thereto* [ECF No. 1155]. |
| "*Estate(s)*" | Individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code. |
| "*Exculpated Parties*" | Collectively, (i) the Debtors, (ii) the Reorganized Debtors, (iii) the Investors, (iv) the Creditors' Committee and each of its present and former members (solely in their capacity as such), (v) the Danish State Noteholder, and (vi) with respect to each of the foregoing Entities in clauses (i) through (v), such Entities' Related Entities, and their respective heirs, executors, estates, and nominees, in each case in their capacity as such. |
| "*Expense Reimbursement*" | An expense reimbursement to be paid to the Danish State Investor in an amount equal to the lesser of (A) 2.0% of the Danish State Investor's portion of (i) the Total Share Subscription Amount and (ii) the principal amount of |

| **Defined Terms** |
|---|

|  | the New Convertible Notes, both of which as set forth opposite its name in column II on <u>Schedule 2.1</u> of the Investment Agreement and (B) SEK 62,500,000 (converted to USD using the Closing FX Rate). |
|---|---|
| "*Fee Claim*" | A Claim for professional services rendered or costs incurred on or after the Commencement Date through the Confirmation Date by professional persons retained by an order of the Bankruptcy Court pursuant to sections 327, 328, 329, 330, 331, or 503(b) of the Bankruptcy Code in the Chapter 11 Cases. |
| "*Final Order*" | A judgment or order of any court of competent jurisdiction entered on the docket maintained by the clerk of such court, which has not been materially modified, amended, reversed, vacated, or stayed (other than such material modifications that are approved by Investor Consent) and as to which (a) the time to appeal, petition for certiorari or move for a new trial, stay, reargument or rehearing has expired, and as to which no appeal, petition for certiorari or other proceeding for a new trial, will then be pending or (b) if an appeal, writ for certiorari, new trial, stay, reargument or rehearing thereof has been sought, such judgment or order will have been affirmed in full by the highest court to which such judgment or order was appealed, or certiorari will have been denied, or a new trial, reargument or rehearing will have been denied, and the time to make any further appeal, petition, writ for certiorari or move for a new trial, reargument or rehearing will have expired.  Notwithstanding anything herein to the contrary, no order or judgment will fail to be a Final Order solely because of the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedures, or any analogous rule under the Federal Rules of Bankruptcy Procedure, or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed relating to such judgment or order. |
| "*General Unsecured Claims*" | Unsecured Claims against the Debtors that are not entitled to priority of payment under section 507(a) of the Bankruptcy Code, including Aircraft Lease Claims, Trade Claims, Norwegian Term Loan Claims, Commercial Hybrid Bond Claims, Swedish Term Loan Claims, Danish Term Loan Claims, Union Claims, Swiss Bond Claims, State Hybrid Bond Claims, Danish State Hybrid Bond Claims, Intercompany Claims, and Other General Unsecured Claims. |
| "*Gorm Available Cash*" | Available Cash in an amount equal to $[●], including any distributions the applicable Gorm Entity receives on account of Intercompany Claims, to fund distributions to holders of Claims against a Gorm Entity, as applicable to each Gorm Entity on a by-Debtor basis. |
| "*Gorm Entity*" | Each of Gorm Asset Management Limited, Gorm Dark Blue Limited, Gorm Sky Blue Limited, Gorm Light Blue Limited, Gorm Deep Blue Limited, Gorm Warm Red Limited, Gorm Ocean Blue Limited, and Gorm Engine Management Limited, as applicable. |

| **Defined Terms** |
|---|

| "*Gorm New Shares Distribution Pool*" | New Shares from the New Shares Distribution Pool in an amount equal to $[●] to fund distributions to holders of Claims against a Gorm Entity, as applicable to each Gorm Entity on a by-Debtor basis. |
|---|---|
| "*Governance Term Sheet*" | The Equity and Governance Term Sheet, dated as of November 4, 2023, which sets forth the key terms of the Investors' investment in Reorganized Parent and the rights to be granted with respect to the governance of the Reorganized Debtors. |
| "*GUC Trust*" | The trust established pursuant to the GUC Trust Agreement. |
| "*GUC Trustee*" | The trustee of the GUC Trust and any successor thereto in accordance with the GUC Trust Agreement. |
| "*GUC Trust Agreement*" | The agreement by and among the Debtors and the GUC Trustee, substantially in the form to be included in the Plan Supplement, which will govern, among other things, the administration and distribution of the Reserved Funds. |
| "*GUC Trust Interests*" | The non-certificated and non-transferable beneficial interests in the GUC Trust to be distributed to the holders of General Unsecured Claims as set forth in the Plan. |
| "*Impaired*" | With respect to a Claim, Interest, or a class of Claims or Interests, "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code. |
| "*Interest*" | Any equity interest (as defined in section 101(16) of the Bankruptcy Code) in the Company, including any ordinary shares, units, common stock, preferred stock, membership interest, partnership interest, or other instrument evidencing any fixed or contingent ownership interest in the Company, whether or not transferable, including any option, warrant, or other right, contractual or otherwise, to subscribe for any such interest in the Company, that existed immediately before the Effective Date. |
| "*Investment Agreement*" | The Investment Agreement, dated as of November 4, 2023 (as amended, modified or supplemented from time to time in accordance with its terms), by and between SAS AB, CL-S Holdings Lux S.à r.l., Air France-KLM, Lind Invest, and the Danish State Investor. |
| "*Investors*" | Collectively, Castlelake, Air France-KLM, the Danish State Investor, and Lind Invest. |
| "*Investor Consent*" | The prior written consent of each of the Required Investors (which may include the prior written consent of Lind to the extent so required by the |

| **Defined Terms** |
|---|

|  | definition of Required Investors), with such consent as solely determined by each Required Investor. |
|---|---|
| "***Investor Equity***" | The New Shares subscribed for by the Investors in connection with the Transaction. |
| "***Irrevocable Undertaking***" | That certain *Irrevocable Undertaking*, dated as of February 11, 2004, pursuant to which SAS AB undertook to be liable for all interest bearing liabilities, leasing obligations, and other financial obligations of the Consortium then existing or arising in the future through September 30, 2020. |
| "***Key Transaction Documents***" | The Investment Agreement, the Plan, the Confirmation Order, the DIP Credit Agreement, the DIP Order, the New Convertible Notes, the New Convertible Notes Indenture, and the Swedish Reorganization Plan. |
| "***Lind Invest***" | Lind Invest ApS. |
| "***Material Contracts***" | Any executory contract or unexpired lease with an annual value (either on an asset, income, liability, or expense basis) during any 12-month period in excess of $10,000,000, including Material Non-Aircraft Executory Contracts or Leases and executory contracts and unexpired leases related to the Debtors' aircraft, engines, and related equipment and arrangements. |
| "***Material Non-Aircraft Executory Contract or Lease***" | Any executory contract or unexpired lease with an annual value (either on an asset, income, liability, or expense basis) during any 12-month period in excess of $10,000,000, other than executory contracts and unexpired leases related to the Debtors' aircraft, engines, and related equipment and arrangements. |
| "***Material State Aid Decisions***" | With respect to all State aid decisions, a decision that is reasonably likely to (i) create a potential total negative impact of $100,000,000 or greater (when combined with all other State aid decisions) on the Company's projected EBITDA, as set forth in the Business Plan, over a total period of five years, (ii) place material limitations on the ability of the Company to undertake expansion or growth activities after the Effective Date, (iii) limit the ability of the Company to freely operate a worldwide network from a hub in Copenhagen (including to Air France-KLM's and its partners' gateways), or limit the Company's ability to enter into commercial arrangements with Air France-KLM and its joint venture partners providing for any form of code sharing, network coordination, pricing coordination, joint marketing, frequent flyer / loyalty program cooperation, or revenue sharing, and (iv) otherwise impact the material terms of any Key Transaction Document. |
| "***Modified Aircraft*** | Amended and restated Aircraft Leases that have been assumed by the Debtors |

| **Defined Terms** |  |
|---|---|
| *Lease*" | as of the Effective Date. |
| "*New Convertible Notes*" | Senior secured convertible exit notes issued by Reorganized Parent in the aggregate principal amount of $725 million and having the terms set forth in the New Convertible Notes Indenture. |
| "*New Convertible Notes Indenture*" | An indenture reflecting the terms and conditions substantially as set forth in the term sheet attached as <u>Exhibit B</u> to the Investment Agreement. |
| "*New Shares*" | Equity interests of Reorganized Parent. |
| "*New Shares Distribution Pool*" | New Shares to be distributed to the holders of Allowed General Unsecured Claims in an amount equal to (i) the New Shares issued on the Effective Date *less* (ii) the Investor Equity, as set forth in this Chapter 11 Term Sheet and the Plan. |
| "*Non-State Investors*" | Collectively, Castlelake, Air France-KLM, and Lind Invest. |
| "*Other Priority Claim*" | Any Claim other than an Administrative Expense Claim or a Priority Tax Claim that is entitled to priority of payment as specified in section 507(a) of the Bankruptcy Code. |
| "*Other Secured Claim*" | A Secured Claim other than a Priority Tax Claim. |
| "*Overall Cap*" | A cap in the aggregate amount of SEK 500,000,000 on the fees and expenses the Danish State Investor and the Swedish State may receive pursuant to the Danish Contribution Fee, the Commitment Fee, the Expense Reimbursement, and the Swedish Contribution Fee. |
| "*PDP Facility Order*" | The *Order (I) Authorizing Debtors to Honor and Perform Their Obligations Under PDP Facility, (II) Granting Superpriority Administrative Expense Status to Obligations Under PDP Facility, (III) Modifying Automatic Stay, and (IV) Granting Related Relief* [ECF No. 333]. |
| "*Plan Supplement*" | A supplement or supplements to the Plan to be filed with the Bankruptcy Court. |
| "*Priority Tax Claim*" | Any Secured Claim or unsecured Claim of a governmental unit of the kind entitled to priority of payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code. |
| "*Pro Rata*" | The proportion that an Allowed General Unsecured Claim against, or Interest |

| **Defined Terms** ||
|---|---|
| | in, a particular Debtor bears to the aggregate amount of Allowed General Unsecured Claims against, or Interests in, such Debtor. |
| "*Proof of Claim*" | A proof of Claim filed in the Chapter 11 Cases. |
| "*Related Entities*" | With respect to an Entity, that Entity's current and former Affiliates, and such Entity's and its current and former Affiliates' predecessors, successors, assigns, and current and former subsidiaries, officers, directors, principals, equity holders (regardless of whether such interests are held directly or indirectly), members, partners (including both general and limited partners), managers, employees, agents, advisory board members, management companies, managed accounts or funds, affiliated investment funds or investment vehicles, and Representatives; *provided, however*, that Related Entities of the Danish State Investor and the Danish State Noteholder will be limited to Representatives of the Danish State Investor and the Danish State Noteholder. |
| "*Released Parties*" | Collectively, (i) the Debtors, (ii) the DIP Agent and the DIP Lenders, (iii) the Creditors' Committee and each of its present and former members, (iv) the Investors, (v) the Danish State Noteholder, (vi) the Swedish State, and (vii) with respect to each of the foregoing Entities in clauses (i) through (vi), such Entities' Related Entities, and their respective heirs, executors, estates, and nominees, in each case in their capacity as such; *provided, however*, that any party in interest that does not consent to the releases in the Plan will not be a Released Party; *provided, further, however*, that the Danish State Investor and the Danish State Noteholder will provide releases solely pursuant to <u>Section 3.3(e)</u> of the Investment Agreement; *provided, further, however*, that the Released Parties referenced in clause (vii) are Released Parties solely with respect to work performed for or on behalf of the applicable Entity for which releases are given pursuant to the Plan. |
| "*Releasing Parties*" | Collectively, (i) the Released Parties, (ii) the holders of all Claims who vote to accept the Plan, (iii) all holders of Claims and Interests that either vote to reject the Plan or abstain from voting on the Plan and affirmatively opt to grant the releases by checking the appropriate box on the ballot form, and (iv) all holders of Claims and Interests not described in the foregoing clauses (i) – (iii) that affirmatively opt to grant the releases by checking the appropriate box on the notice form; *provided, however*, that the Danish State Investor and the Danish State Noteholder will provide releases solely pursuant to <u>Section 3.3(e)</u> of the Investment Agreement. |
| "*Reorganized Debtors*" | The Debtors as reorganized on the Effective Date in accordance with the Plan. |
| "*Reorganized Parent*" | SAS AB as reorganized on the Effective Date in accordance with the Plan. |

| **Defined Terms** |
|---|
| **"*Representative*"** | Any Entity's attorneys, accountants, investment bankers, consultants, professional advisors, independent auditors, trustees, agents, Affiliates (and any such Affiliates' attorneys, professional advisors, independent auditors, trustees or agents), fund advisors, investment managers, investment advisors, sub-advisors, sub-managers, and other professionals, and each of their respective current and former officers, directors, principals, equity holders (regardless of whether such interests are held directly or indirectly), members, partners (including both general and limited partners), managers, employees, agents, and advisory board members, each in their capacity as such. |
| **"*Required Investors*"** | Castlelake, Air France-KLM, and the Danish State Investor; *provided, however*, that any consent by the Required Investors that adversely affects Lind Invest's rights or obligations as compared to the other Investors will also require Lind Invest's prior written consent (not to be unreasonably withheld, conditioned or delayed). |
| **"*Reserved Funds*"** | Cash proceeds from the Investors' subscription for the New Shares and New Convertible Notes in connection with the Transaction in an aggregate amount of SEK 2.4 billion, following the deduction of amounts required by the Company to defend itself against a claim raised in national courts requiring the Company to pay any State Non-Tax Claim. |
| **"*SANA Available Cash*"** | Available Cash in an amount equal to $[●], including any distributions SANA receives on account of Intercompany Claims, to fund distributions to holders of Claims against SANA under the Plan. |
| **"*SAS AB Available Cash*"** | Available Cash in an amount equal to $[●], including any distributions SAS AB receives on account of Intercompany Claims, to fund distributions to holders of Claims against SAS AB under the Plan. |
| **"*SAS AB New Shares Distribution Pool*"** | New Shares from the New Shares Distribution Pool in an amount equal to $[●] to fund distributions to holders of Claims against SAS AB under the Plan. |
| **"*Secured Claim*"** | A Claim (i) secured by a lien on collateral to the extent of the value of such collateral as (a) set forth in the Plan, (b) agreed to by the holder of such Claim and the Debtors, or (c) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code, or (ii) secured by the amount of any right of setoff of the holder thereof in accordance with section 553 of the Bankruptcy Code. |
| **"*Shareholders' Agreement*"** | The shareholders' agreement to be entered into by the Investors, in a form that incorporates the terms and conditions set forth in the Governance Term Sheet in all material respects, to govern the relationship among the parties |

| **Defined Terms** | |
|---|---|
| | thereto, in each case, in their respective capacity as Post-Closing Company Shareholders. |
| "***States***" | Together, the Danish State Noteholder and the Swedish State. |
| "***Swedish Contribution Fee***" | A fee to be paid to the Swedish State by the Convertible Notes Purchasers, on or after the Effective Date, in an amount equal to 50% of the sum of (i) 10% of SEK 1,250,000,000 (converted to USD (truncated to two decimal places) using the Closing FX Rate) and (ii) 5% of the positive difference of the total distributable value to unsecured creditors of the Debtors pursuant to the Plan and SEK 1,250,000,000 (converted to USD (truncated to two decimal places) using the Closing FX Rate), in each case, such amounts representing a percentage of the total distributable value provided to the holders of Allowed General Unsecured Claims and in all circumstances at least SEK 25,000,000. The Swedish Contribution Fee will be rounded to two decimal places. |
| "***Swedish Court***" | The District Court of Stockholm (Sw. *Stockholms tingsrätt*) (or any relevant court of appeal), contemplated to approve and confirm the Swedish Reorganization Plan. |
| "***Swedish Reorganization Plan***" | The reorganization plan to be filed with the Swedish Court, approved by the affected parties (or a sufficient majority of classes), and ultimately approved and confirmed by the Swedish Court as part of the Swedish SAS AB Reorganization. |
| "***Swedish State***" | The Kingdom of Sweden, including its government and the instrumentalities thereof. |
| "***Total Share Subscription Amount***" | An aggregate subscription amount for the New Shares equal to $475,000,000, payable by the Investors in cash and/or by set-off pursuant to the Investment Agreement, the Plan, and the Swedish Reorganization Plan. |
| "***Transaction***" | A transaction for a new investment in, and issuance of New Shares and New Convertible Notes by, Reorganized Parent, as contemplated by the Investment Agreement, the Confirmation Order, the Plan, and the Swedish Reorganization Plan. |
| "***Unimpaired***" | With respect to a Claim, Interest, or a class of Claims or Interests, not "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code. |
| "***Vendor***" | Any vendor, supplier, or service provider with a Trade Claim. |

## **EXHIBIT B**

Conditions Precedent for the Purchase of the Convertible Notes; Convertible Notes Term Sheet

See attached

AGREED FORM
CONFIDENTIAL

## EXHIBIT B

## CONVERTIBLE NOTES

### CONDITIONS PRECEDENT FOR PURCHASE OF CONVERTIBLE NOTES

### SUMMARY OF KEY TERMS AND CONDITIONS

*Capitalized terms not otherwise defined have the meaning ascribed to them in the Agreement.*

| Conditions Precedent to Purchase of Convertible Notes | |
|---|---|
| **CONDITIONS PRECEDENT:** | The obligation of each Convertible Notes Purchaser to consummate the purchase of the Convertible Notes at the Closing Date shall be subject to the satisfaction (or waiver) of the conditions precedent set forth in the Chapter 11 Term Sheet, Section 8.1 of the Agreement and the following additional conditions precedent (unless waived by consent of the Required Investors): |
| | (i)      Duly executed copies of documentation with respect to the Convertible Notes by the Issuer and each of the other parties thereto, including: <br> a.  the Convertible Note Indenture, which shall be consistent with this Exhibit B (this "***Term Sheet***") or otherwise reasonably acceptable to the Convertible Notes Purchasers; and <br><br> b.  the Convertible Notes (in the form of global notes certificates or another form acceptable to the Convertible Notes Purchasers). |
| | (ii)      prior to or substantially concurrently with the purchase of the Convertible Notes on the Closing Date, (A) all obligations under the DIP Loan Documents having been paid and satisfied in full and all commitments of the DIP Lenders party thereto terminated and, (B) the liens and guarantees provided in support thereof having been released and/or terminated or arrangements for the prompt termination and release, as applicable, having been made; |
| | (iii)      all security agreements, trusts, mortgages, control agreements and other collateral documents necessary or advisable to create and perfect the liens on the Collateral shall have been duly executed and delivered and such liens shall have been validly created and perfected subject to appropriate post-closing |

periods to be agreed and all security agreements, trusts, mortgages, control agreements and other collateral documents in respect of the DIP Credit Agreement in effect prior to the date of emergence from the Chapter 11 Cases shall have been terminated and of no further force and effect;

(iv)    the Bankruptcy Court shall have confirmed the Chapter 11 Plan, and such Chapter 11 Plan shall authorize the transactions herein and all conditions to the effectiveness of such Chapter 11 Plan shall have been satisfied;

(v)     delivery of satisfactory opinions of counsel to the Issuer and the Guarantors and/or to the Convertible Notes Purchasers (as customary in each relevant jurisdiction) which shall cover, among other things, authority, legality, validity, binding effect and enforceability of the documentation for the Convertible Notes and, where applicable, creation and perfection of security interests in the Collateral, and otherwise be in form and substance reasonably acceptable to the Convertible Notes Purchasers;

(vi)    such corporate resolutions, certificates and other ancillary closing documents in respect of the Issuers and the Guarantors as customary for financings of this nature as required by the Convertible Notes Purchasers;

(vii)   filings, recordations and searches necessary in connection with the liens and security interest in the Collateral shall have been duly made and the results or other evidence thereof shall have been furnished, and be reasonably acceptable to, the Convertible Notes Purchasers in each case subject to agreed security principles;

(viii)  the Trustee, the Security Agent and the Convertible Notes Purchasers shall have received payment or irrevocable arrangements to pay, all fees and other amounts due and payable on or prior to the Closing Date and the reimbursement or payment of all reasonable and documented expenses (including fees, charges and disbursements of counsel to the Trustee and the Security Agent);

(ix)    the Issuer shall have paid or shall have made irrevocable arrangements to pay, to each Convertible Notes Purchaser, the OID specified opposite the name of such Convertible Notes Purchaser in column V of Schedule 2.1 to the Agreement and the Upfront Fee (and which amounts may be offset against the

**CONFIDENTIAL**

| | |
|---|---|
| | proceeds of the issuance of the Convertible Notes). |

WEIL:\99385901\13\72316.0004
2351221.06-NYCSR03A

MSW - Draft November 2, 2023 - 9:45 PM

**CONFIDENTIAL**

| Summary of Key Terms and Conditions | |
|---|---|
| **SECURITY:** | Senior secured convertible notes due 20[31] (the "***Convertible Notes***") to be issued pursuant to the Convertible Note Indenture |
| **PRINCIPAL AMOUNT:** | $725,000,000 |
| **ISSUER:** | SAS AB (publ) or a successor thereof created in accordance with the Confirmation Order and the Swedish Reorganization Plan Confirmation (the "***Issuer***") |
| **ISSUE PRICE:** | 100% <br><br> Upon satisfaction of the conditions precedent in the Agreement and as set out above, the Issuer is obliged to issue the Convertible Notes upon receipt of payment from the Investors. |
| **GUARANTORS:** | Subject to customary limitations under applicable law, each of the Issuer's subsidiaries that are debtors and parties to the DIP Credit Agreement, and other subsidiaries of the Issuer required to join as guarantors after the Closing Date pursuant to terms and conditions to be agreed. |
| **GROUP:** | The Issuer and each of its subsidiaries from time to time (including, for the avoidance of doubt, the Guarantors). |
| **TRUSTEE:** | A third-party service provider experienced in similar types of financings selected by the Issuer and reasonably acceptable to the Convertible Notes Purchasers. |
| **SECURITY AGENT:** | A third-party service provider experienced in similar types of financings selected by the Issuer and reasonably acceptable to the Convertible Notes Purchasers for the purposes of holding the security on behalf of the holders of the Convertible Notes. |
| **PURPOSE:** | General corporate purposes |
| **INTEREST RATE:** | Term SOFR + 650bps *per annum*, payable in cash in USD quarterly in arrears starting three (3) months after the Closing Date. Day count actual/365. |

4

**CONFIDENTIAL**

| | |
|---|---|
| **FEES / OID:** | Original issue discount of 1.50% of committed amount of the Convertible Notes (which may be netted from the proceeds of the issuance of the Convertible Notes) (the "**OID**").<br><br>Upfront Fee of 3.025% of committed amount of the Convertible Notes (which may be netted from the proceeds of the issuance of the Convertible Notes) (the "**Upfront Fee**"); provided, that the Upfront Fee will be subject to a true-up/adjustment for the closing SEK to USD exchange rate as of the Closing Date. |
| **MATURITY DATE:** | Seven (7) years after the Closing Date. |
| **REDEMPTION:** | None, except that, beginning on the date that is sixty-six (66) months after the Closing Date, the Convertible Notes shall be redeemed, if a shareholder holding more than 50% of the outstanding equity interests in the Issuer so elects, at 110% of the outstanding aggregate principal amount thereof, plus accrued and unpaid interest. |
| **HOLDER PUT RIGHT FOLLOWING A CHANGE OF CONTROL** | At 110% of the outstanding aggregate principal amount thereof, plus accrued and unpaid interest, upon the occurrence of a change of control[1] |
| **ADDITIONAL AMOUNTS:** | Payments on the Convertible Notes will be made after withholding and deduction for taxes.  The Issuer will pay additional amounts in respect of withholdings and deductions on interest payments as will result in receipt by the holders of the Convertible Notes of such amounts as would have been received by them had no such withholding or deduction for taxes been required (subject to certain customary exclusions and carve outs to be agreed). |
| **CONVERSION FEATURE:** | (i)  The Convertible Notes may be converted into common shares of the Issuer at an amount equal to the product of (x) the sum of (i) the outstanding principal amount and (ii) accrued and unpaid interest and (y) the Applicable Conversion Premium (the |

---

[1] **NTD:** Exceptions to a change of control to be agreed, which will include Air France-KLM acquiring control of the Issuer as an event not triggering a change of control.  **NTD**:  For situations where a noteholder does not exercise their put right, to discuss inclusion of (i) a merger covenant governing what jurisdictions would be permissible for the successor and (ii) reference property provisions providing for the notes to become convertible into the deal consideration.

5

"*Conversion Value*").[2] [3]

"*Applicable Conversion Premium*" means the premium specified in the table below for the applicable fiscal year in which the Conversion Value is calculated:

| *Fiscal Year* | *Applicable Conversion Premium* |
|---|---|
| FY 2024 | 125.00% |
| FY 2025 | 129.03% |
| FY 2026 | 133.33% |
| FY 2027 | 137.93% |
| FY 2028 | 142.86% |
| FY 2029 | 148.15% |
| FY 2030 | 153.85% |
| FY 2031 | 160.00% |

(ii) The value per common share of the Issuer (the "*Conversion Price*") shall be calculated as the Equity Value divided by the Share Count (the SEK amount of which shall in no event be lower than the quota value (Sw. *kvotvärde*) of the shares at the time of Conversion (as defined below)).

"*Equity Value*" shall be calculated as the Enterprise Value of the Issuer less (i) net debt and (ii) working capital adjustments.[4]

"*Share Count*" shall be defined as the number of shares outstanding at the time of Conversion.

"*Enterprise Value*" shall be calculated as the product of (i) the Reference Multiple, and (ii) the Reference EBITDA.

"*Reference Multiple*" shall be determined based on the total Enterprise Value to EBITDA trading multiple of a basket of

---

[2] **NTD:** Fx mechanics (USD/SEK) for conversion to be included in long-form documentation.  The fact that there is a minimum SEK conversion price shall not mean that the amount to be set-off against shares shall be reduced in any way or that the investors would receive fewer shares upon conversion than what would be the case if there would be no minimum SEK conversion price. If the Conversion Price would not equal or exceed the quota value of the shares, an EGM would have to be held to reduce the share capital (and thereby lower the quota value) prior to conversion (as set out in "Conversion Periods" below).

[3] **NTD**: The conversion price formula assumes that the Shareholders' Agreement will contain customary anti-dilution provisions, but, if necessary, parties will discuss including adjustment mechanics to prevent dilution from dilutive events.

[4] **NTD**: net debt and working capital adjustments schedule to be included in long-form documentation.

6

comparable airlines for the last reported 12-month period used for the determination of the Reference EBITDA, weighted as follows: (1) 30% – Air-France KLM; (2) 30% – Lufthansa; (3) 30% – IAG; and (4) 10% – Finnair. [5]

"***Reference EBITDA***" shall be the Issuer's EBITDA for the 12-month period ended on the last day of the fiscal quarter most recently ended before the consummation of the Conversion (calculated based on the audited financial statements as of the last day of such fiscal quarter); provided, that if audited financial statements to calculate the Reference EBITDA are not available within three months following the last day of such fiscal quarter, parties will agree to work in good faith to close the Conversion based on unaudited financial statements.

(iii) Any such conversion (the "***Conversion***") shall entitle the holder of the relevant Convertible Notes to a quantity of common shares of the Issuer equal to the Conversion Value divided by the Conversion Price (truncated to the nearest whole share). Conversion shall constitute full and final satisfaction of all obligations of the relevant Convertible Notes.

(iv) Subject to (v) below, each noteholder of the Convertible Notes shall have the right to voluntarily convert its Convertible Notes with the consent of noteholders holding more than 50% of the aggregate principal amount of the Convertible Notes, provided that no more than one Conversion of the Convertible Notes shall occur in any twelve-month period beginning on or after the Closing Date[6]. For the avoidance of doubt, and subject to (v) below, each Holder of Convertible Notes shall have the right (but not an obligation) to convert its Convertible Notes should any other Holder of Convertible Notes have the right to convert their Convertible Notes under this clause (iv). Furthermore, all noteholders, with the exception of the Danish State, shall only be permitted to convert their holdings of Convertible Notes in full and may not be permitted to convert their holdings of Convertible Notes in part.

(v) Without prejudice to any of the Convertible Notes Purchasers' rights and/or obligations under the Put and Call Option and ROFO Agreement to be entered into between, among others, Castlelake and Air France-KLM, so long as Castlelake is not permitted to

---

[5] ***NTD***: Long-form documentation to include customary mechanics to account for reference companies entering into mergers, demergers and/or group restructuring, divesting material assets etc.

[6] ***NTD:*** If one holder of Convertible Notes obtain consent to convert its Convertible Notes according to this provision, then all holders of Convertible Notes shall be entitled to convert their Convertible Notes (provided that in each case, the Danish State shall remain the only holder permitted to convert only some of their Convertible Notes).

7

convert its Convertible Notes pursuant to such Put and Call Option and ROFO Agreement, no holder of Convertible Notes shall be entitled to convert its Convertible Notes other than in connection with a Qualified IPO or at Maturity.

(vi) In the event of a Qualified IPO (as defined below), the Convertible Notes shall, subject to the proviso below, automatically convert in full in connection with such Qualified IPO into, and be reclassified as, a number of Post-IPO Shares equal to (x) the Conversion Value at such time, divided by (y) the applicable Conversion Price; provided, that any holder of the Convertible Notes shall have the option to elect redemption of its Convertible Notes at 110% of the outstanding aggregate principal amount thereof, plus accrued and unpaid interest, instead of Conversion.

(vii) In the event of a Non-Qualified IPO (as defined below), and provided that noteholders holding more than 50% of the total dollar amount of the Convertible Notes have elected by the Non-Qualified IPO Election Deadline Date (as defined below) to convert the Convertible Notes in connection with the Non-Qualified IPO (the "**IPO Conversion Condition**"), the outstanding amount under the Convertible Notes shall automatically convert in full in connection with the Non-Qualified IPO into a number of Post-IPO Shares equal to (x) the Conversion Value at such time, divided by (y) the Conversion Price; provided, that any holder of the Convertible Notes shall have the option to elect redemption of its Convertible Notes at 110% of the outstanding aggregate principal amount thereof, plus accrued and unpaid interest, instead of Conversion. If a Non-Qualified IPO occurs without the IPO Conversion Condition having been satisfied, then the Issuer will pay 110% of the applicable outstanding amount under the Convertible Notes plus accrued and unpaid interest thereon in cash on the closing date of such Non-Qualified IPO in redemption of the Convertible Notes, instead of Conversion.

(viii) In the event of a Share Sale (as defined below), and provided that noteholders holding more than 50% of the total dollar amount of the Convertible Notes have elected by the Share Sale Election Deadline Date (as defined below) to convert the Convertible Notes in connection with the Share Sale (the "**Share Sale Condition**"), the outstanding aggregate principal amount of the Convertible Notes to be so converted, plus accrued and unpaid interest and additional amounts, if any, will convert into a number of common shares equal to (x) the Conversion Value at such time, divided by (y) the Conversion Price.

(ix) If any Convertible Notes remain outstanding as of the Maturity

8

| | Date, then on the Maturity Date each holder may elect, in its sole discretion to redeem the Convertible Notes as follows: (i) to be paid a cash amount equal to the outstanding aggregate principal amount of the Convertible Notes, plus accrued and unpaid interest and additional amounts, if any, (ii) to convert its Convertible Notes into common shares of the Issuer at the applicable Conversion Price, or (iii) a combination of (i) and (ii). The Convertible Note Indenture will terminate and all positive and negative undertakings thereunder shall cease to be of any effect upon repayment of the Convertible Notes, conversion of the Convertible Notes or the occurrence of (i)-(iii) in the immediately preceding sentence. [7] |
|---|---|
| | "**Non-Qualified IPO**" means any public offering of Post-IPO Shares of the Issuer that does not constitute a Qualified IPO. |
| | "**Non-Qualified IPO Conversion Election**" means that no later than ten (10) Business Days prior to the anticipated commencement of a *bona fide* roadshow for an IPO, the Issuer shall provide the noteholders with a written notice thereof (the "**IPO Notice**"). The IPO Notice shall include an indication as to whether or not the Issuer expects such IPO to be a Qualified IPO, and the date by which the noteholder must make any election to convert its Convertible Notes if the IPO is a Non-Qualified IPO (the "**Non-Qualified IPO Election Deadline Date**"), which date shall be no earlier than fifteen (15) Business Days after the date of the IPO Notice. The date of the anticipated commencement of the roadshow will be determined in good faith by the Issuer in consultation with the lead financial advisors. |
| | "**Post-IPO Shares**" means shares in the Issuer of the class that is or is to be listed on the applicable trading venue (or depositary receipts representing such shares). |
| | "**Qualified IPO**" means a *bona fide* public offering of the Issuer's shares (i) in which such shares are listed on an applicable trading venue, and (ii) either (x) the gross proceeds of which are equal to or greater than an amount to be agreed or (y) at least 10% of the Issuer's shares are issued or sold in connection with the IPO (after giving effect to the primary issuance of any shares in the IPO). |

---

[7] ***NTD***: Definitive documentation to provide for the Danish State to be informed of the election of other noteholders to convert and/or redeem their Convertible Notes, and for the Danish State to elect between redemption and/or conversion based on such information in order for the Danish State to control the size of its ownership stake.

| | |
|---|---|
| | "**Share Sale**" means a *bona fide* sale or transfer, through one or a series of related transactions (including by way of merger), of shares representing 50% or more of the share capital and votes in the Issuer on a fully diluted basis (excluding dilution from the Convertible Notes and other issued convertible notes or loans which can be converted into shares in the Issuer) to one or several purchaser(s) other than a Permitted Holder (with the definition of "Permitted Holder" to expressly include the Investors (including AFKL) and their affiliates and related funds), excluding any *bone fide* internal restructuring or reorganization which does not adversely affect the rights of the noteholder hereunder. |
| | "**Share Sale Conversion Election**" means that no later than sixty (60) Business Days prior to the contemplated Share Sale, the Issuer shall provide the noteholders with a written notice thereof (the "**Share Sale Notice**"). The Share Sale Notice shall include any information, available to the Issuer, relevant for, and appropriate to share with, the noteholders in light of the contemplated Share Sale, including the date by which the noteholder must make any election to convert its Convertible Notes (the "**Share Sale Election Deadline Date**"), which date shall be no earlier than fifteen (15) Business Days after the date of the Share Sale Notice. |
| **CONVERSION PERIODS** | Conversion under any Convertible Notes may only be exercised one time per year in connection with EGMs where (i) the share capital is temporarily reduced (if necessary to ensure that the Conversion Price is at least equal to the quota value (Sw. *kvotvärde*) of the shares and (ii) subsequently restored or, if a share capital reduction is not necessary, increased by the conversion into newly issued shares and (if required) a bonus issue (or, if a bonus issue would not be possible, a permanent share capital reduction, with or without permission). |
| **CONVERSION APPROVALS AND OTHER REQUIREMENTS** | Any conversion is subject to (i) requisite approval by the shareholders to issue and/or authorize the board of directors to resolve on the issuance of shares (in each case including any ancillary resolutions required in respect of changes to the share capital or Articles of Association), and (ii) any regulatory approvals, including anti-trust, FDI and EU ownership approvals (as applicable). |
| | A holder of Convertible Notes must be a party to the shareholders' agreement of the Issuer prior to effecting a Conversion, or shall become a party thereto concurrently with the consummation of the Conversion. |
| **COLLATERAL:** | Subject to agreed security principles, the Convertible Notes shall be secured by: |
| | (i) all intellectual property, including general IP, registered trademarks and domains, customer databases and brand names, |

10

| | |
|---|---|
| | including the "SAS" brand and associated logos; |
| | (ii) all registered trademarks and domains relating to the loyalty program EuroBonus; |
| | (iii) pledge over the shares in SAS EuroBonus AB; |
| | (iv) aircrafts and engines (with perfection requirements not to affect the daily operations of the Group, including from a cost/benefit perspective); and |
| | (v) all London Heathrow slots (excluding slots which are leased to a member of the Group by an entity which is not a member of the Group (with the Issuer to identify, for information purposes only, any slot which is a leased slot by written notice to the Security Agent within a number of days to be agreed, of the commencement of the leasing under such lease) by way of an English law security assignment and fixed charge, together with relevant signed but undated slot transfer authorities and a power of attorney, such assignment and charge to only be enforceable upon the occurrence of an enforcement event which has occurred and is continuing, and provided that such assignment and charge shall not include revenues generated from passenger, freight or other flights operated by a member of the Group using any of the secured slots. |
| **RANKING:** | The obligations under the Convertible Notes will constitute direct and unconditional general secured obligations of the Issuer and the Guarantors, and rank in right of payment and otherwise at least *pari passu* with other senior debt. |
| **NEGATIVE COVENANTS** | The Convertible Note Indenture will include negative covenants customary for high-yield debt, including, but not limited to, the following negative covenants in a form consistent with the Documentation Principles (as defined below) (in each case, subject to exceptions, thresholds and materiality qualifiers to be agreed): |
| | (i)    limitations on debt; |
| | (ii)    limitations on transactions with affiliates, with exceptions to be agreed, including "earn & burn" contracts between EuroBonus and Flying Blue or any other synergy agreement between EuroBonus and Flying Blue not detrimental in a material respect to the value of the EuroBonus loyalty program; |
| | (iii)    limitations on liens; |

11

**CONFIDENTIAL**

(iv)    limitations on mergers, consolidations, sales of all or substantially all assets;

(v)    limitations on sales of assets constituting Collateral, with exceptions to be agreed, including:

    a.    ability to dispose of obsolete or redundant aircraft assets, and to grant leasehold interests in, or licences of, aircraft engines, with the proceeds of such disposals, leases or licences to be available for reinvestment in the business at the discretion of the Issuer; and

    b.    a combination of the EuroBonus and Flying Blue loyalty programs,

in each case pursuant to terms and conditions to be agreed;

(vi)    limitations on dividends and other payment restrictions affecting any direct or indirect restricted subsidiaries;

(vii)    limitations on impairment of security; and

(viii)    for so long as the loyalty program EuroBonus constitutes Collateral, customary covenants associated therewith, including, without limitation, restrictions on modifications of related contracts and non-competition covenants and issuance; provided, that (A) the Convertible Note Indenture shall not restrict "earn & burn" contracts between EuroBonus and Flying Blue or any other synergy agreement between EuroBonus and Flying Blue not detrimental in a material respect to the value of the EuroBonus loyalty program, pursuant to terms and conditions to be agreed, and (B) the Convertible Note Indenture shall provide for flexibility for a combination of frequent flyer programs between SAS and Air France-KLM (EuroBonus/Flying Blue) at any time that Air France-KLM holds more than 50% of the outstanding shares of the Issuer, if (and only to the extent that) in case of any such combination, the holders of the Convertible Notes have the option (but not the obligation) to redeem their Convertible Notes at 110% of the outstanding aggregate principal amount thereof, up to the amount necessary in order for the collateral coverage ratio (to be measures as the value of loans to the value of Collateral) prior to giving effect to such combination, remaining unchanged (or being no less favorable) post combination, after deducting the value of the Collateral associated with the EuroBonus loyalty program.

WEIL:\99385901\13\72316.0004
2351221.06-NYCSR03A

MSW - Draft November 2, 2023 - 9:45 PM

**CONFIDENTIAL**

| | |
|---|---|
| **POSITIVE COVENANTS:** | Customary positive covenants for high-yield debt, including, but not limited to, the following positive covenants (subject to the Documentation Principles and subject to exceptions, thresholds and materiality qualifiers to be agreed):<br><br>(i) further assurance;<br><br>(ii) reporting;<br><br>(iii) compliance certificate;<br><br>(iv) future guarantors; and<br><br>(v) covenants associated with the Collateral, including, without limitation, customary covenants with respect to the slots, including maintenance of certificates, exemptions, franchises, licenses, permits, designations, rights, concessions, authorizations, frequencies and consents that are relevant to the operation of the slots; preserving and keeping in full force and effect its rights in and to use the slots (including, without limitation, "Use or Lose Rules"); and renewing relevant authorities. |
| **EVENTS OF DEFAULT:** | Customary events of default for high-yield debt, including, but not limited to, payment default, covenant default, cross default, cross acceleration, judgment default, certain bankruptcy/insolvency events, invalidity and guarantees and security interest related defaults and provided that no default or event of default shall be deemed to have occurred as a direct or indirect result of the shareholders not exercising their voting rights to issue and/or not authorizing the board of directors to resolve on the issuance of shares (in each case including any ancillary resolutions required in respect of changes to the share capital or Articles of Association) to comply with any conversion provision of the Convertible Notes. |
| **AMENDMENT AND WAIVER:** | Amendments, supplements and waivers of the Convertible Notes, the Convertible Note Indenture and the security documents will require the approval of holders of Convertible Notes representing more than 50% of the outstanding principal amount thereof, except that the consent of each holder of the outstanding Convertible Notes shall also be required with respect to certain customary "sacred rights" matters, including, but not limited to, related to amendments to principal amount, interest rate, extension of maturity, redemption prices, interest payment dates, release of any guarantees and/or security and the amendments clause. |
| **TRANSFER RESTRICTIONS:** | Rule 144A/Regulation S.<br><br>No Convertible Note may be transferred to any person that is not eligible to be a shareholder of the Issuer under the shareholders' |

13

| | |
|---|---|
| | agreement of the Issuer. |
| **REGISTRATION RIGHTS:** | The Convertible Notes will be issued pursuant to Rule 144A, Regulation S or other private placement exemption from the registration requirements of Section 5 under the U.S. Securities Act of 1933, as amended, in each case, without registration rights (other than, for the avoidance of doubt, registration right with respect to the common shares of the Issuer issuable upon conversion of the Convertible Notes) and pursuant to an exemption from the requirement for a prospectus under Regulation (EU) 2017/1129. |
| **MINIMUM DENOMINATION:** | US$200,000 and integral multiples of US$1,000 in excess thereof |
| **DOCUMENTATION PRINCIPLES:** | The definitive documentation for the Convertible Notes (the "***Convertible Note Documents***") will (a) be initially prepared by counsel to the Issuer, (b) reflect the operational and strategic requirements of the Group in light of its consolidated capital structure, size, geographic location, businesses and business practices, operations, financial accounting, matters disclosed in the Agreement (if any) and the industry and practices of the Group, in each case, after giving effect to the Transactions and with thresholds, exceptions, "baskets" and grace and cure periods to be agreed, and (c) not contain any financial covenant, maintenance covenant or excess cash flow sweep and shall only include affirmative and negative covenants, "change of control" and financial definitions, and cross default provisions as are customary in high yield note issuances (collectively, the "***Documentation Principles***"). |
| **LISTING:** | None. |
| **GOVERNING LAW:** | The Convertible Note Indenture, the Convertible Notes and the Guarantees thereof will be governed by the laws of New York.

The Security Documents will be governed by the laws of New York and/or of the relevant collateral. |

WEIL:\99385901\13\72316.0004
2351221.06-NYCSR03A

MSW - Draft November 2, 2023 - 9:45 PM

## **Exhibit C**

Release Form

See attached

AGREED FORM
CONFIDENTIAL

**EXHIBIT C TO THE INVESTMENT AGREEMENT**

<u>DISCHARGE AND RELEASE OF THE DANISH TERM LOAN</u>

WHEREAS

(A)    On July 5, 2022, SAS AB and certain of its subsidiaries commenced voluntary cases under chapter 11 of title 11 of the United States Code, which are being jointly administered under the caption *In re SAS AB, et al.*, Case No. 22-10925 (the "Chapter 11 Cases"), in the United States Bankruptcy Court for the Southern District of New York (the "United States Bankruptcy Court").

(B)    The Danish Ministry of Finance, acting on behalf of the Kingdom of Denmark, holds claims in the principal amount of DKK 1,099,049,999.61 arising and payable under the On-Lending Facility Agreement, dated as of July 8, 2021, and the promissory note (in Danish: Gældsbrev), dated as of February 2, 2022, by and among the Scandinavian Airlines System Denmark-Norway-Sweden, as the borrower, and the Danish Ministry of Finance, acting on behalf of the Kingdom of Denmark, as the lender (the "Danish Term Loan"). The Danish Term Loan is governed by Danish law.

(C)    The Danish Ministry of Finance, acting on behalf of the Kingdom of Denmark, has not consented to the jurisdiction of the United States Bankruptcy Court and is not participating in the vote on the plan of reorganization in the Chapter 11 Cases (the "Plan").

(D)    On November 4, 2023, SAS AB, CL-S Holdings Lux S.à r.l., Air France-KLM S.A., Lind Invest ApS, and the Danish State entered into an investment agreement regarding an investment in SAS AB ("Investment Agreement").

(E)    In order to effectuate the terms of the Investment Agreement and the Plan with respect to treatment of the Danish Term Loan, and for good and valuable consideration, the Danish Ministry of Finance, acting on behalf of the Kingdom of Denmark, will, subject to the conditions detailed herein, discharge the Danish Term Loan (including any accrued, but unpaid interest) and grant certain other releases in accordance with the Plan.

FOR THE PURPOSE OF EFFECTUATING THE TRANSACTIONS, THE DANISH MINISTRY OF FINANCE, ACTING ON BEHALF OF THE KINGDOM OF DENMARK, HEREBY ISSUES THIS IRREVOCABLE RELEASE ON THE TERMS AND CONDITIONS SET OUT HEREIN.[1]

**1        RELEASE AND DISCHARGE OF THE DANISH TERM LOAN**

1.1    Subject to the (i) Closing and (ii) treatment and receipt of the consideration provided for the Danish Term Loan Claims pursuant to the Plan, as set forth in the Plan term sheet attached as Exhibit A to the Investment Agreement and Section [•] of the Plan, the Danish Ministry of Finance, acting on behalf of the Kingdom of Denmark, hereby conclusively, absolutely, unconditionally, irrevocably, and forever releases and discharges the Debtors and the Reorganized Debtors from all claims related to the Danish Term Loan (including any accrued, but unpaid interest) and any and all Causes of Action that the Danish Ministry of Finance, acting on behalf of the Kingdom of Denmark, would have been legally entitled to assert, based on, relating to, or in any manner arising from, in whole or in part, the Danish Term Loan (including any accrued, but unpaid interest).

1.2    If the Investment Agreement is terminated prior to the SCRO Registration but after any amount has been paid to the Company (or any other Debtor), or any claim has been set-off, for

---

[1] When using words that begin with a capital letter, the word refers to the definitions provided in the Investment Agreement and the Plan.

subscription and payment for New Securities pursuant to the Investment Agreement, specifically referencing section 3.9(b) of the Investment Agreement this exhibit, discharge, and associated releases become null and void, thereby preserving the status the Danish Term Loan (including any accrued, but unpaid interest) in its original state.

1.3    The Danish Ministry of Finance, acting on behalf of the Kingdom of Denmark, confirms that the claims falling within the ministry's purview have been registered within the context of these Chapter 11 Cases. For the avoidance of doubt, the Danish Ministry of Finance, acting on behalf of the Kingdom of Denmark, does not have the authority to confirm the general status of all claims on behalf of the Kingdom of Denmark and the various instrumentalities, departments, and agencies thereof, including those of a fiscal nature such as taxes and fines which fall outside the scope of its responsibilities. Consequently, these claims fall outside the scope of this discharge or any associated release including but not limited to the releases set forth in section 2. This discharge solely governs the Danish Term Loan (including any accrued, but unpaid interest), and should not be subject to interpretation or construction to include any other claims.

## 2    RELEASES

2.1    In addition to the foregoing,  as of the Closing, except for the rights, remedies, and Causes of Action that are preserved and remain in effect from and after the Closing, including to enforce the Plan and the obligations contemplated by the Restructuring, for good and valuable consideration, on and after the Closing, the Released Parties will be conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, to the maximum extent permitted by law, by the Danish Ministry of Finance, acting on behalf of the Kingdom of Denmark, in each case from any and all Causes of Action, that the Danish Ministry of Finance, acting on behalf of the Kingdom of Denmark, would have been legally entitled to assert, based on, relating to, or in any manner arising from, in whole or in part: the Debtors (including the management, direct or indirect ownership, or operation thereof) or their Estates; the Reorganized Debtors; the Chapter 11 Cases; the Plan; the Confirmation Order; the Restructuring; the Transaction; the equity solicitation process; any debt or security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or security of the Debtors or the Reorganized Debtors, including the New Shares and the New Convertible Notes; the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan; the business or contractual arrangements or other interactions between any Debtor and any Released Party; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in- or out-of-court restructuring efforts of the Debtors; any intercompany transaction; the negotiation, formulation, preparation, dissemination, or consummation of the Plan and any related agreements, instruments, or other documents or any other contract, instrument, release, or document created or entered into in connection with the Plan or any related agreements, instruments, or other documents (including the Investment Agreement); the solicitation of votes with respect to, or confirmation of, the Plan; or any other act or omission, transaction, agreement, event, or other occurrence related to any of the forgoing and taking place on or before the Effective Date.  Notwithstanding anything herein to the contrary, the releases herein will not (i) affect the liability of any Entity from Causes of Action based on wilful misconduct, gross negligence or intentional fraud as determined by a Final Order, (ii) release post-Effective Date obligations of any Entity under the Plan, the Restructuring, the Definitive Documents or any other document, instrument, or agreement executed to implement the Plan (unless expressly cancelled by the Plan), or (iii) affect the rights of the Danish Ministry of Finance, acting on behalf of the Kingdom of Denmark, that remain in effect from and after the Effective Date to enforce the Plan, the Definitive Documents, and the obligations contemplated by the Transaction or as otherwise provided in any order of the United States Bankruptcy Court.

## 3    GOVERNING LAW

3.1    This exhibit shall be governed, interpreted, and construed in accordance with Danish law, without regard to Danish choice of law rules.

3.2    This exhibit is made without prejudice and shall not establish a precedent or waive the rights of the Danish Ministry of Finance, acting on behalf of the Kingdom of Denmark, in any other

2

CONFIDENTIAL

matter. Additionally, this exhibit shall not be construed or interpreted as submission to the jurisdiction of the United States Bankruptcy Court.

-oo0oo-

IN WITNESS WHEREOF, the Danish Ministry of Finance, acting on behalf of the Kingdom of Denmark, has caused this document to be executed by the respective duly authorized officer.


Date:

By:     _____
Name:   Adrian Lübbert
Title:   Deputy Permanent Secretary

3

**Exhibit B**

**Notice of Effective Date**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------- x
In re                                                   :        **Chapter 11**
                                                        :
**SAS AB**, *et al.*,                                   :        **Case No. 22-10925 (MEW)**
                                                        :
                         Debtors.[1]                    :        **(Jointly Administered)**
                                                        :
-------------------------------------------------------- x

## NOTICE OF (I) ENTRY OF ORDER CONFIRMING SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF SAS AB AND ITS SUBSIDIARY DEBTORS, (II) OCCURRENCE OF EFFECTIVE DATE, AND (III) ADMINISTRATIVE EXPENSE CLAIMS BAR DATE

**PLEASE TAKE NOTICE** that on [●], 2024, the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") entered an order (the "**Confirmation Order**") confirming the *Second Amended Joint Chapter 11 Plan of Reorganization of SAS AB and Its Subsidiary Debtors*, dated as of February 7, 2024 [ECF No. 1936] (as amended, modified, or supplemented, the "**Plan**").[2]

**PLEASE TAKE FURTHER NOTICE** that, on [●], 2024, the Swedish Court approved and confirmed the Swedish Reorganization Plan.

**PLEASE TAKE FURTHER NOTICE** that, on [●], 2024, all conditions precedent to the Effective Date of the Plan were satisfied or waived in accordance with the Plan and the Plan was substantially consummated.  Accordingly, the Effective Date of the Plan occurred on [●], 2024.

**PLEASE TAKE FURTHER NOTICE** that, unless otherwise provided by the Plan, the Confirmation Order, any other applicable order of the Bankruptcy Court, or agreed to by the holder of an Allowed Administrative Expense Claim and the Debtors or Reorganized Debtors, as applicable, all requests for payment of Administrative Expense Claims must be filed with the Bankruptcy Court no later than [●], 2024 (the "**Administrative Expense Claims Bar Date**"); *provided*, *however*, that holders of Administrative Expense Claims that arose in the ordinary course of business during the Chapter 11 Cases shall not be required to file any request for payment of such Administrative Expense Claims, and holders of Fee Claims must comply with Section 2.4 of the Plan.

---

[1] The Debtors in these chapter 11 cases are SAS AB, SAS Danmark A/S, SAS Norge AS, SAS Sverige AB, Scandinavian Airlines System Denmark-Norway-Sweden, Scandinavian Airlines of North America Inc. (2393), Gorm Asset Management Ltd., Gorm Dark Blue Ltd., Gorm Deep Blue Ltd., Gorm Sky Blue Ltd., Gorm Warm Red Ltd., Gorm Light Blue Ltd., Gorm Ocean Blue Ltd., and Gorm Engine Management Ltd.  The Debtors' mailing address is AVD kod: STOUU-T, SE-195 87 Stockholm, Sweden.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

**PLEASE TAKE FURTHER NOTICE** that holders of Administrative Expense Claims that are required to file and serve a request for payment of such Administrative Expense Claims that do not file and serve such a request by the Administrative Expense Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Expense Claims against the Debtors, the Reorganized Debtors, or their respective Estates, property, or interests.

**PLEASE TAKE FURTHER NOTICE** that, on the Effective Date, all executory contracts and unexpired leases to which any of the Debtors were parties were rejected and deemed rejected unless otherwise provided in Section 8.1(a) of the Plan. In accordance with Section 8.3 of the Plan, in the event the rejection of an executory contract or unexpired lease resulted in damages to the other party or parties to such contract or lease, any Claim for such damages, if not currently evidenced by a timely filed Proof of Claim, shall be forever barred and shall not be enforceable against the Debtors or the Reorganized Debtors or their respective Estates, properties or interests, unless a Proof of Claim is filed and served no later than **5:00 p.m. (Prevailing Eastern Time) on [●], 2024**, which is the date that is 30 days after the later of (i) the Confirmation Date or (ii) the effective date of rejection of such executory contract or unexpired lease.

**PLEASE TAKE FURTHER NOTICE** that the Confirmation Order, the Plan, and the Plan Supplement are available free of charge by visiting the website maintained by Kroll Restructuring Administration LLC at https://cases.ra.kroll.com/SAS/ or by accessing the Bankruptcy Court's website at www.nysb.uscourts.gov. Please note that a PACER password and login are required to access documents on the Bankruptcy Court's website, each of which can be obtained at http://www.pacer.psc.uscourts.gov.

**PLEASE TAKE FURTHER NOTICE** that the Plan and the provisions thereof are binding on the Debtors, the Reorganized Debtors, any holder of a Claim against, or Interest in, the Debtors, and such holder's respective successors and assigns, whether or not the Claim or Interest of such holder is Impaired under the Plan and whether or not such holder voted to accept the Plan.

Dated: [●], 2024
        New York, New York

_____/s/_____

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Gary T. Holtzer
Kelly DiBlasi
David Griffiths
Lauren Tauro

*Attorneys for Debtors*
*and Debtors in Possession*